**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| J. C. PENNEY COMPANY, INC., *et al.*,[1] | ) |
| | ) Case No. 20-20182 (DRJ) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

**DECLARATION OF BILL WAFFORD, EXECUTIVE VICE PRESIDENT,
CHIEF FINANCIAL OFFICER OF J. C. PENNEY COMPANY, INC., IN
SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Bill Wafford, hereby declare under penalty of perjury:

1. I am the Executive Vice President, Chief Financial Officer of J. C. Penney Company, Inc. ("JCP" or "HoldCo"), a corporation organized under the laws of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Company," "JCPenney," or the "Debtors"). I have served in this role since April 2019. In my capacity as Chief Financial Officer, I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

2. I have more than twenty-five years of finance experience, particularly in retail. Immediately before becoming CFO of JCP, I served as CFO for The Vitamin Shoppe. Before The Vitamin Shoppe, I was a partner in the advisory practice group of KPMG following a five-year career at Walgreens Boots Alliance. While at Walgreens, I served in positions of increasing responsibility, eventually becoming vice president of international finance and vice president and

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/JCPenney. The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.

managing director for Walgreens' global venture capital portfolio.  I started my career holding multiple finance-related positions at Archstone Consulting, Bank of America, and Target Corporation.  I hold a Bachelor's of Science in economics from the University of California, Riverside, and a Master's in Business Administration from the Indiana University—Kelley School of Business.

3.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions filed with the Court on May 15, 2020, and the various emergency "first day" relief that the Debtors have requested pursuant to the motions and pleadings filed today.

4.  Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of eighteen and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

## Preliminary Statement

5.  JCPenney is a 118-year young American retail icon that plays an important role in the lives of its customers and hundreds of communities throughout the country. Having endured and played a vital role in America's recovery during some of its most difficult periods, including the Great Depression and World War II, JCPenney now finds itself facing another monumental challenge to its business: emerging from the disruption caused by the novel Coronavirus pandemic ("COVID-19").

6.      Before the pandemic, the Company had a substantial liquidity cushion, was improving its operations, and was proactively engaging with creditors to deleverage its capital structure and extend its debt maturities to build a healthier balance sheet. Unfortunately, that progress was wiped out with the onset of COVID-19. And now, the Company is unable to maintain its upward trajectory through its "Plan for Renewal." Moreover, following the temporary shutdown of its 846 brick-and-mortar stores, the Company is unable to responsibly pay the upcoming debt service on its over-burdened capital structure.

7.      On March 11, 2020, the World Health Organization officially declared COVID-19 a pandemic.[2] In response, national, state, and local governments in the United States, and around the world, imposed shelter-in-place and stay at home orders, as well as social distancing protocols.[3] As a result, the American retail industry entered into a new reality, requiring JCPenney to make difficult decisions to protect the safety of its associates, customers, and the long-term future of the Company. JCPenney temporarily closed all of its stores and offices and dramatically reduced supply chain operations on March 18, 2020. These developments disrupted JCPenney's meaningful progress on its "Plan for Renewal" transformation strategy, having just achieved comparable store sales improvement in six of eight merchandise divisions in the second half of 2019 over the first half, and successfully meeting or exceeding guidance on all key financial objectives for the 2019 fiscal year.[4] Under a new management team spearheaded by Chief

---

[2]   Jamie Ducharme, *World Health Organization Declares COVID-19 a 'Pandemic.' Here's What That Means*, TIME (Mar. 11, 2020), https://time.com/5791661/who-coronavirus-pandemic-declaration/.

[3]   *See, e.g.*, Exec. Order by the Governor of the State of Tx. Executive Order GA 14 (Mar. 31, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-14_Statewide_Essential_Service_and_Activity_COVID-19_IMAGE_03-31-2020.pdf.

[4]   The five financial objectives were: (a) Comparable stores sales were expected to be down between 7-8% (stores sales were down 7.7%); (b) adjusted comparable store sales, which excludes the impact of the Company's exit from major appliances and in-store furniture categories were expected to be down in a range of 5-6% (adjusted comparable store sales down 5.6%); (c) cost of goods sold, as a rate of net sales was expected to decrease 150-

Executive Officer Jill Soltau, the Company was improving revenue, while simultaneously cutting costs and expanding margins.

8.      Due to the pandemic, April year-over-year net sales tumbled by ~88% and store sales decreased to nearly zero.   The severe sales decrease resulting from these crucial but economically painful public safety measures has necessitated these chapter 11 cases.   These proceedings will allow JCPenney to successfully navigate this uncertain period and emerge from this bankruptcy (and this pandemic) stronger than ever with an appropriately-sized balance sheet and a rationalized store footprint.

9.      In response to the pandemic, the Debtors immediately went into liquidity conservation mode. *First*, the Company drew down $1.25 billion on the ABL Facility (as defined herein). *Second*, it paused all hiring, cut spending, reduced receipts of merchandising goods, and suspended all merit pay increases for 2020. *Third*, it extended payment terms with its vendors. *Fourth*, the Debtors made the incredibly difficult decision to implement both partial and full furloughs that have affected nearly all of the Company's employees (the "Furlough Program"). *Fifth*, the Debtors began to discuss contingencies with their landlords regarding the temporary store closures.

### The "Plan for Renewal": Revitalizing JCPenney

10.     For the last several years, department stores and much of the retail industry have faced challenging times.   Advances in online shopping combined with the reduction in brick-and-mortar    store    traffic    have    forced    virtually    all    retailers    into    a

---

200 basis points (decreased approximately 210 basis points over prior year, which resulted in improved gross margin); (d) adjusted EBITDA was $583 million (a 2.6% improvement over prior year); and (e) free cash flow for fiscal year 2019 was $145 million, beating the target of positive.

Hobson's Choice:[5] reinvention or extinction. While the retail environment was deteriorating, the highly experienced JCPenney executive team continued to innovate and work hard to restore financial strength to the Company. Watching many of its peers plodding down the path to extinction, even before the global pandemic, JCPenney took proactive steps to reinvent itself through its "Plan for Renewal."

11. After a series of unsuccessful initiatives over the last decade that were designed to stabilize JCPenney's business, the Company appointed industry veteran Jill Soltau as Chief Executive Officer on October 2, 2018. Ms. Soltau had most recently served as President and CEO of JoAnn Stores, Inc. News outlets and industry experts had consistently accused JCPenney of losing its way in the retail landscape and alienating its core customers by trying to be all things to all people.[6] Ms. Soltau's mandates were clear—refocus the Company on the fundamentals that made JCPenney a household name and win back its core customers' business.

12. Ms. Soltau began making deliberate and rigorous strategic modifications over the past 18 months starting with conducting holistic research related to JCPenney's customers' preferences. This research included speaking to thousands of retail consumers. Efforts centered on determining what drives its customers attitudinally and behaviorally. The Company's goal was to truly understand its customers' priorities. These diligent efforts led to the identification of its core customer: the "All-in Shopping Enthusiast."

---

[5]   Hobson's Choice, Dictionary.com, https://www.dictionary.com/browse/hobson-s-choice (describing a Hobson's choice as one which is offered where the options are to take what is offered or nothing; the absence of a real alternative).

[6]   *See* J. C. Penney Has Hired a New CEO Months After an Abrupt Resignation by its Former Chief Executive; https://www.businessinsider.com/J.C.Penney-hires-new-ceo-jill-soltau-2018-10.

13.     Following this research, Ms. Soltau developed and rolled out the Company's transformation strategy, the "Plan for Renewal," which is centered around five components:

a.     ***Offer Compelling Merchandise*** by redefining the brand architecture to reflect how customers live every day.

b.     ***Deliver an Engaging Experience***. The Company used extensive research and customer insights to create tests and develop featured occasion merchandising, improved visual merchandising, and a redesigned shopping experience. The Company expanded the learnings from tests in more than 90 stores.

c.     ***Drive Traffic*** online and in stores. The Company considers its website to be its flagship store. To meet the Company's increasing fulfillment demands, it strengthened its execution on fulfillment, including shipping merchandise from stores and enabling customers to Buy Online, Pickup In Store, or have Curbside Pickup. The Company has developed three distinct work streams to increase foot traffic in its stores: personalization, affinity programs, and improvements to its eCommerce site.

d.     ***Fuel Growth***. The Company is developing a more efficient operating model, reinvesting in value-creating activities, and establishing a capital structure that supports the long-term needs of the Company.

e.     Develop a ***Results-Minded Culture*** focused on accountability, urgency, and innovative problem solving at all levels of the organization, and a culture that connects all associates to achievements larger than the individual.

14.     As a test run, Ms. Soltau introduced her planned changes in what the Company refers to as a "Brand-Defining Store" in Hurst, Texas. It is the fullest articulation of the Company's customer commitment and the manifestation of the research, planning, and hard work that crystalized in 2019. The Brand-Defining Store is a "lab" store that brings to life the five components of the "Plan for Renewal" and helps inform future actions. The store is designed to create an engaging, inspired experience for customers who may have been lost during the last decade. It includes the first ever in-store barber shop (The Barbery), a kids destination (Clubhouse), a bistro with "grab + go" options, the "Take a Moment Make a Moment Lounge,"

and styling rooms for men and women. The "Brand-Defining Store" also has a Movement Studio and Style + Substance space to host exercise classes.

15.     At the heart of Ms. Soltau's vision for the Company is a reversion to the Company's historically strong merchandising areas. This includes focusing on high-margin goods, like the Company's private brand lines of women's apparel, and soft home goods like linens, bedding, and pillows. Indeed, these lines are JCPenney's legacy strengths and are expected to propel the Company into another successful century.

16.     To effectuate her vision and return JCPenney to prosperity, Ms. Soltau has brought together a leadership team with broad experiences in retail merchandising, operations, and finance. Combining Ms. Soltau's vision, the experience, and expertise of the leadership team, and extensive consumer research, the Company has taken several steps to return to its principles as a value retailer providing everyday goods for the entire family at low prices and to re-engage its core customers. These steps include: (a) removing the Company from low-margin furniture and appliances spaces; (b) reducing inventory to lower costs; and (c) developing a new look for JCPenney's stores, exemplified in the "Brand-Defining Store."

## Private Brands: the Pillars of JCPenney[7]

17.     Throughout its history, private brands have been central to the Company's success. Importantly, the Company anticipates that its leading private brands will continue to play a large role in its future. When James Cash (J. C.) Penney founded JCPenney in 1902, he knew that offering high quality goods at a low cost would provide a competitive advantage. Mr. Penney recognized that it was possible for him to offer even higher quality goods at better prices if he

---

[7]     *See* 10 classic J. C. Penney house brands from 1914 to now; https://fortune.com/2014/12/22/jcpenney-private-brands/.



created private brands that he could control from creation through sale. Therefore, he established private brand relationships in 1914 with Marathon Hats and then expanded into private brands for work clothes, fabric goods, men's caps, and lingerie. The development of private brands has continued over the past century; the Company's current private brands include, among other things, women's apparel and home goods, winter apparel, and various accessories.

18.     In fact, JCPenney's private brands are so loved that, according to numerous surveys, many people think they are national brands. The following is a description of the establishment or acquisition of the private brands:



- *1985 -* **Okie Dokie** is a collection of fun separates for infants, toddlers, and little kids that are designed to create mix-and-match outfits. Parents love to dress their little one in these affordable, easy-care pieces that are playful, colorful, and fun.



- *1985 -* **Worthington** offers wear-to-work pieces for the modern professional woman. The brand is grounded in essential separates that can easily be mixed and matched to create versatile modern looks.



- *1986 -* **Stafford** offers men professional attire in a range of classic suit separates, dress shirts, and accessories that will impress at the office. The Stafford man appreciates fine tailoring and quality fabrics, and believes dressing well is essential to his lifestyle.



- *1987 -* **St. John's Bay** is a versatile, comfortable, and casual line for men and women. Starting with quality fabrics and construction, each piece draws inspiration from classic American sportswear and infuses current elements for timeless pieces with a modern touch.



- *1988* - **Arizona Jean Co.** is a classic all-American clothing brand that inspires self-expression through a unique combination of product. Arizona offers original style for teens and kids at prices that fit parents' budgets.

- *1997* - **JCPenney Home** is known for its quality and style, offering bedding and high-quality home furnishings at a practical value. The brand brings pieces and ideas together in a way that is meaningful and approachable.

- *2011* - **Liz Claiborne** is presented as a full lifestyle collection. This classic and timeless brand is available in women's and men's apparel, bedding, and accessories, including handbags, fashion jewelry, sleepwear, outerwear, and swimwear.

19. The Company organizes its brand architecture across two dimensions. First, through customer research, the Company identified *common occasions* shared by customers that serve as the foundation, not just for the brand portfolio, but also for future customer experiences. Further, these occasions in a customer's day, life, or week are universal to everybody, and served as the framework of how the Company organizes its offerings. Second, the Company organizes its brands by *tier*. Offerings are divided into three tiers: good, differentiated, and signature. These tiers determine and support the pricing scheme and brand structure. Within each tier, the Company identifies whom the brands will serve and ensures that there is sufficient merchandise to appeal to all of its customers.

**<u>Proactive Financial Initiatives</u>**

20. Concurrently with the "Plan for Renewal," JCPenney sought to right-size its debt load, engaging with several key stakeholder groups across nearly every tranche of its capital structure over the last 8-plus months in the hopes of consummating a deleveraging, out-of-court transaction that would allow it to capitalize on attractive interest rates and reduce its debt load in advance of upcoming debt maturities. To restructure on its own terms, in mid-2019, the Company began reaching out to its funded debtholders and engaged both Kirkland & Ellis LLP ("<u>K&E</u>")

9

and Lazard Frères & Co. LLC ("Lazard") in July 2019 to assist with reaching a global resolution to de-lever its capital structure. The Company's efforts were three-fold:  (a) preserving liquidity, evidenced by a fully undrawn revolving credit facility at that time; (b) extending the runway during which Ms. Soltau's vision could be implemented; and (c) delevering the capital structure through discount-capture of long-dated unsecured notes. The Company and its advisors communicated these goals with its lenders, and, on numerous occasions, the Company and its lenders came very close to agreement on a deleveraging transaction.

21.    In the midst of these negotiations, COVID-19 struck, severely disrupting JCPenney's business and liquidity, massively accelerating the need for a long-term deleveraging transaction coupled with a critical liquidity infusion into JCPenney's operations.

22.    To navigate these extraordinary market conditions, JCPenney engaged AlixPartners LLP as its restructuring advisor to commence contingency preparations in the event a chapter 11 filing became necessary. At the same time, JCPenney directed its previously engaged advisors, K&E and Lazard, to analyze its financing needs, consider its capital structure alternatives, and begin the process of exploring restructuring options. Ultimately, three key factors influenced JCPenney's deleveraging path forward:  (a) its liquidity runway (the Company's liquidity, which was already in a seasonal cash burn period was further pressured by the closing of its stores and the evaporation of its primary source of cash receipts); (b) utilizing and maximizing the value of its unencumbered real estate; and (c) the participation of its secured lenders in productive negotiations.

23.    Importantly, it became clear that putting JCPenney on a ***long-term*** path to success would require not only a substantial cash infusion, but also a deleveraging strategy that is only possible with the tools available in a chapter 11 proceeding—i.e., the ability to reduce and convert

debt into equity, the ability to shed burdensome leases and executory contracts, and ultimately gain consensus across a complicated and widely dispersed capital structure. Although JCPenney received two formal proposals for out-of-court financing facilities that, if consummated, would have satisfied the need for an immediate cash infusion, both proposals contemplated the imposition of liens on JCPenney's unencumbered assets while *increasing* annual interest expenses—short-term fixes that would do nothing more than minimally extend JCPenney's liquidity runway in exchange for relinquishing assets that have served as a critical piece of value in the Company's restructuring negotiations. As a result, neither proposal represented a viable or desirous path forward.

24.     Moreover, as part of the 2019 liability management efforts, many of JCPenney's funded-debt creditors had formed into groups. As the severity and impact of the pandemic became clear, these creditor groups reactivated under the belief that a chapter 11 process was necessary. To navigate these market conditions, the Company and its advisors knew they needed to build stakeholder support and productively engage with these creditor groups. Therefore, the Company and its advisors, who had already been involved in extensive liability management negotiations with the organized creditor groups, approached those groups again to reach a resolution quickly. The plan contemplated by the RSA (as defined herein) will accomplish what the Company has been trying to do since mid-2019: eliminate the nearly $5 billion in debt burdening the Company and preventing the "Plan for Renewal" from flourishing. Thus, as in times of difficulty in the past, JCPenney is using the tools available—here, these chapter 11 proceedings—to return to its fundamentals and revitalize its business.

25.     Ultimately, two previously competing groups merged into one group, comprised of holders of approximately 70% of first lien loans and notes (collectively, the "First Lien Group").

11

Following several weeks of extensive, arm's-length negotiations, JCPenney and the First Lien Group reached agreement on a comprehensive, pre-negotiated restructuring consisting of the following key terms, and as embodied in the RSA, attached hereto as **Exhibit A** (the "Transaction" and the "RSA," respectively):

- a $900 million senior secured superpriority delayed-draw postpetition financing facility (the "DIP Facility"), $450 million of which will be in the form of new money, committed by certain Consenting First Lien Lenders (as defined in the RSA);

- the Transaction will be effectuated through a separation of certain of JCPenney's real estate into a Real Estate Investment Trust and the remaining assets and operations will be contained in the reorganized operating business;

- a market testing process seeking interest and bids in providing debt or equity financing to the reorganized operating business and/or purchases of some or all of the assets of the Debtors; and

- a sale "toggle" allowing for a potential 363 sale of all of the Debtors' assets upon the occurrence of certain conditions, unless otherwise instructed by a required portion of the Consenting First Lien Lenders.

26.     The Transaction contemplated by the RSA represents JCPenney's ***best and most viable option to emerge from chapter 11***. The Transaction itself is necessarily predicated on speed—it is not an option to languish in chapter 11 during key business seasons with value depleting at an astonishing rate due to the high costs of being in chapter 11. To avoid the fate of so many of its peers, JCPenney must move swiftly towards consummation of a transaction that allows it to emerge before the critical holiday season. Failure in these efforts is not an option, with nearly 85,000 associates depending on the right outcome here.

27.     JCPenney believes that the Transaction puts it on a path to maximize stakeholder recoveries and ensure that JCPenney can efficiently emerge from chapter 11 and continue to fulfill the promise it made at the turn of the twentieth century to be a leading retailer for American communities.

28.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in those certain motions and applications filed contemporaneously herewith, I have organized this declaration into five sections:

- **Section I** provides a general overview of the Company's history and current operations;

- **Section II** details the events leading to the filing of these chapter 11 cases;

- **Section III** provides an overview of the Company's prepetition corporate and capital structure;

- **Section IV** describes the RSA and the Cash Collateral; and

- **Section V** summarizes the relief requested in, and facts supporting, each of the First Day Motions.

## I.     JCPenney's Background and Current Operations.

29.     In the 118 years since its founding, JCPenney has cemented itself as a staple of the American retail landscape and continued to expand in a deliberate and thoughtful fashion. It now operates 846 locations across 49 states and Puerto Rico, employs nearly 85,000 associates, and manages a massive supply chain network with nearly 3,000 vendors and 11 domestic shipping facilities. JCPenney is one of America's largest department store retailers. The Company's revenue reached nearly $20 billion in net sales in 2007, and it concluded 2019 with approximately $10.7 billion in net sales.

30.     As described in further detail below, when James Cash (J. C.) Penney founded the Company in 1902, the name of his store was "Golden Rule." The guiding principle of JCPenney remains aligned with the name of Mr. Penney's first stores—***treat others as you would like to be treated***. Despite the evolution of fashion and shopping patterns, JCPenney's focus on the customer has remained constant and integral to its successes over the past

*"I cannot remember a time when the Golden Rule was not my motto and precept, the torch that guided my footsteps."—James Cash Penney*

ROBERT MASON, JAMES CASH PENNEY QUOTES: INSPIRATIONAL QUOTES BY THE EXTREMELY SUCCESSFUL AMERICAN BUSINESSMAN JAMES CASH PENNEY (2020).

century.  The Company endeavors to provide the merchandise its customers want at affordable prices in an environment where shoppers feel comfortable.  Reflective of the Company's desire to cater to the entire family, JCPenney's sales are widely distributed across a variety of merchandising categories.

31.     In its bid to cater to such a wide cross-section of customers, however, JCPenney incurred substantial debt—***approximately $4.9 billion of funded debt***—and made several strategic missteps.   Debt-service obligations  have squeezed JCPenney's liquidity,  suffocating  the Company's efforts to rejuvenate and directly preventing the Company from executing its "Plan for Renewal."    Its burdensome  capital structure, together  with the unprecedented circumstances surrounding the pandemic and certain operational missteps described below, have left the Company with one clear path to revitalization—reorganizing  through a court-supervised chapter 11 process.

### A.     JCPenney—Following the Golden Rule since 1902.

32.     In 1902, James Cash "J. C." Penney—with $500 in personal savings and a $1,500 promissory note from his hometown bank—opened a small dry goods store called   "Golden   Rule"   in   Kemmerer,   Wyoming. Mr. Penney experienced swift success and, by 1913, he operated 36 Golden Rule stores. His formula for success was simple:     (a) identify and procure fashionable and



J. C. Penney's First Store

high-quality  everyday goods, such as blue jeans and boots for local farmers, that were appealing to consumers; (b) utilize  a supply chain that could deliver these goods to remote, hard-to-reach towns (including within mountain areas) at reasonable costs; and (c) offer these goods to mining communities at fair prices.  In time, he renamed his stores "J. C. Penney."

**B.        Initial Growth and Continued Development: Defining the Penney Principles.**

33.        In 1913, Mr. Penney incorporated his Company as J. C. Penney Company, Inc. and, despite only having stores in the west, moved the corporate headquarters to New York City to be closer to manufacturers and suppliers to help reduce costs. By 1916, Mr. Penney opened the first stores east of the Mississippi in Wisconsin; by 1917, the Company had 175 stores nationwide; by 1924, the Company opened its 500th store; and by 1929, its thousandth.



JCPenney Store in Santa Monica, California in 1950s

34.        Over the next fifty years, the Company continued to grow in both size and profitability, reaching $1 billion in sales at its stores nationwide by 1951. Just 20 years later, the Company reached $5 billion in sales. This growth was fueled by adherence to the principles that Penney established from the opening of his first Golden Rule store in Wyoming: (a) identify and procure or create merchandise that consumers want; (b) establish strong vendors relationship and supply chain fundamentals to deliver the merchandise at low cost; (c) remain visible through effective advertising; and (d) offer merchandise at a value price to customers.

35.     The Company fulfilled these goals by maintaining an eye for consumer trends and spending habits. In the late 1950s, the Company began selling major appliances, home electronics, furniture, and sporting goods. In the 1960s, JCPenney began purchasing drugstores, which became particularly profitable in the 1980s when mail-order pharmacies grew in popularity.

36.     More importantly, the Company developed a broad network of reliable domestic and foreign suppliers to source merchandise, beginning with Mr. Penney's early strategic move to New York to bolster relationships with suppliers and thereby lower costs. Over time, the Company has nurtured and maintained those relations, many of which have turned into decades-long relationships. The Company, however, has been careful to avoid relying too heavily on any single vendor, which prevents supply disruption for JCPenney should that vendor encounter disruption of its own. The Company's network now consists of nearly 3,000 vendors and suppliers.

37.     To remain viable, the Company has successfully fought to remain highly visible to customers throughout its history. The stores themselves have been key to this exposure. The locations of the stores are crucial—in town centers and entryways of shopping malls. In the late-1940s, the Company opened a store in a "drive-in shopping district," a proto-shopping mall, and in 1961, the Company opened its first department store. JCPenney has gone on to serve as an anchor tenant at malls around the country. Thus, its stores have been centralized gathering places for communities where community members can buy merchandise for the everyday needs of the entire family. The Company has always catered its store experience to this dynamic: the earliest department stores carried lines of merchandise and services for the entire family, such as men's, women's, and children's apparel, appliances, sporting goods, garden merchandise, restaurants, beauty salons, portrait studios, auto parts, and auto centers.

38.     The Company launched its first catalogue in 1963. The catalogue stimulated substantial profits and, by 1993, the Company was the largest catalogue retailer in the country.  The catalogue successfully brought the store experience to the customers' homes, advertising the range of goods that the stores provided.  The catalogue naturally dove-tailed into online sales.  In 1996, the Company, foreseeing the impact of eCommerce in the future of retail, launched its retail website.  By 2005, JCPenney hit $1 billion in online sales.



39.     The Company has consistently presented value to its customers.  It has always offered deals and bargains (which it has advertised in its catalogue, newspapers, and elsewhere),

> *"I would never have amounted to anything were it not for adversity. I was forced to come up the hard way."*
> *- James Cash Penney*
>
> ROBERT MASON, JAMES CASH PENNEY QUOTES: INSPIRATIONAL QUOTES BY THE EXTREMELY SUCCESSFUL AMERICAN BUSINESSMAN JAMES CASH PENNEY (2020).

which not only motivates customers to purchase items on sale, but also to visit the store and make additional purchases.  This value strategy has created a strong base of customers who have remained loyal to the Company throughout its history.

## C.     Strength in America's Darkest Hours.

40.     During its 118-year history, JCPenney has survived nation- and world-wide recessions, depressions, wars, and other crises. The Company has consistently found a way to stay relevant and serve its customers using the tools available and keeping a focus on its fundamentals.

41.     On October 23, 1929—less than a week before the "Great Crash" that triggered the Great Depression—the New York Stock Exchange listed JCPenney common stock for public trading for the first time.  Immediately upon becoming a public company, JCPenney was tested through the worst economic meltdown in American history.  To weather the downturn at this inflection point in the Company's history, JCPenney proactively pared back inventory, focused its merchandise on everyday goods, and identified lower-price suppliers, allowing for lower consumer prices and higher margins.  Focused on providing Americans a place to purchase their day-to-day needs, the Company's profits and numbers of stores increased despite widespread economic tumult.  As a result, the Company continued its growth; in January 1930, JCPenney boasted 1,452 stores and employed approximately 25,000 associates.

**J. C. PENNEY SALES UP 17 PER CENT IN YEAR**

Business in December Also Increased Sharply — Other Chain Store Reports.

An increase of 17.84 per cent in December sales has been reported by the J. C. Penney Company over December, 1928. This company also reports a gain in net sales for the whole of 1929 of 18.67 per cent over the preceding twelve months.

The total December sales were $29,585,291, or $4,479,999 more than the $25,105,292 reported for the preceding December. Sales for 1929 amounted to $209,686,640, which were $32,987,471 higher than the figure for 1928.

42.     Through World War II, JCPenney proved its mettle once more.  As more than 5,500 of its associates served in the armed forces defending America, the Company's sales grew to more than $500 million.  The Company succeeded during this time by sticking to the fundamentals: selling high-quality everyday goods and keeping costs low.  When the war ended and Americans returned home, JCPenney experienced a further 23 percent increase in sales in 1946.

43.     Three decades later, when a recession hit the American economy in 1974, JCPenney's earnings fell, and the rise of specialty stores, such as discount, hardware, and specialty apparel stores, threatened the Company's core merchandise offerings.  In response, JCPenney

18

refocused its efforts on apparel and home goods. The Company expanded its fashion programs for men's, women's, and children's apparel and, by the 1980s, began to move away from low-margin sectors like auto service, appliances, hardware, and lawn and garden merchandise.



44.     Following the recession of the 1980s and the Gulf War, the Company again renewed its focus on apparel—particularly women's apparel—and home goods.  JCPenney underscored this emphasis on apparel—spearheaded by its focus on women's jeans—through targeted advertising campaigns and saw continued growth and successful initiatives throughout the 1990s and 2000s.

45.     At the beginning of the 2010s, the Company again faced turbulence, marked by a revolving door of executive leadership.  A CEO transition in the second half of 2011 triggered a sharp, prolonged downward spiral in year-over-year same-store sales, beginning with a 20 percent



drop in the first quarter of 2012.  Attempting to radically reinvent the Company's brand identity, JCPenney launched its third rebranding in as many years, entitled "Enough.  Is. Enough."  Through this campaign, the Company eliminated coupons and focused on everyday low prices.

46. Simply put, the campaign failed.   It failed to resonate with the Company's customers, leaving them confused and feeling disconnected from the store that had built itself as one dedicated to satisfaction of the everyday consumer and the provision of high value, fair cost goods.   Revenue tumbled, and once again, the Company needed to "rebrand." Subsequent leadership, however, was unable to revive the Company's performance.

### D.   A Revitalization and Return to Principles.

47. Several attempts have been made to adapt to ever-changing consumer preferences. For example, for a period of time, the Company entered the high-cost appliance space—decades after extricating itself from this business—to cater to the millennial population that was becoming first-time homebuyers.  This strategy did not bear out.  The move into appliance sales, along with other similar missteps, directed focus away from other segments of the business that had historically been anchors of the Company's strategy—such as women's apparel and home soft goods—and the business suffered as a result.  Under Ms. Soltau's leadership and vision, the Company has brought its sights back to the customer, particularly the customers that have sustained the Company for so long.  And, as discussed above, the Company has also returned to the principles that James Cash Penney established nearly a century ago: quality merchandise, low costs, and value to customers.

### E.   Business Operations.

48. JCPenney's business consists of selling merchandise and services to consumers through its department stores and website.

49. ***Brick-and-Mortar Presence.***   As of the Petition Date, the Company operates 846 stores across the United States, including six stores in the territory of Puerto Rico.  Of these

846 stores, 387 are owned, including 110 stores operating on ground leases. The stores are located in lifestyle centers, shopping malls, power centers, street level shops, and outlets.

50. *eCommerce*. JCPenney was one of the first retail companies to launch an eCommerce website in 1996. It maintains this website today. Customers may also purchase merchandise through JCPenney's smartphone application, which was launched in 2009. The Company fulfills online customer purchases by direct shipment to the customer from distribution facilities and stores or from its suppliers' warehouses.

51. *Omnichannel System*. A particular emphasis under Ms. Soltau's leadership has been its omnichannel system. "Omnichannel" systems integrate the different methods in which consumers shop for merchandise. For example, customers may purchase merchandise online and return it to their local store or vice versa. Additionally, online prices match those in the brick-and-mortar stores. JCPenney's robust omnichannel system allows customers to view, purchase, and pick-up merchandise in various manners (in-store or at home, via website or app). There are numerous examples of the integration of the Company's omnichannel system, demonstrating its flexibility:

> a. customers have the opportunity to view, touch, and/or try on physical merchandise in-store before ordering online or through the JCPenney app;
>
> b. the website and app have increased store sales. Nearly 90% of customers start the path to purchase online before shopping in the store, including verification of which stores have online merchandise in stock;
>
> c. most eCommerce purchases are easily returned in-store;
>
> d. points earned through the Company's reward program, JCPenney Rewards, can be earned and redeemed through all sales channels;
>
> e. in-store customers can order via the eCommerce website with the assistance of in-store associates or can shop via the JCPenney app while inside the store;

f.  customers using the JCPenney app can receive mobile coupons to use when they check out both online or in-store;

g.  eCommerce orders can be shipped from a dedicated fulfillment center, a store, a regional warehouse, directly from vendors, or any combination of the above;

h.  certain categories of store inventory can be accessed and purchased online or through the JCPenney app and shipped directly to the customer's home from the store; and

i.  eCommerce orders can be shipped to stores for customer in-store or curbside pick-up.

52.  ***Merchandise and Key Customer Base.***  The Company primarily sells family apparel and footwear, accessories, fine and fashion jewelry, beauty products, and home furnishings.  In addition, JCPenney department stores provide services such as salons, optical, portrait photography, and custom decorating.  Currently, the Company's inventory falls into the following categories: 21.0% men's apparel; 13.3% women's apparel (does not include specialty apparel like swimwear); 12.7% home furniture and leisure; 12.0% footwear, handbags, and accessories; 10.8% jewelry and watches; and 30.2% other (cosmetics, children's apparel and products, women's specialty apparel).  The Company's core customers, the "All-in Shopping Enthusiasts," are those seeking value for merchandise that can be used every day, particularly apparel and home furnishings.  Approximately 75% of sale transactions are made to JCPenney rewards members and approximately 40-45% of sale transactions are made to JCPenney credit card holders.

53.  ***Intellectual Property***.  In 2018 and 2019, private brand merchandise comprised 46% of total merchandise sales; exclusive brand merchandise comprised 7% and 6% of total merchandise sales in 2018 and 2019, respectively.

### F.      Critical Components of the Debtors' Cost Structure.

#### 1.      The Supply Chain.

54.      The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of renewed merchandise to their brick-and-mortar locations as well as on-demand delivery to customers' homes and stores for customer pickup. The Company utilizes 11 facilities (six owned, five leased) to provide support for direct-to-customer shipping and act as store merchandise distribution centers and regional warehouses.

55.      The Company's supply chain begins at one of its nearly 300 domestic and foreign vendors and suppliers. Over many decades, the Company has worked hard to foster its relationships with suppliers. These time-tested relationships allow the Company to maximize the efficiency of its supply chain and provide merchandise to its customers at fair prices. To monitor its supply chain effectively and to assist with sourcing and quality control, the Company maintains nine buying and quality assurance offices in foreign countries.

56.      Generally, for private brand merchandise, the Debtors, through their purchasing company, J. C. Penney Purchasing Corporation ("Purchasing"), and its foreign subsidiaries, contract with various foreign manufacturers and suppliers to source and ship merchandise. After procuring the merchandise, Purchasing then sells the merchandise to the operating company, J. C. Penney Corporation, Inc. ("OpCo") for eventual sale to the consumer. For non-private brand merchandise, the Debtors contract with domestic suppliers.

#### 2.      Employee Compensation and Benefits.

57.      The Company employs nearly 85,000 associates (the "Employees"). JCPenney offers its Employees the ability to participate in a number of insurance and benefits programs, including health benefits (including vision and dental coverage), prescription drug benefits

23

programs, workers' compensation, life insurance, accidental death and dismemberment insurance, disability benefits, and retirement plans.

58.     In the short term, due to the unprecedented and unforeseen disruption to JCPenney's business that the pandemic caused, the Company made the incredibly difficult decision to implement temporary furloughs through the duration of the pandemic.  As of the Petition Date, approximately 92% of the Employees have been furloughed.  One significant goal of these chapter 11 cases is ensuring that as many of these associates as possible are returned from furlough.

### 3.     Real Estate Portfolio.

59.     The Company maintains 846 stores: JCPenney owns 387 stores and, of those, it ground leases 110 stores.  The full JCPenney experience requires a trip to one of its stores, which are widely spread across 49 states and Puerto Rico.



J. C. Penney Store Locations



## II.     Events Leading to these Chapter 11 Cases.

### A.     The Pandemic.

60.     In-store shopping at JCPenney, the Company's largest revenue stream, came to an abrupt halt as a result of the pandemic.  In response to state and local government mandates and recommendations, on March 18, 2020, the Debtors temporarily closed all retail stores and offices. The Debtors later extended their store closures through May 2020.  These store closures have significantly contributed to missed sales targets, unsold inventory, and depressed profit margins. Online sales have also suffered as a result of the pandemic due to lower disposable income spending and concern among consumers with respect to the state of the economy.    Recently, in accordance with state and local orders, the Company has started to reopen certain stores as it is safe to



do so in a phased approach. As of the Petition Date, of the Company's approximately 846 stores, 41 were fully open and another 7 stores had curbside-only service available. JCPenney communicates with its customers regarding the pandemic and the opening of stores on its COVID-19 website.[8] The Company is taking exceptional measures to ensure that its associates and customers remain safe at its stores. Specifically, the Company is performing diligent nightly cleaning of its stores, offering contact-free curbside pickup, installing plexiglass shields at the register, providing training to its associates on safety practices, and providing masks to each associate, among other measures.

### B.     Brick and Mortar Retail Microenvironment, Marketing Missteps, and the Leadership Carousel.

61.     The Company was experiencing headwinds prior to the pandemic, with COVID-19 being the ultimate reason for these chapter 11 filings. Prior to the pandemic, the Company's projections showed sufficient liquidity to maintain operations without any restructuring transaction for years. The Company, however, intends to utilize these chapter 11 proceedings to work to improve its operations and progress the "Plan for Renewal."

62.     *First*, JCPenney, along with many other apparel and retail companies, had been facing a challenging commercial environment over the past several years brought on by increased competition and the shift away from shopping at brick-and-mortar stores. Given the Company's substantial brick-and-mortar presence in the United States, and the expenses associated therewith, the business had been heavily dependent on physical consumer traffic, and resulting sales conversion, to meet sales and profitability targets. Further, the majority of the Company's locations are in shopping malls, which have seen an even steeper decline in traffic than

---

8       For more information related to the Company's response to COVID-19, see the following website: https://companyblog.jcpnewsroom.com/storesopen/).

other brick-and-mortar locations. This contributed to the Company's falling short of its sales targets and depressed profitability performance and a need for change.

63. *Second*, over the past decade, the Company has experienced substantial turnover at the executive level. Prior leadership made certain merchandising decisions that misread the Company's core audience, failed to attract new customers, and ultimately hurt sales. By May 2018, the Company was on its fourth CEO in seven years. The four separate management teams each came with a different business plan and execution strategy. The regular transition periods disrupted efforts to pursue any of these plans and effectuate a cohesive, long-term strategy. After the Company's CEO abruptly stepped down from his post in May 2018, management and the board of directors of JCP needed to identify and appoint an individual who could immediately step into the colossal challenge of bringing this American staple back from years of declining revenue and profits.

64. Despite the forgoing, and as detailed throughout this declaration, the Company, under the leadership of Ms. Soltau, was on the brink of an operational and financial shift that would prepare JCPenney for a resurgence in the retail industry. Notwithstanding the incredibly challenging macro-economic climate, the "Plan for Renewal" has already improved the sales in several categories. A leadership team with extensive and valuable retail experience was assembled. Further, the Company's management prioritized a right-sizing of its capital structure and proactively sought the cooperation of several key stakeholders.

> ### C.   Prepetition Strategic, Financing, and Governance Initiatives.
>
> #### 1.   Liability Management Transaction.

65.     In August 2019, the Company had approximately $1.68 billion of aggregate liquidity but was levered at ~7.7x Adjusted EBITDA, substantially higher than the industry median.  As demonstrated in the graph below, its Last Twelve Months (LTM) Gross Leverage is substantially above the median for apparel retail.



66.     Ms. Soltau, together with senior management and the Company's advisors, recognized that a substantial delevering was critical to propel the Company into another successful century.  Immediately, the Company's advisors began a robust evaluation of the Debtors' potential strategic alternatives to provide time to grow back into its capital structure.  Although the Company had substantial liquidity runway, its forecasts showed that they might drop below the threshold of sufficient liquidity in the coming years.

67.     Through numerous in-person meetings with the Company's management, K&E and Lazard identified four primary strategic capital structure goals: (a) maintain liquidity, (b) address the more than $2 billion of first lien debt maturing in June 2023; (c) capture discount in the remaining secured debt and unsecured notes, and (d) reduce interest expense, all while simultaneously maintaining operational flexibility.

68. In early August and September 2019, the Company's advisors market-tested the appetite for such a transaction. Given the Company's storied history and expectation for a bright future with the new management team, there was substantial interest from lenders and potential lenders. Over the following months, the Company traded a number of proposals with an ad hoc group of its First Lien Noteholders, Term Loan Lenders, and Second Lien Noteholders (each as defined herein, together, the "Crossover Group") that had aligned with one of the Company's largest funded debt holders. Through mid-November and December 2019, the Company and its advisors traded term sheets with such advisors, but ultimately an impasse was reached.

69. Subsequently, the Company engaged with another potential transaction counterparty who is a frequent player in distressed situations ("Counterparty X"). Counterparty X proposed a transaction whereby it would facilitate an amend-and-extend transaction through, among other transactions, the purchase of more than $750 million of the Term Loans (as defined herein). The deal gained substantial traction in late-December 2019 and January 2020 as Counterparty X became restricted, and fulsome negotiations commenced. With the support of Counterparty X, the Company also continued discussions to raise a new FILO facility from separate commercial lenders. In early February 2020, the Company and Counterparty X agreed to major structural and economic terms of the transaction in principal. Generally, Counterparty X was prepared to purchase and extend the maturity of the Term Loan Obligations in conjunction with the funding of a $360 million FILO facility in exchange for fees and a lien on unencumbered assets. Such transaction would have been the first of a multi-step process to extend the Company's debt maturity and provide it with the flexibility to augment liquidity and delever its capital structure through discount capture on its unsecured notes.

70.     As a next step, the Company proposed a broader amend-and-extend transaction involving its other Term Loan Lenders and First Lien Noteholders that would have provided the same consideration to extending debtholders in exchange for extending debt maturity by three years. Contemporaneously, or shortly thereafter, the Company would launch a tender and/or exchange offer for its long-dated unsecured notes at a discount.

71.     Unfortunately, once COVID-19 was declared a pandemic, and the Company's primary revenue stream—in-store sales—evaporated overnight, talks regarding the potential transactions came to a grinding halt.

### 2.     Implementation of Cost-Saving Initiatives.

72.     Even before the temporary store closures due to COVID-19, the Debtors were in the process of implementing a series of cost-saving initiatives to address its debt obligations and grow its profit margins. These cost-saving initiatives included, among other things, expense reduction, contract renegotiations, and optimization of the Debtors' merchandise labor-force, and real estate portfolios.

73.     Due to the unprecedented and unforeseen disruption to the Company's business caused by COVID-19, the Debtors instituted the Furlough Program. While the Debtors initially maintained wages and salaries for their Employees, effective April 2, 2020, the Debtors placed approximately 78,000 full- and part-time employees on temporary furlough (the "Furloughed Employees"). The Debtors currently believe these measures will last as long as necessary to comply with applicable state and governmental health mandates, which currently remain highly uncertain. During this period, Furloughed Employees will remain on unpaid leave unless otherwise scheduled to work, but will remain eligible to participate in any health benefits programs in which such Furloughed Employees are currently enrolled.

### 3. Governance Initiatives.

74. Finally, once it became clear that a near-term chapter 11 process was a distinct possibility, JCPenney proactively evaluated its corporate governance structure and, after extensive interviews, made a determination to add four disinterested directors. Effective May 1, 2020, Alan Carr and Steven Panagos, two restructuring veterans, were appointed to the board of directors of OpCo (the "OpCo Independents"). The OpCo Independents have retained their own legal counsel, Katten Muchin Rosenman LLP, to assist in evaluating and if necessary and appropriate, pursuing claims held by OpCo against other Debtor entities.

75. Also, on May 1, 2020, William Transier and Heather Summerfield (the "PropCo Independents," together with the OpCo Independents, the "Independent Directors") were appointed to the board of directors of JCP Real Estate Holdings, LLC ("RE HoldCo") and J. C. Penney Properties, LLC ("PropCo"). Mr. Transier and Ms. Summerfield were appointed to Purchasing's board of directors on May 4, 2020. Each of the PropCo Independents has extensive restructuring experience and is wholly independent of the other Debtors, the OpCo Independents, and any other parties within the Debtors' corporate structure. The PropCo Independents also retained their own independent legal counsel, Quinn Emanuel Urquhart & Sullivan LLP. Each of the Independent Directors (and their respective counsel) have gathered, with the assistance of the Debtors' management and other advisors, information related to pre-petition intercompany transactions and transfers. This process is ongoing and the Independent Directors are investigating the extent and validity of any potential intercompany claims (and, if so, the impact of any such claims on a restructuring transaction) (the "Independent Investigation"). Should the Independent Investigation yield actionable results in the form of intercompany claims, the Independent Directors will work with the Debtors to reach an acceptable resolution to such claims.

31

**III.    JCPenney's Prepetition Corporate and Capital Structure.**

**A.    Corporate Structure.**

76.    The Debtors' parent company, HoldCo, is a holding company incorporated in Delaware in 2002. HoldCo has 25 direct and indirect wholly-owned subsidiaries. Most important among these subsidiaries is the only direct subsidiary of HoldCo, OpCo, which is the Company's main operating entity. The remaining subsidiaries are all direct or indirect subsidiaries of OpCo.

77.    Below is an organizational chart of Debtors' corporate structure:



78.    *PropCo.* PropCo is the only direct subsidiary of RE HoldCo, a holding company that is in turn a direct subsidiary of OpCo. PropCo was established in approximately 1962 in order to separate the stores' operations from liability risk resulting from owning real property. Today,

PropCo holds a substantial portion of the Company's real estate interests; OpCo holds the Company's remaining real estate interests.

79.     PropCo does not operate any stores including those that it owns or leases. Rather, PropCo leases all owned properties to OpCo through intercompany lease agreements. OpCo then operates the stores. Prior to January 1, 2020, the intercompany lease agreements required OpCo to make rent payments to PropCo, with the rent figure tied to the cost of the property incurred by PropCo on its books and records. Specifically, the Company researched the net book value of the property, researched the third party interest rate from the Company's treasurer's group, and amortized the cost of the property and the interest rate over the lease term (typically 20–25 years). The Company determined the fair market value of rent for PropCo's properties from 1999 to 2009, when the Company received appraisals of certain locations' rental values. From 2009 to 2020, rent reflected the cost of the mortgage payments plus costs associated with maintaining the properties.

80.     In 1999, PropCo elected to become a captive real estate investment trust ("REIT") to create tax efficiencies. As a REIT, PropCo was required to dividend 100% of its profits. These dividends flowed from PropCo to its direct parent, RE HoldCo, which would then issue dividends to OpCo. On December 31, 2019, PropCo was converted to a single member LLC. One reason for the change was to simplify the tax structure. For federal tax purposes, PropCo and RE HoldCo are now considered disregarded entities.

81.     Additionally, as detailed below, OpCo is the debtor or issuer on multiple secured loans. To collateralize these secured loans, OpCo has pledged equity in nearly all of its direct subsidiaries, including RE HoldCo (which in turn has pledged its equity in PropCo), and PropCo has mortgaged nearly all its owned and ground leased property.

82.     *Purchasing.*   Another direct subsidiary of OpCo (and indirect subsidiary of HoldCo) is Purchasing.   As part of its business, the Company owns and maintains various trademarks of its private label brands, such as Liz Claiborne®, Worthington®, a.n.a®, St. John's Bay®, The Original Arizona Jean Co®, JCPenney Home®, and North Pole Trading Co.™ While OpCo sells merchandise under several private label brands in the stores it operates (e.g., Liz Claiborne, J. Ferrar and St. John's Bay), Purchasing owns and maintains the trademarks of those brands and related designs and textiles.   Further, Purchasing designs, develops or sources nearly all private brand merchandise.

83.     Notably, OpCo is the registrant owner of various domain names for the private brands (and employees of OpCo maintain them).   The Company does not sell merchandise under those domain names and some of those domain names are solely used for informational and marketing purposes (particularly, lizclaiborne.com)   and other domain names are used just for defensive or parking purposes.   No revenue is currently generated through these sites.   These entities transact pursuant to a series of intercompany agreements which were negotiated at arm's-length.

84.     *JCPSI.*   Another direct subsidiary of OpCo (and indirect subsidiary of HoldCo) is JCPenney Services India Private Limited ("JCPSI"), a non-debtor.   JCPSI operates an IT service support center, and performs certain back office functions, in Bangalore, India.   OpCo owns 99% of JCPSI and JCP Procurement, Inc.   ("Procurement") owns 1%.   JCPSI pays its own bills, and sends OpCo a monthly funding request for estimated expenses plus its markup, which is settled monthly as required by Indian law.   In the 2018 fiscal year, aggregate payments to JCPSI from OpCo were $32 million.   Each of the agreements entered into amongst JCPSI and its parent or affiliated entities were negotiated at arm's-length.

85.     The relationship between OpCo and JCPSI is governed by the Services Agreement, entered into between OpCo and JCPSI, effective November 12, 2015.   Under the Services Agreement, OpCo owns all IP "discovered, created, developed, or derived" as a result of JCPSI's work under the Services Agreement.

86.     JCPSI and Procurement also have a Services Agreement, and entered into a 2nd Amendment Agreement effective July 1, 2017, delineating specific services that JCPSI was to provide to Procurement.  JCPSI provides services in relation to "supply of goods," including quality support activities, operational support for data entry, and facilitating communications with suppliers, among other roles.

87.     *jcpSSC.* Another direct subsidiary of OpCo (and indirect subsidiary of HoldCo) is jcpSSC, Inc. ("jcpSSC").  OpCo provides jcpSSC various support services, namely, legal, human resources, real estate, tax, finance, controllers, internal audit, executive, risk management, government relations, and procurement services. In return, jcpSSC agreed to pay to OpCo, based on the proportion of jcpSSC's use of the services, the cost of services plus an appropriate markup.

88.     *JCPPR.* Another direct subsidiary of OpCo (and indirect subsidiary of HoldCo) is JCPenney Puerto Rico, Inc. ("JCPPR").  OpCo and JCPPR entered into their Agreement for Intercompany Goods, Services, and Use of Intangible Properties on May 15, 2009.  Pursuant to that agreement, OpCo provides certain merchandising assistance to JCPPR, including merchandise sourcing, services, trademarks and trade names.  JCPPR pays OpCo's charges for merchandise, for services rendered, royalties and trade payables, and other specified amounts set forth in a payment terms agreement.

89.     *Foreign, Non-Debtor Subsidiaries*. Purchasing is party to service agreements with certain of its foreign subsidiaries:  JCPenney Purchasing India Private Limited ("JCPPI");

JCPenney Purchasing Hong Kong Limited ("JCPP-HK"); JCPenney de Guatemala, S.A. ("JCP GT"); JCPenney de Honduras, S.A. ("JCP HN"); JCPenney Korea ("JCPK"); and JCPenney Business Information Consulting (Shanghai) Co., Ltd. ("JCPBIC"). These agreements involve the subsidiary providing various support services to Purchasing—including administrative services, quality control, and services related to procurement of merchandise—in exchange for cost of the services plus an appropriate markup.

**B.     The Debtors' Prepetition Capital Structure.**

90.     As of the Petition Date, the Debtors' capital structure, as detailed below, consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $4.9 billion. A chart summarizing the relative priorities of various stakeholders to the collateral packages described below is attached hereto as **Exhibit B**.



| Facility | Maturity | Amount Outstanding |
|---|---|---|
| **J. C. Penney – First Lien Debt Obligations** | | |
| ABL Credit Facility | 06/20/2022 | $1,179 million |
| 2016 Term Loan | 06/23/2023 | $1,521 million |
| First Lien Notes | 07/01/2023 | $500 million |
| **J. C. Penney – Second Lien Debt Obligations** | | |
| Second Lien Notes | 03/15/2025 | $400 million |
| **J. C. Penney - Total Secured Obligations** | | **$3,600 million** |
| **J. C. Penney – Unsecured Obligations** | | |
| Unsecured Notes | Varying (2023 – 2097) | $1,318 million |
| **J. C. Penney – Total Funded Debt** | | **$4,918 million** |

### 1.    The ABL Revolving Credit Facility.

91.    Certain of the Debtors are party to that certain Credit Agreement, dated as of June 20, 2014 (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of December 10, 2015, that certain Amendment No. 2 to Credit Agreement, dated as of June 20, 2017, that certain Amendment No. 3 to Credit Agreement, dated as of March 8, 2018, and as may be further amended, restated, modified or supplemented from time to time, the "ABL Credit Agreement"), by and among, *inter alios*, OpCo, HoldCo, and Purchasing, each as borrowers (collectively, the "ABL Borrowers"), the lenders party thereto, and Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "ABL Agent"). The Prepetition ABL Credit Agreement provides for a $2.35 billion credit facility (subject to a borrowing base composed primarily of accounts receivable, credit card receivables and inventory) with a maturity date of June 20, 2022 (the "ABL Facility").

92.    The obligations under the ABL Facility (the "ABL Obligations") are secured by substantially all of each Debtor's working capital assets, including, without limitation, by a first priority lien on substantially all of the Secured Loan Parties' (as defined in the ABL Facility) accounts (including receivables), inventory, deposit accounts, and cash (but excluding the Debtors' equipment, real estate assets, intellectual property, equity interests and intercompany indebtedness owed to such Secured Debt Loan Parties (as defined below)) and identifiable proceeds of the foregoing (collectively, the "ABL Priority Collateral"). Each of RE HoldCo and PropCo (together, with the ABL Borrowers, the "Secured Debt Loan Parties") has guaranteed all obligations under the ABL Facility.[9]  Due to the Debtors' ongoing liquidity constraints, the ABL Borrowers have

---

[9]    Additionally, OpCo has entered into certain deposit account control agreements in favor of the ABL Agent with respect to its bank accounts. Thus, substantially all of the Secured Debt Loan Parties' cash is subject to a perfected security interest in favor of the ABL Agent.  Under the ABL Facility, if aggregate availability is less than the greater of (a) 10 percent of the then-applicable borrowing base (or, if less, the total commitments) and (b) $140

37

recently drawn on the ABL Facility in order to meet anticipated liquidity needs. As of the Petition Date, there are approximately $1,390 million of outstanding obligations under the ABL Facility (consisting of borrowings and obligations in respect of undrawn letters of credit).

93.     The ABL Facility allows for certain lenders thereunder (or their affiliates) to enter into certain swap, treasury services or supply chain financing agreements outside of the ABL Facility. Obligations under these agreements are secured under the security documents related to the ABL Facility (and share in any liens created thereunder) on a *pari passu* basis with the ABL Obligations. As of the Petition Date, there are approximately $75 million of such outstanding obligations, which are fully reserved against in the borrowing base under the ABL Facility.

### 2.     The Term Loans.

94.     The Secured Debt Loan Parties are party to that certain Amended and Restated Credit and Guaranty Agreement, dated as of June 23, 2016 (as amended, restated, amended and restated, modified, or supplemented from time to time, the "Term Loan Agreement"), by and among, *inter alios*, OpCo, as borrower, JPMorgan Chase Bank, N.A., as administrative agent (the "Term Loan Administrative Agent"), and the lenders from time to time party thereto (the "Term Loan Lenders"). Under the Term Loan Agreement, OpCo borrowed approximately $1.7 billion (the "Term Loans"), approximately $1.521 billion of which remains outstanding. The Term Loans amortize quarterly at a rate of 2.5 percent per annum, with the balance due at its maturity.

95.     The obligations under the Term Loan Agreement (the "Term Loan Obligations") are secured on a *pari passu* basis with the First Lien Note Obligations by substantially all of each

---

million, for at least two consecutive business days, or upon the occurrence of certain events of default, the Secured Debt Loan Parties will lose control of certain accounts and their access to cash contained therein will be restricted (including all cash receipts), enabling the ABL Agent to sweet cash to repay outstanding ABL Obligations on a daily basis.

Secured Debt Loan Party's assets other than certain unencumbered real estate, including, without limitation, by a first priority lien on substantially all of the Secured Debt Loan Parties' equipment, real estate assets, intellectual property, equity interests and intercompany indebtedness owed to such Secured Debt Loan Parties, and identifiable proceeds of the foregoing (the "Term Priority Collateral"), and a second priority lien on the ABL Priority Collateral (collectively, the "Term Loan/First Lien Notes Collateral").  Each non-borrower Secured Debt Loan Party has guaranteed all of the Term Loan Obligations.

### 3.     Secured Bonds.

96.     The Debtors are also obligated under the following two issuances of secured debt securities:

(i)  **5.875% senior notes due 2023.**  On June 23, 2016, OpCo issued $500 million of 5.875% senior secured notes due July 2023 (the "First Lien Notes," and the holders thereof, the "First Lien Noteholders," and the obligations thereunder, the "First Lien Notes Obligations," and the First Lien Notes Obligations together with the Term Loan Obligations, collectively, the "Term Loan/First Lien Notes Obligations"), all of which remains outstanding as of the Petition Date. JCP, Purchasing, RE HoldCo and PropCo are guarantors under the First Lien Notes, and the First Lien Notes Obligations are secured on a *pari passu* basis with the Term Loan Obligations by the Term Loan/First Lien Notes Collateral, including a first priority lien on the Term Priority Collateral and a second priority lien on the ABL Priority Collateral.

(ii)  **8.625% notes due 2025.**  On March 12, 2018, OpCo issued $400 million of 8.625% second lien secured notes due March 2025 (the "Second Lien Notes", and the holders thereof, the "Second Lien Noteholders," and the obligations thereunder, the "Second Lien Notes Obligations"), all of which remains outstanding as of the Petition Date. JCP, Purchasing, RE HoldCo and PropCo are guarantors under the Second Lien Notes, and the Second Lien Notes Obligations are secured on a junior basis to the Term Loan/First Lien Notes Obligations by the Term Loan/First Lien Notes Collateral other than real estate (which does not secure the Second Lien Notes Obligations), including a second priority lien on the Term Priority Collateral (other than real estate) and a third priority lien on the ABL Priority Collateral.

### 4.     Unsecured Bonds.

97.     The Debtors are also obligated under the following six issuances of unsecured debt securities:

(i)     **5.65% senior notes due 2020.**  On May 24, 2010, JCP and OpCo issued $400 million of 5.65% senior unsecured notes due June 2020 (approximately $105 million of which remains outstanding as of the Petition Date).  No other Debtor entity guarantees or is otherwise obligated under the notes.

(ii)     **7.125% debentures due 2023.**  On November 23, 1993, OpCo issued $275 million of 7.125% unsecured debentures due November 15, 2023 (approximately $10 million of which remains outstanding as of the Petition Date).  On January 27, 2002, JCP became a co-obligor with respect to the debentures.  No other Debtor entity guarantees or is otherwise obligated under the debentures.

(iii)     **6.90% debentures due 2026.**  On August 19, 1996, OpCo issued $200 million of 6.90% debentures due August 2026 (approximately $2 million of which remains outstanding as of the Petition Date).  On January 27, 2002, JCP became a co-obligor with respect to the debentures.

(iv)     **6.375% senior notes due 2036.**  On April 27, 2007, JCP and OpCo issued $700 million of 6.375% senior unsecured notes due October 2036 (approximately $388 million of which remains outstanding as of the Petition Date).  No other Debtor entity guarantees or is otherwise obligated under the notes.

(v)     **7.40% debentures due 2037.**  On April 14, 1997, OpCo issued $400 million of 7.40% unsecured debentures due April 2037 (approximately $312 million of which remains outstanding as of the Petition Date).  On January 27, 2002, JCP became a co-obligor with respect to the debentures. No other Debtor entity guarantees or is otherwise obligated under the debentures.

(vi)      **7.625% debentures due 2097.**  On February 25, 1997, OpCo issued $500 million of 7.625% unsecured debentures due March 2097 (all of which remains outstanding as of the Petition Date).  On January 27, 2002, JCP became a guarantor with respect to the debentures.  No other Debtor entity guarantees or is otherwise obligated under the debentures.

## IV.     The RSA and Use of Cash Collateral.

98.      In conjunction with implementing the "Plan for Renewal," obtaining key debt obligation relief, and operationally right-sizing their operations, the Debtors and their advisors commenced negotiations to utilize its substantial cash on hand to fund these chapter 11 cases for the first weeks of these cases. The Company is also requesting court approval of a debtor in possession financing facility on a final basis only, at a future date.

### A.     The Debtors' Need for Use of Cash Collateral during the Interim Period.

99.      The Debtors' businesses are cash-intensive, with significant daily and monthly costs required to satisfy obligations to vendors, employees, and landlords, among others. As such, the Debtors require immediate access to the use of Cash Collateral (as defined in section 363(a) of the Bankruptcy Code) to operate their businesses, preserve value, and avoid irreparable harm in the first 25–30 days of the chapter 11 cases (the "Interim Period"), prior to approval of the proposed DIP financing. Importantly, the Debtors are *not* seeking approval of any postpetition financing facilities during the Interim Period and believe they can responsibly operate their businesses using Cash Collateral during this time.

100.     With the unexpected temporary closure of all of the Debtors' brick-and-mortar locations on March 18, 2020, approximately 85% of the Debtors' cash flow evaporated overnight. In addition, economic disturbance by COVID-19 caused cash flow from online sales to slow significantly over the same period. As a result, the Debtors' access to liquidity became seriously strained.

101.     At the same time, although the Debtors instituted the Furlough Program, they have not furloughed 100% of their employees. In addition, like many of their peers, the Debtors are hopeful that they will be in a position to reopen stores responsibly and safely in July 2020.

41

Planning for this reopening, together with continuing to operate the eCommerce platform during the pandemic, requires access to cash.

102.    Without the cash and stability provided by the DIP Facility, I believe that irreparable harm would occur as a result of the Debtors' inability to continue ordinary course operations, which would not only impact revenue generation but also risk losing the confidence of the Debtors' remaining employees, vendors, landlords, and customers.   The Debtors will materially benefit from the strong message this provides to the Debtors' key stakeholders—that operations will continue, and that the bankruptcy filing will not affect postpetition ordinary course operations.

## B.    The Restructuring Support Agreement.

103.    The RSA contemplates a comprehensive reorganization that establishes both a financially sustainable operating company ("New JCP") and a Real Estate Investment Trust (the "REIT").   New JCP will issue new equity securities (the "New JCP Common Stock") and (a) the REIT will issue new equity securities (the "REIT Interests") and (b) a lower-tier operating partnership will issue common interests ("OP Interests").   The restructuring will result in a substantial deleveraging of the Debtors' balance sheet and allow the Debtors to move expeditiously through chapter 11.   The key financial components of the restructuring are as follows:

- access to the DIP Facility, in an aggregate principal amount of $900 million, $450 million of which shall be new money which shall bear interest at a rate of either a base rate plus 10.75% per annum or LIBOR (subject to a 1.25% floor) plus 11.75% per annum, and matures 180 days after the Petition Date;

- New JCP will enter into post-effective date financing comprised of a new money revolving ABL loan and take-back term debt; and

- The REIT will enter into post-effective date financing comprised of a new money revolving loan and term debt.

42

104.     To ensure the restructuring transactions maximize value for all stakeholders, the RSA also contemplates (i) a market testing process seeking interest in and bids for, among other things, providing debt or equity financing to New JCP and/or purchasing some or all of the assets of the Debtors, and (ii) a sale "toggle" feature allowing for a potential sale of all or substantially all of the Debtors' assets to a third-party purchaser if certain plan-related milestones are unmet. Whether confirmed and consummated through the debt-for-equity transaction or a sale transaction, the plan of reorganization will permit the Debtors to seek maximum recoveries for stakeholders in a timely manner.

105.     Importantly, speed is key for a successful retail reorganization, and is of particular importance here, where JCPenney's long-term success hinges on its ability to successfully emerge prior to the back-to-school season. As a result, the RSA also contains a number of key milestones to ensure the Debtors do not languish in chapter 11.

**V.     Evidentiary Support for First Day Motions.[10]**

106.     Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors, including:

- *Debtors' Emergency Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases;*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, and (C) Maintain Existing Business Forms, and (II) Granting Related Relief;*

---

[10]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief;*

- *Debtors' <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Trade Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief;*

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief;*

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer and Charitable Programs and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief;*

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief;*

- *Debtors' <u>Emergency</u> Application for Entry of an Order Authorizing the Retention and Appointment of Prime Clerk LLC as Claims and Noticing Agent;*

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated List of Creditors and a Consolidated List of the 50 Largest Unsecured Creditors, (II) Waiving the Requirement to File a List of Equity Security Holders, and (III) Authorizing the Debtors to Redact Certain Personal Identification Information, (IV) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (V) Granting Related Relief;*

- *Debtors' <u>Emergency</u> Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs;*

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, (C) Continue to Pay Brokerage Fees, and (D) Maintain the Surety Bond Program, and (II) Granting Related Relief;*

- *Debtors' <u>Emergency</u> Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, (IV) Authorizing Certain Fee Payments for Services Performed, and (V) Granting Related Relief;* and

44

- *Debtors' <u>Emergency</u> Motion for Entry of an Order Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock.*

107.    I have consulted with advisors regarding and understand each of the First Day Motions and the relief requested therein.  To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

108.    I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximum value preservation during the pendency of these chapter 11 cases.  Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtors, their businesses, and their estates. Accordingly, for the reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Respectfully Submitted,
Dated: May 15, 2020                                      */s/ Bill Wafford*

                                                         Name: Bill Wafford
                                                         Title: Executive Vice President, Chief
                                                         Financial Officer

**Exhibit A**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 14.02, this "**Agreement**") is made and entered into as of May 15, 2020 (the "**Agreement Effective Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

    i.    J. C. Penney Company, Inc., a company incorporated under the Laws of Delaware ("**JCP**"), and each of its affiliates listed on **Exhibit B** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting First Lien Lenders (the Entities in this clause (i), collectively, the "**Company Parties**");

    ii.    certain entities that together with their affiliates and their and their affiliates' respective accounts and funds managed or advised by any of them that hold First Lien Notes Claims, or other entities that hold First Lien Notes Claims directly or indirectly on behalf of the undersigned entities, their affiliates and their and their affiliates' respective accounts and funds managed or advised by any of them, and that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting First Lien Noteholders**"); and

    iii.    certain entities that together with their affiliates and their and their affiliates' respective accounts and funds managed or advised by any of them that hold Term Loan Claims, or other entities that hold Term Loan Claims directly or indirectly on behalf of the undersigned entities, their affiliates and their and their affiliates' respective accounts and funds managed or advised by any of them, and that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company (collectively, the "**Consenting Term Lenders**" and together with the Consenting First Lien Noteholders, the "**Consenting First Lien Lenders**").

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

*RECITALS*

**WHEREAS**, the Company Parties and the Consenting First Lien Lenders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit A** hereto, including all exhibits and annexes thereto (the "**RSA Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring**");

**WHEREAS**, the Company Parties intend to implement the Restructuring, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**");

**WHEREAS**, certain of the Consenting First Lien Lenders and/or their affiliates have further agreed to provide, on a committed basis, the Company Parties with superpriority debtor-in-possession financing (the "**DIP Facility**") on the terms set forth in the term sheet attached as **Annex 2** to the RSA Term Sheet (the "**DIP Term Sheet**");

**WHEREAS**, the Restructuring also contemplates the:  (i) formation and implementation of the REIT on the terms that shall be set forth in a term sheet (the "**REIT Term Sheet**" and such transactions as described in this Agreement and the REIT Term Sheet, the "**REIT Transaction**"); (ii) implementation of the JCP Exit Facilities and the REIT Exit Loan on the terms set forth in the RSA Term Sheet; (iii) issuance of the New JCP Common Stock on the terms that shall be set forth in a term sheet (the "**New JCP Governance Term Sheet**"); (iv) issuance of the REIT Interests on the terms set forth in the RSA Term Sheet and as shall be set forth in a term sheet (such term sheet, the "**REIT Governance Term Sheet**" and, together with the REIT Term Sheet, and the New JCP Governance Term Sheet, the "**Term Sheets**");

**WHEREAS**, the Parties shall act in good faith to negotiate and finalize the terms of the Term Sheets that are not finalized as of the Agreement Effective Date as soon as practicable;

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring on the terms and conditions set forth in this Agreement and the RSA Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.** *Definitions and Interpretation*.

1.01.   Definitions.  The following terms shall have the following definitions:

"**Affiliate**" means, with respect to any person, or any other person, which indirectly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, (x) the possession, directly or

indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership, limited liability company or other ownership interests, by contract or otherwise) of such Person or (y) solely with respect to Affiliates of Consenting First Lien Lenders, the investment or voting discretion or control with respect to discretionary accounts of such Person.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Term Loan Credit Agreement, the First Lien Indenture, the Pari Passu Intercreditor Agreement, or the DIP Credit Agreement, including any successors thereto.

"**Agents/Trustees**" means, collectively, each of the Agents and Trustees.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02 (including the RSA Term Sheet and all exhibits and annexes thereto).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any proposal, offer, bid, term sheet or agreement with respect to a sale, new-money investment, restructuring, reorganization, merger, acquisition, consolidation, dissolution, debt investment, equity investment, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to the Restructuring; *provided* that a "full-chain" liquidation shall not constitute an Alternative Restructuring Proposal; *provided further* that the 363 Sale Alternative shall not constitute an Alternative Restructuring Proposal.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Brokers**" means a nationally recognized real estate broker specializing in retail properties and a nationally recognized real estate broker specializing in warehouse and distribution centers.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Business Plan Parameters**" means the processes and parameters related to the Business Plan, including those related to vendor agreements, lessor agreements, and go-forward self-funding capability.

"**Business Plan**" means a reasonably detailed business plan for New JCP and the REIT.

"**Cash Collateral**" has the meaning set forth in Section 363(a) of the Bankruptcy Code.

"**Cash Collateral Order**" means the interim order of the Bankruptcy Court authorizing the use of Cash Collateral attached as Exhibit [_] hereto, in form and substance acceptable to the Required Consenting First Lien Lenders.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including but not limited to the DIP Claims, the Term Loan Claims, the First Lien Notes Claims, the Second Lien Notes Claims, and the Unsecured Notes Claims.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, in connection with any proposed Restructuring.

"**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan in form and substance acceptable to the Required Consenting First Lien Lenders.

"**Consenting First Lien Noteholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" has the meaning set forth in Section 3.01.

"**DIP Agent**" means the "Administrative Agent," as defined in the DIP Term Sheet.

"**DIP Claims**" means any Claim against the Debtors arising under, derived from, or based upon the DIP Facility and the DIP Credit Agreement.

"**DIP Credit Agreement**" means that certain post-petition debtor-in-possession credit agreement evidencing the DIP Facility entered into in accordance with the DIP Order (as the same may be amended, amended and restated, modified or supplemented from time to time in accordance with its terms) terms and conditions of, and subject in all respects to the DIP Term Sheet and the DIP Order in form and substance acceptable to the Required Consenting First Lien Lenders.

"**DIP Facility**" has the meaning set forth in the preamble to this Agreement.

"**DIP Lenders**" has the meaning ascribed to it in the DIP Term Sheet.

"**DIP Loan Documents**" means the DIP Credit Agreement for the DIP Facility entered into in accordance with the DIP Order by the Company Parties and the lenders party thereto, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, which, on and after the Agreement Effective Date, shall be in form and substance acceptable to the Company Parties and the DIP Secured Parties and the Required Consenting First Lien Lenders.

"**DIP Order**" means the order of the Bankruptcy Court authorizing entry into the DIP Facility and the use of Cash Collateral on a final basis and incorporating the terms and conditions set forth in the DIP Credit Agreement and in form and substance acceptable to the DIP Agent and the Required Consenting First Lien Lenders.

"**DIP Secured Parties**" means the DIP Lenders together with the DIP Agent and [the Issuing Banks and the other Secured Parties (each as defined in the DIP Credit Agreement)].

"**DIP Term Sheet**" has the meaning set forth in the preamble to this Agreement.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Exit Costs**" means the costs and expenses of emerging from the Chapter 11 Cases pursuant to the Plan, including, without limitation, accrued but unpaid professional fees, estimated additional professional fees (including transaction, success and similar fees), unpaid 503(b)(9) claims, contract and lease cure costs, and other accrued but unpaid administrative expenses.

"**Exit Costs Estimate**" means a good faith estimate prepared by the Company Parties and their advisors of the Exit Costs associated with the Plan.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**First Lien Debt**" means, collectively, the First Lien Notes and the Term Loans.

"**First Lien Indenture**" means that certain Indenture, dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time),

by and among JCP, as issuer, certain of the Company Parties, as guarantors, and Wilmington Trust, National Association, as the trustee.

"**First Lien Notes**" means the 5.875% Senior Secured Notes, due 2023, outstanding under the First Lien Indenture.

"**First Lien Notes Claim**" means any Claim on account of the First Lien Notes.

"**First Lien Notes Trustee**" means Wilmington Trust, National Association, in its capacity as trustee under the First Lien Indenture, together with its successors and permitted assigns.

"**JCP**" has the meaning set forth in the preamble to this Agreement.

"**JCP Exit Facilities**" means the New JCP ABL and the New JCP Term Loan, collectively, in form and substance acceptable to the Required Consenting First Lien Lenders.

"**JCP Exit Facilities Documents**" means, collectively, the New ABL Credit Agreement, the New Term Loan Credit Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the JCP Exit Facilities, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents in form and substance acceptable to the Required Consenting First Lien Lenders.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit D**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Lease Optimization Plan**" means a plan developed by the Company Parties and their advisors (including the applicable Broker) for the optimization of the Company Parties' leased real estate including information regarding all discussions with existing landlords regarding lease modification or monetization.

"**Market Test**" means a market test process pursuant to which interest will be solicited regarding (a) providing new money debt financing to either New JCP or the REIT (including financing that would "take-out" any of the "take back" paper otherwise proposed for the Plan, (b) the sale or sale sale/leaseback of the Debtors' owned distribution centers, (c) the provision of new capital to either New JCP or the REIT in exchange for equity in such entity, (d) the purchase of New JCP, the REIT or substantially all of the assets of either as a going concern, and (e) the purchase of all or part of the Debtors' assets.

"**Market Test Documents**" means the all documents related to the Market Test, including any agreements documenting a transaction identified in the Market Test and any orders implementing such transaction.

"**Milestones**" means the milestones set forth in Section 4 of this Agreement.

"**New JCP**" means either (i) J. C. Penney Company, Inc., as reorganized pursuant to and under the Plan, or any successor or assign thereto, by merger, amalgamation, consolidation or otherwise, on or after the Plan Effective Date, or (ii) a new corporation or limited liability company that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors in the Chapter 11 Cases and issue the New JCP Common Stock to be distributed pursuant to the Plan.

"**New JCP ABL**" has the meaning set forth on the RSA Term Sheet.

"**New JCP ABL Credit Agreement**" means that certain agreement evidencing the New JCP ABL in accordance with the terms, and subject in all respects to the conditions, as set forth in this Agreement and the RSA Term Sheet (and all exhibits and annexes thereto) in form and substance acceptable to the Required Consenting First Lien Lenders.

"**New JCP ABL Documents**" means, collectively, the New JCPABL Credit Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the New JCP ABL, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents in form and substance acceptable to the Required Consenting First Lien Lenders.

"**New JCP Common Stock**" has the meaning set forth in the RSA Term Sheet.

"**New JCP Common Stock Documents**" means the definitive documentation with respect to the New JCP Common Stock to be issued in accordance with the Plan in form and substance acceptable to the Required Consenting First Lien Lenders.

"**New JCP Governance Documents**" means the organizational and governance documents for New JCP [and its subsidiaries], including, without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, and limited partnership agreements (or equivalent governing documents), which New JCP Governance Documents shall be in accordance with this Agreement, the RSA Term Sheet, and the New JCP Governance Term Sheet, in form and substance acceptable to the Required Consenting First Lien Lenders.

"**New JCP Governance Term Sheet**" has the meaning set forth in the preamble to this Agreement.

"**New Organizational Documents**" has the meaning set forth in the RSA Term Sheet.

"**New JCP Term Loan**" has the meaning set forth in the RSA Term Sheet.

"**New JCP Term Loan Credit Agreement**" means that certain agreement evidencing the New JCP Term Loan in accordance with the terms, and subject in all respects to the conditions, as set forth in this Agreement and the RSA Term Sheet (and all exhibits and annexes thereto) in form and substance acceptable to the Required Consenting First Lien Lenders.

"**New JCP Term Loan Documents**" means, collectively, the New JCP Term Loan Credit Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the New JCP Term Loan, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents in form and substance acceptable to the Required Consenting First Lien Lenders.

"**New REIT Governance Documents**" means the organizational and governance documents for the REIT, including, without limitation, articles of incorporation, bylaws, charter, and other similar organizational and constituent documents for the REIT, which the New REIT Governance Documents shall be in accordance with this Agreement (including the RSA Term Sheet, and all exhibits and annexes thereto), all in form and substance acceptable to the Required Consenting First Lien Lenders.

"**Owned Real Estate Optimization Plan**" means a plan developed by the Company Parties and their advisors (including the Brokers) for the optimization of the Company Parties' owned real estate including information regarding all indications of value received by a Company Party or their advisors for any such owned real estate in the last twelve months.

"**Pari Passu Collateral Agent**" means Wilmington Trust, National Association, together with its permitted successors in its capacity as collateral agent pursuant to the Pari Passu Intercreditor Agreement.

"**Pari Passu Intercreditor Agreement**" means that certain Pari Passu Intercreditor Agreement, dated as of June 23, 2016, by and among *inter alios*, the Pari Passu Collateral Agent, JPMorgan Chase Bank, as Term Loan Authorized Representative for the Term Loan Secured Parties, Wilmington Trust, National Association, as Notes Authorized Representative for the Notes Secured Parties, and each of the additional Authorized Representatives party thereto from time to time, as amended, restated, amended and restated, extended, supplemented, or otherwise modified from time to time.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" means each transfer of any Company Claims/Interests that meets the requirements of Section 9.01.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court, all in form and substance acceptable to the Required Consenting First Lien Lenders.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**REIT**" means a [newly formed] [] [corporation or statutory real estate investment trust], formed in accordance with the terms of the RSA Term Sheet, the REIT Term Sheet, and the REIT Governance Term Sheet.

"**REIT Exit Loan**" means the REIT Revolver and REIT Term Loan, collectively, in form and substance acceptable to the Required Consenting First Lien Lenders.

"**REIT Exit Loan Documents**" means, collectively, the REIT Revolver Agreement, the REIT Term Loan Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the REIT Exit Loan, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents in form and substance acceptable to the Required Consenting First Lien Lenders..

"**REIT Interests**" has the meaning set forth in the RSA Term Sheet.

"**REIT Interests Documents**" means the definitive documentation with respect to the New REIT Interests to be issued in accordance with the Plan in form and substance acceptable to the Required Consenting First Lien Lenders.

"**REIT Revolver**" has the meaning set forth in the RSA Term Sheet.

"**REIT Revolver Agreement**" means that certain agreement evidencing the REIT Revolver in accordance with the terms, and subject in all respects to the conditions, as set forth in this Agreement, and the RSA Term Sheet (and all exhibits and annexes thereto) in form and substance acceptable to the Required Consenting First Lien Lenders.

"**REIT Revolver Documents**" means, collectively, the REIT Revolver Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the REIT Revolver, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents in form and substance acceptable to the Required Consenting First Lien Lenders.

"**REIT Term Loan**" has the meaning set forth in the RSA Term Sheet.

"**REIT Term Loan Agreement**" means that certain agreement evidencing the REIT Term Loan in accordance with the terms, and subject in all respects to the conditions, as set forth in this

Agreement, and the RSA Term Sheet (and all exhibits and annexes thereto) in form and substance acceptable to the Required Consenting First Lien Lenders.

"**REIT Term Loan Documents**" means, collectively, the REIT Term Loan Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the REIT Term Loan, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents in form and substance acceptable to the Required Consenting First Lien Lenders.

"**REIT Transaction**" has the meaning set forth in the recitals to this Agreement.

"**Reorganized Debtor**" means, collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

"**Required Consenting First Lien Lenders**" means, as of the relevant date, Consenting First Lien Lenders holding at least 50.01% of the aggregate outstanding principal amount of First Lien Debt held by Consenting First Lien Lenders.

"**Required DIP Lenders**" means the Required Lenders, as defined in the DIP Term Sheet.

"**Restructuring**" has the meaning set forth in the recitals to this Agreement.

"**RSA Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Second Lien Indenture**" means that certain Indenture, dated as of March 12, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among J. C. Penney Corporation, Inc., as issuer, certain of the Company Parties, as guarantors, and Wilmington Trust, National Association, as the trustee.

"**Second Lien Notes**" means the 8.625% Senior Secured Notes, due 2025, outstanding under the Second Lien Indenture.

"**Second Lien Notes Claim**" means any Claim on account of the Second Lien Notes.

"**Second Lien Notes Trustee**" means Wilmington Trust, National Association, in its capacity as trustee under the Second Lien Indenture, together with its successors and permitted assigns.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan.

"**Term Lenders**" means the lenders party from time to time to the Term Loan Credit Agreement.

"**Term Loan Agent**" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Term Loan Credit Agreement.

"**Term Loan Claims**" means any Claim on account of the Term Loans.

"**Term Loan Credit Agreement**" means that certain Amended and Restated Credit and Guaranty Agreement (as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time), dated as of June 23, 2016, by and among, *inter alios*, J. C. Penney Corporation, Inc., as borrower, certain of the Company Parties, as guarantors, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto from time to time.

"**Term Loans**" means loans outstanding under the Term Loan Credit Agreement.

"**Term Sheets**" has the meaning set forth in the recitals.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, 12.04, or 12.05.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity under the First Lien Notes.

"**Unsecured Indenture**" means that certain Indenture, dated as of September 15, 2014 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among JCP and J. C. Penney Corporation, Inc., as issuers and Wilmington Trust, National Association, as the trustee.

"**Unsecured Notes**" means the 8.125% Unsecured Notes, due 2025, outstanding under the Unsecured Indenture.

"**Unsecured Notes Claim**" means any Claim on account of the Unsecured Notes.

"**Unsecured Notes Trustee**" means Wilmington Trust, National Association, in its capacity as trustee under the Unsecured Indenture, together with its successors and permitted assigns.

1.02.   Interpretation.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribe or allowed herein.  If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

(f)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(g)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(h)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(i)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws; and

(j)      the use of "include" or "including" is without limitation, whether stated or not.

**Section 2.**      *Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties as of 12:01 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties and

(b)      Consenting First Lien Lenders with respect to at least 66 2/3% of the aggregate outstanding principal amount of First Lien Debt shall have executed and delivered counterpart signature pages of this Agreement.

**Section 3.**      *Definitive Documents*.

3.01.    The definitive documents governing the Restructuring shall include without limitation the following (collectively with any other material documents necessary to consummate the Restructuring, the "Definitive Documents"): (A) the Plan (and any and all exhibits, annexes, and schedules thereto);  (B) the Plan Supplement (which shall include the form of the Management Incentive Plans, the form of the New Organizational Documents, [and the form of the New Employment Agreements]; (C) the Confirmation Order; (D) the Disclosure Statement and the other Solicitation Materials; (E) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (F) all pleadings filed by the Company Parties in connection with the Chapter 11 Cases (or related orders) to the extent such pleadings seek relief in connection with the transactions contemplated herein, including the First Day Pleadings and all orders sought pursuant thereto; (G) the Cash Collateral Order; (H) the DIP Loan Documents; (I) the DIP Order; (J) the New JCP Common Stock Documents; (K) the New REIT Interests Documents; (L)  the JCP Exit Facilities Documents; (M) the REIT Exit Loan Documents; (N) any other disclosure documents related to the issuance of the New JCP Common Stock; (O) any other disclosure documents related to the issuance of the New REIT Interests, and (P) any Market Test Documents.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Agreement Effective Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 13.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Agreement Effective Date shall otherwise be in form and substance consistent with the term sheets attached hereto and otherwise acceptable to the Company Parties and the Required Consenting First Lien Lenders.  Each Party agrees that it shall act in good faith and use and undertake commercially reasonable efforts to negotiate and finalize the terms of the Definitive Documents that are not finalized as of the date hereof, *provided* that the Parties shall act in good faith to negotiate and finalize the terms of the Term Sheets that are not finalized as of the Agreement Effective Date as soon as practicable following the Petition Date.

**Section 4.**    *Milestones*.

4.01.    The following Milestones shall apply to the Restructuring unless extended or waived in writing by the Company Parties and the Required Consenting First Lien Lenders:

(a)    no later than May 16, 2020 the Debtors shall commence the Chapter 11 Cases;

(b)    no later than 14 Business Days after the Petition Date, the Debtors shall have filed a motion to retain Brokers acceptable to the Required Consenting First Lien Parties;

(c)    no later than 18 calendar days after the Petition Date, the Bankruptcy Court shall have entered the DIP Order;

(d)    no later than June 15, 2020, the Debtors will have delivered a Lease Optimization Plan and an Owned Real Estate Optimization Plan, each in form and substance acceptable to the Required Consenting First Lien Lenders, to the Consenting First Lien Lenders.

(e)      no later than June 15, 2020 the Company Parties shall have delivered proposed Business Plan Parameters to the Consenting First Lien Lenders and the DIP Lenders;

(f)      no later than June 20, 2020 the Company Parties and the Required Consenting First Lien Lenders shall have agreed on acceptable Business Plan Parameters;

(g)      no later than July 8, 2020, the Company Parties shall have delivered a Business Plan (consistent with the acceptable Business Plan Parameters) to the Consenting First Lien Lenders and the DIP Lenders;

(h)      no later than July 14, 2020, the Company Parties and the Required Consenting First Lien Lenders shall have agreed on an acceptable Business Plan;

(i)      no later than 130 days after the Petition Date the Bankruptcy Court shall have entered an order either (A) approving the Disclosure Statement or (B) acceptable bidding procedures;

(j)      no later than 160 days after the Petition Date, the Bankruptcy Court shall have entered either (A) the Confirmation Order or (B) approving an acceptable sale or sales; and

(k)      no later than November 15, 2020 the Plan Effective Date shall have occurred.]

4.02.   The Milestones may be extended by the Company Parties with the prior written consent (email from counsel being sufficient) of the Required Consenting First Lien Lenders.

**Section 5.**      ***Commitments of the Consenting First Lien Lenders***

5.01.   <u>General Commitments and Waivers</u>.

(a)      During the Agreement Effective Period, each Consenting First Lien Lender (severally and not jointly) agrees, in respect of all of its Company Claims/Interests, to:

(i)      support the Restructuring, including without limitation the REIT Transaction and the Market Test, and vote for or otherwise support any matter requiring approval to the extent necessary to implement the Restructuring;

(ii)      use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring from the Company Parties' other First Lien Lenders;

(iii)      negotiate in good faith and use commercially reasonable efforts to execute and deliver any appropriate additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of, the Restructuring;

(iv)      negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement and to which it is required to be a party;

(v)      give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the Restructuring, including, to the extent such Consenting First Lien Lenders holds First Lien Notes Claims or Term Loan Claims, directing the Pari Passu Collateral Agent, the First Lien Notes Trustee,  and the Term Loan Agent, as applicable, to consent to adequate protection arrangements set forth in the [DIP Term Sheet/DIP Loan Documents];

(vi)      act in good faith to negotiate and finalize the terms of the Term Sheets that are not finalized as of the Agreement Effective Date as soon as practicable;

(vii)      use commercially reasonable efforts to cause the Company Parties to extend any offer made by the Company Parties to such Consenting First Lien Lender to all Consenting First Lien Lenders on a ratable basis; and

(b)      During the Agreement Effective Period, each Consenting First Lien Lender (severally and not jointly) agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring, including the DIP Facility; or (y) encourage any person or entity to do any of the foregoing;

(ii)      propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Company Claims/Interests, including rights or remedies arising from or asserting or bringing any Claims under or with respect to the Term Loan Credit Agreement or the First Lien Indenture that are inconsistent with this Agreement or the Definitive Documents;

(vi)      object to or commence any legal proceeding challenging the adequate protection granted or proposed to be granted to the holders of First Lien Note Claims and Term Loan Claims under the DIP Order or Cash Collateral Order; or

(vii)      object to or commence any legal proceeding challenging the liens or claims (including the priority thereof) granted or proposed to be granted to the DIP Lenders under the DIP Order or Cash Collateral Order.

5.02.   Commitments with Respect to Chapter 11 Cases.

(a)     During the Agreement Effective Period, each Consenting First Lien Lender (severally and not jointly) that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting First Lien Lenders of the Solicitation Materials:

(i)     vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    not object to the Plan;

(iii)   support the mutual release, exculpation, and injunction provisions to be provided in the Plan;

(iv)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(v)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i),(ii), (iii), and (iv) above.

(b)     During the Agreement Effective Period, each Consenting First Lien Lender (severally and not jointly), in respect of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 6.     *Additional Provisions Regarding the Consenting First Lien Lenders' Commitments*.**

6.01.   Generally.  Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting First Lien Lenders to consult with any other Consenting First Lien Lenders, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting First Lien Lenders to assert or raise any objection permitted under this Agreement in connection with the Restructuring; and (c) prevent any Consenting First Lien Lenders from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

6.02.   DIP Facility.  Capitalized terms used but not defined in this Section 6.02 shall have the meaning set forth in the DIP Term Sheet, the DIP Loan Documents, the DIP Order, or the Cash Collateral Order, as applicable.

(a)     Notwithstanding anything contained in this Agreement, nothing in this Agreement shall affect the rights of the DIP Agent and the DIP Lenders under the DIP Order or the DIP Loan

Documents and to the extent of any conflict between this Agreement and the DIP Order or the DIP Loan Documents, the DIP Order or the DIP Loan Documents, as applicable, shall govern.

(b)       Each of the Consenting First Lien Lenders irrevocably consents to (i) the DIP Facility as set forth in the DIP Term Sheet, (ii) entry of the DIP Order, and (iii) entry of the Cash Collateral Order.

**Section 7.       *Commitments of the Company Parties*.**

7.01.   Affirmative Commitments.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a)       support and take all steps reasonably necessary and desirable to consummate the Restructuring in accordance with this Agreement;

(b)       to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)       use best efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring;

(d)       negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring as contemplated by this Agreement;

(e)       use commercially reasonable efforts to seek additional support for the Restructuring from their other material First Lien Lenders to the extent reasonably prudent;

(f)       provide counsel to the Consenting First Lien Lenders a reasonable opportunity to review draft copies of all First Day Pleadings and all other material pleadings filed by the Company Parties in the Chapter 11 Cases

(g)       provide on the first day of each month an updated Exit Costs Estimate to the Consenting First Lien Lenders;

(h)       provide the Consenting First Lien Lenders with drafts of the Lease Optimization Plan and the Owned Real Estate Optimization Plan no later than the Friday of each week beginning with June 1, 2020, consult with the Consenting First Lien Lenders and their advisors regarding the same, and consider in good faith all suggestions of the Consenting First Lien Lenders and their advisors regarding the same; and

(i)       Extend any offer made to one or more Consenting First Lien Lenders to all Consenting First Lien Lenders (on a *pro rata* basis).

7.02.   Negative Commitments.  Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring described in, this Agreement or the Definitive Documents;

(c)      modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(d)      file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

**Section 8.      *Additional Provisions Regarding Company Parties' Commitments*.**

8.01.    Notwithstanding anything to the contrary in this Agreement, if a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel determines that applicable Law or its fiduciary obligations under applicable Law requires taking an action prohibited by this Agreement or refraining from taking an action required by this Agreement, the relevant Company Party may terminate this Agreement in accordance with Section 12.02(B) of this Agreement.

8.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions or negotiations of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiation with holders of Claims against or Equity Interests in a Company Party (including any Consenting First Lien Lenders), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring or Alternative Restructuring Proposals.

8.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.      *Transfer of Interests and Securities*.**

9.01.    During the Agreement Effective Period, no Consenting First Lien Lender shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated

or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)    the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (iii) an institutional accredited investor (as defined in the Rules), or (iv) a Consenting First Lien Lender; and

(b)    either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting First Lien Lender and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

9.02.    Upon compliance with the requirements of Section 9.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests. Any Transfer in violation of Section 9.01 shall be void *ab initio*.

9.03.    This Agreement shall in no way be construed to preclude the Consenting First Lien Lenders from acquiring additional Company Claims/Interests; *provided*, *however*, that such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting First Lien Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting First Lien Lender).

9.04.    This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting First Lien Lender to Transfer any of its Company Claims/Interests. Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (a) such Qualified Marketmaker subsequently Transfers such Company Claims/Interests within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee; and (c) the Transfer otherwise is a Permitted Transfer. To the extent that a Consenting First Lien Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting First Lien Lender without the requirement that the transferee be a Permitted Transferee.

9.06.    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 10.    *Representations and Warranties of Consenting First Lien Lenders*.**    Each Consenting First Lien Lender severally, and not jointly, represents and warrants that, as of the date such Consenting First Lien Lender executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it (or its affiliates and its and their respective accounts and funds managed by any of them or other entities that hold interests directly or indirectly on behalf of its affiliates its and their respective accounts and funds managed by any of them): (i) is the direct or indirect beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting First Lien Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 9); and (ii) has the full power and authority to act on behalf of, vote and consent to matters concerning such Company Claims/Interests;

(b)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction (including, for the avoidance of doubt, any placement "on loan"), right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting First Lien Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(c)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting First Lien Lenders in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 11.    *Mutual Representations, Warranties, and Covenants*.**    Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Plan Effective Date:

(a)    it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.    *Termination Events*.**

12.01.  <u>Consenting First Lien Lenders Termination Events</u>.  This Agreement may be terminated by the Required Consenting First Lien Lenders by the delivery to the Company Parties of a written notice in accordance with Section 14.10 hereof upon the occurrence of the following events:

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured for ten (10) Business Days after such terminating Consenting First Lien Lenders transmit a written notice in accordance with Section 14.10 hereof detailing any such breach;

(b)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) remains in effect for thirty (30) calendar days after such terminating Consenting First Lien Lenders transmit a written notice in accordance with Section 14.10 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Consenting First Lien Lenders group if a holder of such Consenting First Lien Lenders group sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)      the Bankruptcy Court enters an order denying confirmation of the Plan;

(d)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting First Lien Lenders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement;

(e)     the Company Parties lose access to the use of Cash Collateral in accordance with the Cash Collateral Order, subject to any applicable remedies notice period;

(f)     the Company Parties lose access to the use of the DIP Facility in accordance with the DIP Order, subject to any applicable remedies notice period; or

(g)     subject to any extension set forth in Section 4.02, the failure of the Company Parties to comply with a Milestone, which Milestone has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of a holder included in the applicable the terminating Consenting First Lien Lenders group in violation of its obligations under this Agreement.

12.02. Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by one or more of the Consenting First Lien Lenders of any provision set forth in this Agreement that remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting First Lien Lenders of notice of such breach;

(b)     the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; provided, that this termination right shall not apply to or be exercised by the Company Parties if any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

(d)     the Bankruptcy Court enters an order denying confirmation of the Plan.

12.03. Individual Termination.   Any individual Consenting First Lien Lender may terminate this Agreement, as to itself only, by the delivery to counsel to the Company Parties and the Consenting First Lien lenders of a written notice setting forth the basis for such termination:

(a)     in the event that the Required Consenting First Lien Lenders agree to extend or waive a Milestone or to amend this Agreement to remove a Milestone, any Consenting First Lien Lender that has not agreed to such extension, waiver, or removal may terminate this Agreement as to itself by notice delivered within the earlier of (X) five Business Days after such extension, waiver, or removal and (Y) the second Business Day after such Milestone would have been required to occur but for such waiver, extension, or removal; provided that any such termination must occur before the satisfaction of such Milestone;

(b)      if the Company Parties fail to meet any Milestone (and such Milestone is not extended, waived, or removed in accordance with the terms of this Agreement) then any Consenting First Lien Lender may terminate this Agreement as to itself by notice delivered within five Business Days of such Milestone failure;

(c)      if such Consenting First Lien Lender has not consented to the form and substance of the Lease Optimization Plan or the Owned Real Estate Optimization Plan by June 15, 2020, such Consenting First Lien Lender may terminate this Agreement as to itself by notice delivered no later than June 22, 2020;or

(d)      if such Consenting First Lien Lender has not consented to the form and substance of the Plan, such Consenting First Lien Lender may terminate this Agreement as to itself by notice delivered no later than five Business Days after such Plan is filed with the Bankruptcy Court by a Company Party.

12.04.  Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting First Lien Lenders; and (b) each Company Party.

12.05.  Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.  This Agreement shall also automatically terminate in the event that Consenting First Lien Lenders representing a majority of the aggregate outstanding principal amount of First Lien Debt that was held by Consenting First Lien Lenders as of the Agreement Effective Date exercise their individual termination rights pursuant to Section 12.03.

12.06.  Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise; provided, however, any Consenting First Lien Lender withdrawing or changing its vote pursuant to this Section 12.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting First Lien Lender from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under

this Agreement), remedies, and interests, including its claims against any Consenting First Lien Lenders, and (b) any right of any Consenting First Lien Lender, or the ability of any Consenting First Lien Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting First Lien Lenders. No purported termination of this Agreement shall be effective under this Section 12.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(b) or Section 12.02(d). Nothing in this Section 12.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b).

**Section 13.** *Amendments and Waivers*.

(a) This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

(b) This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by each Company Party and the Required Consenting First Lien Lenders; *provided*, *however*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting First Lien Lender in a manner different from the effect on the Company Claims/Interests held by other Consenting First Lien Lenders, then the consent of each such affected Consenting First Lien Lender shall also be required to effectuate such modification, amendment, waiver or supplement.

(c) Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(d) The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.** *Miscellaneous*.

14.01. <u>Acknowledgement</u>. Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02. <u>Exhibits Incorporated by Reference; Conflicts</u>. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part

of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.  In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the RSA Term Sheet, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.  In the event of any inconsistency between the RSA Term Sheet (without reference to the exhibits, annexes, and schedules thereto) and the exhibits, annexes, and schedules thereto, such exhibits, annexes, and schedules thereto shall govern.  In the event of any inconsistency between the terms of this Agreement (including all exhibits, annexes, and schedules hereto) and the Plan, the terms of the Plan shall govern.

14.03.  Further Assurances.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring, as applicable.

14.04.  Complete Agreement.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05.  GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in federal or state courts located in the City of New York, Borough of Manhattan.  Notwithstanding the foregoing consent to jurisdiction, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto; and (d) consents to entry of a final order or judgment by the Bankruptcy Court.

14.06.  TRIAL BY JURY WAIVER.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07.  Execution of Agreement.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute

the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting First Lien Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting First Lien Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Company Party, to:

J. C. Penney Corporation, Inc.
6501 Legacy Drive
Plano, Texas 75024
Attn: Brandy Treadway
E-mail address: btreadwa@jcp.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:   Joshua Sussberg
        Christopher Marcus
        Aparna Yenamandra
E-mail address:       joshua.sussberg@kirkland.com;
                      christopher.marcus@kirkland.com;
                      aparna.yenamandra@kirkland.com

(b)      if to a Consenting First Lien Lender, to the address set forth on such Consenting First Lien Lenders' signature page hereto:

with copies to (which shall not constitute notice):

Milbank LLP

55 Hudson Yards
New York, New York 10001
Attn:   Dennis F. Dunne
        Andrew M. Leblanc
        Thomas R. Kreller
        Brian Kinney
E-mail address:        ddunne@milbank.com
                       aleblanc@milbank.com
                       tkreller@milbank.com
                       bkinney@milbank.com

Any notice given by delivery, mail, or courier shall be effective when received.

14.11.  Independent Due Diligence and Decision Making.  Each Consenting First Lien Lenders hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.12.  Enforceability of Agreement.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  Waiver.   If the Restructuring are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  Several, Not Joint, Claims.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16.  Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions

shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17. <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18. <u>Capacities of Consenting First Lien Lenders</u>.   Each Consenting First Lien Lender has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19. <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 13, or otherwise, including a written approval by the Company Parties or the Required Consenting First Lien Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.20. <u>Publicity</u>. The Company Parties will submit to counsel to the Consenting First Lien Lenders all press releases, public filings, or public announcements, in each case, to be made relating to this Agreement or the transactions contemplated hereby and any amendments thereof in advance of release and will consult with such counsel with respect to such communications. For the avoidance of doubt, such press releases, public filings, or public announcements are to be made solely by the Company Parties and not by any other Party to this Agreement.   Nothing contained herein shall be deemed to waive, amend or modify the terms of any Confidentiality Agreement.

*[Remainder of page intentionally left blank.]*

# EXHIBIT A

## RSA Term Sheet

*Execution Version*

---

## J. C. PENNEY COMPANY, INC.

## RESTRUCTURING TERM SHEET

### May 15, 2020

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES AS TO ANY EXCHANGE OR CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH SECTION 4(A)(2) OF THE SECURITIES ACT OF 1933 AND/OR SECTION 1145 OF THE BANKRUPTCY CODE AND ALL APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS.

---

This Term Sheet (the "**Term Sheet**") sets forth the principal terms of a restructuring (the "**Restructuring**") of J. C. Penney Company, Inc. ("**JCP**"), a company incorporated under the Laws of Delaware, and each of its affiliates party to the Restructuring Support Agreement ("**RSA**") to which this Term Sheet is attached as Exhibit A (together with JCP, collectively, the "**Company Parties**" or the "**Debtors**"). The regulatory, corporate, tax, accounting, and other legal and financial matters related to the Restructuring have not been fully evaluated, and any such evaluation may affect the terms and structure of any Restructuring. The transactions contemplated in this Term Sheet are subject in all respects to the negotiation, execution, and delivery of definitive documentation.

This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions. Nothing contained in this Term Sheet shall be an admission of fact or liability or, until the occurrence of the Execution Date on the terms described herein and in the RSA, deemed binding on any of the parties hereto.

This Term Sheet does not purport to summarize all of the terms, conditions, covenants, and other provisions that may be contained in the fully negotiated and definitive documentation necessary to implement the Restructuring. Capitalized terms used but not otherwise defined in this Term Sheet shall have the meanings ascribed to such terms in the annexes attached hereto or in the RSA.

| KEY PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Overview** | The Restructuring will be accomplished through the Company Parties commencing Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court for the Southern District of Texas. |
| | The goal of the Parties will be to pursue a Chapter 11 Plan on the terms below that establishes both a financially sustainable operating company ("**New JCP**") and a Real Estate Investment Trust (the "**REIT**").[1]  In order to achieve this result, the Debtors will, in accordance with the provisions of this Term Sheet and the RSA: |
| | • Prepare a Plan and Disclosure Statement consistent with this term sheet; |
| | • Prepare additional diligence materials as necessary to determine the assets to be contributed to the REIT; |
| | • Pursue a sale/leaseback of the Debtors' owned distribution centers; |
| | • Conduct an in-depth analysis of the Debtors' existing leases and determine whether to reject or seek concessions form their landlords; |
| | • Seek an order approving the adequacy of the Disclosure Statement and approving solicitation procedures; and |
| | • Conduct a market testing process (the "**Market Test**") seeking interest and bids in providing debt or equity financing to New JCP and/or purchasing some or all of the assets of the Debtors. |
| **Current Capital Structure** | Current capital structure: |
| | i.  the extensions of credit made under the Credit Agreement, dated as of June 20, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**ABL Facility**"), by and among JCP, J. C. Penney Corporation, Inc. ("**JCP Corp.**"), J. C. Penney Purchasing Corporation, the Lenders party thereto (the "**ABL Lenders**"), Wells Fargo Bank, National Association, as  Administrative Agent, Collateral Agent, Revolving Agent, Swingline Lender, and LC Agent, and the other parties thereto and (B) each counterparty to a swap agreement constituting a Secured Swap Obligation (as defined in the ABL Facility) (a "**Swap Counterparty**") ((A) and (B), collectively, the "**ABL Claims**"); |
| | ii.  the loans (the "**Term Loans**") borrowed under the Amended and Restated Credit and Guaranty Agreement, dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among, *inter alios*, JCP Corp., as Borrower, the Guarantors party thereto, the Lenders party thereto (the "**Term Loan Lenders**"), and JP Morgan Chase Bank, N.A., as Administrative Agent (in such capacity, the "**Term Loan Agent**") (the "**Term Loan Claims**"); |
| | iii.  the 5.875% Senior Secured Notes due 2023 (the "**First Lien Notes**" and, the holders of the First Lien Notes, the "**First Lien Noteholders**"; the First Lien Noteholders, together with the Term Loan Lenders, |

---

[1]  The REIT shall be organized as an "UPREIT," with its assets indirectly owned through an operating partnership (the "**OP**"). References in this term sheet to the REIT may include the REIT or the OP as context requires.

| KEY PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | the "**First Lien Lenders**") issued under the Indenture, dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among JCP Corp., as Issuer, the Guarantors party thereto, and Wilmington Trust National Association, as Trustee (in such capacity, the "**First Lien Notes Trustee**") (the "**First Lien Note Claims**," and together with the Term Loan Claims, the "**First Lien Claims**"); |
| | iv.  the 8.625% Senior Secured Second Priority Notes due 2025 issued under the Indenture (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), dated as of March 12, 2018, by and among JCP Corp., as Issuer, the Guarantors party thereto, and Wilmington Trust, National Association, as Trustee (the "**Second Lien Note Claims**"); |
| | v.  all outstanding unsecured senior notes issued by the Debtors (the "**Unsecured Note Claims**"); and |
| | vi.  all other unsecured claims against the Debtors (the "**Other Unsecured Claims**"); and |
| | vii.  common equity interests in JCP. |
| **DIP Facilities** | Certain Consenting First Lien Lenders (in such capacity, collectively, the "**DIP Lenders**") commit to provide a $900 million senior secured superpriority DIP Facility, $450 million of which will be in the form of new money, on the terms set forth in the DIP Term Sheet attached hereto as **Annex 1**. |
| **REIT Structure** | A subset of the Debtors' properties, mutually identified by the Debtors and the Required Consenting First Lien Lenders, will be transferred to the REIT. The stores in the REIT shall be leased to New JCP pursuant to a market-rate master lease.  Pursuant to the Plan and with the consent of the Required Consenting First Lien Lenders, up to 35% of the REIT Interests (defined below) may be sold to a strategic third party investor, and the proceeds of such sale may either be used to provide funding for the REIT or to allow for the distribution of cash in lieu of such equity under the Plan. |
| **Business Plan** | The Debtors will develop a business plan acceptable to the Required Consenting First Lien Lenders for New JCP and the REIT.[2]  The Debtors will retain a nationally recognized real estate broker acceptable to the Required Consenting First Lien Lenders to analyze the Debtors' store portfolios and any excess real estate.  The Debtors and such advisors will consult with the Consenting First Lien Lenders with respect any determination whether to assume, reject, assume with modifications, or sell any such real property leases and/or real property (or enter into any similar transaction).  The assumption, rejection, or sale of such real property leases and/or real property (or enter into any similar transaction) shall be subject to the consent of the Required Consenting First Lien Lenders.  The Required |

---

[2]  Parties to discuss in good faith and reasonably agree on the inclusion of financial tests (if any) following review of updated budget and provision of updated Business Plan that will form the basis for operational covenants. Financial conditions to be calculated based on financial levels needed to exit.

3

| KEY PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | Consenting First Lien Lenders will inform the Debtors by May 21, 2020 whether they consent to the rejection of the leases associated with the stores identified for closure in connection with the business plan provided on May 6, 2020 (if they so consent, the "Agreed Closing Stores"). |
| **Distribution Centers** | The Debtors will retain a nationally recognized broker specializing in warehouse and distribution centers (acceptable to the Required Consenting First Lien Lenders) to analyze the Debtors' distribution centers and will pursue the sale (including by way of full or partial sale/leaseback) of the Debtors' owned distribution centers property (or enter into a similar transaction) and will use the proceeds to fund the Plan. Any such sale (or similar transaction) will be subject to the approval of the Required Consenting First Lien Lenders and the Bankruptcy Court. |
| **Plan Overview** | Unless the Market Test achieves a superior outcome (as determined by the Required Consenting First Lien Lenders) or the Toggle Event occurs, the Debtors and the Consenting Lenders will pursue a Plan of Reorganization under which parties may receive the treatment set forth below. The composition of the forms of consideration set forth below (including for the avoidance of doubt the entities at which Holders of Claims receive such consideration) are preliminary and subject to change in the Definitive Documentation (which Definitive Documentation may provide for parties to hold portions of such consideration on a temporary or bridge basis): |
| | i. The Plan will be funded, in part by (a) a new money revolving ABL loan in an amount not less than $[●] on New JCP (the "**New JCP ABL**") on terms acceptable to the Required Consenting First Lien Lenders (including with respect to pro forma borrowing base) (b) a new money first lien revolving loan in an amount not less than $[●] at the REIT (the "**REIT Revolver**") on terms acceptable to the Required Consenting First Lien Lenders, (c) the sale of certain owned real property and (d) the sale of the equity interests in New JCP and/or the REIT, pursuant to the Market Test described below. |
| | ii. Holders of DIP Loans will receive $[●] in first lien take-back term debt against New JCP on terms acceptable to the DIP Lenders and the Required Consenting First Lien Lenders in full and final satisfaction of their DIP Claims. |
| | iii. Holders of ABL Claims will receive (a) $[●] million in first lien term take-back debt against the REIT on terms acceptable to the Required Consenting First Lien Lenders (the "**REIT Term Loan**"), (b) an appropriate sized portion of the New JCP ABL, and/or (c) cash as appropriate. |
| | iv. Holders of First Lien Claims will receive $[●] in first lien take-back term debt against New JCP on terms acceptable to the Required Consenting First Lien Lenders and [●]% of the equity in the REIT. |
| | v. The Plan will be subject to a number of conditions to its confirmation and its effectiveness, including acceptance by ABL Lenders on terms acceptable to the Debtors and Required Consenting First Lien Lenders, satisfaction of an acceptable and achievable level of go-forward vendor support/terms, minimum rent savings for New JCP, minimum liquidity for New JCP and the REIT, acceptable maximum |

4

| KEY PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | exit costs and acceptable funding structure for such costs, and appropriate tax structuring and the rendering of an opinion from a nationally-recognized accounting or law firm that the REIT meets the requirements for qualification and taxation as a "real estate investment trust" and that the Master Lease is a "true lease" for US federal income tax purposes. |
| **Equity Interests in the Reorganized Company** | On the Plan Effective Date, New JCP shall issue new common stock or other equity interests (the "**New JCP Common Stock**"). The New JCP Common Stock shall have voting rights in New JCP on a one vote per share basis in all matters stockholders are entitled to vote on.<br><br>On the Plan Effective Date, the REIT shall issue new equity interests of the REIT (the "**REIT Interests**") and the OP shall issue common interests, to the extent necessary (the "**OP Interests**") as set forth on the REIT Term Sheet. The voting structure of the REIT shall conform to a typical "UPREIT" structure.<br><br>The Reorganized Debtors shall use commercially reasonable efforts to list the New JCP Common Stock and REIT Interests (but not, for the avoidance of doubt, the OP Interests) on a national securities exchange, as soon as reasonably practicable following the Plan Effective Date. |
| **Market Test** | Concurrently with the Plan process, the Debtors will, in consultation with the Required Consenting First Lien Lenders, conduct a robust Market Test process in accordance with the Milestones attached to the RSA. In the Market Test the Debtors shall solicit interest (a) from parties wishing to provide new money debt financing to New JCP and/or the REIT (including financing that would "take-out" any of the "take back" paper otherwise proposed for the Plan), (b) in the sale or sale sale/leaseback of the Debtors' owned distribution centers, (c) in the provision of new capital to New JCP and/or the REIT in exchange for equity in such entity, (d) in the purchase of New JCP, the REIT or substantially all of the assets of either as a going concern, and (e) in the purchase of all or part of the Debtors' assets.<br><br>The DIP Lenders and First Lien Lenders shall have the right to credit bid in connection with any sale conducted in connection with the Market Test. |
| **Toggle Event** | By July 14, 2020, the Debtors and the Required Consenting First Lien Lenders shall have agreed on an acceptable Business Plan.<br><br>By August 15, 2020, the Debtors shall also obtain binding commitments for all third-party financing (on terms acceptable to Required Consenting First Lien Lenders) necessary to finance such a business plan in accordance with the other Plan provisions of the term sheet.<br><br>Upon a failure of either condition, the Debtors shall immediately cease pursing the Plan and instead pursue a 363 sale of all of their assets unless otherwise instructed by the Required Consenting First Lien Lenders and shall seek approval of any relief required to undertake such 363 sale on an expedited basis. |

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| **Distributions** | | Each holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described below (or less favorable treatment that may be agreed by the Debtors and the holder of such allowed Claim or Interest) in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest.  Any action to be taken by the Debtors on the Plan Effective Date may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter. | |
| **Class No.** | **Type of Claim** | **Treatment** | **Voting** |
| **Unclassified Non-Voting Claims** | | | |
| N/A | DIP Facility Claims | On the Plan Effective Date, each holder of an allowed DIP Facility Claim shall receive its pro rata share of [●]. | N/A |
| N/A | Administrative Claims | On the later of the Plan Effective Date and the date on which such Administrative Claim becomes due and payable in the ordinary course, each holder of an allowed Administrative Claim shall receive, at the option of the applicable Debtor(s), payment in full in cash or such other treatment (a) to render such Administrative Claim unimpaired under section 1124 of the Bankruptcy Code or (b) as otherwise permitted by section 1129(a)(9) of the Bankruptcy Code. | N/A |
| N/A | Priority Tax Claims | On the later of the Plan Effective Date and the date on which such Priority Tax Claim becomes due and payable in the ordinary course, each holder of an allowed Priority Tax Claim shall receive treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the Debtors** | | | |
| Class 1 | Other Secured Claims | On the Plan Effective Date, each holder of an allowed Other Secured Claim shall receive, at the option of the applicable Debtor(s):  (a) payment in full in cash; (b) the collateral securing its allowed Other Secured Claim; (c) reinstatement of its allowed Other Secured Claim; or (d) such other treatment to render such Other Secured Claim unimpaired under section 1124 of the Bankruptcy Code. | Unimpaired; deemed to accept |
| Class 2 | Other Priority Claims | On the later of the Plan Effective Date and the date on which such Other Priority Claim becomes due and payable in the ordinary course, each holder of an allowed Other Priority Claim shall receive, at the option of the applicable Debtor(s), payment in full in cash or such other treatment (a) to render such Administrative | Unimpaired; deemed to accept |

| | TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | |
|---|---|---|---|
| | | Claim unimpaired under section 1124 of the Bankruptcy Code or (b) as otherwise permitted by section 1129(a)(9) of the Bankruptcy Code. | |
| Class 3 | ABL Claims / Hedge Claims | On the Plan Effective Date, each holder of an allowed ABL Claim or Hedge Claim shall receive its pro rata share of (a) [●], (b) payment in full in cash, or (c) such other treatment to render such ABL Claim or Hedge Claim unimpaired under section 1124 of the Bankruptcy Code. | [TBD] |
| Class 4 | First Lien Claims | On the Plan Effective Date, each holder of an allowed First Lien Claim shall receive its Pro Rata share of [●]. | Impaired; entitled to vote |
| Class 5 | Second Lien Notes Claims[3] | On the Plan Effective Date, each holder of an allowed Second Lien Notes Claim shall receive [●]. | Impaired; [entitled to vote] |
| Class 6 | First Lien Deficiency Claims | On the Plan Effective Date, each holder of an allowed Secured Notes Deficiency Claim shall receive [●]. | Impaired; [entitled to vote] |
| Class 7 | Unsecured Notes Claims | On the Plan Effective Date, each holder of an allowed Unsecured Notes Claim shall receive [●]. | Impaired; [entitled to vote] |
| Class 8 | Non-Funded Debt General Unsecured Claims at [funded debt obligor entities][4] | On the Plan Effective Date, each holder of an allowed Non-Funded Debt General Unsecured Claim at [●] shall receive [●]. | Impaired; [entitled to vote] |
| Class 9 | Non-Funded Debt General Unsecured Claims at [non-obligor entities] | On the Plan Effective Date, each holder of an allowed Non-Funded Debt General Unsecured Claim at [●] shall receive [●]. | Impaired; [entitled to vote] |
| Class 10 | Intercompany Claims | On the Plan Effective Date, each allowed Intercompany Claim shall be, at the option of the applicable Debtor(s) and subject to the Restructuring Transactions Memorandum, either reinstated, compromised, set off, distributed, contributed, settled, or canceled and released without any distribution. | Impaired; deemed to reject or Unimpaired; deemed to accept |
| Class 11 | Intercompany Interests | On the Plan Effective Date, each Intercompany Interest shall be, at the option of the applicable Debtor and subject to the Restructuring Transactions Memorandum, | Impaired; deemed to reject or Unimpaired; |

---

[3]    Note:  May classify Second Lien Notes Claims and First Lien Deficiency Claims together.

[4]    Note:  Division of Non-Funded Debt General Unsecured Claims by Debtor entity (i.e., classes 8-9) subject to change.

7

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| | | either reinstated or canceled and released without any distribution. | deemed to accept |
| Class 12 | Existing Equity Interests | On the Plan Effective Date, all Equity Interests in JCP shall be extinguished and cancelled. Holders of Existing Equity Interests shall receive no recovery on account of such Existing Equity Interests. | Impaired; deemed to reject |
| Class 13 | Section 510(b) Claims | Section 510(b) Claims shall be discharged, cancelled, released, and extinguished without any distribution to holders of such claims. | Impaired; deemed to reject |

| GENERAL PROVISIONS REGARDING THE PLAN | |
|---|---|
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Term Sheet or the Plan, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from SEC registration under applicable law. |
| **Release and Exculpation** | The Plan shall include the exculpation, Debtor releases, and "Third-Party" releases provisions set forth on **Annex 2**, attached hereto, in all material respects, subject to the completion of the Disinterested Directors' investigation into potential claims held by the Company Parties, which investigation shall be completed before the entry of the Confirmation Order. |
| | Each Consenting First Lien Lender will, pursuant to the RSA, agree to "opt in" to, or not to "opt out" of, as applicable, the consensual "Third-Party" releases, including those granted to the Company's current and former officers, directors, and employees. |
| **Conditions Precedent to the Plan Effective Date** | The occurrence of the Plan Effective Date shall be subject to the following conditions precedent: |
| | i. the RSA shall have been executed and shall not have been terminated and remains in full force and effect; |
| | ii. the Plan and all related Plan exhibits and other documents shall have been executed and delivered, and any conditions (other than the occurrence of the Plan Effective Date or certification by the Debtors that |

8

| GENERAL PROVISIONS REGARDING THE PLAN | |
|---|---|
| | the Plan Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith; |
| | iii. the orders approving the Disclosure Statement and confirming the Plan shall have been entered, consistent with the RSA, and such orders shall not have been vacated, stayed, or modified; |
| | iv. the Bankruptcy Court shall have entered the DIP Order, consistent with the RSA, and the DIP Order shall not have been vacated, stayed, or modified without the prior written consent of the Required Lenders (as defined in the DIP Credit Agreement) or, with respect to any provisions that affect the rights or duties of the DIP Agent (as defined in the DIP Credit Agreement), the DIP Agent, and there shall be no default or event of default existing under the DIP Facility; |
| | v. All financing necessary for the Plan shall have been obtained, and any documents related thereto shall have been executed, delivered, and be in full force and effect (with all conditions precedent thereto, other than the occurrence of the Plan Effective Date or certification by the Debtors that the Plan Effective Date has occurred, having been satisfied or waived); |
| | vi. the issuance of the New JCP Stock, REIT Interests, and OP Interests; |
| | vii. the Required Consenting First Lien Lenders shall have consented to the assumption or rejection of every store lease assumed or rejected by the Debtors; |
| | viii. all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date have been placed in a professional fee escrow account pending approval by the Bankruptcy Court; |
| | ix. all accrued and unpaid fees and expenses of the Consenting First Lien Lenders in connection with the Restructuring (including fees and expenses of the Consenting First Lien Lenders' Advisors) shall have been paid in accordance with the terms and conditions set forth in the RSA and the DIP Credit Agreement; and |
| | x. any and all requisite governmental, regulatory, environmental, and third-party approvals and consents shall have been obtained. |
| **Allocation of Administrative Expenses** | All Administrative Expenses, including professional fees and any wind-down expenses, shall be allocated between activities related to New JCP and the REIT pursuant to a formula  mutually agreeable to the Debtors and the Required Consenting First Lien Lenders. |
| **Post-Plan Effective Date Administration** | [●] |

9

| GENERAL PROVISIONS REGARDING THE PLAN | |
|---|---|
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Conditions Precedent to the Plan Effective Date may be waived by the Debtors, including, in the case of any Conflict Matter between any Debtors, each Debtor acting at the direction of its respective Disinterested Director or Manager (as applicable) and without the consent of any other Debtor, but with the prior written consent of the Required Consenting First Lien Lenders. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |

| OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Governance** | The board of directors for each of New JCP and the REIT (collectively, the "**New Boards**") shall be determined or selected, as applicable, by the Required Consenting First Lien Lenders. Corporate governance documents for New JCP, the other Reorganized Debtors, and the REIT, including charters, bylaws, operating agreements, or other organization documents, as applicable (collectively, the "**New Organizational Documents**"), shall be consistent with section 1123(a)(6) of the Bankruptcy Code and shall otherwise be in form and substance reasonably acceptable to the Required Consenting First Lien Lenders. Substantially final forms of the New Organizational Documents shall be filed as part of the Plan Supplement prior to the date upon which the Bankruptcy Court enters the Confirmation Order. |
| **Management Incentive Plans and Employment Agreements** | On the Plan Effective Date, New JCP and the REIT will implement management incentive plans that provide for New JCP Common Stock and REIT Interests to be reserved for issuance to management of New JCP, the other Reorganized Debtors, and the REIT after the Plan Effective Date on terms to be agreed by the respective boards of directors of New JCP and the REIT. |
| **Employee Compensation and Benefit Programs** | On the Plan Effective Date, the Debtors shall assume (and assign to the applicable Reorganized Debtor, if necessary) the employee compensation and benefits plans and programs applicable to any of the Debtors' employees and retirees, in each case existing as of the Plan Effective Date, on terms to be agreed between the Debtors and the Required Consenting First Lien Lenders and as will be set forth in the Plan. |
| **Indemnification of Prepetition Directors, Officers, Managers, *et al.*** | Consistent with applicable law, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other |

10

| OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | professionals of the Debtors than the indemnification provisions in place prior to the Restructuring. |
| **Director, Officer, Manager, and Employee Tail Insurance Coverage** | On or before the Petition Date, the Debtors shall purchase and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Plan Effective Date on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an aggregate limit of liability upon the Plan Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement.  Directors and officers insurance policies shall remain in place in the ordinary course during the Chapter 11 Cases and from and after the Plan Effective Date. |
| | Furthermore, the Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including, without limitation, the "tail policy") in effect prior to the Plan Effective Date, and any directors and officers of the Company Parties who served in such capacity at any time before or after the Plan Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Plan Effective Date.  Notwithstanding anything herein to the contrary, the Company Parties shall retain the ability to supplement such directors' and officers' insurance policies as the Company Parties deem necessary, including purchasing any tail coverage. |

11

**Annex 1**

**DIP Term Sheet**

**EXECUTION VERSION**

**$450 MILLION SECURED SUPERPRIORITY DEBTOR IN POSSESSION CREDIT FACILITY**

SUMMARY OF TERMS AND CONDITIONS

This summary of terms and conditions (this "***DIP Term Sheet***") outlines certain terms and conditions of the DIP Facility referred to below.  Capitalized terms used and not defined herein have the meanings assigned to such terms in the Restructuring Support Agreement ("***RSA***") or the Restructuring Term Sheet (the "***RSA Term Sheet***") to which this DIP Term Sheet is attached as Annex 2.

| | |
|---|---|
| **Executive Summary:** | This DIP Term Sheet provides for a $450 million secured superpriority debtor in possession credit facility, to be funded on a delayed draw basis as appropriate in light of case liquidity needs, access to cash collateral, and milestones in order to (i) finance the Debtors and their operations in accordance with the Budget and (ii) ensure that the Debtors have sufficient liquidity, taking into account access to cash collateral. |
| | Pursuant to the RSA and as described herein, the DIP Lenders will agree to convert certain of their Loans into loans under an exit facility to be made available on terms and conditions customary for facilities and transactions of such type and in each case satisfactory to the DIP Lenders and the Debtors (such loans, the "***Exit Loans***"). |
| | The DIP Facility will be fully committed to by the DIP Lenders (determined on a pro rata basis among the DIP Lenders based on the aggregate amount of the Prepetition First Lien Obligations held by the DIP Lenders as of the date of this DIP Term Sheet (the "***Pro Rata Allocations***")) pursuant to the terms and conditions described in this DIP Term Sheet and the Commitment Letter to which this DIP Term Sheet is attached (the "***Commitment Letter***"). |
| **Borrower:** | J. C. Penney Corporation, Inc. (the "***DIP Borrower***"), as a debtor and debtor in possession under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "***Bankruptcy Code***").  The DIP Borrower and its affiliated debtors and debtors in possession, collectively, the "***Debtors***". |
| **DIP Facility:** | A non-amortizing senior secured priming multi-draw delayed draw term loan facility (the "***DIP Facility***") with a maximum funded principal amount equal to $450 million in "new money" (such principal amount, together with the Prepetition First Lien Obligations rolled up into the DIP Facility as set forth below, the "***Total Aggregate Commitment***" and the loans thereunder, the "***Loans***") to be funded in two borrowings as follows: (a) $225 million made not later than one business day following |

1

the entry of the DIP Order (as defined below) (the "***Initial Borrowing***") and subject to satisfaction of the Conditions Precedent to Initial Borrowing and (b) the remainder of the Total Aggregate Commitment in an aggregate principal amount equal to $225 million (the "***Subsequent Borrowing***") shall be made available following the entry of the DIP Order on July 15, 2020 subject to satisfaction of the Conditions Precedent to Initial Borrowing and the Conditions Precedent to The Subsequent Borrowing (and no other conditions precedent), and otherwise on the terms and conditions in this DIP Term Sheet, the Commitment Letter and the Operative Documents referred to below.

With respect to the DIP Facility, (i) upon satisfaction of the Conditions Precedent to Initial Borrowing, funds with respect to the Initial Borrowing shall be funded directly to the Debtors for use in accordance with the Budget and (ii) upon satisfaction of the Conditions Precedent to The Subsequent Borrowing, all funded amounts shall be deposited in a blocked controlled account in favor of the DIP Agent (the "***Escrow Account***"; the funds deposited therein "***Drawn Funds***").  The Subsequent Borrowing shall be in an aggregate principal amount equal to $225 million, which represents the remainder of the Total Aggregate Commitment.  Drawn Funds may be withdrawn from the Escrow Account once per week, subject to a draw request being delivered to the DIP Agent, which shall certify (i) that such applicable Drawn Funds will be required during the subsequent week in accordance with the Budget (giving effect to any maximum Permitted Variances with respect to such week) and (ii) no Default or Event of Default (each as defined in the Operative Documents) shall have occurred and be continuing.

| | |
|---|---|
| **Guarantors:** | The obligations of the DIP Borrower shall be unconditionally guaranteed, on a joint and several basis, by each other Debtor (each, a "***Guarantor***" and collectively, the "***Guarantors***"). Each entity which guarantees (or is required to guarantee) the Prepetition First Lien Obligations shall be a Guarantor and a Debtor. |
| **Case:** | The bankruptcy cases (the "***Chapter 11 Cases***") of the Debtors to be filed under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") (the date of filing of such petition, the "***Petition Date***").  The Petition Date shall be no later than May 16, 2020. |

2

| | |
|---|---|
| **DIP Agent:** | GLAS USA LLC ("*GLAS*") shall act as administrative agent and collateral agent for the DIP Facility (in such capacity, the "*DIP Agent*") on behalf of the DIP Lenders (as defined below). Any action, exercise of remedies, approval, consent or similar action to be taken or not taken by the DIP Agent in respect of the DIP Facility shall only be taken (or not taken) as may be directed by the Required Lenders.  The DIP Agent and the DIP Borrower shall enter into an agency fee letter providing for fees to be payable to the DIP Agent to be mutually agreed and reasonably acceptable to the Debtors. |
| **DIP Lenders:** | All rights and obligations of the DIP Lenders under the DIP Facility shall be several and not joint. |
| **Prepetition ABL Credit Agreement:** | The Amended and Restated Credit Agreement dated as of June 20, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Prepetition ABL Credit Agreement*") by and among the DIP Borrower, Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "*Prepetition ABL Agent*"), the lenders from time to time party thereto (the "*Prepetition ABL Lenders*") and the other parties thereto. |
| **Prepetition Term Loan Credit Agreement:** | The Amended and Restated Term Loan Credit Agreement dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Prepetition Term Loan Credit Agreement*") by and among the DIP Borrower, the Lenders party thereto (the "*Prepetition Term Loan Lender*"), JPMorgan Chase Bank, N.A., as administrative agent (the "*Prepetition Term Loan Agent*"), and the other parties thereto.  The loans under the Prepetition Term Loan Credit Agreement are referred to herein as the "*Prepetition Term Loans*". |
| **Prepetition First Lien Notes** | The senior secured notes (the "*Prepetition First Lien Notes*") outstanding under that Indenture, dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*Prepetition First Lien Notes Indenture*") by and among the DIP Borrower, Wilmington Trust, National Association, as trustee (the "*Prepetition First Lien Notes Trustee*"), and the other parties thereto.  The holders of such Prepetition First Lien Notes are referred to herein as the "*Prepetition First Lien Noteholders*". The Prepetition Term Loans together with the Prepetition First Lien Notes are referred to herein as the "*Prepetition First Lien Obligations*". |

3

**ABL Intercreditor Agreement:**   The Intercreditor and Collateral Cooperation Agreement dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "*ABL Intercreditor Agreement*") by and among the DIP Borrower, the Prepetition ABL Agent, Wilmington Trust, National Association, as collateral agent under the Prepetition Term Loan Credit Agreement and the Prepetition First Lien Notes Indenture (the "*Prepetition First Lien Collateral Agent*"), and the other parties thereto.

**Restructuring Support Agreement:**   A restructuring support agreement executed on or prior to the Petition Date and which is mutually acceptable to the DIP Lenders and the Debtors (the "*RSA*").

**Tenor of DIP Facility:**   The DIP Facility will mature on the earliest of (such earliest date, the "*Maturity Date*"):

(a) the date that is 180 days after the Petition Date (the "*Scheduled Maturity Date*");

(b) 20 days after the Petition Date, if the DIP Order (as defined below) has not been entered by the Bankruptcy Court prior to the expiration of such 20-day period;

(c) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases;

(d) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise;

(e) without the DIP Agent's prior written consent, the date of filing or express written support by the Debtors of bidding procedures, sale processes, transactions, plans of liquidation or reorganization or related disclosure statements that are not in accordance with the RSA, if applicable, and that are not otherwise acceptable to the DIP Lenders;

(f) the date of termination of the DIP Lenders' commitments and the acceleration of any outstanding Loans, in each case, under the DIP Facility in accordance with the terms of the DIP Facility credit agreement (the "*DIP Credit Agreement*") and the other definitive documentation with respect to the DIP Facility (collectively with the DIP Credit Agreement and the related security documents, the "*Operative Documents*");

(g) any breach by the Debtors which has not been cured or

4

waived or termination of the RSA after the effectiveness thereof;

(h) dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code;

(i) the Debtors shall lose access to the use of cash collateral in accordance with the Cash Collateral Order (as defined below), subject to any applicable remedies notice period; and

(j) other customary circumstances to be mutually agreed.

**Closing Date:** The date of the effectiveness of the Operative Documents (the "***Closing Date***") (which, for the avoidance of doubt, shall not occur prior to the entry of the DIP Order).

**DIP Facility Interest Rate:** Loans under the DIP Facility will bear interest at a rate, at the DIP Borrower's option, equal to the Base Rate plus 10.75% per annum or LIBOR (subject to a 1.25% floor) plus 11.75% per annum, compounded monthly and payable monthly in cash in arrears.

At any time when an Event of Default under the DIP Facility has occurred and is continuing, all outstanding amounts under the DIP Facility shall bear interest, to the fullest extent permitted by law, at the interest rate applicable to base rate loans plus 2.00% per annum and shall be payable on demand in cash (the "***Default Rate***"). Interest on overdue amounts under the DIP Facility shall also accrue at the Default Rate and shall be payable in cash.

**DIP Facility Premiums:** A commitment premium payable in cash to the DIP Lenders equal to 6.00% of each DIP Lender's initial commitments in respect of the $450 million "new money" portion of the DIP Facility on the Petition Date, which shall be earned, due and payable upon execution of the Commitment Letter.

An upfront premium payable in cash to the DIP Lenders equal to 4.00% of each DIP Lender's commitments in respect of the $450 million "new money" portion of the DIP Facility on the Petition Date, which shall be earned, due and payable upon execution of the Commitment Letter.

An exit premium payable in cash to the DIP Lenders equal to 3.00% of each DIP Lender's funded Loans or unfunded commitments under the DIP Facility (including the "new money" and rolled up portion of the DIP Facility) on the Maturity Date or on the date of any earlier voluntary or

5

mandatory prepayment (the "*Exit Premium*").

**Exit Loans:** Upon terms and conditions to be agreed in the RSA, but in any event including the following:

Exit Loans will bear interest at a rate, at the DIP Borrower's option, equal to the Base Rate plus 10.00% per annum or LIBOR (subject to a 1.25% floor) plus 11.00% per annum, compounded monthly and payable monthly in cash in arrears.

A commitment premium payable in cash equal to 2.00% of the commitments in respect of the Exit Loans, which shall be due and payable in cash on the date that the Business Plan is approved (in accordance with the timeline set forth in the DIP Milestones (as defined below)).

An upfront premium payable in cash equal to 3.00% of the commitments in respect of the Exit Loans, which shall be earned, due and payable on the closing date of the Exit Loans.

**Roll Up:** On the date of entry of the DIP Order, $225 million in principal amount of the Prepetition Term Loans held by the DIP Lenders (or their applicable designees) shall be rolled up into the DIP Facility in accordance with each such DIP Lender's (or its applicable designee's) share of the DIP Facility. On the date of the Subsequent Borrowing, an additional $225 million of principal amount of the Prepetition Term Loans held by the DIP Lenders (or their applicable designees) shall be rolled up into the DIP Facility on a dollar-for-dollar basis in accordance with each such DIP Lender's (or its applicable designee's) share of the DIP Facility. Except with respect to the Exit Premium, the premiums set forth above shall only be payable with respect to the $450 million "new money" portion of the DIP Facility and shall not be payable with respect to any rolled up Prepetition Term Loans. Notwithstanding the foregoing, in the event that any DIP Lender (or any of its designees) does not hold sufficient Prepetition Term Loans to fully participate in the roll up on a pro rata basis based on its pro rata share of the funded Loans, such DIP Lender (or its applicable designee) shall be permitted to roll up its Prepetition First Lien Notes to the extent necessary to achieve such pro rata share of the roll up.

**Adequate Protection:** As adequate protection for any diminution in the value of the interests of the Prepetition Term Loan Lenders and the Prepetition First Lien Noteholders in the collateral securing the Prepetition Term Loan Credit Agreement and the Prepetition First Lien Noteholders in the collateral securing the Prepetition

6

First Lien Notes Indenture, respectively, the Prepetition Term Loan Lenders and the Prepetition First Lien Noteholders will receive, subject in all cases to the Carve-Out, the following as adequate protection: (A) the payment of the reasonable and documented out-of-pocket fees and expenses of legal counsel and financial advisors retained by the Prepetition Term Loan Lenders that are also DIP Lenders, (B) cash payments of accrued and unpaid interest on the Prepetition Term Loans and Prepetition First Lien Notes upon entry of the  DIP Order and each date thereafter on which such interest payment would otherwise become due under the Prepetition Term Loan Credit Agreement or Prepetition First Lien Notes Indenture, as applicable, (C) validly perfected liens on and security interests in the Debtors' post-petition Collateral junior only to the liens granted to the DIP Lenders under the DIP Facility and existing valid, perfected, and superior liens in the Collateral held by other creditors (including, for the avoidance of doubt, the liens of the Prepetition ABL Lenders with respect to the ABL Priority Collateral) and (D) a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code, which claim shall have priority over all priority claims (other than the claims of the DIP Lenders under the DIP Facility) and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c), 507(a), 507(b), 546(c), 726(b), and 1114 of the Bankruptcy Code or otherwise (collectively, "***Adequate Protection***").

**Optional Prepayments and Commitment Reductions:**  The DIP Borrower may, upon at least one business day's notice, prepay or terminate in full (but not in part), with the payment of the Exit Premium but without other premium or penalty, subject to breakage costs, if applicable, the outstanding Loans and unfunded commitments. Once repaid, Loans may not be re-borrowed.

**Mandatory Prepayments:**  Mandatory prepayments of the Loans customary for similar debtor-in-possession financings shall be required, including, in an amount equal to (a) 100% of insurance and condemnation proceeds, (b) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the DIP Credit Agreement and (c) 100% of the net cash proceeds of any sale of assets constituting Collateral and other asset sales (without any reinvestment rights, but subject to de minimis dollar carveouts to be agreed, but subject, in the case of ABL Priority

7

Collateral (or proceeds thereof), to prior repayment of the Prepetition ABL Credit Agreement solely to the extent required pursuant to the Cash Collateral Arrangements).

All voluntary prepayments and mandatory prepayments (within one business day of receipt thereof) shall be applied as follows: first, to pay accrued and unpaid interest on, and expenses in respect of, the obligations under the DIP Facility, to the extent then due and payable; and second, to any principal amounts or other obligations (including the Exit Premium) which are outstanding under the DIP Facility.  Other than the Exit Premium, there shall be no premium or penalty payable in connection with mandatory prepayments.

**Security:**

All amounts owing by the DIP Borrower under the DIP Facility and by the Guarantors in respect thereof will be secured by a perfected security interest in, with the priority described below under "Priority," and lien on substantially all of the Debtors' tangible and intangible assets, including, without limitation, the following (collectively, the "*Collateral*"): accounts receivable, equipment, inventory, contracts, fee owned and ground leased real estate, real property leaseholds, investment property, insurance proceeds, deposit accounts (other than payroll, trust and tax accounts), monies, equity interests of subsidiaries of each Debtor and the products and proceeds thereof and, upon entry of the DIP Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates pursuant to the Bankruptcy Code, subject to certain exclusions to be mutually agreed.  Notwithstanding anything to the contrary, no mortgages shall be required and perfection on the Collateral shall be obtained solely through entry of the DIP Order.

**Priority:**

Subject in all cases to the Carve-Out and certain exclusions to be mutually agreed, all amounts owing by the DIP Borrower under the DIP Facility and by the Guarantors in respect thereof shall at all times:

> (a)    pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claims status in the Chapter 11 Cases;

> (b)    pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all Collateral that is not subject to valid, perfected, and non-avoidable liens as of the Petition Date, including all unencumbered fee-owned, ground-leased and space-

8

leased real estate, and including upon entry of the DIP Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates pursuant to the Bankruptcy Code;

(c)    (i) pursuant to section 364(d) of the Bankruptcy Code, be secured by a perfected first priority and priming lien on all collateral that secures obligations under the Prepetition Term Loan Credit Agreement (other than ABL Priority Collateral, as defined in the ABL Intercreditor Agreement ("***ABL Priority Collateral***")) and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected second priority lien on all ABL Priority Collateral, junior only to the lien securing the claims in respect of the Prepetition ABL Credit Agreement ("***Prepetition Collateral***"); and

(d)    pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected second priority lien on all other property of the Debtors that is subject to valid and perfected liens in existence as of the Petition Date (including liens (if any) perfected subsequent to the Petition Date as permitted by and in accordance with section 546(b) of the Bankruptcy Code) but with a priority immediately junior to such liens.

Such liens shall be senior to all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

All liens authorized and granted pursuant to the DIP Order, as applicable, in each case, entered by the Bankruptcy Court approving the DIP Facility shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection. The DIP Lenders, or the DIP Agent on behalf of the DIP Lenders, shall be permitted, but not required, to make any filings, deliver any notices or take any other acts as may be desirable under state law or other law in order to reflect the perfection and priority of the DIP Lenders' claims described herein.

| | |
|---|---|
| **Carve-Out:** | See Schedule II to this DIP Term Sheet. |
| **Conditions Precedent to Initial Borrowing:** | The Operative Documents will contain customary conditions precedent to the Initial Borrowing under the DIP Facility and other conditions deemed by the DIP Agent to be appropriate to the specific transaction, and in any event, including, without |

9

limitation:

(a)  The execution of the RSA and the filing of the executed RSA.

(b) The preparation, authorization and execution of the Operative Documents with respect to the DIP Facility, in form and substance satisfactory to the DIP Agent.

(c) No later than 18 calendar days after the Petition Date, the Bankruptcy Court shall have entered a final order approving the DIP Facility on a final basis (the "***DIP Order***"), in form and substance satisfactory to the DIP Agent in their sole discretion as confirmed by the DIP Agent in writing, authorizing and approving the DIP Facility and the transactions contemplated hereby, including Adequate Protection and the DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the DIP Agent.

(d) All premiums, fees and documented out-of-pocket fees and expenses (including fees and expenses of counsel and financial advisors) required to be paid to the DIP Lenders and DIP Agent (and with respect to which invoices have been received by the Debtors at least one (1) business day before the Closing Date) on or before the Closing Date (whether incurred before or after the Petition Date and including estimated fees and expenses through the Closing Date) shall have been paid.

(e) The delivery of a 13-week cash flow projection (the "Initial DIP Budget") in form and substance reasonably satisfactory to the DIP Agent in its reasonable discretion as confirmed by the DIP Agent in writing. Such Initial DIP Budget and all updates thereto (in accordance with reporting requirements described herein) shall include the same line item detail as provided in the Alix Partners 13 week cash flow provided on May 13, 2020 prepetition, and will forecast, on a weekly basis, the period commencing May 17, 2020 through the end of the fiscal month following the last week of such 13-week period, and on a monthly basis for each month thereafter through the Maturity Date; provided that with the written consent and approval of the DIP Agent the Initial Budget may be updated by the DIP Borrower no more than once per month, which update shall be effective three calendar

10

days following delivery to the DIP Agent except to the extent objected to by the DIP Agent in writing. Upon effectiveness, such updated budget shall thereupon become the "budget" for purposes of the DIP Facility (as so approved, the "***Budget***").

(f) The Debtors shall have obtained requisite consents from the Prepetition ABL Agent and the Prepetition ABL Lenders to the use of cash collateral in the Chapter 11 Cases in an amount and on terms satisfactory to the Prepetition ABL Agent, the Prepetition ABL Lenders and the DIP Lenders, or the Bankruptcy Court shall have entered a cash collateral order acceptable to the DIP Agent (the "***Cash Collateral Order***"). For the avoidance of doubt the DIP Agent may not determine the Cash Collateral Order is not acceptable solely on account of the Prepetition ABL Agent and the Prepetition ABL Lenders not consensually consenting to the use of such cash collateral.

(g) Subject to a post-closing period to be agreed upon, the DIP Agent shall have received endorsements naming the DIP Agent as additional insureds, loss payee, lender loss payee and mortgagee under all insurance policies to be maintained with respect to the properties of the Debtors forming part of the Collateral.

(h) The DIP Agent shall have a valid and perfected lien on and security interest in the Collateral with the priority described herein. All filings, recordations and searches necessary or desirable in connection with such liens and security interests shall have been duly made; and all filing and recording fees and taxes shall have been duly paid.

(i) Since January 31, 2020, there shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Chapter 11 Cases) or threatened in any court or before any arbitrator or governmental authority that, in the opinion of the DIP Agent, affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a material adverse change or material adverse condition in or affecting the businesses, assets, operations or condition (financial or otherwise) of any of the Debtors and their respective direct and indirect subsidiaries or any of the transactions contemplated hereby; provided, that none of (i) the Chapter 11 Cases, the events and conditions

11

leading up to the Chapter 11 Cases, or their reasonably anticipated consequences, (ii) the actions required to be taken pursuant to the DIP Credit Agreement, the RSA, the DIP Order, or the Cash Collateral Order, or (iii) the occurrence of the COVID-19 pandemic or the impacts thereof on the business, financial condition or results of the DIP Borrower or its subsidiaries shall constitute a "material adverse effect" for any purpose.

(j) No default or event of default shall exist under the Operative Documents.

(k) The representations and warranties of the DIP Borrower and each Guarantor under the Operative Documents shall be true and correct in all material respects after giving effect to such funding.

(l) The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(m) The DIP Agent shall have received all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the U.S. Patriot Act.

(n) No later than five business days after the Petition Date, the Debtors shall have filed a motion seeking the retention of AlixPartners LLP as the Debtors' restructuring advisor and Lazard as the Debtors' investment banker.

(o) An order approving the Debtors' cash management system, the form of which is reasonably acceptable to the DIP Agent, shall have been entered by the Bankruptcy Court.

(p) Orders approving customary "first day" relief, the form of which is reasonably acceptable to the DIP Agent, shall have been entered by the Bankruptcy Court.

(q) The Debtors shall not have entered into, or made any payment in respect of, any critical vendor agreements or otherwise entered into any agreement to pay, or made on a postpetition basis any payment in respect of, any prepetition trade obligations except as consented to by the DIP Agent pursuant to an order of the Bankruptcy Court (which may be via consent to the "first day" orders).

12

(r) Other customary conditions to be mutually agreed.

**Conditions Precedent to The Subsequent Borrowing**:

On the funding date of the Subsequent Borrowing, the following conditions precedent shall have been satisfied:

(a) The RSA shall be in full force and effect.

(b) No default or event of default shall exist under the Operative Documents.

(c) The representations and warranties of the DIP Borrower and each Guarantor under the Operative Documents shall be true and correct in all material respects after giving effect to such funding (except to the extent such representation relates to an earlier date, in which case such representation shall have been true and correct in all material respects as of such date).

(d) The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(e) The DIP Agent shall have received a borrowing notice, substantially in the form as attached to the DIP Credit Agreement, at least three business days in advance of the requested borrowing.

(f) The DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the DIP Agent.

(g) All premiums, fees and documented out-of-pocket fees and expenses (including fees and expenses of counsel and financial advisors) required to be paid to the DIP Lenders and the DIP Agent on or before the date of such funding shall have been paid in cash.

(h) The Debtors shall be in compliance with the Operative Documents and the DIP Milestones; provided that the DIP Milestones relating to the Business Plan (other than the receipt of the Business Plan and the Business Plan Parameters in accordance with the DIP Milestones) shall not be a condition precedent to the funding of the Subsequent Borrowing into the Escrow Account; provided, further, that no Drawn Funds in respect of the Subsequent Borrowing shall be permitted to be withdrawn from the Escrow Account until the Business Plan has been approved or disapproved in accordance with the DIP Milestones, with (i) $225

13

million permitted to be withdrawn from the Escrow Account commencing July 15, 2020 in accordance with the Budget if the Business Plan is approved in accordance with the DIP Milestones or (ii) upon the occurrence of a Toggle Event, $50 million shall be permitted to be drawn from the Escrow Account on July 15, 2020 for a toggle to a 363 sale, with the release of such $50 million from the Escrow Account subject to agreement among the DIP Borrower, the DIP Agent and the Prepetition ABL Agent to an acceptable 363 sale budget, and $175 million shall be released from the Escrow Account and remitted to the DIP Lenders within 2 business days of the date of the occurrence of such Toggle Event.

|  |  |
|---|---|
| **Representations and Warranties:** | The Operative Documents will contain representations and warranties that are (a) customary for similar debtor-in-possession financings and (b) and additional representations and warranties required by the DIP Lenders as mutually agreed with the Debtors. |
| **Reporting Requirements:** | The Operative Documents will contain financial reporting requirements that are customary for similar debtor-in-possession financings, including, without limitation, (i) monthly updates of the Budget for each fiscal month of the Debtors to be provided within five business days following the end of any fiscal month of the Debtors, (ii) all financial, operating and other reporting provided to the Prepetition ABL Lenders during the Chapter 11 Cases, including pursuant to the Cash Collateral Order, as and when so provided, (iii) a weekly cash flow forecast budget to actuals for each line item in a form to be attached to the DIP Credit Agreement and otherwise acceptable to the DIP Agent, with management commentary on any individual line item with a positive or negative variance of 5.0% or more as compared to the Budget (unless the dollar amount corresponding to such percentage variance is less than $1,000,000, in which case no management commentary shall be required) (the "***Weekly Variance Report***"), (iv) monthly delivery of operating statements and balance sheets for the Debtors and their consolidated subsidiaries within 15 business days following the end of the applicable period, (v) quarterly store-level operating statements for all properties within 45 days following the end of the applicable period and (vi) reasonable reporting requirements to be agreed with respect to professional fee monitoring no later than June 15, 2020.

The Operative Documents will contain additional requirements |

14

that the Debtors' counsel provide advance copies of all pleadings and/or filings in the Chapter 11 Cases to be made by the Debtors. The Debtors shall also provide copies of any monthly reporting provided to the Bankruptcy Court or the U.S. Trustee.

**Other Maintenance Covenants:**

The Debtors shall not pay any expenses or other disbursements other than those set forth in the Budget.

The DIP Borrower's cumulative actual receipts shall not be less than 85% of budgeted receipts for the corresponding test period (the "*Permitted Collections Budget Variances*").

The DIP Borrower's cumulative actual disbursements (excluding professional fees) will be not more than 12.5% greater than the budgeted disbursements for the corresponding test period (the "*Permitted Expenditures Budget Variances*").

The DIP Borrower's cumulative actual disbursements to merchandise vendors (domestic and foreign) will not be more than 10% greater than the budgeted disbursements for the corresponding test period (the "*Permitted Inventory Budget Variances*").

The Permitted Collections Budget Variances, Permitted Expenditures Budget Variances, and Permitted Inventory Budget Variances, collectively the "*Budget Variances*", in each case, as set forth in the then operative Budget. Notwithstanding anything to the contrary herein, the Debtors and Required Lenders shall agree to include provisions in the Operative Documents providing for the implementation of increased Permitted Expenditures Budget Variances and Permitted Inventory Budget Variances, in each case, in the event that the Debtors are able to more rapidly open store locations than anticipated in the Initial DIP Budget; provided, that Permitted Collections Budget Variances shall be adjusted accordingly to the extent agreed.

The Budget Variances shall each be tested (i) first, on June 6, 2020 on a cumulative basis for the prior two weeks, (ii) second, on June 13, 2020 on a cumulative basis for the prior three weeks, and (iii) at the end of each week thereafter on a cumulative four week basis for the prior four weeks. The Debtors shall deliver a Weekly Variance Report to the DIP Agent by 12:00 p.m., Eastern time, on Friday of each week.

Simultaneously with the delivery of the Weekly Variance Report, the DIP Borrower shall report on consolidated unrestricted book cash as of the end of the preceding week (as

15

reported in the Weekly Variance Report), which shall not be less than $50 million.

By June 1, 2020, the DIP Borrower and its real estate advisors will present to the DIP Agent and the DIP Lenders a summary of lease renegotiation discussions with content of such presentation to be acceptable to the DIP Agent with landlords, including the asks made of each landlord by property. Thereafter, the DIP Borrower shall report on a weekly basis the status of lease renegotiations by property, including any settlements achieved with any landlords by property, to the DIP Agent and the DIP Lenders, with associated terms of such settlements acceptable to the DIP Agent.

By July 1, 2020, the DIP Borrower and its real estate advisors will present to the DIP Agent and the DIP Lenders a proposed monetization strategy of the DIP Borrower's fee-owned and ground-leased real estate assets, including any offers or indications of value received by property for the last 12 months. Thereafter, the DIP Borrower shall report on a bi-weekly basis any offers or indications of value received by property to the DIP Agent and the DIP Lenders.

Process for construct for monthly reporting on allocation of disbursements by entity to be agreed between Required Lenders and the DIP Borrower by June 15, 2020, which shall be implemented as promptly as practical thereafter and provided on a monthly basis once implemented.

**Affirmative Covenants:**    The Operative Documents will contain (a) affirmative covenants that are customary for similar debtor-in-possession financings and (b) additional affirmative covenants required by the DIP Lenders and mutually agreeable to the Debtors and shall, in any event, include without limitation (i) the advance delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Debtors in the Chapter 11 Cases to the DIP Lenders and their counsel, (ii) compliance with Budget covenants consistent with the section titled "Budget and Variances," (iii) compliance with the DIP Milestones in the administration of the Chapter 11 Cases, (iv) update meetings and/or calls with the Debtors' senior management and advisors and the DIP Lenders no less than weekly if requested and (v) one or more members of the Debtors' senior management team shall be available for discussion with the DIP Lenders upon reasonable notice.

**Negative Covenants:**    The Operative Documents will contain negative covenants that are (a) customary for similar debtor-in-possession financings

16

and (b) additional negative covenants required by the DIP Lenders and mutually agreeable to the Debtors, and including, without limitation, restrictions on (i) incurrence of additional debt and liens (it being understood that any debt secured by the ABL Priority Collateral on a senior basis shall be capped at the amount of the Prepetition ABL Credit Agreement as of the Petition Date, subject to providing the ability of the DIP Borrower to access renewals or replacements of letters of credit thereunder, in each case, subject to the requirements and terms of the Cash Collateral Order), (ii) asset sales, (iii) investments, (iv) restricted payments, (v) fundamental changes and (vi) affiliate transactions.

**Events of Default:**

The Operative Documents will contain (a) events of default that are customary for similar debtor-in-possession financings and (b) additional events of default required by the DIP Lenders and mutually agreeable to the Debtors (collectively, the "*Events of Default*") and shall, in any event, include without limitation the following (subject to mutually agreeable grace periods as applicable):

(i)    failure to make any payment when due under the Operative Documents;

(ii)    noncompliance with covenants or breaches in any material respect of representations and warranties, in either case, under the Operative Documents;

(iii)    cross-default to any prepetition indebtedness in a principal amount above a threshold to be agreed that is not stayed by the automatic stay in the Chapter 11 Cases;

(iv)    failure to satisfy or stay execution of judgments above a threshold to be agreed;

(v)    the existence of certain employee benefit or environmental liabilities,, which would constitute a material adverse effect;

(vi)    impairment of the Operative Documents or the security interests described in "Security" above;

(vii)    change of ownership or control;

(viii)    a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases;

(ix)    appointment of a responsible officer or examiner with enlarged powers relating to the

17

operation of the business of any Debtor;

(x)  granting of relief from any stay of proceeding (including the automatic stay) so as to allow a third party to proceed against any asset of the Debtors in an amount in excess of $1,000,000 in the aggregate;

(xi)  entry of an order granting any superpriority claim which is senior to or *pari passu* with the DIP Lenders' claims under the DIP Facility without the prior consent of the DIP Agent (other than as described under the caption "Priority" above);

(xii)  any termination of the RSA as to all parties thereto, except as to any individual DIP Lender pursuant to Section 12.03 of the RSA;

(xiii)  any Debtor shall have filed, proposed, or supported a plan of reorganization, plan of liquidation, or a motion seeking to approve a sale of any material portion of the Collateral, in each case unless contemplated by, and in accordance with, the RSA or as otherwise agreed to by the DIP Agent;

(xiv)  entry of an order staying, reversing, vacating or otherwise modifying, without the prior written consent of the DIP Agent, the DIP Facility, or the DIP Order;

(xv)  payment of, or granting adequate protection with respect to, prepetition debt (other than as contemplated by the Operative Documents) unless otherwise agreed by the DIP Agent;

(xvi)  cessation of liens or superpriority claims granted with respect to the Collateral securing the Debtors' obligations in respect of the DIP Facility to be valid, perfected and enforceable in all respects with the priority described herein;

(xvii)  failure to comply with this DIP Term Sheet, the Operative Documents or any of the DIP Milestones; and

(xviii)  entry into, or the making of any payment in respect of, any critical vendor agreements or otherwise entry into any agreement to pay, or the making of any payment in respect of, any

18

prepetition trade obligations except as consented to by the DIP Agent (which may be via consent to the "first day" orders).

**Remedies:**          Upon the occurrence and during the continuance of an Event of Default:

(a) the Required Lenders (as defined below) may direct the DIP Agent, in their discretion, to immediately take any or all of the following actions: (i) deliver a notice of an Event of Default; (ii) charge the Default Rate of interest on the Loans and other outstanding obligations; and (iii) terminate all commitments under the DIP Facility; and

(b) upon five (5) business days' written notice from the DIP Lenders, in their sole and absolute discretion, the automatic stay of section 362 of the Bankruptcy Code shall be terminated without further order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading, for the limited purpose of permitting the DIP Lenders  Trustee, and counsel to the  to do any of the following: (i) foreclose on the Collateral; (ii) enforce all of the guaranty rights; (iii) accelerate all Loans and other outstanding obligations under the DIP Facility; and (iv) declare the principal of and accrued interest, premiums, fees and expenses constituting the obligations under the DIP Facility to be due and payable. Section 362 relief from the stay in favor of the DIP Lenders shall be embodied in any order approving the DIP Facility and the use of cash collateral. At any hearing addressing the exercise of remedies by the DIP Lenders under the Operative Documents, the only objection that may be raised by the Debtors or the Committee shall be whether an Event of Default has in fact occurred and is continuing, and the Debtors and the Committee shall waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit, restrict or delay the rights and remedies of the DIP Agent under the Operative Documents.

**Milestones:**          The DIP Borrower shall comply with the following chapter 11 milestones which Milestones may be extended in writing by the DIP Agent in its sole and absolute discretion (the "*Milestones*"):

19

(a) on the Petition Date, the Debtors shall have filed a motion seeking approval of the DIP Facility;

(b) no later than 14 business days following the Petition Date, the Debtors shall have filed a motion to retain Brokers acceptable to the Required Lenders;

(c) no later than 18 calendar days after the Petition Date, the Bankruptcy Court shall enter an order approving the DIP Credit Agreement, in form and substance satisfactory to the DIP Agent in its discretion as confirmed by the DIP Agent in writing;

(d) no later than 18 calendar days after the Petition Date, the Bankruptcy Court shall have entered the DIP Order;

(e) no later than June 15, 2020, the Debtors will have delivered a Lease Optimization Plan and an Owned Real Estate Optimization Plan, each in form and substance acceptable to the Required Lenders;

(f) no later than June 15, 2020 the Debtors shall have delivered proposed processes and parameters related to a proposed business plan (the "**Business Plan**") including those related to vendor agreements, lessor agreements, and go-forward self-funding capability (the "**Business Plan Parameters**"*)* to the DIP Lenders;

(g) no later than June 20, 2020 the Debtors and the Required Lenders shall have agreed on acceptable Business Plan Parameters;

(h) no later than July 8, 2020, the Debtors shall have delivered a Business Plan (consistent with the agreed acceptable Business Plan Parameters) to the DIP Lenders;

(i) no later than July 14, 2020, the Debtors and the Required Lenders shall have agreed on an acceptable Business Plan;

(j) no later than 90 days after the Petition Date, the Debtors will (unless otherwise provided for in the RSA) have filed either (A) a motion seeking approval of a disclosure statement with respect to a chapter 11 plan that is acceptable to the DIP Agent or (B) a motion seeking approval of bidding procedures and a sale that is acceptable to the DIP Agent;

(k) no later than 130 days after the Petition Date, the

20

Bankruptcy Court shall have entered an order acceptable to the DIP Agent either approving (A) an acceptable disclosure statement or (B) acceptable bidding procedures;

(l) no later than 160 days after the Petition Date, the Bankruptcy Court shall have entered one or more orders acceptable to the DIP Agent either (A) confirming an acceptable chapter 11 plan or (B) approving an acceptable sale or sales; and

(m) no later than November 15, 2020 the Plan Effective Date shall have occurred.

| | |
|---|---|
| **Toggle Event:** | A "***Toggle Event***" shall occur if either: (x) by July 15, 2020, the failure of 66.7% of the DIP Lenders to approve the Business Plan or (y) by August 15, 2020, the Debtors shall have failed to obtain binding commitments for all third-party financing (on terms acceptable to the Required Lenders) necessary to finance Business Plan in accordance with the other plan provisions of the RSA Term Sheet. |
| | Upon a failure of such condition, the Debtors shall immediately cease pursing the Plan and instead pursue a 363 sale of all of their assets unless otherwise instructed by the Required Lenders and shall seek approval of any relief required to undertake such 363 sale on an expedited basis. |
| **Indemnification:** | The DIP Borrower shall indemnify and hold harmless the DIP Agent, each DIP Lender, each of their respective affiliates and each of their respective officers, directors, partners, security-holders, employees, agents, advisors, attorneys and representatives (each, an "***Indemnified Party***") from and against any and all claims, damages, losses, liabilities and expenses (including all reasonable and documented fees, expenses and disbursements of their respective specified legal counsel, specified financial advisors or other specified professionals retained by the DIP Agent or DIP Lenders, in each case as agreed and specifically set forth in the Commitment Letter and the Operative Documents[1]), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case, arising out of or in connection with or by reason of the DIP Facility, |

---

[1] In all cases, DB, Hillco, Houlihan, Milbank, S&C and others to be determined.

21

the Operative Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, or any operation of any business by any Debtor. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the DIP Borrower, any of its directors, security-holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

**Expenses**: Each Debtor shall jointly and severally be obligated to pay all reasonable and documented out-of-pocket costs and expenses of the DIP Lenders and the DIP Agent, including all reasonable and documented fees, expenses and disbursements of their respective specified legal counsel, specified financial advisors or other specified professionals retained by the DIP Agent or DIP Lenders, in each case as agreed and specifically set forth in the Commitment Letter and the Operative Documents[2], in connection with (a) the discussion, negotiation, preparation, execution and delivery of any documents in connection with the proposed financing contemplated by this DIP Term Sheet, including the Operative Documents and the funding of all Loans under the DIP Facility, the administration of the DIP Facility and any amendment, modification or waiver of any provision of the Operative Documents, (b) the interpretation, enforcement or protection of any of their rights and remedies under the Operative Documents or (c) the Chapter 11 Cases.

**Other Bankruptcy Matters:** The DIP Order shall be in form and substance reasonably satisfactory to the DIP Agent as confirmed by the DIP Agent in writing (it being understood that any communication by email shall suffice), and all motions relating thereto, shall be in form and substance reasonably satisfactory to the DIP Agent in its discretion and, unless otherwise agreed by the DIP Agent in writing, shall include the following provisions:

(a) modifying the automatic stay to permit the creation and perfection of the DIP Lenders' liens on the Collateral;

(b) prohibiting the assertion of claims arising under section 506(c) of the Bankruptcy Code against any of the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the

---

[2] In all cases, DB, Hillco, Houlihan, Milbank, S&C and others to be determined.

22

Prepetition First Lien Notes Trustee, the Prepetition First Lien Noteholders or, except as expressly permitted therein, the commencement by the Debtors of other actions adverse to the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the Prepetition First Lien Notes Trustee, the Prepetition First Lien Noteholders or any of their respective rights and remedies under the DIP Facility, the Prepetition Term Loan Credit Agreement or the Prepetition First Lien Notes Indenture, as applicable, the DIP Order, or any other order;

(c) prohibiting the incurrence of any debt with priority equal to or greater than the DIP Facility;

(d) prohibiting any granting or imposition of liens senior to the liens granted under the Operative Documents;

(e) authorizing and approving the DIP Facility and the transactions contemplated thereby, including the granting of the superpriority status, security interests and liens and the payment of all premiums and fees, referred to herein;

(f) acknowledging the validity and enforceability of the Prepetition Term Loan Credit Agreement and the Prepetition First Lien Notes Indenture, the debt outstanding thereunder and the liens granted in connection therewith;

(g) waiving any and all claims or causes of action against the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the Prepetition First Lien Notes Trustee and the Prepetition First Lien Noteholders, whether arising prior to or after the Petition Date including, without limitation, any lender or noteholder liability claims, any subordination claims or any claims under any non-disclosure or confidentiality agreement;

(h) providing that the DIP Lenders and their respective counsel, advisors and consultants shall be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code;

(i) providing that the DIP Lenders, the Prepetition First Lien Lenders and the Prepetition First Lien Noteholders reserve the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the Loans (including any prepetition loans or notes

23

rolled-up) and the Prepetition First Lien Obligations, in each case, in whole or in part, in connection with any sale or disposition of assets in the Chapter 11 Cases and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code;

(j) providing that the Prepetition Term Loan Lenders, the Prepetition Term Loan Agent, the Prepetition First Lien Notes Trustee and the Prepetition First Lien Noteholders are entitled to all of the benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception thereunder shall not apply to any of the Prepetition Term Loan Lenders, the Prepetition Term Loan Agent, the Prepetition First Lien Notes Trustee or the Prepetition First Lien Noteholders with respect to proceeds, product, offspring, or profits of any of the collateral securing the Prepetition Term Loan Credit Agreement or the Prepetition First Lien Notes Indenture; and

(k) providing that in no event shall any of the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the Prepetition First Lien Notes Trustee, the Prepetition First Lien Noteholders the DIP Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

| | |
|---|---|
| **Assignments:** | Customary for similar debtor-in-possession financings; provided that if no Event of Default has occurred and is continuing, the DIP Borrower's consent shall be required (except with respect to an assignment to any other DIP Lender or any entity described in the definition of DIP Lender) for assignments of the Loans, which such consent shall not be unreasonably withheld, conditioned or delayed, and the DIP Borrower shall deemed to consent to any such assignment if it is has failed to respond to any such request for consent within five business says thereof. |
| **Required Lenders:** | DIP Lenders, as of any date of determination, holding greater than 50% of the outstanding Loans and commitments under the DIP Facility (the "***Required Lenders***"); provided that the consent of each DIP Lender adversely affected thereby shall be required to any amendment or modification (i) to extend the final maturity of any Loan, (ii) to waive, reduce or postpone any scheduled repayment (but not prepayment) of any Loan, (iii) to reduce the rate of interest on any Loan (other than any |

24

waiver of default interest) or any premium set forth in this DIP Term Sheet, (iv) to the definition of Pro Rata Allocation or (v) that adversely and disproportionately affects such DIP Lender in a material respect relative to the other DIP Lenders taken as a whole (it being understood that, for the avoidance of doubt, any DIP Lender declining an opportunity or option offered ratably to all DIP Lenders shall not constitute disproportionate treatment for purposes of this clause (v)); provided, further, that in each case such adversely affected DIP Lender is in compliance with its funding obligations under the Commitment Letter; provided, further, that any amendment or modification of any of the dates or consents in clauses (f), (g), (h) or (i) of the DIP Milestones related to the Business Plan, the Toggle Event or the funding the Subsequent Borrowing will require the consent of 66.7% of the DIP Lenders.

| | |
|---|---|
| **Governing Law and Submission to Jurisdiction:** | State of New York. Exclusive jurisdiction of the Bankruptcy Court, including with respect to the exercise of the remedies by the DIP Lenders and preservation of the value of the Collateral. |
| **Counsel to the DIP Lenders:** | Milbank LLP. |
| **Local Counsel to the DIP Lenders:** | To be determined. |
| **Counsel to the DIP Agent**: | Arnold & Porter. |

25

Schedule II

DIP Carve Out

(a)        Notwithstanding anything to the contrary in this Final Order, the Debtors' obligations to the DIP Secured Parties and [Prepetition Secured Parties] and the liens, security interests, and superpriority claims granted herein, under the DIP Loan Documents, and/or under the Prepetition Loan Documents, including the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and the Prepetition Liens, shall be subject in all respects and subordinate to the Carve Out.

(b)        As used in this Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors or any Official Committee) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee  pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount

27

not to exceed $4,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c)      Carve Out Reserves.  The Debtors shall establish and fund a segregated account (the "Funded Reserve Account") for purposes of funding the Carve Out.  The Funded Reserve Account will be funded first from the [DIP Proceeds Account],  then from the DIP Priority Collateral. Notwithstanding anything to the contrary in this Order, the DIP Documents, or the Prepetition Loan Documents, (i) in no circumstances (which, for the avoidance of doubt, includes, but is not limited to, an Event of Default or a termination of the DIP Credit Agreement or DIP Loan Documents) shall the Debtors be prohibited in any way from accessing or drawing upon the [DIP Proceeds Account] for the purpose of funding the Funded Reserve Account, and (ii) the [DIP Proceeds Account] shall not be ABL Priority Collateral or Prepetition ABL Collateral.  Upon entry of this Order, the Debtors will deposit into the Funded Reserve Account an amount equal to the aggregate amount of Allowed Professional Fees projected to accrue from entry of this Order through June 30, 2020 (the "Initial Funded Reserve Amount"), which, for the avoidance of doubt, shall not include the Post-Carve Out Trigger Notice Cap.  Commencing July 1, 2020 (or the first business day thereafter), on the first business day of each month, the Debtors shall deposit in the

28

Funded Reserve Account an amount equal to the aggregate amount of Allowed Professional Fees (excluding restructuring, sale, financing, or other success fees) projected to accrue for the following month in the Budget plus twenty percent of such aggregate amount of Allowed Professional Fees in the following month in the Budget (the "Monthly Funded Reserve Amount"). Each Professional Person may deliver to the Debtors a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred in the preceding month (each such statement, a "Fee Statement"), and to the extent the amount of Allowed Professional Fees accrued and claimed in a Fee Statement exceeds the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount for the applicable period or month, respectively, and such fees and expenses have otherwise not been paid by the Debtors, the Debtors shall, within one business day, fund additional amounts into the Funded Reserve Account equal to the difference between, as applicable, the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount and the amount accrued and claimed in the applicable Fee Statement (each, a "Top Off Amount").  At any time, if the Debtors in good faith believe a restructuring, sale, financing, or other success fee has been earned by a Professional Person and is then due and payable, the Debtors shall deposit in the Funded Reserve Account an amount equal to such fee.  Upon entry of the Order, the Debtors shall deposit into the Funded Reserve Account an amount equal to (i) the Post Carve Out Trigger Notice Cap plus (ii) the amounts contemplated under (b)(i) and (ii) above.  The Funded Reserve Account shall be maintained, and the funds therein (the "Funded Reserve Amount") shall be held in trust for the benefit of Professional Persons.  Any and all amounts in the Funded Reserve Account shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Loan Documents or DIP Loan Documents and neither the [Prepetition Secured Parties] nor the DIP Secured Parties shall be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary

29

in the [Prepetition Loan Documents] or DIP Loan Documents. Notwithstanding the foregoing, any and all payments to Professional Persons allowed by the Court (excluding restructuring, sale, financing, or other success fees) shall be paid first from the Funded Reserve Account.

(d)      On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors in accordance with paragraph [[___](b)] above, with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, including cash in the DIP Proceeds Account, to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees in excess of the Funded Reserve Amount; provided that in the event that a Termination Declaration Date occurs, Professional Persons shall have two business days to deliver additional Fee Statements to the Debtors, and the Debtors shall fund into the Funded Reserve Amount and Top Off Amounts.  The Debtors shall deposit and hold such amounts in the Funded Reserve Account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, including cash in the DIP Proceeds Account, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post Carve Out Trigger Notice Cap to the extent not already funded (including upon entry of the Order as set forth above).  The Debtors shall deposit and hold such amounts in a segregated account at an institution designated by the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.   All

30

funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash (or other form of payment pursuant to an Acceptable Plan), and all Commitments have been terminated, in which case any such excess shall be paid to the [Prepetition Secured Parties] in accordance with their rights and priorities as set forth herein.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash (or other form of payment pursuant to an Acceptable Plan), and all Commitments have been terminated, in which case any such excess shall be paid to the [Prepetition Secured Parties] in accordance with their rights and priorities as set forth herein. Notwithstanding anything to the contrary in the DIP Loan Documents, or this Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph [__], then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph [__], prior to making any payments to the DIP Agent or the [Prepetition Secured Parties], as applicable.  Notwithstanding anything to the contrary in the DIP Loan Documents or this Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the [Prepetition Agents] shall not sweep or foreclose on cash (including

31

cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents.  Further, notwithstanding anything to the contrary in this Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Order, the DIP Loan Documents, or in any Prepetition Loan Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the Prepetition Liens, and the DIP Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(e)        Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out and shall be funded first from the Funded Reserve Account.

(f)        No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Agent, DIP Lenders, or the [Prepetition Secured Parties] shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.

32

33

Nothing in this Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the [Prepetition Secured Parties], in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)     Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar for-dollar basis.

**Annex 2[5]**

**Exculpation and Release Language**

---

[5] [NOTE – ALL DEFINITIONS SUBJECT TO REVIEW AND CHANGE BASED ON PLAN STRUCTURE]

**Defined Terms[6]**

"*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

"*Causes of Action*" means claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

"*Disinterested Directors' Settlement*" means the settlement negotiated by and among the Disinterested Directors regarding Debtor Intercompany Claims incorporated in [this Plan].

"*Exculpated Party*" means collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL Agent; (d) the ABL Lenders; (e) the Term Loan Agent; (f) the Term Loan Lenders; (g) the First Lien Notes Trustee; (h) the First Lien Noteholders; (i) the Second Lien Notes Trustee; (j) the Second Lien Noteholders; (k) the Unsecured Notes Trustee; (l) the Unsecured Noteholders; (m) the Plan Sponsors; (n) the DIP Agent; (o) the DIP Lenders; (p) the Consenting First Lien Lenders; (q) the Plan Administrator; (r) with respect to each of the foregoing parties in clauses (a) through (q), each of such party's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (s) with respect to each of the foregoing parties in clauses (a) through (r), each of such party's current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors, and other professionals.

"*Released Party*" means each of the following, solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Wind-Down Debtors; (d) the Plan Administrator; (e) the ABL Agent; (f) the ABL Lenders; (g) the Term Loan Agent; (h) the Term Loan Lenders; (i) the First Lien Notes Trustee; (j) the First Lien Noteholders; (k) the Second Lien Notes Trustee; (l) the Second Lien Noteholders; (m) the Unsecured Notes Trustee; (n) the Unsecured Noteholders; (o) the Plan Sponsors; (p) the DIP Agent; (q) the DIP Lenders; (r) the Consenting First Lien Lenders; (s); with respect to each of the foregoing parties in clauses (a) through (r), each of such party's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (r) with respect to each of the foregoing parties in clauses (a) through (r), each of such party's current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board

---

[6]     Capitalized terms used but not defined in this **Annex 2** to the RSA Term Sheet shall have the meanings ascribed to them in the Plan.

members, investment advisors, and other professionals; *provided* that any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) files an objection to the releases contained in the Plan, or (z) votes to reject the Plan shall not be a "Released Party."

"*Releasing Party*" means each of the following, solely in its capacity as such: (a) the ABL Agent; (b) the ABL Lenders; (c) the Term Loan Agent; (d) the Term Loan Lenders; (e) the First Lien Notes Trustee; (f) the First Lien Noteholders; (g) the Second Lien Notes Trustee; (h) the Second Lien Noteholders; (i) the Unsecured Notes Trustee; (j) the Unsecured Noteholders; (k) the Plan Sponsors; (l) the DIP Agent; (m) the DIP Lenders; (n) the Consenting First Lien Lenders; (o) with respect to the foregoing clauses (a) through (n), each of such party's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; (p) with respect to each of the foregoing parties in clauses (a) through (o), each of such party's current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors, and other professionals; and (q) all holders of Claims or Interests; *provided* that any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) files an objection to the releases contained in the Plan, or (z) votes to reject the Plan shall not be a "Releasing Party."

**Releases by the Debtors**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, the Wind-Down Debtors, and their Estates from any and all Claims and Causes of Action, including Claims and Causes of Action identified, claimed, or released in the Disinterested Directors' Settlement, as well as other Claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or their Estates (as applicable) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:  the Debtors or the Wind-Down Debtors (including the management, ownership, or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' or the or the Wind-Down Debtors' restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), any intercompany transactions, the Tax Sharing Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Disinterested Directors' Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Disinterested Directors' Settlement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim or

Causes of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**Releases by Holders of Claims and Interests**

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, Wind-Down Debtor, and Released Party from any and all Claims and Causes of Action, including Claims and Causes of Action identified, claimed, or released in the Disinterested Directors' Settlement, as well as other Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Wind-Down Debtors, or their Estates (as applicable), that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the management, ownership or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' or the Wind-Down Debtors' restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions, the Tax Sharing Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Disinterested Directors' Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Disinterested Directors' Settlement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim or Causes of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and

their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

**Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Disinterested Directors' Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Disinterested Directors' Settlement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## EXHIBIT B

## Company Parties

Future Source, LLC
J. C. Penney Company, Inc.
J. C. Penney Corporation, Inc.
J. C. Penney de Guatemala, Sociedad Anonimad
J. C. Penney de Honduras, S.A.
J. C. Penney Direct Marketing Services, LLC
J. C. Penney Export Merchandising Corporation
J. C. Penney Business Information Consulting (Shanghai) Co., Ltd.
J. C. Penney International, Inc.
J. C. Penney Korea
J. C. Penney Properties, LLC
J. C. Penney Purchasing Corporation
J. C. Penney Purchasing Hong Kong Limited
J. C. Penney Purchasing India Private Limited
J. C. Penney Services India Private Limited
JCP Construction Services, Inc.
JCP Media, Inc.
JCP New Jersey, LLC
JCP Procurement, Inc.
JCP Real Estate Holdings, LLC
JCP Realty, LLC
JCP Telecom Systems, Inc.
JCPenney Insurance Agency, Inc.
JCPenney Puerto Rico, Inc.
JCPenney Services, LLC
jcpSSC, Inc.

<u>**EXHIBIT C**</u>

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**")[1] by and among J. C. Penney Company, Inc. ("**JCP**") and its affiliates and subsidiaries bound thereto and the Consenting First Lien Lenders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting First Lien Lenders" and a ["Consenting Term Lender"] ["Consenting First Lien Noteholder"] under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed the above-named Transferee, its affiliates and its and their respective accounts and funds managed or advised by any of them or other entities that hold interests directly or indirectly on behalf of such Transferee, its affiliates its and their respective accounts and funds managed or advised by any of them* | |
|---|---|
| [ABL Loans] | |
| First Lien Notes | |
| [Second Lien Notes] | |
| [Unsecured Notes] | |
| Term Loans | |
| [Equity Interests] | |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## EXHIBIT D

**Form of Joinder Agreement**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among J. C. Penney Company, Inc. ("**JCP**") and its affiliates and subsidiaries bound thereto and the Consenting First Lien Lenders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a ["Consenting Term Lender"] ["Consenting First Lien Noteholder"] under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:
Address:
E-mail address(es):

| | |
|---|---|
| ***Aggregate Amounts Beneficially Owned or Managed the above-named Joinder Party, its affiliates and its and their respective accounts and funds managed or advised by any of them or other entities that hold interests directly or indirectly on behalf of such Joinder Party, its affiliates its and their respective accounts and funds managed or advised by any of them*** | |
| [ABL Loans] | |
| First Lien Notes | |
| [Second Lien Notes] | |
| [Unsecured Notes] | |
| Term Loans | |
| [Equity Interests] | |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## Exhibit B

**Collateral Lien Priority Chart**

## Collateral Priorities Chart

| Collateral Category | Collateral Description | Collateral Priority (Senior to Junior) | | |
|---|---|---|---|---|
| ABL Priority Collateral | Accounts receivable, credit card receivables, inventory, cash, and certain related assets | ABL Obligations | Term Loan Obligations and First Lien Notes Obligations | Second Lien Obligations |
| Term Priority Collateral (other than Encumbered Real Estate) | Intellectual Property, Intercompany Claims, Equity Interests, Equipment and certain related assets | Term Loan Obligations and First Lien Notes Obligations | Second Lien Obligations | None |
| Encumbered Real Estate | Mortgaged owned real estate and ground leases | Term Loan Obligations and First Lien Notes Obligations | None | |
| Unencumbered Assets | Certain owned real estate, ground leases, operating leases | None | | |