**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| J. C. PENNEY COMPANY, INC., *et al.*,[1] | ) | Case No. 20-20182 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF (I) AN INTERIM AND FINAL
ORDER (A) AUTHORIZING DEBTORS TO USE CASH COLLATERAL,
(B) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED
PARTIES, AND (C) SCHEDULING A FINAL HEARING; AND (II) A FINAL ORDER
(A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING
PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (B) GRANTING LIENS
AND SUPERPRIORITY CLAIMS, (C) MODIFYING THE AUTOMATIC STAY, AND
(III) GRANTING RELATED RELIEF**

EMERGENCY RELIEF HAS BEEN REQUESTED.  A HEARING WILL BE CONDUCTED ON THIS
MATTER ON MAY 16, 2020, AT 1:00 P.M. (CENTRAL TIME) AT UNITED STATES BANKRUPTCY
COURT FOR THE SOUTHERN DISTRICT OF TEXAS, 1133 N. SHORELINE BLVD, CORPUS
CHRISTI, TEXAS 78401.  IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT
EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE
HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING.  OTHERWISE, THE
COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

RELIEF IS REQUESTED NOT LATER THAN MAY 16, 2020.

PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-
10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY
CONDITIONS.

IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY
APPEAR VIA VIDEO AT THIS HEARING.

AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S REGULAR DIAL-IN NUMBER.
THE DIAL-IN NUMBER IS +1(832) 917-1510.  YOU WILL BE RESPONSIBLE FOR YOUR OWN
LONG-DISTANCE CHARGES.  YOU WILL BE ASKED TO KEY IN THE CONFERENCE ROOM
NUMBER.  JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691.

PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET
CONNECTION.  THE INTERNET SITE IS WWW.JOIN.ME.  PERSONS CONNECTING BY MOBILE
DEVICE WILL NEED TO DOWNLOAD THE FREE JOIN.ME APPLICATION.

ONCE CONNECTED TO WWW.JOIN.ME, A PARTICIPANT MUST SELECT "JOIN A MEETING".
THE CODE FOR JOINING THIS HEARING BEFORE JUDGE JONES IS "JUDGE JONES".  THE

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors'
proposed claims and noticing agent at http://cases.primeclerk.com/JCPenney.  The location of Debtor
J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11
cases is 6501 Legacy Drive, Plano, Texas 75024.

---

**NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME IN THE LOWER LEFT CORNER.  PLEASE COMPLETE THE NAME AND CLICK "NOTIFY".**

**HEARING APPEARANCES SHOULD BE MADE ELECTRONICALLY AND IN ADVANCE OF THE HEARING.  YOU MAY MAKE YOUR ELECTRONIC APPEARANCE BY:**

**1) GOING TO THE SOUTHERN DISTRICT OF TEXAS WEBSITE;**

**2) SELECTING "BANKRUPTCY COURT" FROM THE TOP MENU;**

**3) SELECTING JUDGES' PROCEDURES AND SCHEDULES;**

**4) SELECTING "VIEW HOME PAGE" FOR JUDGE DAVID R. JONES;**

**5) UNDER "ELECTRONIC APPEARANCE" SELECT "CLICK HERE TO SUBMIT ELECTRONIC APPEARANCE;"**

**6) SELECT J. C. PENNEY COMPANY, INC., ET AL. FROM THE LIST OF ELECTRONIC APPEARANCE LINKS, AND**

**7) AFTER SELECTING J. C. PENNEY COMPANY, INC., ET AL. FROM THE LIST, COMPLETE THE REQUIRED FIELDS AND HIT THE "SUBMIT" BUTTON AT THE BOTTOM OF THE PAGE.**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this motion (this "Motion") for the relief set forth herein.  In support of this Motion, the Debtors submit the Declaration of James Mesterharm in support of *Debtors' Emergency Motion for Entry of an (I) Interim and Final Order (A) Authorizing Debtors to Use Cash Collateral, (B) Granting Adequate Protection to the Prepetition Secured Parties, (C) Modifying the Automatic Stay, and (D) Scheduling a Final Hearing; and  (II) a Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Granting Liens and Superpriority Claims, (C) Modifying the Automatic Stay, and (D) Granting Related Relief* (the "Mesterharm Declaration") filed contemporaneously herewith, and the First Day Declaration.[2]  In further support of this Motion, the Debtors respectfully state the following:

1.      In the midst of an unprecedented pandemic exacerbating the disruption in the brick-and-mortar retail industry, the Debtors are pleased to present the Court with this Motion requesting

---

[2]     On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of Bill Wafford, Executive Vice President, Chief Financial Officer of J. C. Penney Company, Inc., in Support of Chapter 11 Petitions and First Day Motions*, filed concurrently herewith (the "First Day Declaration").

(a) authorization for the immediate use of Cash Collateral and (b) access after a final hearing to a $900 million postpetition delayed-draw term loan facility (the "DIP Facility"), provided by Consenting First Lien Lenders in **both** tranches of the Debtors' prepetition first lien funded debt (the "First Lien Group").[3]   The DIP Facility will provide the Debtors with $450 million of new money, all of which is fully committed by certain holders of First Lien Claims pursuant to the terms of the commitment letter attached hereto as **Exhibit A** (the "DIP Commitment Letter"), and will be provided on the terms set forth in the term sheet attached to the DIP Commitment Letter (the "DIP Term Sheet").

2.      The terms for use of Cash Collateral and the DIP Financing are the product of weeks of arm's-length, hard-fought (and at times contentious) negotiations with the Prepetition ABL Lenders and the First Lien Group, which holds, in the aggregate, more than 66 2/3% of the outstanding principal of First Lien Notes and the outstanding principal of Term Loans.  Ultimately, the resolution reflected in the DIP Commitment Letter, the proposed Interim Cash Collateral Order attached hereto (the "Interim Order"),[4] and the restructuring support agreement (the "RSA") attached to the First Day Declaration appropriately provides the Debtors with the necessary liquidity to operate their businesses and administer their estates during the anticipated duration of these chapter 11 cases (the Chapter 11 Cases").  This resolution is supported by the First Lien Group and, the Debtors believe, acceptable to the Prepetition ABL Lenders.  By reaching a consensual deal, the Debtors have avoided protracted, costly litigation with the various secured

---

[3]     The Debtors will seek approval of entry into the DIP Facility pursuant to an order (the "DIP Order") to be filed prior to the hearing scheduled to approve such facility (the "Final Hearing").

[4]     At the time of filing of this Motion, the Debtors and the Prepetition ABL Lenders reached consensus on nearly all aspects of the use of Cash Collateral and the Debtors hope and anticipate that prior to the hearing on this Motion, overall consensus will be reached.

parties who hold a lien on the Cash Collateral and built a bridge from the Petition Date through emergence from chapter 11.

3.      Immediate access to Cash Collateral is critical to the Debtors' restructuring efforts. Nearly all $500 million of the Debtors' cash on hand is Cash Collateral and is necessary to pay nearly 85,000 associates, restock stores with merchandise, maintain operations, and administer these chapter 11 cases as the Debtors look forward to reopening stores and emerging from the "cash preservation mode" implemented in light of the coronavirus pandemic.  This cash preservation mode involved several measures to pause outflows and protect the Debtors.  ***First***, the Debtors drew down $1.25 billion on their ABL Facility.  ***Second***, they paused all hiring, cut spending, reduced receipts of merchandising goods, and suspended all merit pay increases for 2020.  ***Third***, they extended payment terms with their vendors.  ***Fourth***, the Debtors made the incredibly difficult decision to implement both partial and full furloughs that have affected nearly all of the Debtors' employees.  ***Fifth***, the Debtors did not pay the majority of May rent on account of temporary store closures.  These difficult but necessary measures not only shielded the Debtors from immediate danger, but enabled the Debtors to enter chapter 11 with sufficient liquidity to responsibly operate and maintain their businesses for the first few weeks of the cases.

4.      As the Debtors look forward to reopening more stores in the coming weeks and months, their need for additional liquidity will grow.  The Debtors' businesses are capital intensive and require constantly bringing in fresh inventory to stock their shelves, both online and in stores. To that end, the Debtors have negotiated for $450 million in new liquidity through the DIP Facility to help finance operations and create a bridge as the Debtors pursue the restructuring embodied in the RSA.

5.      The Debtors have also negotiated a reasonable adequate protection package for their secured lenders, most of whom consent to this Motion.  As set forth below, the adequate protection proposed for and agreed to by the ABL Secured Parties includes liens on existing and new inventory and adequate protection claims due to any diminution in value of their collateral, and other adequate protection provisions that are reasonable, appropriate, and in line with market expectations.  Mesterharm Decl. ¶ 21.

6.      The Term Loan Secured Parties and First Lien Notes Secured Parties are also being provided a sufficient adequate protection package.  As described in more detail below, this includes adequate protection liens, diminution claims, quarterly reporting rights, and other reasonable and appropriate protections.

7.      The Second Lien Notes Secured Parties (who have only third priority liens on the Cash Collateral) are being provided with adequate protection claims, and adequate protection liens (but not on unencumbered assets until entry of the Final DIP/Cash Collateral Order).  *Id.*

8.      All of these packages are reasonable, appropriate, and in line with market expectations.  *Id.* ¶ 23.

9.      For these reasons, and for the reasons set forth below, in the Mesterharm Cash Collateral Declaration, and in the First Day Declaration, the Debtors believe that immediate access to Cash Collateral will maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment.  Further, for the reasons set forth herein and in light of the evidence to be adduced at or in advance of the Final Hearing, the Debtors believe that entering into the DIP Facility will also maximize the value of the Debtors' estates and is a sound exercise of the Debtors' business judgment.  Accordingly, the Debtors respectfully request that the Court approve the entry of the Interim Order and the Final Order.

**Relief Requested**

10.    The Debtors seek the following relief pursuant to entry of the Interim Order:

    a.    authorizing for the Debtors, pursuant to sections 105, 361, 362, 363, 503 and 507 of the Bankruptcy Code, to use the Cash Collateral, and all other Prepetition Collateral (as defined herein) of the Prepetition Secured Parties;

    b.    authorizing for the Debtors to provide adequate protection to the Prepetition Secured Parties;

    c.    modifying the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay") to the extent necessary to permit the Debtors and their affiliates, and Prepetition Secured Parties, to implement and effectuate the terms and provisions of the Interim Order;

    d.    scheduling a final hearing (the "Final Hearing") to  consider (i) authorizing the Debtors on a final basis to continue to use the Cash Collateral and the other Prepetition Collateral subject to the terms and conditions of the Final Order and (ii) authorizing and approving the relief requested in the Motion to become effective pursuant to the Final Order and final approval of the DIP Facility pursuant to the Final Order, as set forth in this Motion and the DIP Documents (as defined below) filed with this Court; and

    e.    waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order upon entry, if necessary.

11.    Additionally, the Debtors seek entry of the Final Order, among other things, authorizing the DIP Loan Parties to obtain postpetition financing (the "DIP Financing") pursuant to a senior secured, superpriority debtor in possession credit facility (the "DIP Facility" and the term loans thereunder, the "DIP Loans"), subject to the terms and conditions set forth in the DIP Commitment Letter in an aggregate principal amount of up to $900 million.

**Jurisdiction and Venue**

12.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157 (b).  The Debtors confirm their consent, pursuant to

Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order.

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

14.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

15.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of these Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).  No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.

**Concise Statement of the Material Terms of the Interim Order
Pursuant to Bankruptcy Rule 4001 and the United States Bankruptcy
Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases**

16.     The below chart contains a summary of the material terms of the Interim Order, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the *United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases* (the "Complex Case Procedures") and the anticipated terms of the DIP Financing as set forth on the DIP Term Sheet attached DIP Commitment Letter (and the term sheet attached thereto, the "DIP Term Sheet").[5]  In advance of the Final Hearing, the Debtors will provide a credit agreement

---

[5]     The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the [DIP Credit Agreement], the Interim Order, and the Final Order.  To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

pertaining to the DIP Facility, as well as a proposed Final Order.  For the avoidance of doubt, the

Debtors seek approval of the DIP Facility only upon entry of the Final Order.

| Summary of Material Terms for Interim Order | | Interim Order Location |
|---|---|---|
| **Parties with an Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | The lenders under the ABL Credit Agreement (as defined herein) (the "ABL Lenders") and the ABL Agent (as defined herein) (together with the ABL Lenders and the other "Secured Parties" identified in the ABL Credit Agreement, the "ABL Secured Parties").<br><br>The lenders under the Term Loan Agreement (as defined herein) (the "Term Loan Lenders"), and the Term Loan Administrative Agent (together with the Term Loan Lenders and the other "Secured Parties" identified in the Term Loan Agreement, the "Term Loan Secured Parties").<br><br>The holders of the First Lien Notes (as defined herein) (the "First Lien Noteholders" and together with the First Lien Notes Indenture Trustee (as defined herein), the other "Secured Parties" identified in the First Lien Notes Indenture (as defined herein) and the Term Loan Secured Parties, the "Term Loan/First Lien Notes Secured Parties").<br><br>The holders of the Second Lien Notes (as defined herein) (the "Second Lien Noteholders," and together with the Second Lien Notes Trustee and the and the other "Secured Parties" identified in the Second Lien Notes Indenture (as defined herein), the "Second Lien Notes Secured Parties"). | ¶ 5 |
| **DIP Parties**<br>Bankruptcy Rule 4001(c)(1)(B) | **Debtor Parties:**<br><br>a. *Borrower*:  J. C. Penney Corporation, Inc. (the "DIP Borrower").<br><br>b. *Guarantors*:  J. C. Penney Company, Inc. and each its subsidiaries that are Debtors other than the Borrower.<br><br>**Lending Parties:**<br><br>a. *DIP Lenders*:  Those DIP Lenders identified on Schedule 1 to the DIP Term Sheet attached to the DIP Commitment Letter attached hereto as Exhibit A.<br><br>b. *DIP Agent*:  GLAS USA, LLC. | Pending - Final Order |

---

Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Summary of Material Terms for Interim Order | | Interim Order Location |
|---|---|---|
| **DIP Commitments**<br>Bankruptcy Rule 4001(c)(1)(B) | An aggregate principal amount of $450 million in new money commitments and a $450 million roll-up of the Term Loans, to be funded in multiple borrowings as follows: (a) up to $225 million made not later than one business day following the entry of the DIP Order (as defined below) (the "<u>Initial Borrowing</u>"), and (b) the remainder of the Total Aggregate Commitment in an aggregate principal amount equal to $225 million (the "<u>Subsequent Borrowing</u>") made available following the entry of the DIP Order on July 15, 2020, subject to satisfaction of the Conditions Precedent to Initial Borrowing and the Conditions Precedent to the Subsequent Borrowing.<br><br>**(DIP Term Sheet, Facility)** | Pending - Final Order |
| **Purposes for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | Subject to the provisions of the Interim Order, and in accordance with the Initial Budget, Cash Collateral may be used by the Debtors to avoid immediate and irreparable harm to the Debtors pending the Final Hearing. | ¶ 12 |
| **Budget.**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The Debtors are permitted to use Cash Collateral in accordance with the Initial Budget attached to the Interim Order as <u>Annex 1</u> (the "<u>Initial Budget</u>"). | ¶ 12 |
| **DIP Facility Interest Rate**<br>Bankruptcy Rule 4001(b)(1)(B)(ii) | Loans under the DIP Facility will bear interest at a rate, at the DIP Borrower's option, equal to the Base Rate plus 10.75% per annum or LIBOR (subject to a 1.25% floor) plus 11.75% per annum, compounded monthly and payable monthly in cash in arrears.<br>At any time when an Event of Default under the DIP Facility has occurred and is continuing, all outstanding amounts under the DIP Facility shall bear interest, to the fullest extent permitted by law, at the interest rate applicable to base rate loans plus 2.00% per annum and shall be payable on demand in cash (the "<u>Default Rate</u>"). Interest on overdue amounts under the DIP Facility shall also accrue at the Default Rate and shall be payable in cash.<br><br>**(DIP Term Sheet, DIP Facility Interest Rate)** | Pending - Final Order |
| **DIP Facility - Fees and Expenses** | Pursuant to the Operative Documents and in consideration for the services of the DIP Agent and the DIP Lenders, as applicable, the Debtors shall pay the premiums described in the DIP Term Sheet and separate fee letters.<br><br>**(DIP Commitment Letter; DIP Term Sheet, DIP Facility Premiums)** | Pending - Final Order |
| **Conditions**<br>Bankruptcy Rules 4001(c)(1)(B) | <u>**Conditions Precedent to Initial Borrowing.**</u> The Operative Documents will contain customary conditions precedent to the Initial Borrowing under the DIP Facility and other conditions deemed by the DIP Agent to be appropriate to the specific transaction, and in any event, including, without limitation:<br><br>    a.      The execution of the RSA and the filing of the executed RSA.<br><br>    b.      The preparation, authorization and execution | |

| Summary of Material Terms for Interim Order | Interim Order Location |
|---|---|
| of the Operative Documents with respect to the DIP Facility, in form and substance satisfactory to the DIP Agent. | |
| c.  No later than 18 calendar days after the Petition Date, the Bankruptcy Court shall have entered a final order approving the DIP Facility on a final basis (the "DIP Order"), in form and substance satisfactory to the DIP Agent in their sole discretion as confirmed by the DIP Agent in writing, authorizing and approving the DIP Facility and the transactions contemplated hereby, including Adequate Protection and the DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the DIP Agent. | |
| d.  All premiums, fees and documented out-of-pocket fees and expenses (including fees and expenses of counsel and financial advisors) required to be paid to the DIP Lenders and DIP Agent (and with respect to which invoices have been received by the Debtors at least one (1) business day before the Closing Date) on or before the Closing Date (whether incurred before or after the Petition Date and including estimated fees and expenses through the Closing Date) shall have been paid. | |
| e.  The delivery of a 13-week cash flow projection (the "Initial DIP Budget") in form and substance reasonably satisfactory to the DIP Agent in its reasonable discretion as confirmed by the DIP Agent in writing. Such Initial DIP Budget and all updates thereto (in accordance with reporting requirements described herein) shall include the same line item detail as provided in the AlixPartners 13-week cash flow provided on May 13, 2020 prepetition, and will forecast, on a weekly basis, the period commencing May 17, 2020 through the end of the fiscal month following the last week of such 13-week period, and on a monthly basis for each month thereafter through the Maturity Date; provided that with the written consent and approval of the DIP Agent the Initial Budget may be updated by the DIP Borrower no more than once per month, which update shall be effective three calendar days following delivery to the DIP Agent except to the extent objected to by the DIP Agent in writing. Upon effectiveness, such updated budget shall thereupon become the "budget" for purposes of the DIP Facility (as so approved, the | |

| Summary of Material Terms for Interim Order | Interim Order Location |
|---|---|

"Budget").

f.      The Debtors shall have obtained requisite consents from the Prepetition ABL Agent and the Prepetition ABL Lenders to the use of cash collateral in the Chapter 11 Cases in an amount and on terms satisfactory to the Prepetition ABL Agent, the Prepetition ABL Lenders and the DIP Lenders, or the Bankruptcy Court shall have entered a cash collateral order acceptable to the DIP Agent (the "Cash Collateral Order").  For the avoidance of doubt, the DIP Agent may not determine the Cash Collateral Order is not acceptable solely on account of the Prepetition ABL Agent and the Prepetition ABL Lenders not consensually consenting to the use of such cash collateral.

g.      Subject to a post-closing period to be agreed upon, the DIP Agent shall have received endorsements naming the DIP Agent as additional insureds, loss payee, lender loss payee and mortgagee under all insurance policies to be maintained with respect to the properties of the Debtors forming part of the Collateral.

h.      The DIP Agent shall have a valid and perfected lien on and security interest in the Collateral with the priority described herein.  All filings, recordations and searches necessary or desirable in connection with such liens and security interests shall have been duly made; and all filing and recording fees and taxes shall have been duly paid.

i.      Since January 31, 2020, there shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Chapter 11 Cases) or threatened in any court or before any arbitrator or governmental authority that, in the opinion of the DIP Agent, affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a material adverse change or material adverse condition in or affecting the businesses, assets, operations or condition (financial or otherwise) of any of the Debtors and their respective direct and indirect subsidiaries or any of the transactions contemplated hereby; provided, that none of (i) the Chapter 11 Cases, the events and conditions leading up to the Chapter 11 Cases, or their reasonably anticipated consequences, (ii) the actions required to be taken pursuant to the DIP Credit Agreement, the RSA, the DIP Order, or the Cash Collateral

| Summary of Material Terms for Interim Order | | Interim Order Location |
|---|---|---|
| | Order, or (iii) the occurrence of the COVID-19 pandemic or the impacts thereof on the business, financial condition or results of the DIP Borrower or its subsidiaries shall constitute a "material adverse effect" for any purpose. | |
| j. | No default or event of default shall exist under the Operative Documents. | |
| k. | The representations and warranties of the DIP Borrower and each Guarantor under the Operative Documents shall be true and correct in all material respects after giving effect to such funding. | |
| l. | The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently. | |
| m. | The DIP Agent shall have received all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the U.S. Patriot Act. | |
| n. | No later than five business days after the Petition Date, the Debtors shall have filed a motion seeking the retention of AlixPartners LLP as the Debtors' restructuring advisor and Lazard as the Debtors' investment banker. | |
| o. | An order approving the Debtors' cash management system, the form of which is reasonably acceptable to the DIP Agent, shall have been entered by the Bankruptcy Court. | |
| p. | Orders approving customary "first day" relief, the form of which is reasonably acceptable to the DIP Agent, shall have been entered by the Bankruptcy Court. | |
| q. | The Debtors shall not have entered into, or made any payment in respect of, any critical vendor agreements or otherwise entered into any agreement to pay, or made on a postpetition basis any payment in respect of, any prepetition trade obligations except as consented to by the DIP Agent pursuant to an order of the Bankruptcy Court (which may be via consent to the "first day" orders). | |
| r. | Other customary conditions to be mutually agreed. | |
| On the funding date of the Subsequent Borrowing, the following conditions precedent shall have been satisfied: | | |

| Summary of Material Terms for Interim Order | Interim Order Location |
|---|---|
| a.   The RSA shall be in full force and effect. | |
| b.   No default or event of default shall exist under the Operative Documents. | |
| c.   The representations and warranties of the DIP Borrower and each Guarantor under the Operative Documents shall be true and correct in all material respects after giving effect to such funding (except to the extent such representation relates to an earlier date, in which case such representation shall have been true and correct in all material respects as of such date). | |
| d.   The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently. | |
| e.   The DIP Agent shall have received a borrowing notice, substantially in the form as attached to the DIP Credit Agreement, at least three business days in advance of the requested borrowing. | |
| f.   The DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the DIP Agent. | |
| g.   All premiums, fees and documented out-of-pocket fees and expenses (including fees and expenses of counsel and financial advisors) required to be paid to the DIP Lenders and the DIP Agent on or before the date of such funding shall have been paid in cash. | |
| h.   The Debtors shall be in compliance with the Operative Documents and the DIP Milestones (as defined in the DIP Term Sheet); *provided* that the DIP Milestones relating to the Business Plan (other than the receipt of the Business Plan and the Business Plan Parameters in accordance with the DIP Milestones) shall not be a condition precedent to the funding of the Subsequent Borrowing into the Escrow Account; provided, further, that no Drawn Funds in respect of the Subsequent Borrowing shall be permitted to be withdrawn from the Escrow Account until the Business Plan has been approved or disapproved in accordance with the DIP Milestones, with (i) $225 million permitted to be withdrawn from the Escrow Account commencing July 15, 2020 in accordance with the Budget if the Business Plan is approved in | |

| Summary of Material Terms for Interim Order | | Interim Order Location |
|---|---|---|
| | accordance with the DIP Milestones or (ii) upon the occurrence of a Toggle Event, $50 million shall be permitted to be drawn from the Escrow Account on July 15, 2020 for a toggle to a 363 sale, with the release of such $50 million from the Escrow Account subject to agreement among the DIP Borrower, the DIP Agent and the Prepetition ABL Agent to an acceptable 363 sale budget, and $175 million shall be released from the Escrow Account and remitted to the DIP Lenders within 2 business days of the date of the occurrence of such Toggle Event.. **(DIP Term Sheet, Conditions Precedent to Initial Borrowing; Conditions Precedent to Each Subsequent Borrowing)** | |
| **Roll Up of Certain Claims** | On the date of entry of the Final Order approving the DIP Facility, $225 million in principal amount of the Prepetition Term Loans held by the DIP Lenders (or their applicable designees) shall be rolled up into the DIP Facility in accordance with each such Prepetition Term Loan Lender's share of the DIP Facility.   On the date the Subsequent Borrowing, a corresponding amount of principal amount of the Prepetition Term Loans held by the DIP Lenders (not to exceed an additional $225 million in the aggregate) shall be rolled up into the DIP Facility on a dollar-for-dollar basis in accordance with each such Prepetition Term Loan Lender's share of the DIP Facility. **(DIP Term Sheet, Roll Up)** | Pending - Final Order |
| **Cash Collateral Termination Events** **Bankruptcy Rules 4001(b)(1)(B)(iii), 4001(c)(1)(B)** | The Interim Order provides for certain events of default (collectively, the "Cash Collateral Termination Events") that are usual and customary for consensual use of cash collateral in chapter 11 proceedings.   Occurrence of Cash Collateral Termination Event shall terminate the Debtors' right to use Cash Collateral, subject to filing of the Stay Relief Motion and expiration of the ABL Remedies Notice Period.  Notable Cash Collateral Termination Events include: • Cross-default to any material prepetition indebtedness that is not stayed by the automatic stay in the Chapter 11 Cases; • An order shall be entered reversed, adversely amending, adversely supplementing, staying, vacating or otherwise adversely modifying material provisions of the Interim Order without the written agreement of the ABL Agent, the Term Loan Administrative Agent, and the Term Loan/First Lien Notes Collateral Agent; • The Interim Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any | ¶¶ 31–32 |

14

| Summary of Material Terms for Interim Order | Interim Order Location |
|---|---|
| modification or amendment (other than entry of the Final Order); | |

- The Debtors shall have entered an order dismissing any of the Chapter 11 Cases absent consent of the Prepetition Secured Parties;

- The Court shall have entered an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, unless the ABL Agent has consented to such order in writing;

- The Court shall have entered an order authorizing the appointment or election of a trustee or examiner with expanded powers or any other representative with expanded powers relating to the operation of the businesses in the Chapter 11 Cases, unless consented to in writing by the ABL Agent;

- The Court shall have entered an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entity other than the ABL Agent or any of the ABL Secured Parties, the Term Loan Administrative Agent or any of the Term Loan Secured Parties, the First Lien Notes Indenture or any First Lien Notes Secured Parties, or the Term Loan/First Lien Notes Collateral Agent, the First Lien Notes Indenture Trustee or any First Lien Notes Secured Party, or the Second Lien Notes Indenture Trustee, the Second Lien Notes Collateral Agent or any Second Lien Notes Secured Party with respect to any material Prepetition Collateral or Cash Collateral without the written consent of the ABL Agent, which consent may be withheld by each in its sole discretion;

- A filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the ABL Credit Facility or asserting any other cause of action against and/or with respect to the ABL Credit Facility, the Prepetition Collateral, or the ABL Agent, any of the ABL Secured Parties (or if the Debtors support any such motion, pleading, application or adversary proceeding commenced by any third party); and

- The Debtors shall use Cash Collateral in any manner inconsistent with the terms of the Interim Order; or the Court shall have entered an order avoiding, disallowing, subordinating or recharacterizing any claim, lien, or interest held by any Prepetition Secured Party arising under the ABL Credit Agreement, unless (i) the Debtors have sought a stay of such order within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated

| Summary of Material Terms for Interim Order | | Interim Order Location |
|---|---|---|
| | within ten (10) business days after the date of such issuance or (ii) the ABL Agent has consented to such order in writing. | |
| **Cash Collateral - Adequate Protection.**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iv) | The Debtors will provide adequate protection to the ABL Secured Parties as follows:<br><br>• <u>ABL Adequate Protection Claims</u>. To the extent of any Diminution in Value with respect to the use of Cash Collateral, superpriority administrative expense claims that are entitled to priority in payment over any and all unsecured claims and administrative expense claims against the Debtors, now existing or hereafter arising, of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, subject and subordinate only to the Carve Out.<br><br>• <u>ABL Adequate Protection Liens</u>. As security for and solely to the extent of any diminution in value, the Debtors shall provide replacement or, if applicable, new liens on substantially all prepetition and postpetition property of the Debtors, subject to certain exceptions set forth in the Interim Order.<br><br>• <u>Interest and Other Amounts Due</u>. The ABL Agent, on behalf of the ABL Secured Parties, shall receive cash payment in immediately available funds in respect of prepetition interest and certain other amounts, as they come due subject to the limitations set forth in the Interim Order.<br><br>• <u>Reporting.</u> The Debtors shall provide (i) the quarterly reporting required under Section 5.01(b) of the ABL Credit Agreement and (ii) all reporting that the Debtors provide to the DIP Lenders pursuant to the DIP Documents, the Interim Order and the Final Order.<br><br>• <u>Fees and Expenses</u>. The Debtors are authorized and directed to pay the reasonable and documented invoiced out-of-pocket fees, costs and expenses of the ABL Secured Parties.<br><br>• <u>Cash Management Covenant</u>. The Debtors shall maintain their cash management arrangements in a manner consistent with that described in the applicable "first day" order.<br><br>• <u>Cash Collateral Borrowing Base</u>. The Debtors shall not permit Excess Availability (as defined in the ABL Credit Agreement) at any time to be less than 10.0% of the Revolving Credit Line Cap (as defined in the ABL Credit Agreement) (the "<u>Minimum Excess Availability Requirement</u>"); *provided*, that, (A) commencing on August 8, 2020 and at all times thereafter, the Minimum Excess Availability Requirement shall be reduced to 7.5% of the Revolving Credit Line Cap (as defined in the ABL Credit Agreement), (B) notwithstanding anything to the contrary in the ABL Credit Agreement, the definition of "Borrowing Base" used in the calculation of Excess Availability shall be the "Borrowing Base" as defined in, and determined in accordance with, the ABL Credit Agreement and set forth in the most recent Cash Collateral Borrowing Base Certificate delivered prior to the Petition Date but modified as provided | ¶¶15–20 |

| Summary of Material Terms for Interim Order | Interim Order Location |
|---|---|
| below herein (the "<u>Cash Collateral Borrowing Base</u>"), which, for the avoidance of doubt, shall give effect to the Net Orderly Liquidation Values ("<u>NOLV</u>") set forth in the appraisal prepared by Tiger Valuation Services, LLC for the ABL Agent delivered to the Debtors on April 28, 2020 pursuant to Section 5.14 of the ABL Credit Agreement which NOLV shall remain in effect for a period of six months, and (C) notwithstanding anything to the contrary (i) in the ABL Credit Agreement, (x) the Cash Collateral Borrowing Base shall not otherwise reflect any new reserves (discretionary or otherwise) during such period or any modifications to any eligibility criteria set forth in the ABL Credit Agreement and (y) the Cash Collateral Borrowing Base shall be increased (on a dollar-for-dollar basis) by the amount of cash held in the Segregated Cash Collateral Account (as defined below) (the "<u>Builder Cash</u>") as provided below and (ii) in the event that a Post-Maturity Exam (as defined below) has been completed (but at no time prior to the completion thereof), the Cash Collateral Borrowing Base and NOLV may be adjusted in accordance with the ABL Credit Agreement, as modified hereby.<br><br>• <u>Appraisals</u>. Notwithstanding anything to the contrary in the ABL Credit Agreement, the ABL Agent will not be entitled to request access for and/or request any new inspections, appraisals and field examinations (including, without limitation, with respect to ABL Priority Collateral) for a period of six months, at which time the ABL Agent may request access for and commission on one new appraisal and one new field examination of ABL Priority Collateral on terms consistent with the ABL Credit Agreement (such appraisal and field examination, the "<u>Post-Maturity Exam</u>"). Notwithstanding the foregoing, the ABL Agent shall be permitted to request access for and/or request any new inspections, appraisals, and field examinations from time to time, at the ABL Agent's own expense, for valuation purposes only, which (i) do not impact the calculation of the ABL Borrowing Base and (ii) do not unreasonably interfere with the ordinary course activities and operations of the Debtors as in effect at such time.<br><br>• <u>Segregated Collateral Account</u>. If, at any point in the Chapter 11 Cases, the Debtor Obligors fail to comply with the Minimum Excess Availability Requirement, the Debtors will be required to, at their option, either: (x) deposit cash into a controlled segregated cash reserve account (which account shall constitute ABL Priority Collateral that is secured by Prepetition ABL Liens) on a dollar-for-dollar basis equal to the amount necessary to restore compliance with the Minimum Excess Availability Requirement, which amount shall be deemed automatically designated as a Builder Cash (and shall increase the ABL Borrowing Base accordingly) (such account, the "<u>Segregated Cash Collateral Account</u>"), or (y) pay down the outstanding ABL Obligations in cash (using cash on hand or cash in the Segregated Cash | |

| Summary of Material Terms for Interim Order | Interim Order Location |
|---|---|
| Collateral Account) in the amount necessary to restore compliance with the Minimum Excess Availability Requirement.<br><br>• <u>Borrowing Base Certificate</u>.  The Debtors shall provide the ABL Agent with a Borrowing Base Certificate within five (5) business days of the end of each calendar week beginning with the second full calendar week following the Petition Date, calculated as of the close of business on Saturday of the immediately preceding calendar week.<br><br>• <u>Consent / Administration Fee</u>.  In consideration for the ABL Agent's consent to the use of Cash Collateral in accordance with the terms of the Interim Order and continued maintenance of the Debtors' cash management system, the ABL Agent shall be paid, in addition to all ABL Obligations owing by Debtors to the ABL Secured Parties, a weekly fee in the amount of $500,000 until all ABL Obligations have been Paid in Full (the "<u>Administration Fee</u>").<br><br>• <u>Discharge Waiver</u>.  Subject to the entry of a Final Order, the Debtors expressly stipulate that neither the ABL Adequate Protection Claims nor the ABL Adequate Protection Liens shall be discharged by the entry of an order confirming any plan of reorganization, notwithstanding section 1141(d) of the Bankruptcy Code, unless (i) the order is entered with the prior written consent of the ABL Agent, (ii) the Court enters an order finding that the ABL Adequate Claims are valued at zero dollars; or (iii) the ABL Adequate Claims have been Paid in Full in cash on or before the effective date of such plan.<br><br>The Debtors will provide adequate protection to the Term Loan/First Lien Notes Secured Parties as follows:<br><br>• <u>Term Loan/First Lien Notes Adequate Protection Claim</u>. To the extent of any Diminution in Value with respect to the use of Cash Collateral, superpriority administrative expense claims that are entitled to priority in payment over any and all unsecured claims and administrative expense claims against the Debtors, now existing or hereafter arising, of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, subject and subordinate only to the Carve Out;<br><br>• <u>Term Loan/First Lien Notes Adequate Protection Liens</u>. As security for and solely to the extent of any diminution in value, the Debtors shall provide replacement or, if applicable, new liens on substantially all prepetition and postpetition property of the Debtors, subject to certain exceptions set forth in the Interim Order.<br><br>• <u>Fees and Expenses</u>. The Debtors are authorized and directed to pay the reasonable and documented invoiced out-of-pocket fees, costs and expenses of the First Lien Group incurred in connection with the Chapter 11 Cases, subject to | |

| Summary of Material Terms for Interim Order | Interim Order Location |
|---|---|
| | the review procedures set forth in paragraph 20 of the Interim Order.<br><br>• <u>Reporting</u>.  The Debtors shall provide (i) the quarterly reporting required under Section 5.1(a) of the Term Loan Agreement and First Lien Notes Indenture and (ii) all reporting that the Debtors provide to the ABL Agent pursuant to the Interim Order and the Final Order.<br><br>• <u>Cash Management Covenant</u>.  The Debtors shall maintain their cash management arrangements in a manner consistent with that described in the applicable "first day" order; provided that the Debtors are authorized to create new, segregated bank accounts as required under any debtor-in-possession financing arrangements approved by the Court during the Cases.<br><br>The Debtors will provide adequate protection to the Second Lien Secured Parties as follows:<br>• <u>Second Lien Notes Adequate Protection Claim</u>.  To the extent of any Diminution in Value with respect to the use of Cash Collateral, superpriority administrative expense claims that are entitled to priority in payment over any and all unsecured claims and administrative expense claims against the Debtors, now existing or hereafter arising, of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, subject and subordinate only to the Carve Out;<br><br>• <u>Second Lien Notes Adequate Protection Liens</u>. As security for and solely to the extent of any diminution in value, the Debtors shall provide replacement or, if applicable, new liens on substantially all prepetition and postpetition property of the Debtors, subject to certain exceptions set forth in the Interim Order | |
| **DIP Facility - Adequate Protection**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | As adequate protection for any diminution in the value of the interests of the Term Loan Lenders and the First Lien Noteholders in the collateral securing the Prepetition Term Loan Credit Agreement and the First Lien Noteholders in the collateral securing the Prepetition First Lien Notes Indenture, respectively, the Term Loan Lenders and the First Lien Noteholders will receive, subject in all cases to the Carve-Out, the following as adequate protection:<br><br>    (a) the payment of the reasonable and documented out-of-pocket fees and expenses of legal counsel and financial advisors retained by the Term Loan Lenders that are also DIP Lenders;<br><br>    (b) [cash payments of accrued and unpaid interest on the Prepetition Term Loans and Prepetition | Pending - Final Order |

| Summary of Material Terms for Interim Order | | Interim Order Location |
|---|---|---|
| | First Lien Notes upon entry of the Final Order approving the DIP Facility and each date thereafter on which such interest payment would otherwise become due under the Prepetition Term Loan Credit Agreement or Prepetition First Lien Notes Indenture, as applicable;] | |
| | (c) validly perfected liens on and security interests in the Debtors' post-petition Collateral junior only to the liens granted to the DIP Lenders under the DIP Facility and existing valid, perfected, and superior liens in the Collateral held by other creditors (including, for the avoidance of doubt, the liens of the Prepetition ABL Lenders with respect to the ABL Priority Collateral); and | |
| | (d) a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code, which claim shall have priority over all priority claims (other than the claims of the DIP Lenders under the DIP Facility) and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c), 507(a), 507(b), 546(c), 726(b), and 1114 of the Bankruptcy Code or otherwise. | |
| **DIP Liens and Priorities**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | **DIP Liens**.<br><br>All amounts owing by the DIP Borrower under the DIP Facility and by the Guarantors in respect thereof will be secured by a perfected security interest in, with the priority described below under "Priority," and lien on substantially all of the Debtors' tangible and intangible assets, including, without limitation, the following (collectively, the "Collateral"): accounts receivable, equipment, inventory, contracts, fee owned and ground leased real estate, real property leaseholds, investment property, insurance proceeds, deposit accounts (other than payroll, trust and tax accounts), monies, equity interests of subsidiaries of each Debtor and the products and proceeds thereof and, upon entry of the DIP Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates pursuant to the Bankruptcy Code, subject to certain exclusions to be mutually agreed. Notwithstanding anything to the contrary, no mortgages shall be required and perfection on the Collateral shall be obtained solely through entry of the DIP Order.<br><br>Subject in all cases to the Carve-Out and certain exclusions to be mutually agreed, all amounts owing by the DIP Borrower under | Pending - Final Order |

| Summary of Material Terms for Interim Order | Interim Order Location |
|---|---|

|  | the DIP Facility and by the Guarantors in respect thereof shall at all times: |  |
|---|---|---|
|  | • pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claims status in the Chapter 11 Cases; |  |
|  | • pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all Collateral that is not subject to valid, perfected, and non-avoidable liens as of the Petition Date, including all unencumbered fee-owned, ground-leased and space-leased real estate, and including upon entry of the DIP Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates pursuant to the Bankruptcy Code; |  |
|  | • pursuant to section 364(d) of the Bankruptcy Code, be secured by a perfected first priority and priming lien on all collateral that secures obligations under the Prepetition Term Loan Credit Agreement (other than ABL Priority Collateral, as defined in the ABL Intercreditor Agreement ("ABL Priority Collateral")) and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected second priority lien on all ABL Priority Collateral, junior only to the lien securing the claims in respect of the Prepetition ABL Credit Agreement); and |  |
|  | • pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected second priority lien on all other property of the Debtors that is subject to valid and perfected liens in existence as of the Petition Date (including liens (if any) perfected subsequent to the Petition Date as permitted by and in accordance with section 546(b) of the Bankruptcy Code) but with a priority immediately junior to such liens. |  |
|  | **(DIP Term Sheet, Security, Priority)** |  |
| **DIP Facility Covenants.**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | **DIP Facility Covenants.**<br><br>The Operative Documents will contain (a) affirmative covenants that are customary for similar debtor-in-possession financings and (b) additional affirmative covenants required by the DIP Lenders and mutually agreeable to the Debtors and shall, in any event, include without limitation (i) the advance delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Debtors in the Chapter 11 Cases to the DIP Lenders and their counsel, (ii) compliance with Budget covenants consistent with the section titled "Budget and Variances," (iii) compliance with the DIP Milestones in the administration of the Chapter 11 Cases, (iv) update meetings and / or calls with the Debtors' senior management and advisors and the DIP Lenders no less than weekly if requested and (v) one or more members of the Debtors' | Pending - Final Order |

| Summary of Material Terms for Interim Order | Interim Order Location |
|---|---|
| senior management team shall be available for discussion with the DIP Lenders upon reasonable notice.<br><br>The Operative Documents will contain negative covenants that are (a) customary for similar debtor-in-possession financings and (b) additional negative covenants required by the DIP Lenders and mutually agreeable to the Debtors, and including, without limitation, restrictions on (i) incurrence of additional debt and liens (it being understood that any debt secured by the ABL Priority Collateral on a senior basis shall be capped at the amount of the Prepetition ABL Credit Agreement as of the Petition Date, subject to providing the ability of the DIP Borrower to access renewals or replacements of letters of credit thereunder, in each case, subject to the requirements and terms of the Cash Collateral Order), (ii) asset sales, (iii) investments, (iv) restricted payments, (v) fundamental changes and (vi) affiliate transactions.<br><br>**(DIP Term Sheet, Affirmative Covenants, Negative Covenants)** | |
| **DIP Facility - Indemnification** | The DIP Borrower shall indemnify and hold harmless the DIP Agent, each DIP Lender, each of their respective affiliates and each of their respective officers, directors, partners, security-holders, employees, agents, advisors, attorneys and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including all reasonable and documented fees, out-of-pocket expenses and disbursements of their respective specified legal counsel, specified financial advisors or other specified professionals retained by the DIP Agent or DIP Lenders, in each case as agreed and specifically set forth in the Backstop Commitment Letter to which this DIP Term Sheet is attached and the Operative Documents), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case, arising out of or in connection with or by reason of the DIP Facility, the Operative Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, or any operation of any business by any Debtor. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the DIP Borrower, any of its directors, security-holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. | Pending - Final Order |

| Summary of Material Terms for Interim Order | | Interim Order Location |
|---|---|---|
| **Carve Out**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Interim Order provides a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors and any Committee appointed in the Chapter 11 Cases pursuant to section 1103 of the Bankruptcy Code, and a Post-Carve Out Trigger Notice Cap of $1 million, all as detailed in the Interim Order. | ¶¶ 21–28 |
| **Waiver/Modification of Automatic Stay**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The automatic stay under section 362 of the Bankruptcy Code will be deemed modified and vacated to the extent necessary to (i) permit the Debtors to grant and (as applicable) perfect the Adequate Protection Liens and the Adequate Protection Claims and to incur all liabilities and obligations under the Interim Order, and (ii) authorize the Prepetition Secured Parties to retain and apply any applicable payments hereunder; *provided* that during the ABL Remedies Notice Period, unless otherwise ordered by the Court, the automatic stay under section 362 of the Bankruptcy Code shall remain in effect to the extent provided pursuant to the Interim Order. | ¶¶ 34 |
| **Stipulations and Agreements of the Debtors**<br><br>Complex Case Procedures, Ex. B | The Interim Order contains certain stipulations by the Debtors, among other things, to:<br><br>• the aggregate amount of the claims held by the creditors in respect of the ABL Facility, Term Loans, First Lien Notes, and Second Lien Notes as of the Petition Date;<br><br>• the validity, perfection, enforceability, and priority of the Prepetition Liens on the Prepetition Collateral;<br><br>• not challenge or seek to avoid the validity, enforceability, priority, or perfection of the Prepetition Indebtedness or the Prepetition Liens;<br><br>• all of the Debtors' existing cash and all cash (1) constituting Prepetition Collateral; (2) constituting proceeds, products, rents, or profits of property of Prepetition Collateral; or (3) subject to the Prepetition Secured Parties' rights of setoff constitutes Cash Collateral. | ¶ 5 |
| **Binding Effect of the Debtors' Stipulations on Third Parties**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii);<br>Complex Case Procedures, Ex. B | The Debtors have admitted, stipulated, and agreed to various matters as set forth in paragraph 5 of the Interim Order and the stipulations and admissions contained in the Interim Order, including without limitation, in paragraph 5 of the Interim Order, shall be binding upon the Debtors and any successor thereto in all circumstances, *provided* that parties in interest may challenge the stipulations set forth in the Interim Order by the Challenge Deadline, pursuant to the Interim Order | ¶¶ 47–50 |
| **506(c) Waiver**<br><br>Complex Case Procedures, Ex. B | Subject and subordinate to the Carve Out, upon entry of the Final Order, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral, including Cash Collateral pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the affected party (e-mail shall suffice), and no such consent shall be implied from any other action, inaction, or acquiescence by the ABL Agent, the Term Loan/First Lien Notes Collateral Agent, or any of the Prepetition Secured Parties. | ¶¶ 35-37 |

| Summary of Material Terms for Interim Order | | Interim Order Location |
|---|---|---|
| **Provisions Affecting Consideration of the Equities of the Case under Section 552(b)(1)**<br><br>Bankruptcy Rule 4001(c)(I)(B)(i) | The Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties. | Pending - Final Order |
| **DIP Facility Budget and Permitted Variances**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The Debtors shall not pay any expenses or other disbursements other than those set forth in the Budget.<br><br>The DIP Borrower's cumulative actual receipts shall not be less than 85% of budgeted receipts for the corresponding test period (the "Permitted Collections Budget Variances").<br><br>The DIP Borrower's cumulative actual disbursements (excluding professional fees) will be not more than 12.5% greater than the budgeted disbursements for the corresponding test period (the "Permitted Expenditures Budget Variances").<br><br>The DIP Borrower's cumulative actual disbursements to merchandise vendors (domestic and foreign) will not be more than 10% greater than the budgeted disbursements for the corresponding test period (the "Permitted Inventory Budget Variances").<br><br>The Permitted Collections Budget Variances, Permitted Expenditures Budget Variances, and Permitted Inventory Budget Variances, collectively the "Budget Variances", in each case, as set forth in the then operative Budget.  Notwithstanding anything to the contrary herein, the Debtors and Required Lenders shall agree to include provisions in the Operative Documents providing for the implementation of increased Permitted Expenditures Budget Variances and Permitted Inventory Budget Variances, in each case, in the event that the Debtors are able to more rapidly open store locations than anticipated in the Initial DIP Budget; provided, that Permitted Collections Budget Variances shall be adjusted accordingly to the extent agreed.<br><br>The Budget Variances shall each be tested (i) first, on June 6, 2020 on a cumulative basis for the prior two weeks, (ii) second, on June 13, 2020 on a cumulative basis for the prior three weeks, and (iii) at the end of each week thereafter on a cumulative four week basis for the prior four weeks.  The Debtors shall deliver a Weekly Variance Report to the DIP Agent by 12:00 p.m., Eastern time, on Friday of each week.<br><br>Simultaneously with the delivery of the Weekly Variance Report, the DIP Borrower shall report on consolidated unrestricted book cash as of the end of the preceding week (as reported in the Weekly Variance Report), which shall not be less than $50 million. | Pending - Final Order |

| Summary of Material Terms for Interim Order | | Interim Order Location |
|---|---|---|
| **DIP Facility - Maturity Date**<br><br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The DIP Facility will mature on the earliest of (such earliest date, the "<u>Maturity Date</u>"):<br><br>  (a) the date that is 180 days after the Petition Date (the "<u>Scheduled Maturity Date</u>");<br><br>  (b) 20 days after the Petition Date, if the DIP Order (as defined below) has not been entered by the Bankruptcy Court prior to the expiration of such 20-day period;<br><br>  (c) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases;<br><br>  (d) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise;<br><br>  (e) without the DIP Agent's prior written consent, the date of filing or express written support by the Debtors of bidding procedures, sale processes, transactions, plans of liquidation or reorganization or related disclosure statements that are not in accordance with the RSA, if applicable, and that are not otherwise acceptable to the DIP Lenders;<br><br>  (f) the date of termination of the DIP Lenders' commitments and the acceleration of any outstanding Loans, in each case, under the DIP Facility in accordance with the terms of the DIP Facility credit agreement (the "<u>DIP Credit Agreement</u>") and the other definitive documentation with respect to the DIP Facility (collectively with the DIP Credit Agreement and the related security documents, the "<u>DIP Documents</u>");<br><br>  (g) any breach by the Debtors which has not been cured or waived or termination of the RSA after the effectiveness thereof;<br><br>  (h) dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code;<br><br>  (i) the Debtors shall lose access to the use of cash collateral in accordance with the Cash Collateral Order (as defined below), subject to any applicable remedies notice period; and<br><br>  (j) other customary circumstances to be mutually agreed.<br><br>**(DIP Term Sheet, Tenor of DIP Facility)** | Pending - Final Order |

| Summary of Material Terms for Interim Order | | Interim Order Location |
|---|---|---|
| **DIP Facility - Events of Default**<br><br>Bankruptcy Rules 4001(b)(1)(B)(iii),4001(c)(1)(B) | The Operative Documents will contain (a) events of default that are customary for similar debtor-in-possession financings and (b) additional events of default required by the DIP Lenders and mutually agreeable to the Debtors (collectively, the "Events of Default") and shall, in any event, include without limitation the following (subject to mutually agreeable grace periods as applicable): | Pending - Final Order |

| | | |
|---|---|---|
| (i) | failure to make any payment when due under the Operative Documents; | |
| (ii) | noncompliance with covenants or breaches in any material respect of representations and warranties, in either case, under the Operative Documents; | |
| (iii) | cross-default to any prepetition indebtedness in a principal amount above a threshold to be agreed that is not stayed by the automatic stay in the Chapter 11 Cases; | |
| (iv) | failure to satisfy or stay execution of judgments above a threshold to be agreed; | |
| (v) | the existence of certain employee benefit or environmental liabilities,, which would constitute a material adverse effect; | |
| (vi) | impairment of the Operative Documents or the security interests described in "Security" in the DIP Term Sheet; | |
| (vii) | change of ownership or control; | |
| (viii) | a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases; | |
| (ix) | appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of any Debtor; | |
| (x) | granting of relief from any stay of proceeding (including the automatic stay) so as to allow a third party to proceed against any asset of the Debtors in an amount in excess of $1,000,000 in the aggregate; | |
| (xi) | entry of an order granting any superpriority claim which is senior to or *pari passu* with the DIP Lenders' claims under the DIP Facility without the prior consent of the DIP Agent (other than as described under the caption "Priority" in the DIP Term Sheet); | |
| (xii) | any termination of the RSA as to all parties thereto, except as to any individual DIP Lender pursuant to Section 12.03 of the RSA; | |

| Summary of Material Terms for Interim Order | | Interim Order Location |
|---|---|---|
| | (xiii) any Debtor shall have filed, proposed, or supported a plan of reorganization, plan of liquidation, or a motion seeking to approve a sale of any material portion of the Collateral, in each case unless contemplated by, and in accordance with, the RSA or as otherwise agreed to by the DIP Agent; | |
| | (xiv) entry of an order staying, reversing, vacating or otherwise modifying, without the prior written consent of the DIP Agent, the DIP Facility, or the DIP Order; | |
| | (xv) payment of, or granting adequate protection with respect to, prepetition debt (other than as contemplated by the Operative Documents) unless otherwise agreed by the DIP Agent; | |
| | (xvi) cessation of liens or superpriority claims granted with respect to the Collateral securing the Debtors' obligations in respect of the DIP Facility to be valid, perfected and enforceable in all respects with the priority described herein; | |
| | (xvii) failure to comply with this DIP Term Sheet, the Operative Documents or any of the DIP Milestones; and | |
| | (xviii) entry into, or the making of any payment in respect of, any critical vendor agreements or otherwise entry into any agreement to pay, or the making of any payment in respect of, any prepetition trade obligations except as consented to by the DIP Agent (which may be via consent to the "first day" orders). | |
| | **(DIP Term Sheet, Events of Default)** | |
| **DIP Facility - Reporting Requirements**<br><br>Complex Case Procedures. Ex. B. | The Operative Documents will contain financial reporting requirements that are customary for similar debtor-in-possession financings, including, without limitation, (i) monthly updates of the Budget for each fiscal month of the Debtors to be provided within five business days following the end of any fiscal month of the Debtors, (ii) all financial, operating and other reporting provided to the Prepetition ABL Lenders during the Chapter 11 Cases, including pursuant to the Cash Collateral Order, as and when so provided, (iii) a weekly cash flow forecast budget to actuals for each line item in a form to be attached to the DIP Credit Agreement and otherwise acceptable to the DIP Agent, with management commentary on any line item with a positive or negative variance of 5.0% or more as compared to the Budget (unless the dollar amount corresponding to such percentage variance is less than $1,000,000 in the aggregate across all line items, in which case no management commentary shall be required) (the "Weekly Variance Report"), (iv) monthly delivery | Pending - Final Order |

| Summary of Material Terms for Interim Order | Interim Order Location |
|---|---|
| of operating statements and balance sheets for the Debtors and their consolidated subsidiaries within 15 business days following the end of the applicable period, (v) quarterly store-level operating statements for all properties within 45 days following the end of the applicable period and (vi) reasonable reporting requirements to be agreed with respect to professional fee monitoring no later than June 15, 2020.<br><br>The Operative Documents will contain additional requirements that the Debtors' counsel provide advance copies of all pleadings and/or filings in the Chapter 11 Cases to be made by the Debtors. The Debtors shall also provide copies of any monthly reporting provided to the Bankruptcy Court or the U.S. Trustee. | |
| **DIP Facility - Milestones**<br>Complex Case Procedures, Ex. B | <u>**Milestones**</u>.  The DIP Borrower shall comply with the following chapter 11 milestones which Milestones may be extended in writing by the DIP Agent in its sole and absolute discretion (the "<u>Milestones</u>"):<br><br>• on the Petition Date, the Debtors shall have filed a motion seeking approval of the DIP Facility;<br><br>• no later than 14 business days following the Petition Date, the Debtors shall have filed a motion to retain Brokers acceptable to the Required Lenders;<br><br>• no later than 18 calendar days after the Petition Date, the Bankruptcy Court shall enter an order approving the DIP Credit Agreement, in form and substance satisfactory to the DIP Agent in its discretion as confirmed by the DIP Agent in writing;<br><br>• no later than 18 calendar days after the Petition Date, the Bankruptcy Court shall have entered the DIP Order;<br><br>• no later than June 15, 2020, the Debtors will have delivered a Lease Optimization Plan and an Owned Real Estate Optimization Plan, each in form and substance acceptable to the Required Lenders;<br><br>• no later than June 15, 2020 the Debtors shall have delivered proposed processes and parameters related to a proposed business plan (the "<u>Business Plan</u>") including those related to vendor agreements, lessor agreements, and go-forward self-funding capability (the "<u>Business Plan Parameters</u>") to the DIP Lenders;<br><br>• no later than June 20, 2020 the Debtors and the Required Lenders shall have agreed on acceptable Business Plan Parameters; | Pending - Final Order |

| Summary of Material Terms for Interim Order | Interim Order Location |
|---|---|
| • no later than July 8, 2020, the Debtors shall have delivered a Business Plan (consistent with the agreed acceptable Business Plan Parameters) to the DIP Lenders;<br><br>• no later than July 14, 2020, the Debtors and the Required Lenders shall have agreed on an acceptable Business Plan;<br><br>• no later than 90 days after the Petition Date, the Debtors will (unless otherwise provided for in the RSA) have filed either (A) a motion seeking approval of a disclosure statement with respect to a chapter 11 plan that is acceptable to the DIP Agent or (B) a motion seeking approval of bidding procedures and a sale that is acceptable to the DIP Agent;<br><br>• no later than 130 days after the Petition Date, the Bankruptcy Court shall have entered an order acceptable to the DIP Agent either approving (A) an acceptable disclosure statement or (B) acceptable bidding procedures;<br><br>• no later than 160 days after the Petition Date, the Bankruptcy Court shall have entered one or more orders acceptable to the DIP Agent either (A) confirming an acceptable chapter 11 plan or (B) approving an acceptable sale or sales; and<br><br>• no later than November 15, 2020 the Plan Effective Date shall have occurred.<br><br>Terms used but not defined in this "Milestones" section have the meanings set forth in the RSA and the RSA Term Sheet.<br><br>**(DIP Term Sheet, Milestones)** | |
| **Repayment** | **Repayment of Term Loans**.  To the extent not previously paid, all outstanding Term Loans will be due and payable on the Maturity Date.<br><br>**Optional Prepayment of Term Loans**.<br>• The DIP Borrower may, upon at least one business day's notice, prepay or terminate in full (but not in part), with the payment of the Exit Premium but without other premium or penalty, subject to breakage costs, if applicable, the outstanding Loans and unfunded commitments. Once repaid, Loans may not be re-borrowed.<br><br>**Mandatory Prepayment of Term Loans**<br>• Mandatory prepayments of the Loans customary for similar debtor-in-possession financings shall be required, including, in an amount equal to (a) 100% of insurance and condemnation proceeds, (b) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the DIP Credit Agreement and (c) 100% of the net cash proceeds of any sale of assets constituting Collateral and | Pending - Final Order |

| Summary of Material Terms for Interim Order | Interim Order Location |
|---|---|
| other asset sales (without any reinvestment rights, but subject to de minimis dollar carveouts to be agreed, but subject, in the case of ABL Priority Collateral (or proceeds thereof), to prior repayment of the Prepetition ABL Credit Agreement solely to the extent required pursuant to the Cash Collateral Arrangements).<br><br>• All voluntary prepayments and mandatory prepayments (within one business day of receipt thereof) shall be applied as follows: <u>first</u>, to pay accrued and unpaid interest on, and expenses in respect of, the obligations under the DIP Facility, to the extent then due and payable; and <u>second</u>, to any principal amounts or other obligations (including the Exit Premium) which are outstanding under the DIP Facility.  Other than the Exit Premium, there shall be no premium or penalty payable in connection with mandatory prepayments.<br><br>**(DIP Term Sheet, Optional Prepayments, Mandatory Prepayments)** | |
| **Waiver/Modification of Automatic Stay**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The automatic stay under section 362 of the Bankruptcy Code will be deemed modified and vacated to the extent necessary to (i) permit the Debtors to grant and (as applicable) perfect the Adequate Protection Liens and the Adequate Protection Claims and to incur all liabilities and obligations under the Interim Order, and (ii) authorize the Prepetition Secured Parties to retain and apply any applicable payments hereunder; *provided* that during the ABL Remedies Notice Period, unless otherwise ordered by the Court, the automatic stay under section 362 of the Bankruptcy Code shall remain in effect to the extent provided pursuant to the Interim Order. | ¶ 34 |

17.     The Interim Order contains certain of the provisions (the "<u>Significant Provisions</u>")[6]

identified on Exhibit B to the Complex Case Procedures as summarized in the Attorney Checklist

---

[6]     Significant Provisions refer to those provisions that: (a) grant cross-collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors; (b) deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code; (c) bind the bankruptcy estates or any parties in interest with respect to the validity, perfection, or amount of the secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor; (d) waive or limit the estate's rights under section 506(c) of the bankruptcy code; (e) grant prepetition secured creditors liens on the debtor's claims and causes of action arising under chapter 5 of the Bankruptcy Code; (f) impose deadlines for the filing of a plan or disclosure statement; and (g) grant an administrative claim.

Concerning Motion and Order Pertaining to the Use of Cash Collateral attached hereto as

**Exhibit B**.

a.   ***No Cross-Collateralization***. The Interim Order does not provide for cross-collateralization. The Interim Order provides for adequate protection liens and superpriority claims against the Debtors, but limited to the extent of diminution in value of any collateral owned by the Debtors.

b.   ***Validity, Perfection, and Amount of Prepetition Liens***.   The Debtors acknowledge, admit, agree, and stipulate to various matters, including the validity, perfection, and priority of the Prepetition Liens. *See* Interim Order section D.   The stipulations set forth in section D of the Interim Order are binding on the Debtors and any successors thereto. *See* Interim Order ¶ D. Parties in interest may challenge the stipulations set forth in the Interim Order by no later than the date that is the earlier of the date that is (A) the later of (i) 75 calendar days after entry of the Interim Order, or (ii) 60 days after formation of an Official Committee (if appointed), (B) such later date that has been agreed to in writing, prior to the expiration of the deadline to commence a Challenge, or (C) any such later date as has been ordered by the Court. *See* ¶ 50.

c.   ***506(c) Waiver***.   Subject to and effective upon entry of the Final Order, subject and subordinate to the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral or the Adequate Protection Collateral, the Prepetition Secured Parties pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the affected party, and no such consent shall be implied from any other action, inaction, or acquiescence by [the Administrative Agent or any of the Lenders.]  Neither the Term Loan Administrative Agent nor the Term Loan/First Lien Notes Collateral Agent, nor the First Lien Notes Indenture, nor the Second Lien Notes Indenture consent to the Budget nor anything else herein shall be deemed or construed as agreement by the Administrative Agent or the Lenders to be surcharged under section 506(c) or any other provision of the Bankruptcy Code or equitable doctrine.  *See* Interim Order ¶ 35.

d.   ***Liens on Avoidance Actions***.   Subject solely to entry of the Final Order, the Adequate Protection Liens shall attach to any proceeds or property recovered (but not on the actual claims and causes of action) in respect of any Avoidance Action. *See* Interim Order ¶ 1.

e.   ***No Provisions Deeming Prepetition Debt to be Postpetition Debt***.   The Interim Order does not deem prepetition secured debt to be postpetition debt.

      f.      ***Provisions Imposing Plan or Disclosure Statement Filing Deadlines***. There are milestones in the Interim Order for filing a disclosure statement or filing or confirming a chapter 11 plan.  *See* Interim Order Annex 3.

      g.      ***Provisions Granting Administrative Claims***. The Interim Order provides for joint and several superpriority administrative claims against the Debtors as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all unsecured claims and administrative expense claims against Debtors (subject to the Carve Out), which administrative claim shall have recourse to and be payable from all prepetition and postpetition property of the Debtors including, and solely upon entry of the Final Order, the proceeds and property recovered in respect of any Avoidance Actions. *See* Interim Order ¶ 15.

18.     The Final Order: (a) grants superpriority administrative expense claims to the DIP Secured Parties (the "<u>DIP Superpriority Claim</u>"); (b) grants superpriority administrative expense claims to the DIP Lenders, the DIP Agent, and the other secured parties under the DIP Facility (the "<u>DIP Secured Parties</u>"), subject only to the Carve Out and the DIP Superpriority Claim; (c) binds the Debtors and all parties in interest with respect to the validity, perfection, or amount of the DIP Secured Parties' liens or debt, or the waiver of the Debtors' claims against the DIP Secured Parties (each subject to certain challenge rights); (d) waives the Debtors' rights under section 506(c) of the Bankruptcy Code; (e) grants the DIP Secured Parties  liens on the proceeds of the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code; (f) imposes deadlines for the filing of a plan or disclosure statement; and (g) grants adequate protection and liens to the Prepetition Secured Parties. The DIP Facility is critical to the Debtors' continuing operations and essential to facilitating a consensual restructuring transaction.

19.     In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these Chapter 11 Cases.  Accordingly, the Significant Provisions in the Interim Order and the Final Order should be approved.

## Background

### I.      The Debtors' Prepetition Capital Structure.

20.      As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $4.9 billion. As described in greater detail below, the Debtors' significant fund debt obligations include:

| Secured Debt *(in US$ millions)* | Principal |
|---|---|
| ABL Facility | 1,179 |
| First Lien Term Loan | 1,521 |
| First Lien Notes | 500 |
| Second Lien Notes | 400 |
| **Total Secured Debt** | **$3,600 million** |
| **Unsecured Debt *(in US$ millions)*** | **Principal** |
| 5.650% Unsecured Notes due 2020 | 105 |
| 7.125% Debentures due 2023 | 9 |
| 6.900% Unsecured Notes due 2026 | 2 |
| 6.375% Unsecured Notes due 2036 | 388 |
| 7.400% Debentures due 2037 | 312 |
| 7.625% Unsecured Notes due 2097 | 500 |
| **Total Unsecured Debt** | **$1,318 million** |
| **Total Debt Outstanding** | **$4,918 million** |

### A.      The ABL Facility.

21.      Certain of the Debtors are party to that certain Credit Agreement, dated as of June 20, 2014 (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of December 10, 2015, that certain Amendment No. 2 to Credit Agreement, dated as of June 20, 2017, that certain Amendment No. 3 to Credit Agreement, dated as of March 8, 2018, and as may be further amended, restated, modified or supplemented from time to time prior to the Petition Date, the "ABL Credit Agreement"), by and among, *inter alios*, J. C. Penney Corporation, Inc. ("OpCo"), J. C. Penney Company, Inc. ("JCP"), and J.C. Penney Purchasing Corporation ("Purchasing"), each as borrowers (collectively, the "ABL Borrowers"), the lenders party thereto, and Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "ABL Agent").   The ABL Credit Agreement provides for a $2.35 billion credit facility

(subject to a borrowing base composed primarily of accounts receivable, credit card receivables and inventory) with a maturity date of June 20, 2022 (the "ABL Facility").

22.     The obligations under the ABL Facility (the "ABL Obligations") are secured by substantially all of each Secured Debt Loan Party's (as defined below) working capital assets, including, without limitation, by a first priority lien on substantially all of the Secured Loan Parties' accounts (including receivables), inventory, deposit accounts, and cash (but excluding the Secured Debt Loan Parties' equipment, real estate assets, intellectual property, equity interests and intercompany indebtedness owed to such Secured Debt Loan Parties), and identifiable proceeds of the foregoing (collectively, the "ABL Priority Collateral").  Each of JCP Real Estate Holdings, LLC and J. C. Penney Properties (together, with the ABL Borrowers, the "Secured Debt Loan Parties") has guaranteed all obligations under the ABL Facility.[7]  Due to the Debtors' ongoing liquidity constraints, the ABL Borrowers have recently drawn on the ABL Facility in order to meet anticipated liquidity needs.  As of the Petition Date, there are approximately $1.179 billion of outstanding obligations under the ABL Facility (consisting of borrowings and obligations in respect of undrawn letters of credit).

23.     The ABL Facility allows for certain lenders thereunder (or their affiliates) to enter into certain swap, treasury services or supply chain financing agreements outside of the ABL Facility.  Obligations under these agreements are secured under the security documents related to the ABL Facility (and share in any liens created thereunder) on a *pari passu* basis with the ABL

---

[7]     Additionally, OpCo has entered into certain deposit account control agreements in favor of the ABL Agent with respect to its bank accounts.  Thus, substantially all of the Secured Debt Loan Parties' cash is subject to a perfected security interest in favor of the ABL Agent.  Under the ABL Facility, if aggregate availability is less than the greater of (a) 10 percent of the then-applicable borrowing base (or, if less, the total commitments) and (b) $140 million, for at least two consecutive business days, or upon the occurrence of certain events of default, the Secured Debt Loan Parties will lose control of certain accounts and their access to cash contained therein will be restricted (including all cash receipts), enabling the ABL Agent to sweep cash to repay outstanding ABL Obligations on a daily basis (the "Agent Account").

Obligations.  As of the Petition Date, there are approximately $213 million of such outstanding obligations, which are fully reserved against in the borrowing base under the ABL Facility.

**B.    The Term Loans.**

24.    OpCo, as borrower, JPMorgan Chase Bank, N.A., as administrative agent (the "Term Loan Administrative Agent"), and the lenders from time to time party thereto (the "Term Loan Lenders," and together with the Term Loan Administrative Agent and the other "Secured Parties" as defined in the Term Loan Agreement, the "Term Loan Secured Parties") are party to that certain Amended and Restated Credit and Guaranty Agreement, dated as of June 23, 2016 (as amended, restated, amended and restated, modified, or supplemented from time to time prior to the Petition Date, the "Term Loan Agreement").  Under the Term Loan Agreement, J. C. Penney Corporation, Inc., borrowed $1.688 billion (the "Term Loans"), approximately $1.521 billion of which remains outstanding as of the Petition Date.  The obligations under the Term Loan Agreement (the "Term Loan Obligations") are secured on a *pari passu* basis with the First Lien Notes Obligations, as defined herein, by the assets of each Term Loan Credit Party (as defined below) other than certain unencumbered real estate, including, without limitation, by a first priority lien on the Term Loan Credit Parties' equipment, real estate assets, intellectual property, equity interests and intercompany indebtedness owed to the Debtors, and identifiable proceeds of the foregoing, and a second priority lien on the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement, the "ABL Priority Collateral").

25.    As of the Petition Date, the Credit Parties (as defined in the Term Loan Agreement, the "Term Loan Credit Parties") were jointly and severally liable and indebted to the Term Loan Administrative Agent and the Term Loan Lenders in the aggregate principal amount of approximately $1.521 billion, plus any other amounts due and payable under the Credit Documents (as defined in the Term Loan Agreement, the "Term Loan Credit Documents"), including, without

limitation, accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, certain expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith (including all Obligations as defined in the Term Loan Agreement), in each case, as and to the extent provided in, and required to be paid or reimbursed under, the Term Loan Credit Documents.

26.     To secure the Term Loan Obligations and the First Lien Notes Obligations (as hereinafter defined), each of the Debtors party thereto (constituting all of the Term Loan Credit Parties and the First Lien Notes Guarantors) granted to Wilmington Trust, National Association ("Wilmington"), as collateral agent (the "Term Loan/First Lien Notes Collateral Agent") for the Term Loan Secured Parties and the First Lien Notes Secured Parties (collectively, the "Term Loan/First Lien Notes Secured Parties"), for the benefit of the Term Loan/First Lien Notes Secured Parties, properly perfected continuing liens, mortgages on, and security interests (collectively, the "Prepetition Term Loan/First Lien Notes Liens") in all Collateral (as defined in the Term Loan Agreement and the First Lien Notes Indenture, the "Prepetition Term Loan/First Lien Notes Collateral").

**C.     The Secured Bonds.**

27.     ***First Lien Notes***.  Pursuant to that certain Indenture, dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "First Lien Notes Indenture", and together with the other "Notes Documents" as defined in the First Lien Indenture, the "First Lien Notes Documents"), among J. C. Penney Corporation, Inc., as issuer, J. C. Penney, J. C. Penney Purchasing Corporation, JCP Real Estate Holdings, LLC and J. C. Penney Properties, LLC as guarantors, and Wilmington, as

indenture trustee (the "First Lien Notes Indenture Trustee" and together with the First Lien Noteholders (as defined below) and the other Notes Secured Parties, as defined therein, collectively, the "First Lien Notes Secured Parties") J. C. Penney Corporation, Inc. issued 5.875% senior secured notes due July 2023 (the "First Lien Notes").

28.     Pursuant to the First Lien Notes Indenture, J. C. Penney Corporation, Inc., issued, and the Guarantors (as defined in the First Lien Notes Indenture, the "First Lien Notes Guarantors") guaranteed, $500.0 million in aggregate principal amount of First Lien Notes.  As of the Petition Date, J. C. Penney Corporation, Inc., and the First Lien Notes Guarantors were liable and indebted to the holders of the First Lien Notes (the "First Lien Noteholders") and the other First Lien Notes Secured Parties in the aggregate principal amount of not less than $500.0 million in First Lien Notes, plus any other amounts due and payable under the First Lien Notes Documents, including, without limitation, accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, certain expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in, and required to be paid or reimbursed under, the First Lien Notes Documents (collectively, the "First Lien Notes Obligations").

29.     *Second Lien Notes*.  Pursuant to that certain Indenture, dated as of March 12, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "Second Lien Notes Indenture", and together with the other "Notes Documents" as defined in the Second Lien Indenture, the "Second Lien Notes Documents", and together with the ABL Loan Documents, the Term Loan Credit Documents, and the First Lien

Notes Documents, the "Prepetition Secured Credit Documents"), among J. C. Penney, as issuer, J. C. Penney Company, Inc., J. C. Penney Purchasing Corporation, JCP Real Estate Holdings, LLC and J. C. Penney Properties, LLC as guarantors, and Wilmington, as indenture trustee (the "Second Lien Notes Indenture Trustee" and together with the Second Lien Noteholders (as defined below) and the other Notes Secured Parties, as defined therein, collectively, the "Second Lien Notes Secured Parties"; the Second Lien Notes Secured Parties, together with the ABL Secured Parties, the Term Loan Secured Parties, and the First Lien Notes Secured Parties, collectively, the "Prepetition Secured Parties"), J. C. Penney Corporation, Inc. issued 8.625% senior secured second priority notes due 2025 (the "Second Lien Notes").

30.     Pursuant to the Second Lien Notes Indenture, J. C. Penney Corporation, Inc. issued, and the Guarantors (as defined in the Second Lien Notes Indenture, the "Second Lien Notes Guarantors") guaranteed, $400.0 million in aggregate principal amount of Second Lien Notes.  As of the Petition Date, J. C. Penney and the Second Lien Notes Guarantors were liable and indebted to the holders of the Second Lien Notes (the "Second Lien Noteholders") and the other Second Lien Notes Secured Parties in the aggregate principal amount of not less than $400.0 million in Second Lien Notes, plus any other amounts due and payable under the Second Lien Notes Documents, including, without limitation, accrued and unpaid interest thereon, premiums, reimbursement obligations (contingent or otherwise), fees, costs, certain expenses (including any attorneys', accountants', appraisers', and financial advisors' fees and expenses), charges, indemnities, and any other amounts, liabilities, or obligations of whatever nature, whenever arising or accruing (whether before or after the Petition Date), that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided in, and required to be paid or reimbursed under, the Second Lien Notes Documents (collectively, the "Second Lien Notes

Obligations", and together with the ABL Obligations, the Term Loan Obligations, and the First

Lien Notes Obligations, the "Prepetition Secured Credit Obligations").

31.     To secure the Second Lien Notes Obligations, J. C. Penney and each of the Second

Lien Notes Guarantors granted to Wilmington, as collateral agent (the "Second Lien Notes

Collateral Agent") for the Second Lien Notes Secured Parties, for the benefit of the Term

Loan/First Lien Notes Secured Parties, properly perfected continuing liens, mortgages on, and

security interests (collectively, the "Prepetition Second Lien Notes Liens," and together with the

Prepetition ABL Liens and the Prepetition Term Loan/First Lien Notes Liens, collectively, the

"Prepetition Liens") in all Collateral (as defined in the Second Lien Notes Indenture, the

"Prepetition Second Lien Notes Collateral," and together with the Prepetition ABL Collateral and

the Prepetition Term Loan/First Lien Notes Collateral, the "Prepetition Collateral").

### D.      The Unsecured Bonds.

32.     The Debtors are also obligated under the following four issuances of unsecured

debt securities:

    **i.**     ***5.65% senior notes due 2020.***  On May 24, 2010, J. C. Penney Company, Inc. and J. C. Penney Corporation, Inc. issued $400 million of 5.65% senior unsecured notes due June 2020.  The notes are governed by that certain indenture, dated April 1, 1994, as amended and supplemented (the "1994 Indenture"), among J. C. Penney Corporation, Inc. as issuer, and U.S. Bank National Association, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the notes.

    **ii.**     ***7.125% debentures due 2023.***  On November 23, 1993, J. C. Penney Company, Inc. and J. C. Penney Corporation, Inc. issued $275 million of 7.125% unsecured debentures due November 15, 2023.  The debentures are governed by that certain indenture, dated October 1, 1982, as amended and supplemented, among J. C. Penney Corporation, Inc., as issuer, and Wilmington Trust, National Association, as indenture trustee.  No other Debtor entity guarantees or is otherwise obligated under the debentures.

    **iii.**     ***6.90% debentures due 2026***.  On August 19, 1996, J. C. Penney Company, Inc. and J. C. Penney Corporation, Inc. issued $200 million of 6.90% debentures due August 2026.  The notes are governed by the 1994

Indenture.  No other Debtor entity guarantees or is otherwise obligated under the notes.

    iv.    **_6.375% senior notes due 2036._**  On April 27, 2007, J. C. Penney Company, Inc. and J. C. Penney Corporation, Inc. issued $700 million of 6.375% senior unsecured notes due October 2036.  The notes are governed by the 1994 Indenture.  No other Debtor entity guarantees or is otherwise obligated under the notes.

    v.    **_7.40% debentures due 2037._**  On April 14, 1997, J. C. Penney Company, Inc. issued $400 million of 7.40% unsecured debentures due April 2037.  The debentures are governed by the 1994 Indenture.  No other Debtor entity guarantees or is otherwise obligated under the debentures.

    vi.    **_7.625% debentures due 2097._**  On February 25, 1997, J. C. Penney Company, Inc. issued $500 million of 7.625% unsecured debentures due March 2097.  The debentures are governed by the 1994 Indenture.  No other Debtor entity guarantees or is otherwise obligated under the debentures.

    **E.**    **Intercreditor Agreements.**

33.    The ABL Agent, the Term Loan/First Lien Notes Collateral Agent, and the Debtor Obligors are party to that certain Intercreditor and Collateral Cooperation Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "ABL Intercreditor Agreement"), dated as of June 23, 2016, which sets forth the relative lien priorities and other rights and remedies of the ABL Secured Parties and the Term Loan/First Lien Notes Secured Parties with respect to, among other things, the Prepetition ABL Collateral and the Prepetition Term Loan/First Lien Notes Collateral.  The Term Loan Administrative Agent, the First Lien Notes Trustee, the Term Loan/First Lien Notes Collateral Agent and the Debtor Obligors are party to that certain Pari Passu Intercreditor Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "1L Pari Passu Intercreditor Agreement"), dated as of June 23, 2016, which sets forth the relative lien priorities and other rights and remedies of the Term Loan Secured Parties and the First Lien Notes Secured Parties with respect to, among other things, the Prepetition

Term Loan/First Lien Notes Collateral.  The Term Loan/First Lien Notes Collateral Agent, the Second Lien Notes Collateral Agent and the Debtor Obligors are party to that certain Junior Priority Intercreditor Agreement (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "1L-2L Intercreditor Agreement," and together with the ABL Intercreditor Agreement and the 1L Pari Passu Intercreditor Agreement, collectively, the "Prepetition Intercreditor Agreements"), dated as of March 12, 2018, which sets forth the relative lien priorities and other rights and remedies of the Term Loan/First Lien Notes Secured Parties and the Second Lien Notes Secured Parties with respect to, among other things, the Prepetition Term Loan/First Lien Notes Collateral and the Prepetition Second Lien Notes Collateral, the Cash Collateral Intercreditor Agreements are binding and enforceable against the Debtor Obligors and other parties thereto in accordance with their terms, and the Debtor Obligors and other parties thereto are not entitled to take any action that would be contrary to the provisions thereof.

> **F.      JCP Common Stock.**

34.      Shares of JCP's Class A common stock have traded on the New York Stock Exchange ("NYSE") under the symbol "JCP."  All outstanding shares of common stock are publicly owned.

## II.     The Debtors' Need for Immediate Access to Cash Collateral.

35.      The Debtors are in the unique position for a retailer of having sufficient cash on hand to fund both their business operations (which anticipates the reopening of dozens of their stores in the coming weeks), and these chapter 11 cases for the first 21 days *without* an immediate cash infusion. Mesterharm Decl. ¶¶ 16-18.  But the Debtors can only do so with prompt access to their approximately $500 million of Cash Collateral.  *Id* ¶¶ 15-20.  Absent this relief, the Debtors'

operations would come to a standstill and their ability to effectuate a going concern reorganization would be severely restricted.  *Id.* ¶¶ 16, 19.

36.     The Debtors' business requires immediate access to Cash Collateral in order to, among other things, meet working capital and business-operating needs, fund the administration of these Chapter 11 Cases, and enable the Debtors to pursue their going-concern reorganization. *Id.* ¶ 18.   Among other things, absent the ability to use Cash Collateral, the Debtors would immediately become unable to purchase new inventory, honor employee wages and benefits, fund operational expenses, or maintain valuable long-term relationships with their vendors, suppliers, employees, and customers.  *Id.* ¶¶ 18-19.   Refusal to allow the use of Cash Collateral would cause immediate and irreparable harm to the Debtors and to the value of the Debtors' estates to the detriment of all stakeholders.  *Id.* ¶ 16.

**III.     The Debtors' Need for Postpetition Financing.**

37.     Prior to engaging in debtor-in-possession financing discussions with potential lenders, Lazard assisted the Debtors in evaluating potential out-of-court alternatives for rightsizing the Debtors' capital structure.  As described more fully in the First Day Declaration, the Debtors sought to right-size their debt load, engaging with several key stakeholder groups across nearly every tranche of their capital structure over the last eight plus months in the hopes of consummating a deleveraging, out-of-court transaction that would allow them to capitalize on attractive interest rates and reduce their debt load in advance of upcoming debt maturities.  In the midst of these negotiations, the COVID-19 pandemic struck, severely disrupting the Debtors' business and liquidity, massively accelerating the need for a long-term deleveraging transaction coupled with a critical liquidity infusion into the Debtors' operations.

38.     Further compounding the Debtors' liquidity constraints, in store shopping at the Debtors' retail locations has grinded to a halt as a result of COVID-19.  In response to state and

local government mandates and recommendations, on March 18, 2020, the Debtors temporarily closed all retail stores and offices. The Debtors later extended their store closures through May 2020. These store closures have significantly contributed to missed sales targets, unsold inventory, and heavily constrained liquidity. Online sales have also suffered as a result of the COVID-19 outbreak primarily due to lower disposable income spending and concern among consumers with respect to the state of the economy.

39.     Moreover, because the Debtors operate in a highly competitive industry, a seamless transition into chapter 11 and the ability to continue operations uninterrupted is imperative for the Debtors to preserve their market share, the reputation of their businesses, and the loyalty and goodwill of their customers, suppliers, and employees. Further, the ability to effectuate the RSA, and the contemplated terms of restructuring therein, in an orderly manner hinges directly on the Debtors' ability to provide the necessary assurances to their key stakeholders. Specifically, commencing these Chapter 11 Cases with a fully committed DIP facility, coupled with the Debtors' access to the DIP Facility (set to occur only upon entry of the Final Order), will communicate to such stakeholders that the Debtors will be able to continue meeting the needs of their customers, compensating their employees, paying their vendors, and managing their businesses in a manner as close to the ordinary course as possible.

40.     Absent an ability to strongly demonstrate in the current market environment that the Debtors have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations, customers may seek alternatives, and vendors and suppliers may refuse to do business with the Debtors.

41.     Additionally, the DIP Facility will be available to provide coverage of any shortfall in working capital for the Debtors' businesses, fund adequate protection payments, including those

provided for herein, and satisfy the costs associated with consummating a plan of reorganization and completing the Debtors' restructuring.

42.     Accordingly, access to new capital under the DIP Facility upon entry of the Final Order, will ensure the Debtors can convey a position of strength to the market place and have sufficient funds to preserve and maximize the value of their estates and responsibly administer these Chapter 11 Cases.

## IV.    The Debtors' Proposed Adequate Protection Is Fair and Reasonable.

43.     The Adequate Protection provided in the Interim Order is fair and reasonable under the circumstances.  The adequate protection package proposed for and agreed to by the ABL Secured Parties includes: (a) adequate protection liens on existing and new inventory; (b) adequate protection claims to the extent of diminution in value of the ABL Secured Parties' interest in the collateral; (c) all accrued and unpaid amounts to be paid, along with cash pay interest at the non-default contract rate on the ABL Secured Parties' Pre-Petition Claims; (d) quarterly reporting in accordance with the ABL Credit Agreement; (e) payment of the ABL Secured Parties' fees and expenses; (f) a borrowing base reflecting a 7.5% minimum excess availability covenant (and, for some periods, a 10% minimum excess availability covenant); (g) appraisals can be requested at the ABL Agent's expense for the next six months, so long as they do not impact the borrowing base or effect the ordinary course of the Debtors' business; (h) a requirement that, if the Debtors fail to comply with the Minimum Excess Availability Requirement, the Debtors deposit cash into a controlled segregated cash reserve equal to the shortfall or pay down the ABL Facility in that amount; (i) a requirement that the Debtors deliver a borrowing base certificate within five business days of the end of each calendar week following the second full calendar week of the Petition Date which updates inventory on a weekly basis; (j) a consent / administrative fee of $500,000 per week; and (k) a discharge waiver, such that the ABL Secured Claims will not be discharged by a Plan of

Reorganization unless consented to by the ABL Secured Parties or paid in full or in cash. Mesterharm Decl. ¶ 21.

44.     The adequate protection packages being offered to the Debtors' Term Loan Secured Parties, First Lien Notes Secured Parties, and Second Lien Notes Secured Parties, are also reasonable and sufficient.  The Term Loan Secured Parties and First Lien Notes Secured Parties are being provided: (a) adequate protection liens (but not on unencumbered assets until entry of the Final DIP/Cash Collateral Order); (b) adequate protection claims to the extent of diminution in value of the Term Loan/First Lien Notes Collateral; (c) quarterly reporting consistent with the Term Loan Agreement and the First Lien Notes Indenture (as well as the reporting being provided to the ABL Secured Parties); (d) cash pay interest at the default contract rate on Pre-Petition Claims; (e) payment of the reasonable and documented out-of-pocket fees, costs and expenses of counsel; and (f) a cash management covenant requiring the Debtors to maintain their cash management arrangements in a manner consistent with the Cash Management Order; *provided* that the Debtors are authorized to create new, segregated bank accounts as required under the Cash Collateral Order as well as any debtor-in-possession financing arrangements approved by the Court during these Chapter 11 Cases.

45.     And the Second Lien Notes Secured Parties are being provided with adequate protection claims, and adequate protection liens (but not on unencumbered assets until entry of the Final DIP/Cash Collateral Order).  *Id.* ¶ 22.

46.     Access to the Cash Collateral is vital for the Debtors to maintain operations, pay employees, and fund these Chapter 11 Cases.  Pursuant to the terms of the Interim Order, the Adequate Protection package provided to the Prepetition Secured Parties (as applicable) includes, but is not limited to, the following:  adequate protection claims, adequate protection liens, paying

the ABL Secured Parties interest and fees as they come due under the ABL Facility, maintaining reporting requirements, restrictions of the Excess Availability under the ABL Facility, and reimbursing reasonable and documented fees and expenses of certain of the Secured Parties. Taken together, the cumulative effect of all of these provisions is to provide reasonable, appropriate, and indisputably adequate protection for the Debtors' secured lenders. *Id.* ¶ 23 ("It is my opinion that the adequate protection packages being offered to the ABL Secured Parties, the Term Loan Secured Parties, the First Lien Notes Secured Parties, and the Second Lien Notes Secured Parties, are clearly sufficient to protect these creditors' interests in the Cash Collateral, and no further 'adequate protection' is necessary or appropriate.").

47.     The proposed DIP Facility, as contemplated by the DIP Term Sheet, will provide the DIP Lenders valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral, subject to the Carve Out, which includes all of the Prepetition Collateral, and excludes certain Excluded Assets.

48.     Access to the Cash Collateral and the DIP Facility further provides adequate protection to the Prepetition Secured Parties and the DIP Lenders by providing stability for the Debtors' operations.  The incremental value generated by any use of the Cash Collateral and the proceeds of the proposed DIP Facility will inure to the ultimate benefit of the Debtors' estates and their stakeholders.

**V.     The DIP Facility Is in the Best Interest of the Estates.**

49.     As described above, the Debtors ultimately determined in their business judgment that the DIP Facility provided the most attractive financing available.  Access to the DIP Facility provides a path to a cheaper capital structure, instills confidence in the Debtors both from the perspective of the market and key stakeholders, protects against market uncertainty and potentially liquidity concerns during the COVID-19 pandemic and current economic environment, and

provides a clear path to emergence from chapter 11 through commitments to provide financing upon emergence from these Chapter 11 Cases.  The DIP Facility contemplated by this Motion, with authorization to enter into the DIP Facility only upon entry of the Final Order, will provide confidence to the Debtors' customers, vendors, employees, and contract counterparties that operations are appropriately funded and that the bankruptcy filing will not negatively impact the Debtors' businesses.

50.     Access to the DIP Facility will provide the Debtors with sufficient funds to preserve and maximize the value of their estates, responsibly administer these Chapter 11 Cases, and implement their business plan.  As such, the DIP Facility is fundamental to the preservation and maintenance of the Debtors' going-concern value during these Chapter 11 Cases and will facilitate the Debtors' successful reorganization.

51.     The Debtors arrived in chapter 11 with a pre-negotiated deal in place and intend to continue engaging with all stakeholders postpetition to use the chapter 11 process to maintain consensus around a value-maximizing result that will inure to the benefit of stakeholders enterprise wide.   Ultimately, the DIP Lenders offered the superior financing proposal in light of the circumstances of these Chapter 11 Cases, the time available, and the current market for such financing.  Moreover, the DIP Facility will allow the Debtors to emerge from chapter 11 with immediate access to capital through a revolving credit facility on favorable terms.  As a result, the Debtors ultimately determined in their business judgment that the DIP Facility was the most attractive financing available.

### Basis for Relief

**I.      The Debtors Should Be Authorized to Use the Cash Collateral.**

52.      The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code,[8] which provides in relevant part that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

53.      Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the Prepetition Secured Parties consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.  Therefore, the Debtors respectfully submit that they have satisfied the standards of section 363(c)(2) of the Bankruptcy Code.

54.      As described above and in the Mesterharm Declaration, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtors' businesses and smooth entry into the Chapter 11 Cases.  The Debtors believe use of Cash Collateral is in the best interests

---

[8]      Section 363(a) of the Bankruptcy Code defines "cash collateral" as follows:

Cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

of the Debtors' estates and all of their stakeholders, including the Secured Parties, and that the Interim Order should be approved.

## II.     The Debtors' Proposed Grant of Adequate Protection to Use Cash Collateral Is Appropriate.

55.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  Although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citation omitted)).  Courts generally have found that using cash collateral to preserve the value of the secured creditors' collateral is a form of adequate protection in itself.  *See, e.g.*, *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).

56.     The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral in accordance with the Interim Order.  As part of that agreement, the Debtors have

agreed to provide the Prepetition Secured Parties with certain forms of adequate protection to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay.  The proposed adequate protection package includes the payment of postpetition interest, replacement liens and superpriority claims under section 507(b) of the Bankruptcy Code, payment of professional fees and expenses, and continued access to information and financial reporting, among other things, all of which are standard and customary for a case of this size and nature. Additionally, the Debtors and the Prepetition Secured Parties shall continue to discuss whether including a minimum liquidity covenant in the Final Order is necessary and appropriate, and all of the Debtors' and the Prepetition Secured Parties' respective rights, including to argue such issue at the Final Hearing to the extent an agreement is not reached, are fully reserved and preserved.

57.    The Prepetition Secured Parties will inherently benefit from the Debtors' proposed use of property of their estates, including the Cash Collateral, which will prevent avoidable diminution in value of the Cash Collateral, and enhance the likelihood of preserving the Debtors' overall going concern value as the Debtors continue to negotiate with all of their key stakeholders. Preservation of the Debtors' business as a going concern in and of itself serves to provide such parties "adequate protection" for Bankruptcy Code purposes.  *See 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("[A]n increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

58.     The Debtors' provision of the Adequate Protection Obligations is necessary to protect against diminution in value, as required by sections 363(c)(2) and 363(e) of the Bankruptcy Code.  The Debtors' provision of the Adequate Protection Obligations is also fair and appropriate under the circumstances of the Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.[9]  Given the foregoing, the Debtors submit that these proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Parties from diminution in value to the Cash Collateral.

### III.     The Scope of the Carve Out Is Appropriate.

59.     The proposed adequate protection is subject to the Carve Out contained in the Orders.  Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve Out protects against administrative insolvency during the course of these Chapter 11 Cases by ensuring that assets remain for the payment of the Clerk of the Court or U.S. Trustee fees and professional fees of the Debtors and a statutory committee.

---

[9]     Pursuant to the Orders, the Prepetition Secured Parties are permitted to seek additional adequate protection in accordance with the terms thereof.

IV.     **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

A.     **Entry into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

60.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facility pursuant to the Final Order only, repay the ABL Facility in full, and continue using Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with their business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

61.     To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made

in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

62.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus.*, 294 B.R. at 886; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

63.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's-length negotiation process and careful evaluation of available alternatives.  Specifically, the Debtors and their advisors determined that postpetition financing provides certainty with respect to the capital necessary for the administration of these Chapter 11 Cases through emergence and the Debtors' ongoing business operations.  The Debtors negotiated the DIP Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available because (i) no lenders were willing to provide viable debtor-in-possession financing junior to the Prepetition Secured Parties due primarily to the Debtors' high level of existing secured debt obligations and (ii) the DIP Facility presents the best financing reasonably available to the Debtors with significant availability and competitive pricing.

**B.     The Repayment of the Term Loans Under the Final Order Is Appropriate.**

64.     The proposed repayment of a portion of the Term Loans with the proceeds of the DIP Facility is an exercise of the Debtors' sound business judgment.  Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  *See* 11 U.S.C. § 363(b)(1).  Courts in the Fifth Circuit have

recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

65.     Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements, particularly when done pursuant to Final Order only. Here, the roll up of the Term Loans upon the entry of the Final Order, and the applicable draws was a necessary condition from the DIP Lenders to provide the DIP Facility. Indeed, the Debtors' agreement to roll $450 million into the DIP Facility was instrumental in getting to the RSA and the reorganization it contemplates. The benefits for the Debtors and their stakeholders are significant. The reorganization will save thousands of jobs and, by permitting the Debtors to emerge a stronger, more productive business, will maximize recoveries for all stakeholders. Given the unique facts and circumstances of these cases and the enormous benefit to the Debtors (and their stakeholders) that the Term Loans (as defined in the DIP Term Sheet) provided, the roll up of the Term Loans set forth in the DIP Facility is within the Debtors' business judgment, reasonable, and should be approved.

### C.   The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders.

66.    The Debtors intend to provide security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in, and liens on, the DIP Collateral, subject to the Carve Out.

67.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c); *see In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *In re Crouse Grp.*, 71 B.R. at 549.

68.    The Debtors meet each part of this test.  As described above, due to the Debtors' operational difficulties, current negative macro-economic trends, and the Debtors' highly

leveraged balance sheet, no lenders were willing to provide postpetition financing with beneficial terms and conditions junior to the Prepetition Secured Parties.  The DIP Lenders will not fund the DIP Facility on any other terms, and no other existing stakeholder or third party has presented a higher or otherwise better debtor-in-possession financing proposal.  In addition, the DIP Facility provides the Debtors with an exit term loan facility at favorable terms.  Absent the DIP Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer these Chapter 11 Cases and provide comfort to their employees and vendor constituencies that business will continue in the ordinary course, the value of the Debtors' estates would be impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Documents are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors have met the standard for obtaining postpetition financing.

69.     In the event a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  The Debtors are unable to obtain unsecured credit.  Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

70.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is

adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented or (b) the Prepetition Secured Parties' interests in collateral are adequately protected.  As discussed above, what constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992) ("'Adequate protection' is a question of fact because it has as its linchpin the concept of value, and therefore is determined on a case-by-case basis.") (citation omitted).  Section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of adequate protection, including a cash payment or periodic cash payments, additional liens, replacement liens, or the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.  The focus of the adequate protection requirement is to preserve the secured creditor's position at the time of the bankruptcy filing and protect the secured creditor from diminution in the value of its collateral during the reorganization process.  *See In re WorldCom, Inc.*, 304 B.R. 611, 618–19 (Bankr. S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth how adequate protection may be provided under section 363, makes clear that the purpose is to insure that the secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy.").  "However, neither the legislative history nor the Bankruptcy Code require the Court to protect a creditor beyond what was bargained for by the parties."  *Id*. at 619.

71.     As described more fully in the Orders, the Debtors propose to provide the Adequate Protection Obligations to protect the interests in the Debtors' property of the Prepetition Secured Parties and the DIP Lenders from any diminution in value of the Prepetition Collateral resulting from the use of the Prepetition Collateral by the Debtors and the imposition of the automatic stay. The Debtors respectfully submit that the adequate protection contemplated in the Orders is sufficient to constitute adequate protection here as "[a]dequate protection, not absolute protection, is the statutory standard." *Beker*, 58 B.R. at 741 (citation omitted).

72.     Second, the Debtors believe that any out-of-court alternative to these Chapter 11 Cases would reduce the value of the Debtors' estates. Such an outcome would, in turn, undoubtedly diminish the value available for all stakeholders, including the Prepetition Secured Parties and the DIP Lenders. Thus, the DIP Facility provides these parties with adequate protection by enhancing the value of these parties' collateral. Courts have held enhancement of collateral is a critical component of adequate protection and have considered "whether the value of the debtor's property will increase as a result of the" use of the collateral. *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992) (finding that improvements to collateral financed by postpetition financing proceeds would improve collateral value in excess of loans and, therefore, provided adequate protection); *see In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996) (approving postpetition financing to be used, in part, to fund cleanup costs of encumbered property anticipated to improve the value of the collateral, thereby serving the goal of adequate protection). Further, the Court has recognized that a debtor's ability to maintain business value by operating in the ordinary course is itself a significant source of adequate protection. *See In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that a debtor's use of cash collateral to pay operating expenses, thereby "preserv[ing] the base that

generates the income stream," provided adequate protection to the secured creditor); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 104-05 (Bankr. S.D.N.Y. 1991) (finding equity cushion alone was adequate protection when cash collateral was used to preserve value of a building pledged as collateral and noting such use would "preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage").[10]

73.     The Debtors' provision of adequate protection as described herein is (a) fair and reasonable, (b) necessary to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code, and (c) in the best interests of the Debtors, their estates, and all parties-in-interest. Additionally, nothing in this Motion or the Orders alters the Prepetition Secured Parties' need to prove any diminution in value occurred in accordance with the Bankruptcy Code in order to realize the benefit of the various adequate protection benefits conferred in the Orders.

## D.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

74.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Ames Dep't Stores*,

---

[10]     As a general matter, continued operations are far more likely to maintain or increase underlying collateral values compared with the catastrophic loss of value that could result from a debtor's inability to operate in the ordinary course.  *See*, *e.g.*, *In re Jim Kelley Ford of Dundee, Ltd.*, 14 B.R. 812, 818 (N.D. Ill. 1980) (finding the lender was adequately protected and the debtor was authorized to use cash collateral to fund operations where the lender benefited from the difference between the average sale price of a car sold at retail and the average sale price if the same vehicle were sold at a wholesale auction).

115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)) (citing *In re Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area)); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

75.     As noted above, the Debtors do not believe that comparable alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure and the significant execution risk inherent in alternative financing proposals. The Debtors solicited financing proposals from several potential lenders and ultimately conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Facility. Alternative sources of financing, especially ones that offer committed post-emergence financing, with better or equally favorable terms are not available to the Debtors.

76.     Thus, the Debtors determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to fund these Chapter 11 Cases and consummate the restructuring transactions contemplated in the RSA.  The Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**E.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders Under the DIP Documents.**

77.     Pending finalization of the DIP Documents and subject to Court approval, the Debtors have agreed, pursuant to the term sheet, to pay certain fees to the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay:

> **i.**     ***Interest Rate.*** The Borrower shall pay interest at a rate, at the DIP Borrower's option, equal to the Base Rate plus 10.75% per annum or

LIBOR (subject to a 1.25% floor) plus 11.75% per annum, compounded monthly and payable monthly in cash in arrears.

ii.   *Upfront Fee*. The Borrowers shall pay an upfront premium equal to 4.00% of each DIP Lender's commitments in respect of the $450 million "new money" portion of the DIP Facility on the Petition Date, which shall be earned, due and payable upon execution of the DIP Commitment Letter.

iii.   *Commitment Premium Fee*. The Borrowers shall pay to the DIP Lenders a commitment premium equal to 6.00% of each DIP Lender's commitments in respect of the $450 million "new money" portion of the DIP Facility on the Petition Date, which shall be earned, due and payable upon execution of the DIP Commitment Letter.

78.   The Debtors and the DIP Agent and DIP Lenders agree that these fees are an integral component of the overall terms of the DIP Facility, and are required by the DIP Lenders as consideration for the extension of postpetition financing.  Further, each of the fees was subject to arm's-length and good faith negotiations between the Debtors and the DIP Lenders, and are market and appropriate in light of the circumstances of these Chapter 11 Cases.  The Debtors considered the fees described above when determining in their sound business judgment that the DIP Facility constituted the best, and only, actionable terms on which the Debtors could obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates.  Importantly, no upfront or backstop fees will be paid on account of the Roll Up. Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements and ratify and approve fees paid prepetition, which fees would not be subject to recharacterization, avoidance, subordination, disgorgement, or any similar form of recovery.

F.   **The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e) of the Bankruptcy Code.**

79.   Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and their right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

80.     As explained herein, the DIP Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain vital postpetition financing; and (b) arm's-length, good faith negotiations between the Debtors, the DIP Agent, and DIP Lenders.

81.     The Debtors submit that the terms and conditions of the DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, the Debtors market-tested the terms of the DIP Facility before determining that the DIP Facility provided the best terms available. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to the protections afforded by that section.

## G.     The Automatic Stay Should Be Modified on a Limited Basis.

82.     The proposed Final Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents to validate and perfect the liens and security interests granted to them under the Final Order. The proposed Final Order further provides that the automatic stay is modified as necessary to permit the Debtors to

grant the DIP Liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Final Order.  Finally, the proposed Final Order provides that, following the occurrence of an Event of Default, the automatic stay shall be modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Documents, or applicable law, subject to the Debtors' right to seek relief on an expedited basis.

### H.    Failure to Obtain Immediate Interim Access to Cash Collateral Would Cause Immediate and Irreparable Harm.

83.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rule 4001(b)(2).   Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that "on motion by the debtors, a hearing will routinely be conducted within three business days to consider . . . cash collateral use."  Complex Case Procedures, ¶ 3.A.

84.    The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to access Cash Collateral as needed and on the terms provided in the proposed Interim Order.  The Debtors require such access prior to the Final Hearing and entry of the Final Order for the various reasons discussed above, including to ensure they have the necessary liquidity to continue operating, to pay their administrative expenses, and to implement the relief requested in

the Debtors' other "first day" motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.  *See* Mesterharm Decl. ¶ 18-19.  In addition, the Budget establishes that the Debtors' use of Cash Collateral will not prejudice the Secured Parties.

85.     In light of the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 4001(b) and (c) to support immediate access to Cash Collateral pending the entry of the Final Order, and respectfully request that the Court grant the relief requested herein and authorize the immediate use of the Cash Collateral pursuant to the terms and conditions set forth in the Interim Order.

## **Emergency Consideration**

86.     The Debtors request emergency consideration of the Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  An immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  The failure to receive the requested relief during the first 21 days of these Chapter 11 Cases could disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.  The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested herein on an emergency basis.

## **Request for Final Hearing**

87.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after

twenty-five days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

88.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

89.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with Bankruptcy Rules 4001 and 9014, as well as the Bankruptcy Local Rules, and is sufficient under the circumstances.  The Debtors will provide notice to parties-in-interest, including:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) Otterbourg P.C., as counsel to Wells Fargo Bank, N.A., administrative agent under the Debtors' revolving credit facility; (d) JPMorgan Chase Bank, N.A., as administrative agent under the Debtors' term loan facility; (e) Wilmington Trust, N.A., as indenture trustee under the Debtors' (i) 5.875% first lien secured notes due 2023, (ii) 8.625% second lien secured notes due 2025, (iii) 5.65% unsecured notes due 2020, (iv) 7.125% unsecured notes due 2023, (v) 6.90% unsecured notes due 2026, (vi) 6.375% unsecured notes due 2036, (vii)  7.40% unsecured notes due 2037, and (viii) 7.625% unsecured notes due 2097; (f) Milbank LLP, as counsel to the ad hoc group of certain first lien creditors; (g) the United States Attorney's Office for the Southern District of Texas;  (h) the  Internal  Revenue  Service;  (i)  the  United  States  Securities  and  Exchange Commission; (j) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (k) the state attorneys general for states in which the Debtors conduct business; and (l) any party that has requested notice pursuant to Bankruptcy

Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors request that the Court enter interim and final orders, substantially in the forms attached hereto, respectively, granting the relief requested in this Motion and granting such other and further relief as is appropriate under the circumstances.

Respectfully Submitted,
May 16, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:        mcavenaugh@jw.com
              jwertz@jw.com
              kpeguero@jw.com
              vpolnick@jw.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Christopher Marcus, P.C. (*pro hac vice* admission pending)
Aparna Yenamandra (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        joshua.sussberg@kirkland.com
              christopher.marcus@kirkland.com
              aparna.yenamandra@kirkland.com

*Proposed Co-Counsel to the Debtors*
*and Debtors in Possession*

**<u>Certificate of Service</u>**

I certify that on May 16, 2020, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## Exhibit A

**DIP Commitment Letter**

May 15, 2020

<u>PERSONAL AND CONFIDENTIAL</u>

J. C. Penney Corporation, Inc.
6501 Legacy Drive, Mail Code 1304
Plano, TX 75024
Attention: Treasurer

<u>$450 Million Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility</u>
<u>Commitment Letter</u>

       J. C. Penney Corporation, Inc. ("<u>JCP</u>", "<u>you</u>" or "<u>your</u>") has (i) advised the DIP Lenders (as defined in the DIP Term Sheet (as defined below)) (the "<u>Commitment Parties</u>", "<u>we</u>", "<u>us</u>" or "<u>our</u>"), that JCP and certain of its subsidiaries (the "<u>Subsidiary Debtors</u>") and J. C. Penney Company, Inc., a Delaware corporation and the direct parent of JCP ("<u>Holdings</u>" and, collectively with JCP and the Subsidiary Debtors, the "<u>Debtors</u>"), are considering filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et seq.</u> (as amended, the "<u>Bankruptcy Code</u>"), and (ii) in connection with the foregoing, requested that the Commitment Parties agree to commit to provide a $450 million superpriority senior secured debtor-in-possession term loan credit facility for JCP under Sections 364(c) and 364(d) of the Bankruptcy Code (the "<u>DIP Facility</u>") subject solely to the Conditions Precedent to the Initial Borrowing and the Conditions Precedent to The Subsequent Borrowing that are applicable to the relevant borrowing (collectively, the "<u>Conditions Precedents</u>"). Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars. Capitalized terms used herein without definition shall have the meaning assigned thereto in the DIP Term Sheet.

1. <u>Commitment</u>.

       To provide assurance that the DIP Facility shall be available on the terms and conditions set forth herein and in the DIP Term Sheet, each Commitment Party is pleased to advise JCP of its several, but not joint, commitment (the "<u>Commitment</u>") to provide the amount of the DIP Facility set forth on <u>Schedule 1</u> hereto, on the terms set forth in the DIP Term Sheet attached hereto as <u>Exhibit A</u> (the "<u>DIP Term Sheet</u>" and together with this letter, this "<u>Commitment Letter</u>"), subject solely to the Conditions Precedent that are applicable to the relevant borrowing.

       You acknowledge and agree that nothing in this Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Commitment Party, the DIP Agent or any of their respective affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Commitment Party, the DIP Agent or any of their respective affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Commitment Letter or the transactions contemplated hereby, and agree that no Commitment Party, Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated

hereby (including the exercise of rights and remedies hereunder) are arm's-length commercial transactions and that we and the DIP Agent are acting as principal and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated hereby are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we and the DIP Agent may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning JCP and other companies that may be the subject of the transactions contemplated hereby and such affiliates will be entitled to the benefits afforded to us and the DIP Agent hereunder; *provided* that any such affiliates receiving information concerning JCP and other companies in accordance with this paragraph shall be subject to the same confidentiality obligations provided for in this Commitment Letter (with each Commitment Party responsible for its affiliates' compliance with this paragraph).

2.  Information.

You hereby represent, warrant and covenant that (a) all written information concerning you and your subsidiaries and your and their respective business (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "Projections") and information of a general economic or industry specific nature) (the "Information") that has been or will be made available to us or any of our respective affiliates by or on behalf of you is or will be, when furnished, complete and correct in all material respects, when taken as a whole, and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to the updates provided for in the penultimate sentence of this Section 2) and (b) the Projections that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates (it being acknowledged that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and (iv) no guarantee or assurance can be given that the projected results will be realized). In particular, where Projections expressly or implicitly take into account the current market volatility and widespread impact of the COVID-19 outbreak, the extent of the impact of these developments on the Debtors' and their subsidiaries' operational and financial performance will depend on future developments, including the duration and spread of the outbreak and related governmental advisories and restrictions, and the impact of the COVID-19 outbreak on overall demand for the Debtors' and their subsidiaries' products and services, all of which are outside of the control of the Debtors or their subsidiaries, highly uncertain and cannot be predicted. You agree that if, at any time prior to the entry of the Final DIP Order approving the DIP Facility, any of the representations, warranties and covenants in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that

such representations, warranties and covenants would be correct in material respects; *provided*, for the avoidance of doubt, there will be no requirement to update previously delivered Projections to reflect new assumptions so long as the assumptions were reasonable at the time made and made available to us or any of our affiliates. Without limiting the representations, warranties and covenants to be contained in the Operative Documents or the Conditions Precedent that are applicable to the relevant borrowing, the accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Commitment Parties hereunder or the availability of the DIP Facility.

3.  Premiums.

    Without duplication of the commitment premium set forth in the DIP Term Sheet under the heading "DIP Facility Premiums", as consideration for the Commitments and agreements of the Commitment Parties hereunder, JCP agrees to pay (or cause to be paid) to the Commitment Parties a non-refundable commitment premium equal to 6.00% of $450 million (the "Commitment Premium"), which shall be allocated to each Commitment Party in an amount equal to its percentage set forth on Schedule 1 hereto *multiplied by* the Commitment Premium, which shall be earned on the date of this Commitment Letter and shall be due and payable in cash on the date of this Commitment Letter free and clear of any withholding or deduction on account of taxes. The parties hereto hereby acknowledge and agree that the obligation of JCP to pay the Commitment Premium shall constitute an "Obligation" under and as defined in the Operative Documents.

    Without duplication of the upfront premium set forth in the DIP Term Sheet under the heading "DIP Facility Premiums", as consideration for the Commitments and agreements of the Commitment Parties hereunder, JCP agrees to pay (or cause to be paid) to the Commitment Parties a non-refundable upfront premium equal to 4.00% of $450 million (the "Upfront Premium"), which shall be allocated to each Commitment Party in an amount equal to its percentage set forth on Schedule 1 hereto *multiplied by* the Upfront Premium, which shall be earned on the date of this Commitment Letter and shall be due and payable in cash on the date of this Commitment Letter free and clear of any withholding or deduction on account of taxes. The parties hereto hereby acknowledge and agree that the obligation of JCP to pay the Upfront Premium shall constitute an "Obligation" under and as defined in the Operative Documents.

4.  Conditions.

    The Commitment Parties' Commitments and agreements hereunder in respect of the DIP Facility are subject solely to the satisfaction (or waiver by the Commitment Parties) of the Conditions Precedent that are applicable to the relevant borrowing. The Commitment Parties' commitments to fund the DIP Facility on the date of the relevant borrowing are subject solely to the satisfaction (or waiver by the Commitment Parties) of the Conditions Precedent that are applicable to the relevant borrowing. There are no conditions (implied or otherwise) to the Commitments hereunder in respect of the DIP Facility, and there will be no conditions (implied or otherwise) to the availability of the DIP Facility on the date of the relevant borrowing, including compliance with the terms of this Commitment Letter or the DIP Term Sheet, other than the Conditions Precedent that are applicable to the relevant borrowing. For the avoidance of doubt, the Commitment Parties' commitments to fund the DIP Facility on the date of the

relevant borrowing are subject to their receipt of the Commitment Premium and Upfront Premium on the date of this Commitment Letter subject to the confirmation by the escrow agent that the Commitment Premium and the Upfront Premium have been received, along with irrevocable instructions from the Debtors to disburse the funds to the DIP Lenders, by the escrow agent on the date of this Commitment Letter prior to the filing of the petition by the Debtors commencing the Chapter 11 Cases.

5.   Indemnification and Expenses.

You agree to (a) indemnify and hold harmless each Commitment Party and the DIP Agent, their respective affiliates and their and their affiliates' respective officers, directors, employees, agents, attorneys, accountants, advisors (including investment managers, financial advisors and advisers), consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("Losses") to which any such Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the DIP Facility, the use of proceeds thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, and to (b) reimburse each Commitment Party promptly (but in any event within ten business days) upon receipt of their demand for any reasonable and documented out-of-pocket (i) legal or other expenses (including Milbank LLP, Sullivan & Cromwell LLP and any reasonably necessary local legal counsel) and (iii) fees and expenses of Deutsche Bank Securities Inc., Houlihan Lokey, Inc., and Hilco Real Estate, LLC) incurred in connection with the Chapter 11 Cases, the DIP Facility, the enforcement of this Commitment Letter, the definitive documentation for the DIP Facility, and any ancillary documents and security arrangements in connection therewith, but no other third-party financial advisors (other than Deutsche Bank Securities Inc., Houlihan Lokey, Inc., and Hilco Real Estate, LLC) without your prior written consent; *provided*, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith or willful misconduct or (ii) material breach of its obligations under this Commitment Letter, or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Debtors or any of their respective subsidiaries (other than any claim, litigation, investigation or proceeding against the DIP Agent, in its capacity or in fulfilling its role as such).

None of you, Holdings, the other Debtors, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to one another for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the DIP Facility, the enforcement of this Commitment Letter, the definitive documentation for the DIP Facility, or any ancillary documents and security arrangements in connection therewith; *provided* that your indemnity and reimbursement obligations under this Section 5 shall not be limited by this sentence.

6.   Assignments, Amendments.

This Commitment Letter shall not be assignable by you or us without the prior written consent of the other parties hereto (and any attempted assignment without such consent shall be

null and void), is intended to be solely for the benefit of the parties hereto, the Indemnified Persons and with respect to Section 5 and this Section 6, the DIP Agent, and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto, the Indemnified Persons and with respect to Section 5 and this Section 6, the DIP Agent; *provided* that, for the avoidance of doubt, any DIP Lender may assign its rights, commitments and obligations under this Commitment Letter to any other DIP Lender (including any entity described in the definition of "DIP Lender").  This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by (a) except to the extent a greater percentage of the DIP Lenders is expressly required in the DIP Term Sheet, the Required Lenders and (b) you.

This Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof.  Section headings used herein are for convenience of reference only, are not part of this Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.  You acknowledge that information and documents relating to the DIP Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Commitment Party nor the DIP Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Commitment Letter, together with the RSA, supersedes all prior understandings, whether written or oral, between us with respect to the DIP Facility.

7.  <u>Governing Law, Etc.; Jurisdiction</u>.

THIS COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE DOMESTIC SUBSTANTIVE LAWS OF ANY OTHER STATE).

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the non-exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof and the Bankruptcy Court, in any suit, action or proceeding arising out of or relating to this Commitment Letter or the DIP Facility, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, or, to the extent applicable, the Bankruptcy Court; *provided* that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (b) waives, to the fullest extent it may legally and effectively do so, any objection

which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Commitment Letter or the DIP Facility in any New York State court, in any such Federal court or in Bankruptcy Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

You hereby agree that you shall not bring any suit, action, proceeding, claim or counterclaim under this Commitment Letter or with respect to the transactions contemplated hereby in any court other than such New York State court or Federal Court of the United States of America sitting in the Borough of Manhattan in New York City.  Service of any process, summons, notice or document by registered mail addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

8.  Waiver of Jury Trial.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

9.  Confidentiality.

This Commitment Letter is delivered to JCP on the understanding that neither this Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you, Holdings and its subsidiaries and your and their respective officers, directors, employees, legal counsel, accountants, financial advisors on a confidential and "need to know" basis and, in each case, who are involved in the consideration of the financing transactions contemplated hereby who have been informed by you, Holdings or any of its subsidiaries, as applicable, of the confidential nature of this Commitment Letter and have agreed to treat such information confidentially, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any ad-hoc or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis, (d) to the Bankruptcy Court, (e) as and to the extent required in any financial statements or for other customary accounting purposes and (f) you may disclose the aggregate amount of the premiums hereunder as part of projections, pro forma information and a generic disclosure of aggregate sources and uses.

Each Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated hereby or obtained from or on behalf of you, Holdings or your and its respective affiliates in the course

of the transactions contemplated hereby, except that the Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants and advisors involved in the transactions contemplated hereby on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Commitment Party responsible for such persons' compliance with this paragraph), (b) on a confidential basis to any bona fide prospective DIP Lender, prospective participant or swap counterparty (in accordance with the terms of the DIP Term Sheet) that agrees to keep such information confidential in accordance with (x) the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or (y) other customary confidentiality language in a "click-through" arrangement, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Commitment Parties promptly in advance thereof), (d) to the extent such information: (i) becomes publicly available other than as a result of a breach of this Commitment Letter or other confidentiality obligation owed by such Commitment Party to you or your affiliates or (ii) becomes available to the Commitment Parties on a non-confidential basis from a source other than you or on your behalf that, to such Commitment Party's knowledge, is not in violation of any confidentiality obligation owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Commitment Parties' rights with respect to this Commitment Letter and/or the DIP Facility, (g) to the extent independently developed by such Commitment Party or its affiliates without reliance on confidential information, (h) with respect to the existence and contents of the DIP Term Sheet and Operative Documents, in consultation with you, to the rating agencies or (i) with respect to the existence and contents of this Commitment Letter and the DIP Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the DIP Facility and to industry trade organizations where such information with respect to the DIP Facility is customarily included in league table measurements.  The Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provisions in the Operative Documents upon the effectiveness thereof and, in any event, will terminate one year from the date of this Commitment Letter.

10. Miscellaneous.

You  acknowledge and agree that nothing in this Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Commitment Party, the DIP Agent or any of their respective affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Commitment Party, the DIP Agent or any of their respective affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Commitment Letter or the transactions contemplated hereby, and agree that no Commitment Party, Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your

equity holders, employees or creditors. You acknowledge that the transactions contemplated hereby (including the exercise of rights and remedies hereunder) are arm's-length commercial transactions and that we and the DIP Agent are acting as principal and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated hereby are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we and the DIP Agent may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning JCP and other companies that may be the subject of the transactions contemplated hereby and such affiliates will be entitled to the benefits afforded to us and the DIP Agent hereunder; *provided*, that any such affiliates receiving information concerning JCP and other companies in accordance with this paragraph shall be subject to the same confidentiality obligations provided for in this Commitment Letter (with each Commitment Party responsible for its affiliates' compliance with this paragraph).

The Commitment Parties hereby notify JCP that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act") and the requirements of 31 C.F.R. § 1010.230 (the "Beneficial Ownership Regulation"), it and its affiliates are required to obtain, verify and record information that identifies each Credit Party, which information includes names, addresses, tax identification numbers and other information that will allow Commitment Parties and its affiliates to identify each Credit Party in accordance with the PATRIOT Act and the Beneficial Ownership Regulation. This notice is given in accordance with the requirements of the PATRIOT Act and the Beneficial Ownership Regulation and is effective for Commitment Parties and its affiliates.

Absent a change in applicable tax law or a contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), each of the parties hereto agrees that (i) each of the Commitment Premium and the Upfront Premium shall be treated as a premium paid by JCP to the relevant Commitment Party in exchange for the issuance of a put right to JCP with respect to the DIP Facility and (ii) to not take any tax position inconsistent with the tax treatment described in the foregoing clause (i).

Each of the parties hereto agrees that this Commitment Letter is a binding and enforceable agreement (subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law)) with respect to the subject matter contained herein, including an agreement to negotiate in good faith the definitive documentation for the DIP Facility by the parties hereto in a manner consistent with this Commitment Letter, it being acknowledged and agreed that the availability of the DIP Facility is subject solely to the Conditions Precedent that are applicable to the relevant borrowing.

If the foregoing correctly sets forth our agreement, please indicate JCP's acceptance of the terms of this Commitment Letter by returning to the Commitment Parties executed counterparts of this Commitment Letter not later than 11:59 p.m., New York City time, on the date first written above. This offer will automatically expire at such time if the Commitment Parties have not received such executed counterparts in accordance with the preceding sentence.

This Commitment Letter and the Commitments and agreements hereunder shall automatically terminate on the earlier of (i) the date of the effectiveness of the Operative Documents and (ii) unless the Commitment Parties shall, in their sole discretion, agree in writing to an extension, 11:59 p.m., New York City time, on June 9, 2020.  Notwithstanding the immediately preceding sentence, Section 3 above, as well as the indemnification and expenses, confidentiality, information, jurisdiction, governing law and waiver of jury trial provisions contained herein shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Commitment Letter or the Commitment Parties' Commitments hereunder; *provided* that your obligations under this Commitment Letter, other than those pursuant to Section 3 and with respect to confidentiality, shall automatically terminate and be superseded by the applicable provisions in the Operative Documents, in each case, to the extent covered thereby, on the date of the effectiveness of the Operative Documents, and you shall be released from all liability in connection therewith at such time.

[*Signature Pages Follow*]

**Exhibit A**

<u>See Attached</u>.

EXECUTION VERSION

**$450 MILLION SECURED SUPERPRIORITY DEBTOR IN POSSESSION CREDIT FACILITY**

**SUMMARY OF TERMS AND CONDITIONS**

This summary of terms and conditions (this "***DIP Term Sheet***") outlines certain terms and conditions of the DIP Facility referred to below.  Capitalized terms used and not defined herein have the meanings assigned to such terms in the Restructuring Support Agreement ("***RSA***") or the Restructuring Term Sheet (the "***RSA Term Sheet***") to which this DIP Term Sheet is attached as Annex 2.

| | |
|---|---|
| **Executive Summary:** | This DIP Term Sheet provides for a $450 million secured superpriority debtor in possession credit facility, to be funded on a delayed draw basis as appropriate in light of case liquidity needs, access to cash collateral, and milestones in order to (i) finance the Debtors and their operations in accordance with the Budget and (ii) ensure that the Debtors have sufficient liquidity, taking into account access to cash collateral. |
| | Pursuant to the RSA and as described herein, the DIP Lenders will agree to convert certain of their Loans into loans under an exit facility to be made available on terms and conditions customary for facilities and transactions of such type and in each case satisfactory to the DIP Lenders and the Debtors (such loans, the "***Exit Loans***"). |
| | The DIP Facility will be fully committed to by the DIP Lenders (determined on a pro rata basis among the DIP Lenders based on the aggregate amount of the Prepetition First Lien Obligations held by the DIP Lenders as of the date of this DIP Term Sheet (the "***Pro Rata Allocations***")) pursuant to the terms and conditions described in this DIP Term Sheet and the Commitment Letter to which this DIP Term Sheet is attached (the "***Commitment Letter***"). |
| **Borrower:** | J. C. Penney Corporation, Inc. (the "***DIP Borrower***"), as a debtor and debtor in possession under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "***Bankruptcy Code***").  The DIP Borrower and its affiliated debtors and debtors in possession, collectively, the "***Debtors***". |
| **DIP Facility:** | A non-amortizing senior secured priming multi-draw delayed draw term loan facility (the "***DIP Facility***") with a maximum funded principal amount equal to $450 million in "new money" (such principal amount, together with the Prepetition First Lien Obligations rolled up into the DIP Facility as set forth below, the "***Total Aggregate Commitment***" and the loans thereunder, the "***Loans***") to be funded in two borrowings as follows: (a) $225 million made not later than one business day following |

the entry of the DIP Order (as defined below) (the "***Initial Borrowing***") and subject to satisfaction of the Conditions Precedent to Initial Borrowing and (b) the remainder of the Total Aggregate Commitment in an aggregate principal amount equal to $225 million (the ***"Subsequent Borrowing"***) shall be made available following the entry of the DIP Order on July 15, 2020 subject to satisfaction of the Conditions Precedent to Initial Borrowing and the Conditions Precedent to The Subsequent Borrowing (and no other conditions precedent), and otherwise on the terms and conditions in this DIP Term Sheet, the Commitment Letter and the Operative Documents referred to below.

With respect to the DIP Facility, (i) upon satisfaction of the Conditions Precedent to Initial Borrowing, funds with respect to the Initial Borrowing shall be funded directly to the Debtors for use in accordance with the Budget and (ii) upon satisfaction of the Conditions Precedent to The Subsequent Borrowing, all funded amounts shall be deposited in a blocked controlled account in favor of the DIP Agent (the "***Escrow Account***"; the funds deposited therein "***Drawn Funds***"). The Subsequent Borrowing shall be in an aggregate principal amount equal to $225 million, which represents the remainder of the Total Aggregate Commitment. Drawn Funds may be withdrawn from the Escrow Account once per week, subject to a draw request being delivered to the DIP Agent, which shall certify (i) that such applicable Drawn Funds will be required during the subsequent week in accordance with the Budget (giving effect to any maximum Permitted Variances with respect to such week) and (ii) no Default or Event of Default (each as defined in the Operative Documents) shall have occurred and be continuing.

| | |
|---|---|
| **Guarantors:** | The obligations of the DIP Borrower shall be unconditionally guaranteed, on a joint and several basis, by each other Debtor (each, a "***Guarantor***" and collectively, the "***Guarantors***"). Each entity which guarantees (or is required to guarantee) the Prepetition First Lien Obligations shall be a Guarantor and a Debtor. |
| **Case:** | The bankruptcy cases (the "***Chapter 11 Cases***") of the Debtors to be filed under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") (the date of filing of such petition, the "***Petition Date***"). The Petition Date shall be no later than May 16, 2020. |

2

| | |
|---|---|
| **DIP Agent:** | GLAS USA LLC ("***GLAS***") shall act as administrative agent and collateral agent for the DIP Facility (in such capacity, the "***DIP Agent***") on behalf of the DIP Lenders (as defined below). Any action, exercise of remedies, approval, consent or similar action to be taken or not taken by the DIP Agent in respect of the DIP Facility shall only be taken (or not taken) as may be directed by the Required Lenders.  The DIP Agent and the DIP Borrower shall enter into an agency fee letter providing for fees to be payable to the DIP Agent to be mutually agreed and reasonably acceptable to the Debtors. |
| **DIP Lenders:** | All rights and obligations of the DIP Lenders under the DIP Facility shall be several and not joint. |
| **Prepetition ABL Credit Agreement:** | The Amended and Restated Credit Agreement dated as of June 20, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Prepetition ABL Credit Agreement***") by and among the DIP Borrower, Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "***Prepetition ABL Agent***"), the lenders from time to time party thereto (the "***Prepetition ABL Lenders***") and the other parties thereto. |
| **Prepetition Term Loan Credit Agreement:** | The Amended and Restated Term Loan Credit Agreement dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Prepetition Term Loan Credit Agreement***") by and among the DIP Borrower, the Lenders party thereto (the "***Prepetition Term Loan Lender***"), JPMorgan Chase Bank, N.A., as administrative agent (the "***Prepetition Term Loan Agent***"), and the other parties thereto.  The loans under the Prepetition Term Loan Credit Agreement are referred to herein as the "***Prepetition Term Loans***". |
| **Prepetition First Lien Notes** | The senior secured notes (the "***Prepetition First Lien Notes***") outstanding under that Indenture, dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Prepetition First Lien Notes Indenture***") by and among the DIP Borrower, Wilmington Trust, National Association, as trustee (the "***Prepetition First Lien Notes Trustee***"), and the other parties thereto.  The holders of such Prepetition First Lien Notes are referred to herein as the "***Prepetition First Lien Noteholders***". The Prepetition Term Loans together with the Prepetition First Lien Notes are referred to herein as the "***Prepetition First Lien Obligations***". |

| | |
|---|---|
| **ABL Intercreditor Agreement:** | The Intercreditor and Collateral Cooperation Agreement dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***ABL Intercreditor Agreement***") by and among the DIP Borrower, the Prepetition ABL Agent, Wilmington Trust, National Association, as collateral agent under the Prepetition Term Loan Credit Agreement and the Prepetition First Lien Notes Indenture (the "***Prepetition First Lien Collateral Agent***"), and the other parties thereto. |
| **Restructuring Support Agreement:** | A restructuring support agreement executed on or prior to the Petition Date and which is mutually acceptable to the DIP Lenders and the Debtors (the "***RSA***"). |
| **Tenor of DIP Facility:** | The DIP Facility will mature on the earliest of (such earliest date, the "***Maturity Date***"): |

(a) the date that is 180 days after the Petition Date (the "***Scheduled Maturity Date***");

(b) 20 days after the Petition Date, if the DIP Order (as defined below) has not been entered by the Bankruptcy Court prior to the expiration of such 20-day period;

(c) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases;

(d) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise;

(e) without the DIP Agent's prior written consent, the date of filing or express written support by the Debtors of bidding procedures, sale processes, transactions, plans of liquidation or reorganization or related disclosure statements that are not in accordance with the RSA, if applicable, and that are not otherwise acceptable to the DIP Lenders;

(f) the date of termination of the DIP Lenders' commitments and the acceleration of any outstanding Loans, in each case, under the DIP Facility in accordance with the terms of the DIP Facility credit agreement (the "***DIP Credit Agreement***") and the other definitive documentation with respect to the DIP Facility (collectively with the DIP Credit Agreement and the related security documents, the "***Operative Documents***");

(g) any breach by the Debtors which has not been cured or

4

waived or termination of the RSA after the effectiveness thereof;

(h) dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code;

(i) the Debtors shall lose access to the use of cash collateral in accordance with the Cash Collateral Order (as defined below), subject to any applicable remedies notice period; and

(j) other customary circumstances to be mutually agreed.

| | |
|---|---|
| **Closing Date:** | The date of the effectiveness of the Operative Documents (the "***Closing Date***") (which, for the avoidance of doubt, shall not occur prior to the entry of the DIP Order). |
| **DIP Facility Interest Rate:** | Loans under the DIP Facility will bear interest at a rate, at the DIP Borrower's option, equal to the Base Rate plus 10.75% per annum or LIBOR (subject to a 1.25% floor) plus 11.75% per annum, compounded monthly and payable monthly in cash in arrears. |
| | At any time when an Event of Default under the DIP Facility has occurred and is continuing, all outstanding amounts under the DIP Facility shall bear interest, to the fullest extent permitted by law, at the interest rate applicable to base rate loans plus 2.00% per annum and shall be payable on demand in cash (the "***Default Rate***"). Interest on overdue amounts under the DIP Facility shall also accrue at the Default Rate and shall be payable in cash. |
| **DIP Facility Premiums:** | A commitment premium payable in cash to the DIP Lenders equal to 6.00% of each DIP Lender's initial commitments in respect of the $450 million "new money" portion of the DIP Facility on the Petition Date, which shall be earned, due and payable upon execution of the Commitment Letter. |
| | An upfront premium payable in cash to the DIP Lenders equal to 4.00% of each DIP Lender's commitments in respect of the $450 million "new money" portion of the DIP Facility on the Petition Date, which shall be earned, due and payable upon execution of the Commitment Letter. |
| | An exit premium payable in cash to the DIP Lenders equal to 3.00% of each DIP Lender's funded Loans or unfunded commitments under the DIP Facility (including the "new money" and rolled up portion of the DIP Facility) on the Maturity Date or on the date of any earlier voluntary or |

mandatory prepayment (the "***Exit Premium***").

**Exit Loans:**

Upon terms and conditions to be agreed in the RSA, but in any event including the following:

Exit Loans will bear interest at a rate, at the DIP Borrower's option, equal to the Base Rate plus 10.00% per annum or LIBOR (subject to a 1.25% floor) plus 11.00% per annum, compounded monthly and payable monthly in cash in arrears.

A commitment premium payable in cash equal to 2.00% of the commitments in respect of the Exit Loans, which shall be due and payable in cash on the date that the Business Plan is approved (in accordance with the timeline set forth in the DIP Milestones (as defined below)).

An upfront premium payable in cash equal to 3.00% of the commitments in respect of the Exit Loans, which shall be earned, due and payable on the closing date of the Exit Loans.

**Roll Up:**

On the date of entry of the DIP Order, $225 million in principal amount of the Prepetition Term Loans held by the DIP Lenders (or their applicable designees) shall be rolled up into the DIP Facility in accordance with each such DIP Lender's (or its applicable designee's) share of the DIP Facility. On the date of the Subsequent Borrowing, an additional $225 million of principal amount of the Prepetition Term Loans held by the DIP Lenders (or their applicable designees) shall be rolled up into the DIP Facility on a dollar-for-dollar basis in accordance with each such DIP Lender's (or its applicable designee's) share of the DIP Facility. Except with respect to the Exit Premium, the premiums set forth above shall only be payable with respect to the $450 million "new money" portion of the DIP Facility and shall not be payable with respect to any rolled up Prepetition Term Loans. Notwithstanding the foregoing, in the event that any DIP Lender (or any of its designees) does not hold sufficient Prepetition Term Loans to fully participate in the roll up on a pro rata basis based on its pro rata share of the funded Loans, such DIP Lender (or its applicable designee) shall be permitted to roll up its Prepetition First Lien Notes to the extent necessary to achieve such pro rata share of the roll up.

**Adequate Protection:**

As adequate protection for any diminution in the value of the interests of the Prepetition Term Loan Lenders and the Prepetition First Lien Noteholders in the collateral securing the Prepetition Term Loan Credit Agreement and the Prepetition First Lien Noteholders in the collateral securing the Prepetition

First Lien Notes Indenture, respectively, the Prepetition Term Loan Lenders and the Prepetition First Lien Noteholders will receive, subject in all cases to the Carve-Out, the following as adequate protection: (A) the payment of the reasonable and documented out-of-pocket fees and expenses of legal counsel and financial advisors retained by the Prepetition Term Loan Lenders that are also DIP Lenders, (B) cash payments of accrued and unpaid interest on the Prepetition Term Loans and Prepetition First Lien Notes upon entry of the  DIP Order and each date thereafter on which such interest payment would otherwise become due under the Prepetition Term Loan Credit Agreement or Prepetition First Lien Notes Indenture, as applicable, (C) validly perfected liens on and security interests in the Debtors' post-petition Collateral junior only to the liens granted to the DIP Lenders under the DIP Facility and existing valid, perfected, and superior liens in the Collateral held by other creditors (including, for the avoidance of doubt, the liens of the Prepetition ABL Lenders with respect to the ABL Priority Collateral) and (D) a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code, which claim shall have priority over all priority claims (other than the claims of the DIP Lenders under the DIP Facility) and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c), 507(a), 507(b), 546(c), 726(b), and 1114 of the Bankruptcy Code or otherwise (collectively, "***Adequate Protection***").

**Optional Prepayments and Commitment Reductions:**

The DIP Borrower may, upon at least one business day's notice, prepay or terminate in full (but not in part), with the payment of the Exit Premium but without other premium or penalty, subject to breakage costs, if applicable, the outstanding Loans and unfunded commitments. Once repaid, Loans may not be re-borrowed.

**Mandatory Prepayments:**

Mandatory prepayments of the Loans customary for similar debtor-in-possession financings shall be required, including, in an amount equal to (a) 100% of insurance and condemnation proceeds, (b) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the DIP Credit Agreement and (c) 100% of the net cash proceeds of any sale of assets constituting Collateral and other asset sales (without any reinvestment rights, but subject to de minimis dollar carveouts to be agreed, but subject, in the case of ABL Priority

Collateral (or proceeds thereof), to prior repayment of the Prepetition ABL Credit Agreement solely to the extent required pursuant to the Cash Collateral Arrangements).

All voluntary prepayments and mandatory prepayments (within one business day of receipt thereof) shall be applied as follows: <u>first</u>, to pay accrued and unpaid interest on, and expenses in respect of, the obligations under the DIP Facility, to the extent then due and payable; and <u>second</u>, to any principal amounts or other obligations (including the Exit Premium) which are outstanding under the DIP Facility. Other than the Exit Premium, there shall be no premium or penalty payable in connection with mandatory prepayments.

**Security:** All amounts owing by the DIP Borrower under the DIP Facility and by the Guarantors in respect thereof will be secured by a perfected security interest in, with the priority described below under "Priority," and lien on substantially all of the Debtors' tangible and intangible assets, including, without limitation, the following (collectively, the "***Collateral***"): accounts receivable, equipment, inventory, contracts, fee owned and ground leased real estate, real property leaseholds, investment property, insurance proceeds, deposit accounts (other than payroll, trust and tax accounts), monies, equity interests of subsidiaries of each Debtor and the products and proceeds thereof and, upon entry of the DIP Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates pursuant to the Bankruptcy Code, subject to certain exclusions to be mutually agreed. Notwithstanding anything to the contrary, no mortgages shall be required and perfection on the Collateral shall be obtained solely through entry of the DIP Order.

**Priority:** Subject in all cases to the Carve-Out and certain exclusions to be mutually agreed, all amounts owing by the DIP Borrower under the DIP Facility and by the Guarantors in respect thereof shall at all times:

> (a)      pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claims status in the Chapter 11 Cases;

> (b)      pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all Collateral that is not subject to valid, perfected, and non-avoidable liens as of the Petition Date, including all unencumbered fee-owned, ground-leased and space-

8

leased real estate, and including upon entry of the DIP Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates pursuant to the Bankruptcy Code;

(c)     (i) pursuant to section 364(d) of the Bankruptcy Code, be secured by a perfected first priority and priming lien on all collateral that secures obligations under the Prepetition Term Loan Credit Agreement (other than ABL Priority Collateral, as defined in the ABL Intercreditor Agreement ("**ABL Priority Collateral**")) and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected second priority lien on all ABL Priority Collateral, junior only to the lien securing the claims in respect of the Prepetition ABL Credit Agreement ("**Prepetition Collateral**"); and

(d)     pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected second priority lien on all other property of the Debtors that is subject to valid and perfected liens in existence as of the Petition Date (including liens (if any) perfected subsequent to the Petition Date as permitted by and in accordance with section 546(b) of the Bankruptcy Code) but with a priority immediately junior to such liens.

Such liens shall be senior to all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

All liens authorized and granted pursuant to the DIP Order, as applicable, in each case, entered by the Bankruptcy Court approving the DIP Facility shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection. The DIP Lenders, or the DIP Agent on behalf of the DIP Lenders, shall be permitted, but not required, to make any filings, deliver any notices or take any other acts as may be desirable under state law or other law in order to reflect the perfection and priority of the DIP Lenders' claims described herein.

**Carve-Out:**     See Schedule II to this DIP Term Sheet.

**Conditions Precedent to Initial Borrowing:**     The Operative Documents will contain customary conditions precedent to the Initial Borrowing under the DIP Facility and other conditions deemed by the DIP Agent to be appropriate to the specific transaction, and in any event, including, without

9

limitation:

(a)  The execution of the RSA and the filing of the executed RSA.

(b)  The preparation, authorization and execution of the Operative Documents with respect to the DIP Facility, in form and substance satisfactory to the DIP Agent.

(c)  No later than 18 calendar days after the Petition Date, the Bankruptcy Court shall have entered a final order approving the DIP Facility on a final basis (the "***DIP Order***"), in form and substance satisfactory to the DIP Agent in their sole discretion as confirmed by the DIP Agent in writing, authorizing and approving the DIP Facility and the transactions contemplated hereby, including Adequate Protection and the DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the DIP Agent.

(d)  All premiums, fees and documented out-of-pocket fees and expenses (including fees and expenses of counsel and financial advisors) required to be paid to the DIP Lenders and DIP Agent (and with respect to which invoices have been received by the Debtors at least one (1) business day before the Closing Date) on or before the Closing Date (whether incurred before or after the Petition Date and including estimated fees and expenses through the Closing Date) shall have been paid.

(e)  The delivery of a 13-week cash flow projection (the "Initial DIP Budget") in form and substance reasonably satisfactory to the DIP Agent in its reasonable discretion as confirmed by the DIP Agent in writing. Such Initial DIP Budget and all updates thereto (in accordance with reporting requirements described herein) shall include the same line item detail as provided in the Alix Partners 13 week cash flow provided on May 13, 2020 prepetition, and will forecast, on a weekly basis, the period commencing May 17, 2020 through the end of the fiscal month following the last week of such 13-week period, and on a monthly basis for each month thereafter through the Maturity Date; provided that with the written consent and approval of the DIP Agent the Initial Budget may be updated by the DIP Borrower no more than once per month, which update shall be effective three calendar

days following delivery to the DIP Agent except to the extent objected to by the DIP Agent in writing. Upon effectiveness, such updated budget shall thereupon become the "budget" for purposes of the DIP Facility (as so approved, the "***Budget***").

(f) The Debtors shall have obtained requisite consents from the Prepetition ABL Agent and the Prepetition ABL Lenders to the use of cash collateral in the Chapter 11 Cases in an amount and on terms satisfactory to the Prepetition ABL Agent, the Prepetition ABL Lenders and the DIP Lenders, or the Bankruptcy Court shall have entered a cash collateral order acceptable to the DIP Agent (the "***Cash Collateral Order***"). For the avoidance of doubt the DIP Agent may not determine the Cash Collateral Order is not acceptable solely on account of the Prepetition ABL Agent and the Prepetition ABL Lenders not consensually consenting to the use of such cash collateral.

(g) Subject to a post-closing period to be agreed upon, the DIP Agent shall have received endorsements naming the DIP Agent as additional insureds, loss payee, lender loss payee and mortgagee under all insurance policies to be maintained with respect to the properties of the Debtors forming part of the Collateral.

(h) The DIP Agent shall have a valid and perfected lien on and security interest in the Collateral with the priority described herein. All filings, recordations and searches necessary or desirable in connection with such liens and security interests shall have been duly made; and all filing and recording fees and taxes shall have been duly paid.

(i) Since January 31, 2020, there shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Chapter 11 Cases) or threatened in any court or before any arbitrator or governmental authority that, in the opinion of the DIP Agent, affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a material adverse change or material adverse condition in or affecting the businesses, assets, operations or condition (financial or otherwise) of any of the Debtors and their respective direct and indirect subsidiaries or any of the transactions contemplated hereby; provided, that none of (i) the Chapter 11 Cases, the events and conditions

11

leading up to the Chapter 11 Cases, or their reasonably anticipated consequences, (ii) the actions required to be taken pursuant to the DIP Credit Agreement, the RSA, the DIP Order, or the Cash Collateral Order, or (iii) the occurrence of the COVID-19 pandemic or the impacts thereof on the business, financial condition or results of the DIP Borrower or its subsidiaries shall constitute a "material adverse effect" for any purpose.

(j) No default or event of default shall exist under the Operative Documents.

(k) The representations and warranties of the DIP Borrower and each Guarantor under the Operative Documents shall be true and correct in all material respects after giving effect to such funding.

(l) The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(m) The DIP Agent shall have received all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the U.S. Patriot Act.

(n) No later than five business days after the Petition Date, the Debtors shall have filed a motion seeking the retention of AlixPartners LLP as the Debtors' restructuring advisor and Lazard as the Debtors' investment banker.

(o) An order approving the Debtors' cash management system, the form of which is reasonably acceptable to the DIP Agent, shall have been entered by the Bankruptcy Court.

(p) Orders approving customary "first day" relief, the form of which is reasonably acceptable to the DIP Agent, shall have been entered by the Bankruptcy Court.

(q) The Debtors shall not have entered into, or made any payment in respect of, any critical vendor agreements or otherwise entered into any agreement to pay, or made on a postpetition basis any payment in respect of, any prepetition trade obligations except as consented to by the DIP Agent pursuant to an order of the Bankruptcy Court (which may be via consent to the "first day" orders).

12

(r)  Other customary conditions to be mutually agreed.

**Conditions Precedent to The Subsequent Borrowing**:

On the funding date of the Subsequent Borrowing, the following conditions precedent shall have been satisfied:

(a)  The RSA shall be in full force and effect.

(b)  No default or event of default shall exist under the Operative Documents.

(c)  The representations and warranties of the DIP Borrower and each Guarantor under the Operative Documents shall be true and correct in all material respects after giving effect to such funding (except to the extent such representation relates to an earlier date, in which case such representation shall have been true and correct in all material respects as of such date).

(d)  The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)  The DIP Agent shall have received a borrowing notice, substantially in the form as attached to the DIP Credit Agreement, at least three business days in advance of the requested borrowing.

(f)  The DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the DIP Agent.

(g)  All premiums, fees and documented out-of-pocket fees and expenses (including fees and expenses of counsel and financial advisors) required to be paid to the DIP Lenders and the DIP Agent on or before the date of such funding shall have been paid in cash.

(h)  The Debtors shall be in compliance with the Operative Documents and the DIP Milestones; provided that the DIP Milestones relating to the Business Plan (other than the receipt of the Business Plan and the Business Plan Parameters in accordance with the DIP Milestones) shall not be a condition precedent to the funding of the Subsequent Borrowing into the Escrow Account; provided, further, that no Drawn Funds in respect of the Subsequent Borrowing shall be permitted to be withdrawn from the Escrow Account until the Business Plan has been approved or disapproved in accordance with the DIP Milestones, with (i) $225

13

million permitted to be withdrawn from the Escrow Account commencing July 15, 2020 in accordance with the Budget if the Business Plan is approved in accordance with the DIP Milestones or (ii) upon the occurrence of a Toggle Event, $50 million shall remain in the Escrow Account in connection with a toggle to a 363 sale, with the release of such $50 million from the Escrow Account subject to agreement among the DIP Borrower, the DIP Agent and the Prepetition ABL Agent to an acceptable 363 sale budget and released in amounts and at times in accordance with such budget, and $175 million shall be released from the Escrow Account to the DIP Lenders within 2 business days of the date of the occurrence of such Toggle Event.

|                              |                              |
|------------------------------|------------------------------|
| **Representations and Warranties:** | The Operative Documents will contain representations and warranties that are (a) customary for similar debtor-in-possession financings and (b) and additional representations and warranties required by the DIP Lenders as mutually agreed with the Debtors. |
| **Reporting Requirements:** | The Operative Documents will contain financial reporting requirements that are customary for similar debtor-in-possession financings, including, without limitation, (i) monthly updates of the Budget for each fiscal month of the Debtors to be provided within five business days following the end of any fiscal month of the Debtors, (ii) all financial, operating and other reporting provided to the Prepetition ABL Lenders during the Chapter 11 Cases, including pursuant to the Cash Collateral Order, as and when so provided, (iii) a weekly cash flow forecast budget to actuals for each line item in a form to be attached to the DIP Credit Agreement and otherwise acceptable to the DIP Agent, with management commentary on any individual line item with a positive or negative variance of 5.0% or more as compared to the Budget (unless the dollar amount corresponding to such percentage variance is less than $1,000,000, in which case no management commentary shall be required) (the "***Weekly Variance Report***"), (iv) monthly delivery of operating statements and balance sheets for the Debtors and their consolidated subsidiaries within 15 business days following the end of the applicable period, (v) quarterly store-level operating statements for all properties within 45 days following the end of the applicable period and (vi) reasonable reporting requirements to be agreed with respect to professional fee monitoring no later than June 15, 2020. |

The Operative Documents will contain additional requirements

that the Debtors' counsel provide advance copies of all pleadings and/or filings in the Chapter 11 Cases to be made by the Debtors. The Debtors shall also provide copies of any monthly reporting provided to the Bankruptcy Court or the U.S. Trustee.

**Other Maintenance Covenants:**

The Debtors shall not pay any expenses or other disbursements other than those set forth in the Budget.

The DIP Borrower's cumulative actual receipts shall not be less than 85% of budgeted receipts for the corresponding test period (the "***Permitted Collections Budget Variances***").

The DIP Borrower's cumulative actual disbursements (excluding professional fees) will be not more than 12.5% greater than the budgeted disbursements for the corresponding test period (the "***Permitted Expenditures Budget Variances***").

The DIP Borrower's cumulative actual disbursements to merchandise vendors (domestic and foreign) will not be more than 10% greater than the budgeted disbursements for the corresponding test period (the "***Permitted Inventory Budget Variances***").

The Permitted Collections Budget Variances, Permitted Expenditures Budget Variances, and Permitted Inventory Budget Variances, collectively the "***Budget Variances***", in each case, as set forth in the then operative Budget. Notwithstanding anything to the contrary herein, the Debtors and Required Lenders shall agree to include provisions in the Operative Documents providing for the implementation of increased Permitted Expenditures Budget Variances and Permitted Inventory Budget Variances, in each case, in the event that the Debtors are able to more rapidly open store locations than anticipated in the Initial DIP Budget; provided, that Permitted Collections Budget Variances shall be adjusted accordingly to the extent agreed.

The Budget Variances shall each be tested (i) first, on June 6, 2020 on a cumulative basis for the prior two weeks, (ii) second, on June 13, 2020 on a cumulative basis for the prior three weeks, and (iii) at the end of each week thereafter on a cumulative four week basis for the prior four weeks.  The Debtors shall deliver a Weekly Variance Report to the DIP Agent by 12:00 p.m., Eastern time, on Friday of each week.

Simultaneously with the delivery of the Weekly Variance Report, the DIP Borrower shall report on consolidated unrestricted book cash as of the end of the preceding week (as

reported in the Weekly Variance Report), which shall not be less than $50 million.

By June 1, 2020, the DIP Borrower and its real estate advisors will present to the DIP Agent and the DIP Lenders a summary of lease renegotiation discussions with content of such presentation to be acceptable to the DIP Agent with landlords, including the asks made of each landlord by property. Thereafter, the DIP Borrower shall report on a weekly basis the status of lease renegotiations by property, including any settlements achieved with any landlords by property, to the DIP Agent and the DIP Lenders, with associated terms of such settlements acceptable to the DIP Agent.

By July 1, 2020, the DIP Borrower and its real estate advisors will present to the DIP Agent and the DIP Lenders a proposed monetization strategy of the DIP Borrower's fee-owned and ground-leased real estate assets, including any offers or indications of value received by property for the last 12 months. Thereafter, the DIP Borrower shall report on a bi-weekly basis any offers or indications of value received by property to the DIP Agent and the DIP Lenders.

Process for construct for monthly reporting on allocation of disbursements by entity to be agreed between Required Lenders and the DIP Borrower by June 15, 2020, which shall be implemented as promptly as practical thereafter and provided on a monthly basis once implemented.

**Affirmative Covenants:** The Operative Documents will contain (a) affirmative covenants that are customary for similar debtor-in-possession financings and (b) additional affirmative covenants required by the DIP Lenders and mutually agreeable to the Debtors and shall, in any event, include without limitation (i) the advance delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Debtors in the Chapter 11 Cases to the DIP Lenders and their counsel, (ii) compliance with Budget covenants consistent with the section titled "Budget and Variances," (iii) compliance with the DIP Milestones in the administration of the Chapter 11 Cases, (iv) update meetings and/or calls with the Debtors' senior management and advisors and the DIP Lenders no less than weekly if requested and (v) one or more members of the Debtors' senior management team shall be available for discussion with the DIP Lenders upon reasonable notice.

**Negative Covenants:** The Operative Documents will contain negative covenants that are (a) customary for similar debtor-in-possession financings

16

and (b) additional negative covenants required by the DIP Lenders and mutually agreeable to the Debtors, and including, without limitation, restrictions on (i) incurrence of additional debt and liens (it being understood that any debt secured by the ABL Priority Collateral on a senior basis shall be capped at the amount of the Prepetition ABL Credit Agreement as of the Petition Date, subject to providing the ability of the DIP Borrower to access renewals or replacements of letters of credit thereunder, in each case, subject to the requirements and terms of the Cash Collateral Order), (ii) asset sales, (iii) investments, (iv) restricted payments, (v) fundamental changes and (vi) affiliate transactions.

**Events of Default:**    The Operative Documents will contain (a) events of default that are customary for similar debtor-in-possession financings and (b) additional events of default required by the DIP Lenders and mutually agreeable to the Debtors (collectively, the "***Events of Default***") and shall, in any event, include without limitation the following (subject to mutually agreeable grace periods as applicable):

(i)    failure to make any payment when due under the Operative Documents;

(ii)    noncompliance with covenants or breaches in any material respect of representations and warranties, in either case, under the Operative Documents;

(iii)    cross-default to any prepetition indebtedness in a principal amount above a threshold to be agreed that is not stayed by the automatic stay in the Chapter 11 Cases;

(iv)    failure to satisfy or stay execution of judgments above a threshold to be agreed;

(v)    the existence of certain employee benefit or environmental liabilities,, which would constitute a material adverse effect;

(vi)    impairment of the Operative Documents or the security interests described in "Security" above;

(vii)    change of ownership or control;

(viii)    a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases;

(ix)    appointment of a responsible officer or examiner with enlarged powers relating to the

17

operation of the business of any Debtor;

(x) granting of relief from any stay of proceeding (including the automatic stay) so as to allow a third party to proceed against any asset of the Debtors in an amount in excess of $1,000,000 in the aggregate;

(xi) entry of an order granting any superpriority claim which is senior to or *pari passu* with the DIP Lenders' claims under the DIP Facility without the prior consent of the DIP Agent (other than as described under the caption "Priority" above);

(xii) any termination of the RSA as to all parties thereto, except as to any individual DIP Lender pursuant to Section 12.03 of the RSA;

(xiii) any Debtor shall have filed, proposed, or supported a plan of reorganization, plan of liquidation, or a motion seeking to approve a sale of any material portion of the Collateral, in each case unless contemplated by, and in accordance with, the RSA or as otherwise agreed to by the DIP Agent;

(xiv) entry of an order staying, reversing, vacating or otherwise modifying, without the prior written consent of the DIP Agent, the DIP Facility, or the DIP Order;

(xv) payment of, or granting adequate protection with respect to, prepetition debt (other than as contemplated by the Operative Documents) unless otherwise agreed by the DIP Agent;

(xvi) cessation of liens or superpriority claims granted with respect to the Collateral securing the Debtors' obligations in respect of the DIP Facility to be valid, perfected and enforceable in all respects with the priority described herein;

(xvii) failure to comply with this DIP Term Sheet, the Operative Documents or any of the DIP Milestones; and

(xviii) entry into, or the making of any payment in respect of, any critical vendor agreements or otherwise entry into any agreement to pay, or the making of any payment in respect of, any

18

prepetition trade obligations except as consented to by the DIP Agent (which may be via consent to the "first day" orders).

**Remedies:**    Upon the occurrence and during the continuance of an Event of Default:

(a) the Required Lenders (as defined below) may direct the DIP Agent, in their discretion, to immediately take any or all of the following actions: (i) deliver a notice of an Event of Default; (ii) charge the Default Rate of interest on the Loans and other outstanding obligations; and (iii) terminate all commitments under the DIP Facility; and

(b) upon five (5) business days' written notice from the DIP Lenders, in their sole and absolute discretion, the automatic stay of section 362 of the Bankruptcy Code shall be terminated without further order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading, for the limited purpose of permitting the DIP Lenders  Trustee, and counsel to the  to do any of the following: (i) foreclose on the Collateral; (ii) enforce all of the guaranty rights; (iii) accelerate all Loans and other outstanding obligations under the DIP Facility; and (iv) declare the principal of and accrued interest, premiums, fees and expenses constituting the obligations under the DIP Facility to be due and payable. Section 362 relief from the stay in favor of the DIP Lenders shall be embodied in any order approving the DIP Facility and the use of cash collateral. At any hearing addressing the exercise of remedies by the DIP Lenders under the Operative Documents, the only objection that may be raised by the Debtors or the Committee shall be whether an Event of Default has in fact occurred and is continuing, and the Debtors and the Committee shall waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit, restrict or delay the rights and remedies of the DIP Agent under the Operative Documents.

**Milestones:**    The DIP Borrower shall comply with the following chapter 11 milestones which Milestones may be extended in writing by the DIP Agent in its sole and absolute discretion (the "***Milestones***"):

(a) on the Petition Date, the Debtors shall have filed a motion seeking approval of the DIP Facility;

(b) no later than 14 business days following the Petition Date, the Debtors shall have filed a motion to retain Brokers acceptable to the Required Lenders;

(c) no later than 18 calendar days after the Petition Date, the Bankruptcy Court shall enter an order approving the DIP Credit Agreement, in form and substance satisfactory to the DIP Agent in its discretion as confirmed by the DIP Agent in writing;

(d) no later than 18 calendar days after the Petition Date, the Bankruptcy Court shall have entered the DIP Order;

(e) no later than June 15, 2020, the Debtors will have delivered a Lease Optimization Plan and an Owned Real Estate Optimization Plan, each in form and substance acceptable to the Required Lenders;

(f) no later than June 15, 2020 the Debtors shall have delivered proposed processes and parameters related to a proposed business plan (the "**_Business Plan_**") including those related to vendor agreements, lessor agreements, and go-forward self-funding capability (the "**_Business Plan Parameters_**") to the DIP Lenders;

(g) no later than June 20, 2020 the Debtors and the Required Lenders shall have agreed on acceptable Business Plan Parameters;

(h) no later than July 8, 2020, the Debtors shall have delivered a Business Plan (consistent with the agreed acceptable Business Plan Parameters) to the DIP Lenders;

(i) no later than July 14, 2020, the Debtors and the Required Lenders shall have agreed on an acceptable Business Plan;

(j) no later than 90 days after the Petition Date, the Debtors will (unless otherwise provided for in the RSA) have filed either (A) a motion seeking approval of a disclosure statement with respect to a chapter 11 plan that is acceptable to the DIP Agent or (B) a motion seeking approval of bidding procedures and a sale that is acceptable to the DIP Agent;

(k) no later than 130 days after the Petition Date, the

20

Bankruptcy Court shall have entered an order acceptable to the DIP Agent either approving (A) an acceptable disclosure statement or (B) acceptable bidding procedures;

(l) no later than 160 days after the Petition Date, the Bankruptcy Court shall have entered one or more orders acceptable to the DIP Agent either (A) confirming an acceptable chapter 11 plan or (B) approving an acceptable sale or sales; and

(m) no later than November 15, 2020 the Plan Effective Date shall have occurred.

**Toggle Event:**

A "***Toggle Event***" shall occur if either: (x) by July 15, 2020, the failure of 66.7% of the DIP Lenders to approve the Business Plan or (y) by August 15, 2020, the Debtors shall have failed to obtain binding commitments for all third-party financing (on terms acceptable to the Required Lenders) necessary to finance Business Plan in accordance with the other plan provisions of the RSA Term Sheet.

Upon a failure of such condition, the Debtors shall immediately cease pursing the Plan and instead pursue a 363 sale of all of their assets unless otherwise instructed by the Required Lenders and shall seek approval of any relief required to undertake such 363 sale on an expedited basis.

**Indemnification:**

The DIP Borrower shall indemnify and hold harmless the DIP Agent, each DIP Lender, each of their respective affiliates and each of their respective officers, directors, partners, security-holders, employees, agents, advisors, attorneys and representatives (each, an "***Indemnified Party***") from and against any and all claims, damages, losses, liabilities and expenses (including all reasonable and documented fees, expenses and disbursements of their respective specified legal counsel, specified financial advisors or other specified professionals retained by the DIP Agent or DIP Lenders, in each case as agreed and specifically set forth in the Commitment Letter and the Operative Documents[1]), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case, arising out of or in connection with or by reason of the DIP Facility,

---

[1] In all cases, DB, Hillco, Houlihan, Milbank, S&C and others to be determined.

the Operative Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, or any operation of any business by any Debtor. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the DIP Borrower, any of its directors, security-holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

**Expenses**:

Each Debtor shall jointly and severally be obligated to pay all reasonable and documented out-of-pocket costs and expenses of the DIP Lenders and the DIP Agent, including all reasonable and documented fees, expenses and disbursements of their respective specified legal counsel, specified financial advisors or other specified professionals retained by the DIP Agent or DIP Lenders, in each case as agreed and specifically set forth in the Commitment Letter and the Operative Documents[2], in connection with (a) the discussion, negotiation, preparation, execution and delivery of any documents in connection with the proposed financing contemplated by this DIP Term Sheet, including the Operative Documents and the funding of all Loans under the DIP Facility, the administration of the DIP Facility and any amendment, modification or waiver of any provision of the Operative Documents, (b) the interpretation, enforcement or protection of any of their rights and remedies under the Operative Documents or (c) the Chapter 11 Cases.

**Other Bankruptcy Matters:**

The DIP Order shall be in form and substance reasonably satisfactory to the DIP Agent as confirmed by the DIP Agent in writing (it being understood that any communication by email shall suffice), and all motions relating thereto, shall be in form and substance reasonably satisfactory to the DIP Agent in its discretion and, unless otherwise agreed by the DIP Agent in writing, shall include the following provisions:

(a) modifying the automatic stay to permit the creation and perfection of the DIP Lenders' liens on the Collateral;

(b) prohibiting the assertion of claims arising under section 506(c) of the Bankruptcy Code against any of the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the

---

[2] In all cases, DB, Hillco, Houlihan, Milbank, S&C and others to be determined.

Prepetition First Lien Notes Trustee, the Prepetition First Lien Noteholders or, except as expressly permitted therein, the commencement by the Debtors of other actions adverse to the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the Prepetition First Lien Notes Trustee, the Prepetition First Lien Noteholders or any of their respective rights and remedies under the DIP Facility, the Prepetition Term Loan Credit Agreement or the Prepetition First Lien Notes Indenture, as applicable, the DIP Order, or any other order;

(c) prohibiting the incurrence of any debt with priority equal to or greater than the DIP Facility;

(d) prohibiting any granting or imposition of liens senior to the liens granted under the Operative Documents;

(e) authorizing and approving the DIP Facility and the transactions contemplated thereby, including the granting of the superpriority status, security interests and liens and the payment of all premiums and fees, referred to herein;

(f) acknowledging the validity and enforceability of the Prepetition Term Loan Credit Agreement and the Prepetition First Lien Notes Indenture, the debt outstanding thereunder and the liens granted in connection therewith;

(g) waiving any and all claims or causes of action against the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the Prepetition First Lien Notes Trustee and the Prepetition First Lien Noteholders, whether arising prior to or after the Petition Date including, without limitation, any lender or noteholder liability claims, any subordination claims or any claims under any non-disclosure or confidentiality agreement;

(h) providing that the DIP Lenders and their respective counsel, advisors and consultants shall be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code;

(i) providing that the DIP Lenders, the Prepetition First Lien Lenders and the Prepetition First Lien Noteholders reserve the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the Loans (including any prepetition loans or notes

rolled-up) and the Prepetition First Lien Obligations, in each case, in whole or in part, in connection with any sale or disposition of assets in the Chapter 11 Cases and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code;

(j) providing that the Prepetition Term Loan Lenders, the Prepetition Term Loan Agent, the Prepetition First Lien Notes Trustee and the Prepetition First Lien Noteholders are entitled to all of the benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception thereunder shall not apply to any of the Prepetition Term Loan Lenders, the Prepetition Term Loan Agent, the Prepetition First Lien Notes Trustee or the Prepetition First Lien Noteholders with respect to proceeds, product, offspring, or profits of any of the collateral securing the Prepetition Term Loan Credit Agreement or the Prepetition First Lien Notes Indenture; and

(k) providing that in no event shall any of the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the Prepetition First Lien Notes Trustee, the Prepetition First Lien Noteholders the DIP Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

| | |
|---|---|
| **Assignments:** | Customary for similar debtor-in-possession financings; provided that if no Event of Default has occurred and is continuing, the DIP Borrower's consent shall be required (except with respect to an assignment to any other DIP Lender or any entity described in the definition of DIP Lender) for assignments of the Loans, which such consent shall not be unreasonably withheld, conditioned or delayed, and the DIP Borrower shall deemed to consent to any such assignment if it is has failed to respond to any such request for consent within five business says thereof. |
| **Required Lenders:** | DIP Lenders, as of any date of determination, holding greater than 50% of the outstanding Loans and commitments under the DIP Facility (the "***Required Lenders***"); provided that the consent of each DIP Lender adversely affected thereby shall be required to any amendment or modification (i) to extend the final maturity of any Loan, (ii) to waive, reduce or postpone any scheduled repayment (but not prepayment) of any Loan, (iii) to reduce the rate of interest on any Loan (other than any |

waiver of default interest) or any premium set forth in this DIP Term Sheet, (iv) to the definition of Pro Rata Allocation or (v) that adversely and disproportionately affects such DIP Lender in a material respect relative to the other DIP Lenders taken as a whole (it being understood that, for the avoidance of doubt, any DIP Lender declining an opportunity or option offered ratably to all DIP Lenders shall not constitute disproportionate treatment for purposes of this clause (v)); provided, further, that in each case such adversely affected DIP Lender is in compliance with its funding obligations under the Commitment Letter; provided, further, that any amendment or modification of any of the dates or consents in clauses (f), (g), (h) or (i) of the DIP Milestones related to the Business Plan, the Toggle Event or the funding the Subsequent Borrowing will require the consent of 66.7% of the DIP Lenders.

**Governing Law and Submission to Jurisdiction:** State of New York. Exclusive jurisdiction of the Bankruptcy Court, including with respect to the exercise of the remedies by the DIP Lenders and preservation of the value of the Collateral.

**Counsel to the DIP Lenders:** Milbank LLP.

**Local Counsel to the DIP Lenders:** To be determined.

**Counsel to the DIP Agent**: Arnold & Porter.

25

Schedule II

DIP Carve Out

(a)      Notwithstanding anything to the contrary in this Final Order, the Debtors' obligations to the DIP Secured Parties and [Prepetition Secured Parties] and the liens, security interests, and superpriority claims granted herein, under the DIP Loan Documents, and/or under the Prepetition Loan Documents, including the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and the Prepetition Liens, shall be subject in all respects and subordinate to the Carve Out.

(b)      As used in this Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors or any Official Committee) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee   pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount

27

not to exceed $4,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c)     Carve Out Reserves. The Debtors shall establish and fund a segregated account (the "Funded Reserve Account") for purposes of funding the Carve Out. The Funded Reserve Account will be funded first from the [DIP Proceeds Account], then from the DIP Priority Collateral. Notwithstanding anything to the contrary in this Order, the DIP Documents, or the Prepetition Loan Documents, (i) in no circumstances (which, for the avoidance of doubt, includes, but is not limited to, an Event of Default or a termination of the DIP Credit Agreement or DIP Loan Documents) shall the Debtors be prohibited in any way from accessing or drawing upon the [DIP Proceeds Account] for the purpose of funding the Funded Reserve Account, and (ii) the [DIP Proceeds Account] shall not be ABL Priority Collateral or Prepetition ABL Collateral. Upon entry of this Order, the Debtors will deposit into the Funded Reserve Account an amount equal to the aggregate amount of Allowed Professional Fees projected to accrue from entry of this Order through June 30, 2020 (the "Initial Funded Reserve Amount"), which, for the avoidance of doubt, shall not include the Post-Carve Out Trigger Notice Cap. Commencing July 1, 2020 (or the first business day thereafter), on the first business day of each month, the Debtors shall deposit in the

Funded Reserve Account an amount equal to the aggregate amount of Allowed Professional Fees (excluding restructuring, sale, financing, or other success fees) projected to accrue for the following month in the Budget plus twenty percent of such aggregate amount of Allowed Professional Fees in the following month in the Budget (the "Monthly Funded Reserve Amount"). Each Professional Person may deliver to the Debtors a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred in the preceding month (each such statement, a "Fee Statement"), and to the extent the amount of Allowed Professional Fees accrued and claimed in a Fee Statement exceeds the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount for the applicable period or month, respectively, and such fees and expenses have otherwise not been paid by the Debtors, the Debtors shall, within one business day, fund additional amounts into the Funded Reserve Account equal to the difference between, as applicable, the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount and the amount accrued and claimed in the applicable Fee Statement (each, a "Top Off Amount").  At any time, if the Debtors in good faith believe a restructuring, sale, financing, or other success fee has been earned by a Professional Person and is then due and payable, the Debtors shall deposit in the Funded Reserve Account an amount equal to such fee.  Upon entry of the Order, the Debtors shall deposit into the Funded Reserve Account an amount equal to (i) the Post Carve Out Trigger Notice Cap plus (ii) the amounts contemplated under (b)(i) and (ii) above.  The Funded Reserve Account shall be maintained, and the funds therein (the "Funded Reserve Amount") shall be held in trust for the benefit of Professional Persons.  Any and all amounts in the Funded Reserve Account shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Loan Documents or DIP Loan Documents and neither the [Prepetition Secured Parties] nor the DIP Secured Parties shall be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary

in the [Prepetition Loan Documents] or DIP Loan Documents. Notwithstanding the foregoing, any and all payments to Professional Persons allowed by the Court (excluding restructuring, sale, financing, or other success fees) shall be paid first from the Funded Reserve Account.

(d)      On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors in accordance with paragraph [[___](b)] above, with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, including cash in the DIP Proceeds Account, to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees in excess of the Funded Reserve Amount; provided that in the event that a Termination Declaration Date occurs, Professional Persons shall have two business days to deliver additional Fee Statements to the Debtors, and the Debtors shall fund into the Funded Reserve Amount and Top Off Amounts.  The Debtors shall deposit and hold such amounts in the Funded Reserve Account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, including cash in the DIP Proceeds Account, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post Carve Out Trigger Notice Cap to the extent not already funded (including upon entry of the Order as set forth above).  The Debtors shall deposit and hold such amounts in a segregated account at an institution designated by the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.   All

funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash (or other form of payment pursuant to an Acceptable Plan), and all Commitments have been terminated, in which case any such excess shall be paid to the [Prepetition Secured Parties] in accordance with their rights and priorities as set forth herein.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash (or other form of payment pursuant to an Acceptable Plan), and all Commitments have been terminated, in which case any such excess shall be paid to the [Prepetition Secured Parties] in accordance with their rights and priorities as set forth herein. Notwithstanding anything to the contrary in the DIP Loan Documents, or this Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph [__], then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph [__], prior to making any payments to the DIP Agent or the [Prepetition Secured Parties], as applicable.  Notwithstanding anything to the contrary in the DIP Loan Documents or this Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the [Prepetition Agents] shall not sweep or foreclose on cash (including

cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents.  Further, notwithstanding anything to the contrary in this Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Order, the DIP Loan Documents, or in any Prepetition Loan Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the Prepetition Liens, and the DIP Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(e)      Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out and shall be funded first from the Funded Reserve Account.

(f)      No Direct Obligation To Pay Allowed Professional Fees.  None of the DIP Agent, DIP Lenders, or the [Prepetition Secured Parties] shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.

Nothing in this Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the [Prepetition Secured Parties], in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)     Payment of Carve Out On or After the Termination Declaration Date.   Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar for-dollar basis.

**<u>Exhibit B</u>**

**Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| J. C. PENNEY COMPANY, INC., *et al.*,[1] | ) | Case No. 20-20182 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) | (Emergency Hearing Requested) |

**ATTORNEY CHECKLIST CONCERNING MOTIONS**
**AND ORDERS PERTAINING TO USE OF CASH COLLATERAL AND**
**POST-PETITION FINANCING (WHICH ARE IN EXCESS OF TEN (10) PAGES)**

Motions and orders pertaining to cash collateral and post-petition financing matters tend to be lengthy and complicated. Although the Court intends to read such motions and orders carefully, it will assist the Court if counsel will complete and file this checklist. All references are to the Bankruptcy Code (§) or Rules (R).

**PLEASE NOTE:**

"*" Means generally not favored by Bankruptcy Courts in this District.

"**" Means generally not favored by Bankruptcy Courts in this District without a reason and a time period for objections.

If your motion or order makes provision for any of the following, so indicate in the space provided:

**CERTIFICATE BY COUNSEL**

This is to certify that the following checklist fully responds to the Court's inquiry concerning material terms of the motion and/or proposed order:

Yes, at Page/Exhibit
Y means yes; N means no
N/A means not applicable
(Page Listing Optional)

1.    Identification of Proceedings:

    (a)    Preliminary or final motion/order (circle one)................................................ _____

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/JCPenney. The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.

    (b)    Continuing use of cash collateral (§ 363)....................................... Y

    (c)    New financing (§ 364).................................................................... N

    (d)    Combination of §§ 363 and 364 financing ..................................... N

    (e)    Emergency hearing (immediate and irreparable harm) ................... Y

2.    Stipulations:

    (a)    Brief history of debtor's businesses and status of debtor's prior relationships with lender.................................................................. Y

    (b)    Brief statement of purpose and necessity of financing. .................. Y

    (c)    Brief statement of type of financing (i.e., accounts receivable, inventory)... Y

    (d)    Are lender's pre-petition security interest(s) and liens deemed valid, fully perfected and non-avoidable.......................................................... Y

        *(i)*  Are there provisions to allow for objections to above? ........................... Y

    (e)    Is there a post-petition financing agreement between lender and debtor? ......................................................................................... N

        *(i)*  If so, is agreement attached?.................................................................. N/A

    (f)    Is there an agreement that lender's post-petition security interests and liens deemed valid, fully perfected and non-avoidable? .............................. Y

    (g)    Is lender undersecured or oversecured (circle one) ................................. N/A

    (h)    Has lender's non-cash collateral been appraised? ........................................ Y

        *(i)*  Insert date of latest appraisal ................................................................ [4/28/20]

    (i)    Is debtor's proposed budget attached?........................................................ Y

    (j)    Are all pre-petition loan documents identified? ......................................... Y

    (k)    Are pre-petition liens on single or multiple assets? (circle one) .................. N/A

    (l)    Are there pre-petition guaranties of debt? .................................................. Y

        *(i)*  Limited or unlimited? (circle one).......................................................... N/A

3.    Grant of Liens:

    (a)    Do post-petition liens secure pre-petition debts?......................................... Y

    (b)    Is there cross-collaterization? ...................................................................... N

    (c)    Is the priority of post-petition liens equal to or higher than existing liens? .. Y

    (d)    Do post-petition liens have retroactive effect? ............................................ N

    (e)    Are there restrictions on granting further liens or liens of equal or higher priority? ...................................................................................................... Y

    (f)    Is lender given liens on claims under §§ 506(c), 544-50 and §§ 522? .......... N

        *(i)*  Are lender's attorneys fees to be paid?................................................... Y

        *(ii)* Are debtor's attorneys fees excepted from § 506(c)?.............................. Y

(g)    Is lender given liens upon proceeds of causes of action under §§ 544, 547 and 548?................................................................................... Y

4.    Administrative Priority Claims:

(a)    Is lender given an administrative priority? ..................................... Y

(b)    Is administrative priority higher than § 507(a)? ............................ Y

(c)    Is there a conversion of pre-petition secured claim to post-petition administrative claim by virtue of use of existing collateral?........................   Y

5.    Adequate Protection (§361):

(a)    Is there post-petition debt service? ................................................ Y

(b)    Is there a replacement/addition 361(/) lien? (circle one or both)................. Y

(c)    Is the lender's claim given super-priority?          N
(§ 364(c) or (d)) [designate] ...........................................................

(d)    Are there guaranties? ...................................................................... N

(e)    Is there adequate Insurance coverage? ........................................... N

(f)    Other? ............................................................................................. Y

**Debtors' comment**:  Adequate protection includes payment of all reasonable and documented out-of-pocket professional fees and expenses payable to the advisors to the ABL Secured Parties and Term Loan/ First Lien Notes Secured Parties.

6.    Waiver/Release Claims v. Lender:

(a)    

                                             Y (subject

Debtor waives or release claims against lender, including, but not limited to, claims under §§ 506(c), 544-550, 552, and 553 of the Code?................. to Final Order)

(b)    Does the debtor waive defenses to claim or liens of lender?........................ Y

7.    Source of Post-Petition Financing (§ 364 Financing):

(a)    Is the proposed lender also the pre-petition lender? ..................................... N/A

(b)    New post-petition lender?............................................................................. N/A

(c)    Is the lender an insider? ............................................................................... N/A

**Debtors' comment**:  [_____]

8.    Modification of Stay:

    (a)   Is any modified lift of stay allowed? ............................................................ Y

    (b)   Will the automatic stay be lifted to permit lender to exercise self-help upon default without further order? ....................................................................... Y

    (c)   Are there any other remedies exercisable without further order of court? .... Y

    (d)   Is there a provision that any future modification of order shall not affect status of debtor's post-petition obligations to lender? ................................... Y

9.    Creditors' Committee:

    (a)   Has creditors' committee been appointed? .................................................... N

    (b)   Does creditors' committee approve of proposed financing? ......................... N

10.    Restrictions on Parties in Interest:

    (a)   Is a plan proponent restricted in any manner, concerning modification of lender's rights, liens and/or causes? ............................................................. Y

    (b)   Is the debtor prohibited from seeking to enjoin the lender in pursuit of rights? ............................................................................................................. N

    (c)   Is any party in interest prohibited from seeking to modify this order? ......... N

    (d)   Is the entry of any order conditioned upon payment of debt to lender? ........ N

    (e)   Is the order binding on subsequent trustee on conversion? ........................... Y

11.    Nunc Pro Tunc:

    (a)   Does any provision have retroactive effect? ................................................. N

12.    Notice and Other Procedures:

    (a)   Is shortened notice requested? ...................................................................... Y

    (b)   Is notice requested to shortened list? ............................................................ N

    (c)   Is time to respond to be shortened? .............................................................. N

    (d)   If final order sought, have 15 days elapsed since service of motion pursuant to Rule 4001(b)(2)? ......................................................... N/A

    (e)   If preliminary order sought, is cash collateral necessary to avoid immediate and irreparable harm to the estate pending a final hearing? ........ Y

    (f)   Is a Certificate of Conference included? ...................................................... N

    (g)   Is a Certificate of Service included? ............................................................. Y

    (h)   Is there verification of transmittal to U.S. Trustee included pursuant to Rule 9034? ................................................................................. Y

    (i)   Has an agreement been reached subsequent to filing motion? ..................... N/A

        (i)   If so, has notice of the agreement been served pursuant to Rule 4001(d)(4)? ............................................................................................. N/A

*(ii)* Is the agreement in settlement of motion pursuant to Rule 4001(d)(4)? . N/A

*(iii)* Does the motion afford reasonable notice of material provisions of agreement pursuant to Rule 4001(d)(4)? ................................................. N/A

*(iv)* Does the motion provide for opportunity for hearing pursuant to Rule 9014? ...................................................................................................... N/A

Respectfully Submitted,
May 16, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**

Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:         mcavenaugh@jw.com
               jwertz@jw.com
               kpeguero@jw.com
               vpolnick@jw.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**

Joshua A. Sussberg, P.C. (*pro hac vice* admission pending)
Christopher J. Marcus, P.C. (*pro hac vice* admission pending)
Aparna Yenamandra (*pro hac vice* admission pending)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:         joshua.sussberg@kirkland.com
               christopher.marcus@kirkland.com
               aparna.yenamandra@kirkland.com

*Proposed Co-Counsel to the Debtors
and Debtors in Possession*