**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| J. C. PENNEY COMPANY, INC., *et al.*,[1] | ) | Case No. 20-20182 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | (Emergency Hearing Requested) |

**DECLARATION AND EXPERT REPORT OF JAMES A. MESTERHARM
IN SUPPORT OF DEBTORS' <u>EMERGENCY</u> MOTION FOR
ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
POSTPETITION USE OF CASH COLLATERAL, (II) GRANTING
ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES,
(III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF**

I, James A. Mesterharm, hereby declare under penalty of perjury:

1. I submit this Declaration and Expert Report in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "<u>Motion</u>"),[2] seeking authority for the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>") to obtain access to the Cash Collateral.

2. Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including the team working under my supervision, my review of relevant documents and

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/JCPenney. The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 6501 Legacy Drive, Plano, Texas 75024.

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the Motion or the proposed Interim Cash Collateral Order, as applicable.

information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my experience and knowledge.

3.      I am not being specifically compensated for this testimony other than through payments received by AlixPartners LLP ("AlixPartners") as a professional retained by the Debtors. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

**Professional Background and Qualifications**

4.      I am a Managing Director at AlixPartners and have served as restructuring advisor to the Debtors since March 2020.

5.      I have been a full-time restructuring advisor for over 25 years.  I received a B.S. in Accounting and Management in 1990 from Purdue University and a Masters of Business Administration in Finance and Organizational Behavior in 1998 from Northwestern University's Kellogg School of Graduate Management, where I have been a guest lecturer on restructuring topics.  I passed the Certified Public Accountant exam, am a certified turnaround professional, and am a Fellow of the American College of Bankruptcy.

6.      I have been employed by AlixPartners since September 1996, and lead the Americas Restructuring Practice.  AlixPartners is a global independent restructuring consulting firm that has a wealth of experience in providing restructuring advisory services, and has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these Chapter 11 Cases. Since its inception in 1981, AlixPartners, its predecessor entities, and its affiliate, AP Services, LLC, have provided restructuring or crisis management services in numerous large cases.  Some notable, publicly-disclosed restructuring assignments that I have personally led include Pacific Gas & Electric Company, American Tire Distributors, Pacific Drilling, S.A., The Gymboree

Corporation, Linn Energy, Inc., Paragon Offshore PLC, Walter Energy, Inc., Nautilus Holdings Ltd., Eastman Kodak Company, General Growth Properties, Tekni-Plex, Hilex-Poly, Silicon Graphics Inc., Parmalat USA, Safety-Kleen Corporation, and Zenith Electronics Corporation.

7.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am also familiar with the Debtors' supply chain and the status of the Debtors' relationships with various vendors, suppliers, and service-providers.

8.      Specifically, in my role as financial advisor to the Debtors, AlixPartners, among other advisory services:  (a) assisted the Debtors with its cash management and cash forecasting efforts; (b) assisted the Debtors with their contingency planning efforts in preparing for a potential chapter 11 filing; (c) assisted the Debtors in negotiating the proposed Interim and Final Orders; and (d) assisted the Debtors with constituency due diligence efforts.

### AlixPartners's Engagement

9.      The Debtors engaged AlixPartners in March 2020, to serve as their restructuring advisor.  The Debtors sought AlixPartners' services to commence contingency preparations in the event a chapter 11 filing became necessary and to advise the Debtors with respect to strategic and business alternatives.  Since commencing its engagement, AlixPartners has evaluated the Debtors' operations and cash requirements to operate their businesses during these Chapter 11 Cases, including by assisting in the development of the Debtors' 13-week and long-term cash flow forecasts.   In addition, AlixPartners has assisted in the Debtors' strategic alternatives and financing-related workstreams.  AlixPartners has worked closely with the Debtors' management and other restructuring professionals and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

10.     In the second half of March 2020, AlixPartners began obtaining diligence from the Debtors and evaluating the Company's operations and cash requirements for the restructuring and

debtor-in-possession financing process. We worked with key members of the Company, including, but not limited to, members of the finance, merchandise planning, store operations, treasury, and financial planning and analysis organizations, to evaluate and understand the Debtors' cash flows, borrowing base management, inventory management, and operations.

11.     As part of an evaluation of the Debtors' liquidity position, AlixPartners assisted in the development of the Debtors' 13-week and long-term cash flow forecasts. These forecasts take into account anticipated cash receipts and disbursements during the projected period, and consider the effects of the chapter 11 filing, including: incremental administrative costs of a complex chapter 11 filing with a larger number of stakeholders; required operational payments; and cost-saving initiatives already undertaken and contemplated to be undertaken.

12.     AlixPartners also considered the unprecedented, adverse market conditions facing the retail industry during the COVID-19 pandemic. AlixPartners ran a series of analyses to assess the Debtors' potential liquidity needs both during and following these Chapter 11 Cases. These cash-flow analyses assumed different store-opening timelines developed by the Company, that accounted for brand partners' and landlords' forecasts during and after the COVID-19 pandemic.

### The Debtors' Capital Structure and Cash Collateral

13.     As of the Petition Date, the Debtors have approximately $4.9 billion in total funded debt obligations. This consists of approximately $1.179 billion in aggregate principal amount outstanding on the ABL Facility, $1.521 billion in aggregate principal amount outstanding on the Term Loans, $500 million in aggregate principal amount outstanding on the First Lien Notes, $400 million in aggregate principal amount outstanding on the Second Lien Notes, and $1.318 billion in Unsecured Bonds. A capitalization table depicting the Debtors' prepetition capital structure as of the Petition Date is attached hereto as **Exhibit A**.

14.     The Debtors commenced these Chapter 11 Cases with approximately $475 million in Cash Collateral.  The Cash Collateral is encumbered by a first priority lien held by the ABL Secured Parties, a second priority lien held by the Term Loan Secured Parties and First Lien Notes Secured Parties, and a third priority lien held by the holders of Second Lien Notes Obligations.

### The Immediate Need for Access to Cash Collateral

15.     The Debtors' business consists of selling merchandise and services to consumers through their department stores and website.  To that end, the Debtors obtain merchandise from an integrated supply chain involving 2,800 domestic and foreign suppliers, operate 846 retail stores, and employ approximately 85,000 associates.

16.     I am familiar with the Debtors' Cash Collateral and liquidity needs.  Interim approval of the Cash Collateral Order will permit the Debtors to access the Cash Collateral in the ordinary course, which is essential to ensure Debtors have sufficient funds to operate and maximize the value of their estates.  Based on my experience generally and my experience with the Debtors in particular, approval of the use of Cash Collateral during the interim period is critical to the Debtors' ability to continue operating and restructure successfully.  Without it, the Debtors may have to pursue a liquidation in short order, to the detriment of their creditors and estates.

17.     The Debtors enter these Chapter 11 Cases with approximately $475 million in cash on hand and no available liquidity under the ABL Facility.  The Debtors' performance and liquidity is limited due to several factors, including the COVID-19 epidemic, industry trends, and tightening trade credit from suppliers and vendors.  This balance also reflects a $71 million reduction in the borrowing base imposed by the ABL Secured Parties over the past three weeks following the receipt of the most recent appraisal of the Debtors' inventory commissioned by the ABL Secured Parties (discussed further below).  The costs associated with administering these Cases will also impose demands on the Debtors' liquidity.

18. The Debtors need to use the Cash Collateral to stabilize their operations, meet working capital and business operating needs, and fund the administration of these Chapter 11 Cases. More specifically, access to the Cash Collateral during these Chapter 11 Cases will allow the Debtors to honor employee wages and benefits, procure goods and services integral to their ongoing business operations, fund operational expenses, and allow the Debtors to maintain relationships with their vendors, suppliers, employees, and customers.

19. By contrast, without the funding provided by the proposed Cash Collateral Order during the interim period, the Debtors' business operations would grind to a halt, given that the Debtors hold very little, if any, unencumbered cash. Moreover, trade creditors would likely cease extending credit or refuse to ship goods, creating a vicious cycle.

20. As described in more detail below, I believe that: (A) the terms of the proposed Interim Order are fair; (B) the adequate protection packages being offered to the ABL Secured Parties, Term Loan Secured Parties, First Lien Notes Secured Parties, and Second Lien Notes Secured Parties, are sufficient and fair; and (C) the use of Cash Collateral under the terms proposed in the Motion is necessary and appropriate.

**The Debtors' Proposed Adequate Protection Packages Are Adequate and Sufficient**

21. The adequate protection package proposed for and agreed to by the ABL Secured Parties includes: (a) adequate protection liens on existing and new inventory; (b) adequate protection claims to the extent of diminution in value of the ABL Secured Parties' interest in the collateral; (c) all accrued and unpaid amounts to be paid, along with cash pay interest at the non-default contract rate on the ABL Secured Parties' Pre-Petition Claims; (d) quarterly reporting in accordance with the ABL Credit Agreement; (e) payment of the ABL Secured Parties' fees and expenses; (f) a borrowing base reflecting a 7.5% minimum excess availability covenant (and, for some periods, a 10% minimum excess availability covenant); (g) appraisals can be requested at

6

the ABL Agent's expense for the next six months, so long as they do not impact the borrowing base or effect the ordinary course of the Debtors' business; (h) a requirement that, if the Debtors fail to comply with the Minimum Excess Availability Requirement, the Debtors deposit cash into a controlled segregated cash reserve equal to the shortfall or pay down the ABL Facility in that amount; (i) a requirement that the Debtors deliver a borrowing base certificate within five business days of the end of each calendar week following the second full calendar week of the Petition Date which updates inventory on a weekly basis; (j) a consent / administrative fee of $500,000 per week; and (k) a discharge waiver, such that the ABL Secured Claims will not be discharged by a Plan of Reorganization unless consented to by the ABL Secured Parties or paid in full or in cash.

22.     The adequate protection packages being offered to the Debtors' Term Loan Secured Parties, First Lien Notes Secured Parties, and Second Lien Notes Secured Parties, are also reasonable and sufficient.  The Term Loan Secured Parties and First Lien Notes Secured Parties are being provided: (a) adequate protection liens; (b) adequate protection claims to the extent of diminution in value of their interest in the Term Loan/First Lien Notes Collateral; (c) quarterly reporting consistent with the Term Loan Agreement and the First Lien Notes Indenture (as well as the reporting being provided to the ABL Secured Parties); (d) cash pay interest at the default contract rate on Pre-Petition Claims; (e) payment of the reasonable and documented out-of-pocket fees, costs and expenses of counsel and financial advisors; and (f) a cash management covenant requiring the Debtors to maintain their cash management arrangements in a manner consistent with the Cash Management Order; *provided* that the Debtors are authorized to create new, segregated bank accounts as required under the Cash Collateral Order as well as any debtor-in-possession financing arrangements approved by the Court during these Chapter 11 Cases.  The Second Lien

7

Notes Secured Parties (who have only third priority liens on the Cash Collateral) are being provided with adequate protection claims, and adequate protection liens.

23.     It is my opinion that the adequate protection packages being offered to the ABL Secured Parties, the Term Loan Secured Parties, the First Lien Notes Secured Parties, and the Second Lien Notes Secured Parties, are clearly sufficient to protect these creditors' interests in the Cash Collateral, and no further "adequate protection" is necessary or appropriate.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Respectfully Submitted,                              /s/ *James A. Mesterharm*
May 16, 2020                                         James A. Mesterharm

# Exhibit A

# Debtors' Capital Structure as of Petition Date



| Facility | Maturity | Amount Outstanding |
|---|---|---|
| **J. C. Penney – First Lien Debt Obligations** | | |
| ABL Credit Facility | 06/20/2022 | $1,179 million |
| 2016 Term Loan | 06/23/2023 | $1,521 million |
| First Lien Notes | 07/01/2023 | $500 million |
| **J. C. Penney – Second Lien Debt Obligations** | | |
| Second Lien Notes | 03/15/2025 | $400 million |
| J. C. Penney - Total Secured Obligations | | $3,600 million |
| **J. C. Penney – Unsecured Obligations** | | |
| Unsecured Notes | Varying (2023 – 2097) | $1,318 million |
| J. C. Penney – Total Funded Debt | | $4,918 million |