To,

**Honorable Judge David R. Jones**
United States Bankruptcy Court,
Southern District of Texas
133 N. Shoreline Blvd.
Corpus Christi, TX   78401
http://www.txs.uscourts.gov/bankruptcy/
Phone: 361.888.3142

United States Courts
Southern District of Texas
FILED

*May 28, 2020*

David J. Bradley, Clerk of Court

**Subject:** JC Penney Company Inc. Case no. 20-20182.

Shareholders Petition to the bankruptcy court and Objection to Debtors petition filed in Docket 1 and Docket 25.

Respected Sir,

   I am an individual shareholder who is impacted by JC Penney's bankruptcy proceeding. We as a collective group of individual shareholders representing over almost 10million in JC Penney equity have come together and put together a common petition through

- https://jcpshareholders.com/
- And https://www.change.org/p/southern-district-of-texas-bankruptcy-court-j-c-penney-bankruptcy-shareholder-s-rights-petition

And have mailed that petition to the court as an unified group of shareholders separately.

The attached petition is representing the 10 million plus equity holder who wanted their voice to be heard and who wanted justice in this case and wanted protection of their investment in this bankruptcy proceeding.

 We are looking up to you to help protect the rights and investments of these innocent investor whose lives will be devastated if they lose their entire lives worth of savings if the court approved the elimination of current equity holders interest in the JC Penneys current assets.

Hope you will do justice and represent innocent investors in this proceeding.

Regards
Rahul Shekatkar            05/25/2020
Individual JCP investor.

P.O. Box 275
Pennington, NJ - 08534

To,

Office of the United States Trustee
515 Rusk St, Ste 3516
Houston, TX 77002
https://www.justice.gov/ust-regions-r07,

**Subject:** JC Penney Company Inc. Case no. 20-20182.

Shareholders Petition to the office of united states trustee to appoint equity committee.

Respected Sir,

I am an individual shareholder who is impacted by JC Penney's bankruptcy proceeding. We as a collective group of individual shareholders representing over almost 10million in JC Penney equity have come together and put together a common petition through

- https://jcpshareholders.com/
- And https://www.change.org/p/southern-district-of-texas-bankruptcy-court-j-c-penney-bankruptcy-shareholder-s-rights-petition

And have mailed that petition to the court as an unified group of shareholders separately.

The attached petition is representing the 10 million plus equity holder who wanted their voice to be heard and who wanted justice in this case and wanted protection of their investment in this bankruptcy proceeding.

We needed some help from the office of united states trustee to form an equity committee representing the shareholders and their equity interest in the current JC Penney's assets.

Hope you will do justice and represent innocent investors in this proceeding.

Regards

Rahul Shekatkar

Individual JCP investor.    05/25/2020

P.O. Box 275
Pennington, NJ-08534.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

United States Courts
Southern District of Texas
FILED
May 28, 2020
David J. Bradley, Clerk of Court

| | |
|---|---|
| In re: | Chapter 11 |
| J. C. PENNEY CORPORATION, INC., | Case No. 20-20182 (DRJ) |
| Debtor. | |

# SHAREHOLDER'S PETITION TO

1) **DISMISS THE VOLUNTARY BANKRUPTCY PETITION FILED BY J.C. PENNEY CORPORATION ON THE GROUNDS OF BAD FAITH.**

2) **REQUEST TO THE JUDGE AND US TRUSTEE TO IMMEDIATELY APPOINT EQUITY COMMITTEE REPRESNTING THE EXISTING SHAREHOLDERS AND SHAREHOLDER'S INTEREST IN ALL THE ASSETS OF JC PENNEY AND ITS AFFILIATES. (EXISTING COMPANY AND ALL ITS EXISTING AFFILIATES AND IF A SINGLE PENNY OR MORE FROM THE EXISTING CO IS TRANSFERRED TO THE NEW CO AND REIT THEN REPRESENT THE INTEREST OF THE EXISTING SHAREHOLDERS IN THE NEW CO FOR THE TRANSFERRED ASSETS AND TRANSFERRED EQUITY.)**

3) **REQUEST TO THE DEBTOR TO SUBMIT:**
   - THE LATEST BALANCE SHEET AS OF THE DATE OF BRANKRUPTCY PETITION FILING DATE.
   - **ITEMIZED LIST OF ALL THE ASSETS:**
     i. **NOLS**
     ii. **TOTAL ASSETS THAT ARE SECURED AGAINST THE ABL CREDIT FACILITY IN THE FORM OF INVENTORY, ACCOUNTS RECEIVABLES, CREDIT CARD RECEIVABLES ETC.**
     iii. **ITEMIZED LIST OF THE ABL CREDIT THAT'S DRAWN. I.E DETAILS OF THE $1.25B THAT'S DRAWN AND HOW ITS SPENT TILL DATE (FUTURE ACCURALS / PLACEHOLDERS V/S ACTUALLY USING IT)**
     iv. **LIST THE ASSETS THAT ARE CAPTURED AS CO-LATERAL AGAINST THE 2016 TERM LOAN. (E.G EQUIPMENTS, REAL ESTATE, INTELLECTUAL PROPERTY, INTERCOMPANY INDEBTNESS) ACCOUNTING FOR THE APPROPRIATE LTV**

    RATIOS. (LOAN TO VALUE. IF A LOAN IS MADE AT 70% LTV, THEN THE UNDERLYING ASSETS ARE VALUED AT $100 ON A LOAN OF $70 AS AN EXAMPLE)
  v. ON SIMILAR LINES FOR THE FIRST AND SECOND LIEN NOTES ($500M + $400M EACH RESPECTIVELT), PLEASE LIST THE ITEMIZED CO-LATERAL ASSETS AND THEIR VALUATION.
  vi. ITEMIZED LIST OF UNENCUMBERED REAL ESTATE AND OTHER ASSETS AND ITS VALUATION.

4) DETAILS OF PRINCIPAL THAT'S BEING FORGIVEN ON THE LONG-TERM DEBT BY THE LIEN HOLDERS FOR
  i. 2016 TERM LOAN OF REMAINING $1.521 BILLION MATURING 06/23/2023. DETAIL OUT HOW MUCH OF THE PRINCIPAL IS FORGIVEN UNDER THE RSA PLAN, FOR A DEBT TO EQUITY SWAP AGAINST THE NEW CO AND REIT ASSETS. (E.G ONLY $500 MILLION CARRIES FORWARD INTO THE NEW CO AND REIT FOR A DEBT TO EQUITY SWAP, THEN $1.021 BILLION IS FORGIVEN AS AN EXAMPLE. NEED TO KNOW THE EXACT AMOUNT THAT'S FORGIVEN)
  ii. LOAN AMOUNT FORGIVEN UNDER THE 1ST AND 2ND LIEN OBLIGATION.
  iii. LOAN AMOUNT FORGIVEN AGAINST THE ABL CREDIT FACILITY.
  iv. THESE DETAILS ARE NEEDED TO HIGHLIGHT TO THE BANKRUPTCY COURT AND TO THE SHAREHOLDERS OF THE DE-LEVERAGING FOR EACH OF THE RESPECTIVE LOAN CATOGORIES. (THIS IS THE CORE PREMISE OF FILING FOR THE VOLUNTARY PETITION)
  v. IF THERE'S NO DE-LIVERAGING AND JUST A RESTRUCTURE AND DEBT TO EQUITY SWAP IN THE NEW CO AND REIT AT THE EXPENSE OF THE SHAREHOLDERS THEN THIS VOLUNTARY PETITION SHOULD BE DISCARDED AND THE DEBTOR SHOULD EXPLORE THE RESTURCTURE OUTSIDE OF THE BANKRUPTCY COURT. THERE'S NO FUNDAMENTAL GROUND FOR BRANKRUPTCY IN THAT CASE.

5) SUMMARY OF PROJECTED LAWYERS FEES AT THE END OF BANKRUPTCY PROCEEDING.

6) SUMMARY OF DIP COMMISSION FEES I.E $45 MILLION AND CLEAR EXAMPLE OF THE DIP INTEREST RATE. I.E. FOR 180 DAYS OF FINANCING, IS THE INTEREST RATE 10.75 + 11.75% = 22.5%

7) PROJECTION OF FORECASTED REVENUE V/S EXPENSES FOR THE NEXT 3 YEARS IN BOTH SCENARIOS, AS IS WITHOUT THE RSA PLAN, WITH THE 6.3% WEIGHTED INTEREST RATE PAYMENT ON THE CURRENT LONG

**TERM DEBT, WITH A SIMILAR DEBT TO EQUITY SWAP OPTION, BUT WITHOUT BANKRUPTCY AND ALSO WITH THE NEW RSA PLAN WITH 10% PLUS INTEREST RATE FOR SHAREHOLDERS ANLYSIS.**

8) <u>**MR. WAFFORD'S SUMMARY OF THE DEBT PER DOCKET 25, PAGE 38**</u>



| Facility | Maturity | Amount Outstanding |
|---|---|---|
| **J. C. Penney – First Lien Debt Obligations** | | |
| ABL Credit Facility | 06/20/2022 | $1,179 million |
| 2016 Term Loan | 06/23/2023 | $1,521 million |
| First Lien Notes | 07/01/2023 | $500 million |
| **J. C. Penney – Second Lien Debt Obligations** | | |
| Second Lien Notes | 03/15/2025 | $400 million |
| J. C. Penney – Total Secured Obligations | | $3,600 million |
| **J. C. Penney – Unsecured Obligations** | | |
| Unsecured Notes | Varying (2023 – 2097) | $1,318 million |
| J. C. Penney – Total Funded Debt | | $4,918 million |

## 9) MR. WAFFORD'S IMPLIED DECLARATION OF SHAREHOLDERS EQUITY

- **Docket 1, page 6**
  - Total JCP assets = $ 8,568,659,386
  - These comprise of Inventory, Credit card receivables, Accounts receivables, secured real estate asset, intellectual properties, intercompany indebtness etc. used as lien on Term loan, 1st and 2nd lien loan.
  - And the unencumbered real-estate assets and other assets. (**i.e. assets with no lien or liabilities and are clear and owned explicitly in terms of shareholders equity**)
- **Docket 25, page 38**
  - Total Debt (including unsecured debt) = $ 4,918,000,000 (Captured in the original table Mr. Wafford presented in section 8 on the previous page.)
- **Shareholder's equity per Mr. Wafford's implied declaration to the bankruptcy court:**
  - (Total JCP assets) – (Total debt)
  - i.e. $ 8,568,659,386 - $ 4,918,000,000 = **$ 3,650,659,386**
- **Total equities outstanding (Docket 1, page 6)** = 320,981,685
- **Current value of equity =**   $ 3,650,659,386 / 320,981,685 = **$11.374 per share.**

(Details that were not explicitly captured but declared by Mr. Wafford in his filings.)
**(Represented in the table below)**



| Total assets | Total debt | Shareholders' equity |
|---|---|---|
| $ 8,568,659,386.00 | $ 4,918,000,000.00 | $ 3,650,659,386.00 |

| Facility | Maturity | Amount Outstanding |
|---|---|---|
| J. C. Penney – First Lien Debt Obligations | | |
| ABL Credit Facility | 06/20/2022 | $1,179 million |
| 2016 Term Loan | 06/23/2023 | $1,521 million |
| First Lien Notes | 07/01/2023 | $500 million |
| J. C. Penney – Second Lien Debt Obligations | | |
| Second Lien Notes | 03/15/2025 | $400 million |
| J. C. Penney - Total Secured Obligations | | $3,600 million |
| J. C. Penney – Unsecured Obligations | | |
| Unsecured Notes | Varying (2023 – 2097) | $1,318 million |
| J. C. Penney – Total Funded Debt | | $4,918 million |

1) **DISMISS THE VOLUNTARY BANKRUPTCY PETITION FILED BY J.C. PENNEY CORPORATION ON THE GROUNDS OF BAD FAITH**

Shareholders do understand the difficult situation we are in with the pandemic and with the store closures, the impact it has on the revenue and cash flow.

During the pandemic, most of the retailers are focused on preserving cash to maximize the survivability and minimize the cash burn.

**April rents**:
- The debtor paid the April rent in millions of dollars when they knew on March 19th that the shutdown will last at least for a couple of months.
- Instead of negotiating with the landlords and seek for deferral of rent payment in order to conserve cash, they squandered away the critical cash that was needed for the operations during the shutdown. Was this decision intentional to achieve the agenda of pushing JCP into bankruptcy to achieve their grander scheme?
- We understand the obligations that are due, but as an industry, retailers have been coordinating and following a certain protocol collectively. Deferring rent was one of the common protocols that's being followed by most of the retailers with an intention of preserving cash and then address these obligations once the economy recovers.
- Landlords have been accommodating given the long-term relationships these retailers have and the unprecedented pandemic situations they are operating under.

**Adequate Cash on hand and in ABL credit facility to overcome the short-term situation:**
- As of Feb (Balance sheet, 10K filed 3/20)
- Cash in bank + in-transit, Cash and cash equivalent, Cash short term = $108M + $278M + $386M = **$722M.**
- Available ABL Credit = $2.645B (Consolidated cash statement 10Q end of Feb)
- End of the fiscal year. All the ABL Credit was available for withdrawing. (Balance sheet, 10K. i.e. everything was paid off and the line was made available for FY 2020 with a reset)
- ABL credit drawn = **$1.171B**. This was part of the $1.25B that was drawn recently with a portion of that reserved for advance letter of credits. Note that there's more credit available to be drawn but not yet leveraged to its maximum capacity in terms of available credit under the ABL credit facility.
- Docket 25 describes the advance credit drawn and advanced letter of credits reserved against this draw (i.e. reserved as a place holder ahead in advance than consumed and used). Thus, any short-term cash needs and cash needed for any operational funding was already met through the ABL draw and advance cash reserves against this draw.
- The company now has $1.171B + $0.722 = **$1.893B** in liquidity to handle the short-term fluctuations in capital need. (from Docket 25 and 10Q reporting's). **Note there's more ABL credit that's not drawn yet that also needs to be added to this number to get a holistic picture of available cash.**
- With the shut down in April, and furloughed employees and corporate staffs with 20% or more pay cuts, the SGNA burn rate was significantly lower. There was a significant offset from the ecomm business as ecomm did extremely well during this time (double digit comps), though not enough to offset for the retail channel.

- o Thus when you look at Q1 (Feb, March, April), almost 2/3 of the quarterly revenue goals were already met before the shutdown (i.e. Ground hog day, Super Bowl Sunday, Valentine's day, International Women's day, Easter, St Patrick's day etc.) and they missed out (National pets day and Earth day) in April due to the shutdown which are not heavy volume events anyway. Thus, sales volume expectations from the Q1 events were relatively already met). Thus, the anticipated impact though large was manageable with the **$1.893B** in cash and cash equivalent assets the company had at its disposal.
    - o Note, Docket 25 page 4 suggests that April sales tumbled by 88% (which is understandable due to the shutdown). This suggests that the ecomm share of the business was as large as 12% of the business. Which is equivalent to almost 105 average stores worth of sales volume. **This is a very import stat shared in this docket.**
    - o Also, lower April sales doesn't mean the Q1 sales were extremely bad. We should review the Q1 results to understand the total sales, total revenue and cash flow. (most the retailers are coming up with surprisingly good Q1 results, some meeting or beating their targets. JCP shouldn't be significantly off either as Q1 overall was strong with strong consumer sentiment, strong stock market and disposable cash for most consumers (from annual reviews and bonuses) in the larger context, up until March 18th.
    - o Also, with consumers shifting their buying habits, greatly influenced by the pandemic, the ecomm sales ratio should increase from 12% to approximately 15% or even more.
    - o What this means is that even if the stores open slowly and some of the stores are closed permanently (bottom 25% of the stores, which probably make only 5% of the sales volume), the increase in ecomm sales revenue should greatly offset the revenue impact from shutting down these bottom 25% stores. Thus, it's a win win for JCP to get rid of the nonperforming leases, close the bottom 25% stores, and unfortunately get an excuse to layoff almost 25,000 hardworking associates or more (Field and corporate), and improve the cash flow operations after the stores open. Also sell some of the nonperforming stores and garner some cash and boost the cash reserve.
- **Thus, filing for bankruptcy with this much cash in hand and untapped ABL to its max, is deceitful and is not in a good faith.**
- Also note there were no immediate debt obligations the company had to consider given most of the debt is maturing in 2023, 2024, 2036 and 2097
- Here's the table of summary of long-term debt and the principal that's due by year. This is based on 10-Q filings from Feb 2020. The weighted average interest rate is per 10-Q filing.

| In millions | 2020 | 2021 | 2022 | 2023 | 2024 | Total |
|---|---|---|---|---|---|---|
| Scheduled Annual Principal Payments | $ 147 | $ 42 | $ 42 | $ 1,924 | $ 1,603 | $ 3,758 |
| Weighted-average interest rate at year end | 6.30% | 6.30% | 6.30% | 6.30% | 6.30% | |
| Annual Interest due | $ 227.49 | $224.85 | $222.20 | $ 100.99 | $ - | |
| Annual interest and principle obligations | $ 374.49 | $266.85 | $264.20 | $2,024.99 | $1,603.00 | $4,533.53 |

- **Thus there's minimal long term debt obligation until July of 2023/ July of 2024 i.e. at-least 38 to 50 months out with no immediate debt burden in the immediate 3 or 6 or 12 months that would warrant an urgent, forceful bankruptcy filing and cause a disruption in the lives and retirement saving's of hardworking middle class Americans and wipe them out and take advantage of them under the guise of an artificial bankruptcy.**

**JCP in Docket 25 acknowledges they have alternate options on the table v/s Bankruptcy:**
- Page 11: JCP acknowledges that it still has alternate options on the table and need not had to pursue the bankruptcy.
- Please note that the value of the unencumbered real estate asset (Estimates by Barrons.com, 05/22) is around **$1.4B**.
    - Thus Mr. Wafford is impliedly suggesting the value of shareholders equity portion of the unencumbered real estate to be **$1.4B** and was exploring the option of debt financing against these assets.
        - Besides the $0.722B in cash and equivalent he declared in the latest 10Q
        - And inventory value equivalent against which the ABL credit is not yet drawn.
        - And the portion of encumbered real-estate value that's not loaned e.g. if the loan is at 70% LTV then the 30% of the equity is still owned by the shareholders in those encumbered assets)
    - Thus total value of shareholders asset far exceeds just the value of the unencumbered assets. (Section 9 in the earlier page captures the details)
- **Thus Mr. Wafford is acknowledging in this Docket the value of the shareholders equity that's unencumbered and is available for any additional debt financing.**
- They received 2 formal proposals for out of court financing option.
- Mr. Wafford acknowledges that the financing facility would have satisfied the need for the immediate cash infusion if it was liened against the unencumbered real estate.
- The annual interest expense obviously would have increased given the additional debt JCP would have pursued against the unencumbered real estate.
- Alternatively, JCP also could have sold these assets and leased them back. E.g. they sold their corporate headquarter and leased it back. Thus, it provided a significant liquidity.
- On similar lines, they could have sold a fractional portion of their
    - 4 to 5 warehouse locations and leased them back (*this should have addressed the short-term cash requirement. A lot of commercial REIT investments would have been interested in these assets that would have had a guaranteed REIT investment returns*)
    - Sold the unencumbered real estate and leased them back (*similar to the warehouses, but would not have been needed at all after the warehouse sale*) and
    - Re-appraised the assets against which they had term loan, 1st and 2nd loan and tapped into the re-appraised equity as needed.
- Alternatively, they also could have offered the $1.4B as corporate bonds or equity offering by diluting the current equity interest (to reflect the $1.4B of additional float) i.e. offered 100 million of additional equity at $14 par value highlighting the underlying asset value of the unencumbered assets.

- Alternatively, Similar to how they planned to market the REIT investment and its valuation post-bankruptcy, JCP could have spun off the unencumbered assets from current JCP holdings into new REIT entity outside of the bankruptcy proceeding, appraised the assets at $1.4B and offered the debt to equity swap for current lien holders against the assets in the REIT. All the $1.4B of unencumbered assets that would be rolled into the new REIT entity would be owned by JCP equity holders, but this equity could have been diluted for Debt to equity swap, thus reducing the debt ratio on the existing JCP entity and increasing the value of JCP shareholders in the current entity i.e. an offset against the dilution against the new REIT entity (i.e a wash), and the current JCP entity would have gotten rid of the debt and interest and principal burden, thus increasing the valuation proportionately.
- **Thus JCP has multiple options to address their short term cash needs and the bankruptcy was not at all needed and it was absolutely not needed to put families and shareholders through the agony and pain of losing all their life long savings when the reality is that there's significant equity they own in JCP. We only wished the management was transparent and operated their business in good faith and executed their fiduciary duty towards the shareholders in all honesty as all the publicly traded enterprises do.**

**Lack of transparency and communication to shareholders:**
- No forward-looking guidance or any statements issued by the management or JC Penney Investor relationship of the upcoming potential cash challenges since March 19th.
- There were multiple news publications of potential bankruptcy exploration and thousands of shareholders immediately reached out to JC Penney's investor relationship department for clarification and for a response so that they can anticipate and plan the risks ahead appropriately.
- No formal news meant that there was no impending risk. Similar to the rumors from Q3 of 2019, the shareholders assumed these to be just rumors as there was no formal communication from the BOD and JCP management or IR after repeated follow-ups.
- The management failed to warn and notify the shareholders in good faith ahead of a potential impending bankruptcy filing. Even if all the options were on the table, it was critical for the management and IR to have communicated and acknowledged the potential risk around a possibility of bankruptcy and giving heads up to individual mom and pop shareholders whose entire life worth of retirement savings was at stake.
- Emails and voice mails were left every day since March 19th in this regard with no responses.
- Given the above, the JCP board and executives failed to operate in good faith towards the shareholders and anyone saying otherwise will be just as deceitful as the JCP board and management executives.

**Newport trust (Manages JCPs investments, savings, stock ownership and Retirement plans)**
- On March 26th, (8k) outside of the normal blackout schedule, JCP and Newport trust issued a black out notification, citing the pandemic condition and blocked further investments and transactions (i.e. buy or sell of stocks, options, grants etc) in JCP for all their employees. (No exclusion mentioned, i.e the CEO, CFO and Board included)

- On May 1st New port liquidated all the JCP stock position into cash (Filed in 8K), but the blackout was still in place until the Q1 earnings release in May.
- **Sec insider transaction summary**: On April 11th the CFO, Mr. Wafford dumped a portion from 1.2M of his stocks inspite of the blackout and sold at a significantly high price than the price of the stock today. This is a violation of the insider policy. This also should be noted that he acted deceitfully and sold the stock on insider information given their plans to file for the bankruptcy immediately few weeks later.
- The judge should review the timing and the nature of actions on part of JCP executives and Newport trust in this regard. They knew ahead of the impending JCP bankruptcy filing and they liquidated their assets as soon as possible and covered their basis without giving a heads up to the shareholders to do so. Thus, JCP operated in bad faith and left shareholders out in the dark and choreographed the liquidation of their stock funds, stock options and grants ahead of the bankruptcy filing.

**Paying bonuses to the executive team when it was not due**:
- May 10th (8k).
- It was utterly reckless on part of the board and compensation committee to pay upfront bonuses over $10 million for deliverables that are not due until Jan 31st of 2022.
- This indicates bad intended and a predetermined strategy knowing that they will be filing for bankruptcy and their stock option grants would be worthless and hence to compensate for this ahead of the filing, they allocated cash awards in lieu of the stock grants and options.
- Taking out significant sum of money from a critical cash crunched portfolio to pay out these executives for bonuses that were not due until Jan 31st of 2022 is not acceptable and these cash rewards should be returned and the liquidity should be made available to handle the current pandemic crisis and the store openings.
- JCP employees who took 20% or more pay cut and some who were furloughed do not have respect for their management and they see how they are operating deceitfully against their own employees and it reveals how the management is profiting from the pandemic and how they are using this as an excuse to file for the bankruptcy and throw them under the bus and wipe out their lifelong JCP investments (ESPPs, 401k JCP stock fund contributions, stock awards etc) through this artificially created bankruptcy situation. Its important to note that besides the shareholders, even the JCP employees are opposed to this bankruptcy filing. They are worried about the insider selling activities during the blackout period and is a huge topic of their internal conversation.

**Interest payment on senior loan secured facility**:
- May 15 (8K)
- On May 7th JCP filed an 8K suggesting deferral of interest payment to conserve cash.
- On May 14th JCP filed an 8K suggesting that they paid the interest on the senior loan secured facility.
- Thus, indicating to the shareholders that they are going to continue and pay their interest obligations on these senior loans and there's no reason for the shareholders to get worried about false rumors about bankruptcy.
- Filing for a bankruptcy a day after this is deceitful. It also resulted in market manipulation where the stock price went up by almost 100% on Friday (i.e. Doubled from 14cents to 29cents) where lot of insiders liquidated.

- Sec 13F filing from May 15th shows (https://fintel.io/so/us/jcp) a slew of institutional holders selling the stocks on a high when the stock price jumped up almost 100% on Friday after JCPs 8k filing of payment of the $17M in interest. The common shareholders had no clue of what was going on as this information was not made public i.e. cash out before JCP files for bankruptcy. It somehow made it to 100's of institutional owners. It cannot be a coincidence. Please refer the list of 13F filings, attached link.

**Sephora lawsuit:**
- Hearing the Bankruptcy rumors and concerned about the shutdown and associating a premium beauty care brand name against a potential bankrupt company, Sephora wanted to end the relationship.
- A stay order was filed by JC Penney which assured Sephora and impliedly the markets and shareholders that it didn't have bankruptcy in mind, and they assured Sephora of the long-term relationship and long-term viability of JC Penney and its department stores.
- If JC Penney already had plans for filing the bankruptcy then it failed in giving a heads up to the shareholders and market about their intent and leveraged a misleading judgement against Sephora to distract the shareholders and hide away the fact that they were preparing to file for bankruptcy within just a few days of this judgement and this was very deceitful.

**Niemen Markus and J Crew Bankruptcy:**
- Please note that during the pandemic, there are other retailers going through bankruptcy proceedings.
- Please note how carefully these companies communicated and informed the potential financial burden these companies were facing and a heads up and informative updates to general public on the potential upcoming bankruptcy and the reason for the bankruptcy.
- Also note that these companies were under tremendous burden of a leveraged buyout and were challenged on the cashflow and on the operational front.
- JC Penney unlike the above 2, is not under a similar debt burden. Their debts are due in 2023, 2024, 2036 and 2097 and a very limited amount of debt is due in the next upcoming 3 years. A significantly different situation where limited amount of the debt is due immediately.
- Also note that JC Penney has a significant asset value in comparison to the short-term debt. We should not mix the long-term debt that's not due for another 3 to 4 years with short term capital needs.

**Thus, Common shareholders were not aware of these deceitful coordinated and well-orchestrated plans listed above and were caught off guard. The JCP BOD and executives didn't operate in good faith towards the shareholders and failed in their fiduciary duties toward them and behind the scene orchestrated, liquidated and profited from these actions as stated above and thus these should be valid grounds to void and cancel the**

**voluntary bankruptcy petition that the debtor filed on May 15th and have the Debtor explore the available 2 financing proposals they have at their disposal and still explore the restructure options that are proposed in Docket 25, but outside of bankruptcy keeping the shareholders party to the restructure plan.**

### 2) REQUEST TO THE JUDGE AND US TRUSTEE TO IMMEDDIATELY APPOINT EQUITY COMMITTEE REPRESNTING THE EXISTING SHAREHOLDERS AND SHAREHOLDERS INTEREST IN ALL THE ASSETS OF JC PENNEY AND ITS AFFILIATES

- Given the current circumstances under which the voluntary bankruptcy petition was filed, with no representation from millions of equity holders, common equity holders who worked hard and saved every Penney, and made difficult decisions and compromised and sacrificed and cut down and saved for their future saved for their retirement, saved for their kid's education by investing in strong and reputable name like James Cash Penney and his principles of honesty and running the business fairly and treating every one fairly. We risked our entire lives saving with a trust in these principles and trust in the name of James Cash Penney and his enterprise.
- We do understand that these are tough times and in the tough times, the principle of integrity and honesty are tested the most.
- In the tough times, attention to detail, working smartly, intelligently and creatively is important. We need to overcome the situation and not have the situation overcome us
- The Debtors bankruptcy petition is missing these attention to details and feels like its rushed through without much thought on options, alternatives, and how best to preserve shareholders value. This is complex and needs intelligent and smart thinking to navigate these difficult situation and all the more highlights the importance of having smart and experienced executives in senior positions else we end up with these hapless , unthought through rushed petitions that causes harm to every one and particularly the hardworking families and their investments.
- A group of individual common equity holders came together owning over 10 million shares thus far and put together a petition on
- https://jcpshareholders.com/
- And https://www.change.org/p/southern-district-of-texas-bankruptcy-court-j-c-penney-bankruptcy-shareholder-s-rights-petition
- **REQUEST TO THE JUDGE AND US TRUSTEE TO IMMEDDIATELY APPOINT EQUITY COMMITTEE REPRESNTING THE EXISTING**

**SHAREHOLDERS AND SHAREHOLDERS INTEREST IN ALL THE ASSETS OF JC PENNEY AND ITS AFFILIATES (EXISTING COMPANY AND ALL ITS EXISTING AFFILIATES AND IF A SINGLE PENNEY OR MORE FROM THE EXISTING CO IS TRANSFERRED TO THE NEW CO AND REIT THEN REPRESENT THE INTEREST OF THE EXISTING SHAREHOLDERS IN THE NEW CO FOR THE TRANSFERRED ASSETS AND TRANSFERRED EQUITY)**

- The petition in the section below will highlight a significant amount of shareholder equity that will be outstanding even after paying off all the secured and unsecured creditors and the shareholders equity (almost in the tune of multiple Billions) cannot be handed for free at the expense of the current equity holders and cannot be transferred into the new entity and REIT and the current equity's stake in these assets cannot be extinguished.
- Not a single penny of current equity interest can be allowed to be transferred or handed over to the new JC Penney entity or REIT.
- Lawsuits and class actions resulting from such claims cannot be extinguished by the bankruptcy court and an equity committee is the right committee to supervise the equity holders claims against these assets and prevent the harm this proceeding will cause to the equity holders' interest

### 3) REQUEST TO THE DEBTOR TO SUBMIT ITEMIZED LIST OF ALL THE ASSETS

**NOLS:**

- The Company has federal net operating loss (NOL) carryforwards of **$2.1 billion** and **$76 million** of federal tax credit carryforwards as of February 1, 2020 that expire in 2032 through 2034. These NOL carryforwards arose prior to December 31, 2017 and are available to offset future taxable income. The Company may recognize additional NOLs in the future which, under the Tax Act, would not expire but would only be available to offset up to 80% of the Company's future taxable income.
- This is a significant asset to the current shareholders and can be used to offset future taxable income.
- **A change in entity ownership from the existing JC Penney holdings into the new Co and REIT will substantially impact the NOLs and will be a big destruction of JCP assets as these NOLs are a valuable instrument to offset future taxable income.**

**TOTAL ASSESTS THAT ARE SECURED AGAINST THE ABL CREDIT FACILITY:**

- ABL Credit facility is secured against:
    - Inventory (loaned @ 90% of base Inventory)
    - Credit card receivables (loaned @ 90% of base Credit card receivables)

- o   Accounts payable receivables. (loaned @ 80% of base AP)
- Available ABL Credit = $2.645B (Consolidated cash statement 10Q end of Feb)
- Thus, underlying security value (Assuming 90% LTV) = $2.645 / 0.9 = **$2.94B**
- ABL credit drawn = $1.179B (Docket 25, page 36)
- Thus, residual value of the underlying security =
    - o   (total underlying security value) – (ABL credit drawn)
    - o   $2.94B - $1.179 = **$1.761B**
- The $1.179B of ABL credit is drawn in advance for place holder letter of credit and potential cash needed to perform the operations during the store opening. Thus, short term capital needs are already addressed through this withdrawal and thus it begs the question of why additional DIP financing is needed at such an extremely expensive cost to fund the operations for the next 180 days.
- **Please note after accounting for the credit drawn against the ABL credit facility, the residual value of the assets = $1.761B which needs to be accounted against the shareholder equity.** Request to the judge and the equity committee to validate these assets and account for it against the shareholders equity.

## LIST THE ASSETS THAT ARE CAPTURED AS CO-LATERAL AGAINST THE 2016 TERM LOAN

- The 2016 Term loan is secured against the following asset:
    - o   Equipment
    - o   Real estate
    - o   Intellectual property
    - o   Intercompany – Ineptness.
- Original loan = $1.7B (Docket 25, page 38)
- Loan to value (*Assuming 70% LTV as this information was not readily available*).
    - o   Thus, the underlying secured assets = $1.7 B / 0.7 = **$2.43 B**
    - o   * Note that this validation is from 2016. The current 2020 valuation of these assets should be at least 10 ~ 15% higher given the recent commercial estate boom and appreciations in the last 4 to 5 years. (The following calculation is not accounting for this appreciation, but please note that there's additional 10 ~ 15% of shareholders equity in these assets accounting for these appreciations)
- Current outstanding loan amount = $ 1.521 B (Docket 25, page 36)
- **Net value of the secured assets after the loan = $0.909 B * which needs to be accounted against shareholder equity.** Request to the judge and the equity committee to validate these assets and account for it against the shareholders equity.

## LIST THE ASSETS THAT ARE CAPTURED AS CO-LATERAL AGAINST THE FIRST AND SECOND LIEN NOTES

- The First and second Lien loan is secured against the following asset:
  - Equipment
  - Real estate
  - Intellectual property
  - Intercompany – Ineptness.
- Original loan = $0.5B (1st Lien) + $0.4 (2nd Lien) (Docket 25, page 39)
- Loan to value (*Assuming 70% LTV as this information was not readily available*).
  - Thus, the underlying secured assets = $0.9 B / 0.7 = **$1.29 B** *
- Current outstanding loan amount = $ 0.9 B (Docket 25, page 36)
- **Net value of the secured assets after the loan = $0.390 B which needs to be accounted against shareholder equity.** Request to the judge and the equity committee to validate these assets and account for it against the shareholders equity.

## ITEMIZED LIST OF UNENCUMBERED REAL ESTATE AND ITS VALUATION

- Value of the unencumbered real estate and other assets, per independent analyst (Barrons.com this week) is valued roughly at **$1.40B**.
- This asset is owned solely by the current equity owners and is free of lien.
- Debtor acknowledges the importance of this asset Docket 25, page 10 and is part of the central strategy to transfer assets from the current equity holders from the current JC Penney entity into the newly formed Retail entity and REIT.
- Request to the judge and the equity committee to validate these assets and account for it against the shareholders equity.

## Total Net Residual shareholders assets (After netting out the loan amount) against these assets are as follows:

- ABL Credit facility = **$1.761B**
- 2016 Term loan secured assets = **$0.909 B** *
- First and second Lien loan secured assets = **$0.390 B** *
- unencumbered real-estate assets = **$1.40B** *

Total residual shareholders assets = $4.46B

Total unsecured obligation = $1.318B (Docket 25, page 38)

Value of NOLs @ 30% tax rate on $2.2B = $0.66B
Thus net residual shareholder equity in the current JC Penney holding = $3.802B

i.e. $11.85 / share. *

* **Note that the asset valuations are from 2016 and should have at-least 10 ~ 15% additional valuations than what's on the books (if not more).**

**Note: Shareholders will not let go a single penny from the above assets into the new Retail CO and REIT entity unless and until they get an equivalent proportion of the assets in the new entity.**

**Also note that the above shareholders interest and valuation is very close to Mr. Wafford's declaration to the bankruptcy court from Docket 25, page 38 and docket 1, page 6 (also summarized in section 9 of this petition, where he impliedly calculated shareholders interest at $3.651B)**

### 4) DETAILS OF PRINCIPAL THAT'S BEING FORGIVEN ON THE LONG-TERM DEBT BY THE LIEN HOLDERS FOR

- **2016 TERM LOAN OF REMAINING $1.521 BILLION MATURING 06/23/2023.** DETAIL OUT HOW MUCH OF THE PRINCIPAL IS FORGIVEN UNDER THE RSA PLAN, FOR A DEBT TO EQUITY SWAP AGAINST THE NEW CO AND REIT ASSETS. (E.G ONLY $500 MILLION CARRIES FORWARD INTO THE NEW CO AND REIT FOR A DEBT TO EQUITY SWAP, THEN $1.021 BILLION IS FORGIVEN AS AN EXAMPLE. NEED TO KNOW THE EXACT AMOUNT THAT'S FOREGIVEN)
- **LOAN AMOUNT FORGIVEN UNDER THE 1ST AND 2ND LIEN OBLIGATION.**
- **LOAN AMOUNT FORGIVEN AGAINST THE ABL CREDIT FACILITY.**
- **THESE DETAILS ARE NEEDED TO HIGHLIGHT TO THE BANKRUPTCY COURT AND TO THE SHAREHOLDERS OF THE DE-LEVERAGING BY EACH OF THE RESPECTIVE LOAN CATOGORIES. (THIS IS THE CORE PREMISE OF FILING FOR THE VOLUNTERY BRANKRUPTCY PETITION, i.e. LIEN HOLDERS FORGIVING A PORTION OF THE LOAN FOR A DEBT TO EQUITY SWAP)**
- **IF THERE'S NO DE-LIVERAGING AND JUST A RESTRUCTURE AND DEBT TO EQUITY SWAP IN THE NEW CO AND REIT AT THE EXPENSE OF THE SHAREHOLDERS THEN THIS VOLUNTARY PETITION SHOULD BE DISCARDED AND THE DEBTOR SHOULD EXPLORE THE RESTURCTURE OUTSIDE OF THE BANKRUPTCY COURT. THERE'S NO FUNDAMENTAL GROUND FOR BRANKRUPTCY.**

Please note that this petition is prepared by an individual equity holder and may not conform and point to the specific bankruptcy codes and the details furnished here are either part of the documents that are already submitted to the bankruptcy court or available in the SEC filings or data that's already available in the public domain and should he not be held accountable if the valuations that's captured here is off from the actual valuation. Hence the request in the petition to the Debtor to furnish all the details to the bankruptcy court for the shareholders to review it collectively with the court.

WHEREFORE, the equity holder / Shareholder respectfully requests the court enter the proposed petition, granting the relief requested in this petition, and granting such other and further relief as is appropriate under the circumstances.

**Date**: 05/25/2020
Pennington, NJ

Rahul Shekatkar
Long term, individual
JC Penney shareholder