**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| J. C. PENNEY COMPANY, INC., *et al.*,[1] | ) ) ) | Case No. 20-20182 (DRJ) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**DECLARATION AND EXPERT REPORT OF JAMES A. MESTERHARM IN
SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF A FINAL ORDER
AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING
PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE**

I, James A. Mesterharm, hereby declare as follows:

1. I submit this declaration in support of the *Debtors' Motion for Entry of a Final Order (A) Authorizing the Debtors to Obtain Senior Secured Superpriority Postpetition Financing, (B) Granting Liens and Superpriority Administrative Expense Claims, (C) Authorizing Repayment of the Prepetition Revolving Credit Facility in Full, (D) Modifying the Automatic Stay, and (E) Granting Related Relief* (the "<u>DIP Motion</u>").[2] Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including the team working under my supervision, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my experience and knowledge.

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/JCPenney. The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the DIP Motion or the Interim DIP Order, as applicable.

2. If called upon to testify, I could and would testify competently to the facts and opinions set forth herein. As described below, it is my opinion that: (a) the Debtors require the liquidity provided by the proposed DIP Facility to pay the costs necessary to operate their business, secure and replace inventory, pay employees, and manage these chapter 11 cases; (b) the milestones reflected in the proposed DIP Facility were exhaustively negotiated and appropriately balance the Debtors' desire to pursue a value-maximizing restructuring with the First Lien Group's desire to protect their investment and collateral; and (c) the Debtors are well positioned to, and reasonably likely to, meet the milestones in the proposed DIP Facility required to access the Second Tranche of $225 million provided in the DIP Facility.

## Professional Background and Qualifications

3. I am a Managing Director at AlixPartners and have served as restructuring advisor to the Debtors since late March of 2020. I have been a full-time restructuring advisor for over 25 years. I received a B.S. in Accounting and Management in 1990 from Purdue University and a Masters of Business Administration in Finance and Organizational Behavior in 1998 from Northwestern University's Kellogg School of Graduate Management, where I have been a guest lecturer on restructuring topics. I passed the Certified Public Accountant exam, am a certified turnaround professional, and am a Fellow of the American College of Bankruptcy.

4. I have been employed by AlixPartners since September 1996, and lead the Americas Restructuring Practice. AlixPartners is a global independent restructuring consulting firm that has a wealth of experience in providing restructuring advisory services, and has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these Chapter 11 Cases. Since its inception in 1981, AlixPartners, its predecessor entities, and its affiliate, AP Services, LLC, have provided restructuring or crisis management services in numerous large cases. Some

notable, publicly-disclosed restructuring assignments that I have personally led include Pacific Gas & Electric Company, American Tire Distributors, Pacific Drilling, S.A., The Gymboree Corporation, Linn Energy, Inc., Paragon Offshore PLC, Walter Energy, Inc., Nautilus Holdings Ltd., Eastman Kodak Company, General Growth Properties, Tekni-Plex, Hilex-Poly, Silicon Graphics Inc., Parmalat USA, Safety-Kleen Corporation, and Zenith Electronics Corporation.

5. I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I am also familiar with the Debtors' supply chain and the status of the Debtors' relationships with various vendors, suppliers, and service-providers.

6. Specifically, in my role as financial advisor to the Debtors, AlixPartners, among other advisory services: (a) assisted the Debtors with its cash management and cash forecasting efforts; (b) assisted the Debtors with their contingency planning efforts in preparing for a potential chapter 11 filing; (c) assisted the Debtors in negotiating the proposed Interim and Final Orders; and (d) assisted the Debtors with constituency due diligence efforts.

## AlixPartners's Engagement

7. The Debtors engaged AlixPartners in late March of 2020, to serve as their restructuring advisor. The Debtors sought AlixPartners' services to commence contingency preparations in the event a chapter 11 filing became necessary and to advise the Debtors with respect to strategic and business alternatives. Since commencing its engagement, AlixPartners has evaluated the Debtors' operations and cash requirements to operate their businesses during these Chapter 11 Cases, including by assisting in the development of the Debtors' 13-week and long-term cash flow forecasts. In addition, AlixPartners has assisted in the Debtors' strategic alternatives and financing-related workstreams. AlixPartners has worked closely with the Debtors' management and other restructuring professionals and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations.

8. In the second half of March 2020, AlixPartners began obtaining diligence from the Debtors and evaluating the Company's operations and cash requirements for the restructuring and debtor-in-possession financing process. We worked with key members of the Company, including, but not limited to, members of the finance, merchandise planning, store operations, treasury, and financial planning and analysis organizations, to evaluate and understand the Debtors' cash flows, borrowing base reporting, inventory management, and operations.

9. As part of an evaluation of the Debtors' liquidity position, AlixPartners assisted in the development of the Debtors' 13-week and long-term cash flow forecasts. These forecasts take into account anticipated cash receipts and disbursements during the projected period, and consider the effects of the chapter 11 filing, including: incremental administrative costs of a complex chapter 11 filing with a larger number of stakeholders; required operational payments; and cost-saving initiatives already undertaken and contemplated to be undertaken.

10. AlixPartners also considered the unprecedented, adverse market conditions facing the retail industry during the COVID-19 pandemic. AlixPartners ran a series of analyses to assess the Debtors' potential liquidity needs both during and following these Chapter 11 Cases. These cash-flow analyses assumed different store-opening timelines developed by the Company and accounted for brand partners' and landlords' forecasts during and after the COVID-19 pandemic.

**The Debtors' Need For The Financing Provided In The DIP Facility**

11. The Debtors commenced these Chapter 11 cases with approximately $475 million in cash on hand in their short term investment account. While this cash balance avoided the need for entry of an interim DIP Order on an emergency basis (subject to agreement with the ABL Agent and ABL Secured Parties on the term of an adequate protection package, which was achieved), it is insufficient to fund the Debtors' operations throughout the pendency of these cases.

The DIP Facility will allow the Debtors to: (a) acquire the inventory on a timely basis that is essential to the Debtors' continuation as a going concern; (b) provide the liquidity necessary to secure favorable trade terms with vendors and to reassure other stakeholders; (c) fund payroll obligations; and (d) otherwise provide the liquidity necessary to pay the administrative costs of the restructuring process and sustain the Debtors' business operations during these chapter 11 cases.

12. I worked with the Debtors' management team in evaluating the amount of funding that the Debtors will require during the course of these chapter 11 cases. Based on an analysis of the Debtors' receipts and disbursements, as well as their expected liquidity needs during the restructuring process, we created a proposed DIP budget, which has been revised as more information has become available. Based on my experience and familiarity with the Debtors' business, I believe that the revised DIP budget reflects a reasonable projection of the Debtors' liquidity needs, and that the proposed DIP Facility is appropriately sized to meet these needs and provide a reasonable cushion in the event that deviations from the Company's forecast materialize.

13. Based on my analysis of the Debtors' financial condition, the Debtors' projections, and my knowledge and experience, it is my opinion that the size of the DIP Facility is appropriate and necessary to sustain the Debtors during these chapter 11 cases.

### **Immediate Access To The DIP Facility Is Appropriate**

14. It is also my opinion that the Debtors' best interests are served through immediate access to the DIP Facility despite their existing cash balance.

15. Since the Petition Date, the Debtors have experienced some trade contraction due in part, ironically, to the absence of a first-day DIP Facility. The fact that the Debtors did not need a DIP facility on the first day because of their approximately $475 million cash balance, combined with the agreement with the ABL Agent and ABL Secured Parties on the terms for consensual use

5

of cash collateral, meant that the Debtors could continue to operate without a first-day DIP and would not suffer irreparable harm in its absence. But certain vendors took notice of the absence of a first-day DIP and had the opposite reaction, asking questions about the absence of a first-day DIP; as a result many vendors have modified payment terms and the company has received less shipments than anticipated since the Petition Date.

16. Immediate access to the DIP Facility should reverse this trend. Gaining access to the DIP Facility will send a strong message to the Debtors' stakeholders, including vendors, and ensure that the Debtors continue to have access to needed inventory.

### The Debtors are Reasonably Likely to Obtain Access to the Second Tranche

17. The terms of the DIP Facility provide that $225 million shall be available to the Debtors immediately upon issuance of an order granting this DIP Motion, with an additional $225 million (the "Second Tranche") available subject to the satisfaction of certain conditions precedent (the "Conditions Precedent").

18. The Conditions Precedent are detailed in the DIP Term Sheet and are substantially as follows:

   a) The Restructuring Support Agreement ("RSA") shall be in full force and effect.

   b) No default or event of default shall exist under the Operative Documents.

   c) The representations and warranties of the DIP Borrower and each Guarantor under the Operative Documents shall be true and correct in all material aspects after giving effect to the funding of the Second Tranche.

   d) The funding of the Second Tranche shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently.

   e) The DIP Order shall have been entered by the Bankruptcy Court and shall be in full force and effect.

   - The Debtors shall be in compliance with the Operative Documents and the DIP Milestones (provided, that with respect to the Business Plan, only the

       delivery of the Business Plan and the Business Plan Parameters shall be required as a condition).

- The DIP Agent shall have received a borrowing notice.

- All premiums, fees, and documented out-of-pocket fees and expenses (including fees and expenses of counsel and financial advisors) required to be paid to the DIP Lenders and the DIP Agent on or before the date of such funding shall have been paid in cash.

    f)    [TBD -- Following satisfaction of the Conditions Precedent, the DIP Borrower shall be permitted to withdraw funds in respect of the Subsequent Borrowing from the Escrow Account once the Business Plan has been approved or disapproved in accordance with the DIP Milestones, with the full amount of the Second Tranche available only if the Business Plan is approved in accordance with the DIP Milestones. $225 million was be permitted to be withdrawn from the Escrow Account commencing July 15, 2020 in accordance with the Budget if the Business Plan is approved in accordance with the DIP Milestones. If the Business Plan is not approved or if a Toggle Event occurs, $50 million shall remain in the Escrow Account in connection with a toggle to a 363 sale, with the release of such $50 million from the Escrow Account subject to agreement among the DIP Borrower, the DIP Agent and the Prepetition ABL Agent to an acceptable 363 sale budget and released in amounts and at times in accordance with such budget.]

    19.    These Conditions Precedent were the subject of extensive, arms-length negotiations between the Debtors' management and advisors and the First Lien Group. I participated in these negotiations, and on behalf of the Debtors we attempted to negotiate the best terms that we could in light of current market conditions. The First Lien Group were unwilling to provide the Debtors DIP financing without satisfying these conditions. And while the Crossover Group did propose a different DIP that was somewhat less expensive, the Crossover Group's proposed DIP would have required satisfaction of essentially the same conditions.

    20.    I have been involved in many DIPs where these types of conditions are in place. These sorts of conditions are not unusual and, while we would have preferred not to have them, they are achievable, and the Debtors have a reasonable prospect of meeting them. These conditions reflect the nature of the proposed DIP, where the First Lien Group is proposing to provide DIP

financing that rolls over into exit financing through a process in which the remainder of their claims will be converted to equity. These protections reflect the additional risk that the First Lien Group has agreed to take. Based on my discussions with Debtors' management, my review of Debtors' books and records, my knowledge of Debtors' day-to-day operations, business, and financial affairs, and my experience, I believe that the Debtors are reasonably likely to satisfy these conditions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: June 2, 2020

*/s/ James A. Mesterharm*
James A. Mesterharm
Managing Director
AlixPartners,LLP