# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **J. C. PENNEY COMPANY, INC.,** *et al.*, | § | **Case No. 20-20182 (DRJ)** |
| | § | |
| **Debtors.[1]** | § | **(Jointly Administered)** |
| | § | |

**OBJECTION OF THE AD HOC CROSSHOLDER GROUP TO THE
DEBTORS' EMERGENCY MOTION FOR ENTRY OF (I) AN INTERIM AND FINAL
ORDER (A) AUTHORIZING DEBTORS TO USE CASH COLLATERAL,
(B) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED
PARTIES, AND (C) SCHEDULING A FINAL HEARING; AND (II) A FINAL ORDER
(A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING
PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (B) GRANTING LIENS
AND SUPERPRIORITY CLAIMS, (C) MODIFYING THE AUTOMATIC STAY, AND
(III) GRANTING RELATED RELIEF**
**[Relates to Docket No. 38]**

---

[1]      A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/JCPenney.  The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 6

    A.    The RSA and Proposed DIP Financing ................................................... 6

    B.    Alternative DIP Financing Proposals ..................................................... 9

OBJECTION ..................................................................................................................... 12

    A.    The Roll Up and Cross-Collateralization Provisions of the DIP Facility Are Inappropriate ................................................................................... 14

    B.    The DIP Facility Contains Five Separate Fees, which Individually and in the Aggregate, are Beyond Exorbitant ................................................. 20

    C.    The Indemnified Parties Should Not Be Indemnified For Losses Related to the Prepaid DIP Fees .......................................................................... 24

    D.    The Case Milestones Are Unreasonably Short and Contain Unreasonable Case Controls ........................................................................................ 24

    E.    The Proposed DIP Facility Constitutes a *Sub Rosa* Plan ..................... 26

    F.    The Alternative DIP Proposals Are Clearly Superior to the Proposed DIP Facility ................................................................................................. 27

DISCOVERY .................................................................................................................... 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Braniff Airways, Inc.*,
   700 F.2d 935 (5th Cir. 1983) ...............................................................................26

*In re Crowthers McCall Pattern, Inc.*,
   114 B.R. 877 (Bankr. S.D.N.Y. 1990).................................................................26

*In re Ellingsen MacLean Oil Co.*,
   834 F.2d 599 (6th Cir. 1987) ...............................................................................14

*In re Equalnet Commc'ns Corp.*,
   258 B.R. 368 (Bankr. S.D. Tex. 2000) .................................................................14

*In re Equip. Equity Holdings, Inc.*,
   491 B.R. 792 (Bankr. N.D. Tex. 2013)..................................................................20

*In re Farmland Indus., Inc.*,
   294 B.R. 855 (Bankr. W.D. Mo. 2003)..................................................................12

*In re Fleetwood Enterprises, Inc.*,
   2012 WL 2017952 (9th Cir. B.A.P. June 5, 2012) ...............................................13

*In re Gen. Homes Corp. FGMC*,
   134 B.R. 853 (Bankr. S.D. Tex. 1991) .................................................................20

*In re Hinderliter Indus.*,
   228 B.R. 848 (Bankr. E.D. Tex. 1999) .................................................................20

*KeyBank National Association v. Franklin Advisers, Inc.*,
   No. AP19-01104, 2020 WL 2175364 (Bankr. S.D.N.Y. May 4, 2020) .................17

*In re Laffite's Harbor Dev. I, LP*,
   No. 17-36191-H5-11, 2018 WL 272781 (Bankr. S.D. Tex. Jan. 2, 2018) .............13

*In re Phase-I Molecular Toxicology, Inc.*,
   285 B.R. 494 (Bankr. D.N.M. 2002) ....................................................................12

*In re Sanchez Energy Corp.*,
   Case No. 19-34508 (Bankr. S.D. Tex. Sept. 11, 2019)..........................................31

*Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.)*,
   963 F.2d 1490 (11th Cir. 1992) ............................................................................14

*In re Tower Auto. Inc.*,
    241 F.R.D. 162 (S.D.N.Y. 2006) ........................................................................................26

**Statutes**

11 U.S.C. § 364(c) ...................................................................................................................14

11 U.S.C. § 364(d) ..................................................................................................................14

11 U.S.C. § 510(a) .............................................................................................................19, 20

11 U.S.C. § 1129(a)(9)(A) .......................................................................................................15

The ad hoc group of certain holders of the Debtors' first and second lien debt (the "Ad Hoc Crossholder Group"), each of which is a holder or beneficial holder of, or the investment advisor or the manager for the account of a holder or beneficial holder of, claims in respect of Term Loans,[2] First Lien Notes, and/or Second Lien Notes, by and through its undersigned counsel, hereby respectfully submits this objection (the "Objection") to the *Debtors' Emergency Motion for Entry of (I) an Interim and Final Order (A) Authorizing Debtors to Use Cash Collateral, (B) Granting Adequate Protection to the Prepetition Secured Parties, and (C) Scheduling a Final Hearing; and (II) a Final Order (A) Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (B) Granting Liens and Superpriority Claims, (C) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket No. 38] (the "DIP Motion").  In support of this Objection, the Ad Hoc Crossholder Group respectfully states as follows:

**PRELIMINARY STATEMENT**

1.      The proposed DIP financing should not be approved because (i) it contains an impermissible and selective roll up of prepetition first lien debt, which is punitive to all other non-DIP Lender prepetition first lien debtholders and virtually all other creditors, and is in direct violation of the first lien debt documents governing intra-lender relationships and (ii) the Debtors have been offered a far less expensive DIP financing that is better for the Debtors and every party in interest in these cases.

2.      While discussed in detail below, the roll up inflicts its economic pain on non-DIP Lenders by elevating $450 million of prepetition secured claims trading at approximately 39.5 cents on the dollar that are capable of being modified under the Bankruptcy Code into claims that will trade at par because they must be paid in full and in cash and, at the

---

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Motion.

same time, securing those claims with a far more extensive and valuable collateral package than they had on the Petition Date, including hundreds of millions of dollars of previously unencumbered assets. By this claim elevation, the windfall to the proposed DIP Lenders, which functions like another fee, is an astounding $272 million. Indeed, the combination of the trading price of the prepetition first lien debt and the "elevation to par" on more than a third of the total first lien debt held by the proposed DIP Lenders results in a doubling of the recovery on the prepetition debt held by the proposed DIP Lenders when compared to the prepetition debt held by lenders who are being excluded from participating in the proposed DIP. Moreover, the relevant agreements governing the prepetition first lien debt require that all lenders receive *pro rata* treatment, and the Court's approval of the proposed DIP financing would not only do economic injustice to the non-DIP prepetition lenders, it would also breach their prepetition contracts.

3.      As previewed at the May 28, 2020 status conference, the Ad Hoc Crossholder Group has also proposed competing DIP financing to the Debtors that has no roll up, a lower interest rate, no commitment fee, no upfront fee, $25 million more loan proceeds available to the Debtors in the first borrowing tranche, dramatically lower overall costs due to the much smaller DIP financing balance resulting from no roll up, no "toggle event" feature and does not force the Debtors to have to liquidate at the proposed DIP Lenders' whim. Equally important is the fact that the Ad Hoc Crossholder Group also proposed DIP financing on the same structure as the current proposed DIP financing, but with an interest rate that is 1000 basis points lower, half of the exit fees, no commitment fee, no upfront fee, and $75 million more loan proceeds made available in the first borrowing tranche. Moreover, the Ad Hoc Crossholder Group's proposals would provide the estate with non-recourse litigation financing in the amount of $10 million to

2

permit the Debtors to attempt to recover the egregious $45 million commitment and upfront fee paid to the proposed DIP Lenders hours before these cases were filed (assuming such fees were not voluntarily refunded as not earned in the event one of the Alternative DIP Proposals is approved).[3]

4.      Given these facts, it is inconceivable that the Debtors are proceeding to seek approval of the proposed DIP financing, which they do based on two equally flawed arguments. First, the Debtors believe that the RSA entered into with the proposed DIP Lenders is a "cornerstone" on which to construct a reorganization.  Second, the Debtors believe that a "priming fight" with the same lenders would be difficult to win and harmful to their estates. These rationales simply cannot support a sound exercise of business judgment by the Debtors and fail to justify the more expensive and onerous DIP Facility.

5.      The RSA that purportedly justifies approval of the DIP Facility is no "cornerstone" as it is literally full of blanks.  At best, the RSA is an agreement to agree, but, like the second tranche of the proposed DIP financing, is illusory and overridden by the quick trigger that its signatories can pull to force the Debtors into a full-scale liquidation.  The "priming fight" is also no reason to harm prepetition lenders and other parties in interest in these cases.  The sponsors of the proposed DIP financing already have a generous adequate protection package for their prepetition debt and cannot seriously assert that they lack so much of an equity cushion that they cannot be protected by the priming impact of a DIP.  Indeed, they already agreed to prime their own claims that are not subject to the roll up.  More importantly, adequate protection is designed to protect against a diminution in value of a lender's collateral.  The availability of DIP financing (and DIP financing on better terms) ensures that the collateral is protected from

---

[3]      The Ad Hoc Crossholder Group respectfully submits that it would be setting a dangerous precedent if the Debtors were granted a comfort order after paying exorbitant DIP financing fees immediately prior to a bankruptcy filing to avoid the scrutiny of the U.S. Trustee and the Bankruptcy Court.

diminution by fostering either a plan of reorganization or an orderly liquidation.  The Debtors'

own publicly disclosed "dark" versus "lit" store values demonstrate this fact—the "lit" value

exceeds the "dark" value of the Debtors' total encumbered stores by $871 million.[4]  The road to

recovery and renewal starts with store openings, and postpetition financing that provides greater

liquidity at a lower cost is clearly the better pathway to this objective.

6.       In addition, as Debtors' counsel pointed out at the May 28, 2020 status

conference, the Debtors have opened 300 stores and are on track to open another 200 stores by

the time of the hearing on the proposed DIP financing.  Clearly, the value of the lenders'

collateral was at its trough prior to the filing when a near nationwide shutdown was imposed, but

that value is actually increasing each day that the Debtors open more stores and move through

these cases.  Also, given the fact that stores have started reopening and continue to reopen, the

Debtors' cash position is undoubtedly increasing and at the same time, the Debtors are better

able to manage disbursements through the bankruptcy process.  As a result, the Debtors should

be in a much stronger cash position today as compared to where they were on the Petition Date,

so the Debtors will not be prejudiced in any way if the Court chose not to approve the proposed

DIP financing today.

7.       Simply put, the Court cannot lose sight of the fact that the objections raised herein

are not simply intra-creditor issues of lenders and noteholders being disparately treated within

their own contracts.  The objections go to the fundamental fairness of the bankruptcy process, the

standards by which post-petition financing should be governed and the fate of these Chapter 11

Cases.  As explained above and within this Objection, the Ad Hoc Crossholder Group has

offered alternative DIP financing that is materially better for the estates as a whole in every

---

[4]       *See* J.C. Penney Company, Inc., Current Report (Form 8-K) (May 18, 2020), Ex. 99.2, relevant excerpts of which are attached as **Exhibit A**.

aspect. So, there can be only one answer as to why the Debtors have not yet accepted the Ad Hoc Crossholder Group's Alternative DIP Proposals—the proposed DIP Lenders have threatened to use their 75% position in the first lien debt to force the Debtors into a liquidation if they don't get their way. This type of behavior is outrageous and demonstrates careless disregard for the 85,000 employees of J.C. Penney, its thousands of creditors, the integrity of the chapter 11 process and this Court's authority.

8.      Clearly, the proposed DIP Lenders are seeking to use the DIP Facility and the embedded roll up to ensure they get a better recovery than every other creditor in these cases, whether they choose to pull the liquidation hair trigger on July 15th or use the DIP Facility to control the amorphous Opco/Propco structure over time. Both moves are purely for the benefit of the prepetition claims of the proposed DIP Lenders and not for the benefit of these estates in any form. Indeed, by adding $450 million to the DIP balance on account of pre-petition claims, the proposed DIP Lenders are foisting an extraordinary amount of fees onto the Debtors' estates that could be used to pay employees and invest in the business—which is precisely what the Ad Hoc Crossholder Group's Alternative DIP Proposals provide. In addition, because the Ad Hoc Crossholder Group would actually give the Debtors legitimate access to an additional $225 million and runway through the third week of August, the Debtors would have more money and more time to build consensus.

9.      In sum, the Debtors cannot satisfy the thresholds necessary to obtain approval of the proposed DIP financing, and the relief requested in the DIP Motion should be denied. Importantly, denying the DIP Motion will not harm the Debtors because they have alternative DIP financing available to them, and the Debtors are also fortunate to have significant cash with which to continue operating their re-emerging businesses and these cases in the near-term. This

Court and the Debtors should not be bullied into yielding to the threats of predatory lending terms that come at the expense of employees, customers, vendors and other creditors.

## BACKGROUND

### A.      The RSA and Proposed DIP Financing

10.      Immediately before filing these Chapter 11 Cases, on May 15, 2020 (the "Petition Date"), the Debtors entered into a Restructuring Support Agreement (together with all exhibits and schedules thereto, the "RSA") with members of an ad hoc group of holders of Term Loans and/or First Lien Notes (the "Ad Hoc First Lien Group") who collectively hold approximately 70% of the Debtors' first lien debt.  The Debtors also entered into a commitment letter with certain members of the Ad Hoc First Lien Group and/or their affiliates, pursuant to which such parties commit to provide DIP financing to the Debtors on the terms and subject to the conditions set forth in a term sheet attached to the commitment letter as Exhibit A (the "DIP Term Sheet").

11.      On the Petition Date, the Debtors filed the DIP Motion seeking approval of the proposed DIP Facility described in the DIP Term Sheet.  Pursuant to the DIP Motion, the Debtors seek approval of a $900 million senior secured, priming DIP Facility to be provided by a select group of holders of the Debtors' first lien debt to the exclusion of all other Term Loan lenders and holders of First Lien Notes.  The DIP Facility consists, in the aggregate, of (a) $450 million of new money, and (b) $450 million in the form of a dollar-for-dollar roll up of the principal amount of prepetition Term Loans (and, if applicable, First Lien Notes) held by the DIP Lenders (a subset of the prepetition Term Loan lenders) based on their *pro rata* share of the DIP Facility.[5]  The DIP Loans are to be provided in two tranches, the first upon entry of the DIP

---

[5]      If a DIP Lender does not hold sufficient Term Loans to fully participate in the roll up based on its *pro rata* share of the funded DIP Loans, the DIP Lender (or its applicable designee) may also roll up its First Lien Notes on a dollar-for-dollar basis to the extent necessary to participate in its *pro rata* share of the roll up.  *See* DIP Term Sheet at 6.

6

Order for $225 million of new money and a $225 million roll up, and the second on the date of the "Subsequent Borrowing" in the same amounts; however, the Subsequent Borrowing occurs only if certain aggressive milestones, which are by and large in the DIP Lenders' sole discretion, are satisfied.  The collateral securing the DIP Facility includes a first priority and priming lien on all of the collateral securing the Term Loans (other than ABL Priority Collateral), a second priority lien on all ABL Priority Collateral, a second priority lien on all other property that is subject to a lien on the Petition Date, and a first priority lien on all unencumbered property, including any fee-owned, ground-leased and space-leased real estate, and any proceeds of avoidance actions.

12. In addition to being provided with a superpriority position and an enhanced collateral package, the DIP Lenders are being handsomely rewarded for providing the DIP Loans with expensive pricing and a rich fee package—even *in addition* to the $45 million in fees already paid prepetition—particularly given the DIP Facility's relatively short, 6-month tenor and the fact that only 50% of the DIP Facility will consist of new money loans.  Specifically, the DIP Facility provides for an annual interest rate of either the Base Rate plus 10.75% per annum or LIBOR (subject to a 1.25% floor) plus 11.75% per annum, which is ***more than double the interest rate on the prepetition Term Loans***.

13. The fees already paid to the proposed DIP Lenders are extraordinary because of their size ($45 million plus undisclosed professional fees for lawyers and an investment banker) and because they were paid prepetition specifically to avoid this Court's scrutiny, notwithstanding the fact that the proposed DIP Facility itself must be approved by this Court. The proposed DIP Facility, however, also contains numerous other fees, including (i) an Exit Premium of $27 million, (ii) an Exit Loans Commitment Premium of up to $18 million, (iii) an

7

Exit Loans Upfront Premium of up to $27 million and (iv) ongoing legal and investment banking fees. Moreover, the roll up of $450 million of prepetition claims trading at approximately 39.5 cents into claims trading at 100 cents on the dollar results in a windfall of approximately $272 million to the proposed DIP Lenders, which is tantamount to yet another fee the estates are paying to the DIP Lenders.

14. In addition to these extremely rich economic terms, the proposed DIP Facility contemplates a number of milestones, consent rights, and other onerous provisions that give the DIP Lenders more control than is properly delegable in what is represented to be an operating chapter 11 reorganization, rather than a liquidation. For example, the Debtors must comply with eight separate milestones over the next two months, including by (a) delivering "optimization" plans for the Debtors' leases and owned properties by June 15, 2020, (b) delivering proposed processes and parameters related to a proposed Business Plan by June 15, 2020, (c) reaching agreement with the Required Lenders on such parameters by June 20, 2020, (d) delivering a Business Plan consistent with those parameters by July 8, 2020, and (e) reaching agreement with the Required Lenders on a Business Plan by July 14, 2020. Notably, each of the deliverables must be acceptable to the DIP Lenders or the Required Lenders, as applicable, meaning that the Debtors' ability to ultimately satisfy the milestones is at the whim of the lenders. The Debtors' ability to ultimately access the Subsequent Borrowing of $225 million is subject to satisfaction of these conditions, among others, making a foot fault likely. Furthermore, if either (i) 66.67% of the DIP Lenders do not approve the Debtors' business plan by July 15, 2020 or (ii) the Debtors have failed to obtain binding commitments for all third-party financing (on terms acceptable to the Required Lenders) necessary to finance their plan by August 15, 2020 (either event, a "Toggle Event"), the Debtors must immediately cease pursuing a plan of reorganization and

instead toggle to a sale of all or substantially all of their assets under section 363 of the Bankruptcy Code.  Finally, at the apparent behest of the Ad Hoc First Lien Group, and in violation of the Term Loan Credit Agreement, the Debtors have unfairly and unjustifiably excluded other holders of Term Loans from participating in the DIP Facility (including the roll up).

**B.      Alternative DIP Financing Proposals**

15.      On May 19, 2020, the Ad Hoc Crossholder Group submitted two alternative DIP financing proposals to the Debtors (the "Alternative DIP Proposals"), both of which are demonstrably better for the Debtors and their estates than the DIP Facility that the Debtors are currently asking this Court to approve.  The salient terms of the Alternative DIP Proposals are as follows:

| Terms | Debtors' Proposed DIP Facility | Alternative DIP Proposal A | Alternative DIP Proposal B |
|---|---|---|---|
| DIP Facility | New Money: $450 million<br>Roll Up: $450 million (excluding certain Term Loan lenders) | New Money: $450 million<br>Roll Up: None | New Money: $450 million<br>Roll Up: $450 million held by participating Term Loan lenders and holders of First Lien Notes who are members of the Ad Hoc Crossholder Group[6] |
| Draws | Initial: $225 million<br>Subsequent: $225 million | Initial: $250 million<br>Subsequent: $200 million | Initial: $300 million<br>Subsequent: $150 million |
| Upfront Premium Fee | $18 million | None | None |
| Commitment Premium Fee | $27 million | None | None |
| Exit Premium | $27 million | $13.5 million[7] | $13.5 million |

---

[6]      The Ad Hoc Crossholder Group believes that the roll up in the proposed DIP Facility is improper and should not be approved by the Bankruptcy Court unless modified to allow all holders of prepetition first lien debt to participate in the DIP Facility and the roll up on a *pro rata* basis.  However, since the Debtors have taken the opposite position, the Ad Hoc Crossholder Group has made two financing proposals—one with and one without a roll up feature.

[7]      Given the absence of the roll up, the interest expense in respect of the DIP loans and exit loans, the exit premium in respect of the DIP loans, and the commitment and upfront premiums in respect of the exit loans will all

| Terms | Debtors' Proposed DIP Facility | Alternative DIP Proposal A | Alternative DIP Proposal B |
|---|---|---|---|
| Exit Loans Commitment Premium | Up to $18 million | Up to $9 million | Up to $9 million |
| Exit Loans Upfront Premium | Up to $27 million | Up to $13.5 million | Up to $13.5 million |
| Interest | Base Rate + 10.75% LIBOR + 11.75% (subject to 1.25% floor) | Base Rate + 9.75% LIBOR + 10.75% (subject to 1.25% floor) | Base Rate + 0.75% LIBOR + 1.75% (subject to 1.25% floor) |
| Non-Recourse Litigation Funding | N/A | $10 million | $10 million |

16.     Notably, the Debtors would enjoy an aggregate cost savings of $104.9 million under Alternative DIP Proposal A, or $115.1 million under Alternative DIP Proposal B, in each case through the maturity date, as compared to the proposed DIP Facility.[8]

17.     Alternative DIP Proposal A does not contemplate a roll up, so the benefits to the estates resulting from the lower pricing and fees vis-a-vis the proposed DIP Facility are amplified by the lower aggregate principal amount of the alternative DIP facility ($450 million instead of $900 million).  Alternative DIP Proposal B, by contrast, features a roll up that—like the existing DIP Facility—is only available to a select group of lenders.  Specifically, Alternative DIP Proposal B entitles the members of the Ad Hoc Crossholder Group who participate in the alternative DIP facility to roll up their Term Loans and/or First Lien Notes on a dollar-for-dollar basis in relation to their allocated share of the alternative DIP facility that they fund.  This roll up is no more detrimental to the estates than the existing DIP Facility, but the Debtors and their

---

effectively be reduced as a result of the principal amount of the DIP loans being 50% of the principal amount of the DIP loans contemplated by the proposed DIP Facility.

[8]     These aggregate cost savings assume that the $45 million in fees that the Debtor paid to the proposed DIP Lenders prepetition will be recovered for the benefit of the Debtors' estates, and as discussed below, the Ad Hoc Crossholder Group has included in the Alternative DIP Proposals litigation funding to pursue such recovery. Assuming *arguendo* that the $45 million could not be recovered, the Alternative DIP Proposals are still $59.9 million and $70.1 million cheaper for the estates, respectively, than the proposed DIP Facility.

estates would reap substantial benefits by virtue of the extremely low interest rates offered under Alternative DIP Proposal B and the significantly lower fees.  In addition, both Alternative DIP Proposals offer significant benefits to the Debtors by allowing them to access a greater portion of the $450 million new money component as the Initial Borrowing, leaving a smaller remaining amount to be subject to the heavier conditions precedent to the Subsequent Borrowing.  The relative savings offered by the Alternative DIP Proposals are depicted in the following chart:

| | Existing Commitment Roll-Up | Proposed Financing Options | | | |
| --- | --- | --- | --- | --- | --- |
| | | Proposal A No Roll-Up | Savings / Benefit | Proposal B Roll-Up | Savings / Benefit |
| Total Aggregate Commitment - New Money | 450.0 | 450.0 | | 450.0 | |
| Initial Borrowing - New Money | 225.0 | 250.0 | 25.0 | 300.0 | 75.0 |
| Subsequent Borrowing - New Money | 225.0 | 200.0 | | 150.0 | |
| Total Roll-Up | 450.0 | - | | 450.0 | |
| Initial Borrowing - Roll-Up | 225.0 | - | | 300.0 | |
| Subsequent Borrowing - Roll-Up | 225.0 | - | | 150.0 | |
| (I) Incremental Liquidity Provided through 7/15/2020 | | | 25.0 | | 75.0 |
| *Interest* | | | | | |
| Interest Rate (1) | 13.00% | 12.00% | | 3.00% | |
| (II) Interest Cost to 7/15/2020 | 6.9 | 3.5 | 3.4 | 2.1 | 4.8 |
| (IV) Interest Cost to Scheduled Maturity Date | 45.0 | 21.1 | 23.9 | 10.9 | 34.1 |
| *Fees on DIP Loans* | | | | | |
| Commitment Premium (%) | 6.00% | 0.00% | | 0.00% | |
| Commitment Premium ($) | 27.0 | - | 27.0 | - | 27.0 |
| Upfront Premium (%) | 4.00% | 0.00% | | 0.00% | |
| Upfront Premium ($) | 18.0 | - | 18.0 | - | 18.0 |
| Exit Premium (%) | 3.00% | 3.00% | | 1.50% | |
| Exit Premium ($) | 27.0 | 13.5 | 13.5 | 13.5 | 13.5 |
| *Fees on Exit Loans* | | | | | |
| Commitment Premium on Exit Loans (%) | 2.00% | 2.00% | | 1.00% | |
| Commitment Premium on Exit Loans ($) | 18.0 | 9.0 | 9.0 | 9.0 | 9.0 |
| Upfront Premium on Exit Loans (%) | 3.00% | 3.00% | | 1.50% | |
| Upfront Premium on Exit Loans ($) | 27.0 | 13.5 | 13.5 | 13.5 | 13.5 |
| (III) Total Fees through 7/15/2020 | 63.0 | 9.0 | 54.0 | 9.0 | 54.0 |
| (V) Total Fees to Scheduled Maturity Date | 117.0 | 36.0 | 81.0 | 36.0 | 81.0 |
| Total Savings/Benefit Through 7/15/2020    (I + II + III) | | | 82.4 | | 133.8 |
| *Excluding Savings from Commitment & Upfront Premium on DIP Loans* | | | 37.4 | | 88.8 |
| Total Savings/Benefit Through Maturity Date    (IV + V) | | | 104.9 | | 115.1 |
| *Excluding Savings from Commitment & Upfront Premium on DIP Loans* | | | 59.9 | | 70.1 |

*Notes:*
*(1) Assumes LIBOR rate loans.  LIBOR is assumed not to exceed the LIBOR floor of 1.25% during the chapter 11 case.*

18.     Finally, each of the Alternative DIP Proposals provides for up to $10 million in non-recourse litigation funding to allow the Debtors, or any official committee or other party with appropriate standing, to pursue claims against the DIP Lenders to recover the $45 million in fees paid to them prior to the Petition Date.

19.     The Debtors informed the Ad Hoc Crossholder Group that they were not interested in engaging on Alternative DIP Proposal B, despite the fact that it replicates the existing DIP Facility in many respects but is demonstrably better for the Debtors and their estates across the board in all respects as described above.  Nevertheless, the Ad Hoc Crossholder Group has engaged with the Debtors around Alternative DIP Proposal A.  Importantly, in order to accommodate the Debtors' requests and to significantly improve Alternative DIP Proposal A relative to the existing DIP Facility, the Ad Hoc Crossholder Group has agreed to remove any notion of a toggle event that would force the Debtors to liquidate by a date certain, while also giving the Debtors access to the full DIP proceeds—something the current DIP Facility does not do because it handcuffs the Debtors' ability to ever draw on the remaining $225 million as described above.  In addition, the Ad Hoc Crossholder Group has agreed to work with the Debtors in good faith on a business plan—again not forcing the Debtors' hand in any way or driving them to liquidate.  Inexplicably, however, the Debtors have not yet accepted this proposal, and are continuing to march down the path of the existing DIP Facility, despite the fact that the Debtors cannot show that the existing DIP Facility is better for creditors (other than the DIP Lenders) in any respect.[9]

**OBJECTION**

20.     In seeking approval of postpetition financing on a secured basis, a debtor bears the burden of proving, among other things, that: (a) the proposed financing is an exercise of sound and reasonable business judgment; (b) the financing is in the best interests of the estate and its creditors; (c) no alternative financing is available on any other basis; and (d) "as a

---

[9]     This is a fluid process and the Ad Hoc Crossholder Group has only recently made this revised proposal; however, as the Debtors have not yet responded to this proposal by the deadline for filing this Objection, the Ad Hoc Crossholder Group is forced to assume that they have declined to accept it.  The Ad Hoc Crossholder Group sincerely hopes that the Debtors exercise their sound business judgment and accept this superior proposal that is clearly in the best interests of their estates.

corollary to the first three points," better financing opportunities are also not available. *See, e.g.,* *In re Phase-I Molecular Toxicology, Inc.*, 285 B.R. 494, 495 (Bankr. D.N.M. 2002); *In re Farmland Indus., Inc.*, 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003) (listing these four factors, noting "[t]wo additional considerations," including that the financing is necessary to preserve the assets of the estate and that the terms of the transaction are fair and reasonable). Stated differently, courts will not approve DIP financing where it is designed to favor the lender at the expense of other creditors and is not in the best interests of the estate. *See In re Laffite's Harbor Dev. I, LP*, No. 17-36191-H5-11, 2018 WL 272781, at *3 (Bankr. S.D. Tex. Jan. 2, 2018) (rejecting approval of DIP financing, noting that bankruptcy courts "do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender"). Although a debtor in possession is often able to obtain DIP financing only on "onerous terms, which the bankruptcy court must balance against the debtor in possession's apparent lack of alternatives," *In re Fleetwood Enterprises, Inc.*, 2012 WL 2017952, at *11 (9th Cir. B.A.P. June 5, 2012) (quoting 3 COLLIER ON BANKRUPTCY ¶ 364.04[2][d] (Alan N. Resnick & Henry J. Sommer, eds., 16 ed. 2011)), in this case, as explained below in Section F, the Debtors need not acquiesce to the oppressive terms of the DIP Facility because the Ad Hoc Crossholder Group has offered plainly superior alternatives.

21.     That these cases were filed in the midst of the global COVID-19 pandemic does not relieve that Debtors of their obligation to ensure that the DIP Facility is fair and reasonable under the circumstances, and that it does not improve the position of one class of creditors to the detriment of other creditors and the estate. The DIP Facility fails to meet this standard.

13

Accordingly, the Ad Hoc Crossholder Group respectfully submits that the DIP Facility should not be approved as currently proposed for the reasons set forth below.

**A.      The Roll Up and Cross-Collateralization Provisions of the DIP Facility Are Inappropriate**

22.      As an initial matter, no provision of the Bankruptcy Code expressly authorizes "roll up" financing arrangements.  Section 364 of the Bankruptcy Code permits the granting of postpetition liens and superpriority administrative expense claims where a debtor's "obtaining of credit or the incurring of debt" occurs postpetition.  11 U.S.C. § 364(c), (d).  Section 364 does "not authorize the granting of liens to secure pre-petition liens." *Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.)*, 963 F.2d 1490, 1495 (11th Cir. 1992) *see also In re Ellingsen MacLean Oil Co.*, 834 F.2d 599, 601 (6th Cir. 1987) (noting that "[t]he express language of . . . []section [364(c)] suggests that the priority or lien granted thereunder is limited to securing the newly incurred debt authorized by that provision").

23.      Additionally, as this Court is well aware, courts generally disfavor roll ups and cross-collateralization because they provide no economic benefit to the debtor and solely benefit the prepetition lender by elevating prepetition claims and circumventing the Bankruptcy Code's priorities and distribution framework.  *See, e.g.*, *In re Saybrook Mfg. Co. Inc.*, 963 F.2d at 1494–95 (noting that cross-collateralization is "inconsistent with bankruptcy law" because (a) it is "not authorized as a method of post-petition financing under Section 364," and (b) it is "directly contrary to the fundamental priority scheme of the Bankruptcy Code"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369 (Bankr. S.D. Tex. 2000) (noting that, in a prior hearing, "the Court announced its ruling on the financing motion, which included a conclusion that . . . a secured creditor's prepetition loan balance could not be paid off and/or 'rolled into' a postpetition line of debtor in possession financing, with resultant enhancement of collateral

position and administrative priority"). Indeed, in recognition of the extraordinary nature of roll up provisions, the Procedures for Complex Chapter 11 Cases in the Southern District of Texas require a debtor seeking approval of postpetition financing to highlight for the Court any proposed cross-collateralization or roll ups (including any provisions deeming prepetition debt to be postpetition debt, or provisions requiring the proceeds of postpetition loans to be used to repay prepetition debt) and "provide specific reasons why [they] should be approved." *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* ¶¶ 21–22.

24. Here, the Debtors fail to offer an adequate justification for the roll up contemplated under the DIP Facility, especially when offered a far superior alternative by the Ad Hoc Crossholder Group. If the DIP Motion is granted and the roll up is approved, the DIP Lenders whose Term Loans are rolled into the DIP Facility will be entitled to demand payment in full in cash on what would otherwise be prepetition secured claims under any chapter 11 plan that is confirmed in these cases. *See* 11 U.S.C. § 1129(a)(9)(A) (providing that the court shall confirm a chapter 11 plan only if, among other things, each holder of an administrative expense claim "will receive on account of such claim cash equal to the allowed amount of such claim"). This conversion of prepetition secured claims into superpriority administrative expense claims would deprive the Debtors (or any other plan proponent if exclusivity is terminated) of the option to satisfy the DIP Lenders' prepetition secured claims with "take-back" debt under the cramdown provisions of section 1129(b) of the Bankruptcy Code and require such claims be paid in full in cash on the effective date of any confirmed chapter 11 plan, thereby unnecessarily limiting alternative plan constructs and necessitating the Debtors to raise exit financing in an amount sufficient to pay the rolled-up claims in cash and provide working capital for the Debtors post-emergence. If the DIP Lenders' business judgment

15

is to have the Debtors liquidate, that is what will happen.  In the process, the ample previously unencumbered real estate will be available to satisfy the prepetition claims of the DIP Lenders in the first instance, leaving other creditors out of the money.

25.      The fact that the second $225 million would be rolled up upon the funding of the Subsequent Borrowing into the Escrow Account—without regard for whether the Debtors actually have access to the Subsequent Borrowing—will be particularly detrimental to the Debtors' estates and likely will result in a huge windfall to the DIP Lenders.  Specifically, in the event a Toggle Event occurs after the $225 million Subsequent Borrowing has been funded into the Escrow Account, the DIP Lenders would have been entitled to roll up $225 million of their prepetition Term Loans (and, if applicable First Lien Notes), but $175 million of the funds in the Escrow Account would also be returned to the DIP Lenders within two business days of the Toggle Event.  *See* DIP Term Sheet at 6, 13–14.  The roll up, in contrast, would not be returned. The net result would be that the DIP Lenders would have rolled up $450 million of their prepetition secured debt in exchange for funding only $275 million (the $225 million Initial Borrowing plus a net Subsequent Borrowing of $50 million for the Debtors to begin the liquidation process).  In other words, the DIP Lenders would be entitled to roll up $1.64 of prepetition debt for every $1 of new money funded.  Thus, the roll up coupled with the Toggle Event provisions of the RSA and DIP Term Sheet put the non-DIP Lender prepetition lenders at a severe disadvantage and provide the DIP Lenders with an outsized recovery in a liquidation scenario that is unprecedented and an unfair windfall.[10]

---

[10]      If the Court were to entertain the roll up here, the Court certainly should not allow the DIP Lenders to roll up the full second portion of $225 million of prepetition Term Loans (and, if applicable First Lien Notes) if $175 million of the funds in the Escrow Account are ultimately returned to the DIP Lenders in connection with the Toggle Event.  In that scenario, the second portion of the roll up should be limited to the amount of additional funding that the Debtors actually receive (*i.e.*, not more than $50 million).

16

26.     Indeed, the only reasons for the roll up and cross-collateralization here appear to be to: (i) enhance the collateral position of certain Term Loan lenders; and (ii) generate additional fees and interest for certain Term Loan lenders.  The roll up and cross-collateralization proposed is inappropriate because it circumvents the Bankruptcy Code's priorities and distribution framework.

27.     Moreover, the Debtors propose to cross-collateralize the rolled up portion of the Term Loans by (i) securing the entire DIP Facility (including the $450 million roll up) with certain collateral that does not support the prepetition Term Loans, including a first priority lien on all unencumbered fee-owned, ground-leased and space-leased real estate, and any proceeds of avoidance actions (in addition to all of the collateral supporting the prepetition Term Loans), and (ii) providing the DIP Lenders with superpriority administrative expense claims relating to the entire DIP Facility (including the $450 million roll up).  In addition, as described in Section B below, the Term Loan lenders holding rolled-up DIP loans will benefit from a significantly higher interest rate—nearly double—than they are currently receiving under the Term Loans. This disparate treatment as compared to the other Term Loan lenders who were excluded from the DIP negotiations is simply unacceptable, particularly in light of the fact that ████████

████████████████████████████████████████████████████████████

███████████

28.     Equally important is the fact that the roll up also violates the Term Loan Credit Agreement and the 1L Pari Passu Intercreditor Agreement and should not be approved, since to do so would be sanctioning breaches of contract by the DIP Lenders.  *See KeyBank National*

---

[11]     *See* Exhibit  B ████████████████████████████

████████████████████████████████████████

*Association v. Franklin Advisers, Inc.*, No. AP19-01104, 2020 WL 2175364, at *18, *21 (Bankr.

S.D.N.Y. May 4, 2020) (holding that claims for breach of contract and breach of the implied

covenant of good faith and fair dealing arising from the violation of a pro rata sharing provision

through a DIP roll up were adequately alleged).  The Term Loan Credit Agreement contains a

"Ratable Sharing" provision that requires any Term Loan lender to ratably share any amount it

receives in payment of obligations due under the Term Loan with other term loan lenders who

may not receive the same proportional amount.  *See* Term Loan Credit Agreement § 2.17.[12]

Here, the Debtors propose to roll up $450 million in principal amount of the Term Loans held by

the DIP Lenders (or their applicable designees) into DIP Loans in accordance with each

---

[12]       Section 2.17 provides, in its entirety:

> **Ratable Sharing**. Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the Aggregate Amounts Due to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender , then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lender s in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, consolidation, set-off or counterclaim with respect to any and all monies owing by Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder. The provisions of this Section 2.17 shall not be construed to apply to (a) any payment made by Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender ) or (b) any payment obtained by any Lender as consideration for the assignment or sale of a participation in any of its Loans or other Obligations owed to it.

Term Loan Credit Agreement § 2.17.

prepetition lender's allocation of the DIP Facility.  By so doing, the Debtors are repaying (whether in cash or by way of legal fiction)[13] a portion of the outstanding Term Loans with the proceeds of the DIP Facility on a non-*pro rata* basis (*see* DIP Motion ¶¶ 64–65), directly in contravention of the Ratable Sharing provision.

29.     Reinforcing the notion that all Term Loan lenders and holders of First Lien Notes must be treated equally is the 1L Pari Passu Intercreditor Agreement, which sits on top of the Term Loan Credit Agreement and the First Lien Notes Indenture and governs the rights and obligations of the first lien secured parties under those documents.  The 1L Pari Passu Intercreditor Agreement requires that any payments received *vis-à-vis* the DIP Facility be applied to repay the Term Loans and First Lien Notes ratably.  *See* 1L Pari Passu Intercreditor Agreement §§ 2.05(b)(C), 2.01.[14]  As a result, allowing only a portion of Term Loan Lenders and First Lien Noteholders to participate in the roll up, to the exclusion of others, is also a breach of that agreement.

30.     The fact that the roll up is "coupled" with the "new money" DIP Loans does not sanction the breach, and in fact, the Bankruptcy Code mandates that the DIP lenders comply with their prepetition obligations.  The Ratable Sharing provision is an intercreditor provision of the Term Loan Credit Agreement and enforceable under section 510 of the Bankruptcy Code.

---

[13]     A roll up is a repayment of a preexisting obligation, whether new dollars are provided to the company for the selective repayment or whether the prepetition debt is simply elevated to DIP financing by way of legal fiction. In either event, the Ratable Sharing provision is triggered.  *See* Credit Agreement § 2.17 (providing that the Ratable Sharing provision applies if any of the lenders "whether by **voluntary payment** . . ., through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents **or otherwise**, . . . receive **payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender** hereunder or under the other Credit Documents" in a greater proportion than the other lenders) (emphasis added).

[14]     Clause (C) of Section 2.05(b) provides that "if any amount of such DIP Financing and/or cash collateral is applied to repay any of the Term Loan/Notes Secured Obligations, such amount is applied pursuant to Section 2.01 of this Agreement."  1L Pari Passu Intercreditor Agreement § 2.05(b)(C).  Section 2.01 provides for the application of proceeds *first* to the payment of all amounts owing to the Collateral Agent, and *second* to "subject to Section 1.01(b), to the payment in full of the Term Loan/Notes Secured Obligations of each Series **on a ratable basis** in accordance with the terms of the applicable Term Loan/Notes Documents."  *Id.* § 2.01 (emphasis added).

Section 510(a) provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a).  Bankruptcy courts routinely use section 510(a) to enforce provisions governing relationship between creditors.  *See, e.g.*, *In re Equip. Equity Holdings, Inc.*, 491 B.R. 792, 865 (Bankr. N.D. Tex. 2013) (enforcing subordination provisions pursuant to section 510(a)); *In re Hinderliter Indus.*, 228 B.R. 848, 853-54 (Bankr. E.D. Tex. 1999) (enforcing a subordination provision in an indenture); *In re Gen. Homes Corp. FGMC*, 134 B.R. 853, 864 (Bankr. S.D. Tex. 1991) ("Valid contractual subordination agreements have been uniformly enforced according to their terms by bankruptcy courts . . . .").

31.     For this reason alone, the Court should deny approval of the roll up or condition approval of the roll up on all prepetition Term Loan lenders being offered the opportunity to participate in the DIP Facility (including the roll up) on a *pro rata* basis determined by the principal amount of Term Loans held by a lender relative to the aggregate principal amount of all outstanding Term Loans.

**B.     The DIP Facility Contains Five Separate Fees, which Individually and in the Aggregate, are Beyond Exorbitant**

32.     The Debtors seek ratification and/or authorization to pay the DIP Lenders a staggering *$117 million* in fees in connection with the DIP Facility.  Specifically, the Debtors first seek authority to ratify the payment of *$45 million in fees paid to the DIP Lenders prior to the bankruptcy*, comprised of the following:

Upfront Premium Fee: equal to 4.00% of each DIP Lender's commitments in respect of the $450 million "new money" portion of the DIP Facility on the Petition Date—which amounts to *$ 18 million*, and

Commitment Premium Fee: equal to 6.00% of each DIP Lender's commitments in respect of the $450 million "new money" portion of the DIP Facility on the Petition Date—which amounts to *$27 million*.

20

DIP Motion at ¶ 77.

33.     The Debtors contend that these fees, in the aggregate, equal 10% of the $450 million "new money" portion of the DIP Facility.  However, that measure ignores the terms of the DIP Facility.  The magnitude of the fees paid should instead be assessed in relation to the $225 million Initial Borrowing made available under the DIP Facility because the Subsequent Borrowing is, ████████████████████ "illusory"[15]—the DIP Lenders have set such high and subjective thresholds for the Debtors to achieve in order to access the proposed Subsequent Borrowing that the likelihood the Debtors will ever receive the second $225 million is nearly non-existent.  There are conditions precedent before the DIP Lenders are obligated to fund the $225 million Subsequent Borrowing into the Escrow Account and, assuming those conditions are satisfied, there are additional conditions precedent to be satisfied before the Debtors can access the funds.  Specifically: (a) the Debtors must submit proposed Business Plan Parameters to the DIP Lenders relating to vendor agreements, lessor agreements and go-forward self-funding capability by June 15, 2020, and Business Plan Parameters must be agreed by the Debtors and the Required Lenders by June 20, 2020, and (b) the Debtors must submit a proposed Business Plan to the DIP Lenders (consistent with the agreed Business Plan Parameters) by July 8, 2020, and a Business Plan must be agreed by the Debtors and the Required Lenders by July 14, 2020.  And, the DIP Motion refers to Business Plan Parameters and a Business Plan that are "acceptable" to the DIP Lenders, which appears to leave all of the decisions squarely within the DIP Lenders' discretion, without any requirement for the DIP Lenders to act reasonably in exercising their discretion.  As a result, the DIP Lenders could capriciously withhold consent for

---

[15]     *See* Exhibit C ███████████████
████████████████████████████████
█████████████████

the Business Plan Parameters and/or the Business Plan, or delay consent until a date that is past the applicable milestones, causing the Debtors to fall out of compliance with these onerous conditions precedent and lose the opportunity to access the Subsequent Borrowing.[16]  Under those circumstances, the Debtors would have paid commitment and upfront fees totaling 20% of the $225 million of new money provided to the Debtors under the DIP Facility.

34.     The Court should decline to provide the Debtors with a comfort order ratifying the $45 million in fees they paid to the DIP Lenders prepetition.  The Debtors and the DIP Lenders, having agreed that the fees would be paid before this Court could consider the DIP Motion, should now have to live with that decision, and defend against any claims that the payment of such fees was a fraudulent or preferential transfer or otherwise subject to clawback. For that same reason, the Court should also refuse to authorize the Debtors to grant the DIP Lenders a lien on proceeds of avoidance actions as contemplated under the DIP Motion, presumably to further insulate the DIP Lenders from any attempts to claw back these fees.

35.     In addition to the $45 million already paid, the Debtors seek to pay the following additional amounts, all of which are payable in cash:

Exit Premium: to the DIP Lenders, 3.00% of each DIP Lender's funded loans or unfunded commitments under the DIP Facility (including both the "new money" portion and the rolled up portion of the DIP Facility)—which amount is equal approximately *$27 million*—payable upon maturity of the DIP Loans or upon any earlier voluntary or mandatory prepayment of the DIP Loans,

Exit Loans Commitment Premium: to the DIP Lenders, a commitment premium equal to 2.00% of the commitments in respect of the Exit Loans—which amount is *up to $18 million*—payable on the date the Business Plan is approved (which date is scheduled to be on or before July 14, 2020 pursuant to the Milestones), and

---

[16]     Assuming all of the other conditions precedent are met, in the event the Business Plan is not approved or a Toggle Event otherwise occurs, the Debtors will be able to access $50 million of the Subsequent Borrowing, but the remaining $175 million will be remitted back to the DIP Lenders.

22

Exit Loans Upfront Premium: to the DIP Lenders, an upfront premium equal to 3.00% of the commitments in respect of the Exit Loans—which amount is **up to $27 million**—payable on the closing date of the Exit Loans.

Interest:  to accrue at either the Base Rate plus 10.75% per annum or LIBOR (subject to a 1.25% floor) plus 11.75% per annum, compounded monthly and payable monthly in cash in arrears.

36.     The additional exit fees, which may amount to **$72 million**, also are excessive, particularly in light of the DIP fees already paid.  Moreover, the Exit Premium is inappropriately calculated on both the "new money" portion and the rolled up portion of the DIP Loans.

37.     To add insult to injury, the Debtors have agreed to pay significantly higher interest rates that those outstanding under the current Term Loans and First Lien Notes, which are LIBOR plus 4.25% and 5.875%, respectively.  Thus, in addition to all of the benefits typically associated with a roll up, as well as the proposed cross-collateralization, the DIP Lenders will receive a windfall from the roll up due to the application of these significantly higher economics to their Term Loans and First Lien Notes.  Moreover, by elevating $450 million of their prepetition claims trading at approximately 39.5 cents to claims that are entitled to a par recovery, the roll up provides a windfall of an additional $272 million to the DIP Lenders that is tantamount to an additional fee—an astronomical benefit conferred for a new money loan of (at most) $450 million.

38.     Accordingly, the Court should deny ratification of the prepaid DIP Fees and deny authorization and approval of the remaining DIP Fees as egregious and extracted by the DIP Parties to the detriment of the Debtors' estates.[17]

---

[17]     The Debtors also seek authority to pay the ABL Agent, as adequate protection for the ABL Secured Parties, a weekly "administration" fee in the amount of $500,000 until all ABL Obligations have been paid in full.  This fee—which translates into a monthly fee of $2 million—is also unjustifiable, excessive and should not be approved by this Court, particularly considering the already generous adequate protection package granted to the ABL Secured Parties, including cash payment of interest at the default rate.

**C.      The Indemnified Parties Should Not Be Indemnified For Losses Related to the Prepaid DIP Fees**

39.      By the DIP Motion, the Debtors propose to indemnify the DIP Lenders, among others (collectively, the "Indemnified Parties") from and against any and all claims, damages, losses, liabilities and expenses, including out-of-pocket fees and expenses of specified counsel and financial advisors, that may be asserted against any Indemnified Party arising out of or in connection with, among other things, the DIP Facility, the Operative Documents, or any of the transactions contemplated thereby (the "DIP Indemnification Provision").

40.      Although the DIP Indemnification Provision is seemingly ordinary, the Debtors' decision to prepay their DIP Facility fees was not. As discussed herein, the prepetition payments of the Upfront Premium Fee and Commitment Premium Fee are subject to challenge as potential fraudulent or preferential transfers. The DIP Lenders should not be protected in any way from this litigation—including by having the ability to recover from the Debtors their legal fees and expenses in connection with defending against the litigation. As a result, this unusual fact pattern requires an unusual outcome—the DIP Indemnification Provisions should be rejected (or at least limited) and the Debtors, or an official committee or other party in interest, should have the ability to pursue the disgorgement of such fees without fear that such litigation will impact the Debtors in any way.

**D.      The Case Milestones Are Unreasonably Short and Contain Unreasonable Case Controls**

41.      In the context of these Chapter 11 Cases, where there are significant and challenging operational issues to be analyzed and remedied, the proposed Milestones represent artificial deadlines designed to force the Debtors to hastily develop a Business Plan, sale process, and/or chapter 11 plan, all of which ultimately are subject to the DIP Lenders' subjective approval. These control-type mechanisms by the DIP Lenders should not be permitted.

24

42.     Given the size and complexity of the Debtors' business operations—which include 846 stores across 49 states and Puerto Rico, nearly 85,000 associates, a supply chain network with nearly 3,000 vendors and 11 domestic shipping facilities, and approximately $4.9 billion in funded indebtedness—and the Debtors' stated goal of successfully reorganizing their business, it is quite aggressive for the Debtors to prepare and finalize (a) a Lease Optimization Plan, an Owned Real Estate Optimization Plan, and Business Plan Parameters in approximately one month, (b) a Business Plan in approximately two months, and (c) a chapter 11 plan or bidding procedures for a section 363 sale process in approximately three months, while also dealing with the numerous urgent issues that inevitably arise upon a bankruptcy filing.  In addition, the Debtors have agreed that, regardless of whether a Toggle Event occurs, the Plan Effective Date must occur by November 15, 2020.  Critically, these Milestones may not allow sufficient time for the Debtors to undertake the necessary review and analysis to address their businesses' or industry's systemic issues or to fully develop their business plan and consider all strategic alternatives.  Ultimately, the Milestones will likely not result in maximizing the value of the Debtors' estates.

43.     Equally unreasonable is the requirement that the Business Plan Parameters, the Business Plan, the chapter 11 plan, and the bidding procedures must be "acceptable" to the Required Lenders or the DIP Agent, as applicable, without any requirement that such parties act "reasonably."  These provisions grant the DIP Lenders undue and inappropriate control over the most critical aspect of the chapter 11 process and should not be approved.

44.     As noted above, the DIP Lenders are being extremely well compensated (and in fact, overcompensated) for providing postpetition financing to the Debtors.  They should not also be permitted to use the DIP Facility as a means to seize control over the fundamental decisions

25

regarding how these Chapter 11 Cases should proceed.  For these reasons, the Court should not approve the DIP Motion unless the Milestones and control provisions are removed.

**E.      The Proposed DIP Facility Constitutes a *Sub Rosa* Plan**

45.      The proposed DIP Facility is an impermissible *sub rosa* plan that seeks to force what the terms of a future plan of reorganization will be before the Court has had the opportunity to approve a disclosure statement and, thereby, could seek to solicit votes on a plan in violation of the protections afforded to parties-in-interest by section 1125 of the Bankruptcy Code.  This Court is well informed on the Fifth Circuit's views on *sub rosa* plans and certainly is mindful that the practical needs for reorganization can sometimes require extraordinary measures, even early in a case.  However, this DIP Facility, especially when contrasted with the Ad Hoc Crossholder Group's Alternative DIP Proposals, circumvents the Bankruptcy Code's requirements.  The Fifth Circuit defined a *sub rosa* plan as a transaction that has the "practical effect of dictating some of the terms of any future reorganization plan."  *See In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983).  Courts also have found that *sub rosa* plans cannot be approved outside of the well-established solicitation and confirmation requirements of the Bankruptcy Code. *See id*. ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets."); *see also In re Tower Auto. Inc.*, 241 F.R.D. 162, 168-69 (S.D.N.Y. 2006); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877, 885 (Bankr. S.D.N.Y. 1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted.").

46.      Here, the DIP Lenders have taken significant control over the Chapter 11 Cases from the Debtors, including consent rights (not subject to a "reasonableness" standard) over material documents, including the Debtors' Business Plan and Chapter 11 Plan, all of which

must be submitted to the DIP Lenders on an expedited basis.  Moreover, in the event (a) less than 66.7% of the DIP Lenders approve the Business Plan by the July 15, 2020 milestone, or (b) the Debtors are unable to obtain binding commitments for all of the third-party financing (on terms acceptable to the DIP Lenders) necessary to fund the agreed-upon Business Plan in accordance with the terms of the RSA, then the Debtors are required to immediately cease pursuing the Plan and instead pursue a section 363 sale of substantially all of their assets.  *See* DIP Term Sheet at 21.  While the DIP Facility does not prescribe a specific outcome, these consent rights will set the Debtors down a one-way path whereby the Court will not have the opportunity to consider any transaction other than a plan designed by, or for, the DIP Lenders (who are also current Term Loan lenders seeking a roll up).

47.     Accordingly, the proposed DIP Facility which contains onerous terms which appear to control a plan and stakeholder outcomes in these cases constitutes a *sub rosa* plan and should be denied.

**F.     The Alternative DIP Proposals Are Clearly Superior to the Proposed DIP Facility**

48.     Alternative DIP Proposal A dispenses with the unnecessary roll up of the existing DIP Facility, thereby cutting in half the aggregate amount of DIP Loans that would need to be repaid in full in cash under any chapter 11 plan, and it offers the Debtors potential savings of $59.9 million through the life of the facility (without taking account of the savings resulting from the lack of any upfront or commitment fees) by virtue of a 100 basis point lower interest rate than the existing DIP Facility and charging exit fees at the existing percentages on 50% of the principal amount.  Alternative DIP Proposal B retains the $450 million roll up, which makes the estates no worse off than they are under the existing DIP Facility, but it offers the Debtors potential savings of $70.1 million through the life of the facility (without taking account of the savings resulting from the lack of any upfront or commitment fees) by reducing the exit fees by

50% and the non-default interest rate by a whopping 1,000 basis points.  Neither of the Alternative DIP Proposals contain an Upfront Premium Fee or a Commitment Premium Fee (saving the Debtors $45 million), and both of the Alternative DIP Proposals benefit the estates by reducing the total dollar amount of exit fees payable by 50% and providing up to $10 million in non-recourse litigation financing to claw back the $45 million in unjustifiable fees paid to the proposed DIP Lenders in the hours before the Debtors' bankruptcy filing.

49.     Even after the Debtors declined to engage with the Ad Hoc Crossholder Group on Alternative DIP Proposal B, the Ad Hoc Crossholder Group agreed to further improve Alternative DIP Proposal A relative to the existing DIP Facility.  First, the Ad Hoc Crossholder Group has agreed to remove the concept of a toggle event that would force the Debtors to pivot to a liquidation process by a specified date, while at the same time giving the Debtors access to the full DIP proceeds—something the proposed DIP Facility does not do because it hinders the Debtors' ability to ever obtain the second tranche of $225 million as described above.  In addition, the Ad Hoc Crossholder Group has agreed to work with the Debtors in good faith on a business plan, rather than hamstring the Debtors or force them to liquidate.

50.     Notwithstanding the obvious benefits of the Alternative DIP Proposals, the Debtors have decided to proceed with the existing DIP Facility due to their fears that (a) the DIP Lenders would be unwilling to maintain the RSA in the event the DIP Facility is not approved, and (b) the DIP Lenders will engage in a priming fight with respect to any alternative DIP financing.  These arguments are red herrings.

51.     *First*, the RSA provides the Debtors with no value, so there is no reason for them to seek to preserve it.  The RSA is replete with brackets and placeholders for items that have yet to be agreed—including the plan treatment for the holders of DIP Facility Claims and Classes 3,

4, 5, 6, 7, 8, and 9.  In addition, the RSA references a dual structure for the reorganized Debtors that involves a New JCP and a REIT; however, the parties have not described—or even seriously considered—how these structures would be designed, including how the Debtors' assets and resources would be allocated or what the proposed capital structures would look like upon emergence.  This amorphous and undeveloped outline is consistent with the other terms of the purported RSA.  In short, the RSA does not contain a binding and viable restructuring plan, and, in essence, is nothing more than an agreement to continue negotiating and agree in the future on the terms of a restructuring.  If anything, the RSA lays the groundwork for a liquidation of the company as it contains a Toggle Event, which would require the Debtors to liquidate their assets at the sole discretion of the Ad Hoc First Lien Group.  The Debtors' decision to favor the DIP Facility, which contains a $450 million roll up and a Toggle Event in the RSA that could result in a quick liquidation, is particularly detrimental to the non-DIP Lender prepetition lenders because the recovery in a liquidation scenario for the rolled up lenders and non-rolled up lenders will be drastically different.  The Debtors' fate should not be decided by a subset of the Debtors' prepetition lenders who are seeking to hedge their bets and essentially steal value from other prepetition lenders and unsecured creditors.  The Ad Hoc Crossholder Group strongly believes that the best path forward would be to discard the hollow RSA and instead develop a consensual restructuring plan by building consensus among the Debtors' various constituencies.

52.     *Second*, the Ad Hoc First Lien Group undoubtedly is adequately protected and would not be successful in a priming fight.  As an initial matter, the adequate protection package offered to the first lien lenders is one of the most robust in the market, and the Ad Hoc First Lien Group felt comfortable with that adequate protection package in light of the priming liens associated with their own DIP Facility.  The Alternative DIP Proposals do not impact the

existing adequate protection package in any way, and in fact, would provide the Debtors with the same amount of new money on neutral or better terms as the existing DIP Facility, and, therefore, would similarly benefit the members of the Ad Hoc First Lien Group by preserving the Debtors' going concern value and the value of their collateral. Indeed, the purpose of adequate protection is to protect the prepetition lenders against any diminution in the value of their collateral that may result from the Debtors' continued use of cash collateral and from the imposition of any senior liens that may be placed upon the collateral as part of a DIP financing.

53.     Here, the collateral value on the Petition Date likely was at a low point due to the COVID-19 shelter in place orders and numerous store closures.  Now, as noted by the Debtors in the May 28, 2020 status conference, the Debtors have 300 stores open and will have another 200 stores open by the date of the hearing on the DIP Motion.  Using DIP financing to continue to open stores, sell inventory, and generally maintain day-to-day operations, protects the first lien lenders by enhancing the value of their collateral, and in particular, the Debtors' intellectual property, inventory and real estate assets, through the process of a reorganization or orderly liquidation.  In fact, the Debtors have noted that the value of their inventory and real estate assets are significantly higher when the stores are "lit" than when they are "dark."  *See* Exhibit A.  As a result, it is simple for the Debtors to demonstrate, to the extent needed, that the generous adequate protection package already offered to the first lien lenders more than overcomes an objection to being primed.  Finally, there can be no real argument advanced by the DIP Lenders that there is no equity cushion to protect them from the priming by an alternative DIP financing. The DIP Lenders are already priming themselves on claims that they have that are not rolled up and thus are precluded from making the argument.  In addition, as noted above, DIP financing enhances the value of collateral and if the DIP Lenders believed that there was no equity

30

cushion, then no DIP financing should be approved, and the Debtors should move to an immediate liquidation of their assets, which is not contemplated by the terms of the proposed DIP Facility.

54.     Accordingly, considering the substantial benefits offered by the Alternative DIP Proposals vis-a-vis the existing DIP Facility, the Ad Hoc Crossholder Group has made the Debtors an offer that cannot, in the exercise of sound business judgment, be refused.  Indeed, Milbank LLP, counsel to the proposed DIP Lenders here, argued successfully against the roll up in Sanchez Energy, stating that the Court cannot accept a debtor's conclusory assertion that it is the "sound and reasonable exercise of business judgment that [the debtor is] going to take a less good DIP because of the risk associated with priming when a roll-up is involved.  You actually have to run out [the ground] ball and you have to find out whether or not there is a path to execute on the alternative."  Hr'g Tr. 112:4–9, *In re Sanchez Energy Corp.*, Case No. 19-34508 (Bankr. S.D. Tex. Sept. 11, 2019) (ECF No. 359).  In that case, Judge Isgur denied approval of the debtors' proposed DIP financing, where the debtors' only reason for pursuing approval of the proposed DIP financing over alternative DIP financing available was to "avoid [a] priming fight" but "in every other way the [d]ebtors . . . acknowledged that the alternative DIP is superior to the DIP" that the debtors selected.  *Id.* 274:14–18.  Judge Isgur held that the Sanchez Energy debtors' decision to accept the inferior DIP financing could not be affirmed particularly where, as here, the analysis whether the debtors "will win or lose the priming fight or whether it is worth the priming fight just hasn't been done."  *Id.* 275:10–12.

55.     Inexplicably, like the debtors in Sanchez Energy, the Debtors have not yet accepted either of the Alternative DIP Proposals and determined to press forward with their request for approval of an objectively inferior DIP Facility.  The Ad Hoc Crossholder Group

31

respectfully submits that the Debtors are incapable of satisfying their burden of demonstrating that their decision to pursue the existing DIP Facility in light of the Alternative DIP Proposals is an exercise of sound business judgment and, as in Sanchez Energy, the Court should deny approval of the proposed DIP Facility.

## DISCOVERY

56. In connection with this Objection, the Ad Hoc Crossholder Group has sought discovery of the Debtors with respect to the DIP Motion, and reserves the right to depose any witnesses to be proffered at the hearing to consider the DIP Motion. All rights of the Ad Hoc Crossholder Group with respect to the relief sought in the DIP Motion and the hearing to consider the DIP Motion are expressly reserved.

*[Remainder of page intentionally left blank]*

**WHEREFORE**, based on the foregoing, the Ad Hoc Crossholder Group respectfully requests that the Court (a) deny the DIP Motion, and (b) grant the Ad Hoc Crossholder Group relief that is consistent with the foregoing or such other and further relief as the Court may deem just and proper.

Dated: June 2, 2020
　　　New York, New York

HAYNES AND BOONE, LLP

By: /s/ Patrick L. Hughes
Charles A. Beckham, Jr.
Texas State Bar No. 02016600
Patrick L. Hughes
Texas State Bar No. 10227300
Kelli S. Norfleet
Texas State Bar No. 24070678
David Trausch
Texas State Bar No. 24113513
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone.: (713) 547-2000
Facsimile: (713) 547-2600
Email:  charles.beckham@haynesboone.com
Email:  patrick.hughes@haynesboone.com
Email.  kelli.norfleet@haynesboone.com
Email:  david.trausch@haynesboone.com

STROOCK & STROOCK & LAVAN LLP

Kristopher M. Hansen
Kenneth Pasquale
Jonathan Canfield
Samantha Martin
Jason Pierce
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400
Facsimile: (212) 806-6006

*Counsel for the Ad Hoc Crossholder Group*

33