**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **J. C. PENNEY COMPANY, INC.** *et al.*,[1] | § | **Case No. 20-20182** |
| | § | |
| | § | |
| **Debtors.** | § | **Chapter 11** |

**AD HOC EQUITY COMMITTEE'S MOTION FOR ENTRY OF AN ORDER**
**ESTABLISHING AN OFFICIAL COMMITTEE OF EQUITY INTEREST**
**HOLDERS PURSUANT TO 11 U.S.C. § 1102(a)(2)**

The Ad Hoc Committee of Equity Interest Holders (the "Ad Hoc Equity Committee") of

J.C. Penney Company, Inc., *et al.* (the "Debtors" or "JCPenney"), hereby files this Motion (the

"Motion") for Entry of an Order Establishing an Official Committee of Equity Interest Holders

Pursuant to 11 U.S.C. § 1102(a)(2), and in support hereof, respectfully states as follows:

## I.    INTRODUCTION

1.    As the Debtors have noted, JCPenney is not representative of many other retailers

in a chapter 11 case.  For starters, the Debtors entered these bankruptcy proceedings holding more

than $475 million in cash on hand and a significant ability to generate future earnings – including

substantial revenue from *non-core* business segments (i.e., $1.5B online sales and $300MM credit

card revenue).  Far from a "hopelessly insolvent" debtor, in fact, JCPenney entered bankruptcy

holding assets that should reasonably be expected to generate a return to equity under an orderly

liquidation scenario – much less a reorganization.  Since then, the Debtors have outperformed

expectations and have accumulated more than $1.2B in available cash.  Moreover, based upon the

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at **http://cases.primeclerk.com/JCPenney**.  The location of the Debtor J.C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.

Debtors' own financial reporting either immediately prior to or during these Bankruptcy Cases, the Orderly Liquidation Value of the Debtors' assets exceeds $8.4B – more than enough value to satisfy all allowed creditor claims and provide a return to equity.

2.     That reality – the undeniable value of the Debtors' businesses – is not a reality that has been presented to this Court.  Instead, on Saturday, May 16, 2020, this Court held an emergency first day hearing (the "First Day Hearing") in these cases at which the Debtors provided a dire report:  as a result of unprecedented economic disruption caused by the COVID-19 pandemic, the Debtors were facing a severe cash shortage and, within just a few short months, would need an extraordinarily expensive infusion of capital to sustain operations.  Moreover, the value of the Debtors' businesses, like their previously-excellent liquidity position and reportedly improving ability to generate cash from operations, had permanently evaporated overnight.  As a result, the Debtors required extraordinary relief from this Court on an expedited basis.  This report, and the supporting analyses of the Debtors' advisors, played note for note upon every fear or expected calamity that one would expect a long-suffering retailer in the midst of a global economic crisis and pandemic to be facing.

3.     Fortunately for all involved, just over three months later, time has shown that the reports of the Debtors' imminent demise and the fears invoked therein were greatly exaggerated. Rather than facing an immediate cash or liquidity crisis, the Debtors have significantly outperformed their grossly pessimistic projections – exceeding Net Cash Flow projections by more than **229%** and accumulating more than **$1.2B** in available cash.  This extraordinarily-better-than-projected performance simply highlights something the Debtors' investors have long known – the value of JCPenney is far greater than this Court has been led to believe.

4.     Through this Motion, the Ad Hoc Equity Committee seeks recognition as an official equity committee with the hopes that such recognition will grant legitimacy to the Ad Hoc Equity Committee's efforts to require greater transparency and fairness in these proceedings.  Most importantly, though, such recognition will give the Debtors' equity interest holders a legitimate voice with meaningful negotiating power in order to protect their interests in this valuable American retail icon.

## II.     JURISDICTION AND VENUE

5.     The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

6.     The statutory predicate for the relief requested in this Motion are § 1102(a)(2) of the Bankruptcy Code,[2].

## III.     BACKGROUND

### A.     _The Bankruptcy Filing and Formation of the Ad Hoc Equity Committee_

7.     On May 15, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief (the "Bankruptcy Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division (the "Court").  On that same date, this Court entered an Order Directing Joint Administration of Chapter 11 Cases [ECF # 4].

8.     Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtors are operating their businesses and managing their property as debtors in possession. An official committee of unsecured creditors (the "UCC") was appointed on May 28, 2020.

---

[2] 11 U.S.C. §§ 101 – 1532, _et. seq._

9.      On May 28, 2020, Rahul Shekatkar, on behalf of shareholders, filed a motion to dismiss these Bankruptcy Cases, or in the alternative, appoint an equity committee. A hearing was held on such motion on June 6, 2020, and an agreement was reached on the record to appoint an ad hoc equity committee. Pursuant to that agreement, on June 10, 2020, this Court entered the *Order Regarding Shareholders' Motion to Dismiss Cases, or in the Alternative, to Appoint an Equity Committee* [ECF # 680] which ordered the formation of the Ad Hoc Equity Committee.

**B.**      **_The Debtors' Path to Bankruptcy_**

>      i.      _An American Retail Icon and Survivor_

10.      The 118-year-old JCPenney has cemented itself as a staple of the American retail landscape.  Founded in 1902, the guiding principle of JCPenney remains aligned with the Golden Rule – the name of Mr. Penney's first stores.  With this principle in mind, JCPenney survives as an American retail icon long believed in and supported by faithful investors.  The company's long history of success has shown such faith to be warranted.

11.      Incorporated in 1913, Mr. Penney established his corporate headquarters in New York City, despite only operating stores west of the Mississippi, to be closer to manufacturers and suppliers to help reduce costs.  By 1916, Mr. Penney opened the first stores east of the Mississippi in Wisconsin; by 1917, JCPenney had 175 stores nationwide; by 1924, the company opened its 500th store; and by 1929, its thousandth. As of the Petition Date, the company operated 846 locations across 49 states and Puerto Rico, making it one of America's largest department store retailers.

12.      JCPenney's expansion was executed deliberately, thoughtfully, and in a manner designed to survive and endure. During its 118-year history, JCPenney has survived nation- and world-wide recessions, depressions, wars, and other crises.  The company has consistently found

a way to stay relevant and serve its customers using the tools available and keeping a focus on its fundamentals.  As a result, JCPenney's revenue reached nearly $20 billion in net sales in 2007, and it concluded 2019 with approximately $10.7 billion in net sales.

> ii.    *Pre-COVID Operations and Turn-around Plans*

13.    For almost a decade now, however, department stores and much of the retail industry have faced challenging times. Indeed, during the last several years, the term "Retail Apocalypse" has become a well-known moniker to summarily reference the prolonged decline of many seemingly well-established retailers.  And while the convenient trope is to blame the decline of the department store upon the rise of fast fashion, off-price chains, the internet and, now, the COVID-19 pandemic, industry observers have noted that rivals in Europe and Japan facing the same issues have remained healthier than their U.S. counterparts.  As the Wall Street Journal recently noted:

> In the U.K., Harrods and Selfridges are renowned for their food halls, which provide a sensory experience not replicated online. In Japan, the department store Nihombashi Mitsukoshi has hosted exhibits where artisans make ceramics, weave fabrics and practice other traditional crafts, creating a sense of theater.

*Once the Innovators, Department Stores Fight to Stay Alive*, The Wall Street Journal, Suzanne Kapner, August 4, 2020, https://www.wsj.com/articles/once-the-innovators-department-stores-fight-to-stay-alive-11596533403?mod=hp_featst_pos4.    The article further observed that American department stores have failed to replicate such environments.

14.    With this backdrop, the JCPenney executive team took proactive steps to reinvent itself through a highly touted "Plan for Renewal."  This Plan for Renewal consists of five core components that, like JCPenney's European and Asian counterparts, seeks to create an engaging, inspired experience for customers and capture a core customer:  the "All-in Shopping Enthusiast."

15.     To effectuate this Plan for Renewal, JCPenney has taken several steps to return to its principles as a value retailer providing everyday goods for the entire family at low prices and to re-engage its core customers. These steps include: (a) removing JCPenney from low-margin furniture and appliances spaces; (b) reducing inventory to lower costs; and (c) developing a new look for JCPenney's stores.   In 2019, JCPenney introduced its first "Brand-Defining Store" in Hurst, Texas, which JCPenney has described as a "lab store that brings to life the 'Plan for Renewal' and helps inform future actions." *Declaration of Bill Wafford, Executive Vice President, Chief Financial Officer of J.C. Penney Company, Inc., in Support of Debtors' Chapter 11 Petitions and First Day Motions* [ECF # 25] (hereinafter, the "Wafford Declaration"), p. 6.   It includes the first ever in-store barber shop (The Barbery), a kid's destination (Clubhouse), a bistro with "grab + go" options, the "Take a Moment Make a Moment Lounge," and styling rooms for men and women.  The "Brand-Defining Store" also has a Movement Studio and Style + Substance space to host exercise classes.

16.     The result of these efforts placed JCPenney on the brink of an operational and financial shift that would prepare the company for a resurgence in the retail industry.  A belief that JCPenney touted to its shareholders repeatedly.  These proclamations of success were not simply an empty mantra, as the Debtors noted in their first day pleadings: "Notwithstanding the incredibly challenging macro-economic climate, the 'Plan for Renewal' has already improved the sales in several categories." *Wafford Declaration*, p. 27.

17.     In fact, on May 18, 2020, one day after JCPenney commenced these Bankruptcy Cases, the management team publicly released the highly touted Plan for Renewal in a Form 8K SEC filing (the "May 18th 8k").  A true and correct copy of the May 18th 8k filing is attached hereto as **Exhibit A**.  Through that filing, the management detailed its strategy for implementing

the Plan for Renewal, including targeted store closings, major cost reductions, marketing initiatives, online store growth plans, revenue and EBITDA projections, and valuation data.

18.     The projections and assumptions supporting the Plan for Renewal, as outlined in the May 18th 8k, offered much to excite the shareholders.  For example, according to the Plan for Renewal:

- The company identified six of eight divisions that have demonstrated comp improvement and stabilized market share position in key categories;

- The e-commerce channel will, and is, experiencing significant growth, which will enhance margins and cash flow, and JCPenney will "double down" on this channel to drive growth in line with peer companies;

- SG&A, long viewed to be bloated, will be reduced by over $1billion versus FY 19; and

- Unprofitable stores will be closed, and the footprint rationalized.

Further, the financial data provided illustrated:

- Substantial unencumbered real estate holdings;

- Significant projected cash flow including $1.5B of annual online business and approximately $300MM of annual credit card revenue; and

- An estimated orderly liquidation value sufficient to satisfy unsecured creditors and provide a value for equity.

In sum, the Plan for Renewal, contrary to the statements made in these Bankruptcy Cases, indicated management's belief that through these actions, among other things, JCPenney will experience an increase in margins and cash flows, contributing to significant growth in enterprise value. Typically, cash streams as robust as those projected by the Debtors in their online business and credit income are reflected in higher valuation assumptions – not the depressed value assumptions promoted by the Debtors in these Bankruptcy Cases.

iii.    *The COVID-19 Effect*

19.      As a result of these initiatives, JCPenney had a substantial liquidity cushion, was improving its operations, and was proactively engaging with creditors to deleverage its capital structure and extend its debt maturities to build a healthier balance sheet. Then, COVID-19 ravaged the United States and global economies.   In response, national, state, and local governments in the United States, and around the world, imposed shelter-in-place and stay at home orders, as well as social distancing protocols. These measures caused a significant disruption to JCPenney's business – forcing JCPenney to temporarily close all of its stores and offices and reduce supply chain operations as of March 18, 2020. As a result, April year-over-year net sales tumbled by ~88% and store sales decreased to nearly zero.

20.      Given such events, industry observers were understandably grim.  In fact, in an April 21, 2020, N.Y. Times article titled, "*The Death of the Department Store: 'Very Few Are Likely to Survive,*'" several retail analysts pondered whether the American department store could survive the pandemic.[3]  Specifically regarding JCPenney, the article noted that JCPenney had recently skipped an interest payment and had engaged Kirkland & Ellis, LLP, Lazard Freres & Co. LLC, and AlixPartners, LLP to prepare for an imminent bankruptcy filing.  The authors noted that outside analysts estimated only seven months of liquidity for JCPenney if stores remained closed.

21.      Yet, as grim as these outsiders' predictions were, the view of JCPenney's restructuring advisors appeared to be even worse – projecting that, without an immediate infusion of cash, the Debtors' liquidity would be exhausted as early as July 2020.  Based upon these dire projections, the Debtors determined that "putting JCPenney on a long-term path to success would

---

[3] Maheshwari, Sapna and Friedman, Vanessa, The Death of the Department Store: 'Very Few Are Likely to Survive'; April 21, 2020, updated May 7, 2020 available at https://www.nytimes.com/2020/04/21/business/coronavirus-department-stores-neiman-marcus.html.

require not only a substantial cash infusion, but also a deleveraging strategy that is only possible with the tools available in a chapter 11 proceeding." *Wafford Declaration*, p. 10.

22.     Not surprisingly given the views of the Debtors' own advisors, as well as market perspectives generally, significant creditors also came to believe that a chapter 11 bankruptcy was inevitable.  The Debtors thus resolved to commence these Bankruptcy Cases without belief in their ability to survive without the cooperation and support of its first lien secured lenders (the "First Lien Lenders") – support which the Debtors knew would come at significant cost.

**C.**     **_The Bankruptcy Proceedings and Approval of the DIP Financing_**

23.     The Debtors entered these proceedings then having agreed to a Restructuring Support Agreement ("RSA") that reflects the Debtors' pessimism and articulates lender goals that the Debtors were "very focused on and working to achieve."  *Transcript of Hearing* at 29:10-12, *In re J.C. Penney Co., Inc.* No. 20-20182 (Bankr. S.D. Tex. May 15, 2020, Joshua Sussberg speaking) (hereinafter, "First Day Tr.").  The centerpiece of that RSA included a reorganized JCPenney corporate structure "architected by H/2 (one of the First Lien Lenders)" and post-petition financing (the "DIP Loan") from the First Lien Lenders "who would ultimately own" the Debtors.  *Id.* at 29:22-23.  That DIP Loan, which would ultimately be approved by this Court based upon representations of the Debtors and their advisors that have proven to be grossly inaccurate, has dictated the course of these Bankruptcy Cases, has severely handcuffed the Debtors' ability to pursue an exit from bankruptcy, and has further severely hampered the ability of other parties-in-interest to meaningfully participate in these Bankruptcy Cases.

24.     In multiple hearings beginning on the First Day Hearing and continuing through the June 4, 2020 final hearing to consider the Debtors' DIP Loan motion (the "Final DIP Loan Hearing"), the Debtors stressed two points arguing an urgent need for immediate approval of the

DIP Loan.  First, the Debtors' projected that, without access to the DIP Loan, the Debtors would "run out of money in late August." *Transcript of Hearing* at 56:4-7, *In re J.C. Penney Co., Inc.* No. 20-20182 (Bankr. S.D. Tex. June 4, 2020, Mesterharm direct examination) (hereinafter, "Final DIP Loan Hearing Tr."). Second, noting a need for speed in these Bankruptcy Cases – a concern echoed by this Court – the Debtors have routinely argued that the DIP Loan was necessary to ensure the continued cooperation and support of the First Lien Lenders. *See, e.g., Transcript of Hearing at* 8:23-9:03, *In re J.C. Penney Co., Inc.* No. 20-20182 (Bankr. S.D. Tex. June 2, 2020) (Sussberg speaking), *Final DIP Loan Hearing Tr.* at 22:06-13 (Sussberg speaking). Unfortunately, time has shown that the Debtors' rationale mistakenly relied upon too little faith in JCPenney's ability to perform and too much faith in the First Lien Lenders' desire to rapidly exit bankruptcy.

       i.   *No Success Too Good to Dent the Debtors' Pessimism*

25.   On the Petition Date, the Debtors held approximately $475 million in cash available to "be used to fund operations, pay for employees, and administer these [Bankruptcy Cases]." *First Day Tr.* at 28:09-12 (Sussberg speaking). Citing the devastating effects of the COVID-19 pandemic, however, the Debtors projected that this cash would run out by mid-July absent approval of the DIP Loan. *See Interim Order (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* [ECF # 108], Annex 1:  Budget, p. 58 (the "Interim Budget").

26.   The Debtors exceeded expectations and projections out of the gate – performing "better than expected, opening more stores quicker, and having some strong [sales]." *Final DIP Loan Hearing Tr.* at 54:01-04 (Mesterharm testimony). By the date of the Final DIP Loan Hearing,

the Debtors had accumulated approximately $537 million in available cash prior to receiving the first DIP Loan draw – exceeding initial projections by more than $140 million.  *Id*. at 54:11-14.

27.       Nevertheless, the Debtors remained conservative in their outlook – positing that a portion of the $140 million in extra cash was nothing more than a temporary anomaly related to the timing of certain payments and expressing continued concerns regarding the COVID-19 effect and civil unrest.  *Id*. at 54:03-04, 59:05-10.  As a result, the Debtors continued to project a liquidity shortfall – now occurring in late August – unless the Debtors received the DIP Loan.

28.       Time, however, would again prove such pessimism to be ill-founded, as the Debtors have consistently exceeded projections.  The Debtors' overly conservative projections have not just proven to be slightly wrong; they have been significantly wrong – to the positive – on a consistent basis.  In fact, as of August 1, 2020, the Debtors' Net Cash Flow exceeded its Interim Budget projection by 229.4% and the Debtors had accumulated $721 million more in short-term investment funds than projected.

29.       Yet, despite JCPenney's continued better-than-projected performance, the Debtors' advisors continue to paint an overly bleak outlook and subsequent budgets have seemingly failed to reflect the Debtors' faster and stronger than expected recovery.  This continued pessimism, which is reflected in downwardly adjusted end-of-budget projections in more recent budgets, effectively conceals the Debtors' successes in implementing the Plan for Renewal and significantly undervalues the Debtors' business.  For example:

- the Debtors' projected Net Cash Flow for the Aug. 8 through Oct. 3 period has been adjusted downward from the Interim Budget by 33% or $175M, primarily due to unfavorable variances for Operating Disbursements;

- despite outperforming Interim Budget projections for total collections through Aug 1 by 42.5%, subsequent budgets have kept end of budget collections projections relatively flat -- only increasing projections by 8.3%; and

- despite accumulating $721 million more in Book Cash than projected in the Interim Budget through July 31, recent budgets project an increase of ending Book Cash of only $421 million over the Interim Budget ending Book Cash projections.[4]

30.     The severity of this gross undervaluation of the Debtors' business is most apparent when viewing the Debtors' projections related to available cash:



As shown in the chart above, as of July 18, 2020, the Debtors' total available cash exceeded the June 4, 2020 projections by approximately $400 million (and exceeded the projections in the Interim Cash Budget by over half a billion dollars). As of mid-August, just shortly before the Debtors' advisors predicted a liquidity crisis, the Debtors' have instead amassed over $1.25 billion of cash. Further, they have not once during these Bankruptcy Cases faced a financial need remotely justifying the DIP Loan.

---

[4] In fact, based upon this most recent budget, the Debtors' cash on hand will decrease by approximately $520 million between now and October 3, 2020.

ii.     *The First Lien Lenders Continue to Move the Goalposts*

31.     As the Debtors repeatedly outperformed projections, the justification for the onerous DIP Loan has morphed.  While still noting the uncertainty of the times and promoting an overall negative outlook, the Debtors' advisors have emphasized the importance of the DIP Loan – and its related Milestones and other performance requirements – to obtaining the cooperation and support of the First Lien Lenders and the hopes of reaching a consensual reorganization. Unfortunately, despite the Debtors' better-than-expected performance and having eagerly complied with each of the First Lien Lenders' increasing demands, the goalposts continue to be reset in these Bankruptcy Cases.  This shifting narrative in the face of seemingly ever-shifting objectives is well-illustrated through an examination of the Debtors' comments related to the second tranche of DIP Loan financing.

32.     Prior to the Final DIP Loan Hearing, the UCC objected to the dual-tranche structure of the DIP Loan – noting that the promise to extend the second tranche was illusory given the requirement that the First Lien Lenders must approve the Debtors' Business Plan prior to making the second advance.  Given that approval of the Business Plan was left to the sole discretion of the First Lien Lenders, the UCC rightfully feared the opportunity for skullduggery.

33.     In response, the Debtors assured this Court that the UCC's fears were unwarranted. In fact, the Debtors alleged that the two tranche structure benefited the Debtors' estates because the second draw (and accompanying roll-up) would be avoided in the event the Debtors' liquidity position exceeded expectations.  *Final DIP Loan Hearing Tr.* at 17:06-10 (Sussberg speaking) ("And [the structure is] important because it circles back to the comments I made on liquidity. And Mr. Wafford, who I know is on the line, is laser focused on building liquidity so that we can be in a position to make a determination as to whether or not we want to access the capital, no matter

the circumstances we find ourselves in."); *Id.* at 61:23-62:02 (Mesterharm testimony) ("Number one, if we are finding ourselves in a position where performance is better than expected, and it would show that we don't necessarily need to draw that money, we'll have the option not to draw that money, not incur the rollup associated with it.").

34.     Yet, on July 1, 2020, despite it becoming abundantly clear that the Debtors simply did not need to make the second draw, counsel for the Debtors advised this Court that doing so would likely be necessary to ensure that negotiations related to the Debtors' proposed Business Plan proceeded smoothly.  *Transcript of Hearing* at 17:03-18-07, *In re J.C. Penney Co., Inc.* No. 20-20182 (Bankr. S.D. Tex. July 1, 2020) (Sussberg speaking).  While disappointing, this result was not unexpected, as the Debtors had routinely represented to this Court that the importance of reaching an agreement with the First Lien Lenders regarding the Business Plan by the July 15, 2020 Milestone could not be overstated.  *First Day Hearing Tr.* at 33:22-24 (Sussberg speaking ) ("And again, the key, Your Honor, all centers around the July 15th period of time, 60 days from now."); *Transcript of Status Conference* at 17:14-21, *In re J.C. Penney Co., Inc.* No. 20-20182 (Bankr. S.D. Tex. May 28, 2020) (Sussberg speaking) ("Of course, everything circles around July 14th, and we talked about the 60-day period of time to both pursue the standalone plan, as well as the market test. That is the major milestone. That is the major focus. Everything else – and while details matter, are just details. We are focused on getting to July 14th and having a conclusion, and I think everybody in the case has been sensitized to that July 14th bulls-eye."); *Transcript of Hearing* at 17:15-16, *In re J.C. Penney Co., Inc.* No. 20-20182 (Bankr. S.D. Tex. June 11, 2020, 2020) (Ms. Yenamandra speaking) ("July 15th is a bit of a magical date in this case.").

35.     As foreshadowed by Mr. Sussberg, the Debtors did in fact request the second draw despite a demonstrated lack of financial need.[5]  Further, the Debtors delivered the Business Plan on July 8, 2020 in compliance with the terms of the RSA and DIP Loan.  Yet, despite the Debtors' eagerness to appease the First Lien Lenders, to date the Business Plan has not been approved. Instead, the First Lien Lenders' deadline has now been twice extended – with each extension accompanied by further concessions to the First Lien Lenders in the form of conditions precedent to the corresponding Milestone extension.

36.     More disturbingly, while the purported basis for such extensions is to allow for further negotiations related to the Business Plan, it has become apparent that the First Lien Lenders are simply stalling.  At the Final DIP Loan Hearing, the Debtors' investment banking advisor, David Kurtz testified that the Debtors and the First Lien Lenders had "largely reached agreement" regarding the fundamental terms of the Business Plan.  *Final DIP Hearing Tr.* at 119:15-25 (Kurtz testimony).  And, consistent with this projection, during the intervening time, no material modifications have been made to the Business Plan first proposed by the Debtors on July 8, 2020.

37.     In fact, during a recent status update, the Debtors recently seemingly admitted that what was described as the single most important deadline – the decision point allegedly driving all potential paths forward in these Bankruptcy Cases, was nothing more than a sophisticated ploy of misdirection.

---

[5] Perplexingly, the Debtors still cannot access these funds today even if they needed to do so.  Pursuant to the terms of the DIP Loan, the second tranche of funds, if requested, are required to be held in escrow pending the First Lien Lenders' approval of the Business Plan.







**D.** *Lack of Transparency is Undermining the Bankruptcy Process*

38.     Whether such misdirection was intentional or simply evidence of the Debtors' self-perceived inability to control the direction of these Bankruptcy Cases, the result is a process that lacks transparency and credibility.  The most significant document in these Bankruptcy Cases – the Business Plan – has been released solely on a confidential basis to a limited distribution that includes lenders, potential bidders, and professionals, but has not been made available to the general stakeholders or committee members.  Thus, instead of the transparency and disclosure required in bankruptcy cases, the Debtors have to date delivered only that which everyone agrees cannot be afforded in these Bankruptcy Cases – delay.

39.     As has become clear, this delay is designed to facilitate a sale process that will solely benefit the Debtors' First Lien Lenders and no other constituency in these Bankruptcy Cases.  Moreover, the Debtors' lack of disclosure presents a number of issues that will result in an

16

inefficient market that, consistent with the pessimistic tone of the Debtors' advisors, will severely undervalue the Debtors' business:

> *First*:      The Debtors have represented to this Court and the public that an agreement on a Business Plan would be announced, and the failure to make such announcement and disclose the material terms, including if appropriate a statement that the Plan for Renewal would be the go-forward plan, sends a negative message to the market, with the obvious inference that the Plan for Renewal is NOT representative of an agreed plan.  Negative market perceptions translate to negative impacts on value.  A result favorable to the First Lien Lenders, but detrimental to the remainder of the Debtors' stakeholders.

> *Second*:      Potential bids received to date reflect "fire-sale" pricing, not going concern value, and do not come close to providing the type of return that stakeholders should reasonably expect in these Bankruptcy Cases.  Management has done an excellent job implementing the Plan for Renewal under unbelievably dire circumstances and the accumulated cash-horde during these Bankruptcy Cases is a testament to their better than credited execution.  The fire-sale bids fail to reflect such success and demonstrate only that value sufficient to appease the First Lien Lenders.  Public disclosure of the Business Plan – already provided to potential bidders – would allow a fuller, more transparent evaluation of any proposed sale or alternative restructuring.

> *Third*:      Public policy favors disclosure of the Business Plan.  JCPenney is a public company with billions of dollars of traded capital.  Stakeholders should be able to make decisions based on management's direction and disclosures.  The Business Plan should be released to the public in the same basic form as the Plan for Renewal.  That plan revealed a company returning to historic EBITDA levels (page 197), poor assets being shed, and expenses cut.  It also revealed an online business with FY2019 sales of $1.5B growing to $2.3B in 3 years.  Public disclosure will instill significant confidence in the market and provide transparency to stakeholders, which should be a further enhancement to value.

> *Fourth*:      The Plan for Renewal, and other reporting, reveal much about valuation, which has not been reflected in the meager bids received to date, including:

> > - $1.2B in cash, expected to continue to accrete ($1B per the Debtor's 7/29 hearing exhibits, plus other cash and escrow estimates)

> > - $2B in inventory (July 25th weekly borrowing base; May 18th 8k, p. 224)

> > - $3.7B in real estate value (ECF # 513-1; Cushman appraisal disclosed in May 18th 8k, p. 236, which did not include at least

1 owned store and over 100 leased locations that could increase value further)

- More than $3B going concern value of the enterprise, including just the e-commerce platform ($1.54B in annual revenue at a conservative multiple of 1.1x equates to $1.7B of potential value) and credit card portfolio ($300MM in annual credit income at a multiple of 5x equates to $1.5B of value), without regard to the overall enterprise including private label brands, and IP (traditionally valued by DCF and comparable peer company analysis); and

- The Debtors' original bankruptcy petition stated assets of $8.6B, and debts of $8B.

40.    Most significantly, given the early pessimistic statements from the Debtors and the extraordinary relief obtained by the First Lien Lenders, the lack of process transparency creates that feeds upon existing market discomfort and negatively impacts the Debtors' options in a manner that is divorced from the Debtors' actual performance.

## IV.    RELIF REQUESTED

41.    By this Motion, the Ad Hoc Equity Committee seeks entry of an order by this Court recognizing and appointing the members of the Ad Hoc Equity Committee as an official committee pursuant to § 1102(a)(2) of the Bankruptcy Code.

## V.    ARGUMENT AND AUTHORITY

### A.    *The Applicable Standard*

42.    Bankruptcy Code § 1102(a)(2) provides that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to ensure adequate representation of creditors or of equity security holders." 11 U.S.C. § 1102(a)(2). "The United States trustee shall appoint any such committee." *Id.*

43.    While the Bankruptcy Code allows for the appointment of an equity committee pursuant to § 1102(a)(2), the Bankruptcy Code does not define "adequate representation," and a

bankruptcy court "retains the discretion to appoint an equity committee based on the facts of each case." *In re Sunedison, Inc.*, 556 B.R. 94, 102 (Bankr. S.D.N.Y. 2016) (quoting *Williams*, 281 B.R. at 220); accord *Johns-Manville Corp.*, 68 B.R. at 159; *In re Beker Indus.*, 55 B.R. 945, 948 (Bankr. S.D.N.Y. 1985).  In determining whether to appoint an equity committee, courts typically consider the following factors:

>  (i) whether a debtor is likely to prove solvent;

>  (ii) whether equity is adequately represented by stakeholders already at the table;

>  (iii) the complexity of a debtor's case; and

>  (iv) the likely cost to a debtor's estate of an equity committee.

*In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216 (Bankr. N.D. Tex. 2009) (citing *In re Williams Commc'ns. Group, Inc.*, 281 B.R. 216 (Bankr. S.D.N.Y. 2002)); *Albero v. Johns-Manville Corp.*, 68 B.R. 155 (S.D.N.Y. 1986), appeal dismissed 824 F.2d 176 (2d Cir. 1987); *In re Kalvar Microfilm*, 195 B.R. 599 (Bankr. D. Del. 1996); *In re Wang Lab., Inc.*, 149 B.R. 1 (Bankr. D. Mass. 1992)).

44.     Additionally, this Court has stated a fifth catch-all consideration of "whether [an appointment of an equity committee] is going to add something to the case."  *In re Sandridge Energy, Inc. et al.,* Case No. 16-32488 (Bankr. S.D. Tex.) (Aug. 1, 2016 Hr'g Tr. at 94 [ECF # 686]).

**B.**     **_The Ad Hoc Committee Should be Recognized as an Official Committee_**

45.     Applying these factors in the Debtors' Bankruptcy Cases, recognition of the Ad Hoc Equity Committee as an official committee pursuant to Bankruptcy Code § 1102 is appropriate.  As set forth below: (i) the Debtors are not hopelessly insolvent; (ii) the interest of shareholders is not adequately represented by the Debtors or the UCC; (iii) the Bankruptcy Cases are sufficiently complex; and (iv) the potential cost to the estate is outweighed by the benefits of

appointing an equity committee.  Moreover, recognizing the Ad Hoc Equity Committee as an official committee will legitimize the efforts of the Ad Hoc Equity Committee and provide greater transparency in these Bankruptcy Cases.

        i.    *The Debtors Are Not Hopelessly Insolvent*

46.     While not expressly stated in the case law, the solvency of a debtor is the most heavily litigated and weighted factor a court considers when making the determination to appoint an equity committee.[6]  The question of solvency is intertwined with the concept of adequate representation because it defines the extent of the interests that require adequate representation.  *In re Sunedison, Inc.*, 556 B.R. 94, 102 (Bankr. S.D.N.Y. 2016).

47.     "If the debtor is solvent or appears to be solvent, the concern is that a creditors' committee will negotiate a plan based on a conservative estimate of the debtor's worth that captures all of the value of the reorganized entity, including value possibly in excess of the unsecured claims, through the issuance of new stock to the creditors at the expense of old equity whose shares will be cancelled."  *Sunedison*, 556 B.R. at 102-03 (citing *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 219 (Bankr. N.D. Tex. 2009) (equity is as optimistic as creditors are pessimistic in valuing the debtor)).  "Conversely, the stockholders of a 'hopelessly insolvent' estate have no economic interest in the case, and under the absolute priority rule, are not entitled to any distribution under a plan absent the consent of the unsecured creditors."  *Sunedison*, 556 B.R. at 102-03 (citations omitted).

---

[6] However, "[n]o one factor is dispositive, and the amount of weight that the court should place on each factor may depend on the circumstances of the particular Chapter 11 case."  *In re Kalvar Microfilm*, 195 B.R. 599, 600-01 (Bankr. D. Del. 1996).

48.     The test for insolvency turns on the comparison between the debtor's debts and the

fair valuation of its property.  11 U.S.C. § 101(32) (internal quotations omitted).  In the bankruptcy

context, however, fair value does not mean fair ***market*** value.

> There are many approaches to valuation, but value "gathers its meaning in a
> particular situation from the purpose for which a valuation is being made."  The
> Supreme Court has held that a reorganized debtor's value should be based upon
> earning capacity. *Consolidated Rock Products Co. v. Du Bois*, 312 U.S. 510, 526,
> 61 S.Ct. 675, 685, 85 L.Ed. 982 (1941) ("The criterion of earning capacity is the
> essential one if the enterprise is to be freed from the heavy hand of past errors,
> miscalculations or disaster, and if the allocation of securities among the various
> claimants is to be fair and equitable.").  As discussed in a leading treatise, this view
> was "not a rejection of the market; rather, this reflected a notion that markets
> undervalued entities in bankruptcy, and that the taint of the proceeding would
> adversely affect what someone would pay."

*In re Exide Techs.*, 303 B.R. 38, 65 (Bankr. D. Del. 2003); *see also, In re Mirant Corp.*, 334 B.R.

800, 833 (N.D. Tex. 2005) ("[T]he court does not accept that what the market would demand for

investment in Mirant Group is equivalent to what the [Bankruptcy] Code commands creditors are

entitled to."); *In re Pilgrim's Pride Corp.*, 407 B.R. 211, 216-17 (Bankr. N.D. Tex. 2009) ("The

value of Debtors will ultimately be determined based on their ability to generate cash flow.")

(citing *Protective Comm. v. Anderson*, 390 U.S. 414, 442, 88 S. Ct. 1157, 20 L. Ed. 2d 1 (1968)).

49.     Moreover, valuation evidence regarding debtors, especially early in a bankruptcy

case, may be particularly untrustworthy and subject to manipulation.  *See, e.g., In re Mirant Corp.*,

334 B.R. at 820, 848  (noting that a court should exercise caution in establishing a range of values

given the "'soft'" nature of the evidence and observing that "[a]t best, the valuation [in complex

restructuring cases] is an exercise in educated guesswork.  At worst it is not much more than crystal

ball gazing"); *see also* Diane Lourdes Dick, *Valuation in Chapter 11 Bankruptcy:  The Dangers

of an Implicit Market Test*, 2017 U. Ill. L. Rev. 1487, 1495 (2017) (noting that, as a result of

numerous assumptions, qualifications, exclusions, and caveats, most debtor valuations set forth in

required financial disclosures are "essentially meaningless").

50.     As a result, then, the Court need not conduct an exhaustive valuation; rather, the relevant inquiry is whether a debtor appears to be "hopelessly insolvent." *Sunedison*, 556 B.R. at 103 (*citing Eastman Kodak*, 2012 Bankr. LEXIS 2944, 2012 WL 2501071, at *3); *see also Pilgrim's Pride*, 407 B.R. at 217 n. 14; ("[A]ppointment of an equity committee should be denied in cases where there is *no doubt* about the debtor's insolvency."); Diane Lourdes Dick, *Grassroots Shareholder Activism in Large Commercial Bankruptcies*, 40 J. Corp. L. 1, p. 50 (2015) (suggesting that, in order to ensure procedural fairness, courts should appoint an equity committee unless a debtor (or other party opposing such appointment) can show that a debtor is hopelessly insolvent).

51.     In the context of a request to appoint an equity committee, the Court may determine whether a debtor is hopelessly insolvent by examining a variety of factors including the debtor's schedules, public filings with the SEC, monthly operating reports, and a debtor's ability to generate cash flow. *See Pilgrim's Pride*, 407 B.R at 216-17.  In *Pilgrim's Pride*, the court acknowledged that, because the debtors were still in the process of preparing their business plan for the next five years, the court was not able to determine the debtors' going concern value based upon expected future earnings. *See id*.  The court, thus, looked to the debtors' schedules and public filings with the SEC as well as United States Trustee' monthly operating reports to deduce the debtor's value. *See id*.  Relying on the testimony of professionals and analyzing the debtors' public reporting, the court found that the debtors were likely solvent. *See id.*, at 217.

52.     Moreover, the Court must keep in mind the purpose of the judicial valuation being conducted – evaluation of the potential for recovery under the requirements of the Bankruptcy Code.  For example, in *In re Corma Healthcare Corp.*, an equity committee was appointed despite the fact that a liquidation analysis offered by the chapter 11 trustee demonstrated that the debtors'

liquidation value (approximately $134 million) did not exceed the amount of its outstanding debt (at least $ 300 million). *In re Coram Healthcare Corp.*, 315 B.R. 321, 345 (Bankr. D. Del. 2004). The court, however, focused upon confirmation value ($317 million) because the debtors were reorganizing instead of liquidating. *Id.* Finding that the reorganization value indicated sufficient value to support equity interest holders' claims, the court approved appointment of an equity committee. *Id.*

53.    Here, notwithstanding the Debtors' dire narrative, JCPenney's SEC filings and other public reporting reveal significant indicia of value available for equity, including:

- $1.2B in cash as of July 31, 2020, expected to continue to accrete;

- $2B in inventory;

- $3.7B in real estate value;

- More than $3B going concern value of the enterprise, including just the e-commerce platform ($1.54B in annual revenue at a conservative market multiple of 1.1x equates to $1.7B of potential value) and credit card portfolio ($300MM in annual credit income at a market multiple of 5x equates to $1.5B of value), without regard to the overall enterprise including private label brands, and IP (traditionally valued by DCF and comparable peer company analysis); *see* **Exhibit B**;

- The Debtors' original bankruptcy petition stated assets of $8.6B, and debts of $8B; and

- The 10-Q filed by the Debtors on July 21, 2020 state assets of $8.2B, liabilities of $7.9B, and equity of almost $350MM.

Looking beyond potential confirmation, the cash flow stream depicted in the Plan for Renewal shows a company recovering and returning to its core customers and brands that should generate significant cash flow.  The value of this cash flow could be substantial especially since it includes, as noted above, $1.5B of annual online business, which is growing, and approximately $300MM of annual credit card revenue, in addition to stated plans to cut $1B of SG&A expense.

54.     Using the Debtors' own publicly-filed, *current* financial reports and projections, then, the estimated going concern value of the Debtors' business exceeds $10B and an orderly liquidation of the assets should result in approximately $8.4B in value.  Under either scenario, significant value is available for equity.

55.     Further, contrary to early representations, the Debtors have demonstrated an ability to generate sufficient cash flow under extreme circumstances far beyond that projected by the Debtors' advisors.  In fact, the Debtors exceeded initial Net Cash Flow projections by 229.4% and have accumulated $721 million more in short-term investment funds than expected.  This better-than-projected performance validates the projections set forth in the Plan for Renewal and that continued strength further supports a more robust going concern value than has been represented by the Debtors and their advisors in these Bankruptcy Cases.

56.     Ultimately, an analysis of the Debtors' SEC filings and other publicly available financial information, including the Plan for Renewal and financial reporting provided in these Bankruptcy Cases, indicates that the Debtors are far from hopelessly insolvent.  Employing traditional valuation methodologies and relying on market-based data and assumptions, the Ad Hoc Equity Committee's professionals performed three (3) valuation calculations summarized below (*see* **Exhibit B** for notes and additional detail):

| Discounted Cash Flow Analysis | | | Orderly Liquidation Analysis | | |
|---|---|---|---|---|---|
| Enterprise Value - Perpetuity Method | $ | 13,022 | Fair Market Value of Assets | $ | 8,412 |
| Enterprise Value - EBITDA Multiple | $ | 7,109 | DIP Loan | $ | 450 |
| **Weighted Avg of above Methods** | **$** | **10,066** | Secured Debt | | 3,601 |
| | | | Unsecured Funded Debt | | 1,318 |
| Estimate of Going Concern Value | $ | 10,066 | Value Available for Trade Liabilities | $ | 3,043 |
| DIP Loan | $ | 450 | Trade Liabilities | | 1,750 |
| Secured Debt | $ | 3,601 | Estimated Restructuring and Exit Costs | | 424 |
| Unsecured Funded Debt | $ | 1,318 | **Value Available for Equity** | **$** | **869** |
| Value Available for Trade Liabilities | $ | 4,696 | | | |
| Trade Liabilities | $ | 1,750 | | | |
| Estimated Restructuring and Exit Costs | $ | 424 | | | |
| **Value Available for Equity** | **$** | **2,522** | | | |

57.    Each calculation demonstrates an enterprise value for JCPenney in excess of not only the First Lien Lenders' debt, but in excess of the amount of ***all*** funded debt, clearly sufficient to ensure a full recovery to unsecured creditors, and finally, sufficient to demonstrate that JCPenney was not hopelessly insolvent on the Petition Date, nor today, and has value sufficient to provide a recovery to equity participants.

      *ii.    Adequately Represented by Stakeholders*

58.    Next, the Court must determine whether equity interests are "adequately represented" in these Bankruptcy Cases by interested parties.  The inquiry requires an examination of existing parties that may be "wearing too many hats" to effectively represent equity interests.  For example, while management is traditionally viewed as representing shareholders' interest, in a chapter 11 case, fiduciary duties may shift to creditors rather than equity – creating an inherent conflict.  *Pilgrim's Pride*, 407 B.R. at 218.  Thus, the *Pilgrim's Pride* court cautioned to not confuse management's duty to maximize estate value with adequate representation of equity.  *Pilgrim's Pride*, 407 B.R. at 218.  The dynamics of chapter 11 are such that a debtor and its management are likely to be constrained to accept and advocate to the court a conservative value for its business in order to obtain creditor assent to a reorganization plan.  *See id*. 407 B.R at 218-

19 ("While it is unquestionably true that a debtor's officers and directors have a duty to maximize a debtor's estate to the benefit of shareholders as well as creditors . . . , the reorganization process is not so simple that that ensures shareholders are adequately represented by even equity owning management.").

59.     For example, in these Bankruptcy Cases, the Debtors, unfortunately, appear to be held captive by a narrative designed to justify the onerous RSA and DIP Loan deals entered into when JCPenney and markets were at the height of unknowns, and under extreme duress.  That narrative includes an overly pessimistic view of value not supported by the Debtors' public statements made outside of these Bankruptcy Cases or the Debtors' actual performance since filing their petitions for relief.

60.     Alternatively, parties opposing the appointment of an equity committee often argue that an unsecured creditors' committee is sufficient.  Yet, as noted above, the goal of maximizing the value of the estate should not be conflated with adequate representation for equity.  Here, the Debtors' narrative supporting the First Lien Lenders' recovery is so far divorced from reality that the UCC simply cannot be expected to fight beyond their own interests.  Further, the UCC has been demonstrably pessimistic, which is not necessarily unexpected given the treatment and recoveries realized or proposed in other retail cases of late.  JCPenney, however, is not representative of other retailers, as the Debtors have acknowledged.  The UCC does not have the fresh and objective perspective of stakeholders evaluating equity value, and loss of significant value in other retail cases is reasonably likely to taint the perspective of the UCC in these Bankruptcy Cases.

61.     In fact, the awkward position faced by unsecured creditors is evidenced by the UCC's initial concerns that the Debtors' projections were not pessimistic enough and that the

onerous DIP Loan would be too little too late.  Rather than argue that the Debtors, supported by management, were grossly undervaluing their own abilities, the UCC hedged in the opposite direction – warning of a potentially imminent collapse of the Debtors' business.

62.      Just as it is clear now that the Debtors' narrative does not serve the interest of equity interest holders, the same is readily apparent as to the UCC.  The passage of time has demonstrated that the DIP Loan was not needed and, indeed, has not been and will not be drawn against.  Stronger than expected performance and successful going-out-of-business sales have not only sustained JCPenney through any short-term liquidity issues resulting from COVID-19 disruptions, but have also highlighted that the interests and concerns of the UCC are not just incompatible with those of equity, there are certain challenges to a debtor that are naturally better suited to equity interests. *See, e.g., In re Energy XXI Ltd.*, No. 16-31928, Hr'g Tr at 164:9 (Bankr. S.D. Tex. June 15, 2016) (noting that no party other than equity could meaningfully challenge the Debtors' own valuation assumptions).

63.      Accordingly, this Court should analyze the tension between debtor's management, the UCC and the First Lien Lenders to determine whether parties have an interest in utilizing conservative valuation estimates to the point of being prejudicial against existing equity.  These factors – inconsistent statements from management regarding value and performance combined with an extremely aggressive First Lien Lender – are obviously present in these Bankruptcy Cases. As a result, neither the Debtors nor the UCC can be expected to adequately represent the interest of shareholders.  In these Bankruptcy Cases, then adequate representation of equity's concerns requires appointment of an official equity committee.

     *iii.*    <u>*Case Complexity*</u>

64.    Courts have analyzed this factor on a case by case basis and have provided little guidance as to what cases are "complex enough" to warrant the appointment of an equity committee. That said, appointment of an [equity committee] is more appropriate where the complexities of the case make it more difficult for another [management] to protect equity interests as well as those of creditors. *Pilgrim's Pride,* 407 B.R. at 220. In *Pilgrim's Pride* for example, the court found that "the difficulties of valuing [the debtor] would . . . severely complicate for any single fiduciary performance of the two tasks of determining fair treatment of creditors and advocating the entitlement of equity to participation in the reorganized debtors." *Id.*, 407 B.R. at 221.

65.    Here, not only are the Debtors' pre-petition operations complex in magnitude and structure, but truly unique conditions related to COVID-19, the handcuffs imposed by the RSA and its terms, together with the now seemingly shifting endgame that includes a watershed transformation of JCPenney's corporate structure are complex beyond the reasonable comprehension of the average investor. As a result, the appointment of an equity committee is necessary.

     *iv.*    <u>*Cost to Debtors' Estate*</u>

66.    The last of the usual four-factor test considered by courts when deciding whether to appoint an equity committee is the potential cost to the debtor's estate. Adding an equity committee complete with counsel and advisors does add an additional layer of cost to the estate. Such costs also bear upon the adequacy of representation. For example, the *Pilgrim's Pride* court found that the cost disputing value and capital structure with a creditors' committee and secured

lenders is likely to be too great to be borne other than by a statutory fiduciary paid by the estate. *Pilgrim's Pride*, 407 B.R at 218.

67.     Thus, courts should balance whether the debtor's bankruptcy estate should bear the cost of such representation against the fact that "shareholders may still be heard individually or as one or more ad hoc committees because they are parties in interest in the case, 11 U.S.C. § 1109(b), and may recover some or all of their professional fees and expenses if they make a substantial contribution in the case." 11 U.S.C. § 503(b)(3)(D). *Sunedison*, 556 B.R. 105.

68.     While costs do play a factor in determining whether to appoint an equity committee, the U.S. Trustee and this Court have oversight of professional fees incurred and paid, and act as a check against any unreasonable fees and expenses that might be incurred.  The Ad Hoc Equity Committee professionals were selected in part due to their respective abilities to deliver services at rates that will not unduly burden these estates.  Indeed, when considering the already significant amounts budgeted for estate professionals, the expected costs incurred by an official equity committee in these Bankruptcy Cases will not be significant.

>    v.     *An Official Equity Committee Will Add Transparency and Legitimacy*

69.     In her article, *Grassroots Shareholder Activism in Large Commercial Bankruptcies*, Professor Diane Lourdes Dick related the following summary of shareholder sentiment following the Eastman Kodak Company bankruptcy proceedings:

>    In early 2013, a group of similarly situated individuals gathered to discuss how they could defend themselves against a grave potential injustice. Time was of the essence, so they would need to act quickly to preserve their rights. Fortunately, their path to justice was already paved: the matter was pending in federal court, and each had standing to appear and be heard.  But frustratingly, this seemingly well-paved path was barred to them.  These individuals, who were technically parties to the proceeding, were virtually invisible to the court and largely disenfranchised in settlement negotiations.  Striving to overcome these obstacles, they persisted in their efforts to unite and gain a collective voice in the proceedings.  Throughout the summer, the group organized meetings, events and actions; they penned heartfelt

letters to the judge and entered dozens of documents on the case docket. But despite these efforts, the court denied their requests for formal representation in the case and, shortly thereafter, approved a settlement that terminated their interests. Meanwhile, evidence surfaced to confirm their worst fears: others stood to profit handsomely from the settlement. Needless to say, these events have left a profoundly negative impression on these individuals. They believe that the legal system not only failed to protect their most basic procedural and substantive rights, but in fact served as an instrument of economic inequality and social injustice. These individuals were common shareholders of the iconic, publicly traded Eastman Kodak Company during its Chapter 11 bankruptcy reorganization. Many lost their life savings; all lost their trust in the U.S. financial markets and courts of law.

Diane Lourdes Dick, *Grassroots Shareholder Activism in Large Commercial Bankruptcies*, 40 J. Corp. L. 1, p. 1-2 (2015). The story related by Professor Dick is eerily similar to anyone following these Bankruptcy Cases.

70.     Specifically, a collection of grassroots shareholder activists organized around the belief that today's commercial debtors are not necessarily insolvent such that the restructuring process ought to presumptively exclude equity owners; rather, they believed that the applicable large corporate debtors were able to creatively shield substantial economic wealth and use it to reward preferred corporate stakeholders. *Id*. at p. 5. Notably, in both cases (and others similar thereto), these activist shareholders:

are not part of the economic elite or the so-called one percent. They are working- and middle-class persons who invested their life savings in the stock market through retail brokerages or employer-sponsored retirement accounts. And, while they clearly possess courage and conviction to intervene in the federal bankruptcy proceedings of America's largest corporations, these shareholders are not affluent persons with great influence. Rather, they are ordinary people who recognize that they are disenfranchised but refuse to be silenced; they hope that their collective efforts will augment their individual voices.

*Id.*

71.     Like here, the ad hoc group of shareholders organized to present to the court a mounting case illustrating that Kodak's in-court statements of poverty did not quite match up to the statements presented to shareholders in public SEC filings. *Id*. at 15. Ultimately, and

thankfully quite differently than has transpired in these Bankruptcy Cases so far, the *Kodak* court (along with the debtors and other parties-in-interest) showed some frustration towards shareholders, failing to acknowledge the considerable obstacles and structural unfairness overcome by the movants, such as reimbursement of costs, the court roundly criticized them for not putting forth a more thorough valuation case.  *Id.*  at 27.  The court was thus unreceptive to the shareholders' experts, referring to them as "witnesses purported to be experts" and repeatedly comparing them to the debtor's more prominent professional advisors who were securely reimbursed from the bankruptcy estate.  *Id*.  Finally, the court subjected the shareholders' arguments to extreme reductionism, essentially characterizing them as disgruntled conspiracy theorists: "Other than the unsupported hypothesis that Kodak, Kodak's professional advisors, the Creditors' Committee, and the Committee's professional advisors are all not to be trusted, the Shareholders provided no reason whatsoever for disregarding Kodak's publicly filed financial statements and projections."  *Id*.

72.     The outcome was easily predicted.  No equity committee was appointed, and shareholders were extinguished as part of Kodak's ultimate chapter 11 plan.  The result, however, was more than lamentable – leaving jaded shareholders to not merely shoulder the disappointment of their substantial investment losses and any additional expenses they incurred in their self-advocacy efforts, but to also grapple with their deeply held belief that the legal system failed them. *Id.* at 48.  As Professor Dick has eloquently stated, the fact that individual common shareholders were largely denied meaningful representation and forced to engage in grassroots activism in their final, unsuccessful push to advance their interests reminds us that there are a variety of ways in which bankruptcy law privileges economic efficiency goals at the expense of procedural fairness. *Id.* at 39.

73.     Unlike the shareholders in *Kodak*, however, the efforts of the Ad Hoc Equity Committee have indeed been recognized by this Court.  The very existence of the "official" Ad Hoc Equity Committee provides significant testimony to this Court's willingness to look beyond "economic efficiency goals" and ensure that shareholders were at a minimum provided a ***meaningful*** opportunity to evaluate the bankruptcy process and the Debtors' allegations of insolvency.  Unfortunately, an unofficial committee is simply not enough to satisfy shareholders' concerns regarding ***adequate*** representation – especially in light of the Ad Hoc Equity Committee's preliminary determination of value, concerns regarding UCC conflicts and extreme pessimism from the onset, and the demonstrated handcuffs that have been put on the Debtors by the First Lien Lenders.  And, more simply, because the designation of an official committee often directly translates into significant negotiating power not possessed by an ad hoc group and is outcome determinative as to shareholders' recovery.  *See* Lynn M. LoPucki & William C. Whitford, *Corporate Governance in the Bankruptcy Reorganization of Large, Publicly Held Companies*, 141 U. PA. L. REV. 669, 709 (1993) (detailing a comprehensive empirical study of commercial bankruptcies under Chapter 11 that revealed, plan proponents successfully negotiated with the official equity committee-meaning that they gained the committee's consensus to the Chapter 11 plan-in 91% of observed cases in which such a committee existed).

74.     Moreover, given the inconsistent statements of the Debtors regarding solvency and cash flow, and the seemingly unreachable and malleable Milestones imposed by the First Lien Lenders, shareholders are understandably concerned regarding the propriety of these Bankruptcy Cases and the actions of management.  Worse, the Debtors' initially hostile response to concerned shareholders along with their dogmatic adherence to the First Lien Lenders' narrative and the general lack of process transparency, undermines the integrity of these Bankruptcy Cases.  Yet,

32

the Debtors' concerns regarding their ability to preserve confidential information is a valid concern. The appointment of an official equity committee then can serve an important role in legitimizing these proceedings.

75. For these reasons, courts have appointed equity committees even when movants were unable to establish a significant probability of recovery to equity. For example, in *In re Oneida Ltd.*, the court appointed an equity committee in a prepackaged chapter 11 where (i) valuation evidence was "extensive and conflicting" and value would ultimately be determined at confirmation; (ii) the proposed plan cancelled old equity; (iii) there was reason to doubt under the facts of the case that the board would pay due regard to the interests of equity; and (iv) it was unlikely that a creditors' committee would challenge the status quo. No. 06-10489 (ALG), 2006 Bankr. LEXIS 780, at *12-3 (Bankr. S.D.N.Y. May 4, 2006). The *Oneida* court emphasized that it was not making a finding of impropriety at any point in the debtors' restructuring, but noted that "a due regard for appearances also warrants the appointment of an equity committee, if only to dispel any implication that, here, a group of creditors took control of the Board of Directors in the first stage of a two-stage restructuring, neutralized the general unsecured creditors and then took for itself the value of the remaining equity." *Id.*

76. Again, in *In re Horsehead Holding Corp.*, the company's pre-petition public filings disclosed sufficient liquidity to carry it through 2016, but the debtors claimed to be cash poor shortly after obtaining bankruptcy protection. No. 16-32488, Hr'g Tr at 100:25-101:1 (Bankr. D. Del. May 2, 2016). The *Horsehead* court appointed an equity committee, but not because there was a substantial likelihood of recovery for the equity holders. Rather, in light of the drastically different pre- and post-petition valuations, it became obvious that "something does not smell right to the court." *Id.*

77.     Next, in *In re Energy XXI Ltd.*, Judge Isgur utilized the "smell test" when expressing concerns between the pre-petition PV-10 valuations of the proven developed producing wells and its post-petition valuation. No. 16-31928, Hr'g Tr at 164:9 (Bankr. S.D. Tex. June 15, 2016) (noting that "[s]omething stinks" and expressing concern that no one would investigate such disparity unless an equity committee was appointed).

78.     Finally, in *In re Breitburn Energy Partners LP*, the court ignored the parties' valuation reports and instead relied upon the impairment analysis set forth in the company's most recent SEC Reports to conclude that the debtors had a $4 billion valuation which was more than the outstanding debt and appointed an equity committee.  No. 16-11390, Hr'g Tr. At 67:17-68:3 (Bankr. S.D.N.Y. Oct. 14, 2016).

## VI.     CONCLUSION

79.     The Debtors are not hopelessly insolvent, there are multiple indications of value and that equity is not "out of the money", and equity has a meaningful interest in the outcome of these Bankruptcy Cases.  Unfortunately, the Debtors are held captive by the onerous RSA and DIP Loan deals they agreed to with powerful creditors when JCPenney and markets were at the height of unknowns, and under extreme duress.  It is clear now, however, that strong performance and successful GOB sales have sustained JCPenney even during these Bankruptcy Cases.

80.     Yet, the probable outcome of these Bankruptcy Cases is being controlled by creditors whose interest stops at the value of their own liens.  Given the pessimism of the Debtors' advisors and the lack of transparency that has resulted from the First Lien Lenders ever shifting expectations, these Bankruptcy Cases – along with the Debtors' hopes of a successful reorganization – are languishing unnecessarily.  As a result, designation of the Ad Hoc Equity Committee as an official equity committee is not only appropriate, but the failure to do so is likely

to be unfair to shareholders who would otherwise not have their voices heard and are not a meaningful part of the process and tenuous negotiations with other constituents in these Bankruptcy Cases.

81.    Under the circumstances of these Bankruptcy Cases, the relief requested herein will provide a check on the Debtors and the First Lien Lenders and will, ultimately, promote transparency and procedural fairness.  With transparency, the market – and, more importantly, the Debtors' stakeholders – can react with true data rather than conjecture and leaked data, and all parties can better assess the potential for recovery.

## VII.    <u>PRAYER</u>

WHEREFORE, the Ad Hoc Equity Committee requests that this Court enter an order recognizing and appointing the members of the Ad Hoc Equity Committee as an official committee pursuant to § 1102 of the Bankruptcy Code, and for such other and further relief as the Court may deem just and proper.

Dated: August 19, 2020.

Respectfully submitted,

**OKIN ADAMS LLP**

By:      /s/ *Matthew S. Okin*
        Matthew S. Okin
        Texas Bar No. 00784695
        mokin@okinadams.com
        David L. Curry, Jr.
        Texas Bar No. 24065107
        dcurry@okinadams.com
        Johnie A. Maraist
        Texas Bar No. 24109505
        jmaraist@okinadams.com
        1113 Vine St., Suite 240
        Houston, Texas 77002
        Tel: 713.228.4100
        Fax: 888.865.2118

**PROPOSED ATTORNEYS FOR THE AD HOC COMMITTEE OF EQUITY INTEREST HOLDERS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on August 19, 2020 via the Court's CM/ECF system to all parties consenting to service through the same.

By:  /s/ *David L. Curry, Jr.*
        David L. Curry, Jr.