## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

ENTERED
09/14/2020

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| J. C. PENNEY COMPANY, INC., *et al.*,[1] | ) Case No. 20-20182 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 1289** and 1399 |

### ORDER (I) AUTHORIZING (A) THE SALE OF CERTAIN OF THE DEBTORS' REAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES AND (B) THE DEBTORS TO ENTER INTO AND PERFORM UNDER THE PURCHASE AGREEMENT AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order") (I) authorizing (a) the private sale of the Property free and clear of liens, claims, and encumbrances, (b) the Debtors to enter into and perform under the Purchase Agreement (as defined herein), and (c) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/JCPenney. The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.

[2]    Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

## I.   Approval of the Sale and Entry into the Purchase Agreement.

1.      In accordance with section 363 of the Bankruptcy Code and Bankruptcy Rule 6004 and as described in the Motion, the Debtors are authorized to sell the Property to the Purchaser in accordance with the terms and conditions set forth in the Purchase Agreement, attached hereto as **Schedule 1** (the "Purchase Agreement").

2.      The Purchase Agreement, together with all annexes, exhibits, and amendments thereto, is hereby approved.

3.      Purchaser is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

4.      The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and is entitled to the protections of section 363(m) of the Bankruptcy Code.

5.      The Purchase Agreement represents a fair and reasonable offer to purchase the Property under the facts and circumstances of these chapter 11 cases.

6.      Approval of the Purchase Agreement and the consummation of the transaction contemplated thereby is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

7.      The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Property prior to, and outside of, a plan of reorganization.

8.      The Debtors are authorized and empowered to take any and all actions necessary or appropriate to:  (a) consummate the sale of the Property to the Purchaser pursuant to and in accordance with the terms and conditions of the Purchase Agreement; (b) close the sale of the Property as contemplated in the Purchase Agreement and this Order (including any customary or immaterial modifications to purchase price); and (c) execute and deliver, perform under, consummate, implement, and close fully the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the sale of the Property, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and such other ancillary documents.

## II.     Transfer of the Property.

9.      The Debtors are authorized to sell the Property free and clear of liens, claims, and encumbrances against the Debtors or their estates, because one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.

10.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the sale of the Property under the terms and conditions set forth in the Purchase Agreement shall be free and clear of any and all liens, claims, encumbrances, and other interests of any kind or nature whatsoever; *provided* that any such liens, claims, encumbrances, and other interests shall attach to the proceeds of the sale with the same validity, in the amount, with the same priority as, and to the same extent that any such liens, claims, and encumbrances have with respect to the Property, subject to any claims and defenses that the Debtors may possess with respect thereto; *provided*, *further*, that such

sale shall not be free and clear of any reciprocal easement agreements. Any such interests shall be transferred and attached to the proceeds of the sale with the same validity and priority, and subject to the same defenses that such liens had against the Property immediately prior to the closing.

11. All persons and entities holding liens or interests in the Property arising under, out of, in connection with, or in any way relating to the Debtors, the Property or the transfer of the Property to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser or its successors or assigns, its property or the Property, such persons' or entities' liens or interests in and to the Property.

12. Notwithstanding any provision of the Purchase Agreement to the contrary, after the closing of the sale of the Property, the Debtors shall have no further liability with respect to the Property, and any claims, whether administrative or otherwise, relating to or arising from the Property after the closing of the sale and transfer of possession of the Property that are asserted against the Debtors shall be deemed disallowed.

13. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of the liens and other encumbrances of record.

14. If any person or entity which has filed statements or other documents or agreements evidencing liens on, or interests in, the Property shall not have delivered to the Debtors prior to the closing in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of liens or interests which the person or entity has or may assert with respect to the Property, the Debtors are hereby authorized and directed, and the Purchaser are hereby authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Property.

15. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

### III. Other Provisions.

16. The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates or the rights of any party holding a lien, claim or encumbrance on or against the Property.

17. Notwithstanding anything to the contrary contained herein, any proceeds received as a result of the Purchase Agreement shall be deposited and subject in all respects to the terms of the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 566] (the "DIP Order") and of the DIP Credit Agreement (as defined in the DIP Order).

18. All time periods set forth in this Order and the Purchase Agreement shall be calculated in accordance with Bankruptcy Rule 9006(a).

19.     The stay provided for in Bankruptcy Rules 6004(h) is hereby reduced to the extent necessary to permit closing of the sale of the Property.  This Order shall otherwise be effective immediately upon its entry.

20.     To the extent there is any inconsistency between the terms of the Purchase Agreement, the Motion, and this Order, the terms of this Order shall govern.

21.     Notwithstanding the relief granted herein and any actions taken pursuant to such relief, nothing contained in the Motion or this Order shall constitute, nor is it intended to constitute: (a) an admission as to the validity, priority, or amount of any particular claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim or finding that any particular claim is an administrative expense claim or other priority claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates (g) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (h) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Order are valid and the Debtors and all other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection, or to seek avoidance of all such liens.  Any payment made pursuant to this Order should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party-in-interest's rights to subsequently dispute such claim.

22.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

23.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

24.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

25.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

26.     This Order shall be binding upon the Purchaser and all successors and assigns of the Purchaser, the Debtors, their estate, all creditors of and holders of equity interests in the Debtors, and any holders of liens against or on all or any portion of the Property.  This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser, and their respective successors and assigns.

     **Signed:  September 14, 2020.**

_____
**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## Schedule 1

**Purchase Agreement**

JC Penney Store #2055
Collin Creek Mall
Plano, TX

## PURCHASE AND SALE AGREEMENT
### (Existing Penney Parcel)

THIS PURCHASE AND SALE AGREEMENT ("**Agreement**"), is made and entered as of August 11___, 2020 (the "**Effective Date**"), by and between **MM CCM 11JCP, LLC**, a Texas limited liability company , having an address of 1800 Valley View Lane, Suite 300 Farmers Branch, TX  75234, or its assigns ("**Purchaser**"), and **J. C. PENNEY PROPERTIES, LLC**, a Delaware limited liability company (formerly J. C. Penney Properties, Inc., a Delaware corporation), having an address of 6501 Legacy Drive, Plano, Texas 75024-4106 ("**Seller**").

W I T N E S S E T H :

WHEREAS, Seller owns, and operates a JCPenney store (the "**Existing Penney Store Building**") on an approximately 10.66-acre parcel of land located in the City of Plano, Collin County, Texas, such parcel being more particularly described on **Exhibit A** attached hereto and made a part hereof (the "**Existing Penney Parcel**", together with the improvements thereon, the **"Property"**); and

WHEREAS, the Property is a part of the shopping center commonly known as "Collin Creek Mall" being operated on property defined as the "Entire Site" (the "**Existing Shopping Center Site**") in that certain Restated Operating Agreement made as of February 1, 1982 and recorded in the Office of the County Clerk, Collin County, Texas on February 1, 1982, in Volume 1471, Page 634 (as amended, the "**Existing REA**") and that certain Supplemental Agreement, made as of February 1, 1982 by and among Federated Stores Realty, Inc. and J. C. Penney Properties, Inc., and consented to in part by Federated Department Stores, Inc. (as amended, the "**Existing Supplemental Agreement**");

NOW, THEREFORE, for and in consideration of Ten and no/100 Dollars ($10.00) paid by Purchaser to Seller, and in consideration of the promises and agreements of the parties set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, Seller and Purchaser hereby agree as follows:

1.    CONTRACT FOR PURCHASE AND SALE OF REAL PROPERTY.

This Agreement shall, for all purposes upon execution, be deemed a binding bilateral contract between the parties hereto for the purchase and sale of the Property on the terms and conditions hereinafter set forth.

2.    PROPERTY.

1

jcp-2414108.11

(a)   Seller agrees to sell and convey the Property to Purchaser by special warranty deed (the **"Deed"**), subject only to:

    (i)    The lien for current real property taxes which are not yet due or payable; and

    (ii)    Subject to the terms of this Agreement, the exceptions shown on the Seller's Title Policy (defined below),  those set forth in the Commitment (defined in Section 2(b) below), and any other easements, covenants, restrictions, and other defects to which Seller provides to Purchaser and Purchaser, in its sole discretion, may consent; provided that Purchaser shall not be obligated hereto to consent to any such exceptions shown on the Commitment or any of such other easements, covenants, restrictions or other defects.

The title exceptions referred to in subparagraphs 2(a)(i) and 2(a)(ii) are hereinafter called the "**Permitted Exceptions**."

(b)   Purchaser shall at Purchaser's expense obtain a title commitment ("**Commitment**") from Sendera Title Insurance Company, having an address of 1800 Valley View Lane, Suite 160, Farmers Branch, Texas 75234, Attn: Jeanie Acord ("**Title Company")** binding title company to insure fee simple interest in Purchaser of the Property subject to applicable requirements, and showing title to the Property to be in Seller, subject to such exceptions as noted in the Commitment, together with a copy of each deed, easement, plat, restriction, or other exception document referenced in the Commitment (collectively the **"Title Documents"**).  On or prior to the expiration of the Inspection Period (defined in Section 5 below), Purchaser shall notify Seller of any exceptions to title not consented to by Purchaser ("**Title Objections**").  Such Title Objections shall be subject to the provisions set forth in Section 7 of this Agreement.  Prior to or simultaneously with Closing, Seller shall cause to be issued and delivered to Purchaser an endorsement or endorsements to the Commitment, deleting such exceptions as shall not have been approved pursuant to this paragraph or Section 7 as Permitted Exceptions.

Seller shall be required to cure all Monetary Encumbrances whether or not Purchaser includes them in the Title Objections or otherwise notifies Seller of same. **"Monetary Encumbrances"** are herein defined to be encumbrances on title that may be cured by performance of the following acts: (i) satisfaction of any mortgages placed upon the Property as a lien to secure indebtedness; (ii) causing the release of any mechanic's liens placed upon the Property by a third party about work performed or alleged to have been performed on the Property; (iii) causing the release of any judgment or tax lien; or (iv) obtaining any necessary approval and/or consent to proceed with the Closing from any bankruptcy court having jurisdiction over Seller or the Property in the JCP Bankruptcy.

3.    <u>PURCHASE PRICE</u>.

At Closing, as consideration, and in exchange, for the Property, Purchaser agrees to deliver to Seller $15,000,000.00 in cash or other readily available fund (the "Purchase Price").  At

jcp-2414108.11

Purchaser's or Seller's election, the purchase or sale of the Existing Penney Parcel shall be structured as a 1031 like-kind exchange.

4.  TAXES, ASSESSMENTS, FEES, AND OTHER CHARGES.

Subject to the terms of this Section 4, taxes on the Property for the year of Closing shall be prorated to the date of Closing Date (defined herein). If Closing occurs before the real estate tax statements are rendered for the tax year of Closing, the proration of such taxes at Closing shall be based upon the amount of such taxes due for the immediately preceding tax year and shall be re-prorated between Seller and Purchaser upon issuance of the actual bills therefor.

If the Property is not a separate tax parcel, then and in that event, the taxes attributable to the Property shall be determined by multiplying the total tax bill(s) for the tax parcel(s) of which the Property is a part by a fraction, the numerator of which is the amount of land, computed in acreage form, contained in the Property, and the denominator of which is the total amount of land, computed in acreage form, contained in the tax parcel(s) of which the Property is a part. Purchaser shall pay all rollback taxes and other taxes imposed as a result of a change in the use of the Property. If such taxes are determined and billed to the Seller, Purchaser agrees to reimburse Seller within five (5) days after Seller's notice to Purchaser thereof. This Section 4 shall survive Closing.

5.  PURCHASER'S INSPECTION PERIOD.

(a)  During the one (1) day period following the Effective Date (the "**Inspection Period**"), Purchaser shall have the right to perform or conduct any due diligence studies, inspections and other inquires relative to the Property, as well as to ascertain the feasibility of the Property for Purchaser's intended use (collectively, the "**Inspections**") (provided that Purchaser shall not be permitted to enter Tenant's Store Building or to collect soil samples, dig test pits, or conduct any other invasive tests, without Seller's approval of Purchaser's scope of work, such approval not to be unreasonably withheld, and entering into a separate access agreement with Seller on commercially reasonable terms). Seller agrees to reasonably cooperate with Purchaser in connection with securing (if applicable) any necessary amendments (or approvals or consents) relating to any agreements which encumber or affect the Property which relate to Purchaser's intended use of the Property.

(b)  Except for claims arising out of an existing condition of the Property that is discovered by Purchaser during such Inspections, Purchaser covenants to indemnify, defend and hold harmless Seller from and against all claims and all costs, expenses, and liabilities incurred in connection with such claims, including any action or proceeding brought thereon, arising from or as a result of any actual or alleged accident, injury, loss, or damage whatsoever caused to any person, or to the property of any person alleged to have occurred in or about the Property by Purchaser during the Inspections. Such indemnity, defense and hold harmless agreements shall survive any termination of this Agreement, shall survive the Closing and shall not be merged upon delivery and acceptance of the applicable deeds.

(c)  Purchaser shall have the right, in its sole and absolute discretion, for any reason or no reason, to terminate this Agreement by providing notice to Seller on or prior to the expiration of

the Inspection Period. Upon the giving of such notice, this Agreement shall be deemed terminated. Upon such termination, Purchaser shall pay Seller $100 (the "**Independent Consideration**"), which amount the parties hereto bargained for and agreed to as consideration for Seller's execution, delivery and performance of this Agreement. The Independent Consideration is in addition to and independent of any other consideration or payment provided in this Agreement.

(d) In connection with Purchaser's proposed redevelopment of the Existing Shopping Center Site, Purchaser may finance certain improvements by creating one or more Public Improvement District or other special district (collectively, the "PID") and/or a tax increment reinvestment zone ("TIRZ") which would encumber portions of the Existing Shopping Center Site (including the Property), thereby allowing a municipality to levy a special assessment against properties within the PID to recover the costs of such financing. Purchaser hereby agrees that: (i) Purchaser shall not only be responsible for any and all assessments levied in connection with the PID against the Existing Shopping Center Site, and Purchaser shall escrow the entire amount of any such assessment related, at a minimum, to the Property prior to the date the PID is enacted and encumbering the Property (and in all events prior to the first payment of assessment being due; and (ii) Purchaser indemnifies, defends, and holds Seller harmless from and against any and all assessments levied in connection with the PID. Seller agrees to execute any and all reasonably necessary documents for the creation of the PID, the levy of the assessment and the issuance of bonds, such as the landowner's consent. The provisions of this paragraph shall survive the Closing and shall not be merged upon delivery and acceptance of the Deed (if the Closing occurs) and shall survive the expiration or termination of this Agreement.

6. SELLER DELIVERABLES.

Purchaser acknowledges that Seller has at its sole cost and expense caused to be prepared and delivered to Purchaser the following prior to the Effective Date (or such later date to the extent set forth below with respect to a particular item) (the "**Seller Deliverables**"):

1. Title Policy No. 90-81-015115 of Lawyers Title Insurance Corporation, issued to J. C. Penney Properties, Inc. (the "**Seller's Title Policy**");
2. Letter dated August 18, 1994 to Cope Construction Services;
3. Texas Water Commission – Underground Storage Tank Registration Form (Amended) dated June 24, 1991, together with letter of even date by Richard Ceccia of JCPenney to Texas Water Commission;
4. Underground Storage Tank Registration Form (Amended) dated March 2, 1999, together with letter dated March 5, 1999 by Sandra Zachary of JCPenney to Texas Natural Resource Conservation Commission, together with undated letter (believe to be issued in 1999) by Mick Perisho, Market Maintenance Manager of JCPenney to Sandra Zachary regarding diesel tank removal;
5. Letter dated September 18,2009 to Rick Nelinson of JCPenney by PSI, regarding summary report of An Indoor Air Quality Investigation;
6. June 20, 2016 Asbestos Survey;
7. June 1, 2012 Asbestos Survey;
8. November 19, 2010 Asbestos Survey (Mango Project);
9. Asbestos Survey by Allied Environmental Remediation dated March 23, 2000; and

4

10. Asbestos Abatement Monitoring "Closeout" Report Dated November 20, 2009 for Air Handler Room, October 7-8, 2009.

The above materials are being provided without representation and warranty of any kind, including their accuracy, completeness or suitability for reliance thereon by Purchaser. Accordingly, such deliverables and any other materials or information provided to Purchaser by Seller (collectively the "**Materials**") are provided on an "AS IS," WHERE IS" and "WITH ALL FAULTS" condition and Seller shall have no liability therefor. Purchaser shall keep, and shall cause its agents, representatives, employees, contractors, servants, legal counsel, professional advisors, Title Company, affiliates, directors, officers, partners and members (collectively, the "**Agents**") to keep, the Materials confidential. Notwithstanding the foregoing, such confidentiality obligation shall not apply to any information that: (i) is already lawfully known when lawfully obtained by the receiving party from the disclosing party, (ii) thereafter becomes lawfully obtainable from other sources, (iii) is required to be disclosed in any document to be filed with any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or (iv) is required to be disclosed in connection with any exercise of a party's remedies hereunder; provided that in the case of (iii) hereof, the party required to disclose such information shall advise the other party of any such disclosure as far in advance of such disclosure as reasonably practicable so as to permit such party to obtain a protective order or otherwise seek relief from such requirement and shall cooperate with such party in such efforts.

7. <u>TITLE DEFECTS</u>.

In the event that Purchaser shall give Seller notice of the Title Objections, pursuant to the terms of Section 2 hereof, Seller may, at its sole cost and expense, remove such exceptions or cure such defects. If any of said exceptions and/or defects has not been cured by the Closing, Purchaser may, at its sole option, and as its sole and exclusive remedy, choose not to close and terminate this Agreement by giving notice to Seller on the Closing Date. If Purchaser fails to give such termination notice, then it shall close without such defect(s) or exception(s) being cured, in which case such defect(s) or exceptions(s) shall be deemed to be a Permitted Exception. In the event of such termination, Purchaser and Seller shall thereupon be relieved of all obligations hereunder.

The foregoing termination provision is in addition to, and not in lieu of, Purchaser's other termination rights under this Agreement, including without limitation those set forth in Section 5 and Section 16 hereof.

8. <u>AS-IS</u>.

(a) Purchaser acknowledges that, through the Inspections, it has and will have an adequate opportunity to inspect the Property, including the physical and environmental condition of the Property. Except for those particular representations and warranties expressly made by Seller in this Agreement, Seller makes no representations or warranties with respect to the Property. Purchaser hereby releases the Seller and the Seller's officers, directors, partners, members, shareholders, employees, and agents from any and all claims, causes of actions, damages, liabilities, costs and expenses (including attorney's fees whether suit is instituted or not)

jcp-2414108.11

whether known or unknown, liquidated or contingent (collectively the **"Claims"**) arising from or relating to any conditions, including environmental and other physical conditions, affecting the Property. The release set forth herein specifically includes, without limitation, any Claims under any Environmental Laws of the United States.

(b)   Except for those particular representations and warranties expressly made by Seller in this Agreement, Seller hereby specifically disclaims any warranty (oral or written) concerning: (i) the nature and condition of the Property and the suitability thereof for any and all activities and uses that Purchaser elects to conduct thereon; (ii) the manner, construction, condition and state of repair or lack of repair of the Property; (iii) the compliance of the Property or its operation with any laws, rules, ordinances or regulations of any government or other body; and (iv) any other matter whatsoever except as expressly set forth in this Agreement.   THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON A STRICTLY "AS IS" "WHERE IS", "WITH ALL FAULTS" BASIS AS OF THE CLOSING, AND SELLER, EXCEPT FOR THOSE PARTICULAR REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN THIS AGREEMENT, MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF QUANTITY, QUALITY, CONDITION, HABITABILITY, MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, ANY IMPROVEMENTS LOCATED THEREON OR ANY SOIL CONDITIONS RELATED THERETO.

(c)   PURCHASER SPECIFICALLY ACKNOWLEDGES THAT PURCHASER IS NOT RELYING ON (AND SELLER HEREBY DISCLAIMS AND RENOUNCES) ANY REPRESENTATIONS OR WARRANTIES MADE BY OR ON BEHALF OF SELLER OF ANY KIND OR NATURE WHATSOEVER, EXCEPT FOR THOSE PARTICULAR REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN THIS AGREEMENT.   FURTHER, EXCEPT FOR THOSE PARTICULAR REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN THIS AGREEMENT, PURCHASER, FOR PURCHASER AND PURCHASER'S SUCCESSORS AND ASSIGNS, HEREBY RELEASES SELLER FROM, AND WAIVES, ANY AND ALL CLAIMS AND LIABILITIES AGAINST SELLER FOR, RELATED TO, OR IN CONNECTION WITH, ANY ENVIRONMENTAL OR PHYSICAL CONDITION AT THE PROPERTY (OR THE PRESENCE OF ANY HAZARDOUS SUBSTANCE), INCLUDING, BUT NOT LIMITED TO, CLAIMS AND/OR LIABILITIES RELATING TO (IN ANY MANNER WHATSOEVER) ANY HAZARDOUS SUBSTANCES LOCATED IN, AT, ABOUT OR UNDER THE PROPERTY, OR FOR ANY AND ALL CLAIMS OR CAUSES OF ACTION (ACTUAL OR THREATENED) BASED UPON, IN CONNECTION WITH, OR ARISING OUT OF, ENVIRONMENTAL LAWS, OR ANY OTHER CLAIM OR CAUSE OF ACTION (INCLUDING ANY FEDERAL OR STATE BASED STATUTORY, REGULATORY OR COMMON LAW CAUSE OF ACTION) RELATED TO ENVIRONMENTAL MATTERS OR LIABILITY WITH RESPECT TO, OR AFFECTING, THE PROPERTY. UPON CLOSING, PURCHASER SHALL ASSUME THE RISK THAT ADVERSE MATTERS, INCLUDING BUT NOT LIMITED TO, CONSTRUCTION DEFECTS AND ADVERSE PHYSICAL AND ENVIRONMENTAL CONDITIONS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S INVESTIGATIONS OR INSPECTIONS, AND PURCHASER, UPON CLOSING, SHALL BE DEEMED TO HAVE WAIVED, RELINQUISHED AND RELEASED SELLER FROM AND AGAINST ANY AND ALL

jcp-2414108.11

CLAIMS, DEMANDS, CAUSES OF ACTION (INCLUDING CAUSES OF ACTION IN TORT), LOSSES, DAMAGES, LIABILITIES, COSTS AND EXPENSES (INCLUDING ATTORNEYS' FEES AND COURT COSTS) OF ANY AND EVERY KIND OR CHARACTER, KNOWN OR UNKNOWN, WHICH PURCHASER MIGHT HAVE ASSERTED OR ALLEGED AGAINST SELLER, AT ANY TIME BY REASON OF OR ARISING OUT OF ANY LATENT OR PATENT CONSTRUCTION DEFECTS OR PHYSICAL CONDITIONS, VIOLATIONS OF ANY APPLICABLE LAWS (INCLUDING, WITHOUT LIMITATION, ANY ENVIRONMENTAL LAWS) AND ANY AND ALL OTHER ACTS, OMISSIONS, EVENTS, CIRCUMSTANCES OR MATTERS REGARDING THE PROPERTY.


(d)  PURCHASER ACKNOWLEDGES AND AGREES THAT THE WAIVERS, RELEASES AND OTHER PROVISIONS CONTAINED IN THIS SECTION ARE AND WERE A MATERIAL FACTOR IN SELLER'S ACCEPTANCE OF THE PURCHASE PRICE AND THAT SELLER IS UNWILLING TO SELL THE PROPERTY TO PURCHASER UNLESS SELLER IS RELEASED AS EXPRESSLY SET FORTH ABOVE.  PURCHASER, WITH PURCHASER'S COUNSEL, HAS FULLY REVIEWED THE DISCLAIMERS AND WAIVERS SET FORTH IN THIS AGREEMENT, AND UNDERSTANDS THE SIGNIFICANCE AND EFFECT THEREOF.  THE TERMS AND CONDITIONS OF THIS SECTION 8 SHALL EXPRESSLY SURVIVE THE CLOSING AND SHALL NOT MERGE UPON DELIVERY AND ACCEPTANCE OF THE DEED OR UPON PAYMENT OF THE PURCHASE PRICE BY PURCHASER TO SELLER.

**"HAZARDOUS SUBSTANCE"** SHALL MEAN (I) ANY SUBSTANCE NOW OR HEREAFTER DEFINED AS A "HAZARDOUS SUBSTANCE" UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OF 1980 (42 USC §9601, ET SEQ.)(**"CERCLA"**), (II) PETROLEUM, PETROLEUM PRODUCTS, NATURAL GAS, NATURAL GAS LIQUIDS, LIQUEFIED NATURAL GAS, AND SYNTHETIC GAS, NATURAL GAS, AND (III) ANY OTHER SUBSTANCE, MATERIAL OR PRODUCT ADDRESSED UNDER ANY ENVIRONMENTAL LAW OR OTHERWISE DEEMED TO BE HAZARDOUS, HARMFUL, DANGEROUS, TOXIC, OR A POLLUTANT.

**"ENVIRONMENTAL LAWS"** SHALL MEAN AND INCLUDE ALL FEDERAL, STATE, AND LOCAL ENVIRONMENTAL, HEALTH, AND SAFETY STATUTES, REGULATIONS, ORDINANCES, CODES, RULES, DECREES, AND OTHER GOVERNMENTAL RESTRICTIONS AND REQUIREMENTS RELATING TO (1) THE EXISTENCE, TREATMENT, GENERATION, STORAGE, RELEASE, TRANSPORTATION, REMEDIATION MANAGEMENT, REGULATION, OR DISPOSAL OF POLLUTANTS, WATER POLLUTANTS OR PROCESS WASTE WATER, OIL AND GASOLINE PRODUCTS, OR OTHERWISE RELATING IN ANY WAY TO THE ENVIRONMENT OR ANY HAZARDOUS SUBSTANCE, INCLUDING, BUT NOT LIMITED TO, (I) CERCLA; (II) THE RESOURCE CONSERVATION AND RECOVERY ACT OF 1976 (42 USC §6901, ET SEQ.); (III) THE HAZARDOUS MATERIALS TRANSPORTATION ACT (49 USC §1801, ET SEQ.); (IV) THE CLEAN AIR ACT (42 USC §7401, ET. SEQ.); (V) THE SAFE DRINKING WATER ACT (USC 21 §§201 AND 300 ET SEQ.); (VI) THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969 (42 USC §4321); (VII) THE SUPERFUND AMENDMENT AND RE-

7

AUTHORIZATION ACT OF 1986 (42 USC §9601, ET SEQ.); (VIII) WETLANDS, STORM WATER RUNOFF, STREAM MITIGATION, AND MATTERS WITHIN THE JURISDICTION OF THE ARMY CORPS OF ENGINEERS, AND (IX) ALL RULES AND REGULATIONS OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY.

9. <u>CONDITIONS TO PURCHASER'S OBLIGATION TO CLOSE</u>.

Purchaser shall not be obligated to close unless the following are satisfied on or prior to the Closing Date:

    (i)     All governmental and necessary bankruptcy court (in the JCP Bankruptcy) approvals for the sale of the Property have been obtained;

    (ii)    Seller is not in material default of this Agreement.

The Closing shall be delayed by one day for each day the above conditions are not satisfied but in no event longer than 60 days after which Purchaser shall have the option and right to terminate this Agreement, but any rights and remedies for any defaults hereunder shall survive. Notwithstanding the foregoing, if any such delay is caused by a default of Seller under this Agreement, Purchaser may in lieu of waiting for such condition to be satisfied, pursue its rights and remedies set forth herein.

10. <u>CONDITIONS TO SELLER'S OBLIGATION TO CLOSE</u>.

Seller shall not be obligated to close unless and until Purchaser is not in material default of this Agreement. The Closing shall be delayed by one day for each day such condition is not satisfied. Notwithstanding the foregoing, if any such delay is caused by a default of Purchaser under this Agreement, Seller may in lieu of waiting for such condition to be satisfied, pursue its rights and remedies set forth herein.

11. <u>CLOSING</u>.

The term "**Closing**" is defined herein as the delivery to and acceptance by Purchaser, as well as the recording of, the deed for the Property, the payment of the Purchase Price and the satisfaction of the requirements of this Section 11. Notwithstanding anything contained in this Agreement, the date of Closing shall be on or before forty five (45) days after the Effective Date (the "**Closing Date**"); subject to Sections 9 and 10 of this Agreement. At Closing the following shall occur:

    A.    Seller shall execute, acknowledge, and deliver the Deed to Purchaser in form for recording, conveying fee simple interest to the Property to Purchaser, subject only to the Permitted Exceptions.

    B.    [Intentionally Deleted].

8

C.      Purchaser and an affiliate of Seller, J. C. Penney Corporation, Inc., shall enter into a lease of the Property in the form attached hereto as **Exhibit B** (the "**Lease**"), and a commercially reasonable Memorandum of Lease. Such memorandum shall be recorded by the Title Company immediately after the recordation of the Deed and prior to any other encumbrance.

D.      Seller and Purchaser, respectively, shall execute, acknowledge, and deliver to the Title Company all certificates, affidavits, resolutions, instruments, and other documents as may be required by law and as may be required by the Title Company to issue the Title Policy with all Endorsements, and as may be required by law and may be required by the Escrow Agent to act as escrow agent.

E.      The parties shall execute settlement sheets confirming credits, prorations, and other adjustments to the payments required herein.

F.      The parties shall perform such other actions as shall be necessary to vest title to the Property in Purchaser, subject only to the Permitted Exceptions.

The documents and funds to be delivered herein shall be deposited by each party into escrow with Sendera Title Company ("**Escrow Agent**") having the following address and contact information: 1800 Valley View Lane, Suite 160, Farmers Branch, Texas 75234, Attn: Jeanie Acord, subject to the fulfillment of the other party's Closing obligations and the satisfaction of the depositing party's conditions to Closing set forth in this Agreement.

This Section 11 shall survive the Closing.

12.      <u>TITLE CHARGES</u>.

Purchaser shall be responsible for all recording fees, rollback taxes, transfer taxes, and documentary fees incurred in the Deed, and other recordable documents. This Section shall survive Closing.

13.      <u>BROKER'S FEES</u>.

Each of Purchaser and Seller represent that it has not used the services of a real estate broker incident to this transaction and each such indemnifying party shall hold the other harmless from and against any and all claims for brokerage fees and commissions allegedly incurred at the request of either of the parties. The provisions of this Section 13 shall survive the Closing and shall not be merged upon exchange of the deeds between Seller and Purchaser.

14.      <u>RIGHT OF ENTRY</u>.

Purchaser, its agents, employees, representatives, officers, and contractors, shall have reasonable access to the Property from the Effective Date through Closing in order to make inspections, surveys, and such other observations, tests, and studies as are required by Purchaser.

9

In connection with the exercise of such right of access, Purchaser agrees to defend, indemnify and hold harmless Seller from all claims, liens, actions, costs, damages, and/or liabilities arising or resulting from injury or loss of life to person(s) in, on, or about the Property and/or damage to the Property in, on, or about the Property caused by Purchaser, or its representatives, or contractors in connection with such entry; except to the extent caused by Seller's negligence or willful misconduct. Notwithstanding Purchaser's rights under this Section 14, Purchaser shall provide at least 24-hours prior notice to Seller of any access onto the Property and shall attempt to limit any access to non-business hours of Seller.

15. <u>DEFAULT BY PURCHASER; REMEDIES OF SELLER</u>.

In the event Purchaser fails to comply with any or all of the obligations, covenants, or agreements to be performed, honored, or observed by Purchaser under and pursuant to the terms and provisions of this Agreement, and if such failure continues uncured for ten (10) days after notice from Seller specifying such failure, (i) Seller may bring an action at law against Purchaser for damages, including reasonable attorneys' fees, incurred by Seller by reason of any such default, or (ii) Seller may bring an action in equity against Purchaser for specific performance by Purchaser of the terms and provisions of this Agreement, or (iii) Seller shall have the right to terminate this Agreement by giving written notice of such termination to Purchaser, whereupon this Agreement shall be deemed null and void and of no further force and effect, and neither party hereto shall thereafter have any rights, duties, liabilities, or obligations whatsoever accruing thereafter under this Agreement. The foregoing shall not limit or otherwise govern the rights and remedies under the Lease for any separate defaults thereunder, if any.

16. <u>DEFAULT BY SELLER; REMEDIES OF PURCHASER</u>.

In the event Seller fails to close under and pursuant to the terms and provisions of this Agreement, Purchaser shall be entitled, upon providing notice and a ten (10) day opportunity to cure, to exercise the following rights and remedies:

(i) Purchaser may bring an action at law against Seller for damages, including reasonable attorneys' fees, incurred by Purchaser by reason of any such default, or

(ii) Purchaser may bring an action in equity against Seller for specific performance by Seller of the terms and provisions of this Agreement; or

(iii) Purchaser shall have the right to terminate this Agreement by giving written notice of such termination to Seller, whereupon each party shall be relieved of all further obligations hereunder accruing thereafter under this Agreement.

The foregoing shall not limit or otherwise govern the rights and remedies under the Lease for any separate defaults thereunder, if any.

17. <u>CONDEMNATION</u>.

10

Seller warrants and represents that to its actual knowledge other than as may be disclosed by the Materials or the Commitment, Seller has not received notice of any pending or threatened litigation or proceeding regarding the Property, including without limitation, any condemnation or eminent domain litigation. Risk of loss resulting from such litigation or proceeding which is commenced or has been threatened prior to Closing, and risk of loss to the Property due to any other cause prior to Closing, is assumed by Seller. If prior to Closing all or a part of the Property shall be subjected to a bona fide threat of condemnation or shall become the subject of any proceedings, judicial, administrative or otherwise with respect to the taking by eminent domain or condemnation, Seller shall notify Purchaser thereof within seven (7) days after receipt of actual notice by Seller, but in any event prior to Closing, and Purchaser, at its option, may within five (5) business days after receipt of such notice elect to terminate this Agreement, in which event, all parties shall be relieved and released of and from any further duties, obligations, rights or liabilities hereunder. If the Closing is within the aforesaid five-day period, then Closing shall be extended to the next business day following the end of said five-day period. If Purchaser elects to proceed to close its purchase of the Property, this Agreement shall remain in full force and effect and the purchase contemplated herein, less any interest taken by eminent domain or condemnation, shall be effected with no further adjustment, and upon the Closing of this purchase, Seller shall assign, transfer and set over to Purchaser all of the right, title and interest of Seller in and to any awards that have been or that may thereafter be made for any taking or condemnation.

18.     LITIGATION;

With knowledge that Purchaser is relying thereon, Seller represents and warrants to Purchaser, that to its actual knowledge other than as may be disclosed by the Materials, Seller has not received notice of any pending or (to its actual knowledge) threatened litigation or proceeding materially adversely affecting the Property or which at the time of the Closing will be enforced against or satisfied out of the Property. Provided, however, Seller hereby discloses to Purchaser that the Property and Seller are subject to that certain filing under U.S. Bankruptcy Code under Cause No. 20-20182 (the "JCP Bankruptcy")

The validity of foregoing representations and warranties by Seller under this Agreement shall survive the Closing Date for a period of six (6) months, and after such time no claim may be brought by Purchaser or its successors or assigns for any breach or alleged breach thereof more than sixty (60) days after the expiration of such six (6) month period. In the event Purchaser discovers a breach of any of the above representations and warranties prior to Closing, Purchaser's sole and exclusive remedy shall be to terminate this Agreement.

19.     [INTENTIONALLY DELETED].

20.     MISCELLANEOUS.

(a)   When used herein, the phrase "to Seller's current, actual knowledge" or derivations thereof shall mean the current actual knowledge of Larry Smith (not constructive or implied, and without any duty of inquiry or investigation of any kind or nature whatsoever) but shall not include any knowledge which may be imputed to Seller or of any other person. The individual named in

11

the preceding sentence is named solely for the purpose of defining the scope of Seller's knowledge, and such individual shall have no liability of any kind or type to Purchaser.

(b) <u>Execution by Both Parties</u>. This Agreement shall not become effective and binding until this Agreement is executed and delivered by each of Purchaser and Seller.

(c) <u>Notice</u>. All notices, demands and/or consents provided for in this Agreement shall be in writing and shall be delivered to the parties hereto by hand or by United States registered or certified mail, return receipt requested, with postage prepaid. All such notices and communications shall be deemed to have been served on the date of such mailing or transmittal. All such notices and communications shall be addressed to the parties hereto at the respective addresses set forth at page 1 hereof, or at such other addresses as either may specify to the other in writing. Any right of termination hereunder shall be exercised by written notice given pursuant to this paragraph.

(d) <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

(e) <u>Assignment</u>. Neither Purchaser nor Seller shall have the right to assign this Agreement or any of the rights or obligations hereunder without obtaining the prior written consent of the other which may be withheld in such other party's sole discretion (and any such attempted assignment shall be void ab initio); provided, however, either party may assign this Agreement to an entity which directly or indirectly, controls, is controlled by, or is under common control with, such party provided that at least ten (10) days prior to Closing, such assigning party delivers to the other evidence of such affiliation along with a fully executed commercially reasonable assignment and assumption agreement. In the event of any assignment, the assigning party shall not be released from its obligations hereunder but shall be jointly and severally liable hereunder with the assignee.

(f) <u>Successors and Assigns</u>. Except as qualified in (e) hereinabove, this Agreement shall apply to, inure to the benefit of, and be binding upon and enforceable against the parties hereto and their respective successors and assigns.

(g) <u>Time</u>. Time is of the essence of this Agreement.

(h) <u>Paragraph Headings</u>. The headings inserted at the beginning of each paragraph are for convenience of reference only and shall not limit or otherwise affect or be used in the construction of any of the terms or provisions hereof.

(i) <u>Entire Agreement</u>. This Agreement, together with the Lease, to the extent signed and delivered by the parties thereto, contains all the terms, promises, covenants, conditions, and representations made or entered into by and between Seller and Purchaser as to the matters set forth herein, and supersede all prior discussions and agreements, whether written or oral, between Seller and Purchaser with respect to the Property in those regards and all other matters contained herein and constitutes the sole and entire agreement between Seller and Purchaser with respect thereto. This Agreement may not be modified or amended unless such amendment is set forth in a

signed writing. Scanned signatures of this Amendment delivered by facsimile, electronic mail, or other electronic means will be as valid as ink-signed originals.

(j)  <u>Survival</u>.  Sections 4, 6, 13, 14, 15, 16 and this Section 20 and any other provision that expressly provides for survival shall survive Closing.

**[Remainder of Page Intentionally Left Blank - Signature Page Follows.]**

13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under proper authority to be effective as of the Effective Date.

> ### PURCHASER:
>
> MM CCM 11JCP, LLC
> a Texas limited liability company
>
> By:   Collin Creek Development, LLC,
>        a Delaware limited liability company
>        Its Manager
>
> >  By:  MM CCM Investment, LLC,
> >         a Texas limited liability company
> >         Its Manager
> >
> > >  By:  MMM Ventures, LLC,
> > >         a Texas limited liability company
> > >         Its Manager
> > >
> > > >  By:  2M Ventures, LLC,
> > > >         a Delaware limited liability company
> > > >         Its Manager
> > > >
> > > >  By: _____
> > > >  Name:   Mehrdad Moayedi
> > > >  Its:       Manager

**[\*Remainder of Page Intentionally Left Blank\*]**

14

IN WITNESS WHEREOF, the parties hereto have executed this Purchaser and Sale Agreement under proper authority to be effective as of the Effective Date.

**SELLER:**

J. C. PENNEY PROPERTIES, LLC,
a Delaware limited liability company

By: _____
Its: Vice President

**Exhibits Attached**

**A**            **Legal Description of Existing Penney Parcel**

**B**            **Form of Penney Lease**

**[*Remainder of Page Intentionally Left Blank*]**

15

## EXHIBIT A

## Legal Description of Existing Penney Parcel

BEING a part of Lot 3, Block A, of REGIONAL MALL ADDITION, an addition to the City of Plano, COLLIN County, Texas, according to the plat thereof recorded in Cabinet C, Slide 319, Map Records, Collin County, Texas, and being more particularly described as a tract of land, being part of the Joseph Klepper Survey, Abstract 213, and part of the Samuel Klepper Survey, Abstract 216, and described by metes and bounds as follows:

COMMENCING at the intersection of the Northerly line of Plano Parkway (100 feet wide) and the Easterly line of Alma Drive (100 feet wide); thence North 04 deg. 08 min 24 sec. West, along said Easterly line of Alma Drive, a distance of 987.37 feet to the beginning of a curve to the left and the POINT OF BEGINNING;

THENCE in a Southeasterly direction along said curve to the left having a radius of 30.00 feet, a central angle of 44 deg. 25 min. 37 sec., and an arc length of 23.26 feet to the end of said curve to the left;

THENCE North 85 deg. 51 min. 36 sec., East a distance of 159.50 feet to the beginning of a curve to the left;

THENCE in a Northeasterly direction along said curve to the left having a radius of 20.00 feet, a central angle of 90 deg. 00 min. 00 sec., and an arc length of 31.42 feet to the end of said curve to the left;

THENCE North 04 deg. 08 min. 24 sec West a distance of 60.33 feet to the beginning of a curve to the left;

THENCE in a Northwesterly direction along said curve to the left having a radius of 69.00 feet, a central angle of 42 deg. 17 min. 00 sec., and an arc length of 50.92 feet to the end of said curve to the left;

THENCE North 46 deg. 25 min. 24 sec., West a distance of 234.17 feet to a point for corner;

THENCE South 85 deg. 51 min. 36 sec., West a distance of 25.00 feet to a point for corner in the Easterly line of Alma Drive;

THENCE North 04 deg. 08 min. 24 sec., West along said Easterly line of Alma Drive, a distance of 362.82 feet to a point for corner;

THENCE North 88 deg. 34 min. 36 sec., East a distance of 652.40 feet to a point for corner;

16

THENCE South 46 deg. 25 min. 24 sec., East a distance of 75.26 feet to a point for corner;

THENCE South 49 deg. 07 min. 47 sec., East a distance of 119.93 feet to a point for corner;

THENCE South 46 deg. 25 min. 24 sec., East a distance of 218.00 feet to a point for corner;

THENCE South 43 deg. 34 min. 36 sec., West a distance of 249.08 feet to a point for corner;

THENCE South 46 deg. 25 min. 24 sec., East a distance of 28.00 feet to a point for corner;

THENCE South 43 deg. 34 min. 36 sec., West a distance of 54.70 feet to a point for corner;

THENCE South 13 deg. 34 min. 36 sec., West a distance of 31.99 feet to a point for corner;

THENCE South 43 deg. 34 min. 36 sec., West a distance of 187.52 feet to a point for corner;

THENCE North 46 deg. 25 min. 24 sec., West a distance of 30.34 feet to a point for corner;

THENCE South 43 deg. 34 min. 36 sec., West a distance of 5.39 feet to a point for corner;

THENCE North 76 deg. 25 min. 24 sec., West a distance of 37.11 feet to a point for corner;

THENCE North 16 deg. 25 min. 24 sec., West a distance of 58.80 feet to a point for corner;

THENCE North 16 deg. 25 min. 24 sec., West a distance of 58.57 feet to a point for corner;

THENCE North 16 deg. 25 min. 24 sec., West a distance of 36.04 feet to a point for corner;

THENCE North 46 deg. 25 min. 24 sec., West a distance of 74.66 feet to a point for corner;

THENCE South 43 deg. 34 min. 36 sec., West a distance of 127.84 feet to the beginning of a curve to the left;

THENCE in a southwesterly direction along said curve to the left having a radius of 50.00 feet, a central angle of 47 deg. 43 min. 00 sec., and an arc length of 41.64 feet to the end of said curve to the left;

THENCE South 04 deg. 08 min. 24 sec., East a distance of 81.22 feet to a point for corner;

THENCE South 85 deg. 51 min. 36 sec., West a distance of 261.50 feet to the beginning of a curve to the left;

THENCE in a Southwesterly direction along said curve to the left having a radius of 30.00 feet, a central angle of 44 deg. 25 min. 37 sec., and an arc length of 23.26 feet to the end of said curve

17

to the left and to a point in the Easterly line of Alma Drive;

THENCE North 04 deg. 08 min. 24 sec., West, along said Easterly line of Alma Drive, a distance of 77.15 feet to the POINT OF BEGINNING, and containing 10.665 acres, more or less

Tract 2 (Easement Estate)

Non-Exclusive Easement Rights as set out in Restated Operating Agreement, executed by Federated Stores Realty, Inc., Federated Department Stores, Inc., Sears, Roebuck and Co., Adcor Realty Corporation, Construction Developers, Incorporated, Dillard Department Stores, Inc and J. C Penney Properties, Inc., filed for record on February 1, 1982 and recorded in Volume 1471, Page 634, Real Property Records, Collin County, Texas. As affected by Assignment and Assumption Agreement recorded under under Clerk's File No. 94-0113328; under Clerk's File No. 96-0008958 and under Clerk's File No. 96-0008959, Real Property Records, Collin County, Texas; and further affected by Assignment of Operating Agreement recorded in Volume 1757, Page 750, Real Property Records, Collin County, Texas.

**[\*Remainder of Page Intentionally Left Blank\*]**

18

**EXHIBIT B**

**Form of Penney Lease**

JCPenney Store #2055
Collin Creek Mall
Plano, Texas

---

# AGREEMENT OF LEASE

between

## MM CCM 11JCP, LLC
Landlord

and

## J.C. PENNEY CORPORATION, INC.,
Tenant

as of _____ __, 2020

Collin Creek Mall, Plano, Texas

<u>INDEX TO LEASE</u>

<u>Article</u>                                                                                               <u>Page</u>

**ARTICLE I DEFINITIONS AND CONSTRUCTION** ...........................................................1

    1.1   DEFINITIONS ..................................................................................................1
    1.2   EXHIBITS TO LEASE. ......................................................................................3

**ARTICLE II PREMISES**.................................................................................................4

**ARTICLE III TERM** ....................................................................................................4

**ARTICLE IV RENT AND OTHER CHARGES** ...................................................................5

**ARTICLE V COVENANT OF TITLE, AUTHORITY AND QUIET POSSESSION** ....................5

    5.1   COVENANTS OF TITLE .....................................................................................5
    5.2   QUIET ENJOYMENT. .......................................................................................5

**ARTICLE VI DELIVERY OF PREMISES; USE** .................................................................5

**ARTICLE VII SUBLETTING AND ASSIGNING BY TENANT** ...............................................6

    7.1   RIGHT TO DISCONTINUE AND SUBLET/ASSIGN ..................................................6
    7.2   LIABILITY OF TENANT .....................................................................................6

**ARTICLE VIII COMMON FACILITIES MAINTENANCE**....................................................6

**ARTICLE IX TRANSFER OF LANDLORD'S INTEREST** .....................................................7

**ARTICLE X SURRENDER** .............................................................................................8

**ARTICLE XI CONTINUED POSSESSION OF TENANT** ......................................................8

**ARTICLE XII UTILITIES**.............................................................................................9

**ARTICLE XIII ORDINANCES**.......................................................................................9

**ARTICLE XIV DAMAGE CLAUSE** ...............................................................................9

**ARTICLE XV INSURANCE AND INDEMNIFICATION** .....................................................10

    15.1   PROPERTY INSURANCE.................................................................................10
    15.2   WAIVER OF SUBROGATION...........................................................................10
    15.3   LIABILITY INSURANCE.................................................................................10
    15.4   GENERAL PROVISIONS .................................................................................11
    15.5   INDEMNIFICATION .......................................................................................11

**ARTICLE XVI ALTERATIONS; INSTALLATION AND REMOVAL OF EQUIPMENT**.............12

    16.1   ALTERATIONS BY TENANT ...........................................................................12
    16.2   INSTALLATION............................................................................................12
    (A)   SHOPPING CENTER CONSTRUCTION. .............................................................13

**ARTICLE XVII SIGNS** ...............................................................................................13

    17.1   BUILDING SIGNS.........................................................................................13
    17.2   FREESTANDING SIGNS .................................................................................13

**ARTICLE XVIII MECHANICS' LIENS**.........................................................................14

**ARTICLE XIX LANDLORD TO PAY TAXES** ........................................................................................14

**ARTICLE XX ADDITIONAL COVENANTS OF LANDLORD** .............................................................14

**ARTICLE XXI CONDEMNATION** ........................................................................................................14

**ARTICLE XXII SUBORDINATION** ......................................................................................................15

**ARTICLE XXIII UNPERFORMED COVENANTS OF LANDLORD MAY BE PERFORMED BY TENANT** ...............................................................................................................................................15

**ARTICLE XXIV TENANT DEFAULT CLAUSE** ..................................................................................16

**ARTICLE XXV NOTICES** ....................................................................................................................16

**ARTICLE XXVI ESTOPPEL CERTIFICATE** ......................................................................................17

**ARTICLE XXVII WAIVER OF JURY TRIAL** ....................................................................................18

**ARTICLE XXVIII PARTIAL INVALIDITY** ........................................................................................18

**ARTICLE XXIX APPLICABLE LAW** ..................................................................................................18

**ARTICLE XXX RULES OF CONSTRUCTION** ...................................................................................18

**ARTICLE XXXI LEASE NOT TO BE RECORDED** ...........................................................................18

**ARTICLE XXXII BROKER** ..................................................................................................................19

**ARTICLE XXXIII LEASE BINDING ON SUCCESSORS; MISCELLANEOUS** .................................19

**ARTICLE XXXIV TENANT'S RIGHT TO CANCEL LEASE** ............................................................19

**ARTICLE XXXV LANDLORD'S RIGHT OF ENTRY** ........................................................................20

**[Remainder of Page Intentionally Left Blank.]**

**PARTIES**

LEASE (this "**Lease**"), dated and to be effective as of the Effective Date by and between **MM CCM 11JCP, LLC**, a Delaware limited liability company, having an address of 1800 Valley View Lane, Suite 300 Farmers Branch, TX   75234 ("**Landlord**"), and  J. C. PENNEY CORPORATION, INC., a Delaware corporation, having an address of MS 4106 6501 Legacy Drive, Plano, Texas 75024-3698 ("**Tenant**").

THE PARTIES HERETO DO HEREBY COVENANT AND AGREE AS FOLLOWS:

**ARTICLE I**

DEFINITIONS AND CONSTRUCTION

1.1    Definitions.   The following terms for purposes of this Lease shall have the meanings hereinafter specified:

A.    "**Acquisition Corporation**" means an entity to which the Demised Premises is transferred as part of a package deal involving two or more of Tenant's store locations.

B.    "**Common Facilities**" means the parking areas, parking area lighting, streets, roads, driveways, underground service drives, tunnels, aisles, sidewalks, malls (enclosed and open), fire corridors, landscaped areas, and any additions thereto or enlargements thereof, which are located on the Existing Penney Parcel and in the Lease Control Area.

C.    "**Demised Land**" means the Existing Penney Parcel described on Exhibit A hereto.

D.    "**Demised Premises**" means the Demised Land together with the improvements thereon.

E.    "**Developer**" means Collin Creek Development, LLC.

F.    "**Effective Date**" means the date Landlord, or its affiliate, obtains fee simple title to the Existing Penney Parcel by conveyance from Penney Properties pursuant to the Existing Penney Parcel PSA.

G.    "**Exclusive Areas**" means the freight receiving areas, electrical transformer areas, emergency generator areas, and compactor areas, if any, which are attached to or located next to the Demised Premises.

H.    **"Existing Penney Parcel"** means that certain property on which a JCPenney store is currently operating and acquired by Landlord pursuant to the Existing Penney Parcel PSA, such parcel being more particularly described therein and on **Exhibit A** attached hereto.

I.    **"Existing Penney Parcel PSA"** means that certain Purchase and Sale Agreement dated June ___, 2020 pursuant to which Landlord has acquired the Demised Premises.

J.    **"Expiration Date"** means the earliest of: (i) ninety (90) days after the Effective Date; (ii) the earlier termination of this Lease pursuant to its terms, or (iii) the thirtieth (30) day after Tenant for a period of 30 continuous days, ceases operation on, and vacates, the Existing Penney Parcel or Demised Premises (for a reason other than casualty, condemnation, or renovation).

K.    **"Landlord"** means and include, at any given time and subject to the provisions of the article hereof captioned "TRANSFER OF LANDLORD'S INTEREST", Landlord herein named and each successor to or assignee of any interest of Landlord herein named under this Lease.

L.    **"Legal Requirements"** means federal, state, county and city laws and ordinances, and all rules, regulations and orders of all duly constituted authorities.

M.    **"Mortgage"** means an indenture of mortgage, a deed of trust to a trustee, or any other instrument in the nature thereof creating a lien on or other security interest in the Shopping Center or any part thereof.

N.    **"Old REA"** means that certain Restated Operating Agreement made as of February 1, 1982 and recorded in the Office of the County Clerk, Collin County, Texas on February 1, 1982, in Volume 1471, Page 634 (as amended and supplemented from time to time, including without limitation by the Old Supplemental Agreement).

O.    **"Old Supplemental Agreement"** means that certain Supplemental Agreement, made as of February 1, 1982 by and among Federated Stores Realty, Inc. and Penney Properties, and consented to in part by Federated Department Stores, Inc. (as amended and supplemented from time to time).

P.    "**Lease Control Area**" shall mean that area designated as such on the Site Plan.

Q.    **"Penney Corporation"** means J. C. Penney Corporation, Inc., a Delaware corporation.

R.    "**Penney Parking Area**" shall mean that area designated as such on the Site Plan.

S.    **"Penney Properties"** means J. C. Penney Properties, LLC, a Delaware limited liability company, a Related Corporation of Tenant

2

T. **"Related Corporation"** means a corporation, partnership, or other business entity, which, directly or indirectly, controls, is controlled by, or is under common control with, another corporation, partnership, or other business entity. If more than 50 per cent of the voting stock of a corporation shall be owned by another corporation or by a partnership or other business entity, the corporation whose stock is so owned shall be deemed to be controlled by the corporation, partnership, or business entity owning such stock.

U. **"Shopping Center"** means the enclosed mall and lifestyle center as constituted from time to time pursuant to the terms of this Lease, which center is located entirely or partially upon the land governed by the Old REA, such land being particularly described on Exhibit B to this Lease.

V. **"Site Plan"** means the Site Plan attached as Exhibit B to this Lease.

W. **"Successor Corporation"** means a corporation or other business entity into or with which another corporation or other business entity shall be merged or consolidated or to which all or substantially all of the assets of such other corporation or other business entity shall be transferred.

X. **"Tenant"** means and includes, at any given time, J.C. Penney Corporation, Inc., any of its successor(s) in interest, including, without limitation, J.C. Penney Corporation, Inc. as a debtor in possession (DIP) in any bankruptcy proceeding and/or any bankruptcy trustee in any bankruptcy proceeding, and any person, firm, corporation or other legal entity to whom or to which Tenant's interest in this Lease shall be assigned or otherwise transferred pursuant to the terms of this Lease.

Y. **"Tenant's Existing Store Building"** means the retail store building on the Demised Premises.

Z. **"Transaction Documents"** shall mean the Existing Penney Parcel PSA and this Lease.

1.2     Exhibits To Lease. Attached to this Lease and hereby made a part hereof are the following:

**EXHIBIT A**          Description of the Demised Land

**EXHIBIT B**          Site Plan

3

## ARTICLE II

### PREMISES

For the consideration and upon and subject to the covenants, agreements, terms and conditions herein set forth, Landlord hereby demises and leases to Tenant, and Tenant hereby leases from Landlord, the Demised Premises for the term hereinafter stated, and Landlord hereby grants to Tenant for such term:

     (a)     a non-exclusive easement, right and privilege for it and its customers, employees and invitees and the customers, employees and invitees of any subtenant, concessionaire or licensee of Tenant, to use the Common Facilities without charge in common with Landlord and other tenants and occupants of space within the Shopping Center and their customers, employees and invitees;

     (b)     an exclusive easement, right and privilege to have and use the Exclusive Areas; and

     (c)     such other easements, rights and privileges as may be granted to Tenant in and by this Lease.

The ownership and title to Tenant's Existing Store Building and to all other improvements within the Demised Land to be erected under the provisions of this Lease and to all alterations, changes, improvements and additions constituting real property to such building and improvements shall be and remain in Landlord during and throughout the term of this Lease. Penney Properties sold the Demised Premises to Landlord just prior to the commencement hereof, and Tenant was the prior occupant. Tenant accepts the Demised Premises in its absolutely "as is" condition, without any representation or warranty from Landlord. Landlord shall make no change to the Lease Control Area without Tenant's consent. Further, Landlord, on behalf of itself and Collin Creek Development, LLC, hereby acknowledge and agree that the provisions related to the installation and location of wayfinding and other signage as set forth in that letter agreement dated August 28, 2019 by and between Penney Properties and Collin Creek Development, LLC shall remain in full force and effect, and continue to apply.

## ARTICLE III

### TERM

Subject to Tenant's right to cancel this Lease pursuant to the article of this Lease captioned "TENANT'S RIGHT TO CANCEL LEASE", Tenant shall have and hold the Demised Premises together with any and all appurtances belonging or appertaining thereto, and the easements, rights and privileges herein granted to Tenant, for a term commencing as of the Effective Date and continuing thereafter to and including the Expiration Date.

4

## ARTICLE IV

### RENT AND OTHER CHARGES

Tenant shall pay no rent or other amounts under this Lease, including without limitation real estate taxes, common facilities maintenance charges, capital improvement contributions, or any amounts which may be required under the Old REA, the Old Supplemental Agreement or any other encumbrances on the Demised Premises, all of such amounts being Landlord's responsibility and with respect to which Landlord will timely pay to the extent owed. Landlord acknowledges that Landlord has received good and valuable consideration for this Lease pursuant to the Existing Penney Parcel PSA.

## ARTICLE V

### COVENANT OF TITLE, AUTHORITY AND QUIET POSSESSION

5.1     <u>Covenants of Title</u>.     Landlord represents and warrants that:

(a)     Landlord has full right and lawful authority to enter into and perform the Landlord's obligations under this Lease for the full term hereof;

(b)     Landlord will fully and faithfully carry out and perform its obligations under this Lease;

5.2     <u>Quiet Enjoyment.</u>  Landlord further covenants that if Tenant shall discharge the obligations herein set forth to be performed by Tenant, Tenant shall have and enjoy, during the term hereof, the quiet and undisturbed possession of (i) the Demised Premises and all appurtenances appertaining thereto, and (ii) the exclusive and non-exclusive easements, rights and privileges herein granted to Tenant with respect to the Common Facilities and other portions of the Shopping Center, and (iii) the exclusive rights and privileges herein granted to Tenant with respect to the Exclusive Areas.

## ARTICLE VI

### DELIVERY OF PREMISES; USE

The Demised Premises shall be delivered to Tenant as of the Effective Date in its "As-Is" condition. Tenant may only use the Demised Premises as a JCPenney retail store, including, subject to applicable Legal Requirements, a going out of business sale. The foregoing shall not be construed as an operating covenant.

## ARTICLE VII

### SUBLETTING AND ASSIGNING BY TENANT

7.1    Right to Discontinue and Sublet/Assign.    Tenant shall not have a right to assign or sublet the Demised Premises to any person and Landlord shall have the right to withhold or deny its consent to any assignment of this Lease, or any sublease of the Demised Premises, in whole or in part, in Landlord's sole and absolute discretion.  Notwithstanding the foregoing, Tenant shall have the following rights without the need to obtain Landlord's consent:

(a)    the right to discontinue the use of the Demised Premises for the operation of a retail store business conducted by Penney Corporation at any time, and at Tenant's option;

(b)    the right at any time until the Expiration Date to lease or license departments or grant concessions, giving other persons, firms, or corporations the right to sell goods, wares, merchandise and services in the Demised Premises (such leasing or licensing of departments or granting of concessions shall not be considered a subletting within the provisions of this Lease); and

(c)    the right at any time until the Expiration Date to assign this Lease or sublet all of the Demised Premises to a Related Corporation of Penney Corporation or to an Acquisition Corporation or a Successor Corporation of Penney Corporation, it being agreed that (i) the use of the Demised Premises by any such corporation for the operation of a retail store shall be deemed to be the continued use of Demised Premises for the operation of a retail store business conducted by Penney Corporation, and (ii) the rent payable by any such corporation shall be the same as if Penney Corporation had itself continued to operate a retail store in the Demised Premises.

7.2    Liability of Tenant. If this Lease is assigned or the whole or any part of the Demised Premises is sublet, Penney Corporation shall remain liable and responsible under this Lease.

## ARTICLE VIII

### COMMON FACILITIES MAINTENANCE

Landlord shall at all times during the term of this Lease maintain and keep the Common Facilities in good order and repair and in a safe, clean, sightly and sanitary condition and cause such of the Common Facilities as are exposed to the elements to be properly drained and kept reasonably free from ice and snow.  All shrubbery, trees, flower beds, grass and other landscaped areas located within the Lease Control Area which are under Landlord's control shall be well tended and maintained by Landlord in an attractive and healthy condition.

Landlord shall at all times during the term of this Lease provide night time illumination for the parking area and for all areas within the Common Facilities where pedestrians may walk. During all hours of darkness when the Tenant's Existing Store Building is open for business and

6

during a period of approximately 30 minutes after Tenant's store shall have closed for business such illumination measured at grade shall have a minimum maintained for open parking areas and all sidewalks - one foot candle.  For all other areas, the lighting shall equal to the intensity of the following:

> b)      Roadways/Main Drive Aisles - one and one-half foot candles.
> c)      Intersections of entrance / exit ways and public roads - four foot candles.
> d)      sheltered parking areas and walkways - five foot candles.

During other hours of darkness illumination for the parking area shall be provided by keeping at least 25% evenly distributed dusk to dawn lighting.

The parking area, sidewalks, aisles, malls, streets and driveways within the Common Facilities shall not be fenced or otherwise obstructed and shall be kept open at all times.  They shall not be used for the display or sale of merchandise or for any other purpose not contemplated by this Lease.  Landlord will take appropriate action to ensure that all of the parking area located within the Common Facilities shall be used for parking purposes only.

Notwithstanding anything contained herein to the contrary, Landlord may terminate the Old REA and the Old Supplemental Agreement at any time and without any notice to Tenant; provided, however, no termination of the Old REA and/or the Old Supplemental Agreement shall impair, diminish or terminate any obligations set forth in this Lease and/or by reference to the Old REA and/or the Old Supplemental Agreement (and such terms of the Old REA and/or the Old Supplemental Agreement shall be deemed incorporated herein in full by reference irrespective of such termination) unless and until this Lease has been terminated or has expired at which time the obligations related to the Old REA and/or the Old Supplemental Agreement shall immediately (and without further action by Landlord or Tenant) terminate and become null, void and without further force or effect.


## ARTICLE IX

### TRANSFER OF LANDLORD'S INTEREST

In the event of any transfer or conveyance of title to the Demised Premises, Landlord herein named (or the then grantor if Landlord herein named shall have previously made such a transfer or conveyance) shall be automatically released of all liability as respects the performance of any and all obligations on the part of Landlord thereafter to be performed hereunder when and only when all of the following shall have been done:

(a)      Tenant shall have been furnished proof that the aforesaid transfer or conveyance has been made and shall have been notified of the name and address of the transferee, or each transferee if more than one; and

7

(b)      Tenant shall have been furnished a recordable instrument which transferee, or each transferee if more than one, assumes performance of all obligations of Landlord under this Lease, to be performed from and after the date of such transfer or conveyance.

In the event of any change in ownership of the Demised Premises or an assignment of Landlord's interest in this Lease Tenant shall not be obligated to transmit the payment of rents thereafter accruing until Tenant shall have received (i) proof of the type described in items (a) and (b) of the immediately preceding paragraph of this article and (ii) instructions regarding the manner in which rent is to be paid and notices are to be served upon the transferee(s), and the withholding of rents in the meantime shall not be deemed a default upon the part of Tenant.

If during the term hereof Landlord's interest in this Lease shall be acquired by more than one person, firm, corporation, or other entity, whether by conveyance, operation of law or otherwise, Landlord shall by notice to Tenant signed by all of the then lessors hereunder appoint one such lessor to whom rent may be paid by Tenant and upon whom all notices which Tenant may give hereunder may be served.  Until such appointment shall be made, Tenant may select any one of such lessors and to pay all rent coming due hereunder to, and serve all notices upon, the lessor so selected until such time as such appointment shall have been made as aforesaid.   The service of any notice upon and the payment of any amount to the appointed or selected lessor shall constitute service of notice upon, and payment to, Landlord.

## ARTICLE X

### SURRENDER

Upon the termination of this Lease, whether by expiration of time or otherwise, Tenant shall surrender possession of the Demised Premises to Landlord in its then "AS IS" condition.

## ARTICLE XI

### CONTINUED POSSESSION OF TENANT

If Tenant or any party claiming by through or under Tenant fails to surrender the Premises at the expiration or earlier termination of this Lease, continued occupancy of the Premises shall be that of a tenancy at sufferance, which shall be upon the same terms and conditions, including rent, as those herein specified which are in effect immediately prior to the termination of such Term plus Tenant shall pay to Landlord an amount equal to $2,500 per day as additional rent for any such holdover. No holdover by Tenant or payment by Tenant after the expiration or early termination of this Lease shall be construed to extend the Term or prevent Landlord from immediate recovery of possession of the Premises by summary proceedings or otherwise.  In addition to the payment of the amounts provided above, if Tenant fails to vacate the Premises within 5 days after Landlord notifies Tenant of the expiration of the Term, such failure shall constitute a default hereunder; and Tenant shall be liable to Landlord for, and shall indemnify, defend and protect Landlord from, all losses and damages, including without limitation, any consequential damages that Landlord suffers from the holdover.

8

## ARTICLE XII

### UTILITIES

Landlord shall keep or cause to be kept in good and safe condition, sightly in appearance and in good order and repair, without expense to Tenant, all gas, electric, water, telephone and sanitary and storm sewer lines and equipment within the Shopping Center which serve the Demised Premises. Tenant will pay all charges to the utility provider during the term hereof for any gas, electricity, water, telephone, sanitary sewer and other utilities to the extent used by the Demised Premises.

## ARTICLE XIII

### ORDINANCES

Landlord and Tenant acknowledge the current existing use of the Demised Premises. Tenant accepts the existing conditions of the Demised Premises and acknowledges that, subject to its obligations with respect to the Common Facilities, Landlord shall have no obligation to make any changes to Tenant's store building. Landlord shall at Landlord's expense take such action as may be necessary or appropriate to cause the Common Facilities at the commencement of the term hereof and during the entire term hereof to comply with all federal, state, county and city laws and ordinances and all rules, regulations and orders of all duly constituted authorities, present or future. Tenant shall comply with all laws, ordinances, rules, regulations and orders of all duly constituted authorities, present or future, which (i) affect the carrying on of the specific business being conducted in the Demised Premises, as distinguished from the physical facilities in which such business is being conducted, (ii) impose any duty or obligation upon Tenant with respect to the Demised Premises or the use and occupancy thereof arising from the specific use of the Demised Premises for purposes other than the operation of the business conducted therein by Tenant at the commencement of the term of this Lease, or (iii) pertain to the making of any alterations, changes, improvements or additions to the Demised Premises which may be undertaken by Tenant pursuant to the terms of this Lease or to the installation of any signs or advertising devices not initially installed on the Demised Premises which may be erected by Tenant as herein provided during the term of this Lease.

## ARTICLE XIV

### DAMAGE CLAUSE

Landlord shall have no obligation to repair any damage from any casualty to Tenant's Existing Store Building. Tenant may either repair such damage at Tenant's expense (but shall have no obligation to do so) or choose not to make any repairs (or only partial repairs) and/or terminate the Lease by thirty (30) days prior notice given to Landlord. Tenant shall not have any claim for damages except to the extent caused by Landlord, subject to Article 15.2.

9

## ARTICLE XV

### INSURANCE AND INDEMNIFICATION

15.1     Property Insurance.

Neither Landlord nor Tenant is required to maintain any casualty insurance on the Demised Premises.

15.2     Waiver of Subrogation

Landlord and Tenant each waive and release the other from any liability, claim, right of recovery or cause of action for any damage or destruction to the property of the releasing party, even if caused by the negligence of the released party or of its contractors, representatives, agents or employees, arising out of or incident to any property coverage insurance peril covered by any Insurance Services Office form CP 1030 (Causes of Loss-Special Form).  If any party maintains any casualty insurance, such party agrees to give each insurer providing coverage notice of this waiver and require such insurer to provide an endorsement on its policy for a waiver and release of subrogation rights against the other party.  Notwithstanding the failure of a party to obtain such endorsement, the waiver and release set forth in this Section shall in all instances remain in effect and be binding on the parties and their respective insurers. The effect of such release is not limited (i) by the amount of insurance actually carried, (ii) to the actual proceeds received after a loss, or (iii) to any deductible applicable thereto.

15.3     Liability Insurance

Landlord shall maintain from and after the execution and delivery of this Lease and until the Expiration Date commercial general liability insurance written on an occurrence basis, including contractual liability insurance, against claims on account of bodily injury, death or property damage incurred upon any part of the Shopping Center from time to time owned by Landlord or arising as a result of Landlord's operation thereof.  Such insurance shall have a combined single limit of not less than $3,000,000 per occurrence and $10,000,000 annual aggregate for bodily injury, death and property damage.  Such insurance shall be endorsed to provide that the insurance shall be primary to and not contributory to any similar insurance carried by Tenant**.**  Landlord shall be liable for any deductible amount in the event of an insured loss.

Tenant shall continuously maintain commercial general liability insurance written on an occurrence basis, including contractual liability insurance, against claims for bodily injury or death and property damage occurring in Tenant's Existing Store Building.  Such insurance shall afford protection to the combined single limit of not less than $5,000,000 per occurrence and $10,000,000 annual aggregate for bodily injury, death and property damage.  Such insurance shall be endorsed to provide that the insurance shall be primary to and not contributory to any similar insurance carried by Landlord.  Tenant shall have the right to comply with and satisfy the obligations under this paragraph by means of self-insurance to the extent of all or any part of the insurance required

10

to be carried hereunder, but only as and to the extent that Tenant has, or is guaranteed by an entity which has, a net worth of at least $100,000,000.

Tenant represents that the commercial general liability insurance carried by Tenant pursuant to this article and Tenant's indemnification obligations set forth below also extend and cover any of Tenant's special event activities, as may be approved from time to time by Landlord, that occur within the Shopping Center but outside of Tenant's Existing Store Building. Landlord agrees not to require Tenant to carry any additional insurance for Tenant's special event activities and to look to the provisions of this "INSURANCE AND INDEMNIFICATION" article for such purpose.

15.4    General Provisions

All insurance policies required to be maintained hereunder shall be procured from insurance companies rated at least A-VIII or better by the then current edition of Best's Insurance Reports published by A. M. Best Co. All insurance policies shall provide that they shall not be canceled or materially changed without at least providing 30 days prior written notice to the other party. Liability insurance limits may be provided through any combination of primary and/or excess insurance policies.

Each party shall provide the other party with a certificate of liability insurance with copies of endorsements to the policy concurrently with the execution of this Lease, demonstrating that the required coverages are in full force and effect or in lieu thereof, in the event Tenant is permitted to self-insure hereunder, financial statements showing Tenant meets the net worth required for such self-insurance (provided such statement shall not be required to be provided if Tenant is a public company, the financial statements of which are publicly available).

15.5    Indemnification

Tenant covenants to indemnify and hold harmless Landlord from and against all claims and all costs, expenses, and liabilities incurred in connection with such claims, including any action or proceeding brought thereon, arising from or as a result of (a) any accident, injury, loss, or damage whatsoever caused to any natural person, or to the property of any person, alleged to have occurred in Tenant's Existing Store Building during the term of this Lease, or (b) the intentional misconduct or negligent acts or omissions of Tenant or of any subtenant, concessionaire, licensee or departmental lessee of Tenant or of the agents, contractors, servants or employees of Tenant or of any such subtenant, concessionaire, licensee or departmental lessee of Tenant or (c) the use and operation by Tenant of the Demised Premises; excepting, however, in each case, claims, accidents, injuries, loss or damages arising from or as a result of the intentional misconduct or negligent acts or omissions of Landlord or its agents, contractors, servants or employees.

Landlord covenants to indemnify and hold harmless Tenant from and against all claims and all costs, expenses, and liabilities incurred in connection with such claims, including any action

11

or proceeding brought thereon, arising from or as a result of (a) any accident, injury, loss, or damage whatsoever caused to any natural person, or to the property of any person, alleged to have occurred in or about the Shopping Center exclusive of Tenant's Existing Store Building during the term of this Lease or, (b) the intentional misconduct or negligent acts or omissions of Landlord or the agents, contractors, servants or employees of Landlord or (c) the use, operation and maintenance of the Common Facilities; excepting, however, in each case, claims, accidents, injuries, loss, or damages to the extent arising from or as a result of the intentional misconduct or negligent acts or omissions of Tenant or of any subtenant, concessionaire, licensee or departmental lessee of Tenant or of the agents, contractors, servants or employees of Tenant or of any such subtenant, concessionaire, licensee or departmental lessee of Tenant.

Each party hereto shall promptly notify the other of any claim asserted against such party with respect to which such party is indemnified against loss by the other party hereunder, and the party giving such notice shall promptly deliver to the other party the original or a true copy of any summons or other process, pleading, or notice issued or served in any suit or other proceeding to assert or enforce any such claim. The party so notified of any claim against which such party has indemnified the other party hereunder against loss shall defend any such suit at its sole cost and expense with attorneys of its own selection, but the party so indemnified shall have the right, if it sees fit, to participate in such defense at its own expense. All reasonable costs and expenses, including reasonable attorney's fees, incurred by a party to enforce this indemnity shall be recoverable from the other party.

## ARTICLE XVI

### ALTERATIONS; INSTALLATION AND REMOVAL OF EQUIPMENT

16.1 <u>Alterations By Tenant</u>. Subject to applicable Legal Requirements, Tenant shall have the right and privilege at all times until the Expiration Date to make, at its own expense and without consent of Landlord, such alterations, changes, improvements and additions (**"Alterations"**) to the Demised Premises as Tenant may desire provided the same do not exceed the existing permissible building area for Tenant's Existing Store Building shown on the Site Plan. Any Alterations made by Tenant shall immediately become the property of Landlord and shall be considered a part of the Shopping Center. Landlord agrees upon request by Tenant to execute or join in the execution of any application for permits and licenses for Alterations.

16.2 <u>Installation</u>. Tenant may from time to time install in the Demised Premises, at its own cost, trade fixtures and equipment, including, without limitation, partitions and shelving. In addition thereto, Tenant may at any time and from time to time install one or more antennae, satellite dish, telecommunication equipment on the roof or parapet wall of Tenant's Existing Store Building. All such trade fixtures, equipment, and antennae shall remain the property of Tenant notwithstanding the fact that they may as a matter of law be deemed part of the realty. Tenant may but shall not be required to remove such trade fixtures, equipment and antenna, as well as any personal property of Tenant at any time during the term of this Lease. If Tenant fails to remove the foregoing items at the expiration of the term of this Lease, all unremoved items shall be deemed

12

to have been abandoned by Tenant and shall become the property of Landlord to be retained or disposed of by Landlord in its sole discretion without charge to Landlord or Tenant.

(a) <u>Shopping Center Construction.</u> Landlord will cause any construction to be performed during the lease term by Landlord or its occupants not to interfere with: (i) the operations conducted by Tenant in the Demised Premises (ii) the ingress or egress to and from the Demised Premises to and from the Common Facilities, or (iii) the utilities serving the Demised Premises. Any utility work, or other work that may impact utility service (which shall include without limitation gas, electric, water, telephone and sanitary and storm sewer lines and roof water drainage), shall not be conducted during hours when Tenant is open for business to the public in the Demised Premises or for the one hour period prior to and subsequent to such hours. If any work causes a disruption in utility service, then Landlord shall immediately cause service to be restored, and in the event such disruption damages or adversely affects the Demised Premises or the operation thereof, then Landlord shall be responsible to Tenant for liquidated damages in the amount of $2,500.00 per day that Tenant cannot operate. Tenant and Landlord acknowledge and agree that Tenant's actual damages would be difficult to determine and agree that the liquidated damages are a reasonable estimation of the damages to be incurred. Such remedy shall be Tenant's sole and exclusive remedies against Landlord for such disruption and Tenant hereby waives with respect to such disruption any claim for any other damages including without limitation actual, lost profits, punitive, special, or consequential damages, except as expressly set forth in the foregoing. Landlord shall take any and all safety measures reasonably required and/or requested by Tenant. No construction staging shall be permitted on the Common Facilities except as may be shown on the Site Plan. Landlord agrees to the regular cleaning of the Common Facilities of any debris which is caused by the construction of the improvements and to repair any damage to the Common Facilities caused by the construction of the improvements. Upon Tenant's request and provision of sign drawings to Landlord, Landlord will at Landlord's expense fabricate and post temporary signage in locations reasonably designated by Tenant advertising that Tenant's Existing Store Building remains open during construction and directing traffic flow and locations for parking.

## ARTICLE XVII

### SIGNS

17.1 <u>Building Signs</u>. Subject to applicable Legal Requirements, Tenant shall have the right to maintain signs or other advertising devices, electrical or non-electrical, on the building demised to Tenant hereunder or in which the Demised Premises are located, either parallel to said building or at any angle thereto, at or on either the front, back, or sides thereof.

17.2 <u>Freestanding Signs</u>. Notwithstanding the termination of the Old REA but subject to any applicable Legal Requirements, all existing JCPenney signage on the Demised Premises (as defined in the Old REA) and/or located within the Shopping Center shall continue through the Expiration Date, and Tenant will continue to have all of the signage rights Penney Properties had under the Old REA prior to the Effective Date.

13

## ARTICLE XVIII

### MECHANICS' LIENS

If any mechanics', materialman's or other similar lien shall at any time be filed against any part of the Demised Premises on account of any Alterations or other work, labor or services performed or claimed to have been performed, or on account of any materials furnished or claimed to have been furnished, for or at the direction of any party hereto, or by any of their contractors or sub-contractors, such party shall, without cost or expense to the other party, forthwith either cause the same to be (i) discharged of record by payment, bond, order of a court of competent jurisdiction, or otherwise, or (ii) contested, in which event any judgment or other process issued in such contest shall be paid or discharged before execution thereof. If either party fails to do so within 30 days of written notice, the other party may bond over or discharge such mechanics liens at the other's expense

## ARTICLE XIX

### LANDLORD TO PAY TAXES

Landlord shall pay all real estate taxes, assessments and other charges which may be levied, assessed or charged against the Demised Premises and all payments required to be made under the terms of any Mortgage which is now or hereafter a lien on the Demised Premises or the Common Facilities or any part thereof superior to this Lease.

## ARTICLE XX

### ADDITIONAL COVENANTS OF LANDLORD

Landlord covenants with Tenant that:

     (a)     Landlord shall honor the Site Plan attached hereto as **Exhibit B**.

     (b)     Landlord shall provide (i) the parking spaces within the Common Facilities as shown on the Site Plan, and (ii) such additional parking spaces within the Common Facilities as may be required by applicable Legal Requirements for Tenant's operation of its store to the public.

## ARTICLE XXI

### CONDEMNATION

Upon any taking in any proceeding by the public authorities by condemnation or otherwise, or acquisition for public or quasi-public purposes, (i) Landlord shall be entitled to the entire award, (ii) any payments owed by Tenant hereunder shall be proportionally abated, and (ii) Tenant shall have a right to terminate this Lease upon 30 days prior notice given on or before the thirtieth day

14

after Tenant's possession is terminated.  If Tenant does not elect to terminate, then if such taking is 10% or less of the total Floor Area of the Demised Premises, or is a taking of parking spaces and/or ingress/egress, Landlord shall restore said building to the extent necessary to comply with law for Tenant's use.

## ARTICLE XXII

### SUBORDINATION

Landlord shall not permit any mortgage to be recorded prior to the memorandum of this Lease and covenants that this Lease is not and shall not be subject or subordinate to any mortgage or other monetary encumbrances except for such subordination as may be accomplished in accordance with this article. At the request of Landlord, Tenant will enter into an agreement in recordable form with the holder of any first Mortgage placed against the Demised Premises subsequent to the recording of a memorandum of this Lease making this Lease subject and subordinate to the lien of such Mortgage and all renewals, modifications, consolidations, replacements and extensions thereof, provided that such agreement contains a covenant binding upon the mortgagee to the effect that as long as there shall be no default on the part of Tenant entitling Landlord to terminate the term of this Lease, or if such default shall exist as long as Tenant's time to cure such default shall not have expired, (i) the term of this Lease shall not be terminated or modified in any respect whatsoever nor shall the rights of Tenant hereunder or its occupancy of the Demised Premises be affected in any way by reason of such Mortgage or any foreclosure action or other proceeding that may be instituted in connection therewith, and (ii) Tenant shall not be named as a defendant in any such foreclosure action or other proceeding unless required by law to be named.

## ARTICLE XXIII

### UNPERFORMED COVENANTS OF LANDLORD MAY BE PERFORMED BY TENANT

If Landlord shall fail to perform any of the terms, provisions, covenants or conditions to be performed or complied with by Landlord pursuant to this Lease, or if Landlord should fail to make any payment which Landlord agrees to make, and any such failure shall if it relates to a matter which is not of an emergency nature, remain uncured for a period of 30 days after Tenant shall have served upon Landlord notice of such failure, or for a period of 24 hours after service of such notice if in Tenant's judgment reasonably exercised such failure relates to a matter which is of an emergency nature, then Tenant may at Tenant's option perform any such term, provision, covenant or condition or make any such payment, as Landlord's agent, and in Tenant's sole discretion as to the necessity therefor, and the full amount of the cost and expense entailed, or the payment so made, shall immediately be owing by Landlord to Tenant, and Tenant shall have the right to deduct the amount thereof, together with interest at the maximum legal rate thereon from the date of payment, without liability of forfeiture, from rents then due or thereafter coming due hereunder, and irrespective of who may own or have an interest in the Demised Premises at the time such deductions are made.  Any such deduction shall not constitute a default in the payment of rent unless Tenant shall fail to pay the amount of such deduction to Landlord within 30 days after final adjudication that such amount is owing to Landlord.  The option given in this article is for the sole

15

protection of Tenant, and its existence shall not release Landlord from the obligation to perform the terms, provisions, covenants, and conditions herein provided to be performed by Landlord or deprive Tenant of any legal rights which it may have by reason of any such default by Landlord. This reservation of a right by Tenant to make or perform repairs or other work in, to or about the Demised Premises, which, in the first instance, is Landlord's obligation pursuant to this Lease, shall not be deemed to: (a) impose any obligation upon Tenant to do so; (b) render Tenant liable to Landlord or any third party for the failure to do so; or (c) relieve Landlord from any obligation to indemnify Tenant as otherwise provided in this Lease.

## ARTICLE XXIV

### TENANT DEFAULT CLAUSE

If any amounts to be paid by Tenant herein shall be unpaid on the date when due and remain so for a period of 10 business days after Landlord shall have given to Tenant notice of such default, then Tenant shall be in default, and Landlord shall be entitled to any and all remedies at law or in equity, but shall not be entitled to terminate this Lease.

If Tenant shall default in any non-monetary covenant in this Lease which is not cured within 30 days after Landlord shall have given to Tenant notice of such default (or if the default is of such character as reasonably to require more than 30 days to cure and Tenant shall fail to commence to cure the same within such period or shall fail to use reasonable diligence in curing such default within a reasonable time thereafter), Landlord shall be entitled to any and all remedies at law or in equity; provided that Landlord shall have no right to terminate the Lease for a non-monetary covenant. Notwithstanding this paragraph, Tenant shall not be entitled to 30 days' notice and opportunity to cure for any failure to timely vacate the Premises upon the Expiration Date and Landlord shall be entitled to immediately exercise its rights and remedies provided in Article XI hereof.

If Tenant becomes insolvent, files a petition for protection under the U.S. Bankruptcy Code (or similar law) or a petition is filed against Tenant under such laws and is not dismissed within 45 days after the date of such filing, or as determined by an adjudication, makes a transfer in fraud of Landlord, Landlord shall be entitled to any and all remedies at law or in equity, including without limitation, termination of the Lease but any such termination shall not be effective until the 30th day after such termination notice is received by Tenant and then only if Tenant fails to pay such outstanding amounts by such thirtieth (30th) day.

## ARTICLE XXV

### NOTICES

Any notice, demand, consent, approval, request, statement, document or other communication required or permitted to be given to or served upon either party hereto pursuant to

16

this Lease or applicable law shall be in writing and shall be sent by certified US mail, or by FEDEX, UPS, or other nationally recognized courier, postage prepaid, addressed as follows:

(a)     If to Landlord:

        MM CCM 11JCP, LLC
        1800 Valley View Lane, Suite 300
        Farmers Branch, TX  75234

(b)     If to Tenant:

        J. C. Penney Corporation, Inc.
        Attention:  Real Estate Counsel
        P. O. Box 10001
        Dallas, Texas 75301-4106

        with a duplicate copy to:

        J. C. Penney Corporation, Inc.
        P. O. Box 10001
        Dallas, Texas 75301-2102
        Attn: Property Manager for Store #2055 Plano, TX

provided, however, in the case of the exercise of an option hereunder or of the need for emergency repairs, Tenant may give Landlord notice by facsimile to be followed by an original written copy of the notice sent by mail or hand delivered, or may give Landlord notice by a recognized national courier service, such as, but not limited to, Federal Express or United Parcel Service.  All such communications mailed or transmitted in accordance with the foregoing provisions shall be deemed to have been given or served as of the date of such mailing or transmittal (unless otherwise expressly stated in this Lease for a particular notice or other communication).  Either Landlord or Tenant may, by 10 days prior notice to the other as aforesaid, designate a different address or different addresses to which communications intended for it are to be sent.

## ARTICLE XXVI

### ESTOPPEL CERTIFICATE

Each of the parties hereto agrees, at any time, but not more than twice in any 12 month period, upon not less than 30 days prior request by the other party, to execute and deliver to the party making such request a written certificate stating (a) whether this Lease is in full force and effect; (b) whether this Lease has been modified or amended and, if so, identifying and describing any such modification or amendment; (c) whether rent and other charges have been paid more than 30 days in advance of the date when due and if so the date to which they have been paid in advance; and (d) whether to the best knowledge of the party to whom such request is directed any uncured

17

default exists on the part of the other party hereunder, and, if so, specifying the nature of such default.

## ARTICLE XXVII

### WAIVER OF JURY TRIAL

Landlord and Tenant hereby waive trial by jury, to the extent permitted by law, in any action, proceeding or counterclaim brought by Landlord or Tenant against the other or any matter whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, the use or occupancy of the Demised Premises by Tenant or any person claiming through or under Tenant, any claim of injury or damage, and any emergency or other statutory remedy; provided, however, the foregoing waiver shall not apply to any action for personal injury or property damage.

## ARTICLE XXVIII

### PARTIAL INVALIDITY

If any covenant, term or condition of this Lease or any application thereof shall be invalid or unenforceable, the remainder of this Lease and any other application of such covenant, term or condition shall not be affected thereby.

## ARTICLE XXIX

### APPLICABLE LAW

This Lease shall be construed according to, and be governed by, the law of Texas.

## ARTICLE XXX

### RULES OF CONSTRUCTION

The parties acknowledge that the parties and their counsel have reviewed and negotiated this Lease and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Lease, or any portion hereof, or any exhibits or amendments or agreements supplementary hereto.

## ARTICLE XXXI

### LEASE NOT TO BE RECORDED

The parties hereto have executed and delivered a memorandum of this Lease for recording purposes with the expectation that such memorandum is in recordable form. If in the opinion of Tenant's counsel such memorandum will not afford Tenant the protection of the recording statutes, the parties hereto agree to take whatever action may in the opinion of Tenant's counsel be necessary to obtain such protection for Tenant. Landlord agrees that Landlord will not

18

record this Lease unless Tenant shall have consented to Landlord's so doing.  Landlord shall record a memorandum of this Lease prior to any mortgage and shall pay for any and all real estate transfer fees assessed in connection with this Lease or assessed in connection with the recording of the memorandum thereof; provided the memorandum shall specifically provide that it shall automatically be released upon the expiration of the Term.

## ARTICLE XXXII

### BROKER

Landlord and Tenant acknowledge that no brokers, agents or other parties are due a brokerage commission or fee as a result of this transaction. Landlord shall indemnify, defend and hold the Tenant harmless from and against any loss, cost or expense suffered by such party arising out of any claim or threat of claim of any person, party or entity in the nature of a brokerage commission or other similar type arrangement arising from Landlord's dealings with such person. Tenant shall indemnify, defend and hold the Landlord harmless from and against any loss, cost or expense suffered by such party arising out of any claim or threat of claim of any person, party or entity in the nature of a brokerage commission or other similar type arrangement arising from Tenant's dealing with such person.

## ARTICLE XXXIII

### LEASE BINDING ON SUCCESSORS; MISCELLANEOUS

Subject to the provisions of the articles of this Lease captioned "TRANSFER OF LANDLORD'S INTEREST" and "SUBLETTING AND ASSIGNING BY TENANT", all covenants, terms and conditions of this Lease shall be binding upon and inure to the benefit of the parties hereto and their heirs, devisees, executors, administrators, successors in interest and assigns and grantees of Landlord, and shall be deemed to run with the land.  This Lease shall not be binding upon Tenant until a fully executed copy thereof shall have been delivered by Tenant to any one of the parties named herein as Landlord or to Landlord's duly authorized agent or representative.  The covenants, terms and conditions of this Lease may be changed, modified or discharged only by an instrument in writing signed by the party against whom enforcement of the change, modification or discharge is sought or by such party's duly authorized agent. This Lease contains the entire understanding and agreement of the parties with respect to its subject matter, supersedes all other written or oral exchanges, agreements, or negotiations between them or their representatives.  This Lease may be executed in two or more counterparts and each counterpart shall be deemed to be one and the same agreement.  Scanned signatures of this Lease delivered by facsimile, electronic mail, or other electronic means will be as valid as ink-signed originals.

## ARTICLE XXXIV

### TENANT'S RIGHT TO CANCEL LEASE

Subject to the article of this Lease captioned "SURRENDER", Tenant shall have the right at any time without liability to cancel this Lease by giving notice to Landlord whereupon this Lease

19

shall terminate effective as of the earlier of (i) the later of the date set forth in such notice or the date that is 30 days after Landlord's receipt of such notice, or (ii) the Expiration Date.

## ARTICLE XXXV

### LANDLORD'S RIGHT OF ENTRY

Landlord shall have the right to undertake site, engineering, appraisal, feasibility, environmental and such other inspections of the Demised Premises as Landlord deems necessary (but not to perform environmental testing or other invasive testing or to enter into Tenant's Existing Store Building without entering into a separate access agreement with Tenant). Landlord shall provide reasonable prior notice to Tenant by notifying, and coordinating all entries to the Demised Premises with Colleen Puett of Tenant at 972-431-9839 (or such other person as Tenant may designate from time to time). Landlord shall not materially interfere with Tenant or its operations or invitees and shall honor its indemnification and other obligations pursuant to the article of this Lease captioned "INSURANCE AND INDEMNIFICATION". Prior to any entry upon the Demised Premises by Landlord or Landlord's contractors, subcontractors, consultants, agents or employees, Landlord shall deliver to Tenant an insurance certificate of Landlord's commercial general liability insurance policy which evidences that Landlord is carrying the liability insurance required by such article and naming J. C. Penney Corporation, Inc. as an additional insured.

**[Remainder of Page Intentionally Left Blank - Signature Page Follows.]**

20

**SIGNATURE PAGE ATTACHED TO AND MADE
A PART OF THAT CERTAIN LEASE BY AND BETWEEN
MM CCM 11JCP, LLC, AS LANDLORD
AND J.C. PENNEY CORPORATION, INC. AS TENANT**

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and sealed as of the day and year first above written.

**LANDLORD:**
MM CCM 11JCP, LLC
a Texas limited liability company

By:   Collin Creek Development, LLC,
     a Delaware limited liability company
     Its Manager

    By:  MM CCM Investment, LLC,
       a Texas limited liability company
       Its Manager

      By:  MMM Ventures, LLC,
         a Texas limited liability company
         Its Manager

        By:  2M Ventures, LLC,
           a Delaware limited liability company
           Its Manager

           By: _____
           Name:   Mehrdad Moayedi
           Its:        Manager

**[\*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK\*]**

21

Penney Store #2055 Plano, TX

**SIGNATURE PAGE ATTACHED TO AND MADE
A PART OF THAT CERTAIN LEASE BY AND BETWEEN
MM CCM 1JCP, LLC, AS LANDLORD
AND J.C. PENNEY CORPORATION, INC. AS TENANT**

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed and sealed as of the day and year first above written.

**TENANT**:

J.C. PENNEY CORPORATION, INC.,
a Delaware corporation

By _____
_____, Vice President

**[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*]**

22

Penney Store #2055 Plano, TX

# EXHIBIT A

## DESCRIPTION OF DEMISED LAND

### Existing Penney Parcel:

BEING a part of Lot 3, Block A, of REGIONAL MALL ADDITION, an addition to the City of Plano, COLLIN County, Texas, according to the plat thereof recorded in Cabinet C, Slide 319, Map Records, Collin County, Texas, and being more particularly described as a tract of land, being part of the Joseph Klepper Survey, Abstract 213, and part of the Samuel Klepper Survey, Abstract 216, and described by metes and bounds as follows:

COMMENCING at the intersection of the Northerly line of Plano Parkway (100 feet wide) and the Easterly line of Alma Drive (100 feet wide); thence North 04 deg. 08 min 24 sec. West, along said Easterly line of Alma Drive, a distance of 987.37 feet to the beginning of a curve to the left and the POINT OF BEGINNING;

THENCE in a Southeasterly direction along said curve to the left having a radius of 30.00 feet, a central angle of 44 deg. 25 min. 37 sec., and an arc length of 23.26 feet to the end of said curve to the left;

THENCE North 85 deg. 51 min. 36 sec., East a distance of 159.50 feet to the beginning of a curve to the left;

THENCE in a Northeasterly direction along said curve to the left having a radius of 20.00 feet, a central angle of 90 deg. 00 min. 00 sec., and an arc length of 31.42 feet to the end of said curve to the left;

THENCE North 04 deg. 08 min. 24 sec West a distance of 60.33 feet to the beginning of a curve to the left;

THENCE in a Northwesterly direction along said curve to the left having a radius of 69.00 feet, a central angle of 42 deg. 17 min. 00 sec., and an arc length of 50.92 feet to the end of said curve to the left;

THENCE North 46 deg. 25 min. 24 sec., West a distance of 234.17 feet to a point for corner;

THENCE South 85 deg. 51 min. 36 sec., West a distance of 25.00 feet to a point for corner in the Easterly line of Alma Drive;

THENCE North 04 deg. 08 min. 24 sec., West along said Easterly line of Alma Drive, a distance of 362.82 feet to a point for corner;

THENCE North 88 deg. 34 min. 36 sec., East a distance of 652.40 feet to a point for corner;

THENCE South 46 deg. 25 min. 24 sec., East a distance of 75.26 feet to a point for corner;

THENCE South 49 deg. 07 min. 47 sec., East a distance of 119.93 feet to a point for corner;

THENCE South 46 deg. 25 min. 24 sec., East a distance of 218.00 feet to a point for corner;

THENCE South 43 deg. 34 min. 36 sec., West a distance of 249.08 feet to a point for corner;

THENCE South 46 deg. 25 min. 24 sec., East a distance of 28.00 feet to a point for corner;

THENCE South 43 deg. 34 min. 36 sec., West a distance of 54.70 feet to a point for corner;

THENCE South 13 deg. 34 min. 36 sec., West a distance of 31.99 feet to a point for corner;

THENCE South 43 deg. 34 min. 36 sec., West a distance of 187.52 feet to a point for corner;

THENCE North 46 deg. 25 min. 24 sec., West a distance of 30.34 feet to a point for corner;

THENCE South 43 deg. 34 min. 36 sec., West a distance of 5.39 feet to a point for corner;

THENCE North 76 deg. 25 min. 24 sec., West a distance of 37.11 feet to a point for corner;

THENCE North 16 deg. 25 min. 24 sec., West a distance of 58.80 feet to a point for corner;

THENCE North 16 deg. 25 min. 24 sec., West a distance of 58.57 feet to a point for corner;

THENCE North 16 deg. 25 min. 24 sec., West a distance of 36.04 feet to a point for corner;

THENCE North 46 deg. 25 min. 24 sec., West a distance of 74.66 feet to a point for corner;

THENCE South 43 deg. 34 min. 36 sec., West a distance of 127.84 feet to the beginning of a curve to the left;

THENCE in a southwesterly direction along said curve to the left having a radius of 50.00 feet, a central angle of 47 deg. 43 min. 00 sec., and an arc length of 41.64 feet to the end of said curve to the left;

THENCE South 04 deg. 08 min. 24 sec., East a distance of 81.22 feet to a point for corner;

THENCE South 85 deg. 51 min. 36 sec., West a distance of 261.50 feet to the beginning of a curve to the left;

THENCE in a Southwesterly direction along said curve to the left having a radius of 30.00 feet, a central angle of 44 deg. 25 min. 37 sec., and an arc length of 23.26 feet to the end of said curve

2

to the left and to a point in the Easterly line of Alma Drive;

THENCE North 04 deg. 08 min. 24 sec., West, along said Easterly line of Alma Drive, a distance of 77.15 feet to the POINT OF BEGINNING, and containing 10.665 acres, more or less

Tract 2 (Easement Estate)

Non-Exclusive Easement Rights as set out in Restated Operating Agreement, executed by Federated Stores Realty, Inc., Federated Department Stores, Inc., Sears, Roebuck and Co., Adcor Realty Corporation, Construction Developers, Incorporated, Dillard Department Stores, Inc and J. C Penney Properties, Inc., filed for record on February 1, 1982 and recorded in Volume 1471, Page 634, Real Property Records, Collin County, Texas. As affected by Assignment and Assumption Agreement recorded under under Clerk's File No. 94-0113328; under Clerk's File No. 96-0008958 and under Clerk's File No. 96-0008959, Real Property Records, Collin County, Texas; and further affected by Assignment of Operating Agreement recorded in Volume 1757, Page 750, Real Property Records, Collin County, Texas.


**[*Remainder of Page Intentionally Left Blank. *]**

Penney Store #2055 Plano, TX

**EXHIBIT B**

**Site Plan**

**[*To be Attached*]**



## LEGEND

REMOVE EXISTING ASPHALT & FLEX BASE, SUBSURFACE UTILITY IMPROVEMENTS

— — — PROTECTIVE FENCING

FENCE GATE LOCATION

JC PENNEY TEMPORARY SITE SIGN

PROTECTIVE BARRIER NO THRU-WAY

SITE SIGN LEGEND
1 PYLON SIGN
2 MONUMENT SIGN
3 JCP WAYFINDING SIGN

US HIGHWAY 75

CONTINUOUS PERIMETER "RING ROAD" FENCING & GATES ("RR FENCING")

RING ROAD

CULVERT BOUNDARY

RING ROAD ADJUSTMENTS TO ACCOMMODATE CULVERT WORK

LEASE CONTROL AREA INDICATED IN BLUE

GRAY HATCH INDICATES AREA FOR PAVING STRIPPING AND UTILITY IMPROVEMENT ACTIVITIES

JCP TENANT PREMISES

RR FENCING

RINGROAD CLOSURE

RED DASHED LINE INDICATES ONCOR TRANSMISSION LINE EASEMENT

RR FENCING

SECURITY FENCE

JCP PENNEY PARKING AREA

JCP PROTECTED LOT AREA

COMMON FACILITIES INDICATED IN RED

TREE YARD

PLANO PARKWAY

15TH STREET - FM 544

RING ROAD

TREE YARD

RING ROAD

ALMA DRIVE

GRAPHIC SCALE

SITE PLAN
1 : 1300

NORTH

## Bush
ARCHITECTS

4700 WESTGROVE DRIVE, STE 200
ADDISON, TX 75001
PHONE 469-857-3151

COLLIN CREEK
SITE LOGISTICS PLANS
811 N. CENTRAL EXPY
PLANO, TX 75075-8897

ISSUE LOG

| NO. | DESCRIPTION | DATE |
|---|---|---|
| 1 | | 03/27/2020 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

PROJECT NO:
ISSUED FOR:
CHECKED BY:
DATE: 06-23-2020

EXHIBIT B - SITE PLAN

SHEET
EX. B