**Exhibit 2**

[DRAFT – 10/20/2020]
[SUBJECT TO FRE 408]
[STRICTLY CONFIDENTIAL]

**CREDIT AND GUARANTY AGREEMENT**

**dated as of [●], 2020**

**by and among**

**[●],**
**as Borrower,**

**[●],**
**as Holdings,**

**CERTAIN SUBSIDIARIES OF BORROWER,**
**as Guarantors,**

**THE LENDERS PARTY HERETO FROM TIME TO TIME,**
**as Lenders,**

**GLAS USA LLC,**
**as Administrative Agent,**

**and**

**GLAS AMERICAS LLC,**
**as Collateral Agent**

**TABLE OF CONTENTS**

**Page**

SECTION 1. DEFINITIONS AND INTERPRETATION ..................................................... 1
   1.1.    Definitions ................................................................................................... 1
   1.2.    Accounting Terms ...................................................................................... 39
   1.3.    Interpretation, Etc. ..................................................................................... 40
   1.4.    Divisions ..................................................................................................... 40

SECTION 2. LOANS ................................................................................................... 40
   2.1.    Loans ........................................................................................................... 40
   2.2.    [Reserved]. ................................................................................................. 41
   2.3.    [Reserved]. ................................................................................................. 41
   2.4.    [Reserved]. ................................................................................................. 41
   2.5.    [Reserved]. ................................................................................................. 41
   2.6.    [Reserved]. ................................................................................................. 41
   2.7.    Evidence of Debt; Register; Lenders' Books and Records ...................... 41
   2.8.    Interest on Loans ........................................................................................ 42
   2.9.    Conversion/Continuation .......................................................................... 43
   2.10.   Default Interest .......................................................................................... 43
   2.11.   Premiums; Fees .......................................................................................... 44
   2.12.   Scheduled Payments/Repayment at Maturity ......................................... 45
   2.13.   Voluntary Prepayments ............................................................................ 45
   2.14.   Mandatory Prepayments ........................................................................... 46
   2.15.   Application of Prepayments ...................................................................... 47
   2.16.   General Provisions Regarding Payments ................................................. 47
   2.17.   Ratable Sharing ......................................................................................... 48
   2.18.   Making or Maintaining Eurodollar Rate Loans ....................................... 49
   2.19.   Increased Costs; Capital Adequacy .......................................................... 51
   2.20.   Taxes; Withholding, Etc. .......................................................................... 52
   2.21.   Obligation to Mitigate .............................................................................. 55
   2.22.   Defaulting Lenders .................................................................................... 56
   2.23.   Removal or Replacement of a Lender ...................................................... 56
   2.24.   Extensions of Loans. ................................................................................. 57

SECTION 3. CONDITIONS PRECEDENT ................................................................. 59
   3.1.    Conditions to the Closing Date ................................................................. 59

SECTION 4. REPRESENTATIONS AND WARRANTIES ......................................... 63
   4.1.    Organization; Requisite Power and Authority; Qualification ................. 63
   4.2.    Equity Interests and Ownership ................................................................ 63
   4.3.    Due Authorization ..................................................................................... 63
   4.4.    No Conflict ................................................................................................. 64
   4.5.    Governmental Consents ............................................................................ 64
   4.6.    Binding Obligation .................................................................................... 64
   4.7.    Pro Forma Financial Statements ............................................................... 64
   4.8.    Projections ................................................................................................. 64
   4.9.    Properties ................................................................................................... 65
   4.10.   No Event of Default .................................................................................. 65
   4.11.   Investment Company Act ......................................................................... 65

4.12. Federal Reserve Regulations; Exchange Act ................................................................. 65
4.13. Solvency .............................................................................................................................. 66
4.14. Disclosure ........................................................................................................................... 66
4.15. Sanctioned Persons; Anti-Corruption Laws .................................................................. 66
4.16. Insurance ............................................................................................................................ 67
4.17. Special Purpose Subsidiaries .......................................................................................... 67
4.18. EEA Financial Institutions .............................................................................................. 67

SECTION 5. AFFIRMATIVE COVENANTS ...................................................................... 67
5.1. Financial Statements and Other Reports ...................................................................... 67
5.2. Existence ............................................................................................................................. 70
5.3. Payment of Taxes .............................................................................................................. 71
5.4. Maintenance of Properties .............................................................................................. 71
5.5. Insurance ............................................................................................................................ 71
5.6. Books and Records; Inspections ..................................................................................... 71
5.7. Lenders Meetings .............................................................................................................. 72
5.8. Compliance with Laws ..................................................................................................... 72
5.9. Environmental ................................................................................................................... 72
5.10. Subsidiaries ........................................................................................................................ 73
5.11. Real Estate Assets ............................................................................................................. 74
5.12. Further Assurances ........................................................................................................... 75
5.13. Credit Ratings .................................................................................................................... 76
5.14. Special Purpose Subsidiaries .......................................................................................... 76
5.15. Syndication Assistance .................................................................................................... 80
5.16. [Post-Closing Matters] .................................................................................................... 81

SECTION 6. NEGATIVE COVENANTS ............................................................................. 81
6.1. Indebtedness ...................................................................................................................... 81
6.2. Liens .................................................................................................................................... 83
6.3. Restrictive Agreements .................................................................................................... 86
6.4. Restricted Junior Payments ............................................................................................ 86
6.5. Fundamental Changes ...................................................................................................... 88
6.6. Investments ........................................................................................................................ 89
6.7. Financial Covenant ........................................................................................................... 90
6.8. Disposition of Assets ........................................................................................................ 90
6.9. Disposal of Subsidiary Interests ..................................................................................... 92
6.10. Sale and Leaseback Transactions .................................................................................... 92
6.11. Transactions with Affiliates ............................................................................................ 92
6.12. Conduct of Business ......................................................................................................... 93
6.13. Permitted Activities of Holdings .................................................................................... 93
6.14. Amendments of Organizational Documents, Related Agreements and OpCo Sale
        Order ................................................................................................................................... 93
6.15. Fiscal Year .......................................................................................................................... 94
6.16. Intellectual Property ......................................................................................................... 94
6.17. Master Lease Documents ................................................................................................. 94

SECTION 7. GUARANTY ..................................................................................................... 94
7.1. Guaranty of the Obligations ........................................................................................... 94
7.2. Contribution by Guarantors ........................................................................................... 94
7.3. Payment by Guarantors ................................................................................................... 95
7.4. Liability of Guarantors Absolute ................................................................................... 95

| 7.5. | Waivers by Guarantors | 97 |
|------|------------------------|-----|
| 7.6. | Guarantors' Rights of Subrogation, Contribution, Etc. | 97 |
| 7.7. | Subordination of Other Obligations | 98 |
| 7.8. | Continuing Guaranty | 98 |
| 7.9. | Authority of Guarantors or Borrower | 98 |
| 7.10. | Financial Condition of Borrower | 98 |
| 7.11. | Bankruptcy, Etc. | 99 |
| 7.12. | Discharge of Guaranty Upon Sale of Guarantor | 99 |

**SECTION 8. EVENTS OF DEFAULT** ........................................................... 99

| 8.1. | Events of Default | 99 |
|------|-------------------|-----|
| 8.2. | Borrower's Right to Cure | 102 |

**SECTION 9. AGENTS** ............................................................................... 103

| 9.1. | Appointment of Agents | 103 |
|------|------------------------|-----|
| 9.2. | Powers and Duties | 103 |
| 9.3. | General Immunity | 104 |
| 9.4. | Agents Entitled to Act as Lender | 106 |
| 9.5. | Lenders' Representations, Warranties and Acknowledgment | 107 |
| 9.6. | Right to Indemnity | 107 |
| 9.7. | Successor Agent | 108 |
| 9.8. | Collateral Documents and Guaranty | 108 |
| 9.9. | Withholding Taxes | 110 |
| 9.10. | Administrative Agent or Collateral Agent May File Bankruptcy Disclosure and Proofs of Claim | 111 |
| 9.11. | Certain ERISA Matters | 112 |

**SECTION 10. MISCELLANEOUS** .............................................................. 113

| 10.1. | Notices | 113 |
|-------|---------|-----|
| 10.2. | Expenses | 114 |
| 10.3. | Indemnity | 115 |
| 10.4. | Set-Off | 116 |
| 10.5. | Amendments and Waivers | 116 |
| 10.6. | Successors and Assigns; Participations | 119 |
| 10.7. | Independence of Covenants | 123 |
| 10.8. | Survival of Representations, Warranties and Agreements | 124 |
| 10.9. | No Waiver; Remedies Cumulative | 124 |
| 10.10. | Marshalling; Payments Set Aside | 124 |
| 10.11. | Severability | 124 |
| 10.12. | Obligations Several; Independent Nature of Lenders' Rights | 124 |
| 10.13. | Headings | 124 |
| 10.14. | APPLICABLE LAW | 125 |
| 10.15. | CONSENT TO JURISDICTION | 125 |
| 10.16. | WAIVER OF JURY TRIAL | 125 |
| 10.17. | Confidentiality | 126 |
| 10.18. | Usury Savings Clause | 127 |
| 10.19. | Effectiveness; Counterparts | 127 |
| 10.20. | PATRIOT Act | 127 |
| 10.21. | Electronic Execution of Assignments | 127 |
| 10.22. | No Fiduciary Duty | 127 |
| 10.23. | Acknowledgement and Consent to Bail-In of Affected Financial Institutions | 128 |

**APPENDICES**:     A     Commitments
B     Notice Addresses

**SCHEDULES**[1]:     3.1     Organizational and Capital Structure[2]
4.2     Equity Interests and Ownership
4.10     Real Estate Assets and Leases
5.11     Mortgaged Properties[3]
5.16     Post-Closing Matters[4]

**EXHIBITS**:[5]     A     Funding Notice
B     Conversion/Continuation Notice
C     Compliance Certificate
D     Assignment Agreement
E     Certificate re Non-Bank Status
F     Counterpart Agreement
G     Pledge and Security Agreement
H     Intercompany Note
I     Auction Procedures
J     Intercreditor Agreement
K     Collateral Questionnaire
L     Secretary's Certificate
M     Solvency Certificate
N     Closing Date Certificate
O     Fee Letter
P     Form of Mortgage

---

[1] To be delivered by the Borrower in advance of the Closing Date (except for Schedules 3.1 and 5.11). Borrower agrees to deliver all such Schedules to the Administrative Agent and the Lenders with sufficient time for such parties to review in advance of the Closing Date.

[2] Schedules 3.1 and 5.11 to be attached at signing. Schedule 3.1 may be updated in accordance herewith.

[3] Mortgaged Properties Schedule to be provided by the Lenders prior to the Closing Date.

[4] Post-Closing Matters Schedule to contain agreements with respect to post-closing delivery of insurance deliverables and intellectual property security agreements.

[5] Except as otherwise attached hereto (*i.e.,* the Intercreditor Agreement and Fee Letter), exhibits to be substantially the same as the exhibits attached to the prepetition credit agreement, with changes to reflect the provisions of this Agreement, the Related Agreements and the transactions contemplated hereby and thereby, or as otherwise mutually agreed prior to the Closing Date.

## CREDIT AND GUARANTY AGREEMENT

This **CREDIT AND GUARANTY AGREEMENT**, dated as of [●], 2020 (this "**Agreement**"), is entered into by and among [●], a [●] ("**Borrower**"), [●], a [●] ("**Holdings**"), certain Subsidiaries of Borrower, as Guarantors, the lenders party hereto from time to time, as Lenders, **GLAS USA LLC**, a limited liability company organized and existing under the laws of the State of New Jersey, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, "**Administrative Agent**"), and **GLAS AMERICAS LLC**, a limited liability company organized and existing under the laws of the State of New York, as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, "**Collateral Agent**").

### RECITALS:

**WHEREAS**, J.C. Penney Corporation, Inc., J.C. Penney Company, Inc. and certain of their Subsidiaries (as debtors and debtors-in-possession, the "**Debtors**") commenced voluntary cases under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on May 15, 2020 (the "**Petition Date**"), and the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, the Credit Parties and their Subsidiaries have agreed to acquire the OpCo Acquired Assets (as defined in the Asset Purchase Agreement), and assume the OpCo Assumed Liabilities (as defined in the Asset Purchase Agreement), from the Debtors pursuant to the terms and conditions set forth in the Asset Purchase Agreement, which Asset Purchase Agreement was approved by the Bankruptcy Court pursuant to the terms and conditions of the OpCo Sale Order on [●], 2020; and

**WHEREAS**, in connection with the consummation and implementation of the transactions contemplated by the Related Agreements and the OpCo Sale Order, the Initial Loans shall be deemed to have been borrowed by Borrower, and severally made by the Lenders, on the Closing Date in an aggregate principal amount equal to $520,000,000.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants contained in this Agreement and the other Credit Documents, the parties hereto hereby agree as follows:

### SECTION 1. DEFINITIONS AND INTERPRETATION

**1.1.    Definitions**. The following terms used herein, including in the preamble, recitals, appendices, exhibits and schedules hereto, shall have the following meanings:

"**ABL Collateral Agent**" means Wells Fargo Bank, National Association.

"**ABL Credit Agreement**" means that certain Credit Agreement, dated as of the Closing Date, by and among certain of the Credit Parties, the ABL Lenders and Wells Fargo Bank, National Association, as administrative agent and collateral agent, as it may be amended, restated, supplemented, modified, waived or Refinanced from time to time in accordance with this Agreement and the Intercreditor Agreement.

"**ABL Credit Documents**" means the ABL Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"**ABL Lender**" means the lenders from time to time party to the ABL Credit Agreement.

"**ABL Priority Collateral**" means the "ABL Priority Collateral" as defined in the Intercreditor Agreement.

"**Adjusted Eurodollar Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for a Eurodollar Rate Loan, the rate *per annum* obtained by dividing (i) (a) the rate *per annum* equal to the rate determined by Administrative Agent to be the London interbank offered rate administered by the ICE Benchmark Administration (or any other person which takes over the administration of that rate) for deposits (for delivery on the first day of such period) with a term equivalent to such period in Dollars displayed on the ICE LIBOR USD page of the Reuters Screen (or any replacement Reuters page which displays that rate) or on the appropriate page of such other information service which publishes that rate from time to time in place of Reuters, determined as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date ("**LIBOR**"), or (b) in the event the rate referenced in the preceding clause (a) is not available, the rate *per annum* equal to the offered quotation rate to first class banks in the London interbank market by any commercial bank identified by Administrative Agent for deposits (for delivery on the first day of the relevant period) in Dollars of amounts in same day funds comparable to the principal amount of the applicable Loan for which the Adjusted Eurodollar Rate is then being determined with maturities comparable to such period as of approximately 11:00 a.m. (London, England time) on such Interest Rate Determination Date, by (ii) an amount equal to (a) one minus (b) the Applicable Reserve Requirement; provided that, notwithstanding the foregoing, the Adjusted Eurodollar Rate shall at no time be less than 1.00% *per annum*.

"**Administrative Agent**" as defined in the preamble hereto.

"**Adverse Proceeding**" means any action, suit, proceeding, hearing (in each case, whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings or any of its Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims), whether pending or, to the knowledge of Holdings or any of its Subsidiaries, threatened against or affecting Holdings or any of its Subsidiaries or any property of Holdings or any of its Subsidiaries.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affected Lender**" as defined in Section 2.18(b).

"**Affected Loans**" as defined in Section 2.18(b).

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), (i) as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise or (ii) solely for purposes of the definition of "Sponsor Affiliated Lenders" and Section 10.6(i), as applied to Borrower, means the possession, directly or indirectly, of the power to vote 10% or more of the Securities having ordinary voting power for the election of directors of Borrower; provided that any Sponsor Affiliated Institutional Lender of any Sponsor shall not be deemed to be an Affiliate of such Sponsor, Holdings or any of Holdings' Subsidiaries.

"**Agent**" means each of (i) Administrative Agent, (ii) Collateral Agent and (iii) any other Person appointed under the Credit Documents to serve in an agent or similar capacity, including, without limitation, any Auction Manager.

"**Agent Affiliates**" as defined in Section 10.1(b)(iii).

"**Aggregate Amounts Due**" as defined in Section 2.17.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Credit and Guaranty Agreement, dated as of the Closing Date, as it may be amended, restated, supplemented, modified or waived from time to time.

"**AHYDO Amount**" as defined in Section 2.14(d).

"**Anti-Corruption Laws**" as defined in Section 4.15(b).

"**Anti-Money Laundering Laws**" means any and all applicable laws, rules or regulations relating to money laundering or terrorism financing, including, but not limited to, (a) 18 U.S.C. §§ 1956 and 1957 and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., as amended by the PATRIOT Act, and its implementing regulations.

"**Applicable Margin**" means, (i) with respect to Eurodollar Rate Loans, 8.50% *per annum* and (ii) with respect to Base Rate Loans, 7.50% *per annum*.

"**Applicable Reserve Requirement**" means, at any time, for any Eurodollar Rate Loan, the maximum rate, expressed as a decimal, at which reserves (including any basic marginal, special, supplemental, emergency or other reserves) are required to be maintained by member banks of the United States Federal Reserve System (or any successor thereto) with respect thereto against "Eurocurrency liabilities" (as such term is defined in Regulation D) under regulations issued from time to time by the Board of Governors or other applicable banking regulator. Without limiting the effect of the foregoing, the Applicable Reserve Requirement shall reflect any other reserves required to be maintained by such member banks with respect to (i) any category of liabilities which includes deposits by reference to which the applicable Adjusted Eurodollar Rate is to be determined, or (ii) any category of extensions of credit or other assets which include Eurodollar Rate Loans. A Eurodollar Rate Loan shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credit for proration, exceptions or offsets that may be available from time to time to the applicable Lender. The rate of interest on Eurodollar Rate Loans shall be adjusted automatically on and as of the effective date of any change in the Applicable Reserve Requirement.

"**Approved Electronic Communications**" means any notice, demand, communication, information, document or other material provided by or on behalf of Holdings or any of its Subsidiaries to Administrative Agent pursuant to any Credit Document or the transactions contemplated therein which is distributed to Agents or Lenders by means of electronic communications pursuant to Section 10.1(b).

"**Asset Purchase Agreement**" means [●].

"**Asset Sale**" means a sale, lease (including a Capital Lease Obligation) or sub-lease (as lessor or sublessor), sale and leaseback, assignment, conveyance, exclusive license (as licensor or sublicensor), transfer or other disposition to, or any exchange of property with, any Person (including the voluntary termination of a lease (including a Capital Lease Obligation) or other contract for consideration) (other than Borrower or any Guarantor Subsidiary), in one transaction or a series of transactions, of all or any part of Holdings' or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, leased or licensed, including (a) the Equity Interests of any of Holdings' Subsidiaries, (b) any businesses, assets or properties

of any of the Special Purpose Subsidiaries and (c) any grant of an exclusive license to any Intellectual Property (including any covenants not to grant rights to other parties) for a term greater than five years (including any renewals or rights or renewal) for use in multiple product categories (whether for a lump sum or stream or payment stream) (other than any Intellectual Property licenses in effect prior to the Closing Date), other than any disposition pursuant to clauses (a), (b), (c), (d), (e)(i), (f), (g)(i), (i), (j), (n), (p)(i), (q) or (r) of Section 6.8.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit D or in such other form as may be approved by Administrative Agent (including electronic documentation generated by ClearPar, Markitclear or other electronic platform).

"**Assignment Effective Date**" as defined in Section 10.6(b).

"**Attributable Indebtedness**" means, when used with respect to any Sale and Leaseback Transaction permitted by Section 6.10, as at the time of determination, the present value (discounted at a rate equivalent to Borrower's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction.

"**Auction**" as defined in Section 10.6(i).

"**Auction Manager**" means (a) Administrative Agent or any of its Affiliates or (b) any other financial institution or advisor reasonably agreed by Borrower and Administrative Agent (whether or not an Affiliate of Administrative Agent), to act as an arranger in connection with any repurchases pursuant to Section 10.6(i); provided that none of Administrative Agent or any of its Affiliates shall have any obligation to serve as the Auction Manager.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chairman of the board (if an officer), chief executive officer, president, vice president (or the equivalent thereof), chief financial officer, treasurer, assistant treasurer, secretary or assistant secretary of such Person; provided that the secretary or assistant secretary of such Person shall have delivered an incumbency certificate to Administrative Agent as to the authority of such Authorized Officer.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of any Affected Financial Institution.

"**Bail-In Legislation**" means (i) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (ii) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their Affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" as defined in the recitals hereto.

"**Base Rate**" means, for any day, a rate *per annum* equal to the greatest of (i) the Prime Rate in

effect on such day, (ii) the Federal Funds Effective Rate in effect on such day plus ½ of 1.00% and (iii) the sum of (a) the Adjusted Eurodollar Rate (after giving effect to any Adjusted Eurodollar Rate "floor") that would be payable on such day for a Eurodollar Rate Loan with a one-month interest period plus (b) the difference between the Applicable Margin for Eurodollar Rate Loans and the Applicable Margin for Base Rate Loans; provided that, notwithstanding the foregoing, the Base Rate shall at no time be less than 2.00% *per annum*.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"**Base Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Base Rate.

"**Benchmark Replacement**" means the sum of: (i) the alternate benchmark rate (which may include SOFR) that has been selected by Administrative Agent and Borrower giving due consideration to (x) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (y) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to LIBOR for U.S. dollar-denominated syndicated credit facilities and (ii) the Benchmark Replacement Adjustment; provided that if the Benchmark Replacement as so determined would be less than 1.00% *per annum*, then the Benchmark Replacement will be deemed to be 1.00% *per* annum for the purposes of this Agreement.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of LIBOR with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by Administrative Agent and Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of LIBOR with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate", the definition of "Interest Period", timing and frequency of determining rates and making payments of interest and other administrative matters) that Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by Administrative Agent in a manner substantially consistent with market practice (or, if Administrative Agent reasonably decides that adoption of any portion of such market practice is not administratively feasible or if Administrative Agent reasonably determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as Administrative Agent reasonably decides is reasonably necessary in connection with the administration of this Agreement), in each case, in consultation with Borrower.

"**Benchmark Replacement Date**" means the earlier to occur of the following events with respect to LIBOR: (1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of LIBOR permanently or indefinitely ceases to provide LIBOR; or (2) in the case of clause (3) of the definition of "Benchmark Transition Event", the date of the public statement or publication of information referenced therein.

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to LIBOR: (1) a public statement or publication of information by or on behalf of the administrator of LIBOR announcing that such administrator has ceased or will cease to provide LIBOR, permanently or indefinitely, <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR; (2) a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR, the U.S. Federal Reserve System, an insolvency official with jurisdiction over the administrator for LIBOR, a resolution authority with jurisdiction over the administrator for LIBOR or a court or an entity with similar insolvency or resolution authority over the administrator for LIBOR, which states that the administrator of LIBOR has ceased or will cease to provide LIBOR permanently or indefinitely, <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide LIBOR; or (3) a public statement or publication of information by the regulatory supervisor for the administrator of LIBOR announcing that LIBOR is no longer representative.

"**Benchmark Transition Start Date**" means (i) in the case of a Benchmark Transition Event, the earlier of (x) the applicable Benchmark Replacement Date and (y) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (ii) in the case of an Early Opt-in Election, the date specified by Administrative Agent by notice to Borrower and the Lenders.

"**Benchmark Unavailability Period**" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to LIBOR and solely to the extent that LIBOR has not been replaced with a Benchmark Replacement, the period (i) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced LIBOR for all purposes hereunder in accordance with Section 2.18(f) and (ii) ending at the time that a Benchmark Replacement has replaced LIBOR for all purposes hereunder pursuant to Section 2.18(f).

"**Beneficial Ownership Certification**" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

"**Beneficiary**" means each Agent, each Lender and Earnout Co.

"**Benefit Plan**" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Internal Revenue Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Internal Revenue Code) the assets of any such "employee benefit plan" or "plan".

"**BHC Act Affiliate**" of a party means an "Affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"**Board of Governors**" means the Board of Governors of the United States Federal Reserve System, or any successor thereto.

"**Borrower**" as defined in the preamble hereto.

"**Business Day**" means (i) any day excluding Saturday, Sunday and any day which is a legal

holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close and (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Eurodollar Rate or any Eurodollar Rate Loans, the term "**Business Day**" means any day which is a Business Day described in clause (i) and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"**Capital Lease Obligations**" of any Person means, subject to the proviso to the first sentence of Section 1.2(a), the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Cash Equivalents**" means, as at any date of determination, any of the following: (a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency or instrumentality thereof); (b) investments in commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a credit rating of at least A2 from S&P, P2 from Moody's or F2 from Fitch; (c) investments in certificates of deposit, banker's acceptances and time deposits issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, (i) any domestic or offshore office of any commercial bank organized under the laws of the United States of America or any State thereof, (ii) any office located within the United States of America or in a foreign jurisdiction that has a tax treaty with the United States of America of a commercial bank organized under the laws of another country or (iii) any office located in London of any commercial bank organized under the laws of the United States of America, any Asian country or any European country, in each case which, at the time of acquisition, has a combined capital and surplus and undivided profits of not less than $500,000,000; provided, however, that investments with any bank that has a combined capital and surplus and undivided profits of less than $500,000,000 are permitted if Borrower maintains a banking relationship with such bank; (d) collateralized repurchase agreements with a term of not more than 365 days and entered into with a financial institution satisfying the criteria described in clause (c) above or any ABL Lender, FILO Lender or any Affiliate of an ABL Lender or FILO Lender (i) that has a combined capital and surplus and undivided profits of not less than $500,000,000 or (ii) whose obligations under any such agreements is guaranteed by an entity that has a combined capital and surplus and undivided profits of not less than $500,000,000; and (e) money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940 and (ii) have portfolio assets of at least $3,000,000,000; provided, that investments in any money market fund with portfolio assets of less than $3,000,000,000 are permitted if such fund has received a rating of AAA from S&P or Aaa from Moody's.

"**Cause**" means, with respect to an Independent Director or Independent Manager, (i) acts or omissions by such Independent Director or Independent Manager, as applicable, that constitute willful disregard of, or gross negligence with respect to, such Independent Director's or Independent Manager's, as applicable, duties, (ii) such Independent Director or Independent Manager, as applicable, has engaged in or has been charged with or has been indicted or convicted for any crime or crimes of fraud or other acts constituting a crime under any law applicable to such Independent Director or Independent Manager, as applicable, (iii) such Independent Director or Independent Manager, as applicable, has breached its fiduciary duties of loyalty and care as and to the extent of such duties in accordance with the terms of any Special Purpose Subsidiary's organizational documents, (iv) there is a material increase in the fees charged by such Independent Director or Independent Manager, as applicable, or a material change to such Independent Director's or Independent Manager's, as applicable, terms of service, (v) such Independent Director or Independent Manager, as applicable, is unable to perform his or her duties as Independent

Director or Independent Manager, as applicable, due to death, disability or incapacity, or (vi) such Independent Director or Independent Manager, as applicable, no longer meets the definition of Independent Director or Independent Manager, as applicable.

"**Certificate re Non-Bank Status**" means a certificate substantially in the form of Exhibit E.

"**Change in Law**" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; <u>provided</u> that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" means (i) the Sponsors shall cease to beneficially own and control at least 50.1% on a fully diluted basis of the economic and voting interests in the Equity Interests of Holdings, (ii) any Person or "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) other than any Sponsor (a) (x) shall have acquired beneficial ownership or control of 35.0% or more on a fully diluted basis of the economic and/or voting interests in the Equity Interests of Holdings or (y) shall have acquired beneficial ownership or control of the economic and/or voting interests in the Equity Interests of Holdings in excess of those interests collectively owned and controlled by the Sponsors at such time or (b) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of Holdings, (iii) Holdings shall cease to beneficially own and control 100% on a fully diluted basis of the economic and voting interest in the Equity Interests of Borrower or (iv) any "change of control" or similar event under the ABL Credit Agreement or the FILO Credit Agreement shall occur.

"**Chapter 11 Cases**" as defined in the recitals hereto.

"**Class**" (i) with respect to Lenders, refers to whether such Lenders hold a particular Class of Loans, and (ii) with respect to Loans, refers to whether such Loans are Initial Loans or Extended Loans of a given Extension Series.

"**Closing Date**" means [●], 2020.

"**Closing Date ABL/FILO Credit Agreement Secured Obligations**" means the "ABL First Lien Debt" and the "ABL Second Lien Debt", in each case as defined in the Intercreditor Agreement.

"**Closing Date ABL/FILO Credit Agreements**" means, collectively, the ABL Credit Agreement and the FILO Credit Agreement.

"**Closing Date ABL/FILO Credit Documents**" means, collectively, the ABL Credit Documents and the FILO Credit Documents.

"**Closing Date Equity Contribution**" means the cash common equity contribution by the Sponsors and their respective Affiliates to Borrower in an aggregate amount equal to at least $300,000,000.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Agent**" as defined in the preamble hereto.

"**Collateral Documents**" means the Pledge and Security Agreement, the Mortgages, the Intellectual Property Security Agreements, the Intercreditor Agreement and all other instruments, documents and agreements delivered by or on behalf of any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to Collateral Agent, for the benefit of the Secured Parties, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Collateral Questionnaire**" means a certificate substantially in the form of Exhibit K that provides information with respect to the personal or mixed property of each Credit Party.

"**Commitment**" means the commitment of a Lender to be deemed to have severally made an Initial Loan and "Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Commitment, if any, is set forth on Appendix A or in the applicable Assignment Agreement, subject to any adjustment or reduction pursuant to the terms and conditions hereof. The aggregate amount of the Commitments as of the Closing Date is $520,000,000.

"**Company Material Adverse Effect**" means a "Material Adverse Effect" as defined in the Asset Purchase Agreement as in effect on and as of the date of the Asset Purchase Agreement.

"**Compliance Certificate**" means a Compliance Certificate substantially in the form of Exhibit C.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consignment Inventory**" means any Inventory (as defined in the UCC) held by a Credit Party on a consignment basis and as to which the consignor has complied with all applicable requirements of the UCC, which Inventory (as defined in the UCC) is not owned by a Credit Party (and would not be reflected on a consolidated balance sheet of the Credit Parties and their respective Subsidiaries prepared in accordance with GAAP).

"**Consolidated Adjusted EBITDA**" means, for any period, Consolidated Net Income for such period (disregarding any non-cash charges or credits related to any Plan, any non-qualified supplemental pension plan maintained, sponsored or contributed to by Holdings or any ERISA Affiliate, or any Multiemployer Plan) plus:

(a)       without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of:

(i)       consolidated interest expense for such period, plus

(ii)       consolidated income tax expense for such period and Tax Distributions made in respect of such period, plus

(iii)       all amounts attributable to depreciation and amortization for such period, plus

(iv)       any extraordinary, unusual or non-recurring charges for such period; provided that, solely for the purposes of calculating the Financial Covenant, any amounts under this clause (iv), together with any amounts under clause (viii) of this definition, shall not exceed $50,000,000 in the aggregate in any consecutive four-Fiscal Quarter period, plus

(v)       any fees, expenses or charges related to any equity offering, permitted acquisition or other investment, Asset Sale or other disposition, or incurrence or refinancing of (or amendment or other modification to the documents evidencing any) Indebtedness (in each case, whether or not successful or consummated) permitted to be made or incurred hereunder, including fees, expenses or charges relating to the Transactions, plus

(vi)       any premium, make-whole or penalty payments that are required to be made in connection with any prepayment of Indebtedness, plus

(vii)       any non-cash charges for such period; provided that in the event Holdings or any Subsidiary makes any cash payment in respect of any such non-cash charge, such cash payment shall be deducted from Consolidated Adjusted EBITDA in the period in which such payment is made, plus

(viii)       the amount of cash restructuring charges and curtailments and modifications to pension and post-retirement employee benefit plans incurred during such period; provided that, solely for the purposes of calculating the Financial Covenant, any amounts under this clause (viii), together with any amounts under clause (iv) of this definition, shall not exceed $50,000,000 in the aggregate in any consecutive four-Fiscal Quarter period;

and minus:

(b)       without duplication and to the extent included in determining such Consolidated Net Income, the sum of:

(i)       any extraordinary, unusual or non-recurring gains for such period, plus

(ii)       non-cash gains for such period;

all determined on a consolidated basis in accordance with GAAP.

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures by Holdings and its consolidated Subsidiaries for the acquisition or leasing (pursuant to Capital Lease Obligations) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that are required to be capitalized under GAAP on a consolidated balance sheet of Holdings and its consolidated Subsidiaries; provided that Consolidated Capital Expenditures shall not include: (a) expenditures to the extent they are made with proceeds of the issuance of Equity Interests, (b) expenditures with proceeds of insurance settlements, condemnation awards, eminent domain and other settlements in respect of lost (including through eminent domain), destroyed, damaged or condemned assets, equipment or other property, (c) interest capitalized during such period to the extent included in Consolidated Cash Interest Expense, (d) expenditures that are accounted for as capital expenditures of Holdings or any consolidated Subsidiary and that actually are (i) paid for by a third party (excluding Holdings or any consolidated Subsidiary thereof) and for which neither Holdings nor any Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other Person (whether before, during or after such period) or (ii) contractually required to be, and are, reimbursed to the Credit Parties in cash by a third party (including

-10-

landlords) during such period, (e) the book value of any asset owned by Holdings or any of its consolidated Subsidiaries prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of Holdings or such consolidated Subsidiary reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period, (f) the purchase price of equipment purchased during such period to the extent the consideration therefor consists of any combination of (i) used or surplus equipment traded in at the time of such purchase and (ii) the proceeds of a sale of used or surplus equipment made within 90 days of the time of such purchase, in each case, in the ordinary course of business, and (g) expenditures to the extent constituting any portion of the purchase price of an acquisition of, or investment in, a business or line of business permitted under Section 6.6, which, in accordance with GAAP, are or should be capitalized under GAAP.

"**Consolidated Cash Interest Expense**" means, for any period, Consolidated Interest Expense during such period (excluding interest which is payable in kind, but including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Swap Agreements entered into to hedge interest rates to the extent such net costs are allocable to such period in accordance with GAAP (for purposes of clarification, excluding fees and expenses paid in connection with the establishment of this Agreement)), all determined on a consolidated basis in accordance with GAAP.

"**Consolidated Current Assets**" means, as at any date of determination, the total assets of a Person and its Subsidiaries on a consolidated basis that may properly be classified as current assets in conformity with GAAP, excluding cash and Cash Equivalents.

"**Consolidated Current Liabilities**" means, as at any date of determination, the total liabilities of a Person and its Subsidiaries on a consolidated basis that may properly be classified as current liabilities in conformity with GAAP, excluding the current portion of long term debt.

"**Consolidated Excess Cash Flow**" means, for any period, an amount (if positive) equal to:

(a)      the sum, without duplication, of the amounts for such period of:

(i)      Consolidated Adjusted EBITDA, <u>plus</u>

(ii)     the Consolidated Working Capital Adjustment; <u>minus</u>

(b)      the sum, without duplication, of the amounts for such period paid from Internally Generated Cash of:

(i)      cash interest and principal paid on Indebtedness (excluding (x) repayments or prepayments of any revolving credit facility (including under the ABL Credit Agreement), unless there is an equivalent permanent reduction in the commitments thereunder and (y) any payments not permitted by the terms hereof); <u>plus</u>

(ii)     Consolidated Capital Expenditures actually made in an amount not to exceed $262,000,000 in the aggregate during any Fiscal Year; <u>provided</u> that, solely for purposes of this clause (ii), Borrower shall have the right to carry-forward, solely to the next succeeding Fiscal Year and on a non-cumulative basis, an amount not to exceed the positive difference (if any) between $262,000,000 and Consolidated Capital Expenditures actually made during such Fiscal Year, with such carry-forward amount (if any) being deemed to be utilized first in the next succeeding Fiscal Year if actually made in such next succeeding Fiscal Year and forfeited if not

actually made in such next succeeding Fiscal Year; plus

(iii)     payments in respect of long-term liabilities other than Indebtedness; plus

(iv)     investments and acquisitions permitted to be made under Section 6.6; plus

(v)     to the extent included in the determination of Consolidated Adjusted EBITDA for such period, the amount of any extraordinary, unusual or non-recurring cash charges for such period in an amount not to exceed, together with any amounts under clause (vi) of this definition, (x) $150,000,000 in the aggregate during the first two full Fiscal Years ending after the Closing Date and (y) $50,000,000 in the aggregate during any Fiscal Year thereafter; plus

(vi)     to the extent included in the determination of Consolidated Adjusted EBITDA for such period, the amount of cash restructuring charges and curtailments and modifications to pension and post-retirement employee benefit plans incurred during such period in an amount not to exceed, together with any amounts under clause (v) of this definition, (x) $150,000,000 in the aggregate during the first two full Fiscal Years ending after the Closing Date and (y) $50,000,000 in the aggregate during any Fiscal Year thereafter; plus

(vii)     to the extent included in the determination of Consolidated Adjusted EBITDA for such period, the aggregate amount of any fees, expenses or charges related to any equity offering, permitted acquisition or other investment, Asset Sale or other disposition, or incurrence or refinancing of (or amendment or other modification to the documents evidencing any) Indebtedness (in each case, whether or not successful or consummated) permitted to be made or incurred hereunder, including fees, expenses or charges relating to the Transactions; plus

(viii)     to the extent included in the determination of Consolidated Adjusted EBITDA for such period, the aggregate amount of any premium, make-whole or penalty payments that are required to be made in connection with any prepayment of Indebtedness; plus

(ix)     to the extent included in the determination of Consolidated Adjusted EBITDA for such period, consolidated income tax expense for such period and Tax Distributions made in respect of such period.

"**Consolidated Interest Expense**" means, for any period, the interest expense (including imputed interest expense in respect of Capital Lease Obligations) of Holdings and its Subsidiaries for such period, including any interest that is capitalized rather than expensed for such period.

"**Consolidated Net Income**" means, for any period, (i) the net income (or loss) of Holdings and its Subsidiaries on a consolidated basis for such period taken as a single accounting period determined in conformity with GAAP, minus (ii) (a) the income (or loss) of any Person (other than a Subsidiary of Holdings) in which any other Person (other than Holdings or any of its Subsidiaries) has a joint interest, except to the extent of the amount of dividends or other distributions actually paid to Holdings or any of its Subsidiaries by such Person during such period, (b) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of Holdings or is merged into or consolidated with Holdings or any of its Subsidiaries or that Person's assets are acquired by Holdings or any of its Subsidiaries, (c) any after-tax gains or losses attributable to Asset Sales or returned surplus assets of any pension plan and (d) the income (or loss) attributable to the early extinguishment of Indebtedness.

"**Consolidated Total Debt**" means, as at any date of determination, (a) the aggregate stated balance sheet amount of all Indebtedness of Holdings and its Subsidiaries (or, if higher, the par value or stated face

amount outstanding of all such Indebtedness (other than zero coupon Indebtedness)) determined on a consolidated basis in accordance with GAAP, minus (b) the aggregate amount of Unrestricted Cash as of such date.

"**Consolidated Working Capital**" means, as at any date of determination, the excess of Consolidated Current Assets of Holdings and its Subsidiaries over Consolidated Current Liabilities of Holdings and its Subsidiaries.

"**Consolidated Working Capital Adjustment**" means, for any period on a consolidated basis, the amount (which may be a negative number) by which Consolidated Working Capital as of the beginning of such period exceeds (or is less than) Consolidated Working Capital as of the end of such period. In calculating the Consolidated Working Capital Adjustment there shall be excluded the effect of reclassification during such period of current assets to long term assets and current liabilities to long term liabilities and the effect of any acquisition of all or substantially all of the assets of, all of the Equity Interests of, or a business line or unit or a division of any Person during such period; provided that there shall be included with respect to any such acquisition during such period an amount (which may be a negative number) by which the Consolidated Working Capital acquired in such acquisition as at the time of such acquisition exceeds (or is less than) Consolidated Working Capital at the end of such period.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, deed to secure debt, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Conversion/Continuation Date**" means the effective date of a continuation or conversion, as the case may be, as set forth in the applicable Conversion/Continuation Notice.

"**Conversion/Continuation Notice**" means a Conversion/Continuation Notice substantially in the form of Exhibit B.

"**Counterpart Agreement**" means a Counterpart Agreement substantially in the form of Exhibit F delivered by a Credit Party pursuant to Section 5.10.

"**Covered Entity**" means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"**Credit Document**" means any of this Agreement, the Collateral Documents, the Fee Letter and any other documents, certificates, instruments or agreements executed and delivered by or on behalf of a Credit Party for the benefit of any Agent or any other Lender in connection herewith on or after the Closing Date that specifically identifies itself as a "**Credit Document**".

"**Credit Extension**" means the making of a Loan.

"**Credit Party**" means Borrower and the Guarantors.

"**Credit Rating**" means, in the case of Moody's, the "Corporate Family Rating" (or its equivalent) assigned by Moody's to Holdings and, in the case of S&P, the "Issuer Credit Rating" assigned by S&P to

Borrower.

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"**Customary Mandatory Prepayment Terms**" means, in respect of any Indebtedness, terms requiring any obligor in respect of such Indebtedness to pay (or offer to pay) such Indebtedness (a) in the event of a "change in control" (or similar event), (b) in the event of a "fundamental change" (or similar event) that is customary at the time of issuance (a "**Fundamental Change**") and (c) in the event of an "asset sale" (or similar event, including condemnation or casualty); provided that such mandatory payment (or offer to pay) in the event of an "asset sale" (or similar event, including condemnation or casualty) (i) can be avoided pursuant to customary reinvestment rights (it being understood that the terms of such Indebtedness may include additional customary means of avoiding the applicable payment) and (ii) shall not apply to the sale or disposition of Collateral unless the payment or offer to pay may be avoided through reinvestment or prepayment of the Obligations.  Borrower shall provide a certificate of a Financial Officer to the effect that the terms of any (x) reinvestment rights or other means of avoiding the applicable Payment referred to in clause (c)(i) above are customary or (y) Fundamental Change are customary, and such determination shall be conclusive unless Administrative Agent shall have objected to such determination within five (5) Business Days following its receipt of such certificate and the draft documentation governing such Indebtedness.

"**DC Master Lease**" means that certain Master Lease, dated as of the Closing Date, by and between [●], a [Delaware limited liability company], as lessor, and the Special Purpose DC Tenant Subsidiary, as lessee, as it may be amended, restated, supplemented, modified or waived from time to time.

"**Debt Fund Affiliate**" means any Affiliate of any Disqualified Lender that is a bona fide diversified debt fund either (i) with information barriers in place restricting the sharing of investment-related and other information between it and such Disqualified Lender or (ii) whose managers have fiduciary duties to the investors of such fund independent of their fiduciary duties to the investors in such Disqualified Lender; provided that such Disqualified Lender does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of any such fund.

"**Debtor Relief Laws**" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Right**" as defined in, and interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"**Defaulting Lender**" means subject to Section 2.22(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies Administrative Agent and Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (which conditions precedent, together with the applicable default, if any, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to Administrative Agent, Collateral Agent or any Lender any

other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified Borrower or Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lenders' obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with the applicable default, if any, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by Administrative Agent or Borrower, to confirm in writing to Administrative Agent and Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by Administrative Agent and Borrower), or (d) Administrative Agent has received notification that such Lender is, or has a direct or indirect parent company that is, (i) insolvent, or is generally unable to pay its debts as they become due, or admits in writing its inability to pay its debts as they become due, or makes a general assignment for the benefit of its creditors, (ii) the subject of a bankruptcy, insolvency, reorganization, liquidation or similar proceeding, or a receiver, trustee, conservator, intervenor or sequestrator or the like has been appointed for such Lender or its direct or indirect parent company, or such Lender or its direct or indirect parent company has taken any action in furtherance of or indicating its consent to or acquiescence in any such proceeding or appointment or (iii) subject to a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.

"**Deposit Account**" means any "deposit account", within the meaning of Article 9 of the UCC, of any Credit Party.

"**DIP Facility**" means that certain Superpriority Senior Secured Debtor-In-Possession Credit Facility, dated as of June 8, 2020, by and among J. C. PENNEY CORPORATION, INC., J. C. PENNEY COMPANY, INC. and certain Subsidiaries of J. C. PENNEY CORPORATION, INC., each as debtors and debtors-in-possession, the lenders party thereto from time to time, GLAS USA LLC, as administrative agent, and GLAS AMERICAS LLC, as collateral agent, as it may be amended, restated, supplemented, modified or waived from time to time.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (i) matures or is mandatorily redeemable (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (ii) is redeemable at the option of the holder thereof (other than solely for Equity Interests which are not otherwise Disqualified Equity Interests), in whole or in part, (iii) provides for the scheduled payments or dividends in cash, or (iv) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is 91 days after the Latest Maturity Date, except, in the case of clauses (i) and (ii), if as a result of a change of control or asset sale, so long as any rights of the holders thereof upon the occurrence of such a change of control or asset sale event are subject to the prior payment in full in cash of all Obligations; provided that Equity Interests issued to any employee benefit plan, or by any such plan to any employees of Holdings or any of its Subsidiaries, shall not constitute Disqualified Equity Interests solely because they may be required to be paid in order to satisfy applicable statutory or regulatory obligations.

"**Disqualified Lenders**" means:

(a)    those Persons identified by name by Borrower in writing to Administrative Agent as (i) direct operating company competitors of Borrower and its material lines of business or (ii) controlling Affiliates of such direct operating company competitors of Borrower and its material lines of business, in each case of the foregoing clauses (i) and (ii), (x) prior to the Closing Date and approved by Administrative Agent and (y) from time to time after the Closing Date and approved by Administrative Agent (which approval, in the case of this clause (y), shall not be unreasonably withheld, conditioned or delayed); it being understood and agreed that any Debt Fund Affiliate shall not constitute direct operating company competitors of Borrower and its material lines of business or controlling Affiliates of such direct operating company competitors of Borrower and its material lines of business; and

(b)    up to five (5) Persons that have been identified by name by Borrower in writing to Administrative Agent prior to the Closing Date and approved by Administrative Agent and any Affiliate of any such Person to the extent that such Affiliate is (i) clearly identifiable as such on the basis of its name or (ii) identified in writing by Borrower as such to Administrative Agent.

No supplement to the list of Disqualified Lenders pursuant to clause (a)(y) shall operate to disqualify any Person that is an existing Lender or a prospective Lender party to a pending assignment.  Administrative Agent shall, upon the written request of any Lender or prospective Lender, make the list of Disqualified Lenders available to such Person.  Each of the Credit Parties and the Lenders hereby acknowledge and agree that no Agent will have any (i) responsibility or obligation to determine whether any Lender or prospective Lender is a Disqualified Lender or (ii) liability to any Person with respect to any assignment made to a Disqualified Lender.

"**Division**" means, in reference to any Person that is a limited liability company organized under the laws of the State of Delaware, the division of such Person into two (2) or more separate Persons, with the dividing Person either continuing or terminating its existence as part of such division, including as contemplated under (i) Section 18-217 of the Delaware Limited Liability Company Act, (ii) Section 17-220 of the Delaware Revised Uniform Limited Partnership Act, or (iii) any analogous action taken pursuant to any other applicable law.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary organized under the laws of the United States of America, any State thereof or the District of Columbia.

"**Due Date Earnout Payment**" as defined in the Earnout Agreement.

"**Early Opt-in Election**" means the occurrence of:

(1) a reasonable determination by Administrative Agent that U.S. dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in Section 2.18(f), are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace LIBOR, and

(2) the election by Administrative Agent to declare that an Early Opt-in Election has occurred and the provision by Administrative Agent of written notice of such election to Borrower and the Lenders.

"**Earnout Agreement**" means [●].

"**Earnout Amount**" means, for any Fiscal Year, the amounts payable under Section 1 of the Earnout Agreement in respect of such Fiscal Year.

"**Earnout Co.**" means [●].

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition and is subject to the supervision of an EEA Resolution Authority, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision of an EEA Resolution Authority with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Eligible Assignee**" means any Person other than a natural person that is (i) a Lender, an Affiliate of any Lender or a Related Fund or (ii) a commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans in the ordinary course of business; provided that no Defaulting Lender, Disqualified Lender, Credit Party or Affiliate of a Credit Party shall be an Eligible Assignee (except assignments to any Sponsor Affiliated Lender pursuant to Section 10.6(i)).

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed to by, Holdings, any of its Subsidiaries or any of their respective ERISA Affiliates.

"**Environment**" means ambient air, surface water, groundwater, drinking water, land surface, sediments, and subsurface strata & natural resources such as wetlands, flora and fauna.

"**Environmental Claim**" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or legally enforceable directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with the presence, Release or threat of Release of any Hazardous Material or Hazardous Materials Activity; (iii) in connection with any Environmental Liability; or (iv) in connection with any actual or alleged damage, injury, threat or harm to natural resources, the Environment, or as relates to exposure to Hazardous Materials, human health or safety.

"**Environmental Laws**" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the Environment, preservation or reclamation of natural resources, the management, Release or threatened Release of any Hazardous Material or to health and safety matters (as they relate to exposure to Hazardous Materials).

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental investigation or remediation, fines, penalties or indemnities), of

Holdings or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Equity Interests**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with Holdings, is treated as a single employer under Section 414(b) or (c) of the Internal Revenue Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Internal Revenue Code, is treated as a single employer under Section 414 of the Internal Revenue Code.

"**ERISA Event**" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) a failure by any Plan to satisfy the minimum funding standard (as defined in Section 412 of the Internal Revenue Code or Section 302 of ERISA) applicable to such Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) a determination that any Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Internal Revenue Code); (e) the incurrence by Holdings or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (f) the receipt by Holdings or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans (other than a termination initiated by Holdings or an ERISA Affiliate) or to appoint a trustee to administer any Plan; (g) the incurrence by Holdings or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Multiemployer Plan or the withdrawal from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA); (h) the receipt by Holdings or any ERISA Affiliate from any Multiemployer Plan of any notice concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA or in "endangered" or "critical" status (within the meaning of Section 432 of the Internal Revenue Code or Section 305 of ERISA); (i) the occurrence of a non-exempt "prohibited transaction" (as defined in Section 4975 of the Internal Revenue Code or Section 406 of ERISA) with respect to any Employee Benefit Plan and with respect to which Holdings or any ERISA Affiliate is a "disqualified person" (within the meaning of Section 4975 of the Internal Revenue Code) or a "party in interest" (within the meaning of Section 406 of ERISA) or could otherwise be liable; (j) the imposition of a Lien upon the assets of Holdings or any ERISA Affiliate pursuant to the Internal Revenue Code or ERISA with respect to any Plan; or (k) the disqualification by the Internal Revenue Service of any Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) under Section 401(a) of the Internal Revenue Code.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"**Eurodollar Rate Loan**" means a Loan bearing interest at a rate determined by reference to the Adjusted Eurodollar Rate.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Subsidiary**" means (a) a non-wholly owned Subsidiary, (b) a Foreign Subsidiary, (c) a FSHCO, (d) a Special Purpose Tenant Subsidiary or (e) a Special Purpose Tenant Subsidiary HoldCo.

"**Excluded Swap Obligation**" means, with respect to any Guarantor at any time, any obligation (a "**Swap Obligation**") to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act, if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is illegal at such time under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time such guarantee or grant of a security interest becomes effective with respect to such related Swap Obligation.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by Borrower under Section 2.23) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.20, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.20(c), and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Existing Loans**" as defined in Section 2.24(c)(ii).

"**Extended Loans**" as defined in Section 2.24(c)(ii).

"**Extended Maturity Date**" as defined in Section 2.24(a).

"**Extension**" as defined in Section 2.24(a).

"**Extension Amendments**" as defined in Section 2.24(e).

"**Extension Offer**" as defined in Section 2.24(a).

"**Extension Series**" means Extended Loans having the same terms and specified to constitute a single Class of Loans for purposes of this Agreement in the applicable Extension Amendment.

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or heretofore owned, leased, operated or used by Borrower or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) or any intergovernmental agreement (and any related laws or legislation) implementing the foregoing.

"**Federal Funds Effective Rate**" means for any day, the rate *per annum* equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided, (i) if such day is not a Business Day, the Federal Funds Effective Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Effective Rate for such day shall be the average of the rates (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged for such day on such transactions received by Administrative Agent from three federal funds brokers of recognized standing selected by it; provided, further, that, notwithstanding the foregoing, the Federal Funds Effective Rate shall at no time be less than 0.00% *per annum*.

"**Fee Letter**" means that certain Fee Letter, dated as of the Closing Date, in the form of Exhibit O, by and among Agents and Borrower, as amended, restated, supplemented or otherwise modified from time to time.

"**FILO Credit Agreement**" means that certain Credit Agreement, dated as of the Closing Date, by and among certain of the Credit Parties, the FILO Lenders and Pathlight Capital LP, as administrative agent and collateral agent, as it may be amended, restated, supplemented, modified, waived or Refinanced from time to time in accordance with this Agreement and the Intercreditor Agreement.

"**FILO Credit Documents**" means the FILO Credit Agreement and all security agreements, guarantees, pledge agreements and other agreements or instruments executed in connection therewith.

"**FILO Lender**" means the lenders from time to time party to the FILO Credit Agreement.

"**FILO Loans**" means loans outstanding under the FILO Credit Agreement.

"**Financial Covenant**" as defined in Section 6.7.

"**Financial Officer**" means the chief financial officer, principal accounting officer, treasurer, assistant treasurer or controller of Holdings or Borrower.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of a financial officer that such financial statements fairly present, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and

the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"**Financial Plan**" as defined in Section 5.1(h).

"**First Lien Net Leverage Ratio**" means the ratio as of the last day of any Fiscal Quarter of (i) any Consolidated Total Debt as of such day that is secured by a first priority Lien upon any real or personal property or other assets of Holdings or any of its Subsidiaries to (ii) Consolidated Adjusted EBITDA for the consecutive four-Fiscal Quarter period ending on such day; provided that, solely for the purpose of calculating the First Lien Net Leverage Ratio, (x) the portion of Consolidated Total Debt attributable to the Closing Date ABL/FILO Credit Agreement Secured Obligations shall be calculated based on the average daily funded balance of the Closing Date ABL/FILO Credit Agreement Secured Obligations during the consecutive four-Fiscal Quarter period ending on such day and (y) the aggregate amount of Unrestricted Cash shall be calculated based on the average daily Unrestricted Cash during the consecutive four-Fiscal Quarter period ending on such day.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the only Lien to which such Collateral is subject, other than any Permitted Lien.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Holdings and its Subsidiaries ending on the Saturday closest to January 31 of each calendar year.

"**Fitch**" means Fitch, Inc.

"**Flood Hazard Property**" means any Real Estate Asset subject to a mortgage in favor of Collateral Agent, for the benefit of the Secured Parties, and located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**Flood Certificate**" means a "Standard Flood Hazard Determination Form" of the Federal Emergency Management Agency and any successor Governmental Authority performing a similar function.

"**Flood Program**" means, collectively, (a) National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (b) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (c) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"**Flood Zone**" means areas having special flood hazards as described in the Flood Program.

"**Foreign Subsidiary**" means any Subsidiary that is not a Domestic Subsidiary.

"**FSHCO**" means any Subsidiary that owns no material assets other than the Equity Interests of one or more Foreign Subsidiaries and/or other FSHCOs.

"**Fundamental Change**" as defined in the definition of "Customary Mandatory Prepayment Terms".

"**Funding Guarantors**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit A.

"**GAAP**" means, subject to the provisions of Section 1.2, United States generally accepted accounting principles in effect as of the date of determination thereof.

"**Governmental Authority**" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Grantor**" as defined in the Pledge and Security Agreement.

"**guarantee**" of or by any Person (the "**guarantor**") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; underlined provided that the term guarantee shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any guarantee at any time shall be deemed to be (i) an amount equal to the stated or determinable amount at such time of the related primary obligation, or portion thereof, in respect of which such guarantee is made or (ii) if the amount of such primary obligation is not stated or determinable at such time, the amount of the guarantee shall be such guarantor's maximum reasonably anticipated liability in respect thereof; underlined provided that if the terms of such guarantee limit the amount for which such guarantor may be liable thereunder to a maximum stated or determinable amount, the amount of such guarantee shall not in any event exceed such maximum stated or determinable amount.

"**Guaranteed Obligations**" as defined in Section 7.1.

"**Guarantor**" means each of (i) Holdings, (ii) each Subsidiary of Borrower (other than any Excluded Subsidiary), (iii) each Subsidiary that guarantees or is a borrower with respect to the Closing Date ABL/FILO Credit Agreement Secured Obligations and (iv) any Subsidiary of Borrower that is designated by Borrower to become a party to this Agreement and the applicable Collateral Documents for the purpose of granting a security interest in such Subsidiary's Collateral; underlined provided that Borrower shall cause the requirements of Section 5.10(a) to be satisfied with respect to such Subsidiary immediately upon such Subsidiary becoming a Guarantor.

"**Guarantor Subsidiary**" means each Guarantor other than Holdings.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means all explosive or radioactive materials, substances or wastes and all hazardous or toxic materials, substances, wastes or other pollutants, including petroleum or petroleum distillates or by-products, asbestos or asbestos containing materials, polychlorinated biphenyls, per- and

polyfluoroalkyl substances, per- or polyfluoroalkyl substances, radon gas, infectious or medical wastes and all other materials, substances or wastes of any nature regulated as hazardous, toxic, a pollutant, a contaminant, or words of similar import pursuant to any Environmental Law.

"**Hazardous Materials Activity**" means any past or current activity, event or occurrence conducted by Holdings or any of its Subsidiaries involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

"**Historical Financial Statements**" means, as of the Closing Date, the audited financial statements of J. C. PENNEY COMPANY, INC. and its Subsidiaries, for the immediately preceding three Fiscal Years, and the unaudited financial statements of J. C. PENNEY COMPANY, INC. and its Subsidiaries, for each Fiscal Quarter commencing after the most recently ended Fiscal Year and ending prior to the Closing Date, consisting of balance sheets and the related consolidated statements of income, stockholders' equity and cash flows for such Fiscal Years and Fiscal Quarters, respectively.

"**Holdings**" as defined in the preamble hereto.

"**Increased-Cost Lender**" as defined in Section 2.23.

"**Indebtedness**" of any Person means, without duplication, (a) all obligations of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) accounts payable incurred in the ordinary course of business, (ii) any earn-out obligation contingent upon performance of an acquired business, except to the extent such obligation would be required to be reflected on a consolidated balance sheet (without giving effect to the footnotes thereto) of Holdings prepared in accordance with GAAP, (iii) any amount owing under the Earnout Agreement in respect of (x) the Earnout Amount until such amount is payable in accordance with the terms of the Earnout Agreement (without giving effect to any deferral periods or extensions thereunder) and (y) amounts other than the Earnout Amount and (iv) accruals for payroll and other liabilities accrued in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed (provided that with respect to Indebtedness that is nonrecourse to the credit of that Person, such Indebtedness shall be taken into account only to the extent of the lesser of (x) the fair market value of the asset(s) subject to such Lien and (y) the amount of Indebtedness secured), (f) all guarantees by such Person of Indebtedness of others, (g) all Capital Lease Obligations of such Person, (h) all non-contingent reimbursement obligations of such Person in respect of letters of credit, letters of guaranty, and bankers' acceptances, (i) all Off-Balance Sheet Liabilities and (j) Disqualified Equity Interests. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. For the avoidance of doubt, any preferred Equity Interests (other than

-23-

any Disqualified Equity Interests) of any Person that are convertible into common Equity Interests (other than any Disqualified Equity Interests) of such Person shall not constitute Indebtedness of such Person. For the avoidance of doubt, obligations in respect of Swap Agreements shall not constitute Indebtedness.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses, damages (including natural resource damages), penalties, claims, actions, judgments, suits, costs (including the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials), expenses and disbursements of any kind or nature whatsoever (including the reasonable and documented out-of-pocket fees and disbursements of one counsel for all Indemnitees taken as a whole and one counsel for all Agents taken as a whole and, if reasonably necessary, a single local counsel for all Indemnitees taken as a whole and a single local counsel for all Agents taken as a whole in each relevant jurisdiction and, solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Indemnitees similarly situated taken as a whole, in connection with any investigative, administrative or judicial proceeding or hearing commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect, special or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby (including the Lenders' agreement to make Credit Extensions, the syndication of the credit facilities provided for herein or the use or intended use of the proceeds thereof, any amendments, waivers or consents with respect to any provision of this Agreement or any of the other Credit Documents, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)); or (ii) any Environmental Claim, any Environmental Liabilities or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of Holdings or any of its Subsidiaries; provided that "Indemnified Liabilities" shall not include any liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses, disbursements or fees relating to or arising out of the Chapter 11 Cases or the events leading thereto, or any litigation, action or controversy in connection therewith.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Credit Party under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitee**" as defined in Section 10.3(a).

"**Independent Director**" or "**Independent Manager**" means a natural person selected by any Special Purpose Subsidiary (a) with prior experience as an independent director, independent manager or independent member, (b) with at least three (3) years of employment experience, (c) who is provided by a Nationally Recognized Service Company, (d) who is duly appointed as an Independent Director or Independent Manager and is not, will not be while serving as Independent Director or Independent Manager (except pursuant to an express provision in Borrower's operating agreement providing for the appointment of such Independent Director or Independent Manager to become a "special member" upon the last remaining member of any Special Purpose Subsidiary ceasing to be a member of such Special Purpose Subsidiary) and shall not have been at any time during the preceding five (5) years, any of the following:

(i) an equityholder, director (other than as an Independent Director), officer, employee, partner, attorney or counsel of Borrower, any Affiliate of such Special Purpose Subsidiary or any direct or indirect parent of such Special Purpose Subsidiary;

(ii) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with such Special Purpose Subsidiary or any Affiliate of such Special Purpose Subsidiary;

(iii) a Person or other entity controlling or under common control with any such equityholder, partner, customer, supplier or other Person described in clause ((i) or clause (ii) above; or

(iv) a member of the immediate family of any such equityholder, director, officer, employee, partner, customer, supplier or other Person described in clause ((i) or clause (ii) above.

A natural person who otherwise satisfies this definition and satisfies clause ((i) of this definition by reason of being the Independent Director or Independent Manager of a "special purpose entity" affiliated with any Special Purpose Subsidiary shall be qualified to serve as an Independent Director or Independent Manager of any Special Purpose Subsidiary, provided that the fees that such individual earns from serving as Independent Director or Independent Manager of affiliates of any Special Purpose Subsidiary in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.  A natural person who satisfies this definition other than clause (ii) (or clauses (iii) or (iv) as a result of clause (ii)) of this definition shall not be disqualified from serving as an Independent Director or Independent Manager of any Special Purpose Subsidiary if such individual is an independent director, independent manager or special manager provided by a Nationally Recognized Service Company that provides professional independent directors, independent managers and special managers and also provides other corporate services in the ordinary course of its business.

"**Information Materials**" as defined in Section 5.15(a).

"**Initial Loan**" as defined in Section 2.1(a).

"**Insignificant Subsidiary**" shall mean any Subsidiary of Borrower (other than any Special Purpose Subsidiary or any Special Purpose Tenant Subsidiary Holdco) that, when taken with all other Insignificant Subsidiaries as of such date, did not have (x) assets with a value in excess of 5% of total assets of Holdings and its Subsidiaries on a consolidated basis or (y) revenues in excess of 5% of total revenues of Holdings and its Subsidiaries on a consolidated basis, in each case as of the last day of the fiscal quarter of Holdings most recently ended for which financial statements have been (or were required to be) delivered pursuant to the terms hereof.

"**Installment**" as defined in Section 2.12.

"**Intellectual Property**" as defined in the Pledge and Security Agreement.

"**Intellectual Property Security Agreements**" as defined in the Pledge and Security Agreement.

"**Intercompany Intellectual Property Licensing Agreement**" means [●].

"**Intercompany Lease**" means [●].

"**Intercompany Note**" means a promissory note substantially in the form of Exhibit H evidencing

Indebtedness owed among Credit Parties and their Subsidiaries.

"**Intercreditor Agreement**" means the Intercreditor Agreement, dated as of the Closing Date, by and among the Credit Parties, Administrative Agent, Collateral Agent, Wells Fargo Bank, National Association, as administrative agent and collateral agent under the ABL Credit Agreement, and Pathlight Capital LP, as administrative agent and collateral agent under the FILO Credit Agreement, as it may be amended, restated, supplemented, modified or waived from time to time, in the form of Exhibit J.

"**Interest Payment Date**" means with respect to (i) any Loan that is a Base Rate Loan, the last Business Day of each calendar month, commencing on the first such date to occur after the Closing Date, and the final maturity date of such Loan and (ii) any Loan that is a Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the final maturity date of such Loan.

"**Interest Period**" means, in connection with a Eurodollar Rate Loan, an interest period of one month, (i) initially, commencing on the Closing Date or Conversion/Continuation Date thereof, as the case may be; and (ii) thereafter, commencing on the day on which the immediately preceding Interest Period expires; provided that (a) if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day unless no further Business Day occurs in such month, in which case such Interest Period shall expire on the immediately preceding Business Day; (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c) of this definition, end on the last Business Day of a calendar month; (c) no Interest Period with respect to any portion of any Class of Loans shall extend beyond such Class's Maturity Date; and (d) subject to the foregoing clauses (a) through (c), the initial Interest Period shall commence on the Closing Date and end on [●], 2020.

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with Holdings' and its Subsidiaries' operations and not for speculative purposes.

"**Interest Rate Determination Date**" means, with respect to any Interest Period, the date that is two (2) Business Days prior to the first day of such Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the Closing Date and from time to time thereafter, and any successor statute.

"**Internally Generated Cash**" means, with respect to any period, any cash of Holdings or any Subsidiary generated during such period, excluding Net Asset Sale Proceeds, Net Insurance/Condemnation Proceeds and any cash that is generated from an incurrence of Indebtedness, an issuance of Equity Interests or a capital contribution.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by Holdings or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person (other than Borrower or a Guarantor Subsidiary); (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Holdings from any Person (other than Holdings, Borrower or any Guarantor Subsidiary), of any Equity Interests of such Person; (iii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contributions by Holdings or any of its Subsidiaries to any other Person (other than Holdings, Borrower or any Guarantor Subsidiary), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise

from sales to that other Person in the ordinary course of business; (iv) all investments consisting of any exchange traded or over the counter derivative transaction, including any Interest Rate Agreement and Currency Agreement, whether entered into for hedging or speculative purposes or otherwise and (v) any direct or indirect acquisition by purchase or otherwise of the business (including any direct or indirect acquisition by purchase or otherwise of all or substantially all of the property or fixed assets) of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business or other business unit of any Person.  The amount of any Investment of the type described in clauses (i), (ii) and (iii) shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment, as reduced from time to time by any cash dividend, cash distribution, cash interest payment, return of capital in cash, cash repayment or other amount received by Holdings, Borrower or any Guarantor Subsidiary in cash.

"**Landlord Estoppel**" means, with respect to any Leasehold Property, a letter, certificate or other instrument in writing from the lessor under the related Lease, pursuant to which such lessor (a) states that such Lease is in full force and effect, (b) identifies any defaults by the lessee thereunder known to such lessor, (c) that the applicable leasehold mortgagee is a "permitted" or "qualified" mortgagee to the extent required under the applicable lease and (d) such other customary information reasonably requested by Collateral Agent.

"**Latest Maturity Date**" means, at any date of determination, the latest maturity or expiration date applicable to any Loan or Commitment hereunder at such time, in each case as extended pursuant to Section 2.24 from time to time.

"**Leasehold Property**" means any leasehold interest of any Credit Party as lessee under any lease of real property.

"**Lender**" means each financial institution listed on the signature pages to this Agreement and any other Person that becomes a party hereto pursuant to an Assignment Agreement.

"**LIBOR**" as defined in the definition of "Adjusted Eurodollar Rate".

"**Lien**" means with respect to any asset, (a) any mortgage, deed of trust, deed to secure debt, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"**Loan**" means an Initial Loan or an Extended Loan.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination, the sum of (i) the outstanding principal amount of the Loans of such Lender and (ii) the outstanding principal amount of such Lender's unfunded Commitment which has not expired or terminated in accordance with the terms of this Agreement; provided that at any time prior to the making of any Loan, the Loan Exposure of any Lender shall be equal to such Lender's Commitment.

"**Margin Stock**" as defined in Regulation U.

"**Master Lease**" means, individually and/or collectively, as the context may require, the DC Master Lease and the Retail Master Lease.

"**Master Lease Documents**" means, with respect to each Master Lease, such Master Lease and all guaranties, indemnities and other documents executed by Holdings or any of its Subsidiaries in connection therewith, in each case as it may be amended, restated, supplemented, modified or waived from time to time.

"**Material Adverse Effect**" means (a) a materially adverse effect on the business, assets, operations or condition of Holdings and its Subsidiaries, taken as a whole, (b) a material impairment of the ability of the Credit Parties to perform their obligations under the Credit Documents or (c) a material impairment of the rights of or benefits available to the Lenders, Administrative Agent or Collateral Agent under any Credit Document (other than any such impairment of rights or benefits that is primarily attributable to action taken by one or more Lenders, Administrative Agent or Collateral Agent (excluding any action against one or more Lenders, Administrative Agent or Collateral Agent taken by Holdings, Borrower, their respective Subsidiaries or their respective Affiliates)).

"**Material Agreement**" means any agreement that the termination thereof would reasonably be expected to result in a Material Adverse Effect on (a) the business, operations, financial condition, assets or properties of Holdings and its Subsidiaries, taken as a whole, or (b) the ability of Holdings and its Subsidiaries to perform their payment obligations under the Credit Documents.

"**Maturity Date**" means (a) with respect to any (i) Initial Loans, [●][6], 2026 and (ii) Extended Loans, the date specified in the applicable Extension Amendment as the Maturity Date therefor and (b) the date on which all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means a First Priority mortgage, deed of trust, deed to secure debt, security deed, trust deed or spreader of lien, in substantially the form of Exhibit P or otherwise in form and substance reasonably satisfactory to Administrative Agent, Collateral Agent and the Borrower, as it may be amended, restated, supplemented, modified or waived from time to time.

"**Mortgaged Properties**" means each Real Estate Asset set forth on Schedule 5.11.

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA maintained, sponsored or contributed to by Holdings or any ERISA Affiliate.

"**Narrative Report**" means, with respect to the financial statements for which such narrative report is required, a narrative report describing the operations of Holdings and its Subsidiaries in the form prepared for presentation to senior management thereof for the applicable month, Fiscal Quarter or Fiscal Year and for the period from the beginning of the then current Fiscal Year to the end of such period to which such financial statements relate.

"**Nationally Recognized Service Company**" means any of CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, National Corporate Research, Ltd., United Corporate Services, Inc., Independent Member Services LLC or such other nationally recognized company that provides independent director, independent manager or independent member services and that is reasonably satisfactory to the Requisite Lenders, in each case that is not an Affiliate of any Special Purpose Subsidiary and that provides professional independent directors and other corporate

[6] To be the sixth anniversary of the Closing Date.

services in the ordinary course of its business.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (a) cash payments (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by Holdings or any of its Subsidiaries from such Asset Sale, <u>minus</u> (b) (i) transfer, sales, or similar Taxes and Borrower's good faith estimate of income, gains or withholding Taxes payable by the seller or any of its affiliates as a result of, and, without duplication, Tax Distributions paid or payable in respect of, any gain recognized in connection with such Asset Sale or the distribution or payment of any amounts received in such Asset Sale, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Permitted Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale, (iii) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to any indemnities (including with respect to any representations and warranties) given by Holdings or any of its Subsidiaries in favor of the applicable purchaser in connection with such Asset Sale (<u>provided</u> that upon the release of any such reserve to Holdings or such Subsidiary, as applicable, the amount released shall be considered Net Asset Sale Proceeds) and (iv) to the extent such Asset Sale is permitted hereunder, any other bona fide and actual out-of-pocket direct costs incurred or paid to a Person that is not an Affiliate of any Credit Party in connection with such Asset Sale.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (i) any cash payments or proceeds received by Holdings or any of its Subsidiaries (a) under any casualty insurance policy in respect of a covered loss thereunder or (b) as a result of the taking of any assets of Holdings or any of its Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, <u>minus</u> (ii) (a) any actual and reasonable costs incurred by Holdings or any of its Subsidiaries in connection with the adjustment or settlement of any claims of Holdings or such Subsidiary in respect thereof, and (b) any other bona fide direct costs incurred in connection with any sale or transfer of such assets as referred to in clause (i)(b) of this definition or the collection of amounts referred to in clause (i)(a) of this definition, including, in each case, Taxes paid or payable in connection therewith and, without duplication, Tax Distributions paid or payable in respect thereof or in connection with the distribution or payment of any amounts received under clause (i) of this definition.

"**Non-Consenting Lender**" as defined in Section 2.23.

"**Non-Defaulting Lender**" means, at any time, each Lender that is not a Defaulting Lender at such time.

"**Non-Public Information**" means material non-public information (within the meaning of United States federal, state or other applicable securities laws) with respect to Holdings, its Subsidiaries or their respective Securities.

"**Non-US Lender**" as defined in Section 2.20(c).

"**Notice**" means a Funding Notice or a Conversion/Continuation Notice.

"**Obligations**" means (i) all obligations (whether now existing or hereafter arising, absolute or contingent, joint, several or independent) of every nature of each Credit Party from time to time owed to Secured Parties or any of them under any Credit Document, whether for principal, interest (including interest, fees, premiums and other amounts which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such

Credit Party for such interest, fees, premiums and other amounts in the related bankruptcy proceeding), fees, premiums, expenses, indemnification, reimbursement or otherwise, excluding, with respect to any Guarantor, Excluded Swap Obligations with respect to such Guarantor and (ii) the Earnout Amount.

"**Obligee Guarantor**" as defined in Section 7.7.

"**Off-Balance Sheet Liability**" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person or (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person. For the avoidance of doubt, any preferred Equity Interests (other than any Disqualified Equity Interests) of any Person that are convertible into common Equity Interests (other than any Disqualified Equity Interests) of such Person shall not constitute an Off-Balance Sheet Liability of such Person.

"**OpCo Sale Order**" as defined in the Asset Purchase Agreement.

"**Organizational Documents**" means (i) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, organization or association, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended. In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such Organizational Document shall only be to a document of a type customarily certified by such governmental official.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Loan or Credit Document).

"**Other Taxes**" means any and all present or future stamp, court or documentary, intangible, recording, filing, excise or property or similar Taxes arising from any payment made hereunder or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, this Agreement or any other Credit Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than pursuant to an assignment request by Borrower under Section 2.23).

"**Participant Register**" as defined in Section 10.6(g)(i).

"**PATRIOT Act**" as defined in Section 3.1(n).

"**PBGC**" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"**Permitted Encumbrances**" means:

(a)      Liens imposed by law for Taxes, assessments or governmental charges or levies that, in each case, are not overdue by more than thirty (30) days or are being contested in compliance with Section 5.3;

(b)        carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than thirty (30) days (or, in the case of a landlords' Lien, beyond any notice and cure period under the applicable real property lease) or are being contested in compliance with Section 5.3;

(c)        pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance, employers' health taxes and other social security laws or regulations or similar legislation or to secure letters of credit, bank guarantees or similar instruments supporting such obligations;

(d)        pledges or deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds or obligations to insurance carriers and other obligations of a like nature, in each case in the ordinary course of business or to secure letters of credit, bank guarantees or similar instruments supporting such obligations;

(e)        judgment liens in respect of judgments that do not constitute an Event of Default under Section 8.1(h);

(f)        easements, restrictions (including zoning restrictions), rights-of-way and other encumbrances, title defects and matters of record affecting real property that do not (i) materially detract from the value of the Collateral, taken as a whole, (ii) interfere with the ordinary conduct of business of Holdings and its Subsidiaries, taken as a whole, or (iii) with respect to any Mortgaged Property, materially and adversely affect the use and marketability of such Mortgaged Property for its then-current use;

(g)        the special property interest of a consignor in respect of Consignment Inventory;

(h)        Liens (i) in favor of banks, other financial institutions, securities or commodities intermediaries or brokerage arising as a matter of law encumbering deposits of cash, securities, commodities and other funds maintained with such Persons (including rights of set off) and that are within the general parameters customary in such Person's industry, (ii) deemed to exist in connection with investments in repurchase agreements described in clause (d) of the definition of "Cash Equivalents", (iii) attaching to commodity trading accounts or other brokerage accounts in the ordinary course of business securing obligations owed to the institutions with which such accounts are maintained, (iv) that are contractual rights of setoff (x) relating to the establishment of depository relations with banks or other deposit-taking financial institutions in the ordinary course of business and not given in connection with the issuance of Indebtedness or (y) relating to pooled deposit or sweep accounts of Holdings or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business and (v) that are rights of set-off (or holdbacks or reserves established by a credit card issuer or processor) against credit balances of Holdings or any of its Subsidiaries with credit card issuers or credit card processors or amounts owing by such credit card issuers or credit card processors to Holdings or any of its Subsidiaries, or Liens on returned merchandise in favor of such issuers or processors, in each case in the ordinary course of business, but not rights of set-off against any other property or assets of Holdings or any of its Subsidiaries pursuant to agreements with credit card issuers or credit card processors to secure the obligations of Holdings or any of its Subsidiaries to credit card issuers or credit card processors as a result of fees and chargebacks;

(i)        Liens of a collecting bank under Section 4-210 of the UCC in effect in the relevant jurisdiction (or Section 4-208 in the case of the New York UCC) on items in the course of collection;

(j)        Liens of sellers of goods to Holdings or any of its Subsidiaries arising as a matter of law under Article 2 of the UCC in effect in the relevant jurisdiction or similar provisions of applicable law, in

each case in the ordinary course of business;

(k)     licenses of patents, trademarks and other Intellectual Property rights of Holdings or any of its Subsidiaries, in each case in the ordinary course of business and not materially interfering with the conduct of business by Holdings and its Subsidiaries, taken as a whole;

(l)     Liens solely on any cash earnest money deposits made by Holdings or any of its Subsidiaries in connection with any letter of intent or purchase agreement entered into by it;

(m)     Liens incurred in the ordinary course of business in connection with the shipping of goods on the related goods and proceeds thereof in favor of the shipper of such goods;

(n)     as to any Leasehold Property, any Lien in favor of the lessor thereunder and any Lien encumbering the underlying fee estate or master or primary lease in connection therewith, so long as, in each case, fee estate or landlord (or similar) interest is not held by a Person that is a Credit Party or any Subsidiary of any Credit Party; and

(o)     as to any Mortgaged Property and any other fee-owned or ground-leased Real Estate Assets, any matters affirmatively insured over or exceptions noted in the final title polices issued in connection with the applicable Mortgages delivered to Administrative Agent with respect thereto in accordance with this Agreement;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness for borrowed money.

"**Permitted Indebtedness**" means:

(a)     obligations incurred by Holdings or any of its Subsidiaries arising from agreements providing for customary indemnification, earnouts, adjustment of purchase price, non-compete, consulting or other similar obligations, in each case arising in connection with acquisitions or dispositions of any business, assets or subsidiary of Holdings or such Subsidiary permitted under this Agreement;

(b)     Indebtedness in respect of (i) the financing of insurance premiums or (ii) take-or-pay or minimum buy obligations contained in supply agreements, in each case incurred in the ordinary course of business;

(c)     obligations in respect of deferred compensation to employees of Holdings and its Subsidiaries in the ordinary course of business;

(d)     (i) obligations of Holdings or any of its Subsidiaries incurred in the ordinary course of business in respect of performance guarantees, completion guarantees, performance bonds, bid bonds, appeal bonds, surety bonds, judgment bonds, replevin bonds and similar bonds, self-insurance and other similar obligations to the extent any such obligations constitute Indebtedness, (ii) obligations in the ordinary course of business in respect of compliance with workers' compensation, unemployment insurance, employers' health taxes and other social security laws or regulations or similar legislation and (iii) obligations in respect of letters of credit, bank guarantees or similar instruments supporting any such obligations or obligations described in clauses (c) and (d) of the definition of "Permitted Encumbrances";

(e)     customer deposits and advance payments received in the ordinary course of business from customers for goods purchased in the ordinary course of business; and

(f)     Indebtedness incurred in the ordinary course of business in respect of cash management, netting services, automatic clearinghouse arrangements, employee credit card, debit card, prepaid card, purchase card or other payment card programs, overdraft protections and other bank products and similar arrangements and Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument of Holdings or any of its Subsidiaries drawn against insufficient funds in the ordinary course of business that is promptly repaid.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal, replacement, exchange or extension of any Indebtedness of such Person; provided that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed, replaced, exchanged or extended except by an amount equal to accrued and unpaid interest and a reasonable premium thereon plus other reasonable amounts paid, and fees and expenses reasonably incurred (including original issue discount and upfront fees), in connection with such modification, refinancing, refunding, renewal, replacement, exchange or extension and by an amount equal to any existing commitments unutilized thereunder; (b) such modification, refinancing, refunding, renewal, replacement, exchange or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended; (c) if the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal, replacement, exchange or extension is subordinated in right of payment to the Obligations on terms, taken as a whole, as favorable in all material respects to the Lenders (including, if applicable, as to Collateral) as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended or otherwise acceptable to Administrative Agent; (d) if the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended is (i) unsecured, such modification, refinancing, refunding, renewal, replacement, exchange or extension is unsecured, or (ii) if secured by Liens on the Collateral, such modification, refinancing, refunding, replacement, renewal or extension is secured to the same extent, including with respect to any subordination provisions, and subject to the Intercreditor Agreement; (e) the terms and conditions (including, if applicable, as to collateral) of any such modified, refinanced, refunded, renewed, replaced, exchanged or extended (other than to the extent permitted by any other clause of this definition or with respect to interest rate, prepayment premiums and redemption provisions) Indebtedness are, either (i) substantially identical to or less favorable to the investors providing such Permitted Refinancing, taken as a whole, than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed, replaced, exchanged or extended, or (ii) when taken as a whole (other than interest rate, prepayment premiums and redemption premiums) not more restrictive to Holdings and its Subsidiaries than those set forth in this Agreement (provided that a certificate of a Financial Officer of Borrower delivered to Administrative Agent in good faith at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that Borrower has determined in good faith that such terms and conditions satisfy the requirement set out in this clause (e), shall be conclusive evidence that such terms and conditions satisfy such requirement unless Administrative Agent provides notice to Borrower of its objection during such five Business Day period (including a reasonable description of the basis upon which it objects)), in each case, except for terms and conditions only applicable to periods after the Latest Maturity Date; (f) such modification, refinancing, refunding, renewal, replacement, exchange or extension is incurred by the Person who is or would have been permitted to be the obligor or guarantor (or any successor thereto) on the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended (it being understood that the roles of such obligors as a borrower or a guarantor with respect to such obligations may be interchanged); and (g) at

the time thereof, no Event of Default shall have occurred and be continuing.

"**Permitted Supply Chain Financing**" as defined in Section 6.1(h).

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Petition Date**" as defined in the recitals hereto.

"**Plan**" means any pension plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Internal Revenue Code or Section 302 of ERISA that is maintained, sponsored or contributed to by Holdings or any ERISA Affiliate.

"**Platform**" as defined in Section 5.1(m).

"**Pledge and Security Agreement**" means the Pledge and Security Agreement, dated as of the Closing Date, executed by Borrower, each Guarantor and Collateral Agent, substantially in the form of Exhibit G, as it may be amended, restated, supplemented, modified or waived from time to time.

"**Prime Rate**" means the rate of interest quoted in the print edition of *The Wall Street Journal*, Money Rates Section as the Prime Rate (currently defined as the base rate on corporate loans posted by JPMorgan Chase & Co.), as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Any Agent or Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Principal Office**" means Administrative Agent's "Principal Office" as set forth on Appendix B, or such other office or office of a third party or sub-agent, as appropriate, as Administrative Agent may from time to time designate in writing to Borrower and each Lender.

"**Pro Rata Share**" means, with respect to all payments, computations and other matters relating to the Loan of any Lender, the percentage obtained by dividing (a) the Loan Exposure of that Lender by (b) the aggregate Loan Exposure of all Lenders. For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage obtained by dividing (A) an amount equal to the sum of the Loan Exposure of that Lender, by (B) an amount equal to the sum of the aggregate Loan Exposure of all Lenders.

"**PTE**" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lenders**" means Lenders that do not wish to receive Non-Public Information.

"**Public-Side Information**" means information that is either (x) of a type that would be made publicly available if Holdings or any of its Subsidiaries were issuing securities pursuant to a public offering or (y) not material non-public information (for purposes of United States federal, state or other applicable securities laws).

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Credit Party in any real property; provided, however, that the interests of lessees under the Intercompany Lease shall not constitute "Real Estate Assets" for purposes hereof.

"**Recipient**" means (a) Administrative Agent, (b) Collateral Agent and (c) any Lender, as applicable.

"**Refinance**" means, in respect of any indebtedness, to extend, refinance, renew or replace, defease or refund such indebtedness, in each case, in whole or in part and/or with the same or different lenders, agents, arrangers or bookrunners and including any increase in the principal amount of the loans and commitments provided thereunder to the extent such increase is otherwise permitted hereunder. "**Refinanced**" and "**Refinancing**" shall have correlative meanings.

"**Register**" as defined in Section 2.7(b).

"**Regulation D**" means Regulation D of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation T**" means Regulation T of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" means Regulation U of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" means Regulation X of the Board of Governors, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"**Related Agreements**" means, collectively, the Asset Purchase Agreement, the Earnout Agreement, the Intercompany Intellectual Property Licensing Agreement, the Intercompany Lease, each Master Lease and the Transition Services Agreement.

"**Related Fund**" means with respect to any Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the outdoor air, soil, surface water or groundwater.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**Repayment Premium**" as defined in Section 2.11(b).

"**Replacement Lender**" as defined in Section 2.23.

"**Requisite Lenders**" means one or more Lenders having or holding Loan Exposure and representing more than 50% of the aggregate Loan Exposure of all Lenders; provided that the amount of Loan Exposure shall be determined (i) with respect to any Sponsor Affiliated Lender, by deeming such Sponsor Affiliated Lender to have voted its interest as a Lender without discretion in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Sponsor Affiliated Lenders (except as provided in Section 10.6(i)(iii)(A)) and (ii) with respect to any Defaulting Lender, by

disregarding the Loan Exposure of such Defaulting Lender.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Restricted Junior Payment**" means (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Holdings or any of its Subsidiaries (or any direct or indirect parent of Holdings) now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of Holdings or any of its Subsidiaries (or any direct or indirect parent thereof) now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock of Holdings or any of its Subsidiaries (or any direct or indirect parent of Holdings) now or hereafter outstanding; (iv) management or similar fees payable to any Sponsor or any of its Affiliates and (v) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to, any Indebtedness that is unsecured, subordinated or secured on a junior basis to the Liens in favor of Collateral Agent for the benefit of the Secured Parties granted pursuant to any Credit Document.

"**Retail Master Lease**" means that certain Retail Master Lease, dated as of the Closing Date, by and among [●], a [Delaware limited liability company], and [●], a [Delaware limited partnership], collectively as lessor, and the Special Purpose Retail Tenant Subsidiary, as lessee, as it may be amended, restated, supplemented, modified or waived from time to time.

"**S&P**" means S&P Global Ratings.

"**Sale and Leaseback Transactions**" as defined in Section 6.10.

"**Sanctions**" as defined in Section 4.15(a).

"**Sanctions Laws**" as defined in Section 4.15(a).

"**Secured Parties**" means Agents (and any delegate or sub-agent thereof), the Lenders and the Indemnitees.

"**Secured Supply Chain Obligations**" means the due and punctual payment and performance of all obligations of each Credit Party to an ABL Lender, a FILO Lender or an Affiliate of an ABL Lender or a FILO Lender under any Permitted Supply Chain Financing, to the extent the documentation for such obligations specifically provides that such ABL Lender, FILO Lender or Affiliate thereof is entitled to be secured under the "Collateral Agreement" (as defined in the ABL Credit Agreement or the FILO Credit Agreement, as applicable).

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any

successor statute.

"**Significant Subsidiary**" shall mean any Subsidiary that is not an Insignificant Subsidiary.

"**SOFR**" means the forward-looking term rate based on the Secured Overnight Financing Rate that has been selected or recommended by the Relevant Governmental Body.

"**Solvent**" means, with respect to any Person, that as of the date of determination, (a) the sum of such Person's debt (including contingent liabilities) does not exceed the present fair saleable value of such Person's present assets; (b) such Person's capital is not unreasonably small in relation to its business as contemplated on the Closing Date and reflected in the Projections or with respect to any transaction contemplated to be undertaken after the Closing Date; and (c) such Person has not incurred and does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due (whether at maturity or otherwise). For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under FASB Accounting Standards Codification Topic 450-20).

"**Special Purpose DC Tenant Subsidiary**" means [●].

"**Special Purpose Intellectual Property Subsidiary**" means [●].

"**Special Purpose Real Estate Subsidiary**" means [●].

"**Special Purpose Retail Tenant Subsidiary**" means [●].

"**Special Purpose Subsidiaries**" means, collectively, each Special Purpose Intellectual Property Subsidiary, each Special Purpose Real Estate Subsidiary and each Special Purpose Tenant Subsidiary.

"**Special Purpose Tenant Subsidiary**" means, individually and/or collectively, as the context may require, a Special Purpose DC Tenant Subsidiary and a Special Purpose Retail Tenant Subsidiary.

"**Special Purpose Tenant Subsidiary HoldCo**" means a Subsidiary that holds no assets other than the Equity Interests of one or more Special Purpose Tenant Subsidiaries.

"**Specified Asset Purchase Agreement Representations**" means the representations and warranties made by the Sellers (as defined in the Asset Purchase Agreement), but only to the extent that the OpCo Purchaser (as defined in the Asset Purchase Agreement) has the right to terminate its obligations, or has the right to decline to consummate the OpCo Sale (as defined in the Asset Purchase Agreement), under the Asset Purchase Agreement as a result of a breach of one or more of such representations and warranties in the Asset Purchase Agreement.

"**Specified Equity Contribution**" as defined in Section 8.2.

"**Specified Representations**" means the representations and warranties set forth in Sections 4.1(a), 4.1(b)(ii), 4.2, 4.3, 4.4(a)(ii), 4.5, 4.6, 4.11, 4.12(b), 4.13, 4.15 and 4.17.

"**Sponsor Affiliated Institutional Lender**" means any Person (other than Holdings and its Subsidiaries) that would be an Affiliate of any Sponsor but for the operation of the proviso to the definition of "Affiliate" that is a bona fide diversified equity or debt fund either (i) with information barriers in place

restricting the sharing of investment-related and other information between it and such Sponsor or (ii) whose managers have fiduciary duties to the investors of such fund independent of their fiduciary duties to the investors in such Sponsor; provided that such Sponsor does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of any such fund.

"**Sponsor Affiliated Lenders**" means any Affiliate of Holdings or any Sponsor other than (i) Holdings or any of its Subsidiaries and (ii) any natural person.

"**Sponsors**" means, collectively, (i) Simon Property Group, L.P. and (ii) Brookfield Asset Management Inc.

"**Subsidiary**" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity of which securities or other ownership interests representing more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned or held.

"**Swap Agreement**" means an Interest Rate Agreement or a Currency Agreement.

"**Swap Obligation**" as defined in "Excluded Swap Obligation".

"**Tax**" means any present or future tax, levy, impost, duty, deduction, withholding (including backup withholding), assessment, fee or other charge imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Terminated Lender**" as defined in Section 2.23.

"**Title Policy**" as defined in Section 5.11(a)(iv).

"**Transactions**" means, collectively, (a) the execution and delivery by each Credit Party of the Credit Documents to which it is or is to be a party and the making of the Credit Extension hereunder on the Closing Date, (b) the execution and delivery by each Credit Party of the Closing Date ABL/FILO Credit Documents to which it is or is to be a party and the making of the credit extensions thereunder on the Closing Date, (c) the making of the Closing Date Equity Contribution on the Closing Date, (d) the consummation and implementation of the transactions contemplated by the Related Agreements and the OpCo Sale Order on or about the Closing Date and (e) the payment of fees, premiums, costs and expenses on or about the Closing Date in connection with the foregoing.

"**Transition Services Agreement**" means [●].

"**Type of Loan**" means a Base Rate Loan or a Eurodollar Rate Loan.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any Person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions

and investment firms, and certain Affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Upfront Premium**" as defined in Section 2.11(a).

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"**Unrestricted Cash**" means cash and Cash Equivalents of Borrower and the Guarantors that are not "restricted" under GAAP (other than cash and Cash Equivalents of Borrower and the Guarantors that are "restricted" under GAAP solely in favor of the Obligations and the Closing Date ABL/FILO Credit Agreement Secured Obligations).

"**U.S. Lender**" as defined in Section 2.20(c).

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"**Write-Down and Conversion Powers**" means (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, transfer or dilute shares issued by a UK Financial Institution, to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that Person or any other Person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

### 1.2.  Accounting Terms.

(a)      Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP prior to the effectiveness of FASB ASC 842 and/or IFRS 16 (Leases) shall continue to be accounted for as operating leases for purposes of this Agreement (whether or not such operating leases were in effect on such date) notwithstanding the fact that such obligations are required in accordance with FASB ASC 842 and/or IFRS 16 (Leases) (on a prospective or retroactive basis or otherwise) to be treated as Capital Lease Obligations in the financial statements thereof. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Credit Document, and Borrower shall so

request, Administrative Agent and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Requisite Lenders); provided that, until so amended, such ratio or requirement shall continue to be computed in conformity with those accounting principles and policies used to prepare the Historical Financial Statements.

(b)     All pro forma computations of the Financial Covenant required to be made hereunder giving effect to any incurrence of Indebtedness, investment, acquisition, disposition, Restricted Junior Payment, payment in respect of Indebtedness or other transaction shall be calculated after giving pro forma effect thereto (and, in the case of any pro forma computations made hereunder to determine whether any such transaction is permitted to be consummated hereunder, to any incurrence of Indebtedness, investment, acquisition, disposition, Restricted Junior Payment, payment in respect of Indebtedness or other such transaction consummated since the first day of the period covered by any component of such pro forma computation and on or prior to the date of such computation) as if each such transaction had occurred on the first day of the applicable consecutive four-Fiscal Quarter period, and, to the extent applicable, to the historical earnings and cash flows associated with the assets acquired or disposed of and any related incurrence or reduction of Indebtedness, all in accordance with Article 11 of Regulation S-X under the Securities Act. If any Indebtedness bears a floating rate of interest and is being given pro forma effect, the interest on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Swap Agreement applicable to such Indebtedness if such Swap Agreement has a remaining term in excess of 12 months).

**1.3.     Interpretation, Etc.**  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. References herein to any Section, Appendix, Schedule or Exhibit shall be to a Section, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The terms lease and license shall include sub-lease and sub-license, as applicable. If any report, certificate or other information required to be furnished by Borrower or any other Credit Party is due on any day that is not a Business Day, it shall be deemed due on the next succeeding Business Day.

**1.4.     Divisions**. Any reference in any Credit Document to a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a Division of or by any Person, or an allocation of assets to a series of Persons (or the unwinding of such a Division or allocation), as if it were a merger, transfer, consolidation, amalgamation, consolidation, assignment, sale or transfer, or similar term, as applicable, to, of or with a separate Person. Any Division of a Person shall constitute a separate Person under the Credit Documents (and each Division of any Person that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity) on the first date of its existence. In connection with any Division, if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then such asset shall be deemed to have been transferred from the original Person to the subsequent Person, and if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## SECTION 2. LOANS

**2.1.    Loans**.

(a)    <u>Commitments</u>. Subject to the terms and conditions set forth herein and in connection with the consummation and implementation of the transactions contemplated by the Related Agreements and the OpCo Sale Order, each Lender shall be deemed to have severally made to Borrower, on the Closing Date, a term loan denominated in Dollars (each such loan, an "**Initial Loan**") in a principal amount equal to its Commitment.  The Initial Loans deemed made pursuant to this Section 2.1(a) shall be made without any actual funding in cash or otherwise, and each Lender's Commitment shall terminate immediately and without further action after giving effect to the deemed making of such Lender's Commitment without any actual funding in cash or otherwise.  After giving effect to this Section 2.1(a), the aggregate principal amount of the Initial Loans on the Closing Date shall be $520,000,000.  Any amount borrowed or deemed made under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed or remade. Subject to Sections 2.13 and 2.14, all amounts owed hereunder with respect to the Loans shall be paid in full in cash no later than the Maturity Date.

(b)    <u>Credit Extension Mechanics for Loans</u>.  Borrower shall deliver to Administrative Agent a fully executed Funding Notice no later than (x) one (1) Business Day prior to the Closing Date with respect to Base Rate Loans and (y) three (3) Business Days prior to the Closing Date with respect to Eurodollar Rate Loans (or such shorter period as may be acceptable to Administrative Agent). Promptly upon receipt by Administrative Agent of such Funding Notice, Administrative Agent shall notify each Lender of the proposed borrowing.

**2.2.    [Reserved].**

**2.3.    [Reserved].**

**2.4.    [Reserved].**

**2.5.    [Reserved].**

**2.6.    [Reserved].**

**2.7.    Evidence of Debt; Register; Lenders' Books and Records**.

(a)    <u>Lenders' Evidence of Debt</u>. Each Lender shall maintain on its internal records an account or accounts evidencing the Obligations of Borrower to such Lender, including the amounts of the Loans and Commitments made by it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on Borrower, absent manifest error; <u>provided</u> that the failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or Borrower's Obligations in respect of any applicable Loans; <u>provided</u>, <u>further</u>, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)    <u>Register</u>. Administrative Agent (or its agent or sub-agent appointed by it) shall maintain at its Principal Office a register for the recordation of the names and addresses of Lenders and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender from time to time (the "**Register**"). The Register shall be available for inspection by Borrower or any Lender (with respect to (i) any entry relating to such Lender's Loans and Commitments and (ii) the identity of the other Lenders (but not any information with respect to such other Lenders' Loans or Commitments)) at any reasonable time and from time to time upon reasonable prior notice. Administrative Agent shall record, or

shall cause to be recorded, in the Register the Commitments and the Loans in accordance with the provisions of Section 10.6, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Borrower and each Lender, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Loans or Commitments or Borrower's Obligations in respect of any Loans or Commitments. Borrower hereby designates Administrative Agent to serve as Borrower's non-fiduciary agent solely for purposes of maintaining the Register as provided in this Section 2.7, and Borrower hereby agrees that, to the extent Administrative Agent serves in such capacity, Administrative Agent and its officers, directors, employees, agents, sub-agents and Affiliates shall constitute "Indemnitees".

**2.8.** **Interest on Loans**.

(a)    Except as otherwise set forth herein, each Class of Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) thereof as follows:

(i)    if a Base Rate Loan, at the Base Rate plus the Applicable Margin; or

(ii)    if a Eurodollar Rate Loan, at the Adjusted Eurodollar Rate plus the Applicable Margin.

(b)    The basis for determining the rate of interest with respect to any Loan shall be selected by Borrower and notified to Administrative Agent and Lenders pursuant to the applicable Funding Notice or Conversion/Continuation Notice, as the case may be.

(c)    In connection with Eurodollar Rate Loans, there shall be no more than three (3) Interest Periods outstanding at any time.  In the event Borrower fails to specify between a Base Rate Loan or a Eurodollar Rate Loan in the applicable Funding Notice or Conversion/Continuation Notice, such Loan (if outstanding as a Eurodollar Rate Loan) will be automatically converted into a Base Rate Loan on the last day of the then-current Interest Period for such Loan (or if outstanding as a Base Rate Loan will remain as, or (if not then outstanding) will be made as, a Base Rate Loan).  The Interest Period for any Eurodollar Rate Loan shall be an Interest Period of one month.  As soon as practicable after 10:00 a.m. (New York City time) on each Interest Rate Determination Date, Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Borrower and each Lender.

(d)    Interest payable pursuant to Section 2.8(a) shall be computed (i) in the case of Base Rate Loans on the basis of a 365-day or 366-day year, as the case may be, and (ii) in the case of Eurodollar Rate Loans, on the basis of a 360-day year, in each case for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan, the last Interest Payment Date with respect to such Loan and, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan and, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

(e)     Except as otherwise set forth herein, interest on each Loan (i) shall accrue on a daily basis and shall be payable in arrears on each Interest Payment Date with respect to interest accrued on and to each such payment date; (ii) shall accrue on a daily basis and shall be payable in arrears upon any prepayment of that Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid; and (iii) shall accrue on a daily basis and shall be payable in arrears at maturity of the Loans, including final maturity of the Loans; provided, however, with respect to any voluntary prepayment of a Base Rate Loan, accrued interest shall instead be payable on the applicable Interest Payment Date.

**2.9.     Conversion/Continuation**.

(a)     Subject to Section 2.18 and so long as no Event of Default shall have occurred and then be continuing, Borrower shall have the option:

(i)     to convert at any time all or any part of any Loan equal to $5,000,000 and integral multiples of $1,000,000 in excess of that amount from one Type of Loan to another Type of Loan; provided, a Eurodollar Rate Loan may only be converted on the expiration of the Interest Period applicable to such Eurodollar Rate Loan unless Borrower shall pay all amounts due under Section 2.18 in connection with any such conversion; or

(ii)     upon the expiration of any Interest Period applicable to any Eurodollar Rate Loan, to continue all or any portion of such Loan equal to $5,000,000 and integral multiples of $1,000,000 in excess of that amount as a Eurodollar Rate Loan.

(b)     Subject to clause (c) below, Borrower shall deliver a Conversion/Continuation Notice to Administrative Agent no later than 11:00 a.m. (New York City time) at least one (1) Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan) and at least three (3) Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan). Except as otherwise provided herein, a Conversion/Continuation Notice for conversion to, or continuation of, any Eurodollar Rate Loans shall be irrevocable on and after the related Interest Rate Determination Date, and Borrower shall be bound to effect a conversion or continuation in accordance therewith. If on any day a Loan is outstanding with respect to which a Funding Notice or Conversion/Continuation Notice has not been delivered to Administrative Agent in accordance with the terms hereof specifying the applicable basis for determining the rate of interest, then for that day such Loan shall be a Base Rate Loan.

(c)     In lieu of delivering a Conversion/Continuation Notice, Borrower may give Administrative Agent telephonic notice by the required time of any proposed conversion/continuation; provided that each such notice shall be promptly confirmed in writing by delivery of the Conversion/Continuation Notice to Administrative Agent on or before the close of business on the date that the telephonic notice is given. In the event of a discrepancy between the telephone notice and the written Conversion/Continuation Notice, the written Conversion/Continuation Notice shall govern. In the case of any Conversion/Continuation Notice that is irrevocable once given, if Borrower provides telephonic notice in lieu thereof, such telephone notice shall also be irrevocable once given. Neither Administrative Agent nor any Lender shall incur any liability to Borrower in acting upon any telephonic notice referred to above that Administrative Agent believes in good faith to have been given by a duly Authorized Officer or other Person authorized on behalf of Borrower or for otherwise acting in good faith.

**2.10.     Default Interest**.  Upon the occurrence and during the continuance of an Event of Default, any overdue amounts in respect of Loans (including overdue principal and, to the extent permitted by applicable law, overdue interest payments on the Loans or any premiums, fees or other amounts owed hereunder which are overdue) shall thereafter bear interest (including post-petition interest in any

proceeding under Debtor Relief Laws) payable on demand at a rate that is 2.00% per annum in excess of the interest rate otherwise payable hereunder with respect to the applicable Loans (or, in the case of any such premiums, fees and other amounts, at a rate which is 2.00% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans); provided that in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Eurodollar Rate Loans shall thereupon become Base Rate Loans and overdue amounts in respect thereof shall thereafter bear interest payable upon demand at a rate which is 2.00% per annum in excess of the interest rate otherwise payable hereunder for Base Rate Loans. Payment or acceptance of the increased rates of interest provided for in this Section 2.10 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Administrative Agent or any Lender

**2.11. Premiums; Fees**.

(a)     Borrower agrees to pay (or cause to be paid pursuant to the terms and conditions of the Asset Purchase Agreement) on the Closing Date to Administrative Agent for the ratable benefit of each Lender (based on its Pro Rata Share) an upfront premium equal to 1.00% of the aggregate principal amount of such Lender's Initial Loans as compensation for the deemed making of such Lender's Initial Loans on the Closing Date (the "**Upfront Premium**").  The Upfront Premium shall be earned, due and payable in cash on the Closing Date and non-refundable and non-creditable thereafter.

(b)     In the event of  (i) the prepayment or repayment of all or any portion of the Loans pursuant to Section 2.13 (including any repricing, replacement or effective refinancing through any waiver, consent, amendment, restatement or amended and restatement of this Agreement, but excluding prepayments pursuant to Section 2.14(a), (b) or (c)) or (ii) following acceleration of the Loans in accordance with Section 8.1, such prepayment or repayment shall be accompanied by a premium (the "**Repayment Premium**") in an amount equal to (1) if such prepayment or repayment occurs prior to the first anniversary of the Closing Date, $0, (2) if such prepayment or repayment occurs on and after the first anniversary but prior to the second anniversary of the Closing Date, 2.00% of the aggregate principal amount prepaid, repaid or required to be repaid, (3) if such prepayment or repayment occurs on and after the second anniversary but prior to the third anniversary of the Closing Date, 1.00% of the aggregate principal amount prepaid, repaid or required to be repaid and (4) if such prepayment or repayment occurs on or after the third anniversary of the Closing Date, $0.  The Repayment Premium shall be due and payable, on the date of such repayment or prepayment.  Notwithstanding anything to the contrary herein, the Repayment Premium shall be earned, due and payable (x) whether or not there has been an acceleration of the Loans hereunder and (y) whether or not such prepayment occurred before or after (A) a Default or Event of Default has occurred or is continuing or (B) the commencement of an insolvency proceeding.  It is hereby understood and agreed that in the event all or any portion of the Loans are accelerated or otherwise become due prior to the Maturity Date, the Repayment Premium applicable at the time of such acceleration shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties hereto as to a reasonable calculation of each Lender's lost profits as a result thereof.  The Repayment Premium shall be presumed to be the liquidated damages sustained by each Lender as the result of the acceleration of the Loans, and the Credit Parties agree that it is reasonable under the circumstances currently existing. The Repayment Premium shall also be payable in the event that the Obligations (and/or the Credit Documents) are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means. **EACH CREDIT PARTY EXPRESSLY WAIVES (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE REPAYMENT PREMIUM IN CONNECTION WITH ANY SUCH PREPAYMENT, REPAYMENT OR ACCELERATION.** The Credit Parties expressly agree (to the fullest extent that each may lawfully do so) that: (A) the Repayment Premium is

reasonable and is the product of an arm's-length transaction between sophisticated business people, ably represented by counsel; (B) the Repayment Premium shall be payable notwithstanding the then-prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Credit Parties giving specific consideration in the Transactions for such agreement to pay the Repayment Premium; and (D) the Credit Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph.  The Credit Parties expressly acknowledge that their agreement to pay the Repayment Premium to the Lenders as herein described is a material inducement to the Lenders to provide the Commitments and make the Loans.

(c)     Borrower agrees to pay to each Agent, for its own account, the fees set forth in the Fee Letter.

**2.12.    Scheduled Payments/Repayment at Maturity**.

(a)     The principal amounts of the Loans shall be repaid in consecutive quarterly installments and at final maturity (each such payment, an **"Installment"**) in the aggregate amounts set forth below on each date set forth below, commencing with the last Business Day of the first full Fiscal Quarter following the Closing Date:

| Amortization Date | Installments |
|---|---|
| Last Business Day of First Fiscal Quarter of each Fiscal Year | $1,300,000 |
| Last Business Day of Second Fiscal Quarter of each Fiscal Year | $1,300,000 |
| Last Business Day of Third Fiscal Quarter of each Fiscal Year | $1,300,000 |
| Last Business Day of Fourth Fiscal Quarter of each Fiscal Year | $1,300,000 |
| Maturity Date | Remainder |

(b)     Notwithstanding the foregoing, (x) such Installments shall be reduced in connection with any voluntary or mandatory prepayments of the Loans in accordance with Sections 2.13, 2.14 and 2.15, as applicable, and (y) the Loans, together with all other amounts owed hereunder with respect thereto, shall, in any event, be paid in full in cash no later than the Maturity Date applicable to such Loans.

**2.13.    Voluntary Prepayments**.  Borrower may prepay the Loans on any Business Day in whole or in part without premium or penalty (except as provided in Section 2.11).  With respect to Base Rate Loans, Borrower may prepay any such Loans on any Business Day in whole or in part, in an aggregate minimum amount of $5,000,000 and integral multiples of $1,000,000 in excess of that amount. With respect to Eurodollar Rate Loans, Borrower may prepay any such Loans on any Business Day in whole or in part in an aggregate minimum amount of $5,000,000 and integral multiples of $1,000,000 in excess of that amount.  Such prepayment shall be made upon not less than three (3) Business Days' prior written or telephonic notice given to Administrative Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed by delivery of written notice thereof to Administrative Agent (and Administrative Agent will promptly transmit such original notice by e-mail or telephone to each

Lender).  Upon the giving of any such notice, the aggregate principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified in such notice; provided that such notice may state that such notice is conditioned upon the effectiveness of other credit facilities, the receipt of proceeds from the issuance of Equity Interests or other Indebtedness or the disposition of assets or the closing of a merger, acquisition or other transaction, in which case such notice may be revoked or extended by Borrower by written notice to Administrative Agent on or prior to the prepayment date specified therein if the satisfaction of such condition has not occurred or is delayed.  Such prepayment shall be applied as specified in Section 2.15(a) and shall be accompanied by the Repayment Premium, if any.

      **2.14.**    **Mandatory Prepayments**.

      (a)    <u>Asset Sales</u>.  No later than the fifth Business Day following the date of receipt by Holdings or any of its Subsidiaries of any Net Asset Sale Proceeds (other than any Net Asset Sale Proceeds (i) with respect to any ABL Priority Collateral or (ii) that are less than (x) with respect to any single Asset Sale (or series of related Asset Sales), $1,000,000 or (y) when aggregated with the Net Asset Sale Proceeds of all other Asset Sales made within the same Fiscal Year, $5,000,000), Borrower shall prepay the Loans as set forth in Section 2.15(b) in an aggregate amount equal to 100% of such Net Asset Sale Proceeds; provided that (x) so long as no Event of Default shall have occurred and be continuing or would result therefrom, Borrower shall have the option, directly or through one or more of its Subsidiaries that are Credit Parties, to use Net Asset Sale Proceeds with respect to any sales or dispositions of assets or property not owned by any Special Purpose Subsidiary within three hundred sixty-five (365) days of the receipt thereof to make Consolidated Capital Expenditures in an aggregate amount not to exceed $100,000,000 in any Fiscal Year and (y) in the event of any disposition of any Mortgaged Property pursuant to the exercise of a purchase option for a purchase price that is not based on the "fair market value" thereof under any reciprocal easement agreement, ground lease or other similar agreement affecting such Mortgaged Property as a result of discontinuation of operations or maintenance of such Mortgaged Property, the amount of the prepayment by Borrower pursuant to this Section 2.14(a) shall be the "fair market value" of such Mortgaged Property (determined, *mutatis mutandis*, based on the arbitration procedures set forth in Section [23.1] of the applicable Master Lease) net of amounts deducted pursuant to clause (b) of the definition of "Net Asset Sale Proceeds".[7]

      (b)    <u>Insurance/Condemnation Proceeds</u>.  No later than the fifth Business Day following the date of receipt by Holdings or any of its Subsidiaries, or Administrative Agent as loss payee, lender loss payee or mortgagee, of any Net Insurance/Condemnation Proceeds (other than any Net Insurance/Condemnation Proceeds with respect to any ABL Priority Collateral), Borrower shall prepay the Loans as set forth in Section 2.15(b) in an aggregate amount equal to 100% of such Net Insurance/Condemnation Proceeds; provided that so long as no Event of Default shall have occurred and be continuing or would result therefrom, Borrower shall have the option, directly or through one or more of its Subsidiaries that are Credit Parties, to restore the related damaged or destroyed assets (if applicable) with such Net Insurance/Condemnation Proceeds within three hundred and sixty-five (365) days of the receipt thereof.

      (c)    <u>Consolidated Excess Cash Flow</u>.  In the event that there shall be Consolidated Excess Cash Flow for any Fiscal Year (commencing with the Fiscal Year ending January 29, 2022), no later than the fifth Business Day after the delivery of the annual financial statements pursuant to Section 5.1(b) for such Fiscal Year, Borrower shall prepay the Loans as set forth in Section 2.15(b) in an aggregate amount equal to 50% of such Consolidated Excess Cash Flow for such Fiscal Year *minus* the Due Date Earnout Payment; provided that, if the Due Date Earnout Payment subtracted from the foregoing calculation for any Fiscal Year exceeds the final and conclusive Earnout Amount paid for such Fiscal Year as determined pursuant

---

[7] Subject to resolution of the arbitration procedures in the applicable Master Lease.

to the terms and conditions of the Earnout Agreement, then Borrower shall prepay the Loans in an amount equal to such excess Earnout Amount no later than the fifth Business Day after the date on which such final and conclusive Earnout Amount is so determined; provided, further, that if the final and conclusive Earnout Amount paid for any Fiscal Year as determined pursuant to the terms and conditions of the Earnout Agreement exceeds the Due Date Earnout Payment subtracted from the foregoing calculation for such Fiscal Year, then such excess amount shall be deducted from Consolidated Excess Cash Flow in the next succeeding Fiscal Year in which there is Consolidated Excess Cash Flow (it being agreed that, to the extent such excess amount is unable to be fully deducted in such next succeeding Fiscal Year as a result of insufficient Consolidated Excess Cash Flow, such excess amount (after giving effect to any partial deduction of Consolidated Excess Cash Flow in such next succeeding Fiscal Year (if any)) shall be deducted from Consolidated Excess Cash Flow in the remaining Fiscal Years in sequential order until such excess amount shall have been fully deducted from Consolidated Excess Cash Flow).

(d)    AHYDO.  If the Loans would otherwise constitute an "applicable high yield discount obligation" within the meaning of Section 163(i) of the Internal Revenue Code, then Borrower shall prepay the Loans as set forth in Section 2.15(b) on each Interest Payment Date following the fifth anniversary of the Closing Date in an aggregate amount equal to the amount necessary to ensure that the Loans shall not constitute an "applicable high yield discount obligation" (such amount, the "**AHYDO Amount**").

(e)    Prepayment Certificate. Concurrently with any prepayment of the Loans pursuant to Sections 2.14(a) through 2.14(d), Borrower shall deliver to Administrative Agent a certificate of a Financial Officer demonstrating the calculation of the amount of the Net Asset Sale Proceeds, the Net Insurance/Condemnation Proceeds, the Consolidated Excess Cash Flow, the Due Date Earnout Payment, the Earnout Amount or the AHYDO Amount, as the case may be.  In the event that Borrower shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, Borrower shall promptly make an additional prepayment of the Loans in an amount equal to such excess, and Borrower shall concurrently therewith deliver to Administrative Agent a certificate of a Financial Officer demonstrating the derivation of such excess.

**2.15.    Application of Prepayments**.

(a)    Application of Voluntary Prepayments. Any prepayment of any Loan pursuant to Section 2.13 shall be applied to prepay the Loans of each Class on a pro rata basis (in accordance with the respective outstanding principal amounts thereof) first, to reduce the next eight remaining Installments of principal of the Loans and, second, on a pro rata basis to reduce the scheduled remaining Installments of principal of the Loans.

(b)    Application of Mandatory Prepayments. Any amount required to be prepaid pursuant to Sections 2.14(a) through 2.14(d) shall be applied to prepay Loans of each Class on a pro rata basis (in accordance with the respective outstanding principal amounts thereof) first, to reduce the next eight remaining scheduled Installments of principal of the Loans in direct order of maturity and, second, on a pro rata basis to reduce the scheduled remaining Installments of principal of the Loans.

(c)    Application of Prepayments of Loans to Base Rate Loans and Eurodollar Rate Loans. Considering each Class of Loans being prepaid separately, any prepayment thereof shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by Borrower pursuant to Section 2.18(c).

**2.16.    General Provisions Regarding Payments**.

(a)    All payments by Borrower of principal, interest, premiums, fees and other Obligations shall be made in Dollars in same day funds, without defense, recoupment, setoff or counterclaim, free of any restriction or condition, and delivered to Administrative Agent not later than 2:00 p.m. (New York City time) on the date due at the Principal Office of Administrative Agent for the account of Lenders; provided that, for purposes of computing interest, premiums and fees, funds received by Administrative Agent after that time on such due date shall be deemed to have been paid by Borrower on the next succeeding Business Day.

(b)    All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest, premiums, fees and any amounts due under Section 2.11(b) and Section 2.18(c) in respect of the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest then due and payable before application to principal.

(c)    Administrative Agent (or its agent or sub-agent appointed by it) shall promptly distribute to each Lender at such address as such Lender shall indicate in writing, such Lender's Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all premiums and fees payable with respect thereto, to the extent received by Administrative Agent.

(d)    Notwithstanding the foregoing provisions hereof, if any Conversion/Continuation Notice is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(e)    Whenever any payment to be made hereunder with respect to any Loan shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day.

(f)    Administrative Agent shall have the right to deem any payment by or on behalf of Borrower hereunder that is not made in same day funds prior to 2:00 p.m. (New York City time) to be a non-conforming payment. Any such payment so deemed to be non-conforming shall not be deemed to have been received by Administrative Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day. Administrative Agent shall give prompt telephonic notice to Borrower and each applicable Lender (confirmed in writing) if any payment is non-conforming. Any non-conforming payment may constitute or become a Default or Event of Default in accordance with the terms of Section 8.1(a). Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.10 from the date such amount was due and payable until the date such amount is paid in full in cash.

(g)    If an Event of Default shall have occurred and not otherwise been waived, and the maturity of the Obligations shall have been accelerated pursuant to Section 8.1 or pursuant to any sale of, any collection from, or other realization upon all or any part of the Collateral in connection with any exercise of remedies permitted hereunder, in connection with any proceeding under any Debtor Relief Law, under applicable Law or under the other Credit Documents, all payments or proceeds received by Agents in respect of any of the Obligations, shall, subject to the provisions of the Intercreditor Agreement, be applied

in accordance with the application arrangements described in [Section 9.2][8] of the Pledge and Security Agreement.

(h)     If at any time insufficient funds are received by and available to Administrative Agent to pay fully all amounts of principal, interest, premiums and fees then due hereunder, such funds shall be applied (i) *first*, towards payment of interest, premiums and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest, premiums and fees then due to such parties and (ii) *second* towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

**2.17.     Ratable Sharing**. Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, premiums, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents in respect of any Class of Loans hereunder (collectively, the "**Aggregate Amounts Due**" to such Lender) which is greater than the proportion received by any other Lender of such Class of Loans in respect of the Aggregate Amounts Due to such other Lender in respect of such Class of Loans, then the Lender receiving such proportionately greater payment shall (a) notify Administrative Agent and each other Lender of such Class of Loans of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders of such Class of Loans so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders of such Class of Loans in proportion to the Aggregate Amounts Due to them; <u>provided</u> that if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, consolidation, set-off or counterclaim with respect to any and all monies owing by Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder. The provisions of this Section 2.17 shall not be construed to apply to (a) any payment made by Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (b) any payment obtained by any Lender as consideration for the assignment or sale of a participation in any of its Loans or other Obligations owed to it.

**2.18.     Making or Maintaining Eurodollar Rate Loans**.

(a)     <u>Inability to Determine Applicable Interest Rate</u>. In the event that Administrative Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of "Adjusted Eurodollar Rate", Administrative Agent shall on such date give notice (by e-mail or by telephone confirmed in writing) to Borrower and each Lender of such determination, whereupon (i) no Loans may be

---

[8] Reference to be conformed to the Pledge and Security Agreement.

made as, or converted to, Eurodollar Rate Loans until such time as Administrative Agent notifies Borrower and Lenders that the circumstances giving rise to such notice no longer exist, and (ii) any Funding Notice or Conversion/Continuation Notice given by Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by Borrower.

(b)      Illegality or Impracticability of Eurodollar Rate Loans. In the event that on any date (i) any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto absent manifest error) that the making, maintaining, converting to or continuation of its Eurodollar Rate Loans has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful), or (ii) Administrative Agent is advised by the Requisite Lenders (which determination shall be final and conclusive and binding upon all parties hereto) that the making, maintaining, converting to or continuation of its Eurodollar Rate Loans has become impracticable, as a result of contingencies occurring after the Closing Date which materially and adversely affect the London interbank market or the position of the Lenders in that market, then, and in any such event, such Lenders (or in the case of the preceding clause (i), such Lender) shall be an "**Affected Lender**" and such Affected Lender shall on that day give notice (by e-mail or by telephone confirmed in writing) to Borrower and Administrative Agent of such determination (which notice Administrative Agent shall promptly transmit to each other Lender). If Administrative Agent receives a notice from (x) any Lender pursuant to clause (i) of the preceding sentence or (y) a notice from the Lenders constituting the Requisite Lenders pursuant to clause (ii) of the preceding sentence, then (1) the obligation of the Lenders (or, in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender) to make Loans as, or to convert Loans to, Eurodollar Rate Loans shall be suspended until such notice shall be withdrawn by each Affected Lender, (2) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, the Lenders (or in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender) shall make such Loan as (or continue such Loan as or convert such Loan to, as the case may be) a Base Rate Loan, (3) the Lenders' (or in the case of any notice pursuant to clause (i) of the preceding sentence, such Lender's) obligations to maintain their respective outstanding Eurodollar Rate Loans (the "**Affected Loans**") shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (4) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by Borrower pursuant to a Funding Notice or a Conversion/Continuation Notice, Borrower shall have the option, subject to the provisions of Section 2.18(c), to rescind such Funding Notice or Conversion/Continuation Notice as to all Lenders by giving written or telephonic notice (promptly confirmed by delivery of written notice thereof) to Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Administrative Agent shall promptly transmit to each other Lender).

(c)      Compensation for Breakage or Non-Commencement of Interest Periods. Borrower shall compensate each Lender, upon written request by such Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including any interest paid or payable by such Lender to lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any loss, expense or liability sustained by such Lender in connection with the liquidation or re-employment of such funds but excluding loss of anticipated profits) which such Lender may sustain: (i) if for any reason (other than a default by such Lender) a Credit Extension of any Eurodollar Rate Loan does not occur on a date specified therefor in a Funding Notice or a telephonic request for a Credit Extension, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Conversion/Continuation Notice or a telephonic request for conversion or continuation; (ii) if any

prepayment or other principal payment of, or any conversion of, any of its Eurodollar Rate Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan; or (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by Borrower. With respect to any Lender's claim for compensation under this Section 2.18(c), Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) calendar days prior to the date that such Lender notifies Borrower of the event that gives rise to such claim.

(d)      Booking of Eurodollar Rate Loans. Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of such Lender.

(e)      Assumptions Concerning Funding of Eurodollar Rate Loans. Calculation of all amounts payable to a Lender under this Section 2.18 and under Section 2.19 shall be made as though such Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to clause (i) of the definition of "Adjusted Eurodollar Rate" in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such Eurodollar deposit from an offshore office of such Lender to a domestic office of such Lender in the United States of America; provided, however, each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.18 and under Section 2.19.

(f)      Effect of Benchmark Transition Event.

(i)      Benchmark Replacement. Notwithstanding anything to the contrary herein or in the other Credit Documents, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, Administrative Agent and Borrower may amend this Agreement to replace LIBOR with a Benchmark Replacement; provided, that such amendment shall meet the standards set forth in proposed United States Treasury Regulation Section 1.1001-6 or any amended, temporary or final version thereof so as not to be treated as a "modification" (and therefore an exchange) for purpose of United States Treasury Regulation Section 1.1001-3.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after Administrative Agent has posted such proposed amendment to all Lenders and Borrower so long as Administrative Agent has not received, by such time, written notice of objection to such amendment from Borrower or Lenders comprising the Requisite Lenders. Any such amendment with respect to an Early Opt-in Election will become effective on the date that Borrower and Lenders comprising the Requisite Lenders have delivered to Administrative Agent written notice that the Requisite Lenders accept such amendment. No replacement of LIBOR with a Benchmark Replacement pursuant to this Section 2.18(f) will occur prior to the applicable Benchmark Transition Start Date.

(ii)      Benchmark Replacement Conforming Changes. In connection with the implementation of a Benchmark Replacement (effected in accordance with Section 2.18(f)(i)), Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time in consultation with Borrower and, notwithstanding anything to the contrary herein or in the other Credit Documents, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(iii)      Notices; Standards for Decisions and Determinations. Administrative Agent will promptly notify Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any

Benchmark Unavailability Period. Any determination, decision or election that may be made by Administrative Agent or Lenders pursuant to this Section 2.18(f), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party hereto, except, in each case, as expressly required pursuant to this Section 2.18(f).

(iv)     Benchmark Unavailability Period. Upon Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, Borrower may revoke any request for a Credit Extension of, conversion to or continuation of Eurodollar Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, Borrower will be deemed to have converted any such request into a request for a Credit Extension of or conversion to Base Rate Loans. During any Benchmark Unavailability Period, the component of the Base Rate based upon LIBOR will not be used in any determination of the Base Rate.

**2.19.     Increased Costs; Capital Adequacy**.

(a)     Compensation For Increased Costs and Taxes. If any Change in Law (i) subjects a Lender (or its applicable lending office) or any company controlling such Lender to any additional Tax (other than Indemnified Taxes, Connection Income Taxes and Taxes described in clauses (b)-(d) of the definition of "Excluded Taxes") with respect to this Agreement or any of the other Credit Documents or any of its obligations hereunder or thereunder or any payments to such Lender (or its applicable lending office) of principal, interest, premiums, fees or any other amount payable hereunder; (ii) imposes, modifies or holds applicable any reserve (including any marginal, emergency, supplemental, special or other reserve), special deposit, liquidity, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender (other than any such reserve or other requirements with respect to Eurodollar Rate Loans that are reflected in the definition of "Adjusted Eurodollar Rate") or any company controlling such Lender; or (iii) imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or any company controlling such Lender or such Lender's obligations hereunder or the London interbank market; and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto; then, in any such case, Borrower shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or in a lump sum or otherwise as such Lender may determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder. Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this Section 2.19(a) which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)     Capital Adequacy Adjustment. In the event that any Lender shall have determined that any Change in Law, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on the capital of such Lender or any company controlling such Lender as a consequence of, or with reference to, such Lender's Loans or Commitments, or participations therein or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling company could have achieved but for such adoption, effectiveness, phase-in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling company with regard to capital adequacy), then from time to time, within ten (10) Business Days after receipt by Borrower from such Lender of the statement referred to in the next sentence, Borrower shall pay or cause to be paid to such

Lender such additional amount or amounts as will compensate such Lender or such controlling company on an after-tax basis for such reduction. Such Lender shall deliver to Borrower (with a copy to Administrative Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 2.19(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(c)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.19 shall not constitute a waiver of such Lender's right to demand such compensation; provided that Borrower shall not be required to compensate a Lender pursuant to this Section 2.19 for any increased costs incurred or reductions suffered more than 9 months prior to the date that such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 9-month period referred to above shall be extended to include the period of retroactive effect thereof). Notwithstanding the foregoing, no Lender may demand compensation pursuant to this Section 2.19 unless it is then the general policy of such Lender to pursue similar compensation in similar circumstances under comparable provisions of other credit agreements.

**2.20.     Taxes; Withholding, Etc.**

(a)     Payments to Be Free and Clear. All sums payable by or on behalf of any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of any Tax except as required by applicable law.

(b)     Withholding of Taxes. If any Credit Party or any other Person (acting as a withholding agent) is (in such withholding agent's reasonable good faith discretion) required by law to make any deduction or withholding on account of any Indemnified Tax from any sum paid or payable by any Credit Party to Administrative Agent or any Lender under any of the Credit Documents: (i) Borrower shall notify Administrative Agent of any such requirement or any change in any such requirement reasonably promptly after Borrower becomes aware of it; (ii) Borrower shall pay, or cause to be paid, any such Indemnified Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Credit Party) for its own account or (if that liability is imposed on Administrative Agent or such Lender, as the case may be) on behalf of and in the name of Administrative Agent or such Lender; (iii) unless otherwise provided in this Section 2.20, the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, Administrative Agent or such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made; and (iv) within thirty (30) days after the due date of payment of any Indemnified Tax which it is required by clause (ii) above to pay, or as soon as practicable thereafter, Borrower shall deliver to Administrative Agent evidence satisfactory to the affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority.

(c)     Evidence of Exemption From U.S. Withholding Tax. Each Lender that is not a United States person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for U.S. federal income tax purposes (a "**Non-US Lender**") shall, to the extent such Lender is legally able to do so, deliver to Administrative Agent and Borrower, on or prior to the Closing Date or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of Borrower or Administrative Agent (each in the reasonable exercise of its discretion), (i) two copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, W-8ECI, W-8EXP and/or W-8IMY (or, in each case, any successor forms), as applicable,

properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code or United States Treasury Regulations and reasonably requested by Borrower or Administrative Agent to establish that such Lender is not subject to (or is subject to a reduced rate of) deduction or withholding of United States federal tax with respect to any payments to such Lender of principal, interest, premiums, fees or other amounts payable under any of the Credit Documents, or (ii) if such Lender is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code, a Certificate re Non-Bank Status together with two copies of Internal Revenue Service Form W-8BEN or W-8BEN-E (or any successor form), properly completed and duly executed by such Lender, and such other documentation required under the Internal Revenue Code or United States Treasury Regulations and reasonably requested by Borrower or Administrative Agent to establish that such Lender is not subject to (or is subject to a reduced rate of) deduction or withholding of United States federal tax with respect to any payments to such Lender of interest payable under any of the Credit Documents. Each Non-US Lender shall, to the extent it is legally able to do so, deliver to Borrower and Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-US Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Administrative Agent), copies of executed versions of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrower or Administrative Agent to determine the withholding or deduction required to be made. Each Lender that is a United States person (as such term is defined in Section 7701(a)(30) of the Internal Revenue Code) for United States federal income tax purposes (a "**U.S. Lender**") shall deliver to Administrative Agent and Borrower on or prior to the Closing Date (or, if later, on or prior to the date on which such Lender becomes a party to this Agreement) two copies of Internal Revenue Service Form W-9 (or any successor form), properly completed and duly executed by such Lender, certifying that such U.S. Lender is entitled to an exemption from United States backup withholding tax, or otherwise prove that it is entitled to an exemption. If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to Borrower and Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrower or Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by Borrower or Administrative Agent as may be necessary for Borrower and Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  On or before the date on which GLAS USA LLC (and any successor or replacement Administrative Agent) becomes Administrative Agent hereunder (and from time to time thereafter upon the reasonable request of Borrower), it shall deliver to Borrower two executed copies of, as applicable: (i) Internal Revenue Service Form W-9, or (ii) Internal Revenue Service Form W-8ECI (with respect to any payments to be received on its own behalf) and Internal Revenue Service Form W-8IMY (for all other payments), in each case, establishing that Borrower can make payments to Administrative Agent without deduction or withholding of any Taxes imposed by the United States, including Taxes imposed under FATCA.  Solely for purposes of this Section 2.20(c), "FATCA" shall include any amendments made to FATCA after the date of this Agreement. Each Recipient required to deliver any forms, certificates or other evidence with respect to United States federal tax withholding matters pursuant to this Section 2.20(c) hereby agrees to the extent such Recipient is legally able, from time to time after the initial delivery by such Recipient of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Recipient shall promptly deliver to Administrative Agent and Borrower two new copies of Internal Revenue Service Form W-8BEN or W-8BEN-E, W-8ECI, W-8EXP, W-8IMY and/or W-9 (or, in each case, any successor form), as applicable, or a Certificate re Non-Bank Status and two copies of Internal Revenue Service Form W-

8BEN or W-8BEN-E (or any successor form), as the case may be, properly completed and duly executed by such Recipient, and such other documentation required under the Internal Revenue Code or United States Treasury Regulations and reasonably requested by Borrower or Administrative Agent to confirm or establish that such Recipient is not subject to (or is subject to a reduced rate of) deduction or withholding of United States federal income tax with respect to payments to such Recipient under the Credit Documents, or notify Administrative Agent and Borrower of its inability to deliver any such forms, certificates or other evidence.

(d)     Without limiting the provisions of Section 2.20(b) and without duplication of any obligation under Section 2.20(b), Borrower shall timely pay all Other Taxes to the relevant Governmental Authorities in accordance with applicable law. Borrower shall deliver to Administrative Agent official receipts or other evidence of such payment reasonably satisfactory to Administrative Agent in respect of any Other Taxes payable hereunder promptly after payment of such Other Taxes.

(e)     Without duplication of any obligation under Section 2.20(b) or Section 2.20(d), Borrower shall indemnify Administrative Agent and any Lender for the full amount of Indemnified Taxes for which additional amounts are required to be paid pursuant to Section 2.20(b) arising in connection with payments made under this Agreement or any other Credit Document and Other Taxes (including any such Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.20) paid by Administrative Agent or Lender or any of their respective Affiliates and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to such Credit Party shall be conclusive absent manifest error. Such payment shall be due within ten (10) Business Days of such Credit Party's receipt of such certificate.

(f)     If any party determines that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including additional amounts pursuant to this Section 2.20), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.20 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this clause (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this clause (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this clause (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the indemnification payments or additional amounts giving rise to such refund had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)     Each party's obligations under this Section 2.20 shall survive the resignation or replacement of Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

(h)     Indemnification by Lenders.  Each Lender shall severally indemnify Administrative Agent, within ten (10) Business Days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that Borrower has not already indemnified Administrative Agent for such Indemnified Taxes and without limiting the obligation of Borrower to do so), (ii) any Taxes attributable to

such Lender's failure to comply with the provisions of Section 10.6(g) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Administrative Agent in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by Administrative Agent to the Lender from any other source against any amount due to Administrative Agent under this Section 2.20(h).

(i)     Issue Price. Borrower and Administrative Agent shall cooperate in good faith to determine the "issue price" (within the meaning of Section 1273 of the Internal Revenue Code) of the Loans and shall not take any Tax reporting position inconsistent with such determination, except as otherwise required by a Change in Law or pursuant to the good faith resolution of a Tax contest.

**2.21.     Obligation to Mitigate**. Each Lender agrees that, as promptly as practicable after the officer of such Lender responsible for administering its Loans becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become an Affected Lender or that would entitle such Lender to receive payments under Section 2.18, 2.19 or 2.20, it will, to the extent not inconsistent with the internal policies of such Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Credit Extensions, including any Affected Loans, through another office of such Lender, or (b) take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.18, 2.19 or 2.20 would be materially reduced and if, as determined by such Lender, the making, funding or maintaining of such Commitments or Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Commitments or Loans or the interests of such Lender; provided, such Lender will not be obligated to utilize such other office pursuant to this Section 2.21 unless Borrower agrees to pay all incremental expenses incurred by such Lender as a result of utilizing such other office as described above. A certificate as to the amount of any such expenses payable by Borrower pursuant to this Section 2.21 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender to Borrower (with a copy to Administrative Agent) shall be conclusive absent manifest error.

**2.22.     Defaulting Lenders**.

(a)     Defaulting Lender Waterfall. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law, any payment of principal, interest, premiums, fees or other amounts received by Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 8 or otherwise) or received by Administrative Agent from a Defaulting Lender pursuant to Section 10.4 shall be applied at such time or times as may be determined by Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to Administrative Agent hereunder; *second*, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *third*, as Borrower may request (so long as no Default or Event of Default shall have occurred and be continuing), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by Administrative Agent; *fourth*, if so determined by Administrative Agent and Borrower, to be held in a Deposit Account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with

respect to Loans under this Agreement; *fifth*, so long as no Event of Default shall have occurred and be continuing, to the payment of any amounts owing to Borrower as a result of any judgment of a court of competent jurisdiction obtained by Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the applicable Pro Rata Shares. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)     Defaulting Lender Cure. If Borrower and Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to premium or fees accrued or payments made by or on behalf of Borrower while that Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

**2.23.     Removal or Replacement of a Lender**.   Anything contained herein to the contrary notwithstanding, in the event that: (a) (i) any Lender (an "Increased-Cost Lender") shall give notice to Borrower that such Lender is an Affected Lender or that such Lender is entitled to receive payments under Section 2.18, 2.19 or 2.20, (ii) the circumstances which have caused such Lender to be an Affected Lender or which entitle such Lender to receive such payments shall remain in effect, and (iii) such Lender shall fail to withdraw such notice within three (3) Business Days after Borrower's request for such withdrawal, (b) any Lender shall become and continues to be a Defaulting Lender or (c) in connection with any proposed amendment, modification, termination, waiver or consent with respect to any of the provisions of this Agreement as contemplated by Section 10.5(b) or Section 2.24, the consent of the Requisite Lenders shall have been obtained but the consent of one or more of such other Lenders (each a "Non-Consenting Lender") whose consent is required (or, with respect to an Extension, requested; provided that, in respect of an Extension, if Borrower elects to exercise its rights under this Section 2.23, Borrower shall require that all such Non-Consenting Lenders assign their outstanding Loans in accordance with this Section 2.23) shall not have been obtained; then, with respect to each such Increased-Cost Lender, Defaulting Lender or Non-Consenting Lender (a "Terminated Lender"), Borrower may, by giving written notice to Administrative Agent and any Terminated Lender of its election to do so, elect to cause such Terminated Lender (and such Terminated Lender hereby irrevocably agrees) to assign its outstanding Loans and its Commitments, if any, in full to one or more Eligible Assignees (each, a "Replacement Lender") in accordance with the provisions of Section 10.6 and Borrower shall pay the fees, if any, payable thereunder in connection with any such assignment from an Increased-Cost Lender, a Non-Consenting Lender or a Defaulting Lender; provided that (1) on the date of such assignment, the Replacement Lender shall pay to such Terminated Lender an amount equal to the principal of, and all accrued interest on, all outstanding Loans of such Terminated Lender, (2) on the date of such assignment, Borrower shall pay any amounts payable to such Terminated Lender pursuant to Section 2.11 (except to the extent the Non-Consenting Lenders hold Loans representing less than one-third (1/3) of the Loans then outstanding), 2.18, 2.19 or 2.20, (3) in the event such Terminated Lender is a Non-Consenting Lender, each Replacement Lender shall consent, at the time of such assignment, to each matter in respect of which such Terminated Lender was a Non-Consenting Lender and (4) in the case of any such assignment resulting from a claim for payment under Section 2.18, 2.19 or 2.20, such assignment will result in a reduction in such compensation or payments thereafter.   Upon the

prepayment of all amounts owing to any Terminated Lender, if any, such Terminated Lender shall no longer constitute a "Lender" for purposes of this Agreement; provided, further, that any rights of such Terminated Lender to indemnification hereunder shall survive as to such Terminated Lender. Each Lender agrees that if Borrower exercises its option hereunder to cause an assignment by such Lender as a Non-Consenting Lender or Terminated Lender, such Lender shall, promptly after receipt of written notice of such election, execute and deliver all documentation necessary to effectuate such assignment in accordance with Section 10.6. In the event that a Lender does not comply with the requirements of the immediately preceding sentence within one Business Day after receipt of such notice, each Lender hereby authorizes and directs Administrative Agent to execute and deliver such documentation as may be required to give effect to an assignment in accordance with Section 10.6 on behalf of a Non-Consenting Lender or Terminated Lender and any such documentation so executed by Administrative Agent shall be effective for purposes of documenting an assignment pursuant to Section 10.6.

**2.24.    Extensions of Loans.**

(a)    Borrower may from time to time, pursuant to the provisions of this Section 2.24, agree with one or more Lenders holding Loans of any Class to extend the maturity date and to provide for other terms consistent with this Section 2.24 (each such modification, an "**Extension**") pursuant to one or more written offers (each an "**Extension Offer**") made from time to time by Borrower to all Lenders under any Class that is proposed to be extended under this Section 2.24, in each case on a pro rata basis (based on the relative principal amounts of the outstanding Loans of each Lender of such Class of Loans) and on the same terms to each such Lender, which Extension Offer may be conditioned as determined by Borrower and set forth in such offer. In connection with each Extension, Borrower will provide notification to Administrative Agent (for distribution to the Lenders of the applicable Class), no later than ten (10) Business Days prior to the maturity of the applicable Class or Classes to be extended of the requested new maturity date for the extended Loans of each such Class of Loans (each an "**Extended Maturity Date**") and the due date for Lender responses.  In connection with any Extension, each Lender of the applicable Class wishing to participate in such Extension shall, prior to such due date, provide Borrower and Administrative Agent with a written notice thereof.  Any Lender that does not respond to an Extension Offer by the applicable due date shall be deemed to have rejected such Extension.  In connection with any Extension, Borrower shall agree to such procedures, if any, as may be reasonably necessary to accomplish the purposes of this Section 2.24.

(b)    After giving effect to any Extension, the Loans so extended shall cease to be a part of the Class that they were a part of immediately prior to the Extension and shall be a new Class hereunder; provided that at no time shall there be more than ten different Classes of Loans.

(c)    The consummation and effectiveness of each Extension shall be subject to the following:

(i)    no Event of Default shall have occurred and be continuing at the time any Extension Offer is delivered to the Lenders or at the time of such Extension;

(ii)    the Loans of any Lender extended pursuant to any Extension ("**Extended Loans**") shall have the same terms as the Class of Loans subject to the related Extension Amendment ("**Existing Loans**"); except (A) the final maturity date of any Extended Loans of a Class to be extended pursuant to an Extension shall be later than the Latest Maturity Date at the time of such Extension, and the weighted average life to maturity of any Extended Loans of a Class to be extended pursuant to an Extension shall be no shorter than the weighted average life to maturity of the Class of Existing Loans subject to the Latest Maturity Date at the time of such Extension; (B) the all-in pricing (including, without limitation, margins, fees and premiums) with respect to the Extended Loans may be higher or lower than the all-in pricing (including, without limitation, margins, fees and premiums) for the Existing Loans; (C) no repayment of any Extended Loans shall be permitted unless such repayment is accompanied by an at least pro rata

-58-

repayment of all earlier maturing Loans (including previously extended Loans) (or all earlier maturing Loans (including previously extended Loans) shall otherwise be or have been terminated and repaid in full in cash); (D) the Extended Loans may contain a "most favored nation" provision for the benefit of Lenders holding Extended Loans; and (E) the other terms and conditions applicable to Extended Loans may be terms different than those with respect to the Existing Loans so long as such terms and conditions only apply after the Latest Maturity Date at the time of such Extension; provided, further, that each Extension Amendment may, without the consent of any Lender other than the applicable extending Lenders, effect such amendments to this Agreement and the other Credit Documents as may be necessary or appropriate, in the opinion of Administrative Agent and Borrower, to give effect to the provisions of this Section 2.24, including any amendments necessary to treat the applicable Loans of the extending Lenders as a new "Class" of loans hereunder; provided that no Extension Amendment may provide for any Class of Extended Loans to (x) be secured by any Collateral or other assets of Holdings or any of its Subsidiaries that does not also secure the Existing Loans or (y) have additional direct or contingent obligors other than the Credit Parties become liable in respect of such Class of Extended Loans at any time.

(iii)    all documentation in respect of such Extension shall be consistent with the foregoing, and all written communications by Borrower generally directed to the applicable Lenders under the applicable Class in connection therewith shall be in form and substance consistent with the foregoing and otherwise reasonably satisfactory to Administrative Agent; and

(iv)    a minimum amount in respect of such Extension (to be determined in Borrower's discretion and specified in the relevant Extension Offer, but in no event less than $25,000,000, unless another amount is agreed to by Administrative Agent) shall be satisfied.

(d)    For the avoidance of doubt, it is understood and agreed that the provisions of Section 2.17 and Section 10.5 will not apply to Extensions of Loans pursuant to Extension Offers made pursuant to and in accordance with the provisions of this Section 2.24, including to any payment of interest, premiums or fees in respect of any Extended Loans that have been extended pursuant to an Extension at a rate or rates different from those paid or payable in respect of Loans of any other Class, in each case as is set forth in the relevant Extension Offer.

(e)    The Lenders hereby irrevocably authorize Administrative Agent to enter into amendments (collectively, "**Extension Amendments**") to this Agreement and the other Credit Documents as may be necessary in order to establish new Classes of Loans created pursuant to an Extension, in each case on terms consistent with this Section 2.24. Notwithstanding the foregoing, Administrative Agent shall have the right (but not the obligation) to seek the advice or concurrence of the Requisite Lenders with respect to any matter contemplated by this Section 2.24 and, if Administrative Agent seeks such advice or concurrence, Administrative Agent shall be permitted to enter into such amendments with Borrower in accordance with any instructions received from such Requisite Lenders and shall also be entitled to refrain from entering into such amendments with Borrower unless and until it shall have received such advice or concurrence; provided, however, that whether or not there has been a request by Administrative Agent for any such advice or concurrence, all such Extension Amendments entered into with Borrower by Administrative Agent hereunder shall be binding on the Lenders. Without limiting the foregoing, in connection with any Extension, (i) the appropriate Credit Parties shall (at their expense) amend (and Administrative Agent is hereby directed to amend) any Credit Document that Administrative Agent reasonably requests to be amended to reflect an Extension that has a maturity date prior to the latest Extended Maturity Date so that such maturity date is extended to the then latest Extended Maturity Date (or such later date as may be advised by local counsel to Administrative Agent) and (ii) Borrower shall deliver board resolutions, secretary's certificates, officer's certificates and other documents as may reasonably be requested by Administrative Agent in connection therewith and a legal opinion of counsel reasonably acceptable to Administrative Agent (i) as to the enforceability of such Extension Amendment, this Agreement as

amended thereby, and such of the other Credit Documents (if any) as may be amended thereby and (ii) to the effect that such Extension Amendment, including without limitation, the Extended Loans provided for therein, does not conflict with or violate the terms and provisions of Section 10.5.

(f)    Promptly following the consummation and effectiveness of any Extension, Borrower will furnish to Administrative Agent (who shall promptly furnish to each Lender) written notice setting forth the Extended Maturity Date and material economic terms of the Extension and the aggregate principal amount of each class of Loans and Commitments after giving effect to the Extension and attaching a copy of the fully executed Extension Amendment.

## SECTION 3. CONDITIONS PRECEDENT

**3.1.    Conditions to the Closing Date**. The deemed making of the Initial Loans by the Lenders on the Closing Date is subject to the satisfaction, or waiver in accordance with Section 10.5, of the following conditions on or before the Closing Date:

(a)    Credit Documents.  Administrative Agent shall have received copies of this Agreement, the Pledge and Security Agreement, the Intercreditor Agreement and each other Credit Document required by the terms and conditions hereof to be executed and delivered on the Closing Date, executed and delivered by each Credit Party and each other Person party thereto.

(b)    Organizational Documents; Incumbency. Administrative Agent shall have received, in respect of each Credit Party, (i) copies of each Organizational Document of such Credit Party, and, to the extent applicable, certified as of the Closing Date or a recent date prior thereto by the appropriate Governmental Authority; (ii) signature and incumbency certificates of the officers of such Credit Party; (iii) resolutions of the Board of Directors or similar governing body of such Credit Party approving and authorizing the execution, delivery and performance of this Agreement, the other Credit Documents and the Related Agreements to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Authority of such Credit Party's jurisdiction of incorporation, organization or formation, each dated as of the Closing Date or a recent date prior thereto; and (v) signature and incumbency certificates of one or more officers of Borrower who are authorized to execute Funding Notices delivered under this Agreement, in substantially the form of Exhibit L.

(c)    Organizational and Capital Structure.  The organizational structure and capital structure of Holdings and its Subsidiaries, after giving effect to the Transactions, shall be as set forth on Schedule 3.1, as the same may be updated from time to time by Borrower; provided that no such update shall be materially adverse to the Lenders (in their capacities as such) without the prior written consent of Administrative Agent (not to be unreasonably withheld, conditioned or delayed).

(d)    Consummation of the Transactions.

(i)    (1) The Transactions shall have been consummated in accordance with the terms and conditions of the Asset Purchase Agreement (without giving effect to any amendments, restatements, supplements, modifications or waivers thereto by the OpCo Purchaser (as defined in the Asset Purchase Agreement) that are materially adverse to the interests of the Lenders (in their capacities as such)), (2) the Closing Date Equity Contribution shall have been made and (3) aggregate cash proceeds of at least $[●] of loans under the Closing Date ABL/FILO Credit Agreements shall have been received by Borrower.

(ii)    Administrative Agent shall have received a fully executed copy of each Related

Agreement and each Closing Date ABL/FILO Credit Document, (x) which shall be consistent in all respects with the terms and conditions of this Agreement and the other Credit Documents and (y) in the case of the Intercompany Intellectual Property Licensing Agreement and the Intercompany Lease, the form of which (but not, for the avoidance of doubt, the substance) will be satisfactory to Administrative Agent (not to be unreasonably withheld, conditioned or delayed) and the substance of which shall provide (i) for an arms' length royalty or rent, as applicable, and other terms and conditions, in each case as determined by Borrower in a commercially reasonable manner and exercising its good faith business judgment, so long as the Lenders and their advisors shall have been afforded a reasonable opportunity to review and comment on the Intercompany Intellectual Property Licensing Agreement and the Intercompany Lease and the royalty or rent, as applicable, thereunder in consultation with Borrower prior to the Closing Date, (ii) that Administrative Agent, after any Event of Default or in any insolvency proceeding of Holdings or any of its Subsidiaries, may seek to have a court of competent jurisdiction adjust or reset the amounts, payments or rates on a prospective basis only under the Intercompany Intellectual Property Licensing Agreement or the Intercompany Lease, as applicable, to then current market amounts, payments or rates in the event the amounts, payments or rates thereunder are below then current market amounts, payments or rates (it being understood and agreed that (x) no downward adjustment or reset shall be permitted and (y) any such adjustment or reset shall not be given retroactive effect), (iii) it being agreed that any such adjustment would be integral to the Intercompany Intellectual Property Licensing Agreement or the Intercompany Lease, as applicable, and that any such upward adjustment would need to be assumed along with such Agreement or Lease in any insolvency proceeding of Holdings or any of its Subsidiaries), (iv) at the option of Administrative Agent, for the termination thereof upon the occurrence and during the continuance of an Event of Default and the enforcement of remedies under any of the Credit Documents and (v) that the Secured Parties shall be express third party beneficiaries thereof.  Each Related Agreement and each Closing Date ABL/FILO Credit Document shall be in full force and effect on the Closing Date and the OpCo Sale Order shall have been entered and be in full force and effect on the Closing Date.

(e)      Existing Indebtedness.  On the Closing Date, Holdings and its Subsidiaries shall have no Indebtedness for borrowed money other than the Obligations, the Closing Date ABL/FILO Credit Agreement Secured Obligations and other Indebtedness assumed on the Closing Date pursuant to the terms and conditions of the Asset Purchase Agreement and the OpCo Sale Order and permitted by Section 6.1.

(f)      Sponsor Affiliate Landlord Estoppels.  Collateral Agent shall have received from the Credit Parties a Landlord Estoppel for each Leasehold Property for which a Sponsor or one of its Affiliates is the ground lessor [(other than any joint venture properties where any such documentation is prohibited by the terms of the joint venture)].[9]

(g)      Personal Property Collateral.  Each Credit Party shall have delivered to Collateral Agent, in each case subject to Section 5.16 and the last paragraph of this Section 3.1:

(i)      documents reasonably necessary, or reasonably requested by Collateral Agent, to evidence the compliance by each Credit Party with its obligations under the Pledge and Security Agreement and the other Collateral Documents (including their obligations to execute or authorize, as applicable, and deliver UCC financing statements, originals of securities, instruments and chattel paper and any agreements governing deposit and/or securities accounts as provided therein);

(ii)      a completed Collateral Questionnaire dated the Closing Date and executed by an Authorized Officer of each Credit Party, together with all attachments contemplated thereby;

---

[9] Inclusion subject to diligence.

(iii)     fully executed Intellectual Property Security Agreements, in proper form for filing or recording in the United States Patent and Trademark Office and the United States Copyright Office, as applicable, memorializing and recording the encumbrance of the Intellectual Property Assets listed in Schedule [●] to the Pledge and Security Agreement;

(iv)     opinions of counsel with respect to the creation and perfection of the security interests in favor of Collateral Agent in such Collateral as Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to Collateral Agent; and

(v)     evidence that each Credit Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument (including the Intercompany Note) and made or caused to be made any other filing and recording (other than as set forth herein), in each case, in accordance with the terms and conditions of the Pledge and Security Agreement.

(h)     Pro Forma Financial Statements; Projections.  Administrative Agent shall have received from Borrower (i) pro forma consolidated balance sheets of Holdings and its Subsidiaries as at the end of the last Fiscal Quarter ended at least sixty (60) days prior to the Closing Date and the related consolidated statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter and (ii) the Projections (it being understood and agreed that the information provided pursuant to this Section 3.1(h) shall not be made available to Public Lenders).

(i)     Evidence of Insurance.  Collateral Agent shall have received a certificate from the applicable Credit Party's insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.5 is in full force and effect, together with endorsements naming Collateral Agent, for the benefit of the Secured Parties, as additional insured, loss payee, lender loss payee and mortgagee thereunder to the extent required under Section 5.5, in each case subject to Section 5.16 and the last paragraph of this Section 3.1.

(j)     Opinions of Counsel to Credit Parties. Agents and Lenders and their respective counsel shall have received originally executed copies of the favorable written opinions of Paul, Weiss, Rifkind, Wharton & Garrison LLP, special New York counsel for Credit Parties, as to such matters as Agents may reasonably request (but not with respect to bankruptcy remoteness, true sale or non-consolidation matters), dated as of the Closing Date and in form and substance reasonably satisfactory to Agents (and each Credit Party hereby instructs such counsel to deliver such opinions to Agents and Lenders).

(k)     Premiums; Fees.  Borrower shall have paid (or caused to be paid pursuant to the terms and conditions of the Asset Purchase Agreement) to each Agent and Lender the premiums and fees payable on or before the Closing Date referred to in Section 2.11(a) and (c).

(l)     Solvency Certificate.  Administrative Agent shall have received a solvency certificate executed and delivered by Holdings and Borrower, substantially in the form of Exhibit M, dated as of the Closing Date and addressed to Agents and the Lenders, and certifying that after giving effect to the consummation of the Transactions, Holdings and its Subsidiaries are, on a consolidated basis, Solvent.

(m)     Closing Date Certificate.  Administrative Agent shall have received a closing date certificate executed and delivered by Holdings and Borrower, substantially in the form of Exhibit N, dated as of the Closing Date and addressed to Agents and the Lenders.

(n)     Know Your Customer Information.  At least five (5) Business Days prior to the Closing

Date, Agents and the Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) the "**PATRIOT Act**"), and a Beneficial Ownership Certification, to the extent that such information was requested by any Agent or Lender at least ten (10) Business Days prior to the Closing Date (or such later date as Borrower may agree).

(o)      <u>Funding Notice</u>.  Administrative Agent shall have received a fully executed and delivered Funding Notice in accordance with Section 2.1(b).

(p)      <u>Representations and Warranties</u>.  The Specified Representations and the Specified Asset Purchase Agreement Representations shall be true and correct in all material respects on and as of the Closing Date; <u>provided</u> that any Specified Representation or Specified Asset Purchase Agreement Representation that is qualified by materiality, material adverse effect or similar language shall be true and correct in all respects.

(q)      <u>No Material Adverse Effect</u>.  Since the date of the Asset Purchase Agreement, there shall not have occurred a Company Material Adverse Effect.

(r)      <u>OpCo Closing Cash</u>.  The Credit Parties shall have received the OpCo Closing Cash (as defined in the Asset Purchase Agreement).

(s)      <u>Adverse Proceedings</u>.  There shall be no Adverse Proceedings enjoining the financing contemplated by the Credit Documents.

(t)      <u>Material Agreements</u>.  Borrower shall have delivered a true, correct and complete list and, to the extent not prohibited by applicable confidentiality limitations and after Borrower's use of commercially reasonable efforts to overcome such confidentiality limitations, copies of all Material Agreements (other than each Credit Document, each Related Agreement and each Closing Date ABL/FILO Credit Document) to be entered into by Holdings or any of its Subsidiaries on the Closing Date (if any) (other than any Material Agreement acquired or assumed pursuant to the terms and conditions of the Asset Purchase Agreement and the OpCo Sale Order), and with appropriate redactions for commercially sensitive information.

For purposes of determining satisfaction of the conditions precedent specified in this Section 3.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved, accepted and be satisfied with, each document or other matter required under this Agreement to be consented to, approved by, acceptable to or satisfactory to any Agent or Lender unless Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Notwithstanding anything to the contrary in this Agreement or in any other Credit Document, it is hereby agreed that to the extent any security interest in the intended Collateral or any deliverable (including those referred to in Sections 3.1(g) and (i)) related to the perfection of security interests in the intended Collateral (other than any Collateral the security interests in which may be perfected by the filing of a UCC financing statement, the possession of stock certificates and powers (if any) or the possession of the Intercompany Note) is not or cannot be provided and/or perfected on the Closing Date (1) without undue burden or expense or (2) after Borrower has used commercially reasonable efforts to do so, then the provision and/or perfection of such security interest or deliverable shall not constitute a condition precedent to the deemed making of the Initial Loans on the Closing Date but, to the extent otherwise required hereunder, shall be

delivered after the Closing Date in accordance with Section 5.16. [10]

## SECTION 4. REPRESENTATIONS AND WARRANTIES

In order to induce each Agent and Lender to enter into this Agreement and the other Credit Documents and to induce each Lender to make each Credit Extension to be made thereby, each Credit Party represents and warrants to each Agent and Lender, on the Closing Date, that the following statements are true, complete and correct (it being understood and agreed that the representations and warranties made on the Closing Date are deemed to be made concurrently with the consummation of the Transactions):

**4.1. Organization; Requisite Power and Authority; Qualification.** Each of Holdings and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, (b) has all requisite power and authority to (i) own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, and (ii) enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby, and (c) is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

**4.2. Equity Interests and Ownership.** The Equity Interests of each of Holdings and its Subsidiaries has been duly authorized and validly issued and is fully paid and non-assessable. As of the Closing Date, there is no existing option, warrant, call, right, commitment or other agreement to which Holdings or any of its Subsidiaries is a party requiring, and there is no membership interest or other Equity Interests of Holdings or any of its Subsidiaries outstanding which upon conversion or exchange would require, the issuance by Holdings or any of its Subsidiaries of any additional membership interests or other Equity Interests of Holdings or any of its Subsidiaries or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Equity Interests of Holdings or any of its Subsidiaries. Schedule 4.2 correctly sets forth the ownership interest of Holdings and each of its Subsidiaries in their respective Subsidiaries as of the Closing Date after giving effect to the Transactions.

**4.3. Due Authorization.** The execution, delivery and performance of the Credit Documents have been duly authorized by all necessary action on the part of each Credit Party that is a party thereto.

**4.4. No Conflict.** The execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate (i) any provision of any law or any governmental rule or regulation applicable to Holdings or any of its Subsidiaries except to the extent such violation would not reasonably be expected to have a Material Adverse Effect, (ii) any of the Organizational Documents of Holdings or any of its Subsidiaries, or (iii) any order, judgment or decree of any court or other agency of government binding on Holdings or any of its Subsidiaries except to the extent such violation (other than with respect to any order, judgment or decree of the Bankruptcy Court) would not reasonably be expected to have a Material Adverse Effect; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of Holdings or any of its Subsidiaries except to the extent such conflict, breach or default would not reasonably be expected to have a Material

---

[10] Except as set forth in this paragraph, the other items listed in Section 3.1 shall be on Schedule 5.16, subject to the same timing requirements in the ABL Facility (if applicable) (in which case, if in respect of ABL Priority Collateral, shall be subject to any extensions granted under the ABL Facility with respect to timing) or, if not required under the ABL Facility, within a period not shorter than 90 days.

Adverse Effect; (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of Holdings or any of its Subsidiaries (other than any Liens created under any of the Credit Documents in favor of Collateral Agent, for the benefit of the Secured Parties, or Permitted Liens); or (d) require any approval of equityholders, members or partners or any approval or consent of any Person under any Contractual Obligation of Holdings or any of its Subsidiaries, except for such approvals or consents which will be obtained on or before the Closing Date and disclosed in writing to Lenders and except for any such approvals or consents the failure of which to obtain would not reasonably be expected to have a Material Adverse Effect.

      **4.5.**    **Governmental Consents**.  The execution, delivery and performance by Credit Parties of the Credit Documents to which they are parties and the consummation of the transactions contemplated by the Credit Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except (a) the OpCo Sale Order, (b) subject to Sections 5.11(a) and 5.16 and the last paragraph of Section 3.1, filings and recordings with respect to the Collateral to be made, or otherwise delivered to Collateral Agent for filing and/or recordation, as of the Closing Date or (c) as would not reasonably be expected to have a Material Adverse Effect.

      **4.6.**    **Binding Obligation**.  Each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of such Credit Party, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

      **4.7.**    **Pro Forma Financial Statements**.  Assuming the Historical Financial Statements were prepared in accordance with GAAP and fairly present, in all material respects, the matters set forth therein, the pro forma financial statements delivered pursuant to Section 3.1(h) were prepared based on good faith estimates and assumptions made by the management of Holdings (and in conformity with GAAP) and fairly present, in all material respects, the estimated financial position, on a consolidated and pro forma basis, of the Persons described in such financial statements as at the respective dates thereof and the estimated results of operations and cash flows, on a consolidated and pro forma basis, of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments and assuming that the Transactions had actually occurred at the respective dates thereof or at the beginning of the periods then ended.

      **4.8.**    **Projections**.  As of the Closing Date, the projections of Holdings and its Subsidiaries for the period of Fiscal Year 2020 through and including Fiscal Year 2026 (the "**Projections**") are based on good faith estimates and assumptions made by the management of Holdings and its Subsidiaries; provided that the Projections are not to be viewed as facts, the Projections are subject to significant uncertainties, actual results during the period or periods covered by the Projections may differ significantly from the projected results and no assurance can be given that the projected results will be realized.

      **4.9.**    **Properties**.

      (a)   Title.  Each of Holdings and its Subsidiaries has (i) good, sufficient and legal title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property), (iii) valid licensed rights in (in the case of licensed interests in Intellectual Property) and (iv) good title to (in the case of all other personal property), all of their respective properties and assets except, in each case, as would not reasonably be expected to have a Material Adverse Effect. All such properties and assets are free and clear of all Liens other than Permitted Liens.

      (b)   Real Estate.

(i)   As of the Closing Date, Schedule 4.10 contains a true, accurate and complete list of (A) all Real Estate Assets, and (B) all leases (including ground leases), subleases and assignments of leases (together with all amendments, modifications, supplements, renewals and extensions of any thereof, collectively, "**Leases**") pursuant to which any applicable Credit Party owns an interest in any Leasehold Property (whether directly or as an assignee or successor in interest) as lessee.  Each agreement described in clause (B) of the immediately preceding sentence is in full force and effect and Holdings does not have knowledge of any default that has occurred and is continuing thereunder, in each case, except as would not reasonably be expected to have a Material Adverse Effect.

(ii)   With respect to (A) each Lease and (B) each reciprocal easement agreement or other similar agreement encumbering or binding upon any Real Estate Asset to which any Credit Party is a party (an "**REA**" and, together with each Lease, each, a "**Property Document**"), (1) such Property Document is in full force and effect and constitutes the legally valid and binding obligation of each such Credit Party, enforceable against such Credit Party in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles and (2) neither Holdings nor any of its Subsidiaries has knowledge of any default that has occurred and is continuing under such Property Document, except, in the case of each of clauses (1) and (2), as would not reasonably be expected to have a Material Adverse Effect.

(c)  Intellectual Property.  Each of Holdings and its Subsidiaries owns, or is licensed to use, all trademarks, tradenames, copyrights, patents, trade secrets, rights of publicity or likeness, and other Intellectual Property applicable to its business, and the use thereof by Holdings and its Subsidiaries does not infringe upon the rights of any other Person, except for any defects in ownership or licenses or any such infringements that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

**4.10.   No Event of Default**.  No event shall have occurred and be continuing or would result from the consummation of the Transactions that would constitute an Event of Default.

**4.11.   Investment Company Act.**  Neither Holdings nor any of its Subsidiaries is subject to regulation under the Investment Company Act of 1940.  Neither Holdings nor any of its Subsidiaries is a "registered investment company" or a company "controlled" by a "registered investment company" or a "principal underwriter" of a "registered investment company" as such terms are defined in the Investment Company Act of 1940.

**4.12.   Federal Reserve Regulations; Exchange Act**.

(a)   None of Holdings or any of its Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)   No portion of the proceeds (if any) of any Credit Extension shall be used in any manner, whether directly or indirectly, that causes or could reasonably be expected to cause, such Credit Extension or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors or any other regulation thereof or to violate the Exchange Act.

**4.13.   Solvency.**  As of the Closing Date, after giving effect to the Transactions, Holdings and its Subsidiaries are, on a consolidated basis, Solvent.

**4.14.** **Disclosure**. No information or data (other than the Projections and the pro forma financial statements delivered pursuant to Section 3.1(h)) contained in any Credit Document or in any other documents, certificates or written statements furnished to any Agent or Lender by or on behalf of Holdings or any of its Subsidiaries for use in connection with the transactions contemplated hereby (to the extent relating to the OpCo Acquired Assets or the OpCo Assumed Liabilities prior to the Closing Date, to Holdings' and its Subsidiaries' knowledge) contains any untrue statement of a material fact or omits to state a material fact (known to Holdings or any of its Subsidiaries, in the case of any document not furnished by any of them) necessary in order to make the statements contained herein or therein not materially misleading in light of the circumstances in which the same were made.  Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by Holdings and its Subsidiaries to be reasonable at the time made and at the time made available to any Agent or Lender by or on behalf of Holdings or any of its Subsidiaries, it being recognized by Agents and the Lenders that such projections as to future events are not to be viewed as facts, that such projections are subject to significant uncertainties, that actual results during the period or periods covered by any such projections may differ significantly from the projected results and that no assurance can be given that the projected results will be realized.

**4.15.** **Sanctioned Persons; Anti-Corruption Laws**.

(a)      None of Holdings or any of its Subsidiaries or any of their respective directors, officers or, to the knowledge of Holdings or any of its Subsidiaries, employees, agents, advisors or Affiliates is the subject of any sanctions or economic embargoes administered or enforced by the U.S. government, including by the U.S. Department of State or the Office of Foreign Assets Control of the U.S. Department of the Treasury, or any other applicable sanctions authority (collectively, "**Sanctions**", and the associated laws, rules, regulations and orders, collectively, "**Sanctions Laws**").

(b)      Each of Holdings and its Subsidiaries and their respective directors, officers and, to the knowledge of Holdings or any of its Subsidiaries, employees, agents, advisors and Affiliates is in compliance (i) in all respects with all Sanctions Laws, and (ii) in all material respects with (A) the United States Foreign Corrupt Practices Act of 1977, as amended, and any other applicable anti-bribery or anti-corruption laws, rules, regulations and orders (collectively, "**Anti-Corruption Laws**") and (B) Anti-Money Laundering Laws.

(c)      No part of the proceeds (if any) of the Loans will be used, directly or indirectly, (i) for the purpose of financing any activities or business of or with any Person or in any country or territory that at the time of such financing is the subject of any Sanctions, (ii) in any other manner that would constitute or give rise to a violation of Sanctions by any party hereto, including any Lender, or (iii) for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any Anti-Corruption Law.

**4.16.** **Insurance**. Holdings and each of its Subsidiaries maintain the insurance required to be maintained by it pursuant to Section 5.5 and such insurance is in full force and effect and all premiums then due thereon have been paid.  Neither the execution of the Credit Documents, nor the performance of the Credit Parties' respective obligations thereunder, will result in any insurance policy of Holdings or any of its Subsidiaries being cancelled, except to the extent such cancellation would not result in a violation of Section 5.5.

**4.17.** **Special Purpose Subsidiaries**. No Special Purpose Subsidiary is in default in any manner under any provision of Section 5.14.

**4.18.    EEA Financial Institutions**. No Credit Party is an EEA Financial Institution.

**SECTION 5. AFFIRMATIVE COVENANTS**

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until payment in full in cash of all Obligations (other than (x) any unasserted contingent indemnification obligations and (y) obligations in respect of the Earnout Agreement), such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5.

**5.1.    Financial Statements and Other Reports**. Borrower will deliver to Administrative Agent for distribution to each Lender (except as otherwise expressly required below):

(a)    Quarterly Financial Statements.

(i)    As soon as available, and in any event within 45 (or, in the case of the first two Fiscal Quarters ending after the Closing Date for which reporting would otherwise be due in accordance with this Section 5.1(a)(i), 60) days after the end of each of the first three Fiscal Quarters of each Fiscal Year, commencing with the first Fiscal Quarter ending after the Closing Date for which reporting would otherwise be due in accordance with this Section 5.1(a)(i), the consolidated balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Financial Plan for the current Fiscal Year, all in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto;

(ii)    As soon as available, and in any event within 30 days after the end of the Fiscal Quarter ending January 30, 2021, the internally prepared preliminary and unaudited "flash" numbers for the Fiscal Quarter ending January 30, 2021, which shall be limited to the following: (i) revenue; (ii) Consolidated Adjusted EBITDA; (iii) same-store sales; (iv) Unrestricted Cash; (v) Indebtedness outstanding under any revolving credit facilities; and (vi) availability under any revolving credit facilities, in addition to (if available) consolidated balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Quarter and the related internally prepared "flash" consolidated statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Quarter, all in reasonable detail as at the end of and for such Fiscal Quarter (it being understood and agreed that such numbers are preliminary and unaudited and no representation or warranty shall be made with respect thereto);

(b)    Annual Financial Statements.  As soon as available, and in any event within 90 (or, in the case of the Fiscal Year ending January 30, 2021, 120) days after the end of each Fiscal Year, commencing with the Fiscal Year ending January 30, 2021, (i) the consolidated balance sheets of Holdings and its Subsidiaries as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year and the corresponding figures from the Financial Plan for the Fiscal Year covered by such financial statements, in reasonable detail, together with a Financial Officer Certification and a Narrative Report with respect thereto; and (ii) with respect to such consolidated financial statements, a report thereon of one of Deloitte Touche Tohmatsu Limited, Ernst & Young Global Limited, KPMG International Limited or PricewaterhouseCoopers or another independent certified public accountant of recognized national standing selected by Holdings and reasonably satisfactory to Administrative Agent (which report and/or the

accompanying financial statements shall be unqualified and contain no exception as to (x) other than for the Fiscal Years ending January 30, 2021 and January 29, 2022, going concern (other than solely with respect to, or resulting solely from, any potential inability to satisfy the Financial Covenant on a future date or in a future period) or (y) scope of audit, and, in each case, shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP);

(c)     Compliance Certificate. Together with each delivery of financial statements of Holdings and its Subsidiaries pursuant to Sections 5.1(a)(i) and 5.1(b), a duly executed and completed Compliance Certificate of a Financial Officer (i) certifying as to whether a Default or Event of Default has occurred and is continuing on the date thereof and, if a Default or Event of Default has occurred and is continuing on such date, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) certifying the calculation of the Financial Covenant (whether or not it is in effect) and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the most recent audited financial statements delivered pursuant to Section 5.1(b) and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such Compliance Certificate;

(d)     Material Agreements. Promptly upon the entry into any Material Agreement by Holdings or any of its Subsidiaries, a written notice of such entry and a copy of such Material Agreement (but only to the extent not prohibited by applicable confidentiality limitations and after Borrower's use of commercially reasonable efforts to overcome such confidentiality limitations, and with appropriate redactions for commercially sensitive information);

(e)     Notice of Default or Event of Default. Promptly upon any Financial Officer or other executive officer of Holdings or any of its Subsidiaries obtaining knowledge of the occurrence of any Default or any Event of Default, a certificate of a Financial Officer or other executive officer of Borrower setting forth the details of the Default or Event of Default requiring such notice and any action taken or proposed to be taken with respect thereto;

(f)     Notice of Litigation. Promptly upon any Financial Officer or other executive officer of Holdings or any of its Subsidiaries obtaining knowledge of the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting Holdings or any of its Subsidiaries that, if adversely determined, would reasonably be expected to result in a Material Adverse Effect, a certificate of a Financial Officer or other executive officer of Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto;

(g)     ERISA. Promptly upon any Financial Officer or other executive officer of Holdings or any of its Subsidiaries obtaining knowledge of the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in a Material Adverse Effect, a certificate of a Financial Officer or other executive officer of Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto;

(h)     Financial Plan. Within 60 days after the end of each Fiscal Year, an annual financial forecast for Holdings and its Subsidiaries for the subsequent Fiscal Year (including a consolidated balance sheet of Holdings and its Subsidiaries as of the end of the prior Fiscal Year and consolidated statements of income and cash flows of Holdings and its Subsidiaries for such Fiscal Year) based on good faith estimates and assumptions made by the management of Holdings and its Subsidiaries as of the date of delivery thereof

and which annual financial forecast the management of Holdings and its Subsidiaries believes is reasonable and attainable as of the date of delivery thereof (a "**Financial Plan**");

(i)      Insurance Report.  Each Credit Party shall deliver to Administrative Agent a copy of a certificate of insurance evidencing the required coverage on or prior to the Closing Date and promptly following each renewal or replacement of such policies thereafter, and Borrower will furnish to Administrative Agent, upon its reasonable request, information in reasonable detail as to the insurance so maintained;

(j)      Information Regarding Collateral.  Borrower will furnish to Administrative Agent and Collateral Agent prompt written notice of any change (i) in the legal name of any Credit Party, (ii) in the identity or type of organization or corporate structure of any Credit Party, (iii) in the Federal Taxpayer Identification Number or other identification number of any Credit Party or (iv) in the jurisdiction of organization of any Credit Party; provided that the Credit Parties agree not to effect or permit any of the foregoing changes described in this sentence unless all filings have been made under the UCC or otherwise that are required in order for Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in the Collateral;

(k)      Annual Collateral Verification.  Each year, at the time of delivery of annual financial statements with respect to the preceding Fiscal Year pursuant to Section 5.1(b), Borrower shall deliver to Administrative Agent (i) a certificate of its Authorized Officer (A) either confirming that there has been no change in the information set forth in sections [I.A.-D., I.H., II.A.-B. and II.E.-G.][11] of the Collateral Questionnaire delivered on the Closing Date or the date of the most recent certificate delivered pursuant to this Section 5.1 and/or identifying such changes and (B) certifying that all UCC financing statements (including fixtures filings, as applicable) and all other filings, recordings or registrations required by the terms of the Pledge and Security Agreement have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction identified pursuant to clause (A) above (or in such Collateral Questionnaire) to the extent necessary to establish a legal, valid and perfected security interest in favor of the Collateral Agent (for the benefit of the Secured Parties) in respect of all Collateral in which a Lien may be perfected by filing, recording or registration in the United States (or any political subdivision thereof), and (ii) upon request by Administrative Agent, a copy of any certificate or other document delivered to the administrative agent or collateral agent under the ABL Credit Agreement or the FILO Credit Agreement updating the information contained in any perfection certificate or similar document with respect to the ABL Priority Collateral, or certifying that there have been no changes to such information;

(l)      Other Information. (A) Promptly upon their becoming publicly available, copies (or email notice) of all periodic reports and all registration, proxy statements and prospectuses, if any, filed by any Credit Party with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, (B) promptly after any Credit Party obtains knowledge that (i) Moody's or S&P shall have announced a change in any Credit Rating established or deemed to have been established by such rating agency, written notice of such Credit Rating change, (C) promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of Holdings or any Subsidiary as Administrative Agent (or any Lender through Administrative Agent) may reasonably request in writing and (D) promptly following any written request therefor, such information and documentation reasonably required by the Lenders or Agents for purposes of complying with any applicable "know your customer" regulations under the PATRIOT Act or other applicable Anti-Money Laundering Laws; provided that none of Holdings or any of its Subsidiaries will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any

---

[11] References to be conformed to the Collateral Questionnaire.

document, information or other matter that (x) constitutes non-financial trade secrets or non-financial proprietary information, (y) in respect of which disclosure to Agents or any Lender (or their respective representatives or contractors) is prohibited by law or any bona fide binding agreement or (z) is subject to attorney-client or similar privilege or constitutes attorney work product; and

(m)     Certification of Public Information. Borrower and each Lender acknowledge that certain of the Lenders may be Public Lenders and, if documents or notices required to be delivered pursuant to this Section 5.1 or otherwise are being distributed through IntraLinks, SyndTrak or another relevant website or other information platform (the "**Platform**"), any document or notice that Borrower has indicated contains Non-Public Information shall not be posted on that portion of the Platform designated for such Public Lenders. Borrower agrees to use commercially reasonable efforts to clearly designate all information provided to Administrative Agent by or on behalf of Borrower which is suitable to make available to Public Lenders; provided that the documents and notices required to be delivered pursuant to Section 5.1(a)(i), (b) and (c) shall be posted on that portion of the Platform designated for Public Lenders. If Holdings or Borrower has not indicated whether a document or notice delivered pursuant to this Section 5.1 contains Non-Public Information (other than the documents and notices required to be delivered pursuant to Section 5.1(a)(i), (b) and (c)), Administrative Agent reserves the right to post such document or notice solely on that portion of the Platform designated for Lenders who wish to receive material Non-Public Information with respect to Holdings and its Subsidiaries and their respective Securities.

Documents required to be delivered pursuant to Section 5.1 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the earliest of the date (i) on which Borrower posts such documents, or provides a link thereto on Borrower's website; (ii) on which such documents are posted to the Securities and Exchange Commission's (or any Governmental Authority succeeding to any or all of the functions of said Commission's) website (including as part of any 10-K or 10-Q filing) or (iii) on which such documents are posted on Borrower's behalf on any Platform to which each Lender and Administrative Agent have access (whether a commercial, third-party website or whether sponsored by Administrative Agent); provided that (A) Borrower shall have notified Administrative Agent of the posting of such documents and (B) in the case of documents required to be delivered pursuant to Section 5.1(a) or (b), Holdings shall deliver electronic copies of such documents to Administrative Agent if any Lender requests that Holdings deliver such copies until a request to cease delivering copies is given by Administrative Agent at the request of such Lender.  Administrative Agent shall have no obligation to request the delivery of or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by Holdings or Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

**5.2.     Existence**. Each Credit Party will, and will cause each of its Subsidiaries to, (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and (b) except as would not reasonably be expected to have a Material Adverse Effect, take all reasonable action to preserve, renew and keep in full force and effect its rights, licenses, permits, privileges and franchises; provided that the foregoing clauses (a) and (b) shall not prohibit any merger, consolidation, liquidation, transfer of assets or dissolution permitted under Section 6.5 and, in the case of an asset transfer, Section 6.8.

**5.3.     Payment of Taxes**. Each Credit Party will, and will cause each of its Subsidiaries to, pay its Tax liabilities, that, if not paid, would reasonably be expected to result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) Holdings and its Subsidiaries have set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest would not reasonably be expected to result in a Material Adverse Effect.

**5.4.    Maintenance of Properties**.  Each Credit Party will, and will cause each of its Subsidiaries to, keep and maintain all property material to the conduct of the business of Holdings and its Subsidiaries (taken as a whole) in good working order and condition, ordinary wear and tear, condemnation and casualty loss excepted, except where the failure to do so would not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit the disposition of any property otherwise permitted by this Agreement; provided, further, that nothing in this Section shall prevent Holdings or any of its Subsidiaries from discontinuing the operations (or, as determined by Borrower in a commercially reasonable manner and exercising its good faith business judgment, for "dark" properties, discontinuing the maintenance of "dark" properties) of any of its properties, or terminating any Leases (other than a termination of any Master Lease in violation of Section 6.17), in each case no longer deemed by Borrower to be useful (under the circumstances) in the conduct of its business.

**5.5.    Insurance**.  Each Credit Party will, and will cause each of its Subsidiaries to, maintain, (1) with financially sound and reputable insurance companies or (2) with association or captive insurance companies or pursuant to self-insurance, insurance in such amounts (with no greater risk retention) and against such risks (including physical loss or damage to the Collateral (including all inventory constituting Collateral)) as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations. Each of the Credit Parties shall ensure that each such policy of insurance shall name Collateral Agent, for the benefit of the Secured Parties, as an additional insured thereunder as its interests may appear, and policies maintained with respect to any Collateral shall be endorsed or otherwise amended to include a lenders' loss payable clause in favor of Collateral Agent and providing for losses thereunder (other than, prior to the repayment in full of the Closing Date ABL/FILO Credit Agreement Secured Obligations, losses in respect of the ABL Priority Collateral) to be payable to Collateral Agent or its designee, provided that, unless an Event of Default shall have occurred and be continuing, (A) Collateral Agent shall turn over to Borrower any amounts received by it as lender loss payee, loss payee or mortgagee under any such policies and (B) Holdings and/or the applicable Subsidiary shall have the sole right to make, settle and adjust claims in respect of such insurance. Each of the Credit Parties shall ensure that each such policy referred to in this paragraph shall be evidenced by a certificate pursuant to which the relevant insurance broker will endeavor to provide Collateral Agent (A) at least ten (10) days' prior written notice of any cancelation, modification or nonrenewal of any such policy by reason of nonpayment of premium (giving Collateral Agent the right to cure defaults in the payment of premiums) and (B) at least thirty (30) days' prior written notice of any cancelation, modification or nonrenewal of any such policy for any reason other than nonpayment of premium.

**5.6.    Books and Records; Inspections**.  The Credit Parties will, and will cause each of their respective Subsidiaries to, keep proper books of record and account in accordance with GAAP. The Credit Parties will, and will cause each of their respective Subsidiaries to, permit any representatives designated by Administrative Agent, upon reasonable prior notice and without disruption of the normal and ordinary conduct of the business of Holdings or any such Subsidiary, to visit and inspect its properties, to examine and make extracts from its books and records (but Administrative Agent may not have more than one such visit per any twelve month period except during the continuance of an Event of Default), and to discuss its affairs, finances and condition with its officers and, if an executive officer or a Financial Officer has been afforded an opportunity to be present, independent accountants (subject to such accountants' customary policies and procedures), all at such reasonable times during normal business hours and as often as reasonably requested. Notwithstanding anything to the contrary in this Section 5.6, (a) none of Holdings or any Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter that (i) in respect of which disclosure to Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by law or any bona fide binding agreement or (ii) is subject to attorney-client or similar privilege or constitutes attorney work product; provided that the Credit Parties will, and will cause each of their respective Subsidiaries to, make available redacted versions of requested documents or, if unable to do so consistent

with the preservation of such privilege, shall endeavor in good faith otherwise to disclose information responsive to the requests of Administrative Agent, any Lender or any of their respective related parties, in a manner that will protect such privilege, (b) any such inspection of any Real Estate Asset shall not unreasonably interfere with the use and/or operation of such Real Estate Asset and shall, at the applicable Credit Parties' option, be conducted in the presence of a representative of such Credit Parties and (c) Administrative Agent shall not have the right to perform any Phase I Environmental Site Assessment or any invasive analysis, testing or sampling of any environmental medium, including any Phase II Environmental Site Investigation or Assessment, without the written authorization of Borrower absent an Event of Default.

5.7. **Lenders Meetings**. The Credit Parties will, upon the request of Administrative Agent or Requisite Lenders, participate in a meeting of Administrative Agent and Lenders once during each Fiscal Quarter, to be held at Borrower's corporate offices (or at such other location, or by teleconference, in each case as may be agreed to by Borrower and Administrative Agent) at such time as may be agreed to by Borrower and Administrative Agent; provided that, so long as no Event of Default shall have occurred and be continuing, any travel or other similar expenses of any Lender shall be borne by such Lender to the extent such meeting is held at Borrower's corporate offices; provided, further, that no such meeting shall be held at Borrower's corporate offices to the extent Borrower and Administrative Agent reasonably agree that holding such meeting at Borrower's corporate offices is not advisable or possible as a result of any viral outbreak (including the "Coronavirus" or "COVID-19").

5.8. **Compliance with Laws**. The Credit Parties will, and will cause each of their respective Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not result in a Material Adverse Effect.

5.9. **Environmental**.

(a)    Environmental Disclosure. Borrower will deliver to Administrative Agent (for distribution to the Lenders) and Collateral Agent:

(i)    as soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of Holdings or any of its Subsidiaries or by independent consultants, Governmental Authorities or any other Persons, with respect to environmental matters at any Facility or with respect to any Environmental Claims or Environmental Liabilities, if such environmental matters, Environmental Claims or Environmental Liabilities could reasonably expected to result in a Material Adverse Effect;

(ii)    promptly upon the occurrence thereof, written notice describing in reasonable detail (1) any Release of Hazardous Materials that is reasonably expected to result in a Material Adverse Effect, (2) any remedial action taken by Borrower or any other Person in response to any Hazardous Materials Activities the existence of which could reasonably be expected to result in one or more Environmental Claims or Environmental Liabilities having, individually or in the aggregate, a Material Adverse Effect, (3) any Environmental Claims or Environmental Liabilities that, individually or in the aggregate, could reasonably expected to result in a Material Adverse Effect, and (4) Holdings', Borrower's or any of its Subsidiaries' discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Real Estate Asset that could cause such Real Estate Asset or any part thereof to be subject to any material restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws;

(iii)     as soon as practicable following the sending or receipt thereof by Holdings or any of its Subsidiaries, a copy of any material written communications with or from any Person or any request for information from any Governmental Authority, in either case, with respect to any Environmental Liability, including any investigation by any Governmental Authority with respect to whether Holdings or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity, if such Environmental Liability could reasonably expected to give rise to a Material Adverse Effect; and

(iv)     with reasonable promptness, such other documents and information as from time to time may be reasonably requested by Administrative Agent or Collateral Agent in relation to any matters disclosed pursuant to this Section 5.9(a).

(b)     Hazardous Materials, Etc. Each Credit Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all commercially reasonable actions to (i) cure any violation of applicable Environmental Laws by such Credit Party or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim or Environmental Liabilities against such Credit Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.10.     Subsidiaries**.

(a)     If any Subsidiary other than any Excluded Subsidiary is formed or acquired, or if any Excluded Subsidiary ceases to be an Excluded Subsidiary, after the Closing Date, then the Credit Parties shall, within fifteen (15) Business Days after the date such Subsidiary (other than any Excluded Subsidiary) is formed or acquired or ceases to be an Excluded Subsidiary, notify Administrative Agent and the Lenders thereof and promptly (i) cause such Subsidiary to become a Guarantor hereunder and a Grantor under the Pledge and Security Agreement by executing and delivering to Administrative Agent and Collateral Agent a Counterpart Agreement, (ii) obtain all consents and approvals required to be obtained by it in connection with the execution and delivery of the Collateral Documents and the performance of its obligations thereunder and the granting by it of the Liens thereunder and (iii) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates reasonably requested by Administrative Agent in order to create Liens in favor of the Collateral Agent, for the benefit of the Secured Parties, on any Collateral and the Liens intended to be created by the Pledge and Security Agreement and to perfect such Liens to the extent required by, and with the priority required by, the Pledge and Security Agreement and the Intercreditor Agreement.  In the event that any Person becomes an Excluded Subsidiary, and the ownership interests of such Excluded Subsidiary are owned by Borrower or by any other Credit Party, Borrower shall, or shall cause such other Credit Party to, take all of the actions necessary to grant a Lien in favor of Collateral Agent, for the benefit of the Secured Parties, in 100% of such ownership interests; provided that the foregoing shall not apply to the ownership interests in any Special Purpose Tenant Subsidiary or any Special Purpose Tenant Subsidiary HoldCo.  With respect to each such Subsidiary required to become a Guarantor pursuant to this Section 5.10, Borrower shall promptly send to Administrative Agent written notice setting forth with respect to such Person (i) the date on which such Person became a Subsidiary and (ii) all of the data required to be set forth in Schedule 4.2 with respect to all Subsidiaries of Borrower, and such written notice shall be deemed to supplement Schedule 4.2 for all purposes of this Agreement.

(b)     Notwithstanding anything to the contrary herein, in no event shall the Collateral include Excluded Assets[12] (as such term is defined in the Pledge and Security Agreement).

---

[12] For the avoidance of doubt, to include payroll, trust and tax accounts, and equity of foreign subsidiaries the pledge

**5.11.    Real Estate Assets**.[13][14]

(a)       Borrower and each applicable Guarantor hereby agrees that Collateral Agent shall be responsible for and retain all rights with respect to Collateral Agent's preparation, filings, registrations, recordings and other actions with respect to the Mortgaged Properties and, subject to Section 5.12, Borrower and each applicable Guarantor hereby agrees that it shall use commercially reasonable efforts to assist, and shall cooperate in good faith in a commercially reasonable and prompt manner with, Collateral Agent with respect to Collateral Agent's preparation, filings, registrations, recordings and other actions with respect to each of the following for the Mortgaged Properties (collectively, the "**Real Estate Collateral Documents**"):

(i)       a fully executed and notarized Mortgage creating a valid and, subject only to recording or filing in the county or other applicable jurisdiction in which the same is located, perfected First Priority lien on each  applicable Mortgaged Property, which Mortgage shall be in proper form for recording or filing (as applicable) in such county or other applicable jurisdiction;

(ii)       an opinion of counsel (which counsel shall be reasonably satisfactory to Collateral Agent) in each state in which an applicable Mortgaged Property is located with respect to the enforceability of the Mortgages to be recorded in such state and such other customary matters as Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to Collateral Agent;

(iii)       with respect to each applicable Mortgaged Property that is a Leasehold Property, a Landlord Estoppel; provided that the requirement set forth in this clause (iii) shall be deemed to be satisfied as to any Landlord Estoppel with respect to a Leasehold Property if (1) Borrower uses commercially reasonable efforts, and fails, to obtain such Landlord Estoppel and (2) neither of the Sponsors nor their respective Affiliates is the ground lessor of such Leasehold Property;

(iv)       contemporaneously with the delivery of the applicable Mortgage for the Mortgaged Property, an American Land Title Association ("**ALTA**") (or local equivalent thereof) mortgagee title insurance policies issued by one or more title companies reasonably satisfactory to Collateral Agent (it being acknowledged and agreed that First American Title Insurance Company and Commonwealth Land Title Insurance Company are approved by Collateral Agent) with respect to each applicable Mortgaged Property (each, a "**Title Policy**"), in amounts not less than the fair market value of the applicable Mortgaged Property, containing customary endorsements reasonably requested by Collateral Agent and available at commercially reasonable rates, insuring the lien of the applicable Mortgage subject to no Liens other than Permitted Liens, and otherwise in form and substance reasonably satisfactory to Collateral Agent, together with evidence reasonably satisfactory to Collateral Agent that such Credit Party has paid to the applicable title company the portion of the following expenses for which the Credit Party is responsible: (a) all expenses and premiums owed to such title company in connection with the issuance of

---

of which would give rise to a material adverse tax consequence (e.g., due to change in law), leasehold mortgages, fee-owned and ground leased real property with lit value less than $2,000,000 and not otherwise on the Mortgaged Properties Schedule and other customary exclusions.  No perfection actions will be required to be taken outside of the United States with respect to any Collateral.

[13] The Lenders will agree to file, register and record the Mortgages and related deliverables described in this Section 5.11.

[14] All OpCo fee-owned and ground-leased properties as of the Closing Date with a lit value over $2,000,000 to be included on Schedule 5.11. All property values for initial mortgages will definitively be determined by the Lenders.

each Title Policy and (b) all recording, filing and stamp taxes and fees (including mortgage recording and intangible taxes) payable in connection with recording or filing the Mortgages for each Mortgaged Property in the appropriate real estate records;

(v)     (A)  a completed Flood Certificate with respect to each applicable Mortgaged Property, which Flood Certificate shall (x) be addressed to the Collateral Agent and (y) otherwise comply with the Flood Program; (B)  if any such Flood Certificate states that such Mortgaged Property is located in a Flood Zone, Borrower's written acknowledgment of receipt of written notification from Collateral Agent (x) that such Mortgaged Property is a Flood Hazard Property and (y) as to whether the community in which such Mortgaged Property is located is participating in the Flood Program; and (C) if such Mortgaged Property is a Flood Hazard Property and is located in a community that participates in the Flood Program, evidence that Borrower has obtained a policy of flood insurance that is in compliance with all applicable requirements of the Flood Program; and

(vi)     ALTA surveys of all applicable Mortgaged Properties, certified to Collateral Agent and dated not more than thirty (30) days prior to the date of the delivery of the corresponding Mortgage for the applicable Mortgaged Property, or such other surveys or maps as will cause the applicable Title Policies to omit a general survey exception.

(b)     In the event that any Credit Party acquires a Real Estate Asset following the Closing Date, then such Credit Party shall (a) unless it is a Special Purpose Real Estate Subsidiary, promptly convey such Real Estate Asset to a Special Purpose Real Estate Subsidiary, (b) promptly deliver to Collateral Agent the Real Estate Collateral Documents with respect to such Real Estate Asset (except to the extent constituting an Excluded Asset) in accordance with this Section 5.11 (but in any event within sixty (60) days after such acquisition) and (c) take such other actions and execute and deliver, or cause to be executed and delivered, such other documents, instruments and certificates as Administrative Agent may reasonably request to create in favor of Collateral Agent, for the benefit of the Secured Parties, a valid and, subject only to any necessary filings and/or recordings, perfected First Priority liens on such Real Estate Asset.  In addition to the foregoing, Borrower shall, at the reasonable request of Administrative Agent, cooperate to the extent necessary in order for Administrative Agent to obtain, from time to time, such appraisals as the Administrative Agent (including at the request of any Lender) determines may be required by law or regulation to obtain with respect to any Real Estate Asset; provided that Borrower shall not be obligated to deliver any appraisal with respect to a Real Estate Asset no more than one (1) time in any twelve (12) month period so long as no Event of Default is continuing and the Credit Parties shall have no obligation to pay (or reimburse the Administrative Agent or any Lender) for the costs or expenses of any such appraisals.

**5.12.    Further Assurances**. Each Credit Party will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions, which may be required under any applicable law, or which Administrative Agent may reasonably request, to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets of the Credit Parties and all of the outstanding Equity Interests of each Guarantor Subsidiary (subject to limitations contained in Section 5.10 and in the Credit Documents), all at the expense of the Credit Parties. The Credit Parties also agree to provide to Administrative Agent from time to time upon reasonable request, evidence reasonably satisfactory to Administrative Agent as to the perfection and priority of the Liens created or intended to be created by the Collateral Documents.

**5.13.    Credit Ratings**. Unless otherwise consented to by Requisite Lenders, the Credit Parties will use commercially reasonable efforts to obtain on or prior to the 30th day following the Closing Date and maintain continuously in effect (i) a Credit Rating (but no specific rating) from each of Moody's and S&P and (ii) a credit rating (but no specific rating) of the Loans from each of Moody's and S&P; provided

that, to the extent not so obtained on or prior to the 30th day following the Closing Date, the Credit Parties will continue to use commercially reasonable efforts to obtain such Credit Rating and such credit rating.

**5.14.    Special Purpose Subsidiaries**.

(a)      Each Special Purpose Subsidiary (i) has been, is, and will be organized solely for the purpose of acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating (x) the Intellectual Property (in the case of a Special Purpose Intellectual Property Subsidiary), (y) the Real Estate Assets (in the case of a Special Purpose Real Estate Subsidiary) and (z) the leasehold interest in the real properties demised under the applicable Master Lease, subject to the terms thereof (in the case of a Special Purpose Tenant Subsidiary) (in each case, the "**Applicable Assets**"), as well as entering into the Credit Documents and the Related Agreements and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, (ii) has not owned, does not own, and will not own any asset or property other than (A) the Applicable Assets, (B) cash and Cash Equivalents and (C) incidental personal property necessary for the ownership or operation of the Applicable Assets, and (iii) has been, is, and will be organized for the purpose of investing the equity capital that was contributed to each Special Purpose Subsidiary by the Sole Member of each Special Purpose Subsidiary in compliance with the provisions of this Section 5.14.

(b)      Each Special Purpose Subsidiary will permit Holdings and its other Subsidiaries to use the Intellectual Property (in the case of a Special Purpose Intellectual Property Subsidiary) or the Real Estate Assets (in the case of a Special Purpose Real Estate Subsidiary or Special Purpose Tenant Subsidiary) pursuant to the Intercompany Intellectual Property Licensing Agreement and the Intercompany Lease, as applicable.

(c)      Each Special Purpose Subsidiary has not engaged and will not engage in any business other than the ownership, management and operation of its Applicable Assets.

(d)      Except in connection with the Obligations, each Special Purpose Subsidiary has not incurred and will not incur any Indebtedness except as permitted under Section 6.1.

(e)      Each Special Purpose Subsidiary has not made and will not make any loans or advances to any third party (including any Affiliate or constituent party), and has not and shall not acquire obligations or securities of its Affiliates, in each case except as permitted by Section 6.6.

(f)      The Special Purpose Subsidiaries have done or caused to be done, and will do, all things necessary to observe organizational formalities and preserve its existence, and the Special Purpose Subsidiaries have not, will not (i) terminate or fail to comply with the provisions of its organizational documents, or (ii) unless the Requisite Lenders have consented, amend, modify or otherwise change its operating agreement or other organizational documents.

(g)      Except in each case to the extent that any Special Purpose Subsidiary is (i) required to file consolidated tax returns by law; or (ii) treated as a "disregarded entity" for tax purposes and is not required to file separate tax returns under applicable law, (1) each Special Purpose Subsidiary has maintained and will maintain all of its books, records, financial statements (which shall be unaudited except, with respect to any Special Purpose Tenant Subsidiary, as otherwise expressly required under the Master Lease) and bank accounts separate from those of its Affiliates and any other Person (other than any Special Purpose Subsidiary holding the same type of Applicable Asset); (2) each Special Purpose Subsidiary's assets will not be listed as assets on the financial statement of any other Person (other than any Special Purpose Subsidiary holding the same type of Applicable Asset); it being understood that each Special Purpose Subsidiary's assets may be included in a consolidated financial statement of its Affiliates; <u>provided</u> that

such assets shall be listed on each Special Purpose Subsidiary's own separate unaudited balance sheet; and (3) each Special Purpose Subsidiary will file its own tax returns (to the extent such Special Purpose Subsidiary is required to file any tax returns) and will not file a consolidated federal income tax return with any other Person (other than any Special Purpose Subsidiary holding the same type of Applicable Asset). Each Special Purpose Subsidiary has maintained and shall maintain its books, records, resolutions and agreements in accordance with this Agreement.

(h)     Recognizing that the Special Purpose Subsidiaries may be treated as "disregarded entities" for tax purposes and the consequences attendant to such status, each Special Purpose Subsidiary has been, will be, and at all times has held and will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of any Special Purpose Subsidiary or any constituent party of any Special Purpose Subsidiary) (other than any Special Purpose Subsidiary holding the same type of Applicable Asset), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its Affiliates (other than any Special Purpose Subsidiary holding the same type of Applicable Asset) as a division or department or part of the other and shall, to the extent reasonably necessary for the operation of its business, maintain and utilize separate stationery, invoices and checks bearing its own name (which may also bear the name of any Special Purpose Subsidiary holding the same type of Applicable Asset).

(i)     (x) Neither the Special Purpose Subsidiaries nor any constituent party of the Special Purpose Subsidiaries has sought or will seek or effect the liquidation, dissolution, winding up, division (whether pursuant to Section 18-217 of the Act or otherwise), consolidation or merger, in whole or in part, of any Special Purpose Subsidiary and (y) the Special Purpose Subsidiaries have not been the product of, the subject of or otherwise involved in, in each case, any limited liability company division (whether as a plan of division pursuant to Section 18-217 of the Act or otherwise).

(j)     Each Special Purpose Subsidiary has not and will not commingle the funds and other assets of such Special Purpose Subsidiary with those of any Affiliate or constituent party or any other Person (other than any Special Purpose Subsidiary holding the same type of Applicable Asset), and has held and will hold all of its assets in its own name.

(k)     Each Special Purpose Subsidiary has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person (other than any Special Purpose Subsidiary holding the same type of Applicable Asset).

(l)     Each Special Purpose Subsidiary has not and will not assume or guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person, except as permitted under Section 6.1 and Section 6.6.

(m)     The organizational documents of each Special Purpose Subsidiary shall provide that the business and affairs of such Special Purpose Subsidiary shall be (A) managed by or under the direction of a board of one or more directors designated by such Special Purpose Subsidiary's sole member (the "**Sole Member**") or (B) a committee of managers designated by Sole Member (a "**Committee**") or (C) by Sole Member, and at all times there shall be at least two (2) duly appointed Independent Directors or Independent Managers. In addition, the organizational documents of each Special Purpose Subsidiary shall provide that no Independent Director or Independent Manager (as applicable) of such Special Purpose Subsidiary may be removed or replaced without Cause and unless such Special Purpose Subsidiary provides the Lenders with not less than three (3) Business Days' prior written notice of (a) any proposed removal of an Independent Director or Independent Manager (as applicable), together with a statement as to the reasons

-78-

for such removal, and (b) the identity of the proposed replacement Independent Director or Independent Manager, as applicable, together with a certification that such replacement satisfies the requirements set forth in the organizational documents for an Independent Director or Independent Manager (as applicable).

(n)      The organizational documents of each Special Purpose Subsidiary shall also provide an express acknowledgment that Administrative Agent is an intended third-party beneficiary of the "special purpose" provisions of such organizational documents.

(o)      The organizational documents of each Special Purpose Subsidiary shall provide that (i) the board of directors, the Committee or Sole Member (as applicable) of each Special Purpose Subsidiary shall not take any Independent Director/Manager Action (as defined below) without the unanimous vote of its board of directors, its Committee or its Sole Member (as applicable), including, or together with, the Independent Directors or Independent Managers (as applicable), and (ii) at the time of any Independent Director/Manager Action, there shall be (A) at least two (2) members of the board of directors (or the Committee as applicable) who are Independent Directors or Independent Managers, as applicable (and such Independent Directors or Independent Managers, as applicable, have participated in such vote) or (B) if there is no board of directors or Committee, then such Independent Managers shall have participated in such vote. **"Independent Director/Manager Actions"** means (i) filing or consenting to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, (ii) seeking or consenting to the appointment of a receiver, liquidator or any similar official of such Special Purpose Subsidiary or a substantial part of its business, (iii) making an assignment for the benefit of creditors or (iv) declaring or effectuating a moratorium on the payment of any obligations. Each Special Purpose Subsidiary shall not take any of the Independent Director/Manager Actions without the unanimous written consent of its board of directors, its Committee or its Sole Member, as applicable, including (or together with) all Independent Directors or Independent Managers, as applicable.  In addition, the organizational documents of each Special Purpose Subsidiary shall provide that, when voting with respect to any Independent Director/Manager Actions, the Independent Directors or Independent Managers (as applicable) shall consider only the interests of such Special Purpose Subsidiary, including its creditors. Without limiting the generality of the foregoing, such documents shall expressly provide that, to the greatest extent permitted by law, except for duties to each Special Purpose Subsidiary (including duties to the members of such Special Purpose Subsidiary solely to the extent of their respective economic interest in such Special Purpose Subsidiary, and recognizing the status of each such Special Purpose Subsidiary as a "disregarded entity" for tax purposes or a requirement that such Special Purpose Subsidiary file taxes as a member of a consolidated group, and to such Special Purpose Subsidiary's creditors as set forth in the immediately preceding sentence), with respect to any Independent Director/Manager Actions, such Independent Directors or Independent Managers (as applicable) shall not owe any fiduciary duties to, and shall not consider, in acting or otherwise voting on any matter for which their approval is required, the interests of (i) the members of each Special Purpose Subsidiary, (ii) other Affiliates of such Special Purpose Subsidiary, or (iii) any group of Affiliates of which such Special Purpose Subsidiary is a part); provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.  For the avoidance of doubt, other than the Independent Director/Manager Actions, (i) the approval or consent of the Independent Directors or Independent Managers shall not be required with respect to any actions taken by the Special Purpose Subsidiaries, and (ii) Holdings and its Subsidiaries shall have full control over the operations of the Special Purpose Subsidiaries, subject to compliance with the express terms of this Agreement (including Section 6) and the terms of the other Credit Documents.

(p)      The organizational documents of each Special Purpose Subsidiary shall provide that, as long as any portion of the Obligations (other than (x) any unasserted contingent indemnification obligations and (y) obligations in respect of the Earnout Agreement) remains outstanding, upon the occurrence of any event that causes Sole Member to cease to be a member of such Special Purpose Subsidiary (other than

(i) upon an assignment by Sole Member of all of its limited liability company interest in such Special Purpose Subsidiary and the admission of the transferee, if permitted pursuant to the organizational documents of such Special Purpose Subsidiary and the Credit Documents, or (ii) the resignation of Sole Member and the admission of an additional member of such Special Purpose Subsidiary, if permitted pursuant to the organizational documents of such Special Purpose Subsidiary and the Credit Documents), each of the persons acting as an Independent Director or Independent Manager (as applicable) of such Special Purpose Subsidiary shall, without any action of any Person and simultaneously with Sole Member ceasing to be a member of such Special Purpose Subsidiary, automatically be admitted as members of such Special Purpose Subsidiary (in each case, individually, a "**Special Member**" and collectively, the "**Special Members**") and shall preserve and continue the existence of such Special Purpose Subsidiary without dissolution or division (whether pursuant to Section 18-217 of the Act or otherwise). The organizational documents of each Special Purpose Subsidiary shall further provide that for so long as any portion of the Obligations is outstanding, no Special Member may resign or transfer its rights as Special Member unless (i) a successor Special Member has been admitted to such Special Purpose Subsidiary as a Special Member, and (ii) such successor Special Member has also accepted its appointment as an Independent Director or Independent Manager (as applicable).

(q)    The organizational documents of each Special Purpose Subsidiary shall provide that, as long as any portion of the Obligations (other than (x) any unasserted contingent indemnification obligations and (y) obligations in respect of the Earnout Agreement) remains outstanding, except as expressly permitted pursuant to the terms of this Agreement, (i) Sole Member of such Special Purpose Subsidiary may not resign, and (ii) no additional member shall be admitted to such Special Purpose Subsidiary.

(r)    The organizational documents of each Special Purpose Subsidiary shall provide that, as long as any portion of the Obligations (other than (x) any unasserted contingent indemnification obligations and (y) obligations in respect of the Earnout Agreement) remains outstanding: (i) such Special Purpose Subsidiary shall be dissolved, and its affairs shall be wound up, only upon the first to occur of the following: (A) the termination of the legal existence of the last remaining member of such Special Purpose Subsidiary or the occurrence of any other event which terminates the continued membership of the last remaining member of such Special Purpose Subsidiary in such Special Purpose Subsidiary unless the business of such Special Purpose Subsidiary is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (as the same may be amended modified or replaced, the "**Act**"), or (B) the entry of a decree of judicial dissolution under Section 18-802 of the Act; (ii) upon the occurrence of any event that causes the last remaining member of such Special Purpose Subsidiary to cease to be a member of such Special Purpose Subsidiary or that causes Sole Member to cease to be a member of such Special Purpose Subsidiary (other than (A) upon an assignment by Sole Member of all of its limited liability company interest in such Special Purpose Subsidiary and the admission of the transferee, if permitted pursuant to the organizational documents of such Special Purpose Subsidiary and the Credit Documents, or (B) the resignation of Sole Member and the admission of an additional member of such Special Purpose Subsidiary, if permitted pursuant to the organizational documents of such Special Purpose Subsidiary and the Credit Documents), to the fullest extent permitted by law, the personal representative of such last remaining member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in such Special Purpose Subsidiary, agree in writing (I) to continue the existence of such Special Purpose Subsidiary, and (II) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of such Special Purpose Subsidiary, effective as of the occurrence of the event that terminated the continued membership of such member in such Special Purpose Subsidiary; (iii) the bankruptcy of Sole Member or a Special Member shall not cause such Sole Member or Special Member, respectively, to cease to be a member of such Special Purpose Subsidiary and upon the occurrence of such an event, the business of such Special Purpose Subsidiary shall continue without dissolution; (iv) in the event of the dissolution of such Special Purpose Subsidiary, such Special Purpose Subsidiary shall conduct only such activities as are

necessary to wind up its affairs (including the sale of the assets of such Special Purpose Subsidiary in an orderly manner), and the assets of such Special Purpose Subsidiary shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; (v) to the fullest extent permitted by law, each of Sole Member and the Special Members shall irrevocably waive any right or power that they might have to cause such Special Purpose Subsidiary or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of such Special Purpose Subsidiary, to compel any sale of all or any portion of the assets of such Special Purpose Subsidiary pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, division (whether pursuant to Section 18-217 of the Act or otherwise), liquidation, winding up or termination of such Special Purpose Subsidiary and (vi) such Special Purpose Subsidiary shall be prohibited from effectuating a division (whether pursuant to Section 18-217 of the Act or otherwise).

(s)      Each Special Purpose Subsidiary has not permitted and will not permit any Affiliate or constituent party (other than any Special Purpose Subsidiary holding the same type of Applicable Assets with which such Special Purpose Subsidiary shares accounts) independent access to its bank accounts.

(t)      Each Special Purpose Subsidiary has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and pay all obligations of any kind incurred; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of such Special Purpose Subsidiary to make any additional capital contributions to such Special Purpose Subsidiary.

(u)      Each Special Purpose Subsidiary has allocated and will allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including shared office space.

(v)      Except in connection with the Obligations or as permitted by Section 6.2 and 6.10, each Special Purpose Subsidiary has not pledged and will not pledge its assets for the benefit of any other Person.

(w)      Each Special Purpose Subsidiary has not, does not, and will not have any of its obligations guaranteed by an Affiliate (other than from the other Guarantors with respect to the Obligations).

**5.15.    Syndication Assistance**. Each Credit Party will, and will cause each of its Subsidiaries to:

(a)      actively assist the Lenders (or any of their respective Affiliates or any arranger or co-arranger or bookrunner or co-bookrunner identified to Borrower by the Requisite Lenders prior to, on or after the Closing Date) in syndicating the Initial Loans and each Lender that was a Lender on the Closing Date in assigning the Initial Loans, including (i) using commercially reasonable efforts to ensure that any syndication or assignment efforts, as applicable, benefit materially from its and the Sponsors' existing lending and investment banking relationships, (ii) providing direct contact between its senior management, representatives and advisors and prospective lenders, in all such cases at times and locations to be mutually and reasonably agreed upon between Borrower and any such Lender (or, if applicable, its Affiliates or any such arranger or bookrunner), (iii) assistance (and using commercially reasonable efforts to cause the Sponsors to assist) in the preparation of confidential information memoranda, lender presentations and other materials and presentations to be used in connection therewith (collectively, "**Information Materials**"), (iv) providing or causing to be provided customary materials reasonably requested by any such Lender (or, if applicable, its Affiliates or any such arranger or bookrunner) in connection with such confidential information memoranda, lender presentations and other materials and presentations and (v) the hosting, with any such Lender (or, if applicable, its Affiliates or any such arranger or bookrunner), of one or more meetings and conference calls of prospective lenders at times and at locations to be mutually agreed upon between Borrower and any such Lender (or, if applicable, its Affiliates or any such arranger or bookrunner);

(b)      assist in the preparation of a version of the Information Materials to be used in connection with the syndication or assignment, as applicable, of the Initial Loans, consisting exclusively of information and documentation that does not contain Non-Public Information, including (i) prior to the distribution of any Information Materials, executing and delivering to any such Lender (or, if applicable, its Affiliates or any such arranger or bookrunner) (x) a letter authorizing the distribution of the Information Materials to prospective lenders willing to receive Non-Public Information and (y) a separate letter authorizing distribution of Information Materials containing solely Public-Side Information and representing that such Information Materials do not contain any Non-Public Information, which letter shall in each case include a customary "10b-5" representation and (ii) at the request of any such Lender (or, if applicable, its Affiliates or any such arranger or bookrunner), identifying any such Information Materials as either (x) containing Non-Public Information or (y) containing solely Public-Side Information (it being acknowledged and agreed that the following documents contain solely Public-Side Information: (A) the Credit Documents; and (B) administrative materials prepared by any such Lender (or, if applicable, its Affiliates or any such arranger or bookrunner) for prospective Public Lenders (such as lender meeting invitations, borrowing notices, and funding and closing memoranda); and

(c)      prepare and provide (and using commercially reasonable efforts to cause the Sponsors to prepare and provide) to any such Lender (or, if applicable, its Affiliates or any such arranger or bookrunner) all customary information with respect to Holdings and its Subsidiaries and the transactions contemplated by the Credit Documents, including all financial information and projections, as any such Lender (or, if applicable, its Affiliates or any such arranger or bookrunner) may reasonably request.

**5.16.    [Post-Closing Matters]**.

**SECTION 6. NEGATIVE COVENANTS**

Each Credit Party covenants and agrees that, so long as any Commitment is in effect and until payment in full in cash of all Obligations (other than (x) any unasserted contingent indemnification obligations and (y) obligations in respect of the Earnout Agreement), such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

**6.1.    Indebtedness**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)      the Obligations;

(b)      to the extent constituting Indebtedness and not otherwise permitted by any non-Dollar capped exception to this Section 6.1 (other than Section 6.1(g) and (h)), Indebtedness existing in respect of "OpCo Assumed Liabilities" (as defined in the Asset Purchase Agreement) and assumed pursuant to the terms and conditions of the Asset Purchase Agreement and the OpCo Sale Order and amendments, extensions, renewals, refinancings and replacements, in whole or in part, of any such Indebtedness that do not increase the outstanding principal amount thereof (other than in respect of any accrued interest, premium, fees, costs or expenses payable in connection with such extension, renewal, refinancing or replacement) or result in an earlier maturity date or decreased weighted average life thereof; provided, that (i) no additional direct or contingent obligors may become liable in respect of such Indebtedness existing when assumed (or any amendments, extensions, renewals, refinancings and replacements of such Indebtedness otherwise permitted pursuant to this clause (b)), (ii) such Indebtedness (and any amendments, extensions, renewals, refinancings and replacements of such Indebtedness otherwise permitted pursuant to this clause (b)) shall not be secured by any assets other than the assets securing Indebtedness as of the date acquired and (iii) in the case of any such Indebtedness constituting intercompany Indebtedness of a Credit

Party to a non-Credit Party, such Indebtedness (and any amendments, extensions, renewals, refinancings and replacements of such Indebtedness otherwise permitted pursuant to this clause (b)) shall be non-cash pay, non-amortizing, and without covenants or defaults other than non-payment at maturity;

(c)     Indebtedness of any Subsidiary to Borrower or to any other Subsidiary, or of Borrower to any Subsidiary; provided that (i) all such Indebtedness shall be evidenced by the Intercompany Note, and, if owed to a Credit Party, shall be subject to a First Priority Lien pursuant to the Pledge and Security Agreement, (ii) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the Intercompany Note, (iii) any payment by any such Guarantor Subsidiary under any guaranty of the Obligations shall result in a pro tanto reduction of the amount of any Indebtedness owed by such Subsidiary to Borrower or to any of its Subsidiaries for whose benefit such payment is made, (iv) in the case of any such Indebtedness owed by a Credit Party to an Excluded Subsidiary, such Indebtedness shall be unsecured, non-cash pay, non-amortizing, and without covenants or defaults other than non-payment at maturity and (v) such Indebtedness is permitted as an Investment under Section 6.6;

(d)     guaranties by Borrower of Indebtedness of a Subsidiary or guaranties by a Subsidiary of Indebtedness of Borrower or another Subsidiary with respect to, in each case, Indebtedness otherwise permitted to be incurred pursuant to this Section 6.1; provided that if the Indebtedness being guarantied is unsecured and/or subordinated to the Obligations, the guaranty shall also be unsecured and/or subordinated to the Obligations; provided, further, that such guaranty is permitted as an Investment under Section 6.6;

(e)     Permitted Indebtedness;

(f)     Indebtedness of Borrower or any of its Subsidiaries incurred to finance the acquisition, construction or improvement of any fixed or capital assets (other than real property or fixtures constituting Collateral as of the Closing Date or required to become Collateral pursuant to Section 5.11) or to finance the acquisition of computer hardware or software or other information technology assets, including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, and extensions, renewals, refinancings and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof (other than in respect of any accrued interest, premium, fees, costs or expenses payable in connection therewith); provided that (i) such Indebtedness is incurred prior to or within 180 days after such acquisition or the completion of such construction or improvement and (ii) the aggregate principal amount of Indebtedness permitted by this clause (f) shall not exceed $75,000,000 at any time outstanding;

(g)     Indebtedness under the Closing Date ABL/FILO Credit Documents; provided that the aggregate principal amount of loans and advances under the Closing Date ABL/FILO Credit Documents and unreimbursed obligations under letters of credit incurred under the Closing Date ABL/FILO Credit Documents shall not exceed $2,000,000,000; provided, further, that such Indebtedness, if secured by the Collateral, constitutes Closing Date ABL/FILO Credit Agreement Secured Obligations permitted under the Intercreditor Agreement; provided, however, that no Credit Party shall, nor shall it permit any of its Subsidiaries to, permit (i) any FILO Loans to be issued in exchange for any other Indebtedness pursuant to an exchange offer or similar agreement or (ii) any increase to the advance rates in the Closing Date ABL/FILO Credit Documents as in effect on the Closing Date unless such increase is made under revolving commitments and revolving loans (with no terms precluding the repayment and reborrowing of such loans other than as set forth in the Closing Date ABL/FILO Credit Documents as in effect on the Closing Date or as are customary in a revolving credit facility) that are provided by either the existing lenders under the Closing Date ABL/FILO Credit Documents or other similar commercial banks;

(h)     Indebtedness of Borrower or any of its Subsidiaries consisting of letters of credit,

guarantees or other credit support provided in respect of trade payables of Borrower or any of its Subsidiaries, in each case issued for the benefit of any bank, financial institution or other Person that has acquired such trade payables pursuant to "supply chain" or other similar financing for vendors and suppliers of Borrower or any of its Subsidiaries, so long as (i) other than in the case of Secured Supply Chain Obligations, such Indebtedness is unsecured, (ii) the terms of such trade payables shall not have been extended in connection with such Indebtedness and (iii) such Indebtedness represents amounts not in excess of those which Borrower or any of its Subsidiaries would otherwise have been obligated to pay to its vendor or supplier in respect of the applicable trade payables ("**Permitted Supply Chain Financing**") in an aggregate amount not to exceed $200,000,000;

(i)        unsecured Indebtedness of Borrower and its Subsidiaries in an aggregate amount not to exceed $250,000,000; provided that (a) if such Indebtedness is for borrowed money and in an aggregate principal amount of $10,000,000 individually or $25,000,000 in the aggregate, then such Indebtedness shall (x) mature later than, and shall not be subject to any scheduled payment of principal, mandatory sinking fund requirement or similar unconditional repayment obligation prior to, (1) the Latest Maturity Date (measured as of the time that such Indebtedness is incurred) or (2) if such Indebtedness is provided by a Sponsor Affiliated Lender, 90 days following the Latest Maturity Date (measured as of the time that such Indebtedness is incurred) and (y) (1) not have a cash pay interest rate or yield that exceeds 12.0% *per annum* or (2) if such Indebtedness is provided by a Sponsor Affiliated Lender, not have any cash pay interest or yield, (b) such Indebtedness shall not be subject to any terms requiring any obligor of such Indebtedness to pay (or offer to pay) such Indebtedness other than (i) pursuant to scheduled payments of principal that comply with clause (a) above and (ii) pursuant to Customary Mandatory Prepayment Terms, (c) no additional direct or contingent obligors other than a Credit Party may become liable in respect of such Indebtedness at any time and (d) if such Indebtedness is provided by a Sponsor Affiliated Lender, such Indebtedness shall be subordinated in right of payment to the payment in full in cash of the Obligations in a manner reasonably satisfactory to Administrative Agent;

(j)        Attributable Indebtedness of Borrower and its Subsidiaries in an aggregate amount not to exceed $75,000,000 at any time outstanding;

(k)        Indebtedness issued by Holdings or any of its Subsidiaries to future, current or former officers, directors and employees thereof, their respective estates, spouses or former spouses, in each case to finance the purchase or redemption of Equity Interests (other than Disqualified Equity Interests) held by any future, present or former employee, director or consultant of Holdings or any of its Subsidiaries pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, or any stock subscription or shareholder agreement, in each case to the extent that would be permitted by Section 6.4(e)(iii) if such purchase or redemption was made as a Restricted Junior Payment; and

(l)        to the extent constituting Indebtedness and not otherwise permitted by any non-Dollar capped exception to this Section 6.1, Indebtedness arising from the Related Agreements;

provided that, notwithstanding the foregoing, no Special Purpose Subsidiary shall, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness except in each case pursuant to clause (a), (b), (e), (j) or (l) above.

**6.2.    Liens**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of Holdings or any of its Subsidiaries, whether now owned or hereafter acquired or licensed, or any income, profits or royalties therefrom, except:

(a)      Liens in favor of Collateral Agent for the benefit of the Secured Parties granted pursuant to any Credit Document;

(b)      Permitted Encumbrances;

(c)      to the extent constituting a Lien and not otherwise permitted by any non-Dollar capped exception to this Section 6.2 (other than Section 6.2(l)), any Lien on any property or asset of Holdings or any Subsidiary in respect of "Permitted Encumbrances" (as defined in the Asset Purchase Agreement) and assumed pursuant to the terms and conditions of the Asset Purchase Agreement and the OpCo Sale Order; provided that (i) such Lien shall not apply to any other property or asset of Holdings or any Subsidiary and (ii) such Lien shall secure only those obligations which it secured on the Closing Date and refinancings, extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof, other than in respect of any accrued interest, premium, fees, costs or expenses payable in connection with such extension, renewal or replacement;

(d)      any Lien existing on any property or asset prior to the acquisition thereof by Holdings or any Subsidiary or existing on any property or asset of any Person that becomes a Subsidiary after the Closing Date prior to the time such Person becomes a Subsidiary; provided that (i) such Lien is not created in contemplation of or in connection with such acquisition or such Person becoming a Subsidiary, as the case may be, (ii) such Lien shall not apply to any other property or assets of Holdings or any of its Subsidiaries and (iii) such Lien shall secure only those obligations which it secures on the date of such acquisition or the date such Person becomes a Subsidiary, as the case may be and refinancings, extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof, other than in respect of any accrued interest, premium, fees, costs or expenses payable in connection with such extension, renewal or replacement;

(e)      Liens on fixed or capital assets (other than real property or fixtures constituting Collateral as of the Closing Date or required to become Collateral pursuant to Section 5.11) or on computer hardware or software or other information technology assets which are acquired, constructed or improved by Borrower or any of its Subsidiaries; provided that (i) such security interests secure Indebtedness permitted by Section 6.1(f), (ii) such security interests and the Indebtedness secured thereby are incurred prior to or within 180 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed 100% of the cost of acquiring, constructing or improving such fixed or capital assets and (iv) such security interests shall not apply to any other property or assets of Holdings or any of its Subsidiaries;

(f)      Liens in respect of leases, subleases, licenses, sublicenses and any other occupancy rights or agreements granted to other Persons (i) in the ordinary course of business and not materially interfering with the conduct of business of Holdings and its Subsidiaries, taken as a whole, or (ii) with respect to Real Estate Assets no longer deemed by Borrower to be useful in the conduct of business of Holdings and its Subsidiaries, taken as a whole;

(g)      with respect to any Consignment Inventory, Liens arising out of conditional sale, title retention, consignment (including "sale or return" arrangements) or similar arrangements for the sale of such Consignment Inventory entered into by Borrower or any of its Subsidiaries in the ordinary course of business, provided that the aggregate amount of such goods shall not exceed $100,000,000 at any time;

(h)      Liens in favor of customs and revenue authorities arising as a matter of law securing payment of customs duties in connection with the importation of goods;

(i)      any encumbrance or restriction (including pursuant to put and call agreements or buy/sell

arrangements) with respect to the Equity Interests of any joint venture or similar arrangement pursuant to the joint venture or similar agreement with respect to such joint venture or similar arrangement;

(j)      to the extent constituting a Lien, the sale or discount, in the ordinary course of business, of accounts receivable in connection with the compromise or collection thereof and not in connection with any financing or factoring arrangement;

(k)      Liens on property rented to, or leased by, Borrower or any of its Subsidiaries pursuant to a Sale and Leaseback Transaction; provided that (i) such Sale and Leaseback Transaction is permitted by Section 6.10, (ii) such Liens do not encumber any other property of Holdings or any of its Subsidiaries and (iii) such Liens secure only the Attributable Indebtedness incurred in connection with such Sale and Leaseback Transaction;

(l)      Liens on the Collateral (other than any Equity Interests in any Special Purpose Subsidiary or any assets or properties thereof) securing (i) the Indebtedness under the Closing Date ABL/FILO Credit Documents to the extent permitted by Section 6.1(g), (ii) obligations under Swap Agreements permitted under Section 6.6(g), (iii) Secured Supply Chain Obligations and (iv) other Closing Date ABL/FILO Credit Agreement Secured Obligations of a type not otherwise described in clauses (i) through (iii), in each case solely to the extent constituting Closing Date ABL/FILO Credit Agreement Secured Obligations; provided that any such Liens are subject to the Intercreditor Agreement;

(m)      Liens on insurance policies and the proceeds thereof and unearned premiums securing the financing of premiums with respect thereto as provided under clause (b) of the definition of "Permitted Indebtedness";

(n)      to the extent constituting a Lien, sales or assignments of any litigation claims or rights to receive payments with respect to any such claims;

(o)      to the extent constituting a Lien, sales or assignments of any right to receive rental payments permitted under Section 6.8;

(p)      Liens on cash or Cash Equivalents securing Swap Agreements permitted under Section 6.6(g);

(q)      Liens on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or trade letters of credit issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(r)      other Liens on the Collateral securing obligations (other than Indebtedness for borrowed money) of Borrower and its Subsidiaries in the ordinary course of business in an aggregate amount not to exceed $50,000,000; provided that such Liens shall be subordinated to the Liens in favor of Collateral Agent for the benefit of the Secured Parties granted pursuant to any Credit Document; and

(s)      to the extent constituting a Lien and not otherwise permitted by any non-Dollar capped exception to this Section 6.2, Liens arising from the Related Agreements;

provided that, notwithstanding the foregoing, no Special Purpose Subsidiary shall, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of Holdings or any of its Subsidiaries, whether now owned or hereafter acquired or licensed, or any income, profits or royalties therefrom, except pursuant to clauses (a), (b), (c), (d), (f), (k), (m), (n), (o) or (s) above; provided, further,

that, notwithstanding the foregoing, no Special Purpose Subsidiary shall, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to the Intercompany Intellectual Property Licensing Agreement or the Intercompany Lease, or any income, profits or royalties therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to the Intercompany Intellectual Property Licensing Agreement or the Intercompany Lease, or any income, profits or royalties therefrom, under the UCC of any State or under any similar recording or notice statute or under any applicable intellectual property laws, rules or procedures, except pursuant to clauses (a), (b) (but limited to clause (k) of the definition of "Permitted Encumbrances") or (f) above.

6.3.    **Restrictive Agreements**.  No Credit Party will, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (1) the ability of Holdings or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to secure the Obligations (or any Indebtedness incurred to refinance or replace the Obligations) or (2) the ability of any Credit Party (other than Holdings) to pay dividends or other distributions with respect to its Equity Interests or the ability of any Credit Party to make or repay loans or advances to a Credit Party or to guarantee the Obligations (or any Indebtedness incurred to refinance or replace any of the Obligations); provided that (a) the foregoing shall not apply to any prohibitions, restrictions or conditions imposed (i) by law, rule, regulation or judicial order, or required by any regulatory authority having jurisdiction over Holdings or any Subsidiary or any of their respective businesses, (ii) the ABL Credit Agreement, the FILO Credit Agreement or, in either case, any Refinancing thereof containing substantially equivalent restrictions or (iii) by any Credit Document, any Related Agreement, the OpCo Sale Order or any related documents or agreements, (b) the foregoing shall not apply to prohibitions, restrictions or conditions contained in agreements relating to the direct or indirect disposition of Equity Interests of any Person, property or assets, imposing restrictions with respect to such Person, Equity Interests, property or assets pending the closing of such disposition, (c) the foregoing shall not apply to prohibitions, restrictions or conditions contained in any agreement of a Person that becomes a Subsidiary after the Closing Date which existed prior to the date that such Person became a Subsidiary; provided that such prohibitions, restrictions or conditions existed at the time that such Person became a Subsidiary and were not created in contemplation of such Person becoming a Subsidiary and do not apply to any other Subsidiary or any assets other than those of the Subsidiary so acquired, (d) the foregoing shall not apply to restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business, (e) clause (1) of the foregoing shall not apply to prohibitions, restrictions or conditions imposed by any agreement relating to secured Indebtedness or other obligations not prohibited by this Agreement if such prohibitions, restrictions or conditions apply only to the property or assets securing such Indebtedness or obligations and any proceeds and products thereof and after-acquired property, except as may otherwise be permitted under this Section 6.3, and (f) clause (1) of the foregoing shall not apply to, in each case to the extent in the ordinary course of business, (i) customary provisions in leases and other contracts or agreements restricting the transfer, assignment, pledge or mortgage thereof, or the subletting, assignment or transfer of any property or asset subject thereto, so long as such restrictions relate to the assets subject thereto, (ii) any reciprocal easement agreements containing customary provisions restricting dispositions of real property interests and (iii) Capital Lease Obligations, tax retention and other synthetic lease obligations and purchase money obligations that impose restrictions with respect to the property or assets so acquired.

6.4.    **Restricted Junior Payments**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Junior Payment, except that:

(a)    any Subsidiary of Borrower may declare and pay dividends or make other distributions ratably to its direct equityholders; provided that no Special Purpose Subsidiary shall distribute any businesses, assets or properties pursuant to this clause (a) except cash and Cash Equivalents;

(b)     Borrower and its Subsidiaries may make regularly scheduled payments of interest and, so long as no Event of Default shall have occurred and be continuing or would result therefrom, principal, including at maturity, in respect of any Indebtedness permitted to be incurred pursuant to Section 6.1 and that is unsecured, subordinated or secured on a junior basis to the Liens in favor of Collateral Agent for the benefit of the Secured Parties granted pursuant to any Credit Document in accordance with the terms of, and only to the extent required by, and subject to any subordination provisions contained in, the indenture or other agreement pursuant to which such Indebtedness was issued;

(c)     payments of (i) Permitted Indebtedness will be permitted and (ii) Indebtedness incurred pursuant to Section 6.1(g) will be permitted;

(d)     repurchases of Equity Interests of Holdings (i) deemed to occur on the exercise of stock options or warrants or similar rights if such Equity Interests represent the delivery of a portion of the Equity Interests subject to such options or warrants or similar rights in satisfaction of the exercise price of such stock options, warrants or similar rights (and do not involve cash consideration) or (ii) deemed to occur in the case of payment by Holdings or Borrower of withholding or similar Taxes payable by any future, present or former employee, director, manager or consultant (or any spouses, former spouses, successors, executors, administrators, heirs, legatees or distributees of any of the foregoing), in connection with the exercise or vesting of stock options, restricted stock warrants or similar rights (in lieu of a portion of the shares that otherwise would be issued upon such exercise or vesting);

(e)     so long as no Event of Default shall have occurred and be continuing or would result therefrom, Holdings and its Subsidiaries may make Restricted Junior Payments:

(i)     in respect of general corporate operating and overhead, legal, accounting and other professional fees and expenses of Holdings or any direct or indirect parent thereof, to the extent allocable to the operations of Borrower and its Subsidiaries;

(ii)     to Holdings or any parent thereof (1) in respect of any taxable period for which Borrower is treated as a partnership (or disregarded as an entity separate from a partnership) for U.S. federal income tax purposes in an aggregate amount not to exceed the amount of U.S. federal, state and local income taxes that Borrower would be required to pay directly in respect of such taxable period with respect to income of Borrower if Borrower were treated as a corporation for U.S. federal income tax purposes (excluding any such taxes that are payable directly by Borrower regardless of Borrower's U.S. federal income tax classification) or (2) in respect of any taxable period for which Borrower and/or any of its Subsidiaries are members of a consolidated, combined, affiliated, unitary or similar tax group for U.S. federal or, as applicable, state or local, income tax purposes, or Borrower is a disregarded entity for U.S. federal income tax purposes that is wholly owned (directly or indirectly) by a parent treated as a corporation for U.S. federal, or, as applicable, state or local, income tax purposes, to pay the consolidated or combined tax liabilities of such group in respect of an allocable portion of the tax liabilities of such group that is attributable to the income of Borrower and its Subsidiaries that are members of, or are entities disregarded as separate from members of, such group in an amount in any fiscal year not to exceed the amount that Borrower and such Subsidiaries would be required to pay in respect of such taxes for such fiscal year were Borrower and each such Subsidiary to pay such taxes on a consolidated or combined basis on behalf of a group consisting only of Borrower and such Subsidiaries, taking into account any net operating losses or other attributes of the consolidated or combined group of which Borrower and such Subsidiaries are a part, less any amounts paid directly by Borrower and such Subsidiaries (other than any Excluded Subsidiaries) with respect to such taxes; provided, that, in the case of either clause (1) or (2), amounts distributable in respect of any income or taxes of or attributable to any Excluded Subsidiaries shall be limited to the extent of any amounts actually received from the Excluded Subsidiaries in respect of such income or taxes (collectively, "**Tax Distributions**");

(iii)      to pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests (other than Disqualified Equity Interests) held by any future, present or former employee, director or consultant of Holdings or any of its Subsidiaries pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, or any stock subscription or shareholder agreement; provided that the aggregate amount of Restricted Junior Payments made under this clause (iii), less the amount of Indebtedness incurred under Section 6.1(k), shall not exceed $15,000,000 in the aggregate;

(f)      to the extent constituting Restricted Junior Payments and without duplication of Section 6.4(e)(iii), Holdings and its Subsidiaries may issue Indebtedness permitted pursuant to Section 6.1(k);

(g)      to the extent constituting Restricted Junior Payments and not otherwise permitted by any non-Dollar capped exception to this Section 6.4, Holdings and its Subsidiaries may make Restricted Junior Payments pursuant to the Related Agreements in accordance with the terms and conditions of the Related Agreements;

(h)      Holdings and its Subsidiaries may make Restricted Junior Payments on or about the Closing Date solely for the purpose of consummating and implementing the Transactions;

(i)      Holdings and its Subsidiaries may Refinance any Indebtedness pursuant to a Permitted Refinancing with the proceeds of other Indebtedness permitted under Section 6.1; and

(j)      Holdings and its Subsidiaries may make other Restricted Junior Payments of or in respect of any such Indebtedness made solely with (or with the proceeds of a substantially concurrent issuance and sale of) Equity Interests (other than Disqualified Equity Interests or the Closing Date Equity Contribution) in Holdings;

provided that, notwithstanding the foregoing, (1) in no event shall any Restricted Junior Payment of Intellectual Property be permitted other than non-material patents, trademarks or other Intellectual Property that are, in the reasonable judgment of Borrower, no longer economically practicable to maintain or useful in the conduct of the business of Holdings and its Subsidiaries taken as a whole, and (2) no Special Purpose Subsidiary shall, directly or indirectly, make any Restricted Junior Payment to any Person except pursuant to clauses (a), (c)(i), (e)(i), (e)(ii), (g) or (h) above.

**6.5.      Fundamental Changes**. No Credit Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of the assets of Holdings and its Subsidiaries, taken as a whole, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing (i) any Person (other than a Special Purpose Subsidiary) may merge with or into or consolidate with Borrower or any Subsidiary of Borrower in a transaction in which the surviving entity is Borrower or (in the case of a transaction not involving Borrower) a Subsidiary and (if any party to such merger or consolidation is or becomes a Credit Party) is a Credit Party; provided that any such merger or consolidation involving a Person that is not a wholly owned Subsidiary immediately prior to or after giving effect to such merger or consolidation shall comply with Sections 6.6 and 6.8, as applicable, (ii) any Subsidiary (other than Holdings, Borrower or any Special Purpose Subsidiary) may liquidate or dissolve or change its legal form if Borrower determines in good faith that such liquidation or dissolution or change in legal form is in the best interests of Holdings and its Subsidiaries and is not materially disadvantageous to the Lenders; provided that, in the case of a liquidation or dissolution of a Subsidiary of Borrower that is a Guarantor Subsidiary, the Person into which such Guarantor Subsidiary is liquidated or dissolved shall be Borrower or a Guarantor Subsidiary and shall succeed to or assume all obligations of such Guarantor

Subsidiary under the Credit Documents, (iv) any merger (other than involving a Special Purpose Subsidiary) the sole purpose and effect of which is to reincorporate or reorganize a Person in another jurisdiction in the United States shall be permitted; provided that, if such Person is a Credit Party, the surviving entity is a Credit Party (and, if not a Credit Party before such merger, shall assume all obligations of such Credit Party under the Credit Documents), and (v) a merger, dissolution, liquidation, consolidation, sale, transfer or other disposition solely among Special Purpose Subsidiaries holding the same type of Applicable Assets shall be permitted if Borrower determines in good faith that such merger, dissolution, liquidation, consolidation, sale, transfer or other disposition is in the best interests of Holdings and its Subsidiaries, is not materially disadvantageous to the Lenders and complies with Section 5.14.

      **6.6.**    **Investments**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, except:

      (a)    Investments in cash and Cash Equivalents;

      (b)    to the extent constituting Investments and not otherwise permitted by any non-Dollar capped exception to this Section 6.6, Investments constituting "OpCo Acquired Assets" (as defined in the Asset Purchase Agreement) acquired, or "OpCo Assumed Liabilities" (as defined in the Asset Purchase Agreement) assumed, pursuant to the terms and conditions of the Asset Purchase Agreement and the Opco Sale Order and any refinancing, replacement, renewal or extension of any such Investment which does not increase the amount thereof except pursuant to the terms of such Investment as in effect as of the Closing Date or as otherwise permitted by another clause of this Section 6.6;

      (c)    Investments made in Borrower and any wholly owned Guarantor Subsidiary of Borrower;

      (d)    Investments in Subsidiaries that are not wholly owned Guarantor Subsidiaries; provided that such Investments shall not exceed an aggregate amount of $25,000,000;

      (e)    Investments (i) received in connection with the bankruptcy or reorganization of, or settlement or satisfaction or partial satisfaction of delinquent accounts and disputes with, customers, suppliers and other account debtors, in each case in the ordinary course of business or upon the foreclosure with respect to any secured Investment or (ii) constituting notes receivable arising in the ordinary course of business or the conversion or exchange of accounts receivable for notes receivable in the ordinary course of business;

      (f)    extensions of trade credit in the ordinary course of business;

      (g)    Swap Agreements which constitute Investments;

      (h)    Investments held by a Subsidiary acquired after the Closing Date or of a Person merged or consolidated with or into Borrower or a Subsidiary in accordance with this Agreement after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

      (i)    Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit and Article 4 customary trade arrangements with customers;

      (j)    promissory notes and other non-cash consideration that is permitted to be received in connection with dispositions permitted by Section 6.8;

(k)     Investments made in any Permitted Supply Chain Financing;

(l)     loans and advances to employees of Holdings and its Subsidiaries made in the ordinary course of business in an aggregate principal amount not to exceed $5,000,000 at any time outstanding;

(m)     other Investments in an aggregate amount not to exceed $25,000,000;

(n)     Investments with proceeds of the issuance of Equity Interests (other than Disqualified Equity Interests) of Holdings made after the Closing Date;

(o)     to the extent constituting Investments, Restricted Junior Payments permitted by Section 6.4;

(p)     Investments pursuant to intercompany cash management arrangements arising in the ordinary course of business;

(q)     to the extent constituting Investments and not otherwise permitted by any non-Dollar capped exception to this Section 6.6, Investments pursuant to the Related Agreements in accordance with the terms and conditions of the Related Agreements;

(r)     Investments on or about the Closing Date solely for the purpose of consummating and implementing the Transactions; and

(s)     Investments (i) in a Special Purpose Tenant Subsidiary (A) reasonably calculated to allow such Special Purpose Tenant Subsidiary to satisfy its obligations under the Master Lease Agreement and (B) to allow such Special Purpose Tenant Subsidiary to maintain its corporate existence (including in respect of (x) general corporate operating and overhead, legal, accounting and other professional fees and expenses and (y) reasonable and customary fees, expenses and indemnities of directors, officers and employees (if any)) and to satisfy any Tax or other ordinary course obligation owing by such Special Purpose Tenant Subsidiary as and when the same becomes due and payable and (ii) in any Special Purpose Tenant Subsidiary HoldCo to be substantially contemporaneously therewith contributed to a Special Purpose Tenant Subsidiary as an Investment pursuant to clause (s)(i);

provided that, notwithstanding the foregoing, (1) in no event shall any Investment of Intellectual Property be permitted other than (x) non-material patents, trademarks or other Intellectual Property that are, in the reasonable judgment of Borrower, no longer economically practicable to maintain or useful in the conduct of the business of Holdings and its Subsidiaries, taken as a whole, (y) Investments of Intellectual Property in a Special Purpose Intellectual Property Subsidiary and other Investments in Intellectual Property so long as such Intellectual Property is contributed substantially contemporaneously therewith into a Special Purpose Intellectual Property Subsidiary or (z) in accordance with the Intercompany Intellectual Property Licensing Agreement, (2) in no event shall Holdings or any of its Subsidiaries make any Investment in a Special Purpose Tenant Subsidiary except pursuant to clause (s)(i) above and (3) no Special Purpose Subsidiary shall, directly or indirectly, make or own any Investment except as permitted by clauses (a), (b), (c) (solely with respect to other Special Purpose Subsidiaries), (e), (i), (j), (o), (p), (q), (r) and (s)(i) above.

**6.7.     Financial Covenant**. No Credit Party shall, nor shall it permit any Subsidiary to, permit the First Lien Net Leverage Ratio as of the last day of any Fiscal Quarter ending during any period set forth below to be greater than the First Lien Net Leverage Ratio set forth opposite such period below (each, as applicable, the "**Financial Covenant**"):

| Period | First Lien Net Leverage Ratio |
| --- | --- |

| | |
|---|---|
| January 29, 2023 – February 3, 2024 | 4.25:1.00 |
| February 4, 2024 – February 1, 2025 | 3.75:1.00 |
| February 2, 2025 – January 31, 2026 | 3.50:1.00 |
| Thereafter | 3.25:1.00 |

**6.8.    Disposition of Assets**. No Credit Party will, nor will it permit any Subsidiary to, sell, transfer, lease or otherwise dispose of any asset, including by way of sale leaseback (including any Sale and Leaseback Transaction), voluntary lease termination or sale, assignment or securitization of a right to receive rental payments and including any Equity Interest owned by it, nor will any Credit Party permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than directors' qualifying shares or to the extent required by applicable law) (each referred to for purposes of this section as a "**disposition**"), except:

(a)    sales of inventory, used or surplus equipment and cash and Cash Equivalents, in each case in the ordinary course of business;

(b)    disposals of inventory pursuant to promotional or similar activities in the ordinary course of business;

(c)    dispositions in the ordinary course of business of property no longer used or useful in the conduct of the business of Holdings and its Subsidiaries (other than real property or fixtures constituting Collateral as of the Closing Date or required to become Collateral pursuant to Section 5.11);

(d)    dispositions to Holdings or any of its Subsidiaries; provided that any dispositions by a Credit Party to a Subsidiary that is not a Credit Party in reliance on this clause (d) shall be made in compliance with Section 6.6;

(e)    any disposition (i) arising from condemnation or similar action with respect to any property or (ii) pursuant to buy/sell arrangements under any joint venture or similar agreement or arrangement;

(f)    the lapse or abandonment or other disposition of non-material patents, trademarks or other Intellectual Property that are, in the reasonable judgment of Borrower, no longer economically practicable to maintain or useful in the conduct of the business of Holdings and its Subsidiaries, taken as a whole;

(g)    leases, subleases, licenses or sublicenses (including the provision of software under an open source license), (i) in the ordinary course of business and which do not materially interfere with the business of Holdings and its Subsidiaries, taken as a whole, or (ii) in connection with the discontinuance of the operations of any Facility no longer deemed by Borrower to be useful in the conduct of the business of Holdings and its Subsidiaries, taken as a whole;

(h)    the unwinding of Swap Agreements;

(i)    dispositions of accounts receivable in connection with the collection or compromise thereof;

(j)    (i) any dividend or other Restricted Junior Payment permitted pursuant to Section 6.4, (ii) any Investment permitted pursuant to Section 6.6 and (iii) any Lien permitted by Section 6.2;

(k)    sales of fixed or capital assets pursuant to Section 6.10;

(l)     sales or other dispositions of assets; provided that (1) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof with such amount being no less than the amount that would be paid pursuant to an arm's-length transaction, (2)  no less than 75.0% of the consideration therefor shall be paid in cash and Cash Equivalents (it being agreed that the transfer or exchange of Indebtedness shall be deemed not to be cash or Cash Equivalents) and (3) the Net Asset Sale Proceeds thereof shall be applied as required by Section 2.14(a);

(m)     bulk sales or other dispositions of inventory of a Credit Party not in the ordinary course of business in connection with store closings;

(n)     any issuance of Equity Interests (i) by Borrower to Holdings or (ii) by any wholly owned Subsidiary of Borrower to Borrower or to any other wholly owned Subsidiary of Borrower;

(o)     any sale or assignments of any litigation claims or rights to receive payments with respect to any such claims;

(p)     any termination or expiration of any (or any portion of any) real property lease, sublease or other occupancy agreement (i) in the ordinary course of business or (ii) in connection with the discontinuance of the operations of any Facility no longer deemed by Borrower to be useful in the conduct of business of Holdings and its Subsidiaries, taken as a whole;

(q)     to the extent constituting dispositions and not otherwise permitted by any non-Dollar capped exception to this Section 6.8, dispositions pursuant to the Related Agreements in accordance with the terms and conditions of the Related Agreements; and

(r)     dispositions on or about the Closing Date solely for the purpose of consummating and implementing the Transactions;

provided that, notwithstanding the foregoing, any disposition by or to a Special Purpose Subsidiary shall be consummated in accordance with the requirements of Section 2.14 and pursuant to clauses (a) (solely with respect to cash and Cash Equivalents), (e)(i), (f), (g), (j), (k), (l), (n), (o), (p), (q) or (r) above.

**6.9.    Disposal of Subsidiary Interests**. Except for any sale of all of its interests in the Equity Interests of any of its Subsidiaries in compliance with the provisions of Section 6.8 or a Lien incurred in accordance with Section 6.2 (as applicable), no Credit Party shall, nor shall it permit any of its Subsidiaries to, (a) directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Equity Interests of any of its Subsidiaries, except to qualify directors if required by applicable law; or (b) permit any of its Subsidiaries directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any Equity Interests of any of its Subsidiaries, except to another Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder), or to qualify directors if required by applicable law.

**6.10.    Sale and Leaseback Transactions**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into any arrangement, directly or indirectly, with any person (other than a Credit Party) whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter, as part of such transaction, rent or lease such property (any such Transaction, a "**Sale and Leaseback Transaction**") unless (i) the sale of such property is made for cash consideration in an amount not less than the fair market value of such property with such amount being no less than the amount that would be paid pursuant to an arm's-length transaction, (ii) the Sale and Leaseback Transaction is consummated within 90 days after the date on which such property is sold or transferred, (iii) any Liens arising in connection with such Sale and Leaseback Transaction are permitted by Section 6.2(j), (iv) the Sale and Leaseback Transaction would be permitted

under Section 6.1, assuming the Attributable Indebtedness with respect to the Sale and Leaseback Transaction constituted Indebtedness under Section 6.1, and (v) no Event of Default has occurred and is continuing or would result therefrom.

**6.11.    Transactions with Affiliates**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction or arrangement (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of Holdings or any Sponsor on terms that are less favorable to Holdings or that Subsidiary, as the case may be, than those that might be obtained on arms-length basis at the time from a Person who is not such an Affiliate; underlined provided that the foregoing restriction shall not apply to: (a) any transaction or arrangement between or among any of Holdings or its Subsidiaries; (b) reasonable and customary compensation and indemnification paid to members of the board of directors (or similar governing body) of Holdings and its Subsidiaries entered into in the ordinary course of business; (c) compensation arrangements for officers and other employees of Holdings and its Subsidiaries entered into in the ordinary course of business; (d) transactions or arrangements involving consideration in an amount not to exceed $5,000,000 individually or $25,000,000 in the aggregate; (e) transactions or arrangements that are at prices and on terms and conditions not less favorable in any material respect to the applicable Credit Party than could be obtained on an arm's-length basis from unrelated third parties; (f) operating leases existing on the Closing Date so long as such operating leases are not amended, restated, supplemented, modified or waived in any manner materially adverse to the interests of the Lenders (in their capacities as such); (g) transactions or arrangements involving the purchase or sale of goods or services which will be distributed to or sold to, or are intended to reach, the public (i.e., through ordinary retail channels) that are at prices and on terms and conditions not less favorable in any material respect to the applicable Credit Party than could be obtained on an arm's-length basis from unrelated third parties and (h) transactions or arrangements pursuant to the Related Agreements and the OpCo Sale Order; underlined provided that, with respect to any transaction or arrangement or series of related transactions or arrangements described in clause (e) or (g) above, (1) involving aggregate consideration in excess of $5,000,000 but equal to or less than $25,000,000, written notice of such transaction or arrangement or transactions or arrangements shall be provided by Borrower to Administrative Agent (for distribution to the Lenders) on a quarterly basis in arrears and (2) involving aggregate consideration in excess of $25,000,000, written notice of such transaction or arrangement or transactions or arrangements shall be provided by Borrower to Administrative Agent (for distribution to the Lenders) at least ten (10) Business Days prior to the consummation of such transaction or arrangement or transactions or arrangements and such transaction or arrangement or transactions or arrangements shall be approved by the board of directors (or similar governing body) of Holdings.

**6.12.    Conduct of Business**. Holdings will not, and will not permit any of its Subsidiaries to, engage to any extent material to Holdings and its Subsidiaries (taken as a whole) in any business other than the businesses of the type conducted by Holdings and its Subsidiaries on the Closing Date and businesses reasonably related, ancillary or complementary to the business or businesses of Holdings or any of its Subsidiaries or any reasonable extension, development or expansion thereof.

**6.13.    Permitted Activities of Holdings**. Holdings shall not (a) incur, directly or indirectly, any Indebtedness or any other obligation or liability whatsoever other than the Indebtedness and obligations under this Agreement, the other Credit Documents, the Closing Date ABL/FILO Credit Documents, the Related Agreements and the OpCo Sale Order; (b) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired, leased or licensed by it other than the Liens created under the Collateral Documents to which it is a party or permitted pursuant to Section 6.2; (c) engage in any business or activity or own any assets other than (i) holding 100% of the Equity Interests of Borrower, (ii) performing its obligations and activities incidental thereto under the Credit Documents, the Closing Date ABL/FILO Credit Documents, the Related Agreements and the OpCo Sale Order; and (iii) making Restricted Junior Payments and Investments to the extent permitted by this Agreement; (d) consolidate with or merge with

or into, or convey, transfer, lease or license all or substantially all its assets to, any Person; (e) sell or otherwise dispose of any Equity Interests of any of its direct Subsidiaries; (f) create or acquire any direct Subsidiary or make or own any Investment in any Person other than Borrower; or (g) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

6.14.    **Amendments of Organizational Documents, Related Agreements and OpCo Sale Order**. No Credit Party will, nor will it permit any Subsidiary to, amend, modify or waive any of its rights under (i) its certificate of incorporation, by-laws, operating, management or partnership agreement or other Organizational Documents, (ii) any Related Agreement or (iii) the OpCo Sale Order, in each case to the extent any such amendment, modification or waiver would be materially adverse to the Lenders (in their capacities as such); provided that Borrower shall endeavor in good faith to provide at least five (5) Business Days' advance written notice to Administrative Agent prior to any immaterial adverse amendments, modifications or waivers of any rights of any Credit Party or any Subsidiary under any such Organizational Documents, Related Agreements or OpCo Sale Order (it being understood that the failure by Borrower to comply with its obligations under this proviso shall not constitute a Default or Event of Default hereunder).

6.15.    **Fiscal Year**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, change its Fiscal Year end from the Saturday closest to January 31 of each calendar year.

6.16.    **Intellectual Property**. No Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any practice with respect to Intellectual Property that is inconsistent with industry standards.

6.17.    **Master Lease Documents**. No Special Purpose Tenant Subsidiary shall, and no Credit Party shall cause or permit any Special Purpose Tenant Subsidiary to, (a) assign its rights under any Master Lease Document without Administrative Agent's prior written consent in each instance (which shall not be unreasonably withheld, conditioned or delayed) other than to an Affiliate in accordance with the express terms of such Master Lease Document in connection with a severance of such Master Lease by the lessor thereunder into one or more separate Leases, (b) amend, restate, supplement, modify, waive or terminate any Master Lease Document in any manner materially adverse to the Lenders (in their capacities as such) without Administrative Agent's prior written consent in each instance (which shall not be unreasonably withheld, conditioned or delayed), except to the extent such amendment, restatement, supplement, modification, waiver or termination is permitted in accordance with the express terms of such Master Lease Document (including any severance of any Master Lease by the lessor thereunder into one or more separate Leases or any exercise by such lessor or the applicable Special Purpose Tenant Subsidiary of any right to terminate such Master Lease Document with respect to a particular property (other than in connection with an event of default thereunder)); provided that Borrower shall endeavor in good faith to provide at least five (5) Business Days' advance written notice to Administrative Agent prior to any immaterial adverse amendments, restatements, supplements, modifications, waivers or terminations of any Master Lease Document (it being understood that the failure by Borrower to comply with its obligations under this proviso shall not constitute a Default or Event of Default hereunder) or (c) accelerate the rent or other amounts payable under any Master Lease Document.

## SECTION 7. GUARANTY

7.1.    **Guaranty of the Obligations**. Subject to the provisions of Section 7.2, Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Administrative Agent, for the ratable benefit of the Beneficiaries, the due and punctual payment in full in cash of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), which shall not include any Excluded Swap Obligations (collectively, the "**Guaranteed Obligations**").

**7.2.** **Contribution by Guarantors**. All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date. "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the Guaranteed Obligations. "**Fair Share Contribution Amount**" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided that solely for purposes of calculating the "**Fair Share Contribution Amount**" with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor. "**Aggregate Payments**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 7.2), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor. The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2.

**7.3.** **Payment by Guarantors**. Subject to Section 7.2, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)), Guarantors will upon demand pay, or cause to be paid, in cash, to Administrative Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

**7.4.** **Liability of Guarantors Absolute**. Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full in cash of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)        this Guaranty is a guaranty of payment when due and not of collectability;

(b)        this Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(c)        the obligations of each Guarantor hereunder are independent of the obligations of Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Borrower or any of such other guarantors and whether or not Borrower is joined in any such action or actions;

(d)        payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the generality of the foregoing, if Administrative Agent is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e)        any Beneficiary, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for the benefit of such Beneficiary in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that such Beneficiary may have against any such security, in each case as such Beneficiary in its discretion may determine consistent herewith or the Earnout Agreement and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against any other Credit Party or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Credit Documents or the Earnout Agreement; and

(f)        this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full in cash of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents or the Earnout Agreement, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or

provisions (including provisions relating to events of default) hereof, any of the other Credit Documents, the Earnout Agreement or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document, the Earnout Agreement or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or the Earnout Agreement or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Holdings or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

   **7.5.    Waivers by Guarantors**. Each Guarantor hereby waives, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of any Credit Party or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrower or any other Guarantor from any cause other than payment in full in cash of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to willful misconduct or bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, under the Earnout Agreement or under any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrower and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

   **7.6.    Guarantors' Rights of Subrogation, Contribution, Etc.**. Until the Guaranteed Obligations shall have been indefeasibly paid in full in cash, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Borrower or any

other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary. In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full in cash, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 7.2. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full in cash, such amount shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

**7.7.   Subordination of Other Obligations**. Any Indebtedness of Borrower or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Administrative Agent on behalf of Beneficiaries and shall forthwith be paid over to Administrative Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

**7.8.   Continuing Guaranty**.  This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations (other than (x) any unasserted contingent indemnification obligations and (y) obligations in respect of the Earnout Agreement) shall have been paid in full in cash and the Commitments shall have terminated. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7.9.   Authority of Guarantors or Borrower**. It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**7.10.   Financial Condition of Borrower**. Any Credit Extension may be made to Borrower or continued from time to time, and the Earnout Agreement may be entered into, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Borrower at the time of any such grant or continuation or at the time the Earnout Agreement is entered into, as the case may be. No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Borrower. Each Guarantor has adequate means to obtain information from Borrower on a continuing basis concerning the financial condition of Borrower and its ability to perform its obligations under the Credit Documents and the Earnout Agreement, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrower

and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Borrower now known or hereafter known by any Beneficiary.

**7.11.   Bankruptcy, Etc.**

(a)      So long as any Guaranteed Obligations remain outstanding, no Guarantor shall, without the prior written consent of Administrative Agent acting pursuant to the instructions of the Requisite Lenders, commence or join with any other Person in commencing any bankruptcy, reorganization or insolvency case or proceeding of or against Borrower or any other Guarantor. The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any other Guarantor or by any defense which Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding.

(b)      Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve Borrower of any portion of such Guaranteed Obligations. Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar Person to pay Administrative Agent, or allow the claim of Administrative Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)      In the event that all or any portion of the Guaranteed Obligations are paid by Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder.

**7.12.   Discharge of Guaranty Upon Sale of Guarantor**. If all of the Equity Interests of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.

**SECTION 8. EVENTS OF DEFAULT**

**8.1.   Events of Default**. If any one or more of the following conditions or events shall occur:

(a)      <u>Failure to Make Payments When Due</u>. Failure by Borrower to pay (i) when due any Installment or principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise or (ii) any interest on any Loan or any fee or any premium or any other amount due hereunder within three (3) Business Days after the date due; or

(b)      <u>Default in Other Agreements</u>. (i) Failure of any Credit Party or any of its Subsidiaries to pay when due any principal of or interest on or any other amount, including any payment in settlement, payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in Section 8.1(a)) in an individual principal amount of $50,000,000 or more or with an aggregate principal amount of $50,000,000 or more, in each case beyond the grace period, if any, provided therefor; or (ii) breach or default by any Credit Party or any of its Subsidiaries with respect to any other material term of (1) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above or (2) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness, in each case beyond the grace period, if any, provided therefor, if the holder or holders of that Indebtedness (or a trustee on behalf of such holder or holders), cause that Indebtedness to become or be declared due and payable (or subject to a compulsory repurchase or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; or

(c)      <u>Breach of Certain Covenants</u>. Failure of any Credit Party or any of its Subsidiaries to comply, observe or perform, or to cause any of its Subsidiaries to comply, observe or perform, any agreement, condition, covenant or term contained in Section 5.1(e), Section 5.2 (with respect to the existence of Holdings, Borrower and the Special Purpose Subsidiaries only), Section 5.11, Section 5.14, Section 5.16 or Section 6; <u>provided</u> that any Event of Default under the Financial Covenant shall be subject to Borrower's right to cure pursuant to Section 8.2; or

(d)      <u>Breach of Representations, Etc.</u> Any representation, warranty, certification or other statement made or deemed made by any Credit Party or any of its Subsidiaries in any Credit Document or in any certificate, document, report or statement at any time delivered, furnished or given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(e)      <u>Other Defaults Under Credit Documents</u>. Any Credit Party or any of its Subsidiaries shall default in the compliance with or observance or performance of any agreement, condition, covenant or term contained herein or any of the other Credit Documents, other than any such agreement, condition, covenant or term referred to in any other paragraph of this Section 8.1, and such default shall not have been remedied or waived within thirty days after the earlier of (i) any Financial Officer or other executive officer of such Credit Party or Subsidiary becoming actually aware of such default or (ii) receipt by Borrower of notice from Administrative Agent of such default; or

(f)      <u>Involuntary Bankruptcy; Appointment of Receiver, Etc.</u> (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of Holdings or any of its Significant Subsidiaries in an involuntary case under any Debtor Relief Laws now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal or state law; (ii) an involuntary case shall be commenced against Holdings or any of its Significant Subsidiaries under any Debtor Relief Laws now or hereafter in effect; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over Holdings or any of its Significant Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of Holdings or any of its Significant Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of Holdings or any of its Significant Subsidiaries, and any such event described in this clause (ii) shall continue for sixty (60) days without having been dismissed, bonded or discharged or (iii) except as permitted by Section 6.5, any order, judgment or decree shall be entered against any Credit Party or any of its Significant Subsidiaries decreeing the dissolution or split up of such Credit Party or Significant Subsidiary and such order shall remain undischarged or unstayed for a period in excess of thirty (30) days; or

(g)     Voluntary Bankruptcy; Appointment of Receiver, Etc. (i) Holdings or any of its Significant Subsidiaries shall have an order for relief entered with respect to it or shall commence a voluntary case under any Debtor Relief Laws now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or Holdings or any of its Significant Subsidiaries shall make any assignment for the benefit of creditors; or (ii) Holdings or any of its Significant Subsidiaries shall be unable, or shall fail generally, or shall admit in writing in any filing with the Securities and Exchange Commission or any Governmental Authority or any press release or similar public disclosure its inability, or any Financial Officer or other executive officer of Holdings or any of its Significant Subsidiaries shall admit in writing Holdings' or any of its Significant Subsidiaries' inability, to pay its debts as such debts become due; or

(h)     Judgments and Attachments. Any money judgment, writ or warrant of attachment or similar process involving (i) in any individual case an amount in excess of $50,000,000 or (ii) in the aggregate at any time an amount in excess of $50,000,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against Holdings or any of its Significant Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of sixty (60) days; or

(i)     Employee Benefit Plans. An ERISA Event shall occur that, when taken together with all other ERISA Events that shall have occurred, would result in a Material Adverse Effect; or

(j)     Change of Control. A Change of Control shall occur; or

(k)     Guaranties, Collateral Documents and other Credit Documents. At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full in cash of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full in cash of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Collateral Agent shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents having an aggregate fair market value of $10,000,000 or more with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Collateral Agent or any Secured Party to take any action within its control, or (iii) any Credit Party or Subsidiary shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability, including with respect to future advances by Lenders, under any Credit Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered by the Collateral Documents; or

(l)     Master Lease Documents. (i) Failure by Holdings or any of its Subsidiaries to pay when due any amounts under any Master Lease Document in excess of $1,000,000 beyond the grace period, if any, provided therefor, (ii) the termination of any Master Lease Document except as permitted in accordance with the express terms of such Master Lease Document (including any severance of any Master Lease by the lessor thereunder into one or more separate Leases or any exercise by such lessor or the applicable Special Purpose Tenant Subsidiary of any right to terminate such Master Lease Document with respect to a particular property (other than in connection with an event of default thereunder)) or (iii) the acceleration of all rent payable under any Master Lease Document; or

(m)      Material Agreements. A termination under any Material Agreement by any counterparty thereto after the occurrence of a breach or default thereunder by Holdings or any of its Subsidiaries that gives such counterparty a right to terminate unless such termination or right to terminate is subject to a bona fide dispute which has not yet been resolved pursuant to a final, non-appealable judgment by a court of competent jurisdiction that such breach or default has occurred and permitted the counterparty to terminate;

**THEN**, (1) upon the occurrence of any Event of Default described in Section 8.1(f) or 8.1(g), automatically, and (2) upon the occurrence and during the continuance of any other Event of Default, at the request of (or with the consent of) Requisite Lenders, upon notice to Borrower by Administrative Agent, (A) the Commitments, if any, of each Lender having such Commitments shall immediately terminate; (B) each of the following shall immediately become due and payable, in each case without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party: (I) the unpaid principal amount of and accrued interest, fees and premiums on the Loans and (II) all other Obligations; and (C) Administrative Agent may cause Collateral Agent to enforce any and all Liens and security interests created pursuant to Collateral Documents.

**8.2.      Borrower's Right to Cure**. Notwithstanding anything to the contrary contained in Section 8.1, for purposes of determining whether an Event of Default has occurred under the Financial Covenant, any equity contribution (in the form of common equity or other equity having terms reasonably acceptable to Administrative Agent) made to Borrower after the last day of any Fiscal Quarter and on or prior to the day that is 10 Business Days after the day on which financial statements are required to be delivered for that Fiscal Quarter will, at the request of Borrower, be included in the calculation of Consolidated Adjusted EBITDA solely for the purposes of determining compliance with the Financial Covenant at the end of such Fiscal Quarter and any subsequent period that includes such Fiscal Quarter (any such equity contribution, a "**Specified Equity Contribution**"); provided that (a) Borrower shall not be permitted to so request a Specified Equity Contribution be included in the calculation of Consolidated Adjusted EBITDA with respect to any Fiscal Quarter unless, after giving effect to such requested Specified Equity Contribution, there shall be no more than two (2) Fiscal Quarters in the Relevant Four Fiscal Quarter Period in respect of which a Specified Equity Contribution is made, (b) no more than five (5) Specified Equity Contributions will be made in the aggregate, (c) the amount of any Specified Equity Contribution will be no greater than the amount required to cause Borrower to be in compliance with the Financial Covenant, (d) all Specified Equity Contributions will be disregarded for all other purposes under the Credit Documents (including calculating Consolidated Adjusted EBITDA for purposes of determining Consolidated Excess Cash Flow), (e) the proceeds of all Specified Equity Contributions (x) will be applied to prepay the Loans or to maintain working capital, equity capital or any other financial statement condition or liquidity of Borrower and (y) will not be applied to fund any investments, acquisitions, Restricted Junior Payments, transactions with Affiliates or for any other purpose and (f) the proceeds of any Restricted Junior Payment made pursuant to Section 6.4 during the period commencing on the first day of the Fiscal Quarter for which any Specified Equity Contribution is made and ending on the date that is 10 Business Days after the day on which financial statements are required to be delivered for such Fiscal Quarter shall not be used to make such Specified Equity Contribution.  To the extent that the proceeds of the Specified Equity Contribution are used to repay Indebtedness, such Indebtedness shall not be deemed to have been repaid for purposes of calculating the Financial Covenant for the Relevant Four Fiscal Quarter Period.  For purposes of this paragraph, the term "**Relevant Four Fiscal Quarter Period**" shall mean, with respect to any requested Specified Equity Contribution, the four Fiscal Quarter period ending on (and including) the Fiscal Quarter in which Consolidated Adjusted EBITDA will be increased as a result of such Specified Equity Contribution.  Upon Administrative Agent's receipt of a written notice from Borrower specifying that a Specified Equity Contribution shall be made (a "**Notice of Intent to Cure**"), until the 10th Business Day following the date on which financial statements for the Fiscal Quarter to which such Notice of Intent to Cure relates are required to be delivered, neither Administrative Agent (nor any sub-agent therefor) nor any Lender shall exercise any right to accelerate the Loans or terminate

the Commitments, and none of Administrative Agent (nor any sub-agent therefor), any Lender or any other Secured Party shall exercise any right to foreclose on or take possession of the Collateral or exercise any other remedy against the Collateral solely on the basis of an allegation of an Event of Default having occurred and being continuing due to the failure to comply with the Financial Covenant for the applicable period.

## SECTION 9. AGENTS

**9.1.    Appointment of Agents**. GLAS USA LLC is hereby appointed Administrative Agent hereunder and under the other Credit Documents and each Lender hereby authorizes GLAS USA LLC to act as Administrative Agent in accordance with the terms hereof and the other Credit Documents. GLAS Americas LLC is hereby appointed Collateral Agent hereunder and under the other Credit Documents and each Lender hereby authorizes GLAS Americas LLC to act as Collateral Agent in accordance with the terms hereof and the other Credit Documents. Each Agent hereby agrees to act in its capacity as such upon the express conditions contained herein and the other Credit Documents, as applicable. Other than Sections 9.8(d) and (e), in respect of which Borrower is a third-party beneficiary, the provisions of this Section 9 are solely for the benefit of Agents and Lenders and no Credit Party shall have any rights as a third party beneficiary of any such provisions. In performing its functions and duties hereunder, each Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Holdings or any of its Subsidiaries. It is understood and agreed that the use of the term "agent" herein or in any other Credit Documents (or any other similar term) with reference to Administrative Agent or Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

## 9.2.    Powers and Duties.

(a)    Each Lender irrevocably authorizes each Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies and perform such duties hereunder and under the other Credit Documents as are specifically delegated or granted to such Agent by the terms of this Agreement and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. Each Agent shall have only those duties and responsibilities that are expressly specified in the Credit Documents to which it is party. Each Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. No Agent shall have, by reason of this Agreement or any of the other Credit Documents, a fiduciary relationship in respect of any Lender or any other Person; and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any duties or obligations in respect of this Agreement or any of the other Credit Documents except as expressly set forth herein or therein, and all duties of Agents hereunder shall be administrative in nature.

(b)    Notwithstanding anything else to the contrary in this Agreement or any other Credit Document, but subject to Section 9.3(b), whenever reference is made in this Agreement or any other Credit Document to any discretionary action by, any consent, designation, specification, requirement or approval of or satisfaction with, any notice, request or other communication from, any selection, determination or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by an Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction, acceptance or approval or other exercise of discretion, rights or remedies to be made (or not to be made) by an Agent, such provision shall refer to such Agent exercising each of the foregoing at the direction of the Requisite Lenders; provided that the foregoing shall not apply to the following: (i) whether any item or sum of money has been delivered to or received by either Agent, (ii) the appointment of any sub-agent or attorney-in-fact

-104-

by either Agent pursuant to this Section 9 or the resignation or removal of either Agent otherwise in accordance with this Section 9, (iii) any matter pertaining to compliance by any Agent with its internal policies, any law applicable to it, including without limitation, the PATRIOT Act or any matter relating to the reimbursement of fees or expenses of or indemnification of any Agent, (iv) subject to Section 9.8, the making of any filings, registrations or recordings or holding any pledged collateral in each case as any Agent may deem appropriate in connection with the perfection of the Liens granted in respect of the Collateral (for the avoidance of doubt, each Agent will take any such action if requested by the Requisite Lenders), (v) releases or documentation to be executed by Agents in accordance with Section 9.8(d) or (e) or (vi) any matter or action relating to or requiring determination with respect to the daily ordinary course administration of the Credit Documents, including but not limited to (A) the posting of any documents and notices to the Lenders or Borrower, including with respect to the use of the Platform, (B) the maintenance of the Register, the calculation, processing and payment of any principal, interest or fees, whether optional or mandatory in nature and the determination of the Applicable Margin, the Adjusted Eurodollar Rate or Base Rate or any component definition thereof, (C) the processing of any assignments or consents by Administrative Agent otherwise permitted by Section 10.6, (D) any matter with respect to any fees payable to any Agent for its own account and (E) Administrative Agent's discretion to waive or refuse to waive any processing and recordation fee pursuant to Section 10.6; provided, further, that in each case, each Agent may at its sole discretion elect to seek the instruction of the Requisite Lenders and any Agent shall be fully justified in failing or refusing to take any such action if it shall not have received written instruction, advice or concurrence from the Requisite Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in any other Credit Document) in respect of such actions.

**9.3.    General Immunity**.

(a)    No Responsibility for Certain Matters. No Agent shall be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of this Agreement or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by any Agent to Lenders or by or on behalf of any Credit Party to any Agent or any Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, the existence, value, perfection or priority of any collateral security or any failure by any Credit Party or any other Person (other than itself) to perform any of its obligations hereunder or under any other Credit Document or the performance or observance of any covenants, agreements, or other terms or conditions set forth herein or therein, nor shall any Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing. Anything contained herein to the contrary notwithstanding, Administrative Agent shall not have any liability arising from confirmations of the amount of outstanding Loans.

(b)    Exculpatory Provisions. No Agent nor any of its officers, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by any Agent under or in connection with any of the Credit Documents (i) with the consent of, or at the request of, the Requisite Lenders (or such other number or percentage of Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances, as provided for herein or in the other Credit Documents), or (ii) in the absence of such Agent's gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction. Each Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or

thereunder unless and until such Agent shall have received instructions in respect thereof from the Requisite Lenders (or Administrative Agent acting with the consent of the Requisite Lenders or such other Lenders as may be required to give such instructions under Section 10.5, as applicable) and, upon receipt of such instructions from the Requisite Lenders (or such other Lenders, as the case may be), such Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions, including for the avoidance of doubt refraining from any action that, in its opinion or the opinion of its counsel, may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law. Without prejudice to the generality of the foregoing, (i) each Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, or upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, (ii) each Agent shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Holdings and its Subsidiaries), accountants, experts and other professional advisors selected by it, and no Agent shall be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants, experts or other professional advisors; and (iii) no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of the Requisite Lenders (or such other Lenders as may be required to give such instructions under Section 10.5). No Agent shall be deemed to have knowledge of any Default or Event of Default or of any event or events that give or may give rise to any Default or Event of Default unless and until written notice describing such Default or Event of Default, identified as a "notice of default", and such event or events is given to Agents by the Credit Parties or any Lender. Without limiting any of the foregoing:

(i)     Neither Agent shall (i) be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing; (ii) have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that Agent is required to exercise as directed in writing by Requisite Lenders (or such other number or percentage of Lenders as shall be expressly provided for herein or in the other Credit Documents); and in all cases each Agent shall be fully justified in failing or refusing to act hereunder or under any other Credit Documents unless it shall (a) receive written instructions from the Requisite Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Credit Documents) specifying the action to be taken and (b) be indemnified to its satisfaction by the Lenders against any and all liability and expenses which may be incurred by it by reason of taking or continuing to take any such action; provided that neither Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose it to liability or that is contrary to any applicable Credit Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law; (iii) except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, or be liable for the failure to disclose, any information relating to any Credit Party or any of its Affiliates that is communicated to or obtained by any Agent or any of its Affiliates in any capacity; and (iv) be liable for any apportionment or distribution of payments made by it in good faith and, if any such apportionment or distribution is subsequently determined to have been made in error, the sole recourse of any Lender to whom payment was due but not made shall be to recover from other Lenders any payment in excess of the amount to which they are determined to be entitled (and such other Lenders hereby agree to return to such Lender any such erroneous payments received by them).

(ii)    Each Agent shall be entitled to request written instructions, or clarification of any instruction or request, from the Requisite Lenders (or, if the relevant Credit Document stipulates the matter is a decision for any other Lender or group of Lenders, from that Lender or group of Lenders) as to whether,

and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion, and each Agent may without any liability hereunder or under any other Credit Document refrain from acting unless and until it receives those written instructions or that clarification. In the absence of such written instructions, each Agent may act (or refrain from acting) as it considers to be in the best interests of the Lenders. The instructions as aforesaid and any action taken or failure to act pursuant thereto by any Agent shall be binding on all of the Lenders.

(iii)     Neither Agent shall be obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

(iv)     Neither Agent shall be responsible for any unsuitability, inadequacy, expiration or unfitness of any security interest created hereunder or pursuant to any other Credit Document nor shall it be obligated to make any investigation into, and shall be entitled to assume, the adequacy and fitness of any security interest created hereunder or pursuant to any other Credit Document.

(v)     Neither Agent shall be responsible or liable for any failure or delay in the performance of its obligations hereunder or under any other Credit Document arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

(c)     Delegation of Duties. Each of Administrative Agent and Collateral Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by it. Each of Administrative Agent, Collateral Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory, indemnification and other provisions of this Section 9 and of Section 10.3 shall apply to the Affiliates of Administrative Agent and Collateral Agent. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Section 9 and of Section 10.3 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein. Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by Administrative Agent or Collateral Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of Credit Parties and the Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to Administrative Agent or Collateral Agent, as the case may be, and not to any Credit Party, Lender or any other Person and no Credit Party, Lender or any other Person shall have any rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.   Neither Administrative Agent nor Collateral Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final, non-appealable judgment that Administrative Agent or Collateral Agent, as applicable, acted with bad faith, gross negligence or willful misconduct in the selection of such sub agents.

**9.4.     Agents Entitled to Act as Lender**. Nothing contained herein or in any other Credit Document shall in any way impair or affect any of the rights and powers of, or impose any duties or

obligations upon, any Agent in its individual capacity as a Lender hereunder. With respect to its participation in the Loans, each Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "Lender" shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity. Any Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Holdings or any of its Affiliates as if it were not performing the duties specified herein, and may accept premiums and fees and other consideration from Borrower for services in connection herewith and otherwise without having to account for the same to Lenders.

**9.5.    Lenders' Representations, Warranties and Acknowledgment**.

(a)    Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of Holdings and its Subsidiaries. No Agent shall have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and no Agent shall have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

(b)    Each Lender, by delivering its signature page to this Agreement or an Assignment Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by any Agent, Requisite Lenders or any other Lenders, as applicable, on the Closing Date. Notwithstanding anything herein to the contrary, each Lender also acknowledges that the Liens and security interests granted to the Collateral Agent pursuant to the Pledge and Security Agreement and the other Collateral Documents on Collateral and the exercise of any right or remedy by Collateral Agent under any of the foregoing with respect to the Collateral are subject to the provisions of the Intercreditor Agreement. As to any such Collateral, in the event of a conflict between the terms of the Intercreditor Agreement, this Agreement or any other Collateral Documents (on the other hand), the terms of the Intercreditor Agreement shall govern and control.

(c)    Each Lender acknowledges that the Sponsors or entities controlled by the Sponsors are Eligible Assignees hereunder and may purchase Loans and/or Commitments hereunder from Lenders from time to time, subject to the restrictions set forth in the definition of "Eligible Assignee" and Section 10.6.

**9.6.    Right to Indemnity**. Each Lender, in proportion to its Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's Pro Rata Share at such time or, if such indemnity or reimbursement is sought after the date upon which the Loans shall have been paid in full in cash and the Commitments have been terminated, based on each Lender's Pro Rata Share in effect immediately prior to such date), severally agrees to indemnify each Agent, to the extent that such Agent shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Agent in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Agent in any way relating to or arising out of this Agreement or the other Credit Documents; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Agent's gross negligence, bad faith or willful misconduct, as determined by a final, non-appealable judgment of a court of competent jurisdiction. If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent,

be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided that in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof; provided, further, that this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

**9.7.    Successor Agent**. Each Agent shall have the right to resign at any time by giving prior written notice thereof to Lenders and Borrower. No such resignation shall require any consent or approval of any type or nature from Holdings, any Subsidiary, any Lender or other Person.  The Requisite Lenders may, without the consent of Administrative Agent or Borrower, remove Administrative Agent for any reason upon thirty (30) days' notice to Administrative Agent and Borrower.  In the event of such resignation or removal, the Requisite Lenders shall have the right to appoint a financial institution to act as successor Agent hereunder, subject to (unless an Event of Default has occurred and is occurring) the consent of Borrower (such consent not to be unreasonably withheld, conditioned or delayed).  Any Agent's resignation or removal shall become effective on the earliest of (i) thirty (30) days after delivery of the notice of resignation or removal (regardless of whether a successor has been appointed or not), (ii) the acceptance of such successor Agent by Borrower (unless an Event of Default has occurred and is occurring) and the Requisite Lenders or (iii) such other date, if any, agreed to by the Requisite Lenders and (unless an Event of Default has occurred and is occurring) Borrower.  If the Requisite Lenders have not so appointed a successor Agent within such thirty (30) days, the Requisite Lenders shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents (it being understood that the Requisite Lenders may appoint a successor Agent at any time after such thirty (30) days).   Upon the acceptance of any appointment as Agent hereunder by a successor Agent, that successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent (other than any rights to indemnity payments owed to the retiring Agent) and the retiring Agent shall promptly transfer to such successor Agent all records and other documents necessary or appropriate in connection with the performance of the duties of the successor Agent under the Credit Documents that are held by it, if not already transferred as provided above in this paragraph, whereupon such retiring Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents, if not already discharged therefrom as provided above in this paragraph. After any retiring Agent's resignation or removal hereunder as Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent hereunder.   After the retiring Agent's resignation or removal hereunder and under the other Credit Documents, the provisions of this Article, Section 10.3, Section 10.4 and Sections 10.14 through 10.16 shall continue in effect for the benefit of such retiring Agent, its sub agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Administrative Agent or Collateral Agent, as applicable.

**9.8.    Collateral Documents and Guaranty**.

(a)    Agents under Collateral Documents and Guaranty. Each Secured Party hereby further authorizes Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of the Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Guaranty, the Collateral and the Credit Documents; provided that neither Administrative Agent nor Collateral Agent shall owe any duty (including but not limited to any fiduciary duty, duty of loyalty, duty of care or duty of disclosure) or any other obligation whatsoever to Earnout Co. with respect to the Earnout Agreement. Subject to Section 10.5, without further written consent or authorization from any Secured Party, Administrative Agent or, if instructed by Administrative Agent, Collateral Agent, as applicable, may

execute any documents or instruments necessary to (i) in connection with a sale or disposition of assets permitted by this Agreement to a Person that is not a Credit Party, release any Lien encumbering any item of Collateral that is the subject of such sale or other disposition of assets or to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented, and (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which Requisite Lenders (or such other Lenders as may be required to give such consent under Section 10.5) have otherwise consented.  In the event of any conflict between the terms of the Intercreditor Agreement and any of the Credit Documents, the provisions of the Intercreditor Agreement shall govern and control. Notwithstanding anything to the contrary in any Credit Document, in the event of any conflict between the terms of this Agreement and any other Credit Document, the terms of this Agreement shall govern and control.  Each Secured Party authorizes and instructs Administrative Agent and Collateral Agent to enter into the Collateral Documents and the Intercreditor Agreement on behalf of the Secured Parties in accordance with this Agreement (and consents to the terms contained therein) and to take all actions (and execute all documents) required (or deemed advisable) by it in accordance with the terms of the Intercreditor Agreement or Collateral Documents.  Notwithstanding anything herein or in any other Credit Documents to the contrary, neither Administrative Agent nor Collateral Agent shall have any responsibility for the preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created under the Collateral Documents.

(b)     Right to Realize on Collateral and Enforce Guaranty. Anything contained in any of the Credit Documents to the contrary notwithstanding, Borrower, Administrative Agent, Collateral Agent and each Secured Party hereby agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder and under any of the Credit Documents may be exercised solely by Administrative Agent or Collateral Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms of this Agreement and thereof and all powers, rights and remedies under the Collateral Documents may be exercised solely by Administrative Agent and Collateral Agent, as applicable, for the benefit of the Secured Parties in accordance with the terms thereof and the Intercreditor Agreement, and (ii) in the event of a foreclosure or similar enforcement action by Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition (including, without limitation, pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code), Collateral Agent or Administrative Agent (or any Lender, except with respect to a "credit bid" pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code) may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and Collateral Agent or Administrative Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities) shall be entitled, upon instructions from the Requisite Lenders, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or disposition, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by Collateral Agent at such sale or other disposition.

(c)     Rights under the Earnout Agreement.  The Earnout Agreement will not create (or be deemed to create) in favor of Earnout Co. any rights in connection with the management or release of any Collateral or of the obligations of any Guarantor under the Credit Documents except as expressly provided in Section 10.5(d)(iii) of this Agreement.  By accepting the benefits of the Collateral, Earnout Co. shall be deemed to have appointed Collateral Agent as its agent and agreed to be bound by the Credit Documents as a Secured Party, subject to the limitations set forth in this clause (c).

(d)     Release of Collateral and Guarantees, Termination of Credit Documents. Notwithstanding anything to the contrary contained herein or any other Credit Document, at the sole expense of Borrower, when all Obligations (other than (x) any unasserted contingent indemnification obligations and (y) obligations in respect of the Earnout Agreement) have been paid in full in cash and all Commitments have

-110-

terminated or expired, upon request of Borrower, Administrative Agent and Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Lender or Earnout Co.) take such actions as shall be required to release its security interest in all Collateral solely with respect to such Obligations, and to release all guarantee obligations provided for in any Credit Document, whether or not on the date of such release there may be outstanding Obligations in respect of the Earnout Agreement.  Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(e)     Release of Collateral in Respect of Permitted Dispositions. Upon any disposition of property, including the Equity Interests of any Guarantor, permitted by this Agreement (other than to another Credit Party), the Liens granted pursuant to the Collateral Documents in respect of such disposed property and in respect of the property of any Guarantor discharged and released from its Guaranty pursuant to Section 7.12 shall be deemed to be automatically released and such property shall automatically revert to the applicable Credit Party with no further action on the part of any Person.  Administrative Agent shall direct the Collateral Agent to (without notice to, or vote or consent of, any Lender), at the applicable Credit Party's sole cost and expense, execute and deliver or otherwise authorize the filing of such documents as such Credit Party shall reasonably request to effectuate the release set forth in the preceding sentence, without recourse to, covenant or warranty of any nature, express or implied, by and otherwise in form and substance reasonably satisfactory to Administrative Agent, including financing statement amendments to evidence any release; provided that, in each case, Borrower shall have delivered to Administrative Agent and Collateral Agent, at their request, a certificate of a Financial Officer certifying that any such transaction has been consummated in compliance with this Agreement and the other Credit Documents and that such release is permitted hereby (and each Lender hereby authorizes and directs each Agent to conclusively rely on such certificate in performing its obligations under this sentence).  If Borrower or any Guarantor is entitled under this Section 9.8 to the release of any Real Estate Asset from the Lien of any Mortgage, then, at Borrower's request, Administrative Agent shall direct the Collateral Agent to (without notice to, or vote or consent of, any Lender), at the applicable Credit Party's sole cost and expense, execute and deliver an assignment of such Mortgage in lieu of a release thereof, without recourse to, covenant or warranty of any nature (other than a warranty that the Collateral Agent shall not have assigned or encumbered its interest in such Mortgage), express or implied, by and otherwise in form and substance reasonably satisfactory to Administrative Agent to a new lender designated by such Credit Party; provided that, in each case, Borrower shall have delivered to Administrative Agent and Collateral Agent, at their request, a certificate of a Financial Officer certifying that any such transaction has been consummated in compliance with this Agreement and the other Credit Documents and that a release of such Mortgage would be permitted hereby (and each Lender hereby authorizes and directs each Agent to conclusively rely on such certificate in performing its obligations under this sentence).

(f)     Agents shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Lien thereon in favor of Collateral Agent, for the benefit of the Secured Parties, or any certificate prepared by any Credit Party in connection therewith, nor shall any Agent have any duty to, and shall not be responsible or liable to the Lenders for any failure to, monitor or maintain or preserve any portion of the Collateral, any security interests of Administrative Agent or Collateral Agent therein or any filings, registrations, or recordings made with respect thereto. Neither Collateral Agent nor Administrative Agent shall have any obligation whatsoever to any Lender or any other person to investigate, confirm or assure that the Collateral exists or is owned by any Credit Party or is insured or has been encumbered, or that the liens and security interests granted to Collateral Agent pursuant hereto or any of

the Credit Documents or otherwise have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority.

(g)     Collateral Agent may conclusively rely on any instruction received by it from Administrative Agent that is in accordance with the appropriate consents from the Lenders or the Requisite Lenders (as applicable) pursuant to the terms of this Agreement.

**9.9.     Withholding Taxes**. To the extent required by any applicable law, Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding Tax ineffective or for any other reason, or if Administrative Agent reasonably determines that a payment was made to a Lender pursuant to this Agreement without deduction of applicable withholding tax from such payment, such Lender shall indemnify Administrative Agent fully for all amounts paid, directly or indirectly, by Administrative Agent as Tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of- pocket expenses) incurred.

**9.10.     Administrative Agent or Collateral Agent May File Bankruptcy Disclosure and Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Credit Party, Administrative Agent and Collateral Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent or Collateral Agent shall have made any demand on Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)     to file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure that, in its sole opinion, complies with such rule's disclosure requirements for entities representing more than one creditor;

(b)     to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, Administrative Agent and Collateral Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of Lenders, Administrative Agent, Collateral Agent and their respective agents and counsel and all other amounts due Lenders, Administrative Agent and Collateral Agent under Section 2.11 and Section 10.2) allowed in such judicial proceeding; and

(c)     to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Administrative Agent and, in the event that Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to Administrative Agent or Collateral Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent, Collateral Agent and their respective agents and counsel, and any other amounts due Administrative Agent or Collateral Agent under Section 2.11 and Section 10.2.  To the extent that the payment of any such compensation, expenses, disbursements and advances of Administrative Agent, Collateral Agent and their respective agents and

counsel, and any other amounts due Administrative Agent or Collateral Agent under this Agreement out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Lenders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise.

Nothing contained herein shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding

**9.11.    Certain ERISA Matters**.

(a)    Each Lender (x) represents and warrants, as of the date such person became a Lender party hereto, to, and (y) covenants, from the date such person became a Lender party hereto to the date such person ceases being a Lender party hereto, for the benefit of, Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the applicable Administrative Agent and such Lender.

(b)    In addition, unless either (1) sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such person became a Lender party hereto, to, and (y) covenants, from the date such person became a Lender party hereto to the date such person ceases being a Lender party hereto, for the benefit of, Administrative Agent and its Affiliates and not, for the avoidance of doubt, to or for the

-113-

benefit of Borrower or any other Credit Party, that none of Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by an Administrative Agent under this Agreement, any Credit Document or any documents related hereto or thereto).

## SECTION 10. MISCELLANEOUS

### 10.1.    Notices.

(a)    Notices Generally. Any notice or other communication herein required or permitted to be given to a Credit Party or Agent shall be sent to such Person's address as set forth on Appendix B or in the other relevant Credit Document, and in the case of any Lender, the address as indicated on Appendix B or otherwise indicated to Administrative Agent in writing. Except as otherwise set forth in paragraph (b) below, each notice hereunder shall be in writing and may be personally served or sent by facsimile (except for any notices sent to Administrative Agent) or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of facsimile, or three (3) Business Days after depositing it in the United States mail with postage prepaid and properly addressed; provided that no notice to any Agent shall be effective until received by such Agent; provided, further, that any such notice or other communication shall at the request of Administrative Agent or Collateral Agent be provided to any sub-agent appointed pursuant to Section 9.3(c) as designated by Administrative Agent or Collateral Agent from time to time.

(b)    Electronic Communications.

(i)    Notices and other communications to any Agent and Lender hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites, including the Platform) pursuant to procedures approved by Administrative Agent, provided that the foregoing shall not apply to notices to any Agent or any Lender pursuant to Section 2 if such Person has notified Administrative Agent that it is incapable of receiving notices under such Section by electronic communication. Administrative Agent or Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications. Unless Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (A) of notification that such notice or communication is available and identifying the website address therefor.

(ii)    Each Credit Party understands that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of Administrative Agent, as determined by a final, non-appealable judgment of a court of competent jurisdiction.

(iii)    The Platform and any Approved Electronic Communications are provided "as is" and "as available". None of Agents or any of their respective officers, directors, employees, agents, advisors

or representatives ("**Agent Affiliates**") warrant the accuracy, adequacy, or completeness of the Approved Electronic Communications or the Platform and each expressly disclaims liability for errors or omissions in the Platform and the Approved Electronic Communications. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects is made by Agent Affiliates in connection with the Platform or the Approved Electronic Communications.

(iv)     Each Credit Party, each Lender and each Agent agrees that Administrative Agent may, but shall not be obligated to, store any Approved Electronic Communications on the Platform in accordance with Administrative Agent's customary document retention procedures and policies.

(v)     Any notice of Default or Event of Default may be provided by telephone if confirmed promptly thereafter by delivery of written notice thereof.

(c)     <u>Non-Public Information Contacts</u>. Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Non-Public Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States federal, state or other applicable securities laws, to make reference to information that is not made available through the "Public-Side Information" portion of the Platform and that may contain Non-Public Information with respect to Holdings, its Subsidiaries or their securities for purposes of United States, state or other applicable securities laws. In the event that any Public Lender has determined for itself to not access any information disclosed through the Platform or otherwise, such Public Lender acknowledges that (i) other Lenders may have availed themselves of such information and (ii) neither Borrower nor Administrative Agent has any responsibility for such Public Lender's decision to limit the scope of the information it has obtained in connection with this Agreement and the other Credit Documents.

**10.2.     Expenses**. Borrower agrees to pay promptly (a) all the reasonable and documented costs of furnishing all opinions by counsel for Borrower and the other Credit Parties; (b) the reasonable, documented fees, expenses and disbursements of counsel to Agents (limited to one counsel for all Agents taken as a whole and, if reasonably necessary, a single local counsel for all Agents taken as a whole in each relevant jurisdiction and, solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Agents similarly situated taken as a whole) and the Lenders (limited to one counsel for all Lenders taken as a whole and, if reasonably necessary, a single local counsel for all Lenders taken as a whole in each relevant jurisdiction and, solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Lenders similarly situated taken as a whole) in connection with the negotiation, preparation, execution and administration of any consents, amendments, waivers or other modifications to the Credit Documents and any other documents or matters requested by Borrower after the Closing Date; (d) all documented, out-of-pocket actual costs and reasonable expenses incurred after the Closing Date of creating, perfecting, recording, maintaining and preserving Liens in favor of Collateral Agent, for the benefit of the Secured Parties, including filing and recording fees, expenses, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to each Agent and of counsel providing any opinions that any Agent may request in respect of the Collateral or the Liens created pursuant to the Collateral Documents; (e) after the occurrence of an Event of Default, all documented, out-of-pocket costs and expenses, including reasonable attorneys' fees of the Agents (limited to one counsel for all Agents taken as a whole and, if reasonably necessary, a single local counsel for all Agents taken as a whole in each relevant jurisdiction and, solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each group of affected Agents similarly situated taken as a whole) and the Lenders (limited to one counsel for all Lenders taken as a whole and, if reasonably necessary, a single local counsel for all Lenders taken as a whole in each relevant jurisdiction and, solely in the case of a conflict of interest, one additional counsel in each relevant jurisdiction to each

group of affected Lenders similarly situated taken as a whole), reasonable fees of other professionals (including financial advisors), and costs of settlement, incurred by any Agent or Lender in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Event of Default (including in connection with the sale, lease or license of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings.  For the avoidance of doubt, the Credit Parties shall not be responsible for payment of any fees or premiums (except as contemplated pursuant to Section 2.11(a) or 2.11(c)), expenses, disbursements or costs of the Agents or the Lenders hereunder to the extent arising on or prior to the Closing Date.

       **10.3.**    **Indemnity**.

       (a)    In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, each Agent and Lender and each of their respective officers, partners, members, directors, trustees, advisors, employees, agents, sub-agents and Affiliates (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities. **THE FOREGOING INDEMNIFICATION SHALL APPLY WHETHER OR NOT SUCH INDEMNIFIED LIABILITIES ARE IN ANY WAY OR TO ANY EXTENT OWED, IN WHOLE OR IN PART, UNDER ANY CLAIM OR THEORY OF STRICT LIABILITY, OR ARE CAUSED, IN WHOLE OR IN PART, BY ANY NEGLIGENT ACT OR OMISSION OF ANY KIND BY ANY INDEMNITEE AND WHETHER OR NOT SUCH INDEMNIFIED LIABILITIES ARE IN CONNECTION WITH AN INVESTIGATION, LITIGATION, CLAIM OR PROCEEDING THAT IS BROUGHT BY ANY CREDIT PARTY, ANY EQUITYHOLDERS OR CREDITORS OF ANY CREDIT PARTY OR ANY OTHER INDEMNITEE AND WHETHER OR NOT SUCH INDEMNITEE IS OTHERWISE A PARTY HERETO**; provided, however, no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise from (x) the gross negligence, bad faith or willful misconduct of such Indemnitee or their respective controlled Affiliates, directors, employees, attorneys, agents or sub-agents, in each case, as determined by a final, non-appealable judgment of a court of competent jurisdiction, (y) arises from a material breach of the obligations of such Indemnitee hereunder (other than with respect to a breach by Collateral Agent), as determined by a final, non-appealable judgment of a court of competent jurisdiction or (z) arises from any dispute solely among Indemnitees other than (1) any claims against any Agent in its capacity or in fulfilling its role as an Agent or any similar role hereunder and (2) any claims arising out of any act or omission on the part of any Credit Party or any of its Affiliates, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

       (b)    To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against each Lender, each Agent and their respective Affiliates, directors, employees, attorneys, agents or sub-agents, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection

therewith, and Holdings and Borrower hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(c)     Each Credit Party also agrees that no Lender, Agent nor their respective Affiliates, directors, employees, attorneys, agents or sub-agents will have any liability to any Credit Party or any person asserting claims on behalf of or in right of any Credit Party or any other person in connection with or as a result of this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, in each case, except in the case of any Credit Party to the extent that any losses, claims, damages, liabilities or expenses incurred by such Credit Party or its Affiliates, equityholders, partners or other equityholders have been found by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Lender, Agent or their respective Affiliates, directors, employees, attorneys, agents or sub-agents in performing its obligations under this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein; provided, however, that in no event will such Lender, Agent, or their respective Affiliates, directors, employees, attorneys, agents or sub-agents have any liability for any indirect, consequential, special or punitive damages in connection with or as a result of such Lender's, Agent's or their respective Affiliates', directors', employees', attorneys', agents' or sub-agents' activities related to this Agreement, any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein.

(d)     This Section 10.3 shall not apply with respect to any Taxes other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

**10.4.    Set-Off**. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence of any Event of Default each Lender is hereby authorized by each Credit Party at any time or from time to time subject to the consent of Administrative Agent (such consent not to be unreasonable withheld or delayed), without notice to any Credit Party or to any other Person (other than Administrative Agent), any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including any payroll, tax or trust accounts) and any other Indebtedness at any time held or owing by such Lender to or for the credit or the account of any Credit Party against and on account of the obligations and liabilities of any Credit Party to such Lender hereunder and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto, irrespective of whether or not (a) such Lender shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such obligations and liabilities, or any of them, may be contingent or unmatured; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to Administrative Agent for further application in accordance with the provisions of Sections 2.17 and 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and their respective Affiliates under this Section 10.4 are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.

**10.5.    Amendments and Waivers**.

(a)    <u>Requisite Lenders' Consent</u>. Subject to the additional requirements of Sections 10.5(b), 10.5(c) and 10.5(d) and except as provided in Sections 10.5(f) and 10.5(g), no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of the Requisite Lenders; <u>provided</u> that Administrative Agent may, with the consent of Borrower only, amend, modify or supplement this Agreement or any other Credit Document (or direct Collateral Agent to do the same) to cure any ambiguity, omission, defect or inconsistency (as reasonably determined by Administrative Agent), so long as such amendment, modification or supplement does not adversely affect the rights of any Lender or the Lenders shall have received at least five (5) Business Days' prior written notice thereof and Administrative Agent shall not have received, within five (5) Business Days of the date of such notice to the Lenders, a written notice from the Requisite Lenders stating that the Requisite Lenders object to such amendment. Notwithstanding anything to the contrary in this Section 10.5, the Credit Parties shall be permitted to supplement or amend schedules to the Pledge and Security Agreement or Collateral Questionnaire, in each case, in accordance with [Section 18][15] of the Pledge and Security Agreement.

(b)    <u>Affected Lenders' Consent</u>. Without the written consent of each Lender (other than any Sponsor Affiliated Lender) that would be directly affected thereby, no amendment, modification, termination, waiver or consent shall be effective if the effect thereof would:

(i)    extend the scheduled final maturity of any Loan;

(ii)    waive, reduce or postpone any scheduled repayment (but not prepayment);

(iii)    reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.10) or any fee or any premium payable hereunder;

(iv)    extend the time for payment of any interest, premium or fee;

(v)    reduce the principal amount of any Loan;

(vi)    amend, modify, terminate or waive any provision of this Section 10.5(b), Section 10.5(d) or any other provision of this Agreement that expressly provides that the consent of all Lenders is required;

(vii)    amend the definition of "Requisite Lenders" or "Pro Rata Share" or, with respect to the ratable allocation of any payments only, amend, modify, terminate or waive any provision of Section 2.15, 2.16 or 2.17 or [Section 9.2][16] of the Pledge and Security Agreement;

(viii)    release or subordinate all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents and except in connection with a "credit bid" undertaken by the Collateral Agent at the direction of the Requisite Lenders pursuant to Section 363(k), Section 1129(b)(2)(a)(ii) or otherwise of the Bankruptcy Code or other sale or disposition of assets in connection with an enforcement action with respect to the Collateral

---

[15] Reference to be conformed to the Pledge and Security Agreement.

[16] Reference to be conformed to the Pledge and Security Agreement.

permitted pursuant to the Credit Documents (in which case only the consent of the Requisite Lenders will be needed for such release or subordination); or

(ix)    consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document;

provided that, for the avoidance of doubt, all Lenders shall be deemed directly affected thereby with respect to any amendment described in clauses (vii), (viii) and (ix).

(c)    Sponsor Affiliated Lenders' Consent. Without the written consent of each Sponsor Affiliated Lender that would be directly affected thereby, no amendment, modification, termination, waiver or consent shall be effective if the effect thereof would (x) materially, adversely and disproportionately affect such Sponsor Affiliated Lender in its capacity as a Lender as compared to other Lenders and (y) deprive such Sponsor Affiliated Lender of its share of any payments which the Lenders are entitled to share on a pro rata basis hereunder.

(d)    Other Consents. No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall:

(i)    increase any Commitment of any Lender over the amount thereof then in effect without the consent of such Lender; provided that no amendment, modification, termination or waiver, or consent to any departure by any Credit Party, of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Commitment of any Lender;

(ii)    alter the required application of any repayments or prepayments as between Classes pursuant to Section 2.15 without the consent of Lenders holding more than 50% of the aggregate Loan Exposure of all Lenders of each Class which is being allocated a lesser repayment or prepayment as a result thereof; provided that Requisite Lenders may waive, in whole or in part, any prepayment so long as the application, as between Classes, of any portion of such prepayment which is still required to be made is not altered;

(iii)    amend, modify, terminate or waive this Agreement or the Pledge and Security Agreement, or consent to any departure by any Credit Party therefrom, so as to alter the treatment of Obligations arising under the Earnout Agreement or the definition of "Earnout Co.", "Earnout Agreement," "Obligations," or "Secured Obligations" (as defined in any applicable Collateral Document) in each case in a manner adverse to Earnout Co. to the extent any Obligations in respect of the Earnout Agreement remain outstanding, in each case without the prior written consent of Earnout Co.; or

(iv)    amend, modify, terminate or waive any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the prior written consent of such Agent.

(e)    Execution of Amendments, Etc. Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, terminations, waivers or consents on behalf of such Lender (or direct Collateral Agent to do the same). Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.5 shall, upon delivery to Administrative Agent, be binding upon

each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

(f)     Cashless Settlement.   Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by Borrower, Administrative Agent and such Lender.

(g)     Extension Amendments. Nothing in this Section 10.5 shall be deemed to limit any Credit Party or Administrative Agent from entering into any Extension Amendments (including, without limitation, to amend the definition of "Maturity Date" to reflect any such Refinancing or Extension) to effectuate Extensions contemplated by Section 2.24 hereof, and the Lenders hereby irrevocably authorize Administrative Agent to enter into such amendments on their behalf.

(h)     Amendments for the Purpose of Granting New Liens or Adding Collateral. Notwithstanding the foregoing, any Collateral Document may be amended or otherwise modified without the consent of any Lender solely to grant a new Lien for the benefit of the Secured Parties or to extend an existing Lien in any Collateral Document over additional assets. The Collateral Agent shall execute and deliver to Administrative Agent any documents reasonably requested by Administrative Agent in connection with the foregoing.

**10.6.     Successors and Assigns; Participations**.

(a)     Generally. This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders. No Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all Lenders. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of Agents, the Lenders and other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Register. Borrower, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans (and stated interest thereon) listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of a fully executed Assignment Agreement effecting the assignment or transfer thereof, together with the required forms and certificates regarding tax matters and any fees payable in connection with such assignment, in each case, as provided in Section 10.6(d). Each assignment shall be recorded in the Register promptly following receipt by Administrative Agent of the fully executed Assignment Agreement and all other necessary documents and approvals, prompt notice thereof shall be provided to Borrower and a copy of such Assignment Agreement shall be maintained, as applicable. The date of such recordation of a transfer shall be referred to herein as the "**Assignment Effective Date".** Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(c)     Right to Assign. Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment or Loans owing to it or other Obligations (provided that pro rata assignments shall not be required and each

assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and any related Commitments):

        (i)     to any Person meeting the criteria of clause (i) of the definition of the term "Eligible Assignee" upon the giving of notice to Administrative Agent; and

        (ii)    to any Person meeting the criteria of clause (ii) of the definition of the term "Eligible Assignee" upon giving of notice to Borrower and Administrative Agent and consented to by each of Borrower and Administrative Agent (such consent not to be (x) unreasonably withheld or delayed or (y) in the case of Borrower, required at any time an Event of Default shall have occurred and then be continuing); provided, further, that (A) Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to Administrative Agent within ten (10) Business Days after having received notice thereof and (B) each such assignment pursuant to this Section 10.6(c)(ii) shall be in an aggregate amount of not less than (w) $1,000,000, (x) such lesser amount as agreed to by Borrower and Administrative Agent, (y) the aggregate amount of the Loans of the assigning Lender with respect to the Class being assigned or (z) the amount assigned by an assigning Lender to an Affiliate or Related Fund of such Lender.

        (d)    <u>Mechanics</u>.

        (i)     Assignments and assumptions of Loans and Commitments by Lenders shall be effected by manual execution and delivery to Administrative Agent of an Assignment Agreement. Assignments made pursuant to the foregoing provision shall be effective as of the Assignment Effective Date. In connection with all assignments there shall be delivered to Administrative Agent and/or Borrower, as applicable, such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver pursuant to Section 2.20(c), together with payment to Administrative Agent of a registration and processing fee of $3,500 (except that such registration and processing fee (x) shall not be payable in connection with any assignment by an assigning Lender to such Lender's Affiliates or Related Funds and (y) may be waived by Administrative Agent).

        (ii)    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of Borrower and Administrative Agent, the applicable Pro Rata Share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to Administrative Agent and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full Pro Rata Share of all Loans. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

        (e)    <u>Representations and Warranties of Assignee</u>. Each Lender, upon execution and delivery hereof or upon succeeding to an interest in the Commitments and Loans, as the case may be, represents and warrants as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee; (ii) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; (iii) it will make or invest in, as the case may be, its

Commitments or Loans for its own account in the ordinary course and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control); and (iv) it will not provide any information obtained by it in its capacity as a Lender to Sponsor or any Affiliate of Sponsor.

(f)      Effect of Assignment. Subject to the terms and conditions of this Section 10.6, as of the Assignment Effective Date (i) the assignee thereunder shall have the rights and obligations of a "Lender" hereunder to the extent of its interest in the Loans and Commitments as reflected in the Register and shall thereafter be a party hereto and a "Lender" for all purposes hereof; (ii) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned to the assignee, relinquish its rights (other than any rights which survive the termination hereof under Section 10.8) and be released from its obligations hereunder (and, in the case of an assignment covering all or the remaining portion of an assigning Lender's rights and obligations hereunder, such Lender shall cease to be a party hereto on the Assignment Effective Date; provided that anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning Lender shall continue to be entitled to the benefit of all indemnities hereunder as specified herein with respect to matters arising out of the prior involvement of such assigning Lender as a Lender hereunder); and (iii) the Commitments shall be modified to reflect any Commitment of such assignee and any Commitment of such assigning Lender, if any.

(g)      Participations.

(i)      Each Lender shall have the right at any time to sell one or more participations to any Person (other than Holdings, any of its Subsidiaries, any of its Affiliates or any natural person) in all or any part of its Commitments, Loans or in any other Obligation. Each Lender that sells a participation pursuant to this Section 10.6(g) shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register on which it records the name and address of each participant and the principal amounts (and stated interest) of each participant's participation interest with respect to the Loan (each, a "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans or its other obligations under this Agreement) except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and 1.163-5(b) of the proposed United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of a participation with respect to the Loan for all purposes under this Agreement, notwithstanding any notice to the contrary. For the avoidance of doubt, Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(ii)      The holder of any such participation, other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (A) extend the final scheduled maturity of any Loan in which such participant is participating, or reduce the rate or extend the time of payment of interest, premiums or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or of a mandatory reduction in the Commitment shall not constitute a change in the terms of such participation, and that an increase in any Commitment or Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof),

(B) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement or (C) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Guaranty (in each case, except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such participant is participating.

(iii)    Borrower agrees that each participant shall be entitled to the benefits of Sections 2.18(c), 2.19 and 2.20 (subject to the requirements and limitations therein, including the requirements under Section 2.20(c) (it being understood that the documentation required under Section 2.20(c) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (c) of this Section; provided that (x) a participant shall not be entitled to receive any greater payment under Section 2.19 or 2.20 than the applicable Lender would have been entitled to receive with respect to the participation sold to such participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after such participant acquired the participation or unless the sale of the participation to such participant is made with Borrower's prior written consent (not to be unreasonably withheld or delayed) and (y) a participant shall not be entitled to the benefits of Section 2.20 unless Borrower is notified of the participation sold to such participant and such participant agrees, for the benefit of Borrower, to comply with Section 2.20 as though it were a Lender; provided, further, that except as specifically set forth in clauses (x) and (y) of this sentence, nothing herein shall require any notice to Borrower or any other Person in connection with the sale of any participation. To the extent permitted by law, each participant also shall be entitled to the benefits of Section 10.4 as though it were a Lender; provided, further, that such participant agrees to be subject to Section 2.17 as though it were a Lender.

(h)    Certain Other Assignments and Participations.  In addition to any other assignment or participation permitted pursuant to this Section 10.6 any Lender may assign, pledge and/or grant a security interest in all or any portion of its Loans and the other Obligations owed by or to such Lender to secure obligations of such Lender including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors and any operating circular issued by such Federal Reserve Bank; provided that no Lender, as between Borrower and such Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge; provided, further, that in no event shall the applicable Federal Reserve Bank, pledgee or trustee, be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

(i)    Assignments to Sponsor Affiliated Lenders.  Each Lender shall have the right at any time to sell, assign or transfer all or a portion of its Commitment or Loans owing to it (provided, however, that each assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any applicable Loan and any related Commitments) to any Sponsor Affiliated Lender on a non-pro rata basis through (x) one or more modified Dutch auctions (each, an "**Auction**") (provided that (A) notice of the Auction shall be made to all Lenders and (B) the Auction shall be conducted pursuant to such procedures as the Auction Manager may establish which are consistent with the Auction Procedures set forth on Exhibit I and are otherwise reasonably acceptable to Borrower, the Auction Manager and Administrative Agent) or (y) any other means of purchase or assignment other than Auctions, in each case subject to the following additional limitations:

(i)    (x) the aggregate principal amount of Loans purchased by assignment pursuant to this Section 10.6(i)(i) and held at any one time by Sponsor Affiliated Lenders may not exceed 30% of the outstanding principal amount of all Loans and (y) the aggregate principal amount of Loans purchased by assignment pursuant to this Section 10.6(i)(i) and held at the time of (and after giving effect to) such purchase by Sponsor Affiliated Lenders may not exceed 20% of the outstanding principal amount of all Loans;

(ii)  the assigning Lender and the Sponsor Affiliated Lender purchasing such Lender's Loans shall execute and deliver to the Auction Manager or Administrative Agent, as applicable, an Affiliate Assignment Agreement; and

(iii)  each Sponsor Affiliated Lender, solely in its capacity as a Lender, hereby agrees, and each Affiliate Assignment Agreement shall provide, that such Sponsor Affiliated Lender shall have no right whatsoever so long as such Person is a Sponsor Affiliated Lender:

(A) to vote with respect to any amendment, modification, waiver, consent or other such action with respect to any of the terms of this Agreement or any other Credit Document and that it shall be deemed to have voted its interest as a Lender without discretion in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Sponsor Affiliated Lenders; provided that, notwithstanding the foregoing, such assignee shall be permitted to vote if such amendment, modification, waiver, consent or other such action (x) materially, adversely and disproportionately affects such Sponsor Affiliated Lender in its capacity as a Lender as compared to other Lenders and (y) deprives such Sponsor Affiliated Lender of its share of any payments which the Lenders are entitled to share on a pro rata basis hereunder;

(B) to attend (or receive any notice of) any meeting, conference call or correspondence with Administrative Agent or any Lender or receive any information from Administrative Agent or any other Lender (other than notices of borrowings, prepayments and other administrative notices in respect of its Loans or Commitments required to be delivered to Lenders pursuant to Section 2); or

(C) to make or bring any claim, in its capacity as Lender, against Administrative Agent, any other Agent or any Lender with respect to the duties and obligations of such Persons under the Credit Documents.

Notwithstanding anything to the contrary set forth herein, in connection with any amendment, modification, waiver, consent or other such action requiring the consent or approval of the Requisite Lenders, Lenders that are Sponsor Affiliated Institutional Lenders shall not be permitted, in the aggregate, to account for more than 49.9% of the amounts actually included in determining whether the threshold in the definition of "Requisite Lenders" has been satisfied.  The voting power of each Lender that is a Sponsor Affiliated Institutional Lender shall be reduced, on a pro rata basis, to the extent necessary in order to comply with the immediately preceding sentence.

Notwithstanding anything to the contrary set forth herein, each Credit Party and Sponsor Affiliated Lender hereby agrees that if a case under Chapter 11 of the Bankruptcy Code is commenced against any Credit Party or any of its Subsidiaries, such Sponsor Affiliated Lender, with respect to any plan of reorganization that does not (x) materially, adversely and disproportionately affect such Sponsor Affiliated Lender in its capacity as a Lender as compared to other Lenders and (y) deprive such Sponsor Affiliated Lender of its share of any payments which the Lenders are entitled to share on a pro rata basis hereunder, shall be deemed to have voted its interest as a Lender without discretion in the same proportion as the allocation of voting with respect to such matter by Lenders who are not Sponsor Affiliated Lenders, and each Sponsor Affiliated Lender hereby acknowledges, agrees and consents that if, for any reason, its vote

-124-

to accept or reject such plan of reorganization pursuant to the Bankruptcy Code is not deemed to have been so voted, then such vote will be "designated" pursuant to Section 1126(e) of the Bankruptcy Code such that the vote is not counted in determining whether the applicable class has accepted or rejected such plan of reorganization in accordance with Section 1126(c) of the Bankruptcy Code; provided that no Sponsor Affiliated Lender shall object in any such case in a manner inconsistent with this paragraph.

**10.7.   Independence of Covenants**. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.8.   Survival of Representations, Warranties and Agreements**. All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension. Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.18(c), 2.19, 2.20, 10.2, 10.3 and 10.4 and the agreements of Lenders set forth in Sections 2.17, 2.20, 9.3(b), 9.6 and 9.9 shall survive the payment of the Loans and the termination hereof.

**10.9.   No Waiver; Remedies Cumulative**. No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. The rights, powers and remedies given to each Agent and each Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents or the Earnout Agreement. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.10.   Marshalling; Payments Set Aside**. Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations. To the extent that any Credit Party makes a payment or payments to Administrative Agent or Lenders (or to Administrative Agent, on behalf of the Lenders), or any Agent or Lender enforces any security interests or exercises any right of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**10.11.   Severability**. In case any provision in or obligation hereunder or under any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**10.12.   Obligations Several; Independent Nature of Lenders' Rights**. The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitment of any other Lender hereunder. Nothing contained herein or in any other Credit Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall

be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**10.13.   Headings**. Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**10.14.   APPLICABLE LAW**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF AND ANY DETERMINATIONS WITH RESPECT TO POST-JUDGMENT INTEREST) SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

**10.15.   CONSENT TO JURISDICTION**. SUBJECT TO CLAUSE (E) OF THE FOLLOWING SENTENCE, ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY ARISING OUT OF OR RELATING HERETO OR ANY OTHER CREDIT DOCUMENTS, OR ANY OF THE OBLIGATIONS, SHALL BE BROUGHT IN ANY FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN THE BOROUGH OF MANHATTAN OR, IF THAT COURT DOES NOT HAVE SUBJECT MATTER JURISDICTION, IN ANY STATE COURT LOCATED IN THE CITY AND COUNTY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH CREDIT PARTY, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (A) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE (SUBJECT TO CLAUSE (E) BELOW) JURISDICTION AND VENUE OF SUCH COURTS; (B) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (C) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE CREDIT PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.1; (D) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (C) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE CREDIT PARTY IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (E) AGREES THAT AGENTS AND LENDERS RETAIN THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY CREDIT PARTY IN THE COURTS OF ANY OTHER JURISDICTION IN CONNECTION WITH THE EXERCISE OF ANY RIGHTS UNDER ANY COLLATERAL DOCUMENT, INCLUDING ANY MORTGAGE, OR AGAINST ANY COLLATERAL, INCLUDING ANY MORTGAGED PROPERTY, OR THE ENFORCEMENT OF ANY JUDGMENT, AND HEREBY SUBMITS TO THE JURISDICTION OF, AND CONSENTS TO VENUE IN, ANY SUCH COURT.

**10.16.   WAIVER OF JURY TRIAL**. EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY

CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.16 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**10.17. Confidentiality**. Each Agent and each Lender shall hold all Non-Public Information regarding Holdings, Borrower and their respective Subsidiaries, Affiliates and their businesses identified as such by Borrower and obtained by such Agent or such Lender pursuant to the requirements hereof in accordance with such Agent's and such Lender's customary procedures for handling Non-Public Information of such nature, it being understood and agreed by Borrower that, in any event, Administrative Agent may disclose such information to the Lenders and each Agent and each Lender and each Agent may make (i) disclosures of such information to Affiliates or Related Funds of such Lender or Agent and to their respective officers, directors, managers, partners, members, employees, legal counsel, investors, limited partners, independent auditors and other advisors, experts or agents who need to know such information and on a confidential basis (and to other Persons authorized by a Lender or Agent to organize, present or disseminate such information in connection with disclosures otherwise made in accordance with this Section 10.17), (ii) disclosures of such information reasonably required by any potential or prospective assignee, transferee or participant in connection with the contemplated assignment, transfer or participation of any Loans or any participations therein or by any direct or indirect contractual counterparties (or the professional advisors thereto) to any swap or derivative transaction relating to Borrower and its obligations (provided, such assignees, transferees, participants, counterparties and advisors are advised of and agree to be bound by either the provisions of this Section 10.17 or other provisions at least as restrictive as this Section 10.17), (iii) disclosure on a confidential basis to any rating agency when required by it, (iv) disclosure on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans, (v) disclosures in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, (vi) disclosures made pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such Person agrees to inform Borrower promptly thereof to the extent not prohibited by law), (vii) disclosures made upon the request or demand of any regulatory or quasi-regulatory authority purporting to have jurisdiction over such Person or any of its Affiliates and (viii) disclosures with the consent of Borrower. In addition, each Agent and each Lender may disclose the existence of this Agreement and the information about this Agreement to market data collectors, similar services providers to the lending industry, and service providers to Agents and the Lenders in connection with the administration and management of this Agreement and the other Credit Documents. Notwithstanding anything to the contrary set forth herein, each party (and each of their respective employees, representatives or other agents) may disclose to any and all persons without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions and other

tax analyses) that are provided to any such party relating to such tax treatment and tax structure. However, any information relating to the tax treatment or tax structure shall remain subject to the confidentiality provisions hereof (and the foregoing sentence shall not apply) to the extent reasonably necessary to enable the parties hereto, their respective Affiliates and their respective directors and employees to comply with applicable securities laws. For this purpose, "tax structure" means any facts relevant to the federal income tax treatment of the transactions contemplated by this Agreement but does not include information relating to the identity of any of the parties hereto or any of their respective Affiliates. Notwithstanding the foregoing, any Agent or Lender may, at its own expense and in the ordinary course of its respective business, issue customary news releases and publish "tombstone" advertisements and other announcements relating to this transaction that do not include Non-Public Information in newspapers, trade journals, and other appropriate media (which may include use of logos of one or more of the Credit Parties).

**10.18.   Usury Savings Clause**. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges, premiums or fees in connection therewith deemed in the nature of interest under applicable law shall not exceed the Highest Lawful Rate. If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full in cash the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, Borrower shall pay to Administrative Agent an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect. Notwithstanding the foregoing, it is the intention of Lenders and Borrower to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to Borrower.

**10.19.   Effectiveness; Counterparts**. This Agreement shall become effective on the Closing Date. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic format (i.e., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

**10.20.   PATRIOT Act**. Each Lender and Agent (for itself and not on behalf of any Lender) hereby notifies each Credit Party that pursuant to the requirements of the PATRIOT Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies each Credit Party and its beneficial owners, which information includes the name and address of each Credit Party and its beneficial owners and other information that will allow such Lender or Agent, as applicable, to identify such Credit Party and its beneficial owners in accordance with the PATRIOT Act and the Beneficial Ownership Regulation.

**10.21.   Electronic Execution of Assignments**. The words "execution", "signed", "signature", and words of like import in any Assignment Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic

Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.22.   No Fiduciary Duty**. Each Agent, Lender and their respective Affiliates (collectively, solely for purposes of this paragraph, the "**Lenders**"), may have economic interests that conflict with those of the Credit Parties, their respective equityholders and/or their respective Affiliates. Each Credit Party agrees that nothing in the Credit Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Credit Party, its equityholders or its Affiliates, on the other. The Credit Parties acknowledge and agree that (i) the transactions contemplated by the Credit Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Credit Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Credit Party, its equityholders or its Affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Credit Party, its equityholders or its Affiliates on other matters) or any other obligation to any Credit Party except the obligations expressly set forth in the Credit Documents and (y) each Lender is acting solely as principal and not as the agent or fiduciary of any Credit Party, its management, equityholders, creditors or any other Person. Each Credit Party acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Credit Party agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Credit Party, in connection with such transaction or the process leading thereto.

**10.23.   Acknowledgement and Consent to Bail-In of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Credit Document may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

[Remainder of page intentionally left blank]

-129-

**APPENDIX A**

**Commitments**

| Lender | Closing Date Loan Commitment | Pro Rata Share |
|---|---|---|
| On file with Administrative Agent | On file with Administrative Agent | On file with Administrative Agent |
| TOTAL | $520,000,000 | 100% |

**APPENDIX B**

### Notice Addresses

[To be completed prior to the Closing Date.]