*Proposed Solicitation Version*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| J. C. PENNEY COMPANY, INC., *et al.*,[1] | ) | Case No. 20-20182 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE
JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF J. C. PENNEY COMPANY, INC. AND ITS DEBTOR AFFILIATES**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher J. Marcus, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:     joshua.sussberg@kirkland.com
        christopher.marcus@kirkland.com
        aparna.yenamandra@kirkland.com

Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:    (713) 752-4221
Email:     mcavenaugh@jw.com
        jwertz@jw.com
        kpeguero@jw.com
        vpolnick@jw.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  October 26, 2020

---

[1]     A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/JCPenney.  The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 6501 Legacy Drive, Plano, Texas 75024.

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

**SOLICITATION OF VOTES ON THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| **CLASS 4** | **FIRST LIEN CLAIMS** |
| **CLASS 6** | **SECOND LIEN NOTES CLAIMS** |
| **CLASS 7** | **UNSECURED NOTES CLAIMS** |
| **CLASS 8A** | **GENERAL UNSECURED CLAIMS** |
| **CLASS 8B** | **KEY GO FORWARD SUPPLIER CLAIMS** |

**IF YOU HOLD A CLAIM IN CLASS 4, CLASS 6, CLASS 7, CLASS 8A, OR CLASS 8B, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN**

---

**DELIVERY OF BALLOTS**

**MASTER BALLOTS, PRE-VALIDATED BENEFICIAL OWNER BALLOTS, AND DIRECT BALLOTS MUST BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND NOTICING AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON NOVEMBER 17, 2020, VIA THE ENCLOSED PRE-PAID, PRE-ADDRESSED RETURN ENVELOPE, OR AS OTHERWISE DIRECTED ON THE BALLOT:**

*If you received an envelope addressed to your nominee, please return your ballot to your nominee, allowing enough time for your nominee to cast your vote on a master ballot before the Voting Deadline.*

**<u>BY REGULAR MAIL, HAND DELIVERY, OR OVERNIGHT MAIL AT:</u>**
J. C. Penney Company, Inc. Ballot Processing
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

**BALLOTS RECEIVED VIA EMAIL OR FACSIMILE WILL NOT BE COUNTED**

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT BY CALLING THE TELEPHONE NUMBER INCLUDED IN YOUR BALLOT**

---

       **THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF**

THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VII HEREIN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, HAS PROVIDED THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS AND THE PLAN ADMINISTRATOR, AS APPLICABLE, MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.   ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.   THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.   THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO MAY BE ELIGIBLE TO SUBMIT BALLOTS BUT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY AND NEITHER THE SEC NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE AND, TO THE EXTENT THAT SECTION 1145 OF THE BANKRUPTCY CODE IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT, THE EXEMPTION SET FORTH IN SECTION 701 PROMULGATED UNDER THE SECURITIES ACT OR ANOTHER EXEMPTION THEREUNDER.   IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE

DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

---

### RECOMMENDATION BY THE DEBTORS

EACH DEBTOR'S BOARD OF DIRECTORS, GENERAL PARTNER, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM AND INTEREST HOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.

EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO **ACCEPT** THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE **ACTUALLY RECEIVED** BY THE CLAIMS AND NOTICING AGENT NO LATER THAN **NOVEMBER 17, 2020 AT 4:00 P.M. (PREVAILING CENTRAL TIME)** PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.

---

**DISCLAIMER**

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All Holders of Claims or Interests entitled to vote to accept or reject the Plan are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims or Interests reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No Holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to Holders of Claims against, or Interests in, the Debtors or any other party in interest. Please refer to Article VII of this Disclosure Statement, entitled "Risk Factors," which begins on page 30, for a discussion of certain risk factors that Holders of Claims or Interests voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan, or the solicitation of votes to accept or reject the Plan to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the solicitation of votes to accept or reject the Plan, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein. When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

# Table of Contents

**Page**

I.  INTRODUCTION ............................................................................................................................1

II.  PRELIMINARY STATEMENT ...................................................................................................1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN .............................................................................................................................................5

    A.  What is chapter 11?.........................................................................................................5
    B.  Why are the Debtors sending me this Disclosure Statement?.........................................5
    C.  Am I entitled to vote on the Plan?...................................................................................5
    D.  What will I receive from the Debtors if the Plan is consummated? .................................6
    E.  What will I receive from the Debtors if I hold an Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim?.......................................................................10
    F.  Are any regulatory approvals required to consummate the Plan?..................................12
    G.  What happens to my recovery if the Plan is not confirmed or does not go effective? ...12
    H.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"...........................................................................................................12
    I.  What are the sources of Cash and other consideration required to fund the Plan?.........13
    J.  Are there risks to owning the New PropCo Securities upon emergence from chapter 11?............13
    K.  Is there potential litigation related to the Plan?............................................................13
    L.  How will the preservation of the Causes of Action impact my recovery under the Plan? .............13
    M.  Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............14
    N.  What is the deadline to vote on the Plan? .....................................................................19
    O.  How do I vote for or against the Plan?...........................................................................19
    P.  Why is the Bankruptcy Court holding a Confirmation Hearing?...................................20
    Q.  When is the Confirmation Hearing set to occur? ..........................................................20
    R.  What is the purpose of the Confirmation Hearing?........................................................20
    S.  What is the effect of the Plan on the Debtors' ongoing businesses?..............................20
    T.  Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? ..................................................................................................................20
    U.  Do the Debtors recommend voting in favor of the Plan?...............................................21
    V.  Who Supports the Plan?.................................................................................................21

IV.  THE DIP FACILITY AND PLAN.............................................................................................21

    A.  The DIP Facility.............................................................................................................21
    B.  The Plan .........................................................................................................................22

V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW...........22

    A.  JCPenney's Corporate History.......................................................................................22
    B.  JCP Corp. Pension Plan. ................................................................................................25
    C.  The Debtors' Key Assets and Operations ......................................................................26
    D.  The Debtor's Prepetition Capital Structure ...................................................................27

VI.  EVENTS LEADING TO THE CHAPTER 11 FILINGS ..........................................................31

    A.  Prolonged Market Decline and Industry-Specific Challenges .......................................31
    B.  The Pandemic.................................................................................................................31

|   |   |   |
|---|---|---|
| C. | Brick-and-Mortar Retail Microenvironment, Marketing Missteps, and the Leadership Carousel. | 31 |
| D. | Prepetition Strategic, Financing, and Governance Initiatives. | 32 |

**VII.   RISK FACTORS** .......................................................................................................................**34**

| A. | Bankruptcy Law Considerations | 34 |
| B. | Risks Related to Recoveries under the Plan | 37 |
| C. | Risks Related to the Debtors' and PropCo's Businesses | 39 |

**VIII.   SOLICITATION AND VOTING** ...............................................................................................**42**

| A. | Holders of Claims or Interests Entitled to Vote on the Plan | 42 |
| B. | Voting Record Date | 43 |
| C. | Voting on the Plan | 43 |
| D. | Ballots Not Counted | 45 |
| E. | Confirmation Hearing. | 45 |

**IX.   CONFIRMATION OF THE PLAN** ............................................................................................**46**

| A. | Requirements for Confirmation of the Plan | 46 |
| B. | Best Interests of Creditors/Liquidation Analysis | 46 |
| C. | Market Test | 47 |
| D. | Feasibility | 48 |
| E. | Acceptance by Impaired Classes | 48 |
| F. | Confirmation Without Acceptance by All Impaired Classes | 49 |

**X.   CERTAIN SECURITIES LAW MATTERS** ...............................................................................**49**

| A. | Issuance of Securities under the Plan | 50 |
| B. | Subsequent Transfers | 50 |

**XI.   CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN** ....................................**51**

| A. | Introduction | 51 |
| B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. | 53 |
| C. | Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims. | 54 |
| D. | Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Allowed Claims. | 59 |

**XII.   RECOMMENDATION** ..............................................................................................................**64**

**EXHIBITS**[2]

EXHIBIT A        Plan of Reorganization

EXHIBIT B        RSA

EXHIBIT C        Corporate Organization Chart

---

[2]        Each Exhibit is incorporated herein by reference.

## I.        INTRODUCTION

J. C. Penney Company, Inc. ("JCP") and its debtor affiliates, as debtors and debtors in possession (collectively,  the "Debtors,"  "JCPenney,"  or  the "Company"),  submit  this  disclosure  statement (this "Disclosure Statement"),  pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Reorganization of J. C. Penney Company, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"),[1] dated October 20, 2020.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS AND THE CONSENTING FIRST LIEN LENDERS SUPPORT THE PLAN, AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.       PRELIMINARY STATEMENT

On May 15, 2020, the Company entered into a restructuring support agreement (the "RSA") with certain consenting First Lien Lenders party thereto (the "Consenting First Lien Lenders"), which contemplates a comprehensive reorganization of the Company's businesses by establishing both a financially sustainable operating company ("OpCo") and a holding entity for certain of the Debtors' real property assets ("PropCo") and provides for various financing arrangements geared towards a successful going-concern outcome for the Debtors.  The restructuring transactions contemplated therein aim to substantially deleverage the Debtors' balance sheet and allow the Debtors to move expeditiously through chapter 11.  The series of transactions set forth in the Plan and the Asset Purchase Agreement (collectively, the "Restructuring Transactions") effectuate such a reorganization.

To ensure the Restructuring Transactions maximize value for all stakeholders, the RSA also provided for (i) a robust market-testing process seeking interest in and bids for, among other things, providing debt or equity financing to OpCo and/or purchasing some or all of the assets of the Debtors (the "Market Test") and (ii) a sale "toggle" feature allowing for a potential sale of all or substantially all of the Debtors' assets to a third-party purchaser if certain plan-related milestones were unmet.  Further, to signal to potential bidders the Debtors' interest in pursuing all value-maximizing bids, the Debtors sought, and the Bankruptcy Court authorized, procedures pursuant to which work fees may be paid to select potential bidders.[2]

Throughout the Debtors' chapter 11 cases, the Debtors and their advisors solicited interest regarding new money debt financing (including financing that would "take out" any of the "take back" paper otherwise contemplated under the RSA), the sale or sale and leaseback of certain owned distribution centers, the provision of new capital, the purchase of the entire company, and/or the purchase of a part of the Debtors' business.  Following a comprehensive outreach initiative, as further described herein, the

---

[1]     Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan or the Asset Purchase Agreement, as applicable.

[2]     *See, Order Approving Procedures to Pay Fees and Expenses of Potential Investors in Connection with the Market Test* [Docket No. 470].

Market Test yielded four bids for certain of the Debtors' assets and, most importantly, resulted in entry into the Letter of Intent and the Asset Purchase Agreement, each described in more detail below.

The following is a description of the significant events leading up to the Restructuring Transactions:

**RSA and Market Test**.  On May 15, 2020, the Debtors and the Consenting First Lien Lenders entered into the RSA.  As a condition to maintaining the support included in the RSA, the Debtors agreed to run the Market Test. The Market Test consisted of a robust process during which the Debtors and their advisors scoured the market for potential partners or buyers.  This Market Test, which the Debtors' investment bank, Lazard Frères & Co. LLC ("Lazard"), officially launched on May 28, 2020, followed the Debtors' efforts since mid-2019 to survey the market in search of a transaction to address the Debtors' capital structure.

As part of their outreach, Lazard contacted a broad list of traditional banks, alternative investment firms, private equity firms, and strategic investors as potential buyers—86 parties in total, comprising 29 potential strategic partners and 57 potential financial partners.  Lazard also fielded 15 inbound inquiries from other interested parties, with all of whom Lazard engaged regarding a potential transaction.  Of approximately 100 parties, 25 executed non-disclosure agreements and received access to the virtual data room through which the Debtors provided extensive information regarding the Debtors' business and financial condition.

After numerous discussions and the expiration of the bid deadline on July 22, 2020, three parties emerged as most likely to consummate a transaction for the Acquired Assets.  The Debtors thoroughly reviewed the bids and determined, in their reasonable business judgment, that the OpCo Purchaser's bid included terms most favorable to their estates.  Most importantly, the OpCo Purchaser's bid provided for a going-concern solution for substantially all of the Acquired Assets.

**Delivery of the Letter of Intent**.  On September 10, 2020, Brookfield Property Group and Simon Property Group (together, the "OpCo Purchaser"), the Debtors, and that certain ad hoc group of first lien lenders represented by Milbank LLP (the "First Lien Ad Hoc Group," and together with OpCo Purchaser and the Debtors, the "Restructuring Transaction Parties") executed the Letter of Intent (the "Letter of Intent"), which the Debtors filed on September 25, 2020 [Docket No. 1489].  The Letter of Intent sets forth the Restructuring Transaction Parties' agreed-upon key terms for the purchase and sale of certain of the Debtors' operating assets (the "OpCo Assets") and lays out the general terms and conditions pursuant to which the OpCo Purchaser agreed to purchase the OpCo Assets (the "OpCo Transaction").

**The Credit Bid Term Sheet**.  On September 25, 2020, the Debtors and the First Lien Ad Hoc Group executed the *Second Amendment to Restructuring Support Agreement* (the "RSA Amendment"), which incorporated into the RSA a term sheet (the "Credit Bid Term Sheet") setting forth the Restructuring Transaction Parties' agreed-upon key terms for a credit bid for the sale of PropCo (the "PropCo Transaction").  The OpCo Transaction and PropCo Transaction together form a unified, comprehensive restructuring transaction for the Debtors' businesses, the terms of which are finalized and memorialized in the Asset Purchase Agreement.

***Entry into the Asset Purchase Agreement***.  Central to the Restructuring Transactions is the Asset Purchase Agreement entered into between the OpCo Purchaser, the PropCo Purchaser, and the Debtors dated as of [___], 2020 (the "Asset Purchase Agreement"). Notably, the Asset Purchase Agreement includes standard "fiduciary-out" provisions, whereby the Debtors are able to pursue a superior transaction, in the event of an alternate bid.  The Bankruptcy Court will hear the Debtors' motion to approve the Asset Purchase Agreement at a hearing scheduled for November 2, 2020.  It is possible that the OpCo Sale may close and OpCo may emerge before the Effective Date. In connection with the consummation of the transactions set forth in the Asset Purchase Agreement, in connection with their $1 billion aggregate credit bid, the holders of DIP Claims and First Lien Claims will receive their ratable portion of each of (A) the New PropCo Securities, (B) a secured term loan facility at OpCo (which will be issued in an aggregate principal amount of $520 million), (C) the interests in an entity, which has the right to receive certain potential payments from OpCo, and (D) cash, in each case to the extent and as set forth in the Asset Purchase Agreement.

***Formation of PropCo.***  The Debtors will initially form PropCo as a new trust, and subsidiary of JCP for the benefit of the Holders of New PropCo Securities.  PropCo will have only nominal capitalization and will hold no assets until the consummation of the Plan. After confirmation of the Plan, the Debtors will transfer their fee or leasehold interest (as applicable) in certain land, buildings, improvements and other real property currently operated as retail or in support of retail operations, together with certain related liabilities to specified subsidiaries of PropCo.  The transferred assets will include 160 retail stores and 6 distribution centers.  PropCo's future operations are expected to consist solely of, in each case through one or more subsidiaries, (a) owning the foregoing assets, (b) leasing such assets to OpCo pursuant to two new triple-net master leases with respect to the retail stores and distribution centers, and (c) subject to market conditions, selling the PropCo Acquired Assets to third party investors as promptly as practicable after PropCo's emergence.

The core terms of the RSA will be implemented through (i) the Sale Order which will approve entry into the Asset Purchase Agreement, and (ii) the Plan, which contemplates, among other things:

- Each Holder of Other Priority Claims shall receive payment in full in Cash on the later of the Effective Date and such date such Other Priority Claim becomes an Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired;

- Each Holder of Other Secured Claims shall receive, at the option of the applicable Debtor or Plan Administrator, as applicable:  (i) payment in full in Cash; (ii) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Claim; or (iv) such other treatment rendering such Claim Unimpaired;

- To the extent their claim has not already been satisfied, Holders of an Allowed ABL Claim or Allowed Secured Swap Claim shall receive payment in full, in Cash;

- Each Holder of First Lien Claims shall receive  (a) pursuant to the Sale Transaction, on account of the Aggregate Bid, its Credit Bid Pro Rata share of the Credit Bid Distribution, subject to dilution under the Plan and (b) its Pro Rata share

of any cash remaining in the Wind-Down Reserve, Professional Fee Escrow, and Administrative / Priority Claims Reserve once all Allowed Claims entitled to payment therefrom have been satisfied and no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated;

- Each Holder of Second Lien Notes Claims shall receive its Pro Rata share (taken together with the Unsecured Notes Claims, General Unsecured Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full;

- Each Holder of Unsecured Notes Claims shall receive its Pro Rata share (taken together with the Second Lien Notes Claims, General Unsecured Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims and Second Lien Notes Claims have been satisfied in full;

- Each Holder of General Unsecured Claims shall receive its Pro Rata share of its Pro Rata share (taken together with the Second Lien Notes Claims, Unsecured Notes Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims and Second Lien Notes Claims have been satisfied in full; and

- Each Holder of Key Go Forward Supplier Claims shall receive (i) its Pro Rata share (taken together with the Second Lien Notes Claims, Unsecured Notes Claims, and General Unsecured Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full; and (ii) a waiver of any preference actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law.

The Restructuring Transactions embodied by the Plan, the Sale Order, and the RSA are a significant achievement for the Debtors in the midst of an unprecedented and challenging operating environment. The Debtors strongly believe that the Plan is in the best interests of their estates, and represents the best available alternative at this time. The Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan to maximize stakeholder recoveries and ensure that JCP can efficiently emerge from chapter 11 and continue to serve as an American retail icon. For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan.

## III.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.     What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.     Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.     Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold and whether you held that Claim as of the Voting Record Date (as defined herein).  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | ABL Claims and Secured Swap Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | First Lien Claims | Impaired | Entitled to Vote |
| Class 5 | [Reserved] | | |
| Class 6 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 7 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 8A | General Unsecured Claims | Impaired | Entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 8B | Key Go Forward Supplier Claims | Impaired | Entitled to Vote |
| Class 9 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 10 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 11 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.    What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|-------|---------------------|---------------------|---------|---------|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| 1 | Other Priority Claims | Each holder of an Other Priority Claim shall receive: (i) payment in full in Cash of the unpaid portion of its Other Priority Claim on the later of the Effective Date and such date such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | N/A | 100% |

---

[3]   The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy Law.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| 2 | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Plan Administrator, as applicable: (i) payment in full in Cash; (ii) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Claim; or (iv) such other treatment rendering such Claim Unimpaired. | N/A | 100% |
| 3 | ABL Claims and Secured Swap Claims | To the extent a holder's Allowed ABL Claim or Allowed Secured Swap Claim has not been paid in full, in Cash prior to the Effective Date, each holder of an Allowed ABL Claim or Allowed Secured Swap Claim shall receive payment in full, in Cash. | $1,258,687,395[4] | 100% |
| 4 | First Lien Claims | On the Effective Date, each holder of an allowed First Lien Claim shall receive, (a) pursuant to the Sale Transaction, on account of the Aggregate Bid, its Credit Bid Pro Rata share of the Credit Bid Distribution, subject to dilution under the Plan and (b) its Pro Rata share of any cash remaining in the Wind-Down Reserve, Professional Fee Escrow, Administrative / Priority Claims Reserve once all Allowed Claims entitled to payment therefrom have been satisfied and no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated. | $1,571,414,063 | 0 - 6.4%[5] |

---

[4]   The projected amount of ABL Claims and Secured Swap Claims includes the projected amount of outstanding principal and accrued and unpaid interest as of the Petition Date.

[5]   Pursuant to the proposed Asset Purchase Agreement, BidCo is delivering a $1 billion credit bid (collectively defined in the Asset Purchase Agreement as the "Credit Bid Amount."). Further, pursuant to the proposed Asset Purchase Agreement, at the OpCo Closing, BidCo shall be deemed to assign a portion of the Credit Bid Amount to the OpCo Purchaser (referred to as the "OpCo Credit Bid Amount" in the Asset Purchase Agreement), with the remaining Credit Bid Amount to be credit bid at the PropCo Closing (referred to as the "PropCo Credit Bid Amount" in the Asset Purchase Agreement).

The range of recoveries set forth herein for Holders of Allowed First Lien Secured Claims (a) assumes illustratively, that (x) on the one hand, all of the Credit Bid Amount is assigned to the OpCo Purchaser at the OpCo Closing (thus establishing the low end of the range of recovery for Holders of Allowed First Lien Secured Claims on account of distributions contemplated to be received under the Plan) and (y) on the other hand, all of the Credit Bid Amount is credit bid at the PropCo Closing (thus establishing the high end of the range of recovery for Holders of Allowed First Lien Secured Claims on account of distributions contemplated to be received under the Plan); (b) does not take into account the reduction in the Allowed Claim amount following the assignment and application of the OpCo Credit Bid Amount; and (c) only takes into account distributions to Holders of Allowed First Lien Secured Claims to be made under this Plan.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| 5 | [Reserved] | [Reserved] | | |
| 6 | Second Lien Notes Claims | Except to the extent that a Holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Second Lien Notes Claim, each Holder of an Second Lien Notes Claim shall receive, up to the full amount of such Holder's Allowed Second Lien Notes Claim, its Pro Rata share (taken together with the Unsecured Notes Claims, General Unsecured Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full. | $405,765,753 | <1% |
| 7 | Unsecured Notes Claims | Except to the extent that a Holder of an Allowed Unsecured Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Unsecured Notes Claim, each Holder of an Unsecured Notes Claim shall receive, up to the full amount of such Holder's Allowed Unsecured Notes Claim, its Pro Rata share (taken together with the Second Lien Notes Claims, General Unsecured Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind- Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims and Second Lien Notes Claims have been satisfied in full; | $1,346,126,431 | <1% |
| 8A | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, up to the full amount of such Holder's Allowed General Unsecured Claim, its Pro Rata share (taken together with the Second Lien Notes Claims, | $710,090,918 | <1% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| | | Unsecured Notes Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full. | | |
| 8B | Key Go Forward Supplier Claims | Except to the extent that a Holder of a Key Go Forward Supplier Claims agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Key Go Forward Supplier Claims, each Holder of an Allowed Key Go Forward Supplier Claim shall receive, (i) up to the full amount of such Holder's Key Go Forward Supplier Claims, its Pro Rata share (taken together with the Second Lien Notes Claims, Unsecured Notes Claims, and General Unsecured Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full; and (ii) a waiver of any preference actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law | $629,423,595 | <1% + value of preference waiver |
| 9 | Intercompany Claims | Each Intercompany Claim shall be, at the option of the Debtors, setoff, contributed, distributed, compromised, settled, Reinstated, canceled and released without any distribution, or otherwise addressed in a manner determined by the Debtors. | N/A | 0% / 100% |
| 10 | Intercompany Interests | Each Intercompany Interest shall be, at the option of the Debtors, contributed, distributed, eliminated via merger or other corporate transaction, Reinstated, canceled and released without any distribution, or otherwise addressed in a manner determined by the Debtors. | N/A | 0% / 100% |
| 11 | Existing Equity Interests | Existing Equity Interests will be canceled, released, and extinguished, and will be of no further force or effect. Each holder of an Interest will not receive any distribution on account of such Interest. | N/A | 0% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| 12 | Section 510(b) Claims | Section 510(b) Claims will be canceled, released, and extinguished, and will be of no further force or effect. Each holder of an Interest will not receive any distribution on account of such Interest. | N/A | 0% |

### E. What will I receive from the Debtors if I hold an Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

### 1. Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or Plan Administrator, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 45 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Plan Administrator, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided* that any Allowed Administrative Claim that is an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of the Debtors or the Wind-Down Debtors; *provided, further,* that any Allowed Administrative Claim that is not an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of Purchasers.

Except for Professional Fee Claims and DIP Claims, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Plan Administrator no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Objections to such requests must be Filed and served on the Plan Administrator (if the Plan Administrator is not the objecting party) and the requesting party on or before the Administrative Claim Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except for Professional Fee Claims and DIP Claims, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not file and serve such a request on or before the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Estates, the Wind-Down Debtors, the Plan Administrator, or the property of any of the foregoing, and such Administrative Claims shall be deemed released as of the Effective Date without the need for any objection from the Debtors, the Wind-Down Debtors or the Plan Administrator or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

**2.      Payment of Fees and Expenses under the Financing Order.**

On the Effective Date, and thereafter as invoiced, the Debtors shall pay all fees, expenses, disbursements, contribution or indemnification obligations, including without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by each of the following, whether prior to or after the Petition Date and whether prior to or after the Effective Date, of the DIP Agents, the DIP Lenders, the First Lien Notes Trustee, the Term Loan Administrative Agent, and the Term Loan/First Lien Notes Collateral Agent, in each case to the extent payable or reimbursable under or pursuant to the Financing Order, the DIP Credit Agreement, the First Lien Notes Indenture, the Prepetition Security Agreement, or the Term Loan Credit Agreement, as applicable.  Such fees, expenses, disbursements, contribution, or indemnification obligations shall constitute Allowed Administrative Claims.  Nothing herein shall require the DIP Agents, DIP Lenders, the First Lien Notes Trustee, the Term Loan Administrative Agent, the Term Loan/First Lien Notes Collateral Agent, or their respective Professionals, to file applications, a Proof of Claim, or otherwise seek approval of the Court as a condition to the payment of such Allowed Administrative Claims.  For the avoidance of doubt, nothing in the Plan shall be deemed to impair, discharge, or negatively impact or affect the rights of the DIP Agents, the First Lien Notes Trustee, the Term Loan Administrative Agent, and the Term Loan/First Lien Notes Collateral Agent to exercise their charging liens pursuant to the terms of the DIP Credit Agreement, the First Lien Notes Indenture, the Prepetition Security Agreement, or the Term Loan Credit Agreement, as applicable.

**3.      Professional Fee Claims.**

Treatment and discussion of Professional Fee Claims is set forth in Article II.C of the Plan.

**4.      DIP Claims.**

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses.  Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of the Plan and the Asset Purchase Agreement, or other such treatment as contemplated by Article II.E of the Plan on the Effective Date all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, and solely with respect to that portion of a Holder's Allowed DIP Claim that has not been satisfied in accordance with the Asset Purchase Agreement prior to the Effective Date, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each such unsatisfied portion of a Holder's Allowed DIP Claim, on the Effective Date each such Holder of an Allowed DIP Claim shall receive, pursuant to the Sale Order and the Confirmation Order, its Credit Bid Pro Rata share of the Credit Bid Distributions. The DIP Claims shall be Allowed in the aggregate amount outstanding under the DIP Facility as of the Effective Date.

Pursuant to the DIP Credit Agreement, all distributions pursuant to Article II.E of the Plan shall be made to the DIP Agent for distributions to the DIP Lenders in accordance with the DIP Credit Agreement and DIP Credit Documents unless otherwise agreed upon in writing by the DIP Agent and the Debtors.  The DIP Agent shall hold or direct distributions for the benefit of the Holders of DIP Claims.  The DIP Agent shall retain all rights as DIP Agent under the DIP Credit Documents in connection with the delivery of the distributions to the DIP Lenders.  The DIP Agent shall not have any liability to any person with respect to distributions made or directed to be made by such DIP Agent, except for liability arising from gross negligence, willful misconduct, or actual fraud of the DIP Agent.

**5.      Priority Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that any Allowed Priority Tax Claim that is an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of the Debtors or the Wind-Down Debtors.

**F.      Are any regulatory approvals required to consummate the Plan?**

The Debtors are subject to the expiration of applicable antitrust waiting periods and/or approval by certain antitrust authorities. There are no other known regulatory approvals that are required to consummate the Plan.  However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article IX.B of this Disclosure Statement, which begins on page 43.

**H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article IX of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 43, for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (1) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (2) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (3) commencement of distributions under the Plan.

**I.      What are the sources of Cash and other consideration required to fund the Plan?**

All amounts necessary for the Debtors, Wind-Down Debtors, OpCo Purchaser, and the PropCo Purchaser, as applicable, to make payments or distributions pursuant to the Plan shall be, in each case subject to the terms of the Asset Purchase Agreement and the Sale Order, obtained from the proceeds of the Exit ABL Facility, the Exit FILO Facility, Cash of the Debtors, and the OpCo-Company Cash Payment. Unless otherwise agreed, distributions required by the Plan on account of Allowed Claims that are Assumed Liabilities under the Asset Purchase Agreement shall be the sole responsibility of the OpCo Purchaser or PropCo Purchaser, as applicable; *provided* that any Allowed Administrative Claim that is not an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of Purchasers.

**J.      Are there risks to owning the New PropCo Securities upon emergence from chapter 11?**

Yes.   *See* Article VII of this Disclosure Statement, entitled "Risk Factors," which begins on page 30.

**K.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VII.C.6 of this Disclosure Statement which begins on page 39.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.   *See* Article IX.F of this Disclosure Statement which begins on page 46.

**L.      How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Articles IV.D and IV.L of the Plan and the Asset Purchase Agreement, the Plan Administrator shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action (a) that constitute OpCo Acquired Assets, (b) released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VII, or (c) waived in accordance with Article IV.J, which in the case of the foregoing (b) or (c) shall be deemed released and waived by the Debtors and the Wind-Down Debtors as of the Effective Date.

The Plan Administrator may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors.  The Plan Administrator shall retain and may exclusively enforce any and all such Causes of Action.  The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release,

withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Plan Administrator will not pursue any and all available Causes of Action against it, except as assigned or transferred to the Purchaser Group in accordance with the Asset Purchase Agreement or otherwise expressly provided in the Plan, including Articles IV.D and IV.L of the Plan.** Unless any such Causes of Action against an Entity are expressly waived (including pursuant to Article IV.L of the Plan), relinquished, exculpated, released, compromised, assigned, or transferred to the Purchaser Group in accordance with the Asset Purchase Agreement, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, Claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Asset Purchase Agreement provides that, among other things, all claims of the Debtors under section 547 or any comparable "preference" action under applicable non-bankruptcy law against suppliers, vendors, merchants, manufacturers, or counterparties to any OpCo Assigned Contracts shall be transferred to OpCo Purchaser or one or more Designees other than actions under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law against Entities designated as Key Go Forward Suppliers in accordance with the Plan that are in fact waived pursuant to consummation of the Plan. Based on preliminary estimates, the Debtors made approximately $1 billion in transfers during the 90 days prior to the Petition Date, which transfers may be susceptible to a claim by the Debtors or the Plan Administrator, as applicable, under section 547 of the Bankruptcy Code or any comparable "preference" action under applicable non-bankruptcy law, subject to applicable defenses.

M.     **Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting First Lien Lenders in obtaining their support for the Plan pursuant to the terms of the RSA.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions. Each Holder of Claims or Interests has the ability to exempt itself from the definition of "Releasing Party" by using the applicable ballot or opt-out form provided by the Debtors. By opting out of the Third-Party Release, such Holder will forgo the benefit of obtaining the releases set forth in Article X of the Plan if such party would otherwise by a Released Party.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES:  ALL HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT**

**(X) VALIDLY OPT OUT OF THE RELEASES CONTAINED IN THE PLAN, (Y) FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN BY THE PLAN OBJECTION DEADLINE, OR (Z) TIMELY VOTE TO REJECT THE PLAN.   THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

        Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

        1.       **Releases by the Debtors.**

        **Notwithstanding anything contained in the Plan to the contrary, effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date each Released Party is deemed released and discharged by each and all of the Debtors, their Estates, and the Wind Down Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Wind Down Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in Law, equity, or otherwise, that the Debtors, their Estates, or the Wind Down Debtors, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' or the Wind-Down Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Documents, the Term Loan Credit Documents, the Restructuring Transactions, the Sale Transaction, entry into the Asset Purchase Agreement, the Exit Facilities, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or Consummation of the RSA, the Disclosure Statement, the DIP Facility, the Sale Transaction, the Asset Purchase Agreement, the Plan, the Plan Supplement, other Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual**

fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any liabilities or obligations of the PropCo Purchaser to the Debtors relating to the Asset Purchase Agreement, (2) any post Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including the Asset Purchase Agreement and any documents set forth in the Plan Supplement, each as applicable) executed to implement the Plan, (3) any Causes of Action listed on the Schedule of Retained Causes of Action, or (4) any Claims by any of the Debtors arising out of any ordinary course dealings between such parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, their respective Estates, or the Wind Down Debtors asserting any Claim or Cause of Action released pursuant to the Debtor Release.

2.       Third-Party Releases.

Notwithstanding anything contained in the Plan to the contrary, effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, to the fullest extent permissible under applicable law, as such Law may be extended or integrated after the Effective Date, on and after the Effective Date each of the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, or because of the foregoing entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in Law, equity, or otherwise, including any derivative Claims, asserted or assertable on behalf of any of the Debtors or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' or the Wind-Down Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Documents, the First Lien Debt Documents, the Restructuring Transactions, the Sale Transaction, entry into the Asset Purchase Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or Consummation of the RSA, the Disclosure Statement, the DIP Facility, the Sale Transaction, the Asset Purchase Agreement, the Plan, the Plan Supplement, other Definitive Documents, the Exit Facilities, the New Takeback Debt, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of

Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any liabilities or obligations of any Entity to the Purchaser Group relating to the Asset Purchase Agreement, (2) any post-Effective Date obligations of any party or Entity under the Plan (or preserved by the Plan), any Restructuring Transaction, or any document, instrument, or agreement (including the Asset Purchase Agreement and any documents set forth in the Plan Supplement, each as applicable) executed to implement the Plan, or (3) any Claims by any of the Debtors arising out of any ordinary course dealings between such parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each Third-Party Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

3.      Exculpation.

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any Cause of Action for any Claim related to any act or omission based on the formulation, preparation, dissemination, negotiation, entry into, filing, execution, and implementation of any transactions approved by the Bankruptcy Court in the Chapter 11 Cases, including the RSA, the Asset Purchase Agreement, the Disclosure Statement, the Plan, the Plan Supplement, other Definitive Documents, the Confirmation Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order, or created or entered into in connection with the RSA, the Asset Purchase Agreement, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance of any securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement, and the implementation of the Sale Transaction and the Restructuring Transactions contemplated by the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or the Wind-Down Debtors, except for Claims related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence, each solely to the

17

extent as determined by a Final Order of a court of competent jurisdiction, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding the foregoing, the exculpation shall not release (1) any obligation or liability of any Entity relating to the Asset Purchase Agreement, (2) for any post Effective Date obligation under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (3) any Claims by any of the Debtors arising out of any ordinary course dealings between such parties.

4. Injunction.

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article X.A of the Plan, released pursuant to the Debtor Release, the Third Party Release, or another provision of the Plan (including the release of liens pursuant to Article X.B of the Plan), or are subject to exculpation pursuant to Article X.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind Down Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article X.F of the Plan.

For the avoidance of doubt and notwithstanding section 1141(d)(3) of the Bankruptcy Code, as of the Effective Date, except as otherwise specifically provided in the Plan and Sale Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing,

18

pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors, the Estates, the Purchaser Group, or the Wind Down Debtors, except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Wind-Down Debtors or otherwise contemplated under the Sale Order.  Such injunction will not enjoin Persons or Entities that do not consent to the Third Party Release from pursuing any direct (but not derivative) Claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Purchaser Group, or the Wind Down Debtors.

     5.     **Release of Liens.**

On the Effective Date, concurrently with the Consummation of the PropCo Sale and except as otherwise set forth in the Asset Purchase Agreement, the PropCo Acquired Assets shall be transferred to and vest in PropCo free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Asset Purchase Agreement, each as applicable.  Without limiting the foregoing, except as otherwise provided in the Asset Purchase Agreement, the Plan, the Plan Supplement, the Exit Facility Documents, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Plan Administrator to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

For more detail, see Article X of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**N.**     **What is the deadline to vote on the Plan?**

The Voting Deadline is November 17, 2020, at 4:00 p.m. (prevailing Central Time).

**O.**     **How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims or Interests that are entitled to vote on the Plan.  All ballots (including master ballots and pre-validated ballots) for Holders of Claims in Classes 4, 6, 7, 8A, or 8B must be properly completed, executed, and delivered, so that the applicable ballot is **actually received** by the Debtors' claims and noticing agent, Prime Clerk, LLC (the "Claims and Noticing Agent") **on or before the Voting Deadline,**

***i.e.* November 17, 2020, at 4:00 p.m., prevailing Central Time**.  *See* Article VIII of this Disclosure Statement, entitled, "Solicitation and Voting" which begins on page 39 for more information.

      **P.**       **Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

      **Q.**       **When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for November 24, 2020 at 9:00 a.m. (prevailing Central Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than November 17, 2020, at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

      **R.**       **What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest Holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

      **S.**       **What is the effect of the Plan on the Debtors' ongoing businesses?**

It is anticipated that substantially all of the Debtors' remaining assets following consummation of the OpCo Transaction will be transferred to PropCo immediately before consummation of the Plan, with the exception of the Excluded Assets which will vest in the Wind-Down Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges or encumbrances.

      **T.**       **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Prime Clerk LLC, via one of the following methods:

*By calling the telephone number included in your Ballot, or by contacting the Claims and Noticing Agent by phone at:*

(877) 720-6576 (US/Canada)
(646) 979-4417(International)

*By regular mail, hand delivery, or overnight mail at:*

J. C. Penney Company, Inc.,
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the claims and noticing agent at http://www.cases.primeclerk.com/JCPenney (free of charge) or the Bankruptcy Court's website at www.txsb.uscourts.gov (for a fee).

### U.      Do the Debtors recommend voting in favor of the Plan?

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

### V.      Who Supports the Plan?

The Plan is supported by the Debtors, certain Holders of Claims, and certain Consenting First Lien Lenders that have executed the RSA, including Holders of at least 66 2/3% in principal amount outstanding of the First Lien Claims.

## IV.      THE DIP FACILITY AND PLAN

### A.      The DIP Facility

To fund the administration of the Chapter 11 Cases, certain Consenting First Lien Lenders committed to provide a $900 million senior secured super-priority delayed-draw postpetition credit facility (the "DIP Facility"), consisting of $450 million in new money term loans and $450 million in Term Loan Obligations and First Lien Notes Obligations "rolled up" into the DIP Facility.  $225 million of the new money financing was advanced upon entry of the Financing Order and has been comingled into the Debtors' cash management system and used for working capital, operating expenses, capital investments and to pay for the costs of the Chapter 11 Cases.  The subsequent $225 million was advanced upon satisfaction of certain conditions precedent and remains in a segregated account, available for the Debtors' use subject to certain conditions.

The DIP Facility provides liquidity that is essential to fund the administrative cost of the Chapter 11 Cases, and it allows the Debtors to pay suppliers and other participants in the Debtors' supply chain in the ordinary course to ensure the continuing and uninterrupted flow of inputs to the Debtors'

businesses. The DIP Facility was made available to the Debtors contingent upon, among other things, the Debtors' compliance with certain covenants set forth therein and the Debtors administering their chapter 11 cases in accordance with the milestones set forth therein.

The Debtors believe that the DIP Facility gives the Debtors sufficient liquidity to stabilize their operations and fund the administration of the Chapter 11 Cases as the Debtors seek to implement the Restructuring Transactions contemplated by the Plan.

### B.     The Plan

The key terms of the Plan, specific aspects of the restructuring transactions, and PropCo's operations following the Consummation of the Plan can be found in the Plan, attached hereto as **Exhibit A**, among others described herein and therein:

| Provision | Plan Section |
|---|---|
| General Settlement of Claims and Interests | Article IV, Section A |
| Restructuring Transactions | Article IV, Section B |
| Sources of Consideration for Plan Distributions | Article IV, Sections C |
| Plan Administrator and the Wind-Down Debtors | Article IV, Sections D |
| Cancellation of Existing Securities and Agreements | Article IV, Section F |
| Corporate Action | Article IV, Section G |
| New Organizational Documents | Article IV, Section H |
| Effectuating Documents; Further Transactions | Article IV, Section I |
| Section 1146 Exemption | Article IV, Section J |
| Exemption from Securities Act Registration | Article IV, Section K |
| Preservation of Causes of Action | Article IV, Section L |
| Releases<br><br>(The Releases are also described in Article III.M of this Disclosure Statement, which begins on page 12) | Article X, Sections B, C, and D |

## V.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.     JCPenney's Corporate History

JCPenney is a 118-year old American retail icon that plays an important role in the lives of their customers throughout hundreds of communities throughout the country.  As of the Petition Date, the Debtors operated 846 locations across 49 states and Puerto Rico, employed nearly 85,000 associates, and managed a massive supply chain network with nearly 3,000 vendors and 11 domestic shipping facilities. The Debtors concluded 2019 with approximately $10.7 billion in net sales.

Having endured and played a vital role in America's recovery during some of its most difficult periods, including the Great Depression and World War II, JCPenney now finds itself facing another monumental challenge to its business: emerging from the disruption caused by the novel Coronavirus pandemic ("COVID-19").

Before the pandemic, the Debtors had a substantial liquidity cushion, were improving their operations, and were proactively engaging with creditors to deleverage their capital structure and extend their debt maturities to build a healthier balance sheet.  Unfortunately, that progress was wiped out with the onset of COVID-19.  And now, the Debtors are unable to maintain their upward trajectory through their "Plan for Renewal."

On March 11, 2020, the World Health Organization officially declared COVID-19 a pandemic.[6] In response, national, state, and local governments in the United States, and around the world, imposed shelter-in-place and stay at home orders, as well as social distancing protocols.[7]  As a result, the American retail industry entered into a new reality, requiring the Debtors to make difficult decisions to protect the safety of their associates, customers, and the long-term future of JCPenney.  The Debtors temporarily closed all of their stores and offices and dramatically reduced supply chain operations on March 18, 2020.  These developments disrupted the Debtors' meaningful progress on their "Plan for Renewal" transformation strategy, having just achieved comparable store sales improvement in six of eight merchandise divisions in the second half of 2019 over the first half, and successfully meeting or exceeding guidance on all key financial objectives for the 2019 fiscal year.[8]  Under a new management team spearheaded by Chief Executive Officer Jill Soltau, JCPenney was improving revenue, while simultaneously cutting costs and expanding margins.

Due to the pandemic, April year-over-year net sales decreased by ~88% and store sales decreased to nearly zero.  The severe sales decrease resulting from these crucial but economically painful public safety measures has necessitated these Chapter 11 Cases.

In response to the pandemic, the Debtors immediately went into liquidity conservation mode.  **First**, JCPenney drew down $1.25 billion on the ABL Facility (as defined herein).  **Second**, JCPenney paused all hiring, cut spending, reduced receipts of merchandising goods, and suspended all merit pay increases for 2020.  **Third**, JCPenney extended payment terms with their vendors.  **Fourth**, the Debtors made the incredibly difficult decision to implement both partial and full furloughs that have affected nearly all of the Debtors' employees (the "Furlough Program").  **Fifth**, the Debtors began to discuss contingencies with their landlords regarding the temporary store closures.

---

[6]   Jamie Ducharme, *World Health Organization Declares COVID-19 a 'Pandemic.' Here's What That Means*, TIME (Mar. 11, 2020), https://time.com/5791661/who-coronavirus-pandemic-declaration/.

[7]   *See, e.g.*, Exec. Order by the Governor of the State of Tx. Executive Order GA 14 (Mar. 31, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-14_Statewide_Essential_Service_and_Activity_COVID-19_IMAGE_03-31-2020.pdf.

[8]   The five financial objectives were: (a) comparable stores sales were expected to be down between 7-8% (stores sales were down 7.7%); (b) adjusted comparable store sales, which excludes the impact of the Company's exit from major appliances and in-store furniture categories, were expected to be down in a range of 5-6% (adjusted comparable store sales were down 5.6%); (c) cost of goods sold, as a rate of net sales, was expected to decrease 150-200 basis points (it decreased approximately 210 basis points over prior year, which correspondingly improved gross margin); (d) adjusted EBITDA was $583 million (a 2.6% improvement over prior year); and (e) free cash flow for fiscal year 2019 was $145 million (beating the target of positive).

For the last several years, department stores and much of the retail industry have faced challenging times.  Advances in online shopping combined with the reduction in brick-and-mortar store traffic have forced virtually all retailers into a Hobson's Choice:[9] reinvention or extinction.  While the retail environment was deteriorating, the highly experienced JCPenney executive team continued to innovate and work hard to restore financial strength to the Company.  Watching many of its peers plodding down the path to extinction, even before the global pandemic, JCPenney took proactive steps to reinvent itself through its "Plan for Renewal."

After a series of unsuccessful initiatives over the last decade that were designed to stabilize JCPenney's business, the Company appointed industry veteran Jill Soltau as Chief Executive Officer on October 2, 2018.  Ms. Soltau had most recently served as President and CEO of JoAnn Stores, Inc.  News outlets and industry experts had consistently accused JCPenney of losing its way in the retail landscape and alienating its core customers by trying to be all things to all people.[10]  Ms. Soltau's mandates were clear— refocus the Company on the fundamentals that made JCPenney a household name and win back its core customers' business.

Ms. Soltau began making deliberate and rigorous strategic modifications over the 18 months preceding these Chapter 11 Cases starting with conducting holistic research related to JCPenney's customers' preferences.  This research included speaking to thousands of retail consumers.  Efforts centered on determining what drives its customers attitudinally and behaviorally.  The Company's goal was to truly understand its customers' priorities.  These diligent efforts led to the identification of its core customer: the "All-in Shopping Enthusiast."

Following this research, Ms. Soltau developed and rolled out the Company's transformation strategy, the "Plan for Renewal," which is centered around five components:

1. ***Offer Compelling Merchandise*** by redefining the brand architecture to reflect how customers live every day.

2. ***Deliver an Engaging Experience***. The Company used extensive research and customer insights to create tests and develop featured occasion merchandising, improved visual merchandising, and a redesigned shopping experience.  The Company expanded the learnings from tests in more than 90 stores.

3. ***Drive Traffic*** online and in stores.  The Company considers its website to be its flagship store. To meet the Company's increasing fulfillment demands, it strengthened its execution on fulfillment, including shipping merchandise from stores and enabling customers to Buy Online, Pickup In Store, or have Curbside Pickup.  The Company has developed three distinct work streams to increase foot traffic in its stores: personalization, affinity programs, and improvements to its eCommerce site.

4. ***Fuel Growth***.  The Company is developing a more efficient operating model, reinvesting in value-creating activities, and establishing a capital structure that supports the long-term needs of the Company.

---

[9]   Hobson's Choice, Dictionary.com, https://www.dictionary.com/browse/hobson-s-choice (describing a Hobson's choice as one which is offered where the options are to take what is offered or nothing; the absence of a real alternative).

[10]   *See* J. C. Penney Has Hired a New CEO Months After an Abrupt Resignation by its Former Chief Executive; https://www.businessinsider.com/J. C. Penney-hires-new-ceo-jill-soltau-2018-10.

5. Develop a ***Results-Minded Culture*** focused on accountability, urgency, and innovative problem solving at all levels of the organization, and a culture that connects all associates to achievements larger than the individual.

At the heart of Ms. Soltau's vision for the Company is a reversion to the Company's historically strong merchandising areas. This includes focusing on high-margin goods, like the Company's private brand lines of women's apparel, and soft home goods like linens, bedding, and pillows. Indeed, these lines are JCPenney's legacy strengths and are expected to propel the Company into another successful century.

To effectuate her vision and return JCPenney to prosperity, Ms. Soltau has brought together a leadership team with broad experiences in retail merchandising, operations, and finance. Combining Ms. Soltau's vision, the experience, and expertise of the leadership team, and extensive consumer research, the Company has taken several steps to return to its principles as a value retailer providing everyday goods for the entire family at low prices and to re-engage its core customers. These steps include: (a) removing the Company from low-margin furniture and appliances spaces; (b) reducing inventory to lower costs; and (c) developing a new look for JCPenney's stores, exemplified in the "Brand-Defining Store."

The Debtors have now reopened all stores and nearly all employees affected by the Furlough Program have been brought back. Company-and store-level employees are continuing to take the necessary safety precautions to ensure all team members and customers are protected. The Debtors have also nearly concluded the process of right-sizing their operational footprint, and have conducted "going out of business" sales at 146 store locations. As of the date of this Disclosure Statement, nearly all of the "going out of business" sales have been completed, with the last of these locations closing by the end of October. As of the date hereof, the Debtors operate 839 locations across forty-nine states and Puerto Rico and employ 63,800 associates.

**B.     JCP Corp. Pension Plan.**

PBGC is a wholly-owned United States government corporation and agency created under Title IV of ERISA to administer the federal pension insurance program and to guarantee the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. Debtor JCP Corp. sponsors the JCP Corp. Pension Plan (the "Pension Plan"), which is covered by Title IV of ERISA. PBGC asserts that the other Debtors are each members of JCP Corp.'s controlled group, as defined in 29 U.S.C. § 1301(a)(14).

During the bankruptcy proceeding, the Pension Plan may terminate under the distress termination provisions of 29 U.S.C. § 1341(c) or under the provisions for PBGC initiation of termination under 29 U.S.C. § 1342(a). If the Pension Plan terminates, PBGC asserts a claim that the sponsor of the Pension Plan and all members of its controlled group are jointly and severally liable for the unfunded benefit liabilities of the terminated Pension Plan. PBGC has filed an estimated contingent claim, subject to termination of the Pension Plan during the bankruptcy proceeding, against each of the Debtors for unfunded benefit liabilities in the amount of approximately $270,200,000. PBGC asserts that this termination liability claim is entitled to priority under 11 U.S.C. §§ 507(a)(2) and (a)(8) in unliquidated amounts. The Debtors reserve all rights relating to any asserted liability, including but not limited to contesting the validity, priority and amount of such claims.

PBGC asserts that the sponsor of the Pension Plan and all other members of its controlled group are obligated to pay the contributions necessary to satisfy the minimum funding standards under sections 412 and 430 of the Internal Revenue Code and sections 302 and 303 of ERISA. PBGC has filed an unliquidated claim against each of the Debtors for any unpaid required minimum contributions, if any, owed to the Pension Plan. PBGC asserts that the claim for required minimum contributions owed is entitled

to priority under 11 U.S.C. §§ 507(a)(2) and(a)(5) in the amounts of the unpaid contributions. The Debtors assert that there are no such Pension Plan contributions that have not been paid or have become due, and the Debtors reserve all rights relating to any asserted liability, including but not limited to contesting the validity, priority and amount of such claims.

PBGC asserts that the sponsor of the Pension Plan and all other members of its controlled group are jointly and severally liable to PBGC for all premium obligations owed to the Pension Plan. PBGC has filed a claim against each of the Debtors for unpaid statutory premiums, if any, owed to PBGC on behalf of the Pension Plan in an unliquidated amount. The Debtors assert that there are no such premiums that have not been paid, and the Debtors reserve all rights relating to any asserted liability, including but not limited to contesting the validity, priority and amount of such claims.

If the Pension Plan terminates in a distress or PBGC-initiated termination during the course of the bankruptcy proceeding, PBGC asserts that the sponsor of the Pension Plan and its controlled group are liable to PBGC for a termination premium at the rate of $1,250 per plan participant per year for three years under 29 U.S.C. § 1306(a)(7). PBGC estimates that the amount of the termination premium liability for the Pension Plan would total approximately $146,482,500. The Debtors reserve all rights relating to any asserted liability, including but not limited to the validity, priority and amount of such claims.

With respect to the Pension Plan, no provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve any parties in interest (as defined in 29 U.S.C. § 1002(14)) to the Pension Plan from liabilities or requirements that are both (i) described within 29 U.S.C. §§ 1101 – 1114 and (ii) enforced solely by the PBGC or the Pension Plan. PBGC and the Pension Plan will not be enjoined or precluded from enforcing such liability with respect to the Pension Plan as a result of any provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code.

## C.    The Debtors' Key Assets and Operations

- **J. C. Penney Brand.** JCPenney has a longstanding heritage of providing quality products at affordable prices to its loyal customers. In the 118 years since its founding, JCPenney has cemented itself as a staple of the American retail landscape. Its private brands have been central to its success. JCPenney's current private brands—such as Okie Dokie, Worthington, Stafford, St. John's Bay, Arizona Jean Co., JCPenney Home, and Liz Claiborne—include, among other things, women's apparel, home goods, and various accessories. JCPenney's private brands are so loved that, according to numerous surveys, many people think they are national brands.

- **Merchandise and Key Customer Base.** JCPenney primarily sells family apparel and footwear, accessories, fine and fashion jewelry, beauty products, and home furnishings. In addition, JCPenney department stores provide services such as salons, optical, portrait photography, and custom decorating. JCPenney's inventory falls into the following categories: 21.7% men's apparel; 23.7% women's apparel (includes specialty apparel); 11.7% home furniture and leisure; 12.8% footwear, handbags, and accessories; 10.0% jewelry and watches; and 20.1% other (cosmetics, children's apparel and products). JCPenney's core customers, the "All-in Shopping Enthusiasts," are those seeking value for merchandise that can be used every day, particularly apparel and home furnishings. Approximately 75% of sale transactions are made to JCP rewards members and approximately 40-45% of sale transactions are made to JCP credit card holders.

- **Supply Chain.** JCPenney's core business is delivering quality, dependable products at fair prices. The ability to adapt to an ever-changing market is thus an essential component of

26

JCPenney's success, which the Debtors have been able to achieve through strong relationships with hundreds of domestic and foreign vendors and suppliers. Therefore, JCPenney's business depends on maintaining an integrated supply chain aimed at ensuring the uninterrupted flow of merchandise to its brick-and-mortar locations as well as on-demand delivery to customers' homes and stores for customer pickup. Generally, for private brand merchandise, the Debtors, through their purchasing company, J. C. Penney Purchasing Corporation ("Purchasing"), and its foreign subsidiaries, contract with various foreign manufacturers and suppliers to source and ship merchandise. After procuring the merchandise, Purchasing then sells the merchandise to the operating company, J. C. Penney Corporation, Inc. ("JCP Corp.") for eventual sale to the consumer. For non-private brand merchandise, the Debtors' primarily contract with domestic suppliers.

- Real Estate Footprint. As of the Petition Date, JCPenney operated 846 stores across the United States, including six stores in Puerto Rico. Of these 846 stores, 387 are owned, including 110 stores operating on ground leases. The stores are located in lifestyle centers, shopping malls, power centers, street level shops, and outlets. As detailed in the *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Assume and Perform Under the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving the Continuation or Implementation of Related Non-Insider Discretionary Payments, and (IV) Granting Related Relief* [Docket No. 542] (the "Store Closing Motion"), and pursuant to the authority granted to the Debtors by the *Order (I) Authorizing the Debtors to Assume and Perform Under the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving the Continuation or Implementation of Related Non-Insider Discretionary Payments, and (IV) Granting Related Relief* [Docket No 727] (the "Store Closing Order") the Debtors are authorized, but not directed, to close stores in accordance with the terms of the store closing procedures attached thereto (the "Store Closings"). The Debtors are in the process of closing 146 stores pursuant to the Store Closing Motion [Docket Nos. 835, 986, and 1166]. Following such closures, the Debtors will operate approximately 690 stores.

- E-Commerce Platform. JCPenney was one of the first retail companies to launch an e-Commerce website in 1996. It maintains this website today. Customers may also purchase merchandise through JCPenney's mobile application, which was launched in 2009. JCP fulfills online customer purchases by direct shipment to the customer from distribution facilities and stores or from its suppliers' warehouses. In recent months, JCPenney has seen substantial growth in online sales, representing a shift in shopping behavior as least in part due to the pandemic, with April, May, and June monthly e-commerce sales showing increases of over 14% compared to 2019 performance.

### D.    The Debtor's Prepetition Capital Structure

As of the date of this Disclosure Statement, the Debtors had approximately $4.9 billion in total outstanding principal amount of prepetition funded debt obligations and, as of September 4, 2020, approximately 322,663,112 shares of outstanding common stock. The following table summarizes the Debtors' capital structure as of the Petition Date:

| Obligation | Maturity | Annual Interest Expense (millions) | Approx. Principal Amount (millions) |
|---|---|---|---|
| **ABL Facility** | June 2022 | Varying (LIBOR + 1.75%–2.25%)[11] | $1,180 million |
| **Term Loan Agreements** | June 2023 | LIBOR + 4.25% | $1,521 million |
| **First Lien Notes** | July 2023 | 5.875% | $500 million |
| **Second Lien Notes** | March 2025 | 8.625% | $400 million |
| | *Total Secured Debt* | | *$3,601 million* |
| **Unsecured Notes** | Varying (2020–2097) | Varying (5.65%–7.625%) | $1,318 million |
| | *Total Unsecured Debt* | | *$1,318 million* |
| | **Total:** | | **$4,919 million** |

### 1.     The ABL Revolving Credit Facility.

Certain of the Debtors are party to that certain Credit Agreement, dated as of June 20, 2014 (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of December 10, 2015, that certain Amendment No. 2 to Credit Agreement, dated as of June 20, 2017, that certain Amendment No. 3 to Credit Agreement, dated as of March 8, 2018, and as may be further amended, restated, modified or supplemented from time to time, the "ABL Credit Agreement"), by and among, inter alios, OpCo, JCP, and Purchasing, each as borrowers (collectively, the "ABL Borrowers"), the lenders party thereto, and Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "ABL Agent"). The Prepetition ABL Credit Agreement provides for a $2.35 billion credit facility (subject to a borrowing base composed primarily of accounts receivable, credit card receivables and inventory) with a maturity date of June 20, 2022 (the "ABL Facility").

The obligations under the ABL Facility (the "ABL Obligations") are secured by substantially all of each Debtor's working capital assets, including, without limitation, by a first priority lien on substantially all of the Secured Debt Loan Parties' (as defined below) accounts (including receivables), inventory, deposit accounts, and cash (but excluding the Debtors' equipment, real estate assets, intellectual property, equity interests and intercompany indebtedness owed to such Secured Debt Loan Parties (as defined below)) and identifiable proceeds of the foregoing (collectively, the "ABL Priority Collateral"). Each of JCP Real Estate Holdings, LLC ("RE HoldCo") and J. C. Penney Properties, LLC (together with RE HoldCo and the ABL Borrowers, the "Secured Debt Loan Parties") has guaranteed all obligations under the ABL Facility. Given the onset of COVID-19, prior to the Petition Date, the ABL Borrowers drew on the ABL Facility in order to meet anticipated liquidity needs. As of the Petition Date, there were approximately $1,390 million of outstanding obligations under the ABL Facility (consisting of borrowings and obligations in respect of undrawn letters of credit).

---

[11]   The interest rate varies based on the Quarterly Average Excess Availability ("QAEP"). If the QAEP is (i) equal to or greater than 66.67% of the Revolving Commitments, the applicable interest rate is 1.75%, (ii) greater than or equal to 33.33% of the Revolving Commitments but less than 66.67% of the Revolving Commitments, the applicable interest rate is 2.00%, or (iii) less than 33.33% of the Revolving Commitments, the applicable interest rate is 2.25%.

The ABL Facility allows for certain lenders thereunder (or their affiliates) to enter into certain swap, treasury services or supply chain financing agreements outside of the ABL Facility. Obligations under these agreements are secured under the security documents related to the ABL Facility (and share in any liens created thereunder) on a pari passu basis with the ABL Obligations. As of the Petition Date, there were approximately $75 million of such outstanding obligations, which are fully reserved against in the borrowing base under the ABL Facility.

### 2.     The Term Loans.

The Secured Debt Loan Parties are party to that certain Amended and Restated Credit and Guaranty Agreement, dated as of June 23, 2016 (as amended, restated, amended and restated, modified, or supplemented from time to time, the "Term Loan Agreement"), by and among, inter alios, OpCo, as borrower, JPMorgan Chase Bank, N.A., as administrative agent (the "Term Loan Administrative Agent"), and the lenders from time to time party thereto (the "Term Loan Lenders"). Under the Term Loan Agreement, OpCo borrowed approximately $1.7 billion (the "Term Loans"), approximately $1.521 billion of which remains outstanding. The Term Loans amortize quarterly at a rate of 2.5 percent per annum, with the balance due at its maturity.

The obligations under the Term Loan Agreement (the "Term Loan Obligations") are secured on a pari passu basis with the First Lien Notes by substantially all of each Secured Debt Loan Party's assets other than certain unencumbered real estate, including, without limitation, by a first priority lien on substantially all of the Secured Debt Loan Parties' equipment, real estate assets, intellectual property, equity interests and intercompany indebtedness owed to such Secured Debt Loan Parties, and identifiable proceeds of the foregoing (the "Term Priority Collateral"), and a second priority lien on the ABL Priority Collateral (collectively, the "Term Loan/First Lien Notes Collateral"). Each non-borrower Secured Debt Loan Party has guaranteed all of the Term Loan Obligations.

### 3.     Secured Bonds.

The Debtors are also obligated under the following two issuances of secured debt securities:

- **5.875% senior notes due 2023**. On June 23, 2016, JCP Corp. issued $500 million of 5.875% senior secured notes due July 2023 (the "First Lien Notes," and the holders thereof, the "First Lien Noteholders," and the obligations thereunder, the "First Lien Notes Obligations," and the First Lien Notes Obligations together with the Term Loan Obligations, collectively, the "Term Loan/First Lien Notes Obligations"), all of which remains outstanding as of the Petition Date. JCP, Purchasing, RE HoldCo and J. C. Penney Properties, LLC are guarantors under the First Lien Notes, and the First Lien Notes Obligations are secured on a pari passu basis with the Term Loan Obligations by the Term Loan/First Lien Notes Collateral, including a first priority lien on the Term Priority Collateral and a second priority lien on the ABL Priority Collateral.

- **8.625% notes due 2025**. On March 12, 2018, JCP Corp. issued $400 million of 8.625% second lien secured notes due March 2025 (the "Second Lien Notes", and the holders thereof, the "Second Lien Noteholders," and the obligations thereunder, the "Second Lien Notes Obligations"), all of which remains outstanding as of the Petition Date. JCP, Purchasing, RE HoldCo and J. C. Penney Properties, LLC are guarantors under the Second Lien Notes, and the Second Lien Notes Obligations are secured on a junior basis to the Term Loan/First Lien Notes Obligations by the Term Loan/First Lien Notes Collateral other than real estate (which does not secure the Second Lien Notes Obligations), including

a second priority lien on the Term Priority Collateral (other than real estate) and a third priority lien on the ABL Priority Collateral.

### 4.    Unsecured Bonds.

The Debtors are also obligated under the following six issuances of unsecured debt securities:

- **5.65% senior notes due 2020**.  On May 24, 2010, JCP and JCP Corp. issued $400 million of 5.65% senior unsecured notes due June 2020 (approximately $105 million of which remained outstanding as of the Petition Date).  No other Debtor entity guarantees or is otherwise obligated under the notes.

- **7.125% debentures due 2023**.  On November 23, 1993, JCP Corp. issued $275 million of 7.125% unsecured debentures due November 15, 2023 (approximately $10 million of which remained outstanding as of the Petition Date).  On January 27, 2002, JCP became a co-obligor with respect to the debentures.  No other Debtor entity guarantees or is otherwise obligated under the debentures.

- **6.90% debentures due 2026**.  On August 19, 1996, JCP Corp. issued $200 million of 6.90% debentures due August 2026 (approximately $2 million of which remained outstanding as of the Petition Date).  On January 27, 2002, JCP became a co-obligor with respect to the debentures.

- **6.375% senior notes due 2036**.  On April 27, 2007, JCP and JCP Corp. issued $700 million of 6.375% senior unsecured notes due October 2036 (approximately $388 million of which remained outstanding as of the Petition Date).  No other Debtor entity guarantees or is otherwise obligated under the notes.

- **7.40% debentures due 2037**.  On April 14, 1997, JCP Corp. issued $400 million of 7.40% unsecured debentures due April 2037 (approximately $312 million of which remained outstanding as of the Petition Date).  On January 27, 2002, JCP became a co-obligor with respect to the debentures.  No other Debtor entity guarantees or is otherwise obligated under the debentures.

- **7.625% debentures due 2097**.  On February 25, 1997, JCP Corp. issued $500 million of 7.625% unsecured debentures due March 2097 (all of which remained outstanding as of the Petition Date).  On January 27, 2002, JCP became a guarantor with respect to the debentures.  No other Debtor entity guarantees or is otherwise obligated under the debentures.

### 5.    Existing Equity Interests

JCP's certificate of incorporation authorizes two classes of stock:  common stock and preferred stock.  As of September 4, 2020, JCP had approximately 322,663,112 shares of common stock and no shares of preferred stock outstanding.  JCP has not paid a dividend since May 2012.  In addition, the ABL Credit Agreement, Term Loan Agreement, and First Lien Notes require that certain financial covenants must be satisfied at the time dividend payments are made.

On May 18, 2020, the staff of NYSE Regulation, Inc. ("NYSE Regulation") notified JCP of its determination to immediately suspend trading in JCP's common stock on the New York Stock Exchange (the "NYSE") after determining that JCP was no longer suitable for listing as a result of the commencement of the Chapter 11 Cases. On May 20, 2020, NYSE Regulation filed a delisting application with the SEC,

and the delisting became effective 10 days later; however JCP shares have continued to trade over-the-counter. As of the date of this Disclosure Statement, JCP's stock had a closing price of $0.24 per share.

## VI.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Prolonged Market Decline and Industry-Specific Challenges

A number of factors, both macro and micro, contributed to the need to commence these Chapter 11 Cases.  Most significantly was the closure of all retail stores and offices in response to the unprecedented pandemic.  While JCPenney has been proactive in addressing changing trends, it faces the same macro-trends that have crippled many apparel and retail companies, including a general trend from brick-and-mortar to online retail channels and a shift in consumer demographics.  Recognizing this, prior to the COVID-19 temporary store closures, the Debtors immediately implemented a series of cost-saving and cash conservation initiatives to grow their profit margins and address their debt obligations.  However, JCPenney experienced a significant decline in in-store traffic and related consumer spending as well as numerous operational challenges as a result of the pandemic.

### B.    The Pandemic

In-store shopping at JCPenney, the Debtors' largest revenue stream, came to an abrupt halt as a result of the pandemic.  In response to state and local government mandates and recommendations, on March 18, 2020, the Debtors temporarily closed all retail stores and offices.  The Debtors later extended their store closures through May 2020.  These store closures significantly contributed to missed sales targets, unsold inventory, and depressed profit margins.  Over the course of the Chapter 11 Cases, in accordance with state and local orders, the Debtors reopened their stores as it was safe to do so in a phased approach.  JCPenney communicates with its customers regarding the pandemic and the opening of stores on its COVID-19 website.[12]  The Debtors are taking exceptional measures to ensure that their associates and customers remain safe at their stores.  Specifically, the Debtors are performing diligent nightly cleaning of their stores, offering contact-free curbside pickup, installing plexiglass shields at the register, providing training to their associates on safety practices, and providing masks to each associate, among other measures.

### C.    Brick-and-Mortar Retail Microenvironment, Marketing Missteps, and the Leadership Carousel.

JCPenney was experiencing headwinds prior to the pandemic, with COVID-19 being the ultimate reason for these chapter 11 filings.  Prior to the pandemic, the Debtors' projections showed sufficient liquidity to maintain operations without any restructuring transaction for years.  The Debtors, however, intend to utilize these chapter 11 proceedings to work to improve their operations and progress the "Plan for Renewal."

*First*, JCPenney, along with many other apparel and retail companies, had been facing a challenging commercial environment over the past several years brought on by increased competition and the shift away from shopping at brick-and-mortar stores.  Given the Debtors' substantial brick-and-mortar presence in the United States, and the expenses associated therewith, the business had been heavily dependent on physical consumer traffic, and resulting sales conversion, to meet sales and profitability targets.  Further, the majority of the Debtors' locations are in shopping malls, which have seen an even

---

[12]    For more information related to the Company's response to COVID-19, see the following website: https://companyblog.jcpnewsroom.com/storesopen/).

steeper decline in traffic than other brick-and-mortar locations.  These factors contributed to the Debtors falling short of their sales targets and depressed profitability performance and a need for change.

*Second*, over the past decade, the Debtors have experienced substantial turnover at the executive level.  Prior leadership made certain merchandising decisions that misread the Debtors' core audience, failed to attract new customers, and ultimately hurt sales.  By May 2018, the Debtors were on their fourth CEO in seven years.  The four separate management teams each came with a different business plan and execution strategy.  The regular transition periods disrupted efforts to pursue any of these plans and effectuate a cohesive, long-term strategy.  After the Debtors' CEO abruptly stepped down from his post in May 2018, management and the board of directors of JCP needed to identify and appoint an individual who could immediately step into the colossal challenge of bringing this American staple back from years of declining revenue and profits.

Despite the foregoing, the Debtors, under the leadership of Ms. Soltau, were on the brink of an operational and financial shift that would prepare JCPenney for a resurgence in the retail industry.  Notwithstanding the incredibly challenging macro-economic climate, the "Plan for Renewal" has already improved the sales in several categories.  A leadership team with extensive and valuable retail experience was assembled.  Further, the Debtors' management prioritized a right-sizing of its capital structure and proactively sought the cooperation of several key stakeholders.

### D.      Prepetition Strategic, Financing, and Governance Initiatives.

#### 1.      Liability Management Transaction.

In August 2019, the Debtors had approximately $1.68 billion of aggregate liquidity but were levered at ~7.7x Adjusted EBITDA, substantially higher than the industry median.  Their Last Twelve Months (LTM) Gross Leverage was substantially above the median for apparel retail.

Ms. Soltau, together with senior management and JCP's advisors, recognized that a substantial delevering was critical to propel JCP into another successful century.  Immediately, JCP's advisors began a robust evaluation of the Debtors' potential strategic alternatives to provide time to grow back into its capital structure.  Although JCP had substantial liquidity runway, its forecasts showed that they might drop below the threshold of sufficient liquidity in the coming years.

Through numerous in-person meetings with the Debtors' management, K&E and Lazard identified four primary strategic capital structure goals:  (a) maintain liquidity, (b) address the more than $2 billion of first lien debt maturing in June 2023; (c) capture discount in the remaining secured debt and unsecured notes, and (d) reduce interest expense, all while simultaneously maintaining operational flexibility.

In early August and September 2019, the Debtors' advisors market-tested the appetite for such a transaction. Given the Debtors' storied history and expectation for a bright future with the new management team, there was substantial interest from lenders and potential lenders.  Over the following months, the Debtors traded a number of proposals with an ad hoc group of their First Lien Noteholders, Term Loan Lenders, and Second Lien Noteholders (each as defined herein, together, the "Crossover Group") that had aligned with one of the Debtors' largest funded debt holders.  Through mid-November and December 2019, the Debtors and their advisors traded term sheets with such advisors, but ultimately an impasse was reached.

Subsequently, JCP engaged with another potential transaction counterparty who is a frequent player in distressed situations ("Counterparty X").  Counterparty X proposed a transaction whereby it would facilitate an amend-and-extend transaction through, among other transactions, the purchase of more than $750 million of the Term Loans (as defined herein).  The deal gained substantial traction in late-December

2019 and January 2020 as Counterparty X became restricted, and fulsome negotiations commenced. With the support of Counterparty X, the Debtors also continued discussions to raise a new FILO facility from separate commercial lenders. In early February 2020, the Debtors and Counterparty X agreed to major structural and economic terms of the transaction in principal. Generally, Counterparty X was prepared to purchase and extend the maturity of the Term Loan Obligations in conjunction with the funding of a $360 million FILO facility in exchange for fees and a lien on unencumbered assets. Such transaction would have been the first of a multi-step process to extend JCP's debt maturity and provide it with the flexibility to augment liquidity and delever its capital structure through discount capture on its unsecured notes.

As a next step, JCP proposed a broader amend-and-extend transaction involving its other Term Loan Lenders and First Lien Noteholders that would have provided the same consideration to extending debtholders in exchange for extending debt maturity by three years. Contemporaneously, or shortly thereafter, the Debtors would launch a tender and/or exchange offer for their long-dated unsecured notes at a discount.

Unfortunately, once COVID-19 was declared a pandemic, and the Debtors' primary revenue stream—in-store sales—evaporated overnight, talks regarding the potential transactions came to a grinding halt. As the Debtors have discovered new ways to operate their stores effectively during the pandemic, although not entirely, in-store sales have rebounded.

### 2. Implementation of Cost-Saving Initiatives.

Even before the temporary store closures due to COVID-19, the Debtors were in the process of implementing a series of cost saving initiatives to address their debt obligations and grow their profit margins. These cost-saving initiatives included, among other things, expense reduction, contract renegotiations, and optimization of the Debtors' merchandise labor-force, and real estate portfolios.

Due to the unprecedented and unforeseen disruption to JCPenney's business caused by COVID-19, the Debtors instituted the Furlough Program. While the Debtors initially maintained wages and salaries for their Employees when they closed their stores and corporate offices, effective April 2, 2020, the Debtors placed approximately 78,000 full- and part-time employees on temporary furlough. The Debtors have since resumed store operations, and brought back nearly all previously furloughed employees, as further detailed below in Article V.A.

### 3. Governance Initiatives.

Finally, once it became clear that a near-term chapter 11 process was a possibility, JCP proactively evaluated its corporate governance structure and, after extensive interviews, made a determination to add four new directors, two to JCP Corp. and two to RE HoldCo and J. C. Penney Properties, LLC, only.

Effective May 1, 2020, Alan Carr and Steven Panagos, were appointed to the board of directors of JCP Corp. (the "Old JCP OpCo Independents"). The Old JCP OpCo Independents have retained their own legal counsel, Katten Muchin Rosenman LLP.

Also on May 1, 2020, William Transier and Heather Summerfield (the "Subsidiary Independents," together with the Old JCP OpCo Independents, the "Independent Directors") were appointed to the board of directors of RE HoldCo and J. C. Penney Properties, LLC. Mr. Transier and Ms. Summerfield were appointed to Purchasing's board of directors on May 4, 2020. The Subsidiary Independents also retained their own independent legal counsel, Quinn Emanuel Urquhart & Sullivan LLP.

## VII.    RISK FACTORS

Holders of Claims or Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims or Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

#### 1.    There Is a Risk of Termination of the RSA

To the extent that events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of cash collateral by the Debtors under certain circumstances.  Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

#### 2.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 3.    The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

#### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims or equity interests within a particular class under such plan

will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA (including the requirement that the Plan be in form and substance acceptable to the Consenting First Lien Lenders), reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.      Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.      Continued Risk Upon Confirmation

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in consumer demand for, and acceptance of, their products, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code gives the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. Subsequently, the Debtors sought and the Bankruptcy Court granted the *Order Extending the Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1533], extending this exclusivity period through and including January 10, 2021. If the Bankruptcy Court terminates that right,

however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

### 7.    The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8.    The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9.    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims or Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims or Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 10.    Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, the Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the

Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the significant deleveraging and financial benefits that they embody.

### 11.      Risk of Non-Occurrence of the Effective Date

There can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As more fully set forth in Article XI of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Effective Date will not take place.

### B.      Risks Related to Recoveries under the Plan

### 1.      A Liquid Trading Market for the New PropCo Securities Does Not Exist and May Not Develop

The New PropCo Securities are new securities for which there is currently no public market. Neither the Debtors not PropCo currently intends to apply for listing of the New PropCo Securities on any national securities exchange.  Although the Debtors and PropCo may in the future apply to list the New PropCo Securities on a national securities exchange, no assurances may be given that this listing will be sought or obtained and even if listed, that liquid trading markets for New PropCo Securities will develop. The liquidity of any market for New PropCo Securities will depend upon, among other things, the number of Holders of New PropCo Securities, PropCo's financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New PropCo Securities will develop, nor can any assurance be given as to the liquidity or prices at which such interests might be traded.  In the event an active trading market does not develop, the ability to transfer or sell New PropCo Securities may be substantially limited.

### 2.      The Trading Price for the New PropCo Securities May Be Depressed Following the Effective Date

Assuming that the Effective Date occurs, New PropCo Securities will be issued to Holders of DIP Claims and First Lien Claims based on the relative amount credit bid by each of them.  Following the Effective Date of the Plan, New PropCo Securities may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements.  In addition, Holders of Claims or Interests (as applicable) that receive New PropCo Securities may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of New PropCo Securities available for trading could cause the trading price for New PropCo Securities to be depressed, particularly in the absence of an established trading market for the New PropCo Securities.

3.    **Certain Holders of New PropCo Securities May Be Restricted in Their Ability to Transfer or Sell Their Interests**

Pursuant to section 1145(a)(1) of the Bankruptcy Code, New PropCo Securities issued under the Plan may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities. Resales by Holders of Claims or Interests (as applicable) who receive New PropCo Securities pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New PropCo Securities may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New PropCo Securities to freely resell the New PropCo Securities.  *See* Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 47.

4.    **Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies**

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and may be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act.  Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  In order to resell securities under Rule 144, both non-affiliates and affiliates will need to meet the holding period requirements specified by Rule 144. In addition, in order to resell securities under Rule 144, an affiliate must comply with the volume, manner of sale, and notice requirements of Rule 144.

Holders of New PropCo Securities who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities.  Resale restrictions are discussed in more detail in Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 47.

5.    **Holders of New PropCo Securities Will Have Limited Influence Over PropCo Following the Effective Date and Not All Income of PropCo Will be Distributed.**

Assuming that the Effective Date occurs, Holders of Claims or Interests (as applicable) who receive distributions of the outstanding New PropCo Securities will have limited influence with respect to the operations of PropCo other than approving certain limited activities or directing PropCo by either a majority or supermajority vote of such New PropCo Securities. Individual Holders may have interests that differ from those of the other majority or supermajority Holders of New PropCo Securities and may vote in a manner adverse to the interests of other Holders of New PropCo Securities but will nevertheless be bound by the directions of the majority or supermajority as applicable.

PropCo's ability to make distributions with respect to the New PropCo Securities is dependent on PropCo's ability to generate sufficient revenues from lease payments at, and sales of, the retail stores and distribution centers. The New PropCo Securities are not obligations of OpCo or any of their affiliates. In addition, if the Restructuring Transactions are effectuated, the amounts reported in PropCo's subsequent consolidated financial statements may materially differ compared to the Debtors' historical consolidated financial statements and such difference may be material and should not be relied upon as an indication of future results of PropCo.  Moreover, distributions to Holders are subordinated to certain other distributions such as taxes and expenses related to PropCo and its operations. For any distribution date, it is possible that expenses are in excess of the amounts of cash that can be distributed and therefore Holders may receive nothing for that month. Additionally, PropCo will be entitled to retain or set aside monthly cash reserves (which may be increased as approved by a majority of Holders of the New PropCo Securities) that would otherwise be distributable to the Holders of the New PropCo Securities, for the purposes of paying taxes, expenses, and other administrative costs. The establishment of such reserves will have the effect of delaying the distribution to Holders of amounts that would otherwise be distributable and may result in these amounts not being distributed at all.

6.      **Certain Tax Implications of the Plan**

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement entitled "Certain U.S. Federal Tax Consequences of the Plan" which begins on page 47, to determine how the tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, PropCo, and Holders of Claims or Interests, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

C.      **Risks Related to the Debtors' and PropCo's Businesses**

1.      **The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy.  These risks include the following:  (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with brand partners, suppliers, landlords, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with brand partners, suppliers, landlords, customers, employees, and other third parties, which in turn could adversely affect the Debtors' business, results of operations and financial condition.  In addition, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

2. **The OpCo Sale Will Affect the Debtors' Operations, and the Performance of OpCo May Affect PropCo.**

Pursuant to the Sale Order, the OpCo Assets are being sold to the OpCo Purchaser. Additionally, and as provided in the Plan, certain of the Debtors' real property assets are being sold to the PropCo Purchaser. The remaining assets of the Debtors will be transferred to the Wind-Down Debtors for the purpose of winding down the Debtors' remaining operations. The Wind-Down Debtors will have no active ongoing operations after the remaining operations are wound down.

As described in the Sale Motion, Plan, and herein, OpCo will be the primary obligor on certain of the PropCo Assets, pursuant to the Master Lease Agreement. Accordingly, any negative effect on OpCo's operations and their credit quality may have an effect on PropCo's performance.

3. **Recent Global Economic Trends, Especially in Response to COVID-19, Could Adversely Affect the Debtors', Wind-Down Debtors, and PropCo's Business, Results of Operations and Financial Condition, Primarily Through Disruption to the Debtors', Wind-Down Debtors', and PropCo's Customers' Business, as applicable.**

Recent global economic conditions, including disruption of financial markets, could adversely affect the Debtors', Wind Down Debtors, or PropCo's business, results of operations and financial condition, primarily through disrupting their customers' businesses. Higher rates of unemployment and lower levels of business activity generally adversely affect the level of demand for certain of the Debtors' and PropCo's products and services. In addition, continuation or worsening of general market conditions in the U.S. economy or other national economies important to the Debtors' or PropCo's business may adversely affect customers' level of spending, ability to obtain financing for purchases and ability to make timely payments to the Debtors, PropCo, or Wind Down Debtors for their products and services, which could require the Debtors to increase the Debtors' allowance for doubtful accounts, negatively impact their days sales outstanding and adversely affect their results of operations.

COVID-19 has significantly disrupted financial markets. The outbreak and the actions taken by federal, state and local governments in response to the outbreak have significantly affected virtually all facets of the U.S. and global economies. Restrictions on and public concern regarding travel and public interaction have materially curtailed retail and hospitality activity. The COVID-19 outbreak resulted in the temporary closure of all of the Debtors' retail stores. And while the Debtors have since reopened all retail locations, there is a significant risk that additional closures are possible. Additionally, a substantial majority of the Debtors' merchandise is manufactured in numerous locations around the globe. The timely delivery of merchandise to the Debtors by their brand partners and private label manufacturers could be adversely affected by supply chain disruptions and travel restrictions which could, in turn, negatively impact the Debtors' ability to meet customers' demand.

Global financial markets have experienced significant volatility and losses as a result of the recent COVID-19 outbreak. Any resulting economic downturn could negatively impact customer demand and spending in the impacted regions and cause an oversupply of goods that could result in meaningful margin pressure. In response to anticipated liquidity pressures stemming from a potential downturn, many companies are exploring liquidity options, including drawing on revolving debt facilities.

The Debtors are closely monitoring developments in connection with this outbreak. Restrictions on travel, quarantines and other measures imposed in response to the COVID-19 outbreak, as well as ongoing concern regarding the virus' potential impact, have had and will likely continue to have a negative effect on economies and financial markets, including supply chain shortages and other business disruptions.

The Debtors expect the outbreak will materially affect results during these Chapter 11 Cases and may affect OpCo's operations in the near- and mid-term.  However, the duration and extent of these and other negative effects is highly uncertain and will depend on future developments with respect to the spread and severity of the virus.  An extended period of further economic deterioration could exacerbate the other risks described herein.

Additional effects of the recent conditions in the global economy include higher rates of unemployment, consumer hesitancy, and limited availability of credit, each of which may constrict the Debtors' business operations during these Chapter 11 Cases.  These factors have had an effect on the Debtors' revenue growth and incoming payments, and the impact may continue for the duration of these Chapter 11 Cases, as well as after the completion of the OpCo Sale.  Additionally, as OpCo's financial results are inextricably linked to OpCo's credit quality and financial performance, to the extent that OpCo's operations are affected by these factors, PropCo may be negatively impacted.

### 4.        Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' and Subsequently OpCo's and PropCo's Businesses

A long period of operations under Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity.  So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of OpCo's and PropCo's businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships, potentially negatively impacting the Debtors' and subsequently OpCo's and PropCo's operations.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.  Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization.

### 5.        Financial Results May Be Volatile and Are Not Indicative of Future Results

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements.  Moreover, there have been mandates from federal, state and local authorities requiring forced closures of non-essential retailers in response to the recent COVID-19 outbreak, and regional or national surges in COVID-19 cases may require additional closures.  The duration of such closures and the extent of the outbreak's effects on the Debtors' business is highly uncertain and will depend on future developments with respect to the spread and severity of COVID-19.  As a result, the Debtors' historical financial performance will not be indicative of their financial performance after the Petition Date or of the future financial performance of OpCo or PropPo.

In addition, if the Restructuring Transactions are effectuated, the amounts reported in PropCo's subsequent consolidated financial statements may materially differ compared to the Debtors' historical consolidated financial statements and such difference may be material.  PropCo may also be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the

fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.

### 6. PropCo May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, PropCo may become party to litigation. Any claims against PropCo, whether meritorious or not, could be time-consuming, result in costly litigation, and divert significant resources. If any of these legal proceedings were to be determined adversely to PropCo, or PropCo were to enter into a settlement arrangement, PropCo could be exposed to monetary damages that could have an adverse effect on the PropCo's business, financial condition and results of operations and therefore any distributions made to Holders of New PropCo Securities. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan. It is not possible to predict the potential litigation that PropCo may become party to, nor the final resolution of such litigation. The impact of any such litigation on PropCo's businesses and financial stability, however, could be material.

### 7. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel in the retail industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their business for the duration of these Chapter 11 Cases. In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations for the duration of these Chapter 11 Cases.

### 8. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Business, Financial Condition, and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on PropCo's business, financial condition, and results of operations.

## VIII.  SOLICITATION AND VOTING

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.  Holders of Claims or Interests Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The table in Article III.D of this Disclosure Statement,

entitled "Am I entitled to vote on the Plan?," which begins on page 4, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 4, 6, 7, 8A, and 8B collectively, the "Voting Classes"). The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 5, 9, 10, 11, and 12, as Holders in these Classes are not entitled to vote on the Plan and are deemed to either Accept or Reject the Plan, as applicable.

### B.       Voting Record Date

**The Voting Record Date is October 19, 2020** (the "Voting Record Date"). The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.       Voting on the Plan

**The Voting Deadline is November 17, 2020, at 4:00 p.m. (prevailing Central Time)**. In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Claims and Noticing Agent on or before the Voting Deadline. Ballots or master ballots returned by facsimile will not be counted. Additionally, certain Holders of Class 4, Class 6, or Class 7 Claims may need to abide by certain voting procedures, as discussed further in this section.

---

**DELIVERY OF BALLOTS**

**J. C. PENNEY COMPANY, INC. BALLOTS PROCESSING
C/O PRIME CLERK LLC
ONE GRAND CENTRAL PLACE
60 EAST 42ND STREET, SUITE 1440
NEW YORK, NY 10165**

---

**PLEASE RETURN A PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE PRIME CLERK LLC TOLL FREE AT (877) 720-6576 (TOLL FREE) OR (646) 979-4417 (INTERNATIONAL). ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL NOT BE COUNTED EXCEPT AS OTHERWISE PROVIDED FOR IN THE SOLICITATION PROCEDURES OR IN THE SOLE AND ABSOLUTE DISCRETION OF THE DEBTORS.**

1.      **Voting Procedures for Certain Holders of Notes in Class 4, Class 6, and Class 7**

Certain voting parties hold their Claims in "street name" through a nominee, including Holders of certain First Lien Notes Claims, Second Lien Notes Claims, and Unsecured Notes Claims. Such Holders may vote on the Plan by one of the following two methods (as selected by such Holder's nominee):

- Complete and sign the enclosed beneficial holder ballot. Return the beneficial holder ballot to your nominee as promptly as possible and in sufficient time to allow such nominee to process your instructions and return a completed master ballot to the Claims and Noticing Agent by the Voting Deadline. If no self-addressed, postage-paid envelope was enclosed for this purpose, contact the Claims and Noticing Agent for instructions; or

- Complete and sign the pre-validated beneficial holder ballot (as described below) provided to you by your nominee. Return the pre-validated beneficial holder ballot to the Claims and Noticing Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Any beneficial holder ballot returned to a nominee will not be counted for purposes of acceptance or rejection of the Plan until such nominee properly completes and delivers to the Claims and Noticing Agent that beneficial holder ballot (properly validated) or a master ballot casting the vote of such holder.

If any Holder holds First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims through more than one nominee, such Holder may receive multiple mailings containing beneficial holder ballots. The Holder should execute a separate beneficial holder ballot for each block of certain First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims that it holds through any particular nominee and return each beneficial holder ballot to the respective nominee in the return envelope provided therewith. Holders who execute multiple beneficial holder ballots with respect to certain First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims held through more than one nominee must indicate on each beneficial holder ballot the names of all such other nominees and the additional amounts of such First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims so held and voted.

A nominee that, on the Voting Record Date, is the record Holder of certain First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims for one or more Holders can obtain the votes of the Holders of such First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

(a)      **Pre-Validated Ballots**

The nominee may "pre-validate" a beneficial holder ballot by: (i) signing the beneficial holder ballot and indicating on the beneficial holder ballot the name of the nominee and DTC Participant Number; (ii) indicating on the beneficial holder ballot the amount and the account number of the First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims held by the nominee for the Holder; and (iii) forwarding such beneficial holder ballot—together with this Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to, and provided by, the Claims and Noticing Agent, and other materials requested to be forwarded—to the Holder for voting. The Holder must then complete the remaining portions of the beneficial holder ballot and return the beneficial holder ballot directly to the Claims and Noticing Agent in the pre-addressed, postage-paid return envelope so that it is **<u>actually received</u>** by the Claims and Noticing Agent on or before the Voting Deadline. A list of the Holders

to whom "pre-validated" beneficial holder ballots were delivered should be maintained by nominees for inspection for at least one year from the Voting Deadline.

**(b)      Master Ballots**

If the nominee elects not to pre-validate beneficial holder ballots, the nominee may obtain the votes of Holders by forwarding to the Holders the unsigned beneficial holder ballots—together with this Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the nominee, and other materials requested to be forwarded. Each such Holder must then indicate its vote on the beneficial holder ballot, complete the information requested on the beneficial holder ballot, review the certifications contained on the beneficial holder ballot, execute the beneficial holder ballot, and return the beneficial holder ballot to the nominee. After collecting the beneficial holder ballots, the nominee should, in turn, complete a master ballot compiling the votes and other information from the beneficial holder ballots, execute the master ballot, and deliver the master ballot to the Claims and Noticing Agent so that it is **actually received** by the Claims and Noticing Agent on or before the Voting Deadline. All beneficial holder ballots returned by holders should either be forwarded to the Claims and Noticing Agent (along with the master ballot) or retained by nominees for inspection for at least one year from the Voting Deadline. EACH NOMINEE SHOULD ADVISE ITS ELIGIBLE HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE CLAIMS AND NOTICING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE CLAIMS AND NOTICING AGENT ON OR BEFORE THE VOTING DEADLINE.

**D.      Ballots Not Counted**

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims and Noticing Agent), or the Debtors' financial or legal advisors instead of the Claims and Noticing Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Scheduling Order to be entered by the Bankruptcy Court for additional requirements with respect to voting to accept or reject the Plan.**

ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS ARTICLE VIII OF THE DISCLOSURE STATEMENT WILL **NOT** BE COUNTED.

**E.      Confirmation Hearing.**

The Bankruptcy Court has scheduled the Confirmation Hearing for November 24, 2020 at 9:00 a.m. (prevailing Central Time). The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than November 17, 2020, at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the New York Times (national edition) and the Houston Chronicle, to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

## IX.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7 on such date.

The Debtors believe that liquidation of the Debtors' estate under chapter 7 of the Bankruptcy Code would not result in any Holder receiving any greater recovery as compared to distributions contemplated under the Plan.

*First*, the Bankruptcy Court is currently scheduled to consider approval of the Asset Purchase Agreement pursuant to section 363 of the Bankruptcy Code on November 2, 2020 (the "Sale Hearing").  The Plan assumes that the Asset Purchase Agreement has been approved, and a section 363 Sale Order has been entered, on or shortly after November 2, 2020, and prior to the confirmation hearing scheduled for November 24, 2020 and November 25, 2020.

*Second*, the Debtors and the parties to the Asset Purchase Agreement expect to ask the Bankruptcy Court to include in the Sale Order a provision binding any subsequent chapter 7 trustee to the terms of the Sale Order.  As will be more fully set forth at the hearing to consider approval of the Asset Purchase Agreement, it will be important for OpCo—as the operating business—to close the OpCo Sale as expeditiously as possible following the Sale Hearing to, among other things, restore vendor confidence in advance of the holiday season and ensure the operating business (and the employees that rely on the stability of that business) returns to normal in advance of the critical holiday season.  As a result, it is highly likely that, if the section 363 Sale Order has been entered, the OpCo Sale will close prior to the confirmation hearing.

During the period between the OpCo Sale closing and the Effective Date, OpCo and the Debtors will enter into the Master Lease Agreement with the understanding that upon the Effective Date, the Debtors will assign the Master Lease Agreement to PropCo, such that after the Effective Date, the parties to the Master Lease will be OpCo, on the one hand, and PropCo on the other hand. Importantly, it is the Debtors' expectation that the OpCo Purchaser will be unwilling to close the OpCo Sale if a chapter 7 trustee is not bound by the Sale Order and that, as a result, OpCo could find itself party to a Master Lease Agreement with no control or visibility into its counterparty.

*Third*, it is the Debtors' expectation that if the Bankruptcy Court does not approve the Asset Purchase Agreement on November 2, 2020 or soon thereafter (or enters a Sale Order that is not acceptable to the parties to the Asset Purchase Agreement), the Debtors and the other parties to the Asset Purchase Agreement will not pursue the Plan as proposed and will consider, among other alternatives, modifications to both the Asset Purchase Agreement and the Plan in response to the Bankruptcy Court's ruling at such time.

In sum, the Plan is premised on: (a) the Bankruptcy Court's approval on or shortly after November 2, 2020, of the Asset Purchase Agreement under a Sale Order containing provisions binding a chapter 7 trustee (based on the record set forth at the hearing to consider approval of the Asset Purchase Agreement); and (b) the closing of the OpCo sale prior to the confirmation hearing scheduled to begin on November 24, 2020. Accordingly, if these cases were converted to a Chapter 7, the estate (and any appointed Chapter 7 Trustee) would still be contractually bound by the Asset Purchase Agreement and bound to comply with the terms of the Sale Order. Upon consummation of the transactions contemplated by the Asset Purchase Agreement and the Sale Order, the only assets remaining in the Debtors' Estates in a Chapter 7 liquidation would be "Excluded Assets" and reserves set aside for the sole purpose of satisfying Administrative Claims and Priority Claims (which are obligations of the Debtors under the Asset Purchase Agreement) as well as a wind-down reserve (to administer the Excluded Assets and wind-down the Debtors following the close of the transactions contemplated by the Asset Purchase Agreement). These Excluded Assets are not expected to have any distributable liquidation value. The result is that conversion to a Chapter 7, and payment of a Chapter 7 Trustee's fees and other administrative expenses, would not result in any additional recovery to any Holder of any Claim.

### C.    Market Test

The Debtors, with the assistance of Lazard, have conducted a comprehensive marketing process for the sale of substantially all of the Debtors' Assets. During that Market Test, the Debtors received input from each of their major creditor constituencies as well as a broad range of potential third-party acquirers. In support of the Market Test, the Debtors paid certain Court-approved work fees to select potential bidders to signal the Debtors' seriousness in pursuing all value-maximizing bids. These payments ensured that all potential bidders had the resources necessary to evaluate a potential transaction. For more information regarding the marketing process and Market Test, *see* Section II of this Disclosure Statement, entitled "Preliminary Statement," which begins on page 1.

After evaluating all available restructuring alternatives, the Debtors determined that the Restructuring Transaction, as embodied in the Plan and the Asset Purchase Agreement, is the highest and otherwise best available transaction in light of, among other factors, (a) the fact that the Asset Purchase Agreement and Plan collectively provide for a going-concern transaction that best maximizes the long-term value of the Debtors' businesses; (b) the consideration provided under the transactions reflected in the Asset Purchase Agreement and the Plan; and (c) the greater certainty of closing provided by the Asset Purchase Agreement compared to other potential but less actionable proposals. For more information regarding the Restructuring Transactions, see Article IV, Section B of the Plan, entitled "Restructuring Transactions," which begins on page 27.

This information regarding the Market Test is presented solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims entitled to vote to accept or reject the Plan make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of Claims against the Debtors or any of their affiliates.

The Debtors' Marketing Test should be considered in conjunction with the "Risk Factors" described in Section VII, entitled "Risk Factors," which begins on page 30. The valuation analysis is based on data and information as of that date.

### D.        Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Debtors believe that PropCo will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### E.        Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[13]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan.  Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

---

[13]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

### F.  Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1.  No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2.  Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## X.  CERTAIN SECURITIES LAW MATTERS

The Debtors believe that the New PropCo Securities will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law"). The Debtors further believe that the offer, sale, issuance, and initial distribution of the New PropCo Securities by PropCo pursuant to the Plan is exempt from federal and state securities

registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.

### A.      Issuance of Securities under the Plan

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of the New PropCo Securities (the "1145 Securities").

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any Blue Sky Laws regulating the issuance of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property.  The Debtors believe that the issuance of the 1145 Securities, in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial issuance of the New PropCo Securities.  Recipients of the New PropCo Securities are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.

### B.      Subsequent Transfers

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates" which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes Controlling Persons) are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of New PropCo Securities who are deemed to be "underwriters" may be entitled to resell their New PropCo Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act. Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met. Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New PropCo Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New PropCo Securities and, in turn, whether any Person may freely resell New PropCo Securities.

**Persons who receive securities under the Plan are urged to consult their own legal advisor with respect to the restrictions applicable under the federal or state securities laws and the circumstances under which securities may be sold in reliance on such laws. The foregoing summary discussion is general in nature and has been included in this Disclosure Statement solely for informational purposes. JCPenney makes no representations concerning, and do not provide, any opinions or advice with respect to the securities or the bankruptcy matters described in this Disclosure Statement. In light of the uncertainty concerning the availability of exemptions from the relevant provisions of federal and state securities laws, we encourage each recipient of securities and party in interest to consider carefully and consult with its own legal advisors with respect to all such matters. Because of the complex, subjective nature of the question of whether a security is exempt from the registration requirements under the federal or state securities laws or whether a particular recipient of securities may be an underwriter, JCPenney makes no representation concerning the ability of a person to dispose of the securities issued under the Plan.**

## XI.    CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims not entitled to vote to accept or reject the Plan. This summary is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, broker-dealers, mutual funds, trusts,

governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, Persons who are related to the Debtors within the meaning of the IRC, Persons that actually or constructively own shares in the Debtors representing 10% or more of the Debtors' voting power or value, Persons that will actually or constructively own more than 5% of the New PropCo Securities, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, Persons subject to the alternative minimum tax, accrual-method Holders that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), real estate investment companies, regulated investment companies and those holding Claims, or who will hold consideration received pursuant to the Plan, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, non-U.S. or non-income taxation is addressed.

Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan. This summary does not address the U.S. federal income tax consequences associated with consideration being received only pursuant to the Asset Purchase Agreement.

For purposes of this discussion, a "U.S. Holder" is a Holder that for U.S. federal income tax purposes is:  (1) an individual citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE**

**FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

      **B.**      **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

            **1.**      **Characterization of the Restructuring Transactions.**

The Restructuring Transactions are intended to be structured as a taxable sale of the assets and/or stock of the Debtors and/or their subsidiaries (a "Taxable Transaction"). Gain or loss, if any, upon the transfer will be recognized based on the difference between the tax basis in the assets that were disposed of and the sale price allocable to such assets. Realized gain, if any, may be offset by current-year losses and deductions, which may include interest deductions that may be (or become) available under section 163(j) of the IRC, and net operating loss ("NOL") carryforwards from prior years; *provided*, that any such gain that is ordinary in nature may not be offset by capital losses. Any taxable gain remaining after such offsets would result in a cash tax obligation. The Debtors do not currently anticipate any material federal income cash tax liability as a result of the Restructuring Transactions.

To the extent the Debtors are treated, for tax purposes, as continuing to own any assets that are sold or otherwise collected upon following the implementation of the Restructuring Transactions (*i.e.*, during the Wind-Down), the sale of or collection upon such assets will give rise to taxable income or loss, as the case may be, depending upon the Debtors' tax basis in such assets. So long as such sales or collections occur prior to the end of the tax year in which Claims against the Debtors are discharged, the Debtors' available tax attributes will be available to offset any resulting taxable income. It is unclear whether the Debtors will incur any taxable income as a result of the sale of, or collection upon, any assets that were not disposed of in the Restructuring Transactions.

            **2.**      **Cancellation of Debt and Reduction of Tax Attributes.**

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the issue price of new debt instruments, (ii) the fair market value of other non-cash consideration, and (iii) the amount of cash, in each case, given in satisfaction of such indebtedness at the time of the exchange.

A taxpayer will not, however, be required to include COD Income in gross income pursuant to section 108 of the IRC if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes and aggregate tax basis in assets (including the stock of subsidiaries) by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. Interest expense deductions allowable under section 163(j) of the IRC (and carryforwards of any such deductions) are not subject to reduction under these rules. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Where the taxpayer joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that certain tax attributes of other members of the group also be reduced.

The exact amount of any COD Income and, accordingly, the amount of tax attributes required to be reduced, will depend, in part, on the issue price of new debt instruments, if any, and the value of non-cash consideration, neither of which can be determined until after the Effective Date. As a general matter, the rules related to COD Income is only expected to be relevant to the Debtors to the extent that taxable income is realized following the conclusion of the current tax year.  In that case, the Debtors' existing tax attributes would, to the extent they are subject to reduction as a result of the rules described above, be unavailable to offset any taxable income arising in, *e.g.*, the Wind-Down, after the conclusion of the current tax year.

### 3. Transfer of Assets to PropCo.

Pursuant to the Plan, on or before the Effective Date, the Debtors will transfer to PropCo all of the Debtors' right, title and interest in the PropCo Acquired Assets and PropCo Assumed Liabilities.  On the Effective Date, the New PropCo Securities will be distributed to Holders of DIP Claims and First Lien Claims. As currently contemplated, PropCo is intended to qualify under United States Treasury Regulation Section 301.7701-4(d) as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). Establishing a trust for the purpose of liquidating assets does not automatically result in treatment as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining a ruling as to the status of a liquidating trust under a Chapter 11 plan. PropCo is expected to be structured with the intention of complying with such general criteria, however, no opinion of counsel or ruling has been sought regarding the tax characterization of PropCo.  If PropCo is not treated as a grantor trust, it is expected to be treated as a partnership for U.S. federal income tax purposes.

Assuming PropCo qualifies as a liquidating trust for U.S. federal income tax purposes, the Debtors' transfer of assets to PropCo will be treated as the deemed transfer of an undivided interest in such assets by the Debtors directly to Holders of DIP Claims and Class 4 First Lien Claims in full or partial satisfaction of such Claims, followed by the deemed transfer of such assets by such Holders to PropCo in exchange for the New PropCo Securities. The Debtors' deemed transfer of assets directly to Holders of DIP Claims and Class 4 First Lien Claims in satisfaction of such Claims would be a taxable exchange and, as described above, is expected to result in the recognition of gain or loss by the Debtors, depending in part on the purchase price treated as paid for such assets and the Debtors' tax basis in such assets. The Debtors believe that their available tax attributes should offset gain (if any) on such transfer and do not expect any material federal income tax cash liability as a result of the transfer.

There is no assurance, however, that the IRS would not take a contrary position as to the treatment of PropCo as a liquidating trust, in which case, the tax consequences of the Debtors' transfer to PropCo may be different that described above. All Holders are urged to consult their tax advisors regarding the U.S. federal income tax treatment of PropCo.

### C. Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims.

The character as capital or ordinary of any gain or loss recognized by a U.S. Holder as a result of receiving its distribution under the Plan will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands (including whether the Claim constitutes a capital asset), whether the Claim was purchased at a discount, whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim, and whether any part of the U.S. Holder's recovery is treated as being on account of accrued but untaxed interest.  Accrued interest and market discount are discussed below. If recognized gain or loss is capital in nature, it generally would

be long-term capital gain or loss if the U.S. Holder held its Claim for more than one year at the time of the exchange.

Prior to the Effective Date, holders of First Lien Claims will, pursuant to the Asset Purchase Agreement, transfer a portion of their First Lien Claims to the OpCo Purchaser in exchange for certain consideration to facilitate the OpCo Purchaser's acquisition of OpCo from the Debtors. Because such distributions are not being received pursuant to the Plan, the receipt of such additional consideration in exchange for First Lien Claims is not addressed here, and the U.S. federal income tax consequences of owning and disposing of such other forms of consideration is not discussed below. This discussion assumes that the sale of certain Claims to the OpCo Purchaser is respected for U.S. federal income tax purposes as a transaction that is separate and distinct from the receipt of the New PropCo Securities pursuant to the Plan. In the event that characterization is not respected, the tax consequences of the Plan discussed below could be materially different.

U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the sale of First Lien Claims to the OpCo Purchaser and the other aspects of the Restructuring Transactions.

### 1. Consequences to U.S. Holders of Class 4 First Lien Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of the portion of their First Lien Claims allocated to the Credit Bid, each U.S. Holder of a Class 4 First Lien Claim shall receive its Pro Rata share of New PropCo Securities and potentially cash. Such U.S. Holders generally should be treated as receiving their distributions under the Plan in a taxable exchange under section 1001 of the IRC.

Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder of such a Claim generally should recognize gain or loss equal to the difference, if any, between (a) the sum of (i) cash, if any, (ii) the amount treated as the fair market value of the underlying assets attributable to its New PropCo Securities based on the Restructuring Transactions and (iii) the fair market value (or issue price, in the case of debt instruments) of any other non-cash consideration, in each case, received in exchange for such U.S. Holder's Claim, and (b) the U.S. Holder's adjusted tax basis, if any, in such Claim.

Subject to the rules regarding accrued but untaxed interest, a U.S. Holder generally should obtain an aggregate tax basis in its undivided beneficial interest in the underlying assets transferred to PropCo equal the amount taken into account by such U.S. Holder for purposes of determining gain or loss on its Claim, increased by its share of certain liabilities assumed by PropCo and liabilities (if any) to which such assets remain subject upon transfer to PropCo. A U.S. Holder's holding period for the New PropCo Securities and the undivided beneficial interest in the underlying assets received in exchange for such U.S. Holder's Claim should begin on the day following the date on which such property is distributed to the U.S. Holder in satisfaction of its Claim.

The tax basis of any non-cash consideration determined to be received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for such non-cash consideration should begin on the day following receipt of such property.

### 2. Consequences to U.S. Holders of Class 6 Second Lien Notes Claims, Class 7 Unsecured Notes Claims, Class 8A General Unsecured Claims or Class 8B Key Go Forward Supplier Claims.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, each U.S. Holder of a Class 6 Second Lien Notes Claim, a Class 7 Unsecured Notes Claim, a Class 8A General Unsecured Claim or a Class 8B Key Go Forward Supplier Claim shall receive its Pro Rata share of cash remaining in the Wind-Down Reserve, to the extent available once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment therefrom remain to be adjudicated, and all First Lien Claims have been satisfied in full.

Such U.S. Holders generally should be treated as receiving their distributions under the Plan in a taxable exchange under section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder of such a Claim generally should recognize gain or loss equal to the difference, if any, between the amount of cash received in exchange for such U.S. Holder's Claim, and the U.S. Holder's adjusted tax basis, if any, in such Claim.

### 3.      Accrued Interest.

To the extent that any amount received by a U.S. Holder of a Claim under the Plan is attributable to accrued but untaxed interest or original issue discount ("OID") during its holding period on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration to be distributed to Claims in each Class will be allocated first to the principal amount of Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest. Certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 4.      Market Discount.

In the case of a U.S. Holder that acquired its Claim with market discount, any gain recognized on the sale or exchange of such Claim generally will be treated as ordinary income to the extent of the market discount treated as accruing during such U.S. Holder's holding period for such Claim. Any such market discount is generally the excess of the "revised issue price" of such Claim over such U.S. Holder's initial tax basis in such Claim upon acquisition, if such excess equals or exceeds a statutory *de minimis* amount. Such market discount is generally treated as accruing during such U.S. Holder's holding period for such Claim on a straight-line basis or, at the election of such U.S. Holder, on a constant yield basis, unless such U.S. Holder has previously elected to include such market discount in income as it accrues. For this purpose, the "revised issue price" of a Claim generally equals its issue price, increased by the amount of OID that has accrued over the term of the Claim. U.S. Holders who acquired their Claims other than at original issuance should consult their own tax advisors regarding the possible application of the market

discount rules to their Claims.

### 5.  Limitations on Use of Capital Losses.

A U.S. Holder who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses. For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years. Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 6.  U.S. Federal Income Tax Consequences to U.S. Holders of Ownership of the New PropCo Securities.

#### (a)  *Tax Classification of PropCo.*

As currently contemplated, PropCo is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes under Treasury Regulations Section 301.7701-4(d). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., all income and loss is taxed on a pass-through basis, directly to the trust beneficiaries). However, merely establishing a trust for the purpose of liquidating assets does not automatically result in treatment as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining a ruling as to the status of a liquidating trust under a Chapter 11 plan. PropCo is expected to be structured with the intention of complying with such general criteria. As such, PropCo will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of PropCo. The PropCo Trustee shall be the trustee of PropCo and shall have the rights, powers, and obligations set forth in PropCo Trust Agreement. All parties will be required for U.S. federal income tax purposes to treat PropCo as a liquidating trust taxed as a grantor trust, with each Holder of a First Lien Claim that receives New PropCo Securities being treated as the owner and grantor of an undivided interest in its respective share of the underlying assets of PropCo that they are deemed to contribute.

No ruling from the IRS is expected to be requested concerning the tax status of PropCo as a liquidating trust taxed as a grantor trust. In the absence of a ruling, there can be no assurances that the IRS would not take a contrary position either from the inception of PropCo or at any time prior to the termination of PropCo when it might determine that PropCo no longer qualifies as a liquidating trust for U.S. federal income tax purposes. Most significantly, PropCo's status as a liquidating trust might be jeopardized after it has initially satisfied the requirements to qualify as a liquidating trust if any of the following were to occur prior to the termination of PropCo: (i) the liquidation purpose of PropCo becomes so obscured by business activities that the declared purpose of liquidation can be said to be lost or abandoned; (ii) the term of PropCo is unreasonably prolonged; or (iii) all of PropCo's net income and net proceeds from the sale of its assets are not distributed at least annually to its beneficiaries, subject to an exception for amounts retained that are reasonably necessary to maintain the value of the trust's assets or to meet claims and contingent (or disputed) claims. If the IRS were to successfully challenge the classification of PropCo, the U.S. federal income tax consequences to PropCo, the Holders of First Lien Claims receiving the New PropCo Securities pursuant to the Plan and the Debtors could vary from those discussed herein (including the possibility of

entity-level tax on income of PropCo). If, contrary to the parties' intent, PropCo were determined to be a business entity for U.S. federal income tax purposes, it would be treated as a partnership unless it was considered a "publicly traded partnership" taxable as a corporation.  If PropCo is treated as a partnership it is not expected to be treated as a "publicly traded partnership" taxable as a corporation.

The following discussion assumes that PropCo will be respected as a liquidating trust taxed as a grantor trust for U.S. federal income tax purposes.  Holders are urged to consult their tax advisors regarding the U.S. federal income tax treatment of PropCo.

<b>(b)</b>      <i>Tax Treatment of Funding PropCo.</i>

Pursuant to the Plan, on the Effective Date, the Debtors will transfer all of the Debtors' right, title and interest in the PropCo Acquired Assets and PropCo Assumed Liabilities to PropCo, on behalf of the Holders of DIP Loans and Class 4 First Lien Claims.

All parties (including, without limitation, the Debtors, the PropCo Trustee and the Holders of DIP Loans and Holders of First Lien Claims receiving the New PropCo Securities pursuant to the Plan) will be required to treat the Debtors' transfer to PropCo as (1) a transfer of the assets (subject to any obligations relating to such assets) directly from the Debtors to the Holders of DIP Loans and Class 4 First Lien Claims in full or partial satisfaction of such Claims, followed by (2) such Holders' contribution of the assets to PropCo in exchange for New PropCo Securities. Accordingly, except in the event of contrary definitive guidance, holders of New PropCo Securities will be treated, and required to report, for U.S. federal income tax purposes as the grantors and direct owners of an undivided interest in their respective share of the underlying assets of PropCo.  The beneficiaries of PropCo shall report consistently with the valuation of the PropCo Acquired Assets transferred to PropCo as determined by the PropCo Trustee.

<b>(c)</b>      <i>Income with Respect to the New PropCo Securities.</i>

For all applicable U.S. federal income tax purposes, the parties will be required to treat PropCo as a liquidating trust taxed as a grantor trust of which Holders of DIP Loans and First Lien Claims receiving the New PropCo Securities pursuant to the Plan are the owners and grantors. Accordingly, each holder of New PropCo Securities will be treated for U.S. federal income tax purposes as the direct owner of an undivided interest in the underlying assets of PropCo, consistent with its economic interests therein. All income, gain, loss, deduction or credit recognized or incurred by PropCo will be allocated among holders of New PropCo Securities in accordance with each such holder's New PropCo Securities. Such items will be treated as directly earned and incurred by the holders of New PropCo Securities with respect to such holders' interests in the underlying assets of PropCo (and not as income or loss with respect to the prior Claims with respect to which such holders received their New PropCo Securities). Accordingly, any amount a holder receives as a distribution from PropCo in respect of its New PropCo Securities should not be included, for U.S. federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such holder's New PropCo Securities.

Upon PropCo's sale or other disposition (or deemed disposition) of any assets, each holder of New PropCo Securities must report on its U.S. federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of cash and/or the fair market value of any property received by PropCo in exchange for the assets so sold or otherwise disposed of and (2) such holder's adjusted tax basis in its share of such assets. The character of any such gain or loss to the holder of New PropCo Securities will be determined as if such holder had, itself, directly sold or otherwise disposed of the relevant assets.

All of the income of PropCo will be treated as subject to tax on a current basis. Each holder of New PropCo Securities will be required to report its share of any income, gain, loss, deduction and credit on its U.S. federal income tax return. The character of such items to any holder and the ability of such holder to benefit from any deductions or losses will depend on the particular situation of the holder. The U.S. federal income tax reporting obligation of a holder of New PropCo Securities is not dependent upon PropCo distributing any cash or other proceeds. Therefore, a holder of New PropCo Securities could incur a U.S. federal income tax liability regardless of the fact that PropCo has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its New PropCo Securities, the holder may be allowed a subsequent or offsetting loss. Because the holder is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed as appropriate at the time the cash was earned or received by PropCo), a distribution of cash or other assets by PropCo will not, in and of itself, constitute taxable income to a holder.

(d)    *Income Tax Reporting by PropCo.*

The trustee for PropCo will file federal income tax returns for PropCo as a grantor trust pursuant to Section 671 of the IRC and Treasury Regulations Section 1.671-4 promulgated thereunder. Although PropCo will not pay tax, the PropCo Trustee will file a blank IRS Form 1041 (U.S. Income Tax Return for Estates and Trusts) annually, attach a separate statement to that form and issue such statement to each holder of New PropCo Securities, separately stating each such holder's Pro Rata portion of PropCo's items of income, gain, loss, deduction, and credit. The trustee will instruct the holders of New PropCo Securities to use the information provided to them in the annual statements in preparing their U.S. federal income tax returns. The tax return of each holder of New PropCo Securities must treat any reported items attributable to their New PropCo Securities in a manner that is consistent with the treatment of such items on PropCo's return and attached statements, unless such holder notifies the IRS of any inconsistent treatment.

### D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Allowed Claims.

This discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders and does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S. and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of consideration received under the Plan.

### 1.    Gain Recognition with Respect to Claims.

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized

on the exchange in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2. Accrued Interest.

Subject to the discussion of backup withholding and FATCA, payments to a non-U.S. Holder that are attributable to accrued interest generally will not be subject to U.S. federal income tax or withholding pursuant to the portfolio interest exemption, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of JCP's stock entitled to vote, within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to JCP, actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

- the Non-U.S. Holder is a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business, as described in section 881(c)(3)(A) of the IRC; or

- such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the portfolio interest exemption generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

3. **PropCo Income.**

PropCo is being formed for the purpose of disposing of its assets and distributing the proceeds to the holders of New PropCo Securities and is not intended to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of PropCo. However, pending sale of its assets, PropCo will receive rent from OpCo pursuant to the Master Lease Agreement. While the Master Lease Agreement is a triple net lease pursuant to which all maintenance of the underlying properties is the responsibility of OpCo. PropCo's real estate activities may nonetheless be treated as a U.S. trade or business for U.S. federal income tax purposes and, to the extent that such activities are so treated, a Non-U.S. Holder would be deemed to be engaged in that underlying U.S. trade or business. If PropCo is treated as engaged in a U.S. trade or business, a Non-U.S. Holder owning New PropCo Securities would likely be treated as engaged in a U.S. trade or business. In that case, a Non-U.S. Holder's share of PropCo's effectively connected income would be subject to tax at normal graduated U.S. federal income tax rates and, if the Non-U.S. Holder is a corporation for U.S. federal income tax purposes, may also be subject to U.S. branch profits tax. A Non-U.S. Holder generally will be required to file a U.S. federal income tax return if PropCo is deemed to be engaged in a U.S. trade or business. Each Non-U.S. Holder receiving New PropCo Securities should consult their own tax advisor regarding the U.S. federal income tax consequences to such Non-U.S. Holder of owning New PropCo Securities.

4. **Income with Respect to PropCo's Disposition of Assets.**

In general, a Non-U.S. Holder of New PropCo Securities would not be subject to U.S. federal income tax or U.S. federal withholding tax with respect to amounts received on account of its New PropCo Securities that are attributable to the disposition of underlying assets of PropCo unless (a) in the case of gain only, such Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition, and certain other requirements are met; (b) any gain attributable to the disposition is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the U.S. (and, if required by any applicable tax treaty, is attributable to a permanent establishment maintained by the Non-U.S. Holder in the United States) or (c) the assets constitute USRPIs for U.S. federal income tax purposes. If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the disposition in the same manner as a U.S. Holder. In addition, a Non-U.S. Holder that is a corporation also may be subject to a branch profits tax equal to 30 percent (or such lower rate specified by an applicable tax treaty) of its effectively connected earnings and profits for the taxable year, as adjusted for certain taxes. If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any recognized gain attributable to the disposition of all or a portion of its USRPI and will be required to file U.S. federal income tax returns. Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), taxable gain from the disposition of a USRPI (generally equal to the difference between the amount realized on the disposition and the Non-U.S. Holder's adjusted tax basis in such USRPI) will constitute effectively connected income, subject to U.S. federal net income tax in the hands of a Non-U.S. Holder in the same manner as a U.S. Holder. The PropCo Trustee would be required to withhold tax at the highest applicable rate on any gain allocable to the Non-U.S. Holder's New PropCo Securities (unless either a special large trust election is made or the New PropCo Securities are considered to be regularly traded on an established securities market, in which case the applicable withholding agent will withhold tax at the highest applicable rate on distributions to Non-U.S. Holders that are attributable to gain from the disposition of USRPIs), although this amount generally would be allowed as a credit against the Non-U.S. Holder's federal income

tax liability described in the preceding sentence and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.

### 5.  Disposition of New PropCo Securities.

The disposition of New PropCo Securities generally will be treated for U.S. federal income tax purposes as though the holder of such New PropCo Securities disposed of an undivided interest in each of the underlying assets of PropCo. In particular, the tax consequences of a U.S. Holder's disposition of the New PropCo Securities will depend on whether the New PropCo Securities are considered to be regularly traded on an established securities market.  As discussed above, PropCo's assets consist primarily of real properties constituting USRPIs. If the New PropCo Securities are not considered to be regularly traded on an established securities market to the extent that amounts received on the disposition of New PropCo Securities are attributable to the holder's deemed disposition of underlying assets that constitute USRPIs, such amounts would be treated as effectively connected income subject to U.S. federal net income tax in the hands of a Non-U.S. Holder in the same manner as a U.S. Holder. Further, the buyer of such New PropCo Securities generally would be required to withhold 15 percent of the amount realized on such New PropCo Securities to the extent the disposition of such New PropCo Securities is attributable to the deemed disposition of underlying assets constituting USRPIs.

To the extent that amounts received on a Non-U.S. Holder's disposition of New PropCo Securities are attributable to the deemed disposition of PropCo's underlying assets (if any) that do not constitute USRPIs, such Non-U.S. Holder generally would not be subject to U.S. federal income tax or U.S. federal withholding tax with respect to amounts unless (a) in the case of gain only, such Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition, and certain other requirements are met or (b) any gain attributable to the disposition is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the U.S. (and, if required by any applicable tax treaty, is attributable to a permanent establishment maintained by the Non-U.S. Holder in the United States). If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the disposition in the same manner as a U.S. Holder.  In addition, a Non-U.S. Holder that is a corporation also may be subject to a branch profits tax equal to 30 percent (or such lower rate specified by an applicable tax treaty) of its effectively connected earnings and profits for the taxable year, as adjusted for certain taxes.

If the New PropCo Securities are considered to be regularly traded on an established securities market, then for purposes of FIRPTA, the disposition of the New PropCo Securities generally will be subject to the rules under FIRPTA that govern interests in publicly traded corporations.  As such, the New PropCo Securities would only be considered USRPIs in the hands of a holder of New PropCo Securities that, at any time during an applicable measuring period, owns more than 5% of the New PropCo Securities (the "5% Public Holder Exception"). A Non-U.S. Holder that meets the 5% Public Holder Exception would not be subject to tax under FIRPTA on the disposition of the New PropCo Securities, though such a Non-U.S. Holder could still be subject to U.S. federal income tax on the disposition if, as described in the prior paragraph, (a) in the case of gain only, such Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition, and certain other requirements are met or (b) any gain attributable to the disposition is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the U.S. (and, if required by any applicable tax treaty, is attributable to a permanent establishment maintained by the Non-U.S. Holder in the United States).  It is not clear whether the New PropCo Securities will be considered to be regularly traded on an established

securities market.

### 6.      FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends.  However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective.  Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### 7.      Information Reporting and Back-Up Withholding.

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from any amounts payable under the Plan or in connection with payments made on account of consideration received pursuant to the Plan. The Debtors will comply with all applicable information reporting requirements of the IRC.  The IRS may make the information returns reporting such amounts available to the tax authorities in the country in which a Non-U.S. Holder is resident.  In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8) (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds.  Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  October 26, 2020

J. C. Penney Company, Inc.
on behalf of itself and all other Debtors

*/s/ Bill Wafford*

Bill Wafford
Chief Financial Officer
J. C. Penney Company, Inc.

## Exhibit A

**Plan of Reorganization**

*Proposed Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| J. C. PENNEY COMPANY, INC., *et al.*,[1] | ) | Case No. 20-20182 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF J. C. PENNEY COMPANY, INC. AND ITS DEBTOR AFFILIATES

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher J. Marcus, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:   joshua.sussberg@kirkland.com
            christopher.marcus@kirkland.com
            aparna.yenamandra@kirkland.com

Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:   mcavenaugh@jw.com
            jwertz@jw.com
            kpeguero@jw.com
            vpolnick@jw.com

*Co-Counsel to the Debtors and Debtors-in-Possession*          *Co-Counsel to the Debtors and Debtors-in-Possession*

---

[1]     A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' Claims and Noticing Agent at http://cases.primeclerk.com/JCPenney.  The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 6501 Legacy Drive, Plano, Texas 75024.

**TABLE OF CONTENTS**

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
      GOVERNING LAW ........................................................................................................ 1
    A.     Defined Terms. ................................................................................................... 1
    B.     Rules of Interpretation. ..................................................................................... 16
    C.     Computation of Time. ....................................................................................... 17
    D.     Governing Law. ................................................................................................ 17
    E.     Reference to Monetary Figures. ....................................................................... 17
    F.     Controlling Document ....................................................................................... 17
    G.     RSA Consent Rights and Controlling Documents. ........................................... 17
    H.     Asset Purchase Agreement Consent Rights and Controlling Documents ......... 18

ARTICLE II ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX
      CLAIMS, AND DIP CLAIMS .................................................................................... 18
    A.     Administrative Claims. ..................................................................................... 18
    B.     Payment of Fees and Expenses under Financing Order. .................................. 19
    C.     Professional Fee Claims. ................................................................................... 19
    D.     Priority Tax Claims. .......................................................................................... 20
    E.     DIP Claims. ....................................................................................................... 20

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..................................... 21
    A.     Classification of Claims and Interests. ............................................................. 21
    B.     Treatment of Claims and Interests. .................................................................. 22
    C.     Special Provision Governing Unimpaired Claims. ........................................... 26
    D.     Elimination of Vacant Classes. ........................................................................ 26
    E.     Voting Classes, Presumed Acceptance by Non-Voting Classes. ..................... 26
    F.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ................. 26
    G.     Controversy Concerning Impairment. .............................................................. 27
    H.     Subordinated Claims. ....................................................................................... 27

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ............................................................. 27
    A.     General Settlement of Claims and Interests. ..................................................... 27
    B.     Restructuring Transactions ............................................................................... 27
    C.     Sources of Consideration for Plan Distributions. ............................................. 28
    D.     Plan Administrator and the Wind-Down Debtors ........................................... 29
    E.     Release of Liens ................................................................................................ 30
    F.     Cancellation of Existing Securities and Agreements. ....................................... 30
    G.     Corporate Action. ............................................................................................. 31
    H.     New Organizational Documents. ...................................................................... 32

i

I.      Effectuating Documents; Further Transactions.............................................................32

J.      Section 1146 Exemption. ...........................................................................................32

K.     Exemption from Securities Act Registration ...............................................................32

L.     Preservation of Causes of Action. ..............................................................................33

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ..............................34

A.     Assumption and Rejection of Executory Contracts and Unexpired Leases. ...................34

B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases......................35

C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases...................35

D.     Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases............36

E.     Indemnification Provisions. ........................................................................................36

F.     Modifications, Amendments, Supplements, Restatements, or Other Agreements. .........36

G.     Reservation of Rights....................................................................................................37

H.     Nonoccurrence of Effective Date. ...............................................................................37

I.      Contracts and Leases Entered Into After the Petition Date. ..........................................37

J.      Sale Order Assignment Procedures...............................................................................37

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS .............................................................................37

A.     Timing and Calculation of Amounts to Be Distributed ................................................37

B.     Distributions on Account of Obligations of Multiple Debtors .....................................38

C.     Distributions Generally ...............................................................................................38

D.     Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...................39

E.     Manner of Payment.....................................................................................................39

F.     Distributions on Account of Claims or Interests Allowed After the Effective Date ......40

G.     Compliance with Tax Requirements. ..........................................................................40

H.     Allocations. ................................................................................................................40

I.      No Postpetition Interest on Claims. .............................................................................40

J.      Foreign Currency Exchange Rate. ...............................................................................40

K.     Setoffs and Recoupment. ............................................................................................41

L.     Claims Paid or Payable by Third Parties......................................................................41

ARTICLE VII THE PLAN ADMINISTRATOR.....................................................................................................41

A.     The Plan Administrator................................................................................................41

B.     Wind-Down...............................................................................................................43

C.     Exculpation, Indemnification, Insurance & Liability Limitation ..................................43

D.     Tax Returns ................................................................................................................43

ARTICLE VIII RESERVES ADMINISTERED BY THE PLAN ADMINISTRATOR ...........................................44

A.     Establishment of Reserve Accounts.............................................................................44

B.     Undeliverable Distribution Reserve .............................................................................44

C.      Wind-Down Reserve ..................................................................................... 44

D.      Administrative / Priority Claims Reserve ..................................................... 45

ARTICLE IX  PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ........................................................................................... 45

A.      Allowance of Claims. .................................................................................... 45

B.      Claims Administration Responsibilities. ...................................................... 45

C.      Estimation of Claims. ................................................................................... 46

D.      Adjustment to Claims or Interests without Objection. ................................. 46

E.      Time to File Objections to Claims. ............................................................... 46

F.      Disallowance of Claims or Interests. ........................................................... 46

G.      No Distributions Pending Allowance. .......................................................... 47

H.      Distributions After Allowance. .................................................................... 47

I.      No Interest. .................................................................................................... 47

J.      Amendments to Claims ................................................................................ 47

ARTICLE X SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ................. 47

A.      Settlement, Compromise, and Release of Claims and Interests. ................... 47

B.      Release of Liens. .......................................................................................... 48

C.      Debtor Release. ............................................................................................ 48

D.      Third-Party Release. ..................................................................................... 49

E.      Exculpation. ................................................................................................. 50

F.      Injunction. .................................................................................................... 51

G.      Protections Against Discriminatory Treatment. ........................................... 51

H.      Document Retention. .................................................................................... 52

I.      Reimbursement or Contribution. .................................................................. 52

J.      Term of Injunctions or Stays. ....................................................................... 52

K.      Subordination Rights. ................................................................................... 52

ARTICLE XI CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ........................ 52

A.      Conditions Precedent to the Effective Date. ................................................ 52

B.      Waiver of Conditions. .................................................................................. 53

C.      Effect of Failure of Conditions. ................................................................... 53

ARTICLE XII MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ................. 54

A.      Modification and Amendments. .................................................................... 54

B.      Effect of Confirmation on Modifications. .................................................... 54

C.      Revocation or Withdrawal of Plan. .............................................................. 54

ARTICLE XIII RETENTION OF JURISDICTION ......................................................................... 54

ARTICLE XIV MISCELLANEOUS PROVISIONS ................................................................56

    A.       Immediate Binding Effect. ....................................................................56

    B.       Additional Documents. ..........................................................................56

    C.       Payment of Statutory Fees. ...................................................................56

    D.       Statutory Committee and Cessation of Fee and Expense Payment. ......56

    E.       Rights of Purchasers Under the Sale Order. ..........................................57

    F.       Reservation of Rights. ...........................................................................57

    G.       Successors and Assigns. ........................................................................57

    H.       Notices. .................................................................................................57

    I.       Entire Agreement. ..................................................................................58

    J.       Exhibits. ................................................................................................58

    K.       Nonseverability of Plan Provisions. ......................................................59

    L.       Votes Solicited in Good Faith. ..............................................................59

    M.       Closing of Chapter 11 Cases. ................................................................59

    N.       Waiver or Estoppel. ...............................................................................59

    O.       Conflicts. ...............................................................................................59

## INTRODUCTION

J. C. Penney Company, Inc. ("J. C. Penney") and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 Cases (each a "Debtor" and, collectively, the "Debtors") propose this joint plan of reorganization (the "Plan") for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code.  Capitalized terms used in the Plan and not otherwise defined shall have the meanings set forth in Article I.A of the Plan.  Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable.  The Plan does not contemplate substantive consolidation of any of the Debtors.  Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties and operations, projections, risk factors, a summary and analysis of the Plan, and certain related matters.

ALL HOLDERS OF CLAIMS OR INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.      *Defined Terms.*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*ABL Agent*" means Wells Fargo Bank, acting through such Affiliates or branches as it may designate, as collateral agent and administrative agent to the ABL Credit Agreement, or any administrative agent as permitted by the terms set forth in the ABL Credit Agreement.

2.      "*ABL Claim*" means any Claim, including Secured Swap Claims, derived from, based upon, or arising under the ABL Credit Agreement.

3.      "*ABL Credit Agreement*" means that certain Credit Agreement, dated as of June 20, 2014 by and among, inter alios, J. C. Penney Corporation, Inc., as a borrower, certain of the Debtors, as other borrowers and guarantors, the ABL Agent, and each of the lenders party thereto from time to time, as amended under (i) that certain Amendment No. 1 to Credit Agreement, dated as of December 10, 2015, (ii) that certain Amendment No. 2 to Credit Agreement, dated as of June 20, 2017, and (iii) that certain Amendment No. 3 to Credit Agreement, dated as of March 18, 2018, and as further amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

4.      "*ABL Documents*" means, collectively, the ABL Credit Agreement and any related letter of credit documentation, security agreement, intercreditor agreement, and any other collateral and ancillary documents, including any forbearance agreements, as amended, restated, modified, or supplemented from time to time in accordance with their terms.

5.      "*ABL Intercreditor Agreement*" means that certain Intercreditor and Collateral Cooperation Agreement, dated as of June 23, 2016 by and among, inter alias, J. C. Penney Corporation, Inc., the ABL Agent, the Term Loan Administrative Agent, and each of the Representatives party thereto from time to time, as amended, restated, amended and restated, extended, supplemented, or otherwise modified from time to time.

6.      "*ABL Lenders*" means the lenders from time to time party to the ABL Credit Agreement.

7.      "*Acquired Assets*" means, collectively, all OpCo Acquired Assets and PropCo Acquired Assets.

8.      "*Administrative / Priority Claims Reserve*" means a segregated account established by the Plan Administrator established in accordance with Article VIII.D.

9.      "*Administrative / Priority Claims Reserve Amount*" means the amount of Cash necessary to satisfy all Allowed Administrative Claims, Allowed Priority Claims, Allowed Secured Tax Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Other Priority Claims to the extent such Allowed Administrative and Allowed Priority Claims are not Assumed Liabilities, which aggregate amount shall be funded into the Administrative / Priority Claims Reserve.

10.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; *provided*, *however*, that any Administrative Claim that is an Assumed Liability shall be satisfied pursuant to the Asset Purchase Agreement, shall not be an obligation of the Debtors or the Wind-Down Debtors, and shall not be satisfied from the Administrative / Priority Claims Reserve.

11.      "*Administrative Claim Bar Date*" means the deadline for filing requests for payment of Administrative Claims, which shall be 30 days after the Effective Date.

12.      "*Administrative Claim Objection Bar Date*" means the deadline for filing objections to Administrative Claims.

13.      "*Affiliate*" means, with respect to any person, or any other person, which indirectly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, (x) the possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership, limited liability company or other ownership interests, by contract or otherwise) of such Person or (y) solely with respect to Affiliates of Consenting First Lien Lender, the investment or voting discretion or control with respect to discretionary accounts of such Person.

14.      "*Aggregate Credit Bid*" means, collectively, (i) the DIP Credit Bid, and (ii) the Prepetition First Lien Credit Bid.

15.      "*Allowed*" means with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.  Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed (where such Proof of Claim is required to be Filed), is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  For the avoidance of doubt:  (x) a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim; and (y) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the

same extent such Claims would be allowed under applicable non-bankruptcy law. "Allow" and "Allowing" shall have correlative meanings.

16.     "*Asset Purchase Agreement*" means that certain Asset Purchase Agreement, dated as of [October __], 2020, executed by Copper Retail JV LLC and Copper BidCo LLC, and the Debtors in connection with the OpCo Sale and the PropCo Sale, a copy of which has been Filed with the Bankruptcy Court at Docket No. [1590-1], together with all exhibits, appendices, supplements, documents, and agreements ancillary thereto, in each case as amended, modified, or supplemented from time to time.

17.     "*Assigned Contracts*" means collectively, all OpCo Assigned Contracts and PropCo Assigned Contracts.

18.     "*Assumed Liabilities*" means collectively, all OpCo Assumed Liabilities and PropCo Assumed Liabilities.

19.     "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other Claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common Law, including fraudulent transfer Laws.

20.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

21.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas or such other court having jurisdiction over the Chapter 11 Cases, including, to the extent of the withdrawal of the reference under 28 U.S.C. § 156, the United States District Court for the Southern District of Texas.

22.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

23.     "*Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim must be Filed with respect to such Claims, other than Administrative Claims, Claims held by Governmental Units, Claims based upon rejection damages, or other Claims or Interests for which the Bankruptcy Court entered an order excluding the holders of such Claims or Interests from the requirement of Filing Proofs of Claim.

24.     "*Bar Date Order*" means the *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 99] entered by the Bankruptcy Court on May 16, 2020.

25.     "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

26.     "*Cash*" means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

27.     "*Cash Collateral*" has the meaning set forth in section 363(a) of the Bankruptcy Code.

28.     "*Cause of Action*" or "*Causes of Action*" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or

unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, Secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, Law, equity, or otherwise.  Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and Claims under contracts or for breaches of duties imposed by Law; (b) the right to object to or otherwise contest Claims or Interests; (c) Claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such Claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign Law fraudulent transfer or similar Claim.

29.     "*Chapter 11 Cases*" means the procedurally consolidated cases Filed for the Debtors in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

30.     "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

31.     "*Claims and Noticing Agent*" means Prime Clerk LLC, the notice, Claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases in accordance with the *Order Authorizing the Employment and Retention of Prime Clerk LLC as Claims, Noticing, and Solicitation Agent* [Docket No. 67].

32.     "*Claims Objection Deadline*" means the date that is 180 days following the Effective Date.

33.     "*Claims Register*" means the official register of Claims maintained by the Claims and Noticing Agent.

34.     "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

35.     "*CM/ECF*" means the Bankruptcy Court's Case Management and Electronic Case Filing system.

36.     "*Confirmation*" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article XI.A of the Plan having been (a) satisfied or (b) waived pursuant to Article XI.B of the Plan.

37.     "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

38.     "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan, pursuant to sections 1128 and 1129 of the Bankruptcy Code and approval of the Disclosure Statement, as such hearing may be continued from time to time.

39.     "*Confirmation Order*" means one or more orders of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

40.     "*Consenting First Lien Lenders*" means the First Lien Lenders party to the RSA.

41.     "*Consummation*" means the occurrence of the Effective Date.

42.     "*Credit Bid*" shall mean, as applicable, a bid by the DIP Collateral Agent and the Term Loan/First Lien Notes Collateral Agent, in a manner consistent with the Financing Order, the Sale Order, and section 363(k) of the Bankruptcy Code.

43.     "*Credit Bid Distributions*" shall mean all the assets whose purchase was authorized by the Sale Order other than the OpCo Acquired Assets, including the New PropCo Securities (subject to dilution for the Management Incentive Plan, if any) and all of the Debtors' Cash except as necessary to fund the Administrative / Priority Claims Reserve, the Wind-Down Reserve and the Professional Fee Escrow Account; *provided*, *however*, that any Credit Bid Distribution to be made by OpCo Purchaser to Holders of Allowed Claims (or the Agent responsible

for making such distribution) pursuant to the Asset Purchase Agreement shall be made pursuant to the Asset Purchase Agreement and not pursuant to this Plan.

44. "*Credit Bid Pro Rata*" shall mean, in accordance with the Asset Purchase Agreement and Sale Order, (a) with respect to DIP Claims, the proportion (x) each Holder's Allowed DIP Claims bears to all Allowed DIP Claims and (y) the DIP Credit Bid bears to the Aggregate Credit Bid and (b) with respect to First Lien Claims, the proportion (x) each Holder's Allowed First Lien Claims bears to all Allowed First Lien Claims and (y) the Prepetition First Lien Credit Bid bears to the Aggregate Credit Bid.

45. "*Creditors' Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 329].

46. "*Cure Cost*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed by the Debtors (and/or assigned by the Debtors pursuant to the Sale Order or the Confirmation Order) pursuant to sections 365 or 1123 of the Bankruptcy Code.

47. "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") and all agreements, documents or instruments relating thereto issued or providing coverage at any time to any of the Debtors or any of their predecessors for current or former directors', managers', and officers' liability.

48. "*Debtors*" means, collectively, each of the following: J. C. Penney Corporation, Inc.; J. C. Penney Company, Inc.; Future Source LLC; J. C. Penney Direct Marketing Services LLC; J. C. Penney Export Merchandising Corporation; J. C. Penney International, Inc.; J. C. Penney Properties, LLC; J. C. Penney Purchasing Corporation; JCP Construction Services, Inc.; JCP Media, Inc.; JCP New Jersey, LLC; JCP Procurement, Inc.; JCP Real Estate Holdings, LLC; JCP Realty, LLC; JCP Telecom Systems, Inc.; JCPenney Puerto Rico, Inc.; JCPenney Services, LLC; jcpSSC, Inc.

49. "*Deficiency Claims*" means, collectively, the First Lien Deficiency Claims and the Second Lien Notes Deficiency Claims.

50. "*Definitive Documents*" means, collectively, Plan and any Plan Supplement, the Disclosure Statement, the Confirmation Order, the Sale Order, the Disclosure Statement Order, the Asset Purchase Agreement and all documents related thereto.

51. "*DIP Agent*" means the "Administrative Agent" as defined in the DIP Credit Agreement.

52. "*DIP Claim*" means a Claim held by the DIP Lenders or the DIP Agent arising under or relating to the DIP Credit Agreement or the Financing Order, including any and all fees, interests paid in kind, and accrued but unpaid interest and fees arising under the DIP Credit Agreement.

53. "*DIP Collateral Agent*" means the "Collateral Agent" as defined in the DIP Credit Agreement.

54. "*DIP Credit Agreement*" means that Superpriority Senior Secured Debtor-In-Possession Credit and Guaranty Agreement evidencing the DIP Facility entered into in accordance with the Financing Order (as the same may be amended, amended and restated, modified or supplemented from time to time in accordance with its terms) terms and conditions of, and subject in all respects to the Financing Order.

55. "*DIP Credit Bid*" means a Credit Bid of $900 million of DIP Claims.

56. "*DIP Credit Documents*" means the DIP Credit Agreement, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the

foregoing) related to or executed in connection therewith, which shall be in form and substance acceptable to the Debtors and the DIP Secured Parties.

57.     "*DIP Facility*" means the senior secured superpriority, priming secured debtor-in-possession credit facility in an aggregate principal amount of $900 million, on the terms set forth in the DIP Credit Agreement and the Financing Order, as applicable.

58.     "*DIP Lenders*" means the lenders under the DIP Credit Agreement.

59.     "*DIP Secured Parties*" means, collectively, the DIP Lenders and the DIP Agent.

60.     "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that:  (a) has been disallowed by a Final Order; (b) is scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the holder thereof; or (e) has been withdrawn by the holder thereof.

61.     "*Disbursing Agent*" means, as applicable, the Debtors, the Plan Administrator, or the Wind-Down Debtors (as applicable) or any Entity or Entities selected by the Debtors or the Plan Administrator to make or facilitate distributions contemplated under the Plan.

62.     "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

63.     "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement, entered on [●], 2020 [Docket No. [●]].

64.     "*Disputed Claim*" means a Claim that is not yet Allowed.

65.     "*Distribution Date*" means a date on which the Disbursing Agent makes distributions to Holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date.

66.     "*Distribution Record Date*" means the date for determining which holders of Claims are eligible to receive distributions hereunder and shall be the Effective Date or such other date as designated in a Final Order of the Bankruptcy Court; *provided* that the Distribution Record Date shall not apply to any securities of the Debtors deposited with DTC, the holders of which shall receive a distribution in accordance with the customary procedures of DTC.

67.     "*Designee*" shall have the meaning set forth in the Asset Purchase Agreement.

68.     "*DTC*" means the Depository Trust Company.

69.     "*Earnout Agreement*" has the meaning set forth in the Asset Purchase Agreement.

70.     "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

71.     "*Entity*" means any entity, as defined in section 101(15) of the Bankruptcy Code.

72.     "*Equity Commitment Letter*" shall have the meaning set forth in the Asset Purchase Agreement.

73.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 upon the commencement of the applicable Debtor's Chapter 11 Case.

74.     "*Excluded Assets*" shall have the meaning set forth in the Asset Purchase Agreement.

75.     "*Excluded Liabilities*" shall have the meaning set forth in the Asset Purchase Agreement.

76.     "*Exculpated Parties*" means collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Consenting First Lien Lenders and any group thereof; (c) the Creditors' Committee and its members; (d) the Purchaser Group; (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (f) including, among others, agents and trustees under the First Lien Debt Documents, the Term Loan Credit Documents, and the DIP Credit Documents.

77.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

78.     "*Existing Equity Interests*" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof), common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtors (in each case whether or not arising under or in connection with any employment agreement).

79.     "*Exit ABL Facility*" means the new money asset-based loan facility in the principal amount of $[__] provided for under the Exit ABL Facility Documents.

80.     "*Exit ABL Facility Agent*" means [Wells Fargo], as administrative and collateral agent under the Exit ABL Facility Agreement, solely in its capacity as such.

81.     "*Exit ABL Facility Agreement*" means that certain credit, loan, or other agreement, dated as of the Effective Date, by and among [___], the Exit ABL Facility Agent, and the Exit ABL Facility Lenders, the terms of which shall be included in the Plan Supplement.

82.     "*Exit ABL Facility Documents*" means, collectively, the Exit ABL Facility Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

83.     "*Exit ABL Facility Lenders*" means the lenders party to the Exit ABL Facility Agreement.

84.     "*Exit Facilities*" means, collectively, the Exit ABL Facility and the Exit FILO Facility.

85.     "*Exit Facility Agents*" means, collectively, the Exit ABL Facility Agent and the Exit FILO Facility Agent.

86.     "*Exit Facility Agreements*" means, collectively, the Exit FILO Facility Agreement and the Exit ABL Facility Agreement.

87.     "*Exit Facility Documents*" means, collectively, the Exit FILO Facility Documents and the Exit ABL Facility Documents.

88.     "*Exit FILO Facility*" means the new money "first-in-last-out" loan facility in the principal amount of $[__] provided for under the Exit FILO Facility Documents.

89. "*Exit FILO Facility Agent*" means [__], as administrative and collateral agent under the Exit FILO Facility Agreement, solely in its capacity as such.

90. "*Exit FILO Facility Agreement*" means that certain credit, loan, or other agreement, dated as of the Effective Date, by and among [___], the Exit FILO Facility Agent, and the Exit FILO Facility Lenders, the terms of which shall be included in the Plan Supplement.

91. "*Exit FILO Facility Documents*" means, collectively, the Exit FILO Facility Agreement, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents.

92. "*Exit FILO Facility Lenders*" means the lenders party to the Exit FILO Facility Agreement.

93. "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

94. "*File*" or "*Filed*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

95. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, modified, or amended, is not subject to any pending stay and as to which the time to appeal, move for reargument, reconsideration, or rehearing, or seek certiorari has expired and no appeal, motion for reargument, reconsideration, or rehearing or petition for certiorari has been timely taken or Filed, or as to which any appeal that has been taken, motion for reargument, reconsideration, or rehearing that has been granted or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument, reconsideration, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion under rule 60 of the Federal Rules of Civil Procedure or any comparable Bankruptcy Rule may be Filed relating to such order or judgment shall not cause such order or judgment to not be a Final Order.

96. "*Financing Order*" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 566].

97. "*First Lien Claims*" means any Claim on behalf of First Lien Debt.

98. "*First Lien Debt*" means, collectively, the First Lien Notes and the Term Loan.

99. "*First Lien Debt Documents*" means, collectively, the Term Loan Credit Agreement, the Prepetition Security Agreement, the First Lien Notes Indenture, and the Pari Passu Intercreditor Agreement.

100. "*First Lien Deficiency Claim*" means any unsecured Claim arising under the First Lien Debt Documents.

101. "*First Lien Lenders*" means, collectively, the First Lien Noteholders and the Term Lenders.

102. "*First Lien Noteholders*" means the parties holding the First Lien Notes as of the Voting Record Date.

103. "*First Lien Notes*" means the 5.875% Senior Secured Notes due 2023.

104. "*First Lien Notes Claim*" means any Claim on account of the First Lien Notes.

105.    "*First Lien Notes Indenture*" means that certain Indenture, dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among JCP, as issuer, certain of the Company Parties, as guarantors, and Wilmington Trust, National Association, as the trustee.

106.    "*First Lien Notes Trustee*" means Wilmington Trust, National Association, in its capacity as trustee under the First Lien Indenture, together with its successors and permitted assigns.

107.    "*General Unsecured Claim*" means any Claim, including the Deficiency Claims (if any), other than a Secured Claim, that is not (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim), (b) an Other Secured Claim, (c) an Other Priority Claim, (d) an Intercompany Claim, or (e) a Key Go Forward Supplier Claim.

108.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

109.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

110.    "*Indemnification Provisions*" means each of the Debtors' indemnification provisions currently in place, whether in the Debtors' bylaws, certificates of incorporation, other formation documents, board resolutions, indemnification agreements, employment contracts, or trust agreements, for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, other Professionals, and agents of the Debtors and such current and former directors', officers', and managers' respective Affiliates.

111.    "*Initial Distribution Date*" means the date on which the Disbursing Agent shall make initial distributions to Holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date.

112.    "*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor.

113.    "*Intercompany Interest*" means any Interest held by a Debtor in another Debtor or non-Debtor subsidiary or Affiliate.

114.    "*Interest*" means any Equity Security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

115.    "*JCP*" means J. C. Penney Company, Inc., a company incorporated under the Laws of Delaware.

116.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

117.    "*Key Go Forward Supplier*" means any Entity from which the Debtors are receiving goods or services that (a) is not party to an executory contract capable of assumption and assignment pursuant to section 365 of the Bankruptcy Code and (b) affirms on its ballot that it will provide goods and services to OpCo or PropCo, as applicable, following consummation of the OpCo Transaction or the PropCo Transaction, as applicable, on terms that are equal to or better than the historical prepetition course of business between the Debtors and such Entity; *provided* that if an Entity receives a Class 8B ballot and does not make the aforementioned affirmation, such Entity shall not be a Key Go Forward Supplier.  For the avoidance of doubt, classification as a Key Go Forward Supplier will not obligate OpCo or PropCo to in fact purchase goods or services from such Entity following OpCo Closing or PropCo Closing, as applicable.

118.    "*Key Go Forward Supplier Claim*" means any Claim held by a Key Go Forward Supplier that is not an Other Secured Claim or an Other Priority Claim.

119. "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

120. "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

121. ["*Management Incentive Plan*" means [__].]

122. "*Master Lease Agreement*" shall have the meaning set forth in the Asset Purchase Agreement

123. "*New Organizational Documents*" shall mean the form of the certificates or articles of incorporation, bylaws, trust agreements, or such other applicable formation or governance documents of PropCo, which forms shall be in form and substance reasonably acceptable to the PropCo Purchaser and consistent with the approval rights set forth in the RSA and the Asset Purchase Agreement.

124. "*New PropCo Securities*" means the securities issued by PropCo in accordance with this Plan.

125. "*OpCo*" means an entity to be formed upon consummation of the OpCo Sale, in accordance with the Asset Purchase Agreement and Sale Order, which entity shall hold the OpCo Acquired Assets and OpCo Assumed Liabilities pursuant to the Sale Order.

126. "*OpCo Acquired Assets*" shall have the meaning set forth in the Asset Purchase Agreement.

127. "*OpCo Assigned Contracts*" shall have the meaning set forth in the Asset Purchase Agreement.

128. "*OpCo Assumed Liabilities*" shall have the meaning set forth in the Asset Purchase Agreement.

129. "*OpCo Available Contracts*" shall have the meaning set forth in the Asset Purchase Agreement.

130. "*OpCo Closing Date*" shall have the meaning set forth in the Asset Purchase Agreement.

131. "*OpCo Closing Date Payment*" shall have the meaning set forth in the Asset Purchase Agreement.

132. "*OpCo Purchaser*" shall have the meaning set forth in the Asset Purchase Agreement.

133. "*OpCo Sale*" shall have the meaning set forth in the Asset Purchase Agreement.

134. "*OpCo-Company Cash Payment*" shall have the meaning set forth in the Asset Purchase Agreement.

135. "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases; *provided* that any Other Priority Claim that is an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of the Debtors or the Wind-Down Debtors and shall not be satisfied from the Administrative / Priority Claim Reserve.

136. "*Other Secured Claim*" means any Secured Claim, other than (a) an ABL Claim, (b) a DIP Claim, or (c) a First Lien Claim; *provided* that any Other Secured Claim that is an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of the Debtors or the Wind-Down Debtors and shall not be satisfied from the Administrative / Priority Claim Reserve.

137. "*Pari Passu Collateral Agent*" means Wilmington Trust, National Association, together with its permitted successors in its capacity as collateral agent pursuant to the Pari Passu Intercreditor Agreement.

138. "*Pari Passu Intercreditor Agreement*" means that certain Pari Passu Intercreditor Agreement, dated as of June 23, 2016, by and among inter alios, the Pari Passu Collateral Agent, JPMorgan Chase Bank, as Term Loan

Authorized Representative for the Term Loan Secured Parties, Wilmington Trust, National Association, as Notes Authorized Representative for the Notes Secured Parties, and each of the additional Authorized Representatives party thereto from time to time, as amended, restated, amended and restated, extended, supplemented, or otherwise modified from time to time.

139.     "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

140.     "*Petition Date*" means May 15, 2020, the date on which the Debtors commenced the Chapter 11 Cases.

141.     "*Plan*" has the meaning set forth in the Introduction.

142.     "*Plan Administrator*" shall mean the person or persons identified in the Plan Supplement (as determined by the Debtors) to be appointed on the Effective Date and who will serve as the trustee and administrator for the Wind-Down Debtors as set forth in Article IV.D of the Plan.

143.     "*Plan Supplement*" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules) to be Filed by the Debtors no later than five (5) days before the Voting Deadline or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, including the following, as applicable:  (a) the New Organizational Documents; (b) the Schedule of PropCo Assigned Contracts; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) Schedule of Retained Causes of Action; (e) the Restructuring Transactions Memorandum; and (f) any additional documents Filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date, subject to the terms of the Plan, the Asset Purchase Agreement, the Sale Order, and the RSA.

144.     "*Prepetition First Lien Credit Bid*" means a Credit Bid of $[__] million of First Lien Debt.

145.     "*Prepetition Security Agreement*" means that certain Amended and Restated Pledge and Security Agreement, dated as of June 23, 2016, by and among, J.C. Penney Corporation, Inc., as borrower, J.C. Penney Company, Inc., certain guarantors and Wilmington Trust, National Association, as Collateral Agent, as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

146.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

147.     "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

148.     "*Professional*" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

149.     "*Professional Fee Claim*" means all Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the Effective Date that the Bankruptcy Court has not denied by Final Order. To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims.

150. "*Professional Fee Escrow Account*" means an interest-bearing escrow account to be funded by the Debtors with Cash on the Effective Date in an amount equal to the Professional Fee Escrow Amount.

151. "*Professional Fee Escrow Amount*" means the aggregate amount of Professional Fee Claims and other unpaid fees and expenses Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II of the Plan.

152. "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases by the applicable Bar Date.

153. "*PropCo*" means an entity to be formed on or before the Effective Date which entity shall hold the PropCo Acquired Assets and PropCo Assumed Liabilities pursuant to the Asset Purchase Agreement and Confirmation Order.

154. "*PropCo Acquired Assets*" shall have the meaning set forth in the Asset Purchase Agreement.

155. "*PropCo Assigned Contracts*" shall have the meaning set forth in the Asset Purchase Agreement

156. "*PropCo Assumed Liabilities*" shall have the meaning set forth in the Asset Purchase Agreement.

157. "*PropCo Closing*" shall have the meaning set forth in the Asset Purchase Agreement.

158. "*PropCo Purchaser*" has the meaning set forth in the Asset Purchase Agreement.

159. "*PropCo Sale*" shall have the meaning set forth in the Asset Purchase Agreement.

160. "*PropCo Trust Agreement*" means the trust agreement entered into on or before the Effective Date between [__] and the PropCo Trustee, as amended, restated, amended and restated, extended, supplemented, or otherwise modified from time to time.

161. "*PropCo Trustee*" means the person designated as the trustee for PropCo, and any successor thereto in accordance with the PropCo Trust Agreement.

162. "*Purchaser Group*" shall have the meaning set forth in the Asset Purchase Agreement.

163. "*Purchasers*" shall have the meaning set forth in the Asset Purchase Agreement.

164. "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

165. "*Related Party*" means, with respect to any person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or Professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other Professionals and advisors of such person or Entity, and any such Person's or Entity's respective heirs, executors, estates, and nominees.

166. "*Released Party*" means each of the following, solely in its capacity as such:  (a) the Debtors, the Wind-Down Debtors and the Plan Administrator; (b) the ABL Agent; (c) the ABL Lenders; (d) the Term Loan Administrative Agent; (e) the Term Loan Lenders; (f) the First Lien Notes Trustee; (g) the First Lien Noteholders; (h) the Holders of Secured Swap Claims; (i) the Unsecured Notes Trustee; (j) the Unsecured Noteholders; (k) the

Purchaser Group; (l) the DIP Agent; (m) the DIP Lenders; (n) the Consenting First Lien Lenders; (o) the PropCo Trustee; (p) the Term Loan/First Lien Notes Collateral Agent; (q) with respect to each of the foregoing parties in clauses (a) through (p), each of such party's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (r) with respect to each of the foregoing parties in clauses (a) through (q) (and groups consisting of such parties), each of such party's Related Parties and (s) all holders of Claims or Interests; *provided* that any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) files an objection to the releases contained in the Plan, or (z) votes to reject the Plan shall not be a "Released Party."

167.    "*Releasing Party*" means each of the following, solely in its capacity as such: (a) the Debtors, the Wind-Down Debtors and the Plan Administrator; (b) the ABL Agent; (c) the ABL Lenders; (d) the Term Loan Administrative Agent; (e) the Term Loan Lenders; (f) the First Lien Notes Trustee; (g) the First Lien Noteholders; (h) the Holders of Secured Swap Claims; (i) the Unsecured Notes Trustee; (j) the Unsecured Noteholders; (k) the Purchaser Group; (l) the DIP Agent; (m) the DIP Lenders; (n) the Consenting First Lien Lenders; (o) the Creditors' Committee; (p) the U.S. Trustee; (q) the PropCo Trustee; (r) the Term Loan/First Lien Notes Collateral Agent (s) with respect to each of the foregoing parties in clauses (a) through (r), each of such party's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (t) with respect to each of the foregoing parties in clauses (a) through (t), each of such party's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; (u) with respect to each of the foregoing parties in clauses (a) through (t) (and groups consisting of such parties), each of such party's Related Parties and (v) all holders of Claims or Interests; *provided* that any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) files an objection to the releases contained in the Plan, or (z) votes to reject the Plan shall not be a "Releasing Party."

168.    "*Restructuring Transactions*" means the transactions described in Article IV of the Plan.

169.    "*Restructuring Transactions Memorandum*" means a document to be included in the Plan Supplement that will set forth the material components of the Restructuring Transactions, including any corporate restructuring or reorganization to be consummated in connection therewith.

170.    "*RSA*" means that certain Restructuring Support Agreement, dated as of May 15, 2020, by and among the Debtors and the Consenting First Lien Lenders, including all exhibits and schedules attached thereto, as may be amended from time to time in accordance with the terms thereof.

171.    "*Rules*" means Rule 501(a)(1), (2), (3) and (7) of the Securities Act.

172.    "*Sale Order*" shall have the meaning set forth in the Asset Purchase Agreement

173.    "*Sale Transaction*" means, collectively, the PropCo Sale and the OpCo Sale, in accordance with the Asset Purchase Agreement, the Sale Order, and the Confirmation Order.

174.    "*Schedule of PropCo Assigned Contracts*" means that certain schedule Filed with the Plan Supplement of Executory Contracts and Unexpired Leases to be assumed by the Debtors and assigned to PropCo or any subsidiary of PropCo pursuant to the Plan and in accordance with the Sale Order and Asset Purchase Agreement, as such schedule may be amended, modified, or supplemented from time to time by the Debtors in accordance with Article V of the Plan, which, including any modifications thereto, shall be acceptable to the Debtors, the Wind-Down Debtors, the Purchasers and PropCo.

175.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means that certain schedule Filed with the Plan Supplement of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan and in accordance with the Asset Purchase Agreement, as such schedule may be amended,

modified, or supplemented from time to time by the Debtors in accordance with Article V of the Plan, which, including any modifications thereto, shall be acceptable to the Purchasers.

176.     "*Schedule of Retained Causes of Action*" means the schedule, which will be included in the Plan Supplement, of certain Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, as the same may be amended, modified, or supplemented from time to time.

177.     "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

178.     "*Second Lien Noteholders*" means the parties holding the Second Lien Notes as of the Voting Record Date.

179.     "*Second Lien Notes*" means the 8.625% Second Lien Secured Notes due 2025.

180.     "*Second Lien Notes Claim*" means any Claim against a Debtor, the Estates, or property of a Debtor, including any Secured or unsecured Claim, arising under, related to, or in connection with the Second Lien Notes.

181.     "*Second Lien Notes Deficiency Claims*" means any unsecured Claims arising under the Second Lien Notes.

182.     "*Second Lien Notes Obligations*" has the meaning set forth in the Financing Order.

183.     "*Second Lien Notes Trustee(s)*" means UMB Bank, N.A., in its capacity as trustee under the Second Lien Indenture, together with its successors and permitted assigns.

184.     "*Section 510(b) Claim*" means any Claim arising from:  (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors; (b) purchase or sale of such a security; or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

185.     "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a Secured Claim.

186.     "*Secured Claim*" means a Claim Secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

187.     "*Secured Swap Claim*" means claims on behalf of the Secured Swap Obligations.

188.     "*Secured Swap Obligations*" means the obligations of J. C. Penney Corporation, Inc. under the Swap Agreements (as defined in the ABL Credit Agreement) made on or around May 6, 2015 by J. C. Penney Corporation, Inc. and the Swap Providers.

189.     "*Secured Tax Claim*" means any Secured Claim that, absent its Secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties; *provided* that any Secured Tax Claim that is an Assumed Liability under the Asset Purchase Agreement shall not be satisfied from the Administrative / Priority Claim

Reserve and shall not be an obligation of the Debtors or the Wind-Down Debtors and shall not be considered a Secured Tax Claim.

190.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

191.    "*Security*" means any security, as defined in section 2(a)(1) of the Securities Act.

192.    "*Solicitation Materials*" means all solicitation materials in respect of the Plan.

193.    "*Term Lenders*" means the lenders under the Term Loan Credit Agreement.

194.    "*Term Loan*" means the loan provided under the Term Loan Credit Agreement.

195.    "*Term Loan Administrative Agent*" means, together, GLAS USA LLC, a limited liability company organized and existing under the Laws of the State of New Jersey, and GLAS AMERICAS LLC, a limited liability company organized and existing under the Laws of the State of New York and any of its successors, assigns, or any replacement agent appointed pursuant to the terms of the Term Loan Credit Agreement.

196.    "*Term Loan Claim*" means any Claim arising under the Term Loan Credit Agreement.

197.    "*Term Loan Credit Agreement*" means that certain Amended and Restated Credit and Guaranty Agreement dated as of June 23, 2016 by and among, inter alios, J. C. Penney Corporation, Inc., as borrower, certain of the Company Parties (as defined in the RSA), as guarantors, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto from time to time, as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time.

198.    "*Term Loan Credit Documents*" has the meaning set forth therefor in the Financing Order.

199.    "*Term Loan/First Lien Notes Collateral Agent*" means the collateral agent under the First Lien Indenture and the Term Loan Credit Agreement.

200.    "*Term Loan/First Lien Notes Secured Parties*" has the meaning set forth therefor in the Financing Order.

201.    "*Term Loan Secured Parties*" has the meaning set forth therefor in the Financing Order

202.    "*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article XD of the Plan.

203.    "*U.S. Trustee*" means the United States Trustee for the Southern District of Texas.

204.    "*U.S. Trustee Fees*" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

205.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

206.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

207.    "*Unsecured Noteholders*" means the Holders of Unsecured Notes.

208. "*Unsecured Notes*" means, collectively, the Second Lien Notes, the unsecured 5.65% notes due 2020, the 7.125% notes due 2023, the 6.9% notes due 2026, the 6.375% notes due 2036, the 7.4% debentures due 2037, and the 7.625% debentures due 2097.

209. "*Unsecured Notes Claims*" means any Claim against a Debtor, the Estates, or property of a Debtor, including any Secured or unsecured Claim, arising under, related to, or in connection with the Unsecured Notes.

210. "*Unsecured Notes Trustees*" means, collectively, the trustees under the Unsecured Notes Indentures.

211. "*Unsecured Notes Indentures*" means those certain Indentures governing the Unsecured Notes.

212. "*Voting Deadline*" means 4:00 p.m., prevailing Central Time, on November 17, 2020, which date may be extended by the Debtors.

213. "*Wells Fargo*" means Wells Fargo Bank and its managed entities.

214. "*Wells Fargo Bank*" means Wells Fargo Bank, National Association on its own behalf and on behalf of certain investment Affiliates and on behalf of certain investment Affiliates and other investment entities managed directly or indirectly by Wells Fargo.

215. "*Wind-Down*" means the wind-down, dissolution, and liquidation of the Debtors' Estates after the Effective Date.

216. "*Wind-Down Amount*" means, as contemplated by the Asset Purchase Agreement, Cash which shall be retained by the Debtors and used by the Plan Administrator to fund the Professional Fee Account and the Wind-Down in accordance with the Plan and the Confirmation Order.

217. "*Wind-Down Budget*" has the meaning set forth in the Asset Purchase Agreement.

218. "*Wind-Down Debtors*" means the Debtors, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

219. "*Wind-Down Reserve*" means a segregated account established by the Plan Administrator established in accordance with Article VIIIC.

B.      *Rules of Interpretation.*

For purposes of this Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (8) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (9) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal Law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the Laws of the State of Delaware, without giving

effect to the principles of conflict of Laws; (10) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (11) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any effectuating provisions may be interpreted by the Debtors, the Wind-Down Debtors, or the Plan Administrator, in consultation with counsel to the ABL Lenders, in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall be conclusive; (15) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (16) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; (17) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (18) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company Laws; and (19) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind-Down Debtors shall mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.

C.       *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.       *Governing Law.*

Unless a rule of Law or procedure is supplied by federal Law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the Laws of the State of Delaware, without giving effect to the principles of conflict of Laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate or limited liability company governance matters relating to the Debtors not incorporated in Delaware shall be governed by the Laws of the state of incorporation or formation of the applicable Debtor.

E.       *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.       *Controlling Document.*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the Plan Supplement shall control.  In the event of any inconsistency between the Plan or Plan Supplement, on the one hand, and the Confirmation Order on the other hand, the Confirmation Order shall control.

G.       *RSA Consent Rights and Controlling Documents.*

Notwithstanding anything herein to the contrary, any and all consent rights of the parties to the RSA as set forth in the RSA with respect to the form and substance of the Plan, any Definitive Document, all exhibits to the Plan,

and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section I.A of the Plan) and be fully enforceable as if stated in full herein until such time as the RSA is terminated in accordance with its terms.

> H.      *Asset Purchase Agreement Consent Rights and Controlling Documents*

Any and all consent rights of the Purchasers set forth in the Asset Purchase Agreement with respect to the form and substance of this Plan, the Confirmation Order, the Disclosure Statement, the Disclosure Statement Order, any Definitive Documents and any other documents related to the Sale Transaction, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Section I. A of the Plan) and be fully enforceable as if stated in full herein until such time as the Asset Purchase Agreement is terminated in accordance with its terms. Failure to reference in this Plan the rights referred to in the immediately preceding sentence as such rights relate to any document referenced in the Asset Purchase Agreement shall not impair such rights and obligations.

## ARTICLE II
## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS, AND DIP CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

> A.      *Administrative Claims.*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or Plan Administrator, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 45 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Plan Administrator, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided* that any Allowed Administrative Claim that is an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of the Debtors or the Wind-Down Debtors; *provided*, *further*, that any Allowed Administrative Claim that is not an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of Purchasers.

Except for Professional Fee Claims and DIP Claims, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Plan Administrator no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order. Objections to such requests must be Filed and served on the Plan Administrator (if the Plan Administrator is not the objecting party) and the requesting party on or before the Administrative Claim Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except for Professional Fee Claims and DIP Claims, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not file and serve such a request on or before the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Estates, the Wind-Down Debtors, the Plan Administrator, or the property of any of the foregoing, and such Administrative Claims shall be deemed released as of the Effective Date without the need for any objection from the Debtors, the Wind-Down Debtors or the Plan Administrator or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

> B.       Payment of Fees and Expenses under Financing Order.

On the Effective Date, and thereafter as invoiced, the Debtors shall pay all fees, expenses, disbursements, contribution or indemnification obligations, including without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by each of the following, whether prior to or after the Petition Date and whether prior to or after the Effective Date, of the DIP Agents, the DIP Lenders, the First Lien Notes Trustee, the Term Loan Administrative Agent, and the Term Loan/First Lien Notes Collateral Agent, in each case to the extent payable or reimbursable under or pursuant to the Financing Order, the DIP Credit Agreement, the First Lien Notes Indenture, the Prepetition Security Agreement, or the Term Loan Credit Agreement, as applicable.   Such fees, expenses, disbursements, contribution, or indemnification obligations shall constitute Allowed Administrative Claims.  Nothing herein shall require the DIP Agents, DIP Lenders, the First Lien Notes Trustee, the Term Loan Administrative Agent, the Term Loan/First Lien Notes Collateral Agent, or their respective Professionals, to file applications, a Proof of Claim, or otherwise seek approval of the Court as a condition to the payment of such Allowed Administrative Claims. For the avoidance of doubt, nothing herein shall be deemed to impair, discharge, or negatively impact or affect the rights of the DIP Agents, the First Lien Notes Trustee, the Term Loan Administrative Agent, and the Term Loan/First Lien Notes Collateral Agent to exercise their charging liens pursuant to the terms of the DIP Credit Agreement, the First Lien Notes Indenture, the Prepetition Security Agreement, or the Term Loan Credit Agreement, as applicable.

> C.       Professional Fee Claims.

> 1.       Final Fee Applications and Payment of Professional Fee Claims.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The Plan Administrator (or the authorized signatories to the Professional Fee Escrow Account, after consultation with the Plan Administrator) shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash to such Professionals from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

> 2.       Professional Fee Escrow Account.

As soon as is reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, Claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way.  Funds held in the Professional Fee Escrow Account shall not be considered property of the Estates, the Debtors, the Plan Administrator, or the Wind-Down Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Debtors or the Plan Administrator, as applicable, from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that the Debtors' and the Plan Administrator's obligations to pay Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account and such Allowed Professional Fee Claims shall also be payable from the Wind-Down Reserve.  When all Professional Fee Claims Allowed by the

Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Wind-Down Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

  3. <u>Professional Fee Amount</u>.

  The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors and/or the UCC before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided* that such estimate shall not be considered or deemed an admission or limitation with respect to the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims and such Professionals are not bound to any extent by the estimates. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account.

  4. <u>Post-Confirmation Fees and Expenses</u>.

  Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals, subject to the Wind-Down Budget. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtors or the Plan Administrator, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.; *provided* that none of the Purchasers shall be liable or otherwise responsible for the payment of any Professional Fee Claims.

  D. *Priority Tax Claims.*

  Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that any Allowed Priority Tax Claim that is an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of the Debtors or the Wind-Down Debtor.

  E. *DIP Claims.*

  As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses. Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of this Plan and the Asset Purchase Agreement, or other such treatment as contemplated by this Article II.E of the Plan on the Effective Date all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

  Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, and solely with respect to that portion of a Holder's Allowed DIP Claim that has not been satisfied in accordance with the Asset Purchase Agreement prior to the Effective Date, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each such unsatisfied portion of a Holder's Allowed DIP Claim, on the Effective Date each such Holder of an Allowed DIP Claim shall receive, pursuant to the Sale Order and the Confirmation Order, its Credit Bid Pro Rata share of the Credit Bid Distributions. The DIP Claims shall be Allowed in the aggregate amount outstanding under the DIP Facility as of the Effective Date. The DIP Claims shall be Allowed in the aggregate amount outstanding under the DIP Facility as of the Effective Date.

Pursuant to the DIP Credit Agreement, all distributions pursuant to this Article II.E shall be made to the DIP Agent for distributions to the DIP Lenders in accordance with the DIP Credit Agreement and DIP Credit Documents unless otherwise agreed upon in writing by the DIP Agent and the Debtors.  The DIP Agent shall hold or direct distributions for the benefit of the Holders of DIP Claims.  The DIP Agent shall retain all rights as DIP Agent under the DIP Credit Documents in connection with the delivery of the distributions to the DIP Lenders.  The DIP Agent shall not have any liability to any person with respect to distributions made or directed to be made by such DIP Agent.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

*A.      Classification of Claims and Interests.*

This Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and in accordance with section 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | ABL Claims and Secured Swap Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | First Lien Claims | Impaired | Entitled to Vote |
| Class 5 | [Reserved] | | |
| Class 6 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 7 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 8A | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 8B | Key Go Forward Supplier Claims | Impaired | Entitled to Vote |
| Class 9 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 10 | Intercompany Interests | Unimpaired/ Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 11 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests.*

Subject to Article IV hereof, each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, and release of, and in exchange for, such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such Holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

1.      Class 1 - Other Priority Claims

   (a)   *Classification*:  Class 1 consists of all Other Priority Claims that are not Assumed Liabilities.

   (b)   *Treatment*:  Each holder of an Other Priority Claim shall receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

      i.    payment in full in Cash of the unpaid portion of its Other Priority Claim on the later of the Effective Date and such date such Other Priority Claim becomes an Allowed Other Priority Claim; or

      ii.   such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

   (c)   *Voting*:  Class 1 is Unimpaired and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.      Class 2 - Other Secured Claims

   (a)   *Classification*:  Class 2 consists of all Other Secured Claims that are not Assumed Liabilities.

   (b)   *Treatment*:  Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Plan Administrator, as applicable:

      (i)   payment in full in Cash;

      (ii)  delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

      (iii) Reinstatement of such Claim; or

      (iv)  such other treatment rendering such Claim Unimpaired.

   (c)   *Voting*:   Class 2 is Unimpaired and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.      Class 3 - ABL Claims and Secured Swap Claims

(a)     *Classification:*  Class 3 consists of all ABL Claims and Secured Swap Claims against any Debtor.

(b)     *Allowance*:  On the Effective Date, ABL Claims and Secured Swap Claims shall be Allowed in an aggregate amount equal to $[___].

(c)     *Treatment*:  To the extent a holder's Allowed ABL Claim or Allowed Secured Swap Claim has not been paid in full, in Cash prior to the Effective Date, each holder of an Allowed ABL Claim or Allowed Secured Swap Claim shall receive payment in full, in Cash.

(d)     *Voting:*  Class 3 is Unimpaired and Holders of ABL Claims and Secured Swap Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Holders of ABL Claims and Secured Swap Claims are not entitled to vote to accept or reject the Plan.

4.     <u>Class 4 – First Lien Claims</u>

(a)     *Classification:*  Class 4 consists of all First Lien Claims against any Debtor (excluding First Lien Deficiency Claims (if any) on account thereof).

(b)     *Allowance*:  The First Lien Claims shall be deemed Allowed in the amount of $[__] (consisting of $[__] in Term Loan Claims and $[__] in First Lien Notes Claims) as of the Petition Date, plus interest, fees, and other expenses and amounts provided for in the Term Loan Credit Agreement and First Lien Notes Indenture, incurred through the Effective Date, solely to the extent Allowed by the Bankruptcy Code.

(c)     *Treatment:* On the Effective Date, each holder of an Allowed First Lien Claim shall receive (a) pursuant to the Sale Transaction, on account of the Aggregate Bid, its Credit Bid Pro Rata share of the Credit Bid Distributions subject to distribution under the Plan (and subject to dilution on account of the Management Incentive Plan, if any) and (b) its Pro Rata share of any cash remaining in the Wind-Down Reserve, Professional Fee Escrow, Administrative / Priority Claims Reserve once all Allowed Claims entitled to payment therefrom have been satisfied and no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated.

(d)     *Voting:*  Class 4 is Impaired under the Plan.  Therefore, holders of First Lien Claims are entitled to vote to accept or reject the Plan.

5.     [Reserved]

6.     <u>Class 6 - Second Lien Notes Claims</u>

(a)     *Classification:*  Class 6 consists of all Second Lien Notes Claims against any Debtor (excluding Second Lien Notes Deficiency Claims (if any) on account thereof).

(b)     *Allowance*:  The Second Lien Notes Claims shall be deemed Allowed in the amount of $[__].

(c)     *Treatment:* Except to the extent that a Holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such

Allowed Second Lien Notes Claim, each Holder of an Second Lien Notes Claim shall receive, up to the full amount of such Holder's Allowed Second Lien Notes Claim, its Pro Rata share (taken together with the Unsecured Notes Claims, General Unsecured Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full.

(d)     *Voting:*  Class 6 is Impaired under the Plan.  Therefore, holders of Second Lien Notes Claims are entitled to vote to accept or reject the Plan.

7.      Class 7 - Unsecured Notes Claims

(a)     *Classification:*  Class 7 consists of all Unsecured Notes Claims against any Debtor.

(b)     *Allowance*:  The Unsecured Notes Claims shall be deemed Allowed in the amount of $[__].

(c)     *Treatment:*  Except to the extent that a Holder of an Allowed Unsecured Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Unsecured Notes Claim, each Holder of an Unsecured Notes Claim shall receive, up to the full amount of such Holder's Allowed Unsecured Notes Claim, its Pro Rata share (taken together with the Second Lien Notes Claims, General Unsecured Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full.

(d)     *Voting:*  Class 7 is Impaired under the Plan.  Therefore, holders of Unsecured Notes Claims are entitled to vote to accept or reject the Plan.

8.      Class 8A - General Unsecured Claims

(a)     *Classification:*  Class 8A consists of all General Unsecured Claims.

(b)     *Treatment:* Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, up to the full amount of such Holder's Allowed General Unsecured Claim, its Pro Rata share (taken together with the Second Lien Notes Claims, Unsecured Notes Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full.

(c)     *Voting:*  Class 8A is Impaired under the Plan.  Therefore, holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

9.     <u>Class 8B - Key Go Forward Supplier Claims</u>

        (a)     *Classification:* Class 8B consists of all Key Go Forward Supplier Claims.

        (b)     *Treatment:* Except to the extent that a Holder of a Key Go Forward Supplier Claims agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Key Go Forward Supplier Claims, each Holder of an Allowed Key Go Forward Supplier Claim shall receive, (i) up to the full amount of such Holder's Key Go Forward Supplier Claims, its Pro Rata share (taken together with the Second Lien Notes Claims, Unsecured Notes Claims, and General Unsecured Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full; and (ii) a waiver of any preference actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law.

        (c)     *Voting:* Class 8B is Impaired under the Plan. Therefore, holders of Key Go Forward Supplier Claims are entitled to vote to accept or reject the Plan.

10.     <u>Class 9 - Intercompany Claims</u>

        (a)     *Classification:* Class 9 consists of all Intercompany Claims.

        (b)     *Treatment:* Each Intercompany Claim shall be, at the option of the Debtors, setoff, contributed, distributed, compromised, settled, Reinstated, canceled and released without any distribution, or otherwise addressed in a manner determined by the Debtors.

        (c)     *Voting:* Holders of Claims in Class 9 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

11.     <u>Class 10 - Intercompany Interests</u>

        (a)     *Classification:* Class 10 consists of all Intercompany Interests.

        (b)     *Treatment:* Each Intercompany Interest shall be, at the option of the Debtors, contributed, distributed, eliminated via merger or other corporate transaction, Reinstated, canceled and released without any distribution, or otherwise addressed in a manner determined by the Debtors.

        (c)     *Voting:* Holders of Claims in Class 10 are conclusively deemed to have accepted or rejected the Plan pursuant to section 1126(f) or section 1126(g) of the Bankruptcy Code, respectively. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

12.     <u>Class 11 - Existing Equity Interests</u>

        (a)     *Classification:* Class 11 consists of all Existing Equity Interests.

      (b)    *Treatment*: Existing Equity Interests will be canceled, released, and extinguished, and will be of no further force or effect. Each holder of an Interest will not receive any distribution on account of such Interest.

      (c)    *Voting*: Class 11 is Impaired. Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

13.    <u>Class 12 - Section 510(b)</u>

      (a)    *Classification:* Class 12 consists of all Section 510(b) Claims.

      (b)    *Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim, if any such Claim exists, may only become Allowed by Final Order of the Bankruptcy Court. The Debtors are not aware of any valid Section 510(b) Claim and believe that no such Section 510(b) Claim exists.

      (c)    *Treatment:* Section 510(b) Claims shall be discharged, cancelled, released, and extinguished without any distribution to holders of such Claims.

      (d)    *Voting:* Class 12 is Impaired and Holders (if any) of Allowed Section 510(b) Claims are conclusively deemed to have rejected the Plan. Therefore, Holders (if any) of Section 510(b) Claims are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Claims that are Unimpaired, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims that are Unimpaired; *provided* that the Reinstatement or other treatment of such Claims shall not be inconsistent with the Asset Purchase Agreement. Unless otherwise Allowed, Claims that are Unimpaired shall remain Disputed Claims under the Plan.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes, Presumed Acceptance by Non-Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

F.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article IIIB of the Plan. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article XII of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including

by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

G.     *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H.     *Subordinated Claims.*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Plan Administrator reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

# ARTICLE IV
# MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *General Settlement of Claims and Interests.*

As discussed in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute and be deemed a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, or otherwise resolved pursuant to the Plan.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Subject to Article VI hereof, all distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

B.     *Restructuring Transactions.*

On the Effective Date (or before the Effective Date, as specified in the Restructuring Transactions Memorandum), the Debtors shall take all actions set forth in the Restructuring Transactions Memorandum, and enter into any transaction and take any reasonable actions as may be necessary or appropriate to effect the transactions described herein, subject in all respects to the terms set forth herein, including, as applicable: (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial Law; and (iv) all other actions that the Debtors and the Purchasers determine to be necessary or appropriate in connection with the Consummation of the Sale Transaction, including, among other things, making filings or recordings that may be required by applicable law in connection with the Plan and authorizing and directing the Term Loan/First Lien Notes Collateral Agent to effectuate the Credit Bid in accordance with the Asset Purchase Agreement and Sale Order and any assignees of the Credit Bid, if applicable, are bound by the terms and provisions of the direction to the Term Loan/First Lien Notes Collateral Agent including, among other things, the Credit Bid Distributions and Credit Bid Pro Rata.

1.      Formation of New PropCo.

On or prior to the Effective Date, PropCo and certain direct or indirect subsidiaries shall be formed for the purpose of acquiring all of PropCo Acquired Assets, assuming all of the PropCo Assumed Liabilities, and issuing the New PropCo Securities pursuant to the Plan.

It is intended that PropCo qualify as a "liquidating trust" within the meaning of Treasury Regulations section 301.7701-4(d). For all federal income tax purposes, the beneficiaries of PropCo will be treated as grantors and owners thereof and will be treated as if they had received an interest in the PropCo Acquired Assets, subject to the PropCo Assumed Liabilities, and contributed the PropCo Acquired Assets, subject to the PropCo Assumed Liabilities, to PropCo in exchange for the New PropCo Securities.  PropCo will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of PropCo. The PropCo Trustee shall be the trustee of PropCo and shall have the rights, powers, and obligations set forth in PropCo Trust Agreement.

2.      Transfer of Master Lease Agreement and PropCo Acquired Assets to PropCo.

On the Effective Date, pursuant to the Asset Purchase Agreement, the Debtors and any Non-Debtor Affiliates that own assets that are PropCo Acquired Assets shall convey, assign, transfer, and deliver all such PropCo Acquired Assets to PropCo.

On the Effective Date, pursuant to the Asset Purchase Agreement, and in accordance with the terms of the Master Lease Agreement, the Debtors' interests in the Master Lease Agreement shall be assigned to, and OpCo Purchaser shall consent to such assignment of such interests to, PropCo.

C.      *Sources of Consideration for Plan Distributions.*

All amounts necessary for the Debtors, Wind-Down Debtors, OpCo Purchaser, and the PropCo Purchaser, as applicable, to make payments or distributions pursuant hereto shall be, in each case subject to the terms of the Asset Purchase Agreement and the Sale Order) obtained from the proceeds of the Exit ABL Facility, the Exit FILO Facility, Cash of the Debtors, and the OpCo-Company Cash Payment. Unless otherwise agreed, distributions required by this Plan on account of Allowed Claims that are Assumed Liabilities under the Asset Purchase Agreement shall be the sole responsibility of the OpCo Purchaser or PropCo Purchaser, as applicable; *provided* that any Allowed Administrative Claim that is not an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of Purchasers. .

1.      Payment of ABL Claims.

To the extent the ABL Claims have not been satisfied prior to Confirmation of the Plan from proceeds of the OpCo-Company Cash Payment, such ABL Claims shall be paid in full, in Cash, upon the Effective Date.

2.      Creation of the Administrative / Priority Claims Reserve and Wind-Down Reserve.

On or before the Effective Date, each of the Administrative / Priority Claims Reserve and Wind-Down Reserve shall be funded in accordance with the Asset Purchase Agreement, the Sale Order, and section 1129 of the Bankruptcy Code.

3.      Payment of Cure Costs.

The Debtors shall pay all Cure Costs, if any, pursuant to sections 365 or 1123 of the Bankruptcy Code and in accordance with the Asset Purchase Agreement and Sale Order.

4.      The New PropCo Securities.

On the Effective Date, PropCo is authorized to issue or cause to be issued and shall, as provided for in the Restructuring Transactions Memorandum, issue the New PropCo Securities for distribution to the Holders of Allowed DIP Claims and Allowed First Lien Claims in accordance with the terms of this Plan without further notice to or order

of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.  The New PropCo Securities shall be issued and distributed free and clear of all Liens, Claims, and other Interests.  All of the New PropCo Securities issued pursuant to the Plan, as contemplated by the Sale Transaction, shall be duly authorized and validly issued.

> ### D.   *Plan Administrator and the Wind-Down Debtors*

> #### 1.   Vesting of Assets

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date, the Excluded Assets of the Debtors shall vest in the Wind-Down Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, the Wind-Down Debtors may, at the direction of the Plan Administrator, and subject to the Asset Purchase Agreement, the Sale Order, and the Confirmation Order, use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

> #### 2.   Wind-Down Debtors

On and after the Effective Date, the Wind-Down Debtors shall continue in existence for purposes of (a) resolving Disputed Claims, (b) making distributions on account of Allowed Claims as provided hereunder, (c) establishing and funding the Administrative / Priority Claims Reserve and Wind-Down Reserve, (d) enforcing and prosecuting claims, interests, rights, and privileges under the Causes of Action on the Retained Causes of Action List in an efficacious manner and only to the extent the benefits of such enforcement or prosecution are reasonably believed to outweigh the costs associated therewith, (e) filing appropriate tax returns, (f) complying with its continuing obligations under the Asset Purchase Agreement, if any, (g) liquidating all assets of the Wind-Down Debtors, and (h) otherwise administering the Plan.  The Wind-Down Debtors shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

> #### 3.   Plan Administrator

As set forth below, the Plan Administrator shall act for the Wind-Down Debtors in the same fiduciary capacity as applicable to a board of managers, directors, and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same) and retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Wind-Down and as otherwise provided in the Confirmation Order.  On the Effective Date, the authority, power, and incumbency of the persons acting as managers, directors, and officers of the Wind-Down Debtors shall be deemed to have resigned, and the Plan Administrator shall be appointed as the sole manager, sole director, and sole officer of the Wind-Down Debtors, and shall succeed to the powers of the Wind-Down Debtors' managers, directors, and officers.

From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtors as further described in Article VII hereof.  The Plan Administrator shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Wind-Down Debtors' assets without any additional notice to or approval from the Bankruptcy Court.

> #### 4.   Board of the Debtors

As of the Effective Date, the existing board of directors or managers, as applicable, of the Debtors shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, or members, and any remaining officers, directors, managers, or managing members of any Debtor shall be dismissed without any further action required on the part of any such Debtor, the equity holders of the Debtors, the

officers, directors, or managers, as applicable, of the Debtors, or the members of any Debtor.  Subject in all respects to the terms of this Plan, the Debtors shall be dissolved as soon as practicable on or after the Effective Date, but in no event later than the closing of the Chapter 11 Cases.

As of the Effective Date, the Plan Administrator shall act as the sole officer, director, and manager, as applicable, of the Debtors with respect to its affairs.  Subject in all respects to the terms of this Plan, the Plan Administrator shall have the power and authority to take any action necessary to wind-down and dissolve any of the Debtors, and shall:  (a) file a certificate of dissolution for any of the Debtors, together with all other necessary corporate and company documents, to effect the dissolution of any of the Debtors under the applicable laws of each applicable Debtor's state of formation; and (b) complete and file all final or otherwise required federal, state, and local tax returns and shall pay taxes required to be paid for any of the Debtors, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors or their Estates for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; and (c) represent the interests of the Debtors or the Estates before any taxing authority in all tax matters, including any action, suit, proceeding, or audit.

The filing by the Plan Administrator of any of the Debtors' certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, board of directors, or board of managers of the Debtors or any of their affiliates.

5.      Tax Returns

After the Effective Date and subject to the Asset Purchase Agreement, the Plan Administrator shall complete and file all final or otherwise required federal, state, provincial, and local tax returns for each of the Debtors and the Wind-Down Debtors.

6.      Dissolution of the Wind- Down Debtors

Upon a certification to be Filed with the Bankruptcy Court by the Plan Administrator of all distributions having been made and completion of all its duties under the Plan and entry of a final decree closing the last of the Chapter 11 Cases, the Wind-Down Debtors shall be deemed to be dissolved without any further action by the Plan Administrator, including the filing of any documents with the secretary of state for the state in which the Debtors are formed or any other jurisdiction.  Notwithstanding the foregoing, the Plan Administrator shall retain the authority to take all necessary actions to dissolve the Debtors in, and withdraw the Debtors from, applicable states and provinces to the extent required by applicable law.

E.      *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Debtors' Estates that have not been previously released shall be fully released, settled, and compromised, and the holder of such mortgages, deeds of trust, Liens, pledges, or other security interest against any property of the Debtors' Estates shall be authorized to take such actions as may be reasonably requested by the Debtors to evidence such releases, at the sole expense of the Debtors or Wind-Down Debtors, as applicable.

F.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except as otherwise specifically provided for in the Plan or the Asset Purchase Agreement:  (1) the obligations under the DIP Credit Documents, First Lien Debt Documents, the ABL Credit Agreement, and any other certificate, Security, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant

30

to the Plan) shall be cancelled, except as set forth herein, and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be released.

Notwithstanding the foregoing, (a) no Executory Contract or Unexpired Lease (i) that has been, or will be, assumed pursuant to section 365 of the Bankruptcy Code or (ii) relating to a Claim that was paid in full prior to the Effective Date, shall be terminated or cancelled on the Effective Date, (b) the First Lien Debt Documents, the Second Lien Indenture, the Unsecured Notes Indentures, and the ABL Credit Agreement shall continue in effect solely for the purpose of (i) allowing Holders of the First Lien Claims and ABL Claims, as applicable, the First Lien Notes Trustee, the Second Lien Notes Trustee, and the Unsecured Notes Trustee to receive the distributions provided for under the Plan, (ii) allowing the Term Loan Administrative Agent, the Term Loan/First Lien Notes Collateral Agent, the First Lien Notes Trustee, the Second Lien Notes Trustee, the Unsecured Notes Trustee, and the ABL Agent to receive or direct distributions from the Debtors and to make further distributions to the Holders of such Claims on account of such Claims, as set forth in Article VI.A of the Plan, (iii) preserving all rights, including rights of enforcement, of the Term Loan Administrative Agent, the First Lien Notes Trustee, the Term Loan/First Lien Notes Collateral Agent, the Second Lien Notes Trustee, the Unsecured Notes Trustee, and the ABL Agent to indemnification or contribution pursuant and subject to the terms of the ABL Credit Agreement and the First Lien Debt Documents in respect of any Claim or Cause of Action asserted against the Term Loan Administrative Agent, and the First Lien Notes Indenture Trustee, as applicable, (iv) permitting each of the Term Loan/First Lien Notes Collateral Agent, the First Lien Notes Trustee, the Second Lien Notes Trustee, the Unsecured Notes Trustee, ABL Agent and the Term Loan Administrative Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, and (v) preserving any rights of the DIP Agent, DIP Collateral Agent, First Lien Notes Trustee, Term Loan Administrative Agent, Term Loan/First Lien Notes Collateral Agent, Unsecured Notes Trustees, Second Lien Notes Trustees to payment of fees, expenses, and indemnification obligations as against any money or property distributable to the Holders under the relevant indenture, Prepetition Security Agreement, Term Loan Credit Agreement, or DIP Credit Agreement, including any rights to priority of payment and/or to exercise charging liens.

Each of the ABL Agent and the Term Loan Administrative Agent shall be released and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the ABL Agent and the Term Loan Administrative Agent and their respective representatives and Professionals of any obligations and duties required under or related to the Plan or Confirmation Order, each of the ABL Agent and the Term Loan Administrative Agent shall be relieved of and released from any obligations and duties arising thereunder.

Except as provided in this Plan, on the Effective Date, the DIP Agent and its respective agents, successors, and assigns shall be automatically and fully released of all of their duties and obligations associated with the DIP Credit Documents. The commitments and obligations, if any, of the DIP Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Credit Documents, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

G.     Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved in all respects, including:  (1) selection of the Plan Administrator; (2) implementation of the Restructuring Transactions; (3) Consummation of the PropCo Sale and (4) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan or deemed necessary or desirable by the Debtors, before, on, or after the Effective Date involving the corporate structure of the Debtors or the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan or corporate structure of the Debtors or the Wind-Down Debtors shall be deemed to have occurred and shall be in effect on the Effective Date, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Plan Administrator.   Before, on, or after the Effective Date, the appropriate officers of the Debtors or the Plan

Administrator, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Debtors or the Wind-Down Debtors, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.G shall be effective notwithstanding any requirements under non-bankruptcy law.

  H.  *New Organizational Documents.*

  The New Organizational Documents will prohibit the issuance of non-voting Equity Securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the New Organizational Documents may be amended or restated as permitted by such documents and the Laws of their respective states, provinces, or countries of incorporation or organization.

  I.  *Effectuating Documents; Further Transactions.*

  On and after the Effective Date, the Plan Administrator may issue, execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Restructuring Transactions, the Sale Transaction, and the instruments issued pursuant to the Plan in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

  J.  *Section 1146 Exemption.*

  To the fullest extent permitted by section 1146(a) of the Bankruptcy Code and applicable law, any transfers of property under the Plan (including pursuant to the Asset Purchase Agreement) or pursuant to (1) the issuance, distribution, transfer, or exchange of any debt, Equity Security, or other interest in the Debtors or the Wind-Down Debtors, including in accordance with the Asset Purchase Agreement, (2) the Restructuring Transactions, (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (4) the making, assignment, or recording of any lease or sublease, or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan (including the Sale Transaction), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

  K.  *Exemption from Securities Act Registration*

  The issuance of New PropCo Securities under the Plan is expected to be exempt pursuant to section 1145 of the Bankruptcy Code.  Thus, the New PropCo Securities to be issued under the Plan (a) would not be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) would be freely tradable and transferable by any initial recipient thereof that (i) is not an "Affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "Affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.  Should PropCo elect on or after the Effective Date to reflect any ownership of the New PropCo Securities to be issued under the Plan through the facilities of DTC, PropCo need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New PropCo Securities (to the extent they are deemed to be securities) to be issued

under the Plan under applicable securities laws.  DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New PropCo Securities (to the extent they are deemed to be securities) to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New PropCo Securities (to the extent they are deemed to be securities) to be issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding any policies, practices, or procedures of DTC, DTC shall cooperate with and take all actions reasonably requested by a Disbursing Agent or an indenture trustee to facilitate distributions to Holders of Allowed Claims without requiring that such distribution be characterized as repayments of principal or interest. No Disbursing Agent or indenture trustee shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Allowed Claims through the facilities of DTC.

To the extent that section 1145 of the Bankruptcy Code is inapplicable, the offering, issuance, exchange, or distribution of any securities pursuant to the Plan is or shall be conducted in a manner that is exempt from the registration requirements of section 5 of the Securities Act, pursuant to section 4(a)(2) of the Securities Act and/or the regulations promulgated thereunder (including Regulation D). To the extent such securities are issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder, each will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law. In that regard, each recipient shall be required to make customary representations to the Debtors including that each is an "accredited investor" (within the meaning of Rule 501(a) of the Securities Act) or a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act).

*L.*     *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VII and Article X hereof and the Asset Purchase Agreement, the Plan Administrator shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action (a) that constitute OpCo Acquired Assets or PropCo Acquired Assets, (b) released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article X, or (c) waived in accordance with Article IV.L which in the case of the foregoing (b) or (c) shall be deemed released and waived by the Debtors and the Wind-Down Debtors as of the Effective Date.

The Plan Administrator may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors.  The Plan Administrator shall retain and may exclusively enforce any and all such Causes of Action.  The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Plan Administrator will not pursue any and all available Causes of Action against it, except as assigned or transferred to the Purchaser Group in accordance with the Asset Purchase Agreement or otherwise expressly provided in the Plan, including this Article IV and Article X of the Plan.  Unless any such Causes of Action against an Entity are expressly waived (including pursuant to Article IV.L of the Plan), relinquished, exculpated, released, compromised, assigned, or transferred to the Purchaser Group in accordance with the Asset Purchase Agreement, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, Claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

M.      *Pension Plan.*

With respect to the Pension Plan, no provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve any parties in interest (as defined in 29 U.S.C. § 1002(14)) to the Pension Plan from liabilities or requirements that are both (i) described within 29 U.S.C. §§ 1101 – 1114 and (ii) enforced solely by the PBGC or the Pension Plan.  PBGC and the Pension Plan will not be enjoined or precluded from enforcing such liability with respect to the Pension Plan as a result of any provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code.

## ARTICLE V
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases.*

Subject to the Sale Order (including the Assignment Procedures (as defined in the Sale Order)), on the Effective Date, except as otherwise provided herein, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned, or rejected shall be deemed automatically rejected by the applicable Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases or the Potentially Assigned Contracts Lists (as defined in the Sale Order); (2) have been previously assumed or rejected by the Debtors pursuant to the Assignment Procedures or any other Bankruptcy Court order; (3) are the subject of a Filed motion to assume, assume and assign, or reject such Executory Contract or Unexpired Lease (or of a Filed objection with respect to the proposed assumption and assignment of such contract) that is pending on the Effective Date; or (4) are a contract, release, or other agreement or document entered into in connection with the Plan.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving, subject to and upon the occurrence of the Effective Date, the assumptions, assumptions and assignments, or rejections of the Executory Contracts and Unexpired Leases as set forth in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, except as otherwise provided in the Plan, the Confirmation Order or the Sale Order.  Any Filed motions, Executory Contracts and Unexpired Leases noticed for assumption and assignment with a pending objection that has not yet been resolved, to assume, assume and assign, or reject any Executory Contracts or Unexpired Leases that are pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order but may be withdrawn, settled, or otherwise prosecuted by the Plan Administrator, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.

Subject to the Sale Order and the Asset Purchase Agreement, each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party on or prior to the Effective Date, shall revest in the Debtors and be fully enforceable by the Plan Administrator in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal Law.

Subject to the Sale Order, to the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Plan Administrator, as applicable, reserve the right to alter, amend, modify, or supplement (i) the Schedule of Rejected Executory Contracts and Unexpired Leases (a) with respect to OpCo Available Contracts, with the consent of the OpCo Purchaser, at any time up to the earlier of (x) 90 days following the OpCo Closing, (y) February 28, 2021, and (z) solely with respect to unexpired Leases for nonresidential real property, the deadline set forth in section 365(d)(4) of the Bankruptcy Code, consistent with the Asset Purchase Agreement and (b) with respect to PropCo Available Contracts (as defined in the Asset Purchase Agreement), with the consent of the PropCo Purchaser, at any time up to the earlier of (a) the Effective Date, (b) PropCo Closing, and (c) solely with respect to unexpired Leases for nonresidential real property, the deadline

set forth in section 365(d)(4) of the Bankruptcy Code (the "PropCo Designation Rights Period"), or (ii) the Schedule of Assumed Executory Contracts and Unexpired Leases, with the consent of the PropCo Purchaser, at any time up to the expiration of the PropCo Designation Rights Period, consistent with the Asset Purchase Agreement.

        B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the Effective Date of such rejection, or (3) the Effective Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Estates, the Wind-Down Debtors, the Plan Administrator, or the Purchaser Group, or the property of any of the foregoing Entities without the need for any objection by the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article IIIB and may be objected to in accordance with the provisions of Article IX of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

        C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Unless the parties to such Executory Contracts or Unexpired Leases may otherwise agree, any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash of the Cure Costs, on, or as soon as reasonably practicable thereafter, the Effective Date; *provided* that the Cure Costs in connection with the Assigned Contracts shall be satisfied in accordance with the terms in the Asset Purchase Agreement and the Sale Order (including the Assignment Procedures). In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Debtors, the Purchaser Group, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, any such dispute shall be resolved and Cure Costs paid as set forth in the Sale Order (including the Assignment Procedures) or Confirmation Order.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, the Asset Purchase Agreement, the Sale Order or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the Effective Date of assumption; *provided* that notwithstanding anything in this Plan, the Asset Purchase Agreement, the Sale Order, the Plan Supplement, or otherwise to the contrary, any non-Debtor party to any such Executory Contract or Unexpired Lease shall be entitled to receive, and nothing herein shall release or result in the satisfaction of such party's right to receive, payment in full of all Cure Costs and all amounts that have accrued or otherwise arisen as of the Effective Date (but are not in default as of the Effective Date) with respect to any Executory Contract or Unexpired Lease.

Notwithstanding anything to the contrary in the Sale Order, Asset Purchase Agreement, or Plan, with respect to any assumed and assigned Unexpired Lease of nonresidential real property, the Debtors, the Wind-Down Debtors, or PropCo Purchaser (as applicable in accordance with the Asset Purchase Agreement) shall remain liable for: (1) amounts owed under the assumed and assigned Unexpired Lease of nonresidential real property that are unbilled or not yet due as of the effective date of the assignment, regardless of when such amounts accrued, such as common area maintenance, insurance, taxes, and similar charges; (2) any regular or periodic adjustment or reconciliation of charges under the assumed and assigned Unexpired Lease of nonresidential real property that are not due or have not been determined as of the date of the effective date of the assignment; (3) any percentage rent that may come due under the assumed and assigned Unexpired Lease of nonresidential real property; (4) indemnification obligations, if any, up to the date of the effective date of the assignment; and (5) any unpaid Cure Costs under the assumed and

assigned Unexpired Lease of nonresidential real property, each calculated in accordance with the terms of any applicable amendment to such Unexpired Lease of nonresidential real property.

**Except as otherwise agreed by any of the Debtors and any non-Debtor counterparty to any Executory Contract or Unexpired Lease, following the assumption of any such Executory Contract or Unexpired Lease, any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court**

D.    *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan, the Asset Purchase Agreement, or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors (for themselves and for their successors) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously purchased by the Debtors contracting from non-Debtor counterparties to rejected Executory Contracts or Unexpired Leases.

E.    *Indemnification Provisions.*

All Indemnification Provisions, consistent with applicable law, currently in place (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of the Debtors, as applicable, shall be Reinstated and remain intact, irrevocable, and shall survive the Effective Date on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other Professionals of the Debtors than the Indemnification Provisions in place prior to the Effective Date.

The Debtors shall maintain tail coverage under any directors' and officers' insurance policies for the six-year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the directors' and officers' existing insurance policies.  In addition to such tail coverage, the directors' and officers' insurance policies shall remain in place in the ordinary course during the Chapter 11 Cases.

The Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including the "tail policy") in effect prior to the Effective Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.  Notwithstanding anything herein to the contrary, the Debtors shall retain the ability to supplement such directors' and officers' insurance policies as the Debtors deem necessary, including purchasing any tail coverage.

F.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, the Sale Order, or the Asset Purchase Agreement, each assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter

the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases or the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan or the Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan or the Sale Order.

H.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor (but excluding any Assigned Contracts), will be performed by the applicable Debtor or, after the Effective Date, the Wind-Down Debtors, liable thereunder in the ordinary course of their business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases but excluding any Executory Contracts or Unexpired Leases that have been rejected as of the date of entry of the Confirmation Order) will survive and remain unaffected by entry of the Confirmation Order.

J.      *Sale Order Assignment Procedures.*

Nothing contained in the Plan or the Confirmation Order constitutes or shall be construed as any modification or amendment of the Sale Order or the Assignment Procedures attached thereto.

**ARTICLE VI**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Initial Distribution Date (or if a Claim is not an Allowed Claim or Allowed Interest on the Initial Distribution Date, on the next Quarterly Distribution Date after such Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), or as soon as is reasonably practicable thereafter, each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article IX hereof.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Distributions on Account of Obligations of Multiple Debtors*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan, *provided* that Claims held by a single entity at different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for such Claim at each applicable Debtor.  Any such Claims shall be released pursuant to Article X of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

C.      *Distributions Generally*

Except as otherwise provided herein, distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Debtors.

Notwithstanding any provision of the Plan to the contrary, distributions to Holders of DIP Claims shall be made to or at the direction of the DIP Agent and distributions to Holders of First Lien Claims shall be made to or at the direction of each of the Term Loan Administrative Agent or the First Lien Notes Indenture Trustee, as applicable, each of which shall act as Disbursing Agent for distributions to the respective Holders of First Lien Claims, as applicable, in each case, at the sole expense of the Debtors or Wind-Down Debtors, as applicable.  The First Lien Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such Holders of First Lien Claims subject to the charging lien in the First Lien Notes Indenture, and regardless of whether such distributions are made by the First Lien Notes Indenture Trustee or by the Disbursing Agent at the reasonable direction of the First Lien Notes Trustee, the charging lien in the First Lien Notes Indenture shall attach to the distributions to Holders of the First Lien Claims in the same manner as if such distributions were made through the First Lien Notes Indenture Trustee. The First Lien Notes Indenture Trustee may establish its own record date for distribution and shall transfer or direct the transfer of such distributions through the facilities of DTC. The First Lien Notes Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or reorganized Debtors, as applicable, shall use commercially reasonable efforts to (i) seek the cooperation of DTC with respect to effectuating distributions and the cancellation of the First Lien Notes as of the Effective Date, and (ii) seek the cooperation of the relevant bank and broker participants in the DTC system to facilitate delivery of the distribution directly to the relevant beneficial owners as soon as practicable after the Effective Date.  None of the DIP Agent, the Term Loan Administrative Agent, or the First Lien Notes Indenture Trustee shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

1.      <u>Powers of the Disbursing Agent.</u>

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ Professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.      <u>Expenses Incurred On or After the Effective Date.</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and out-of-pocket expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and out-of-pocket expense reimbursement Claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash from the Wind-Down Reserve.

D.  *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.  <u>Initial Distribution Date</u>

Except as otherwise provided herein, on the Initial Distribution Date, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records or the register or related document maintained by, as applicable, the DIP Agent as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the reasonable discretion of the Disbursing Agent; *provided*, *further*, that the address for each Holder of an Allowed Claim or Interest shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Proof of Interest Filed by such Holder, or, if no Proof of Claim or Proof of Interest has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder may be aggregated into one Claim and one distribution may be made with respect to the aggregated Claim.

2.  <u>Quarterly Distribution Date</u>

Except as otherwise determined by the Plan Administrator in its reasonable discretion, on each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims and Interests under the Plan on such date.  Any distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that distribution is not an Allowed Claim or Interest on such date, shall be distributed on the first Quarterly Distribution Date after such Claim or Interest is Allowed.  No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI of the Plan.

3.  <u>Minimum Distributions.</u>

No fractional interests in New PropCo Securities shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Allowed Interest (as applicable) would otherwise result in the issuance of a number of New PropCo Securities that is not a whole number, the actual distribution of New PropCo Securities shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized New PropCo Securities to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding. For distribution purposes (including rounding), DTC will be treated as a single holder.

4.  <u>Undeliverable Distributions and Unclaimed Property.</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Wind-Down Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property Laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be released and forever barred.

A distribution shall be deemed unclaimed if a Holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Plan Administrator of an intent to accept a particular distribution; (c) responded to the Debtors' or Plan Administrator's requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

E.  *Manner of Payment.*

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

F.      *Distributions on Account of Claims or Interests Allowed After the Effective Date*

1.      <u>Payments and Distributions on Disputed Claims</u>

Distributions made after the Effective Date to Holders of Disputed Claims or Interests that are not Allowed Claims or Interests as of the Effective Date, but which later become Allowed Claims or Interests, as applicable, shall be paid out of the Wind-Down Reserve or the Administrative / Priority Claim Reserve and shall be deemed to have been made on the applicable Quarterly Distribution Date after they have actually been made, unless the Plan Administrator and the applicable Holder of such Claim or Interest agree otherwise.  No interest shall accrue or be paid on a Disputed Claim before it becomes an Allowed Claim in accordance with Article IXI of the Plan.

2.      <u>Special Rules for Distributions to Holders of Disputed Claims</u>

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Plan Administrator, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interest until the Disputed Claim or Interest has become an Allowed Claim or Interest, as applicable, or has otherwise been resolved by settlement or Final Order; *provided* that if the Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Holder of such Disputed Claim shall be entitled to a distribution on account of that portion of such Claim, if any, that is not disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly-situated Holders of Allowed Claims pursuant to the Plan.

G.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Debtors or the Plan Administrator, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors and Plan Administrator, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

H.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

I.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan (including Article III.B.4.), the Financing Order, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

J.      *Foreign Currency Exchange Rate.*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal, National Edition*, on the Effective Date.

K.      *Setoffs and Recoupment.*

Except as expressly provided in this Plan, the Plan Administrator may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of any Allowed Claim, any and all Claims, rights, and Causes of Action that such Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Debtor(s) and Holder of Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided* that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or its successor of any and all Claims, rights, and Causes of Action that such Debtor or its successor may possess against the applicable Holder.

L.      *Claims Paid or Payable by Third Parties.*

1.      <u>Claims Paid by Third Parties.</u>

To the extent that the Holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or Wind-Down Debtor, such Holder shall be barred from asserting such Claim against the Debtors and precluded from voting on any plans of reorganization filed in these Chapter 11 Cases and/or receiving distributions from the Debtors on account of such claims in these Chapter 11 Cases. The Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove any claims Filed with respect to an Executory Contract or Unexpired Lease that received payment in full on account of such Claim from a party that is not a Debtor or Wind-Down Debtor. To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or Wind-Down Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or Wind-Down Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      <u>Claims Payable by Third Parties.</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the Debtors or the Wind-Down Debtors, as applicable, shall be authorized to update the Claims Register to remove the applicable portion of such Claim.

3.      <u>Applicability of Insurance Policies.</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Notwithstanding anything herein to the contrary (including, without limitation, Article X), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII**
**THE PLAN ADMINISTRATOR**

A.      *The Plan Administrator*

The powers of the Plan Administrator shall include any and all powers and authority to implement the Plan and to administer and distribute the amounts set forth in the Administrative / Priority Claims Reserve and Wind-Down

Reserve in accordance with the Plan, and wind-down the business and affairs of the Debtors and Wind-Down Debtors, including (all without further order of the Bankruptcy Court): (1) liquidating, receiving, holding, investing, supervising, and protecting the assets of the Wind-Down Debtors, the Administrative / Priority Claims Reserve, and the Wind-Down Reserve; (2) taking all steps to execute all instruments and documents necessary to effectuate the distributions to be made under the Plan from the Administrative / Priority Claims Reserve and Wind-Down Reserve; (3) making distributions from the Administrative / Priority Claims Reserve and Wind-Down Reserve as contemplated under the Plan; (4) establishing and maintaining bank accounts in the name of the Wind-Down Debtors; (5) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary; (6) paying all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtors; (7) administering and paying taxes of the Wind-Down Debtors, including filing tax returns; (8) representing the interests of the Wind-Down Debtors or the Estates before any taxing authority in all matters, including any action, suit, proceeding, or audit; (9) complying with the Debtors' continuing obligations under the Asset Purchase Agreement; and (10) exercising such other powers as may be vested in it pursuant to order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan in accordance with the Wind-Down Reserve.

The Plan Administrator may resign at any time upon 30 days' written notice delivered to the PropCo Purchaser, the Wind-Down Debtors, and the Bankruptcy Court; provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator, to be chosen by the PropCo Purchaser, with the consent of the Debtors (not to be unreasonably withheld). Upon any other vacancy of the Plan Administrator, a permanent or interim successor Plan Administrator shall be chosen by the PropCo Purchaser and Wind-Down Debtors. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtors shall be terminated.

1.   Plan Administrator Rights and Powers

The Plan Administrator shall retain and have all the rights, powers, and duties necessary to carry out his or her responsibilities under this Plan in accordance with the Confirmation Order. The Plan Administrator shall be the exclusive trustee of the assets of the Wind-Down Debtors for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

2.   Retention of Professionals

The Plan Administrator shall have the right, subject to the Wind-Down Reserve, to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of his or her duties. The reasonable fees and expenses of such professionals shall be paid by the Wind-Down Debtors from the Wind-Down Reserve upon the monthly submission of statements to the Plan Administrator to the extent set forth in the Wind-Down Reserve. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business from the Wind-Down Reserve and shall not be subject to the approval of the Bankruptcy Court.

3.   Compensation of the Plan Administrator

The Plan Administrator's compensation, on a post-Effective Date basis, shall be as described in the Plan Supplement and paid out of the Wind-Down Reserve. Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with such Plan Administrator's duties shall be paid without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash from the Wind-Down Reserve if such amounts relate to any actions taken hereunder.

4.   Plan Administrator Expenses

All costs, expenses and obligations incurred by the Plan Administrator in administering this Plan, the Wind-Down Debtors, or in any manner connected, incidental or related thereto, in effecting distributions from the Wind-Down Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in accordance with the Wind-Down Budget.  Such costs, expenses and obligations shall be paid from the Wind-Down Reserve.

The Debtors and the Plan Administrator, as applicable, shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the Plan Administrator is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Reserve.

B.      Wind-Down

On and after the Effective Date, the Plan Administrator will be authorized to implement the Plan and any applicable orders of the Bankruptcy Court, and the Plan Administrator shall have the power and authority to take any action necessary to wind-down and dissolve the Debtors' Estates.

As soon as practicable after the Effective Date, the Plan Administrator shall:  (1) cause the Debtors and the Wind-Down Debtors, as applicable, to comply with, and abide by, the terms of the Plan, Confirmation Order, Asset Purchase Agreement, the Sale Order, and any other documents contemplated thereby; (2) to the extent applicable, file a certificate of dissolution or equivalent document, together with all other necessary corporate and company documents, to effect the dissolution of the Debtors under the applicable laws of their state of incorporation or formation (as applicable); and (3) take such other actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan.  Any certificate of dissolution or equivalent document may be executed by the Plan Administrator without need for any action or approval by the shareholders or board of directors or managers of any Debtor.  From and after the Effective Date, except with respect to Wind-Down Debtors as set forth herein, the Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) shall be deemed to have canceled pursuant to this Plan all Interests, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date.  For the avoidance of doubt, notwithstanding the Debtors' dissolution, the Debtors shall be deemed to remain intact solely with respect to the preparation, filing, review, and resolution of applications for Professional Fee Claims.

The filing of the final monthly report (for the month in which the Effective Date occurs) and all subsequent quarterly reports shall be the responsibility of the Plan Administrator.

C.      Exculpation, Indemnification, Insurance & Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Wind-Down Debtors.  The Plan Administrator may obtain, at the expense of the Wind-Down Debtors and with funds from the Wind-Down Reserve, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Wind-Down Debtors.  The Plan Administrator may rely upon written information previously generated by the Debtors.

For the avoidance of doubt, notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Debtors.

D.      Tax Returns

After the Effective Date, the Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Debtors, and, pursuant to section 505(b) of the Bankruptcy Code, may

request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.

## ARTICLE VIII
## RESERVES ADMINISTERED BY THE PLAN ADMINISTRATOR

A.      *Establishment of Reserve Accounts*

The Plan Administrator shall establish each of the Administrative / Priority Claims Reserve and the Wind-Down Reserve (which may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Plan Administrator). The Wind-Down Reserve shall be funded in the amount of the Wind-Down Amount.

B.      *Undeliverable Distribution Reserve*

1.      Deposits

If a distribution to any Holder of an Allowed Claim is returned to the Plan Administrator as undeliverable or is otherwise unclaimed, such distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Article VIIIB.2 of this Plan.

2.      Forfeiture

Any Holder of an Allowed Claim that does not assert a Claim pursuant to this Plan for an undeliverable or unclaimed distribution within three months after the first distribution is made to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for the undeliverable or unclaimed distribution against any Debtor, any Estate, the Plan Administrator, the Wind-Down Debtors, or their respective properties or assets. In such cases, any Cash or other property held by the Wind-Down Debtors in the Undeliverable Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the Wind-Down Debtors, notwithstanding any federal or state escheat laws to the contrary, and shall promptly be transferred to the Wind-Down Reserve to be distributed according to the priority set forth in Article VIII.D without any further action or order of the Court.

3.      Disclaimer

The Plan Administrator and his or her respective agents and attorneys are under no duty to take any action to attempt to locate any Claim Holder; provided that in his or her sole discretion, the Plan Administrator may periodically publish notice of unclaimed distributions.

4.      Distribution from Reserve

Within fifteen (15) Business Days after the Holder of an Allowed Claim satisfies the requirements of this Plan, such that the distribution(s) attributable to its Claim is no longer an undeliverable or unclaimed distribution (provided that satisfaction occurs within the time limits set forth in Article VIII.B of this Plan), the Plan Administrator shall distribute out of the Undeliverable Distribution Reserve the amount of the undeliverable or unclaimed distribution attributable to such Claim.

C.      *Wind-Down Reserve*

On the Effective Date, the Plan Administrator shall establish the Wind-Down Reserve by depositing Cash, in the amount of the Wind-Down Amount into the Wind-Down Reserve. The Wind-Down Reserve shall be used by the Plan Administrator solely to satisfy the expenses of Wind-Down Debtors and the Plan Administrator as set forth

in the Plan and Wind-Down Budget; provided that all costs and expenses associated with the winding up of the Wind-Down Debtors and the storage of records and documents of the Wind-Down Debtors (and excluding, for the avoidance of doubt, records and documents related to any Acquired Assets or Assumed Liabilities) shall constitute expenses of the Wind-Down Debtors and shall be paid from the Wind-Down Reserve to the extent set forth in the Wind-Down Budget.  Any amount remaining in the Wind-Down Reserve after the dissolution of the Wind-Down Debtors shall be distributed on account of the Allowed First Lien Claims until such Claims are paid in full.  In no event shall the Plan Administrator be required or permitted to use its personal funds or assets for such purposes.

      D.      *Administrative / Priority Claims Reserve*

On the Effective Date, the Plan Administrator shall establish the Administrative / Priority Claims Reserve by depositing Cash in the amount of the Administrative / Priority Claims Reserve Amount into the Administrative / Priority Claims Reserve (and the Plan Administrator shall deposit Cash into or withdraw Cash from the Administrative / Priority Claims Reserve if the Administrative / Priority Claims Reserve Amount changes at any time).  The Administrative / Priority Claims Reserve Amount shall be used to pay Holders of all Allowed Priority Claims, Allowed Other Priority Claims, Allowed Administrative Claims (other than Professional Fee Claims or DIP Claims), Allowed Priority Tax Claims, Allowed Secured Tax Claims, and Allowed Other Secured Claims in full; *provided, however*, for the avoidance of doubt, that any such Allowed Priority Claims, Allowed Administrative Claims, Allowed Other Priority Tax Claims, Allowed Secured Tax Claims, or other Allowed Other Secured Claims that are Assumed Liabilities shall be satisfied under the Asset Purchase Agreement and shall not be satisfied from the Administrative / Priority Claims Reserve.

If all or any portion of any such Claim shall become a Disallowed Claim, then the amount on deposit in the Administrative / Priority Claims Reserve attributable to such surplus or such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Administrative / Priority Claims Reserve, shall remain in the Administrative / Priority Claims Reserve to the extent that the Plan Administrator determines necessary to ensure that the Cash remaining in the Administrative / Priority Claims Reserve is sufficient to ensure that all Allowed Priority Claims, Allowed Administrative Claims, Allowed Other Priority Tax Claims, Allowed Secured Tax Claims, or other Allowed Other Secured Claims (that are not Assumed Liabilities) will be paid in accordance with the Plan without any further action or order of the Court.  Any amounts remaining in the Administrative / Priority Claims Reserve after payment of all Allowed Priority Claims, Allowed Administrative Claims, Allowed Other Priority Tax Claims, Allowed Secured Tax Claims, or other Allowed Other Secured Claims (or any amount in excess of that reasonably needed to be reserved for any Disputed Claims) shall promptly be transferred to the Wind-Down Reserve until such time the Wind-Down Debtors are dissolved in accordance with the provisions herein.

## ARTICLE IX
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

      A.      *Allowance of Claims.*

After the Effective Date, subject to Article IVL, the Plan Administrator shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately before the Effective Date except for such rights and defenses assigned or transferred to the Purchasers or their Designee(s) in accordance with the Asset Purchase Agreement (which, for the avoidance of doubt, shall include all rights and defenses of the Debtors with respect to any Claims that constitute Assumed Liabilities (as defined in the Asset Purchase Agreement), which the PropCo Purchaser or OpCo Purchaser, as applicable, shall have and retain).

      B.      *Claims Administration Responsibilities.*

Except as otherwise specifically provided in the Plan, the Plan Administrator shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.      *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Plan Administrator, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before fourteen days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims or Interests without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Plan Administrator without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.  Additionally, any Claim or Interest that is duplicative or redundant with another Claim against or Interest in the same Debtor or another Debtor may be adjusted or expunged on the Claims Register by the Plan Administrator without the Plan Administrator having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed no later than the Claims Objection Deadline.

F.      *Disallowance of Claims or Interests.*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Wind-Down Debtors.  All Claims Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim Filed after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.      *No Distributions Pending Allowance.*

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; *provided* that if the Allowed amount of a Claim or Interest is Disputed, but not the existence or nature of such Claim, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

H.      *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Allowed Interest (as applicable) in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

I.      *No Interest.*

Unless otherwise specifically provided for herein or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim; *provided* that interest on any Disputed Priority Tax Claim that (i) becomes an Allowed Priority Tax Claim and (ii) is treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code shall accrue and be paid in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

J.      *Amendments to Claims*

Except as otherwise expressly provided for in the Plan or the Confirmation Order, on or after the Claims Bar Date or the Administrative Claims Bar Date, as appropriate, a Claim may not be Filed or amended without the authorization of the Bankruptcy Court or the Plan Administrator.  Absent such authorization, any new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

## ARTICLE X
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Settlement, Compromise, and Release of Claims and Interests.*

The assets of the Debtors and the Wind-Down Debtors are being and shall be used for the satisfaction of expense obligations and/or the payment of Claims only in the manner set forth in the Plan and shall not be available for any other purpose.  Except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, compromise, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Plan Administrator), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by current or former employees of the Debtors prior to the Effective Date and

that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  Therefore, notwithstanding anything in section 1141(d)(3) to the contrary, all Persons or Entities who have held, hold, or may hold Claims or Interests based upon any act, omission, transaction, or other activity of any kind or nature related to the Debtors, the Wind-Down Debtors, or the Chapter 11 Cases, that occurred prior to the Effective Date, other than as expressly provided in the Plan, shall be precluded and permanently enjoined on and after the Effective Date from interfering with the use and distribution of the Debtors' assets in the manner contemplated by the Plan.  The Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Claims and Interests subject to the occurrence of the Effective Date.

      B.      *Release of Liens.*

**On the Effective Date, concurrently with the Consummation of the PropCo Sale and except as otherwise set forth in the Asset Purchase Agreement, the PropCo Acquired Assets shall be transferred to and vest in PropCo free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Asset Purchase Agreement, each as applicable.  Without limiting the foregoing, except as otherwise provided in the Asset Purchase Agreement, the Plan, the Plan Supplement, the Exit Facility Documents, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III hereof, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Plan Administrator to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.**

      C.      *Debtor Release.*

Notwithstanding anything contained in this Plan to the contrary, effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date each Released Party is deemed released and discharged by each and all of the Debtors, their Estates, and the Wind-Down Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Wind-Down Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in Law, equity, or otherwise, that the Debtors, their Estates, or the Wind-Down Debtors, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the

Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' or the Wind-Down Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Documents, the Term Loan Credit Documents, the Restructuring Transactions, the Sale Transaction, entry into the Asset Purchase Agreement, the Exit Facilities, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or Consummation of the RSA, the Disclosure Statement, the DIP Facility, the Sale Transaction, the Asset Purchase Agreement, the Plan, the Plan Supplement, other Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any liabilities or obligations of the PropCo Purchaser to the Debtors relating to the Asset Purchase Agreement, (2) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including the Asset Purchase Agreement and any documents set forth in the Plan Supplement, each as applicable) executed to implement the Plan, (3) any Causes of Action listed on the Schedule of Retained Causes of Action, or (4) any Claims by any of the Debtors arising out of any ordinary course dealings between such parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, their respective Estates, or the Wind-Down Debtors asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.     *Third-Party Release.*

Notwithstanding anything contained in this Plan to the contrary, effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, to the fullest extent permissible under applicable law, as such Law may be extended or integrated after the Effective Date, on and after the Effective Date each of the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, or because of the foregoing entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in Law, equity, or otherwise, including any derivative Claims, asserted or assertable on behalf of any of the Debtors or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' or the Wind-Down Debtors' in- or out-of-court restructuring efforts, intercompany

49

transactions, the ABL Documents, the First Lien Debt Documents, the Restructuring Transactions, the Sale Transaction, entry into the Asset Purchase Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or Consummation of the RSA, the Disclosure Statement, the DIP Facility, the Sale Transaction, the Asset Purchase Agreement, the Plan, the Plan Supplement, other Definitive Documents, the Exit Facilities, the New Takeback Debt, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any liabilities or obligations of any Entity to the Purchaser Group relating to the Asset Purchase Agreement, (2) any post-Effective Date obligations of any party or Entity under the Plan (or preserved by the Plan), any Restructuring Transaction, or any document, instrument, or agreement (including the Asset Purchase Agreement and any documents set forth in the Plan Supplement, each as applicable) executed to implement the Plan, or (3) any Claims by any of the Debtors arising out of any ordinary course dealings between such parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that each Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

E.      Exculpation.

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any Cause of Action for any Claim related to any act or omission based on the formulation, preparation, dissemination, negotiation, entry into, filing, execution, and implementation of any transactions approved by the Bankruptcy Court in the Chapter 11 Cases, including the RSA, the Asset Purchase Agreement, the Disclosure Statement, the Plan, the Plan Supplement, other Definitive Documents, the Confirmation Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order, or created or entered into in connection with the RSA, the Asset Purchase Agreement, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance of any securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement, and the implementation of the Sale Transaction and the Restructuring Transactions contemplated by the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or the Wind-Down Debtors, except for Claims related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule,

or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding the foregoing, the exculpation shall not release (1) any obligation or liability of any Entity relating to the Asset Purchase Agreement, (2) for any post-Effective Date obligation under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (3) any Claims by any of the Debtors arising out of any ordinary course dealings between such parties.

      *F.*      *Injunction.*

      Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article X.A of the Plan, released pursuant to the Debtor Release, the Third-Party Release, or another provision of the Plan (including the release of liens pursuant to Article X.B of the Plan), or are subject to exculpation pursuant to Article X.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

      Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article X.F of the Plan.

      For the avoidance of doubt and notwithstanding section 1141(d)(3) of the Bankruptcy Code, as of the Effective Date, except as otherwise specifically provided in the Plan and Sale Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors, the Estates, the Purchaser Group, or the Wind-Down Debtors, except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Wind-Down Debtors or otherwise contemplated under the Sale Order.  Such injunction will not enjoin Persons or Entities that do not consent to the Third-Party Release from pursuing any direct (but not derivative) Claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Purchaser Group, or the Wind-Down Debtors.

      *G.*      *Protections Against Discriminatory Treatment.*

      To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Debtors, or another Entity with whom the Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

*H.      Document Retention.*

On and after the Effective Date, the Plan Administrator may maintain documents in accordance with the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Plan Administrator or in connection with the terms of the Asset Purchase Agreement.

*I.      Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

*J.      Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect on and following the Effective Date in accordance with their terms.

*K.      Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a Holder of a Claim or Interest may have against other Claim or Interest Holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims or controversies relating to the subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, the Estates, their respective property, and Holders of Claims and Interests and is fair, equitable, and reasonable.

## ARTICLE XI
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

*A.      Conditions Precedent to the Effective Date.*

It shall be a condition to the occurrence of the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article XIB hereof:

1.      the RSA shall not have been terminated as to all the Consenting First Lien Lenders and remains in full force and effect as to the Consenting First Lien Lenders that remain party thereto;

2.        the Plan, the Confirmation Order, the Disclosure Statement, the Sale Order, and the Disclosure Statement Order must be, in form and substance, reasonably acceptable to the Purchasers;

3.        PropCo shall have been formed;

4.        PropCo shall have filed a registration statement on Form 10 pursuant to the Securities Exchange Act of 1934, as amended, with the Securities and Exchange Commission, in form and substance satisfactory to Required Lenders and shall have received initial comments reasonably satisfactory to the Required Lenders;

5.        all documents necessary to consummate this Plan shall have been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith;

6.        the Bankruptcy Court shall have entered the Financing Order and the Financing Order shall not have been vacated, stayed, revised, modified, or amended in any manner without the prior written consent of the DIP Agent and, to the extent set forth in the Financing Order, the Credit Agreement Agent, and there shall be no default or event of default existing under the DIP Credit Agreement or the Financing Order;

7.        the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

8.        the Wind-Down Reserve and the Administrative / Priority Claims Reserve shall have each been funded;

9.        the Professional Fee Escrow Account shall have been established and funded with the Professional Fee Amount;

10.        all accrued and unpaid reasonable and documented fees and expenses of the Consenting First Lien Lenders (including any advisors thereto) in connection with the Restructuring Transactions shall have been paid in accordance with the terms and conditions set forth in the RSA, the Financing Order, the DIP Credit Agreement, and the First Lien Debt Documents, as applicable;

11.        the final version of the schedules, documents, and exhibits contained in the Plan Supplement, and all other schedules, documents, supplements and exhibits to the Plan, shall be consistent with the RSA in all material respects and otherwise approved by the parties to the RSA consistent with their respective consent and approval rights as set forth therein;

12.        any and all requisite governmental, regulatory, and third-party approvals and consents shall have been obtained; and

13.        the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated herein in a manner consistent in all respects, the Plan, and the Plan Supplement.

        B.        *Waiver of Conditions.*

        Subject to and without limiting the rights of each party to the RSA, the conditions to Consummation set forth in Article XI may be waived by the Debtors with the consent of the Purchasers without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan;

        C.        *Effect of Failure of Conditions.*

        If the Effective Date of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by the Debtors, any Holders, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other

Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE XII
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

    *A.*    *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the Purchasers, reserve the right to modify the Plan, whether such modification is material or immaterial, seek Confirmation consistent with the Bankruptcy Code, and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), the Debtors expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to each Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

    *B.*    *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

    *C.*    *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent plans, in each case subject to any applicable consent rights as set forth in the Asset Purchase Agreement, the RSA, or the Financing Order. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Interests or Class of Claims or Interests), assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims, Causes of Action, or Interests; (b) prejudice in any manner the rights of such Debtor, any Holder, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor, any Holder, or any other Entity; *provided* that for the avoidance of doubt, if the OpCo Closing Date has occurred, then the revocation or withdrawal of the Plan, or the failure to obtain Confirmation or Consummation of the Plan, shall not affect the occurrence of the OpCo Closing Date or the consummation of the OpCo Sale.

## ARTICLE XIII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

    1.    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.        decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.        resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Costs pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed (or assumed and assigned); (c) the Plan Administrator amending, modifying or supplementing, after the Effective Date, pursuant to Article V, the Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.        ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.        adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.        adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

7.        enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8.        enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9.        resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10.        issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

11.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article X hereof and enter such orders as may be necessary to implement such releases, injunctions, and other provisions;

12.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VIIA hereof;

13.        enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

14.        determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15.        enter an order concluding or closing the Chapter 11 Cases;

16.        adjudicate any and all disputes arising from or relating to distributions under the Plan;

17.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21.      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article X hereof;

22.      enforce all orders entered by the Bankruptcy Court in the Chapter 11 Cases; and

23.      hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind-Down Debtors, the Plan Administrator, and any and all Holders of Claims or Interests (irrespective of whether their Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.      *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Plan Administrator, as applicable, and all Holders receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees.*

All fees due and payable pursuant to section 1930(a) of the Judicial Code prior to the Effective Date, including fees and expenses payable to the U.S. Trustee, shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Disbursing Agent or the Plan Administrator, as applicable, shall pay any and all such fees for each quarter (including any fraction thereof), and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each and every one of the Debtors shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee and file quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

D.      *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, the Creditors' Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising on or prior to the Effective

Date, from, or related to, the Chapter 11 Cases and under the Bankruptcy Code; *provided* that (a) the Creditors' Committee will remain in place after the Effective Date solely for the purpose of addressing (i) all final fee applications for all Professionals for the Committee and (ii) the resolution of any appeals of the Confirmation Order, and (b) the members of the Creditors' Committee are discharged from all of their duties as of the date that the Creditors' Committee is dissolved with respect thereto.

      E.     *Rights of Purchasers Under the Sale Order.*

Nothing contained in the Plan or the Confirmation Order constitutes or shall be construed as any modification or amendment of the rights or obligations of the Purchasers under the Sale Order.

      F.     *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders unless and until the Effective Date has occurred.

      G.     *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

      H.     *Notices.*

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.     if to the Debtors, to:
     J. C. Penney Corporation, Inc.
     6501 Legacy Drive
     Plano, TX 75024
     Attention:     Bill Wafford (Chief Financial Officer)
                   Brandy Treadway (Senior Vice President, General Counsel & Secretary)
     Email address:   bwafford@jcp.com
                   btreadwa@jcp.com

with copies to:
     Kirkland & Ellis LLP
     601 Lexington Avenue
     New York, New York 10022
     Facsimile: (212) 446-4900
     Attention:     Joshua A. Sussberg, P.C.
                   Christopher Marcus, P.C.
                   Aparna Yenamandra
     Email:     joshua.sussberg@kirkland.com
               christopher.marcus@kirkland.com
               aparna.yenamandra@kirkland.com
     and

     Jackson Walker L.L.P.

1401 McKinney Street, Suite 1900
Houston, Texas 77010
Facsimile:       (713) 752-4200
Attention:      Matthew D. Cavenaugh
                    Jennifer F. Wertz
E-Mail:         mcavenuagh@jw.com
                    jwertz@jw.com


2.        **if to a Consenting First Lien Lender, to:**

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attn:    Dennis F. Dunne
        Andrew M. Leblanc
        Thomas R. Kreller
        Brian Kinney
E-mail address:   ddunne@milbank.com
                  aleblanc@milbank.com
                  tkreller@milbank.com
                  bkinney@milbank.com

After the Effective Date, the Plan Administrator may notify Entities that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

      I.        *Entire Agreement.*

Except as otherwise indicated (including with respect to the Asset Purchase Agreement and the Sale Order, as applicable), the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.  If the Effective Date does not occur, nothing herein shall be construed as a waiver by any party in interest of any or all of such party's rights, remedies, Claims, and defenses, and such parties expressly reserve any and all of their respective rights, remedies, Claims and, defenses.  This Plan and the documents comprising the Plan Supplement, including any drafts thereof (and any discussions, correspondence, or negotiations regarding any of the foregoing) shall in no event be construed as, or be deemed to be, evidence of an admission or concession on the part of any party in interest of any Claim or fault or liability or damages whatsoever.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations, discussions, agreements, settlements, and compromises reflected in or related to Plan and the documents comprising the Plan Supplement is part of a proposed settlement of matters that could otherwise be the subject of litigation among various parties in interest, and such negotiations, discussions, agreements, settlements, and compromises shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of the Plan and the documents comprising the Plan Supplement.

      J.        *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://cases.primeclerk.com/JCPenney or the Bankruptcy Court's website at www.txs.uscourts.gov/bankruptcy.

     *K.*      *Nonseverability of Plan Provisions.*

     If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' and the Purchasers' consent; and (3) nonseverable and mutually dependent.

     *L.*      *Votes Solicited in Good Faith.*

     Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan and, therefore, no such parties will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan or any previous plan.

     *M.*      *Closing of Chapter 11 Cases.*

     The Plan Administrator shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

     *N.*      *Waiver or Estoppel.*

     Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

     *O.*      *Conflicts.*

     Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

     [*Remainder of page intentionally left blank*]

Dated:  October 26, 2020

J. C. PENNEY COMPANY, INC.
on behalf of itself and all other Debtors

*/s/ Bill Wafford*

Bill Wafford
Chief Financial Officer
J. C. Penney Company, Inc.

## Exhibit B

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 14.02, this "**Agreement**") is made and entered into as of May 15, 2020 (the "**Agreement Effective Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (iii) of this preamble, collectively, the "**Parties**"):[1]

    i.    J. C. Penney Company, Inc., a company incorporated under the Laws of Delaware ("**JCP**"), and each of its affiliates listed on **Exhibit B** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting First Lien Lenders (the Entities in this clause (i), collectively, the "**Company Parties**");

    ii.   certain entities that together with their affiliates and their and their affiliates' respective accounts and funds managed or advised by any of them that hold First Lien Notes Claims, or other entities that hold First Lien Notes Claims directly or indirectly on behalf of the undersigned entities, their affiliates and their and their affiliates' respective accounts and funds managed or advised by any of them, and that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (the Entities in this clause (ii), collectively, the "**Consenting First Lien Noteholders**"); and

    iii.  certain entities that together with their affiliates and their and their affiliates' respective accounts and funds managed or advised by any of them that hold Term Loan Claims, or other entities that hold Term Loan Claims directly or indirectly on behalf of the undersigned entities, their affiliates and their and their affiliates' respective accounts and funds managed or advised by any of them, and that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company (collectively, the "**Consenting Term Lenders**" and together with the Consenting First Lien Noteholders, the "**Consenting First Lien Lenders**").

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

*RECITALS*

**WHEREAS**, the Company Parties and the Consenting First Lien Lenders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit A** hereto, including all exhibits and annexes thereto (the "**RSA Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, the "**Restructuring**");

**WHEREAS**, the Company Parties intend to implement the Restructuring, including through the commencement by the Debtors of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**");

**WHEREAS**, certain of the Consenting First Lien Lenders and/or their affiliates have further agreed to provide, on a committed basis, the Company Parties with superpriority debtor-in-possession financing (the "**DIP Facility**") on the terms set forth in the term sheet attached as **Annex 2** to the RSA Term Sheet (the "**DIP Term Sheet**");

**WHEREAS**, the Restructuring also contemplates the:  (i) formation and implementation of the REIT on the terms that shall be set forth in a term sheet (the "**REIT Term Sheet**" and such transactions as described in this Agreement and the REIT Term Sheet, the "**REIT Transaction**"); (ii) implementation of the JCP Exit Facilities and the REIT Exit Loan on the terms set forth in the RSA Term Sheet; (iii) issuance of the New JCP Common Stock on the terms that shall be set forth in a term sheet (the "**New JCP Governance Term Sheet**"); (iv) issuance of the REIT Interests on the terms set forth in the RSA Term Sheet and as shall be set forth in a term sheet (such term sheet, the "**REIT Governance Term Sheet**" and, together with the REIT Term Sheet, and the New JCP Governance Term Sheet, the "**Term Sheets**");

**WHEREAS**, the Parties shall act in good faith to negotiate and finalize the terms of the Term Sheets that are not finalized as of the Agreement Effective Date as soon as practicable;

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring on the terms and conditions set forth in this Agreement and the RSA Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**   *Definitions and Interpretation*.

1.01.   Definitions.  The following terms shall have the following definitions:

"**Affiliate**" means, with respect to any person, or any other person, which indirectly or indirectly controls, or is under common control with, or is controlled by, such Person.  As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") shall mean, with respect to any Person, (x) the possession, directly or

indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership, limited liability company or other ownership interests, by contract or otherwise) of such Person or (y) solely with respect to Affiliates of Consenting First Lien Lenders, the investment or voting discretion or control with respect to discretionary accounts of such Person.

"**Agent**" means any administrative agent, collateral agent, or similar Entity under the Term Loan Credit Agreement, the First Lien Indenture, the Pari Passu Intercreditor Agreement, or the DIP Credit Agreement, including any successors thereto.

"**Agents/Trustees**" means, collectively, each of the Agents and Trustees.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02 (including the RSA Term Sheet and all exhibits and annexes thereto).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any proposal, offer, bid, term sheet or agreement with respect to a sale, new-money investment, restructuring, reorganization, merger, acquisition, consolidation, dissolution, debt investment, equity investment, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to the Restructuring; *provided* that a "full-chain" liquidation shall not constitute an Alternative Restructuring Proposal; *provided further* that the 363 Sale Alternative shall not constitute an Alternative Restructuring Proposal.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Brokers**" means a nationally recognized real estate broker specializing in retail properties and a nationally recognized real estate broker specializing in warehouse and distribution centers.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Business Plan Parameters**" means the processes and parameters related to the Business Plan, including those related to vendor agreements, lessor agreements, and go-forward self-funding capability.

"**Business Plan**" means a reasonably detailed business plan for New JCP and the REIT.

"**Cash Collateral**" has the meaning set forth in Section 363(a) of the Bankruptcy Code.

"**Cash Collateral Order**" means the interim order of the Bankruptcy Court authorizing the use of Cash Collateral attached as Exhibit [_] hereto, in form and substance acceptable to the Required Consenting First Lien Lenders.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"**Company Claims/Interests**" means any Claim against, or Equity Interest in, a Company Party, including but not limited to the DIP Claims, the Term Loan Claims, the First Lien Notes Claims, the Second Lien Notes Claims, and the Unsecured Notes Claims.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, in connection with any proposed Restructuring.

"**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan in form and substance acceptable to the Required Consenting First Lien Lenders.

"**Consenting First Lien Noteholders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting First Lien Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Consenting Term Lenders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" has the meaning set forth in Section 3.01.

"**DIP Agent**" means the "Administrative Agent," as defined in the DIP Term Sheet.

"**DIP Claims**" means any Claim against the Debtors arising under, derived from, or based upon the DIP Facility and the DIP Credit Agreement.

"**DIP Credit Agreement**" means that certain post-petition debtor-in-possession credit agreement evidencing the DIP Facility entered into in accordance with the DIP Order (as the same may be amended, amended and restated, modified or supplemented from time to time in accordance with its terms) terms and conditions of, and subject in all respects to the DIP Term Sheet and the DIP Order in form and substance acceptable to the Required Consenting First Lien Lenders.

"**DIP Facility**" has the meaning set forth in the preamble to this Agreement.

"**DIP Lenders**" has the meaning ascribed to it in the DIP Term Sheet.

"**DIP Loan Documents**" means the DIP Credit Agreement for the DIP Facility entered into in accordance with the DIP Order by the Company Parties and the lenders party thereto, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, which, on and after the Agreement Effective Date, shall be in form and substance acceptable to the Company Parties and the DIP Secured Parties and the Required Consenting First Lien Lenders.

"**DIP Order**" means the order of the Bankruptcy Court authorizing entry into the DIP Facility and the use of Cash Collateral on a final basis and incorporating the terms and conditions set forth in the DIP Credit Agreement and in form and substance acceptable to the DIP Agent and the Required Consenting First Lien Lenders.

"**DIP Secured Parties**" means the DIP Lenders together with the DIP Agent and [the Issuing Banks and the other Secured Parties (each as defined in the DIP Credit Agreement)].

"**DIP Term Sheet**" has the meaning set forth in the preamble to this Agreement.

"**Disclosure Statement**" means the disclosure statement with respect to the Plan.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Exit Costs**" means the costs and expenses of emerging from the Chapter 11 Cases pursuant to the Plan, including, without limitation, accrued but unpaid professional fees, estimated additional professional fees (including transaction, success and similar fees), unpaid 503(b)(9) claims, contract and lease cure costs, and other accrued but unpaid administrative expenses.

"**Exit Costs Estimate**" means a good faith estimate prepared by the Company Parties and their advisors of the Exit Costs associated with the Plan.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**First Lien Debt**" means, collectively, the First Lien Notes and the Term Loans.

"**First Lien Indenture**" means that certain Indenture, dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time),

by and among JCP, as issuer, certain of the Company Parties, as guarantors, and Wilmington Trust, National Association, as the trustee.

"**First Lien Notes**" means the 5.875% Senior Secured Notes, due 2023, outstanding under the First Lien Indenture.

"**First Lien Notes Claim**" means any Claim on account of the First Lien Notes.

"**First Lien Notes Trustee**" means Wilmington Trust, National Association, in its capacity as trustee under the First Lien Indenture, together with its successors and permitted assigns.

"**JCP**" has the meaning set forth in the preamble to this Agreement.

"**JCP Exit Facilities**" means the New JCP ABL and the New JCP Term Loan, collectively, in form and substance acceptable to the Required Consenting First Lien Lenders.

"**JCP Exit Facilities Documents**" means, collectively, the New ABL Credit Agreement, the New Term Loan Credit Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the JCP Exit Facilities, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents in form and substance acceptable to the Required Consenting First Lien Lenders.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit D**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Lease Optimization Plan**" means a plan developed by the Company Parties and their advisors (including the applicable Broker) for the optimization of the Company Parties' leased real estate including information regarding all discussions with existing landlords regarding lease modification or monetization.

"**Market Test**" means a market test process pursuant to which interest will be solicited regarding (a) providing new money debt financing to either New JCP or the REIT (including financing that would "take-out" any of the "take back" paper otherwise proposed for the Plan, (b) the sale or sale sale/leaseback of the Debtors' owned distribution centers, (c) the provision of new capital to either New JCP or the REIT in exchange for equity in such entity, (d) the purchase of New JCP, the REIT or substantially all of the assets of either as a going concern, and (e) the purchase of all or part of the Debtors' assets.

"**Market Test Documents**" means the all documents related to the Market Test, including any agreements documenting a transaction identified in the Market Test and any orders implementing such transaction.

"**Milestones**" means the milestones set forth in Section 4 of this Agreement.

"**New JCP**" means either (i) J. C. Penney Company, Inc., as reorganized pursuant to and under the Plan, or any successor or assign thereto, by merger, amalgamation, consolidation or otherwise, on or after the Plan Effective Date, or (ii) a new corporation or limited liability company that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors in the Chapter 11 Cases and issue the New JCP Common Stock to be distributed pursuant to the Plan.

"**New JCP ABL**" has the meaning set forth on the RSA Term Sheet.

"**New JCP ABL Credit Agreement**" means that certain agreement evidencing the New JCP ABL in accordance with the terms, and subject in all respects to the conditions, as set forth in this Agreement and the RSA Term Sheet (and all exhibits and annexes thereto) in form and substance acceptable to the Required Consenting First Lien Lenders.

"**New JCP ABL Documents**" means, collectively, the New JCPABL Credit Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the New JCP ABL, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents in form and substance acceptable to the Required Consenting First Lien Lenders.

"**New JCP Common Stock**" has the meaning set forth in the RSA Term Sheet.

"**New JCP Common Stock Documents**" means the definitive documentation with respect to the New JCP Common Stock to be issued in accordance with the Plan in form and substance acceptable to the Required Consenting First Lien Lenders.

"**New JCP Governance Documents**" means the organizational and governance documents for New JCP [and its subsidiaries], including, without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, and limited partnership agreements (or equivalent governing documents), which New JCP Governance Documents shall be in accordance with this Agreement, the RSA Term Sheet, and the New JCP Governance Term Sheet, in form and substance acceptable to the Required Consenting First Lien Lenders.

"**New JCP Governance Term Sheet**" has the meaning set forth in the preamble to this Agreement.

"**New Organizational Documents**" has the meaning set forth in the RSA Term Sheet.

"**New JCP Term Loan**" has the meaning set forth in the RSA Term Sheet.

"**New JCP Term Loan Credit Agreement**" means that certain agreement evidencing the New JCP Term Loan in accordance with the terms, and subject in all respects to the conditions, as set forth in this Agreement and the RSA Term Sheet (and all exhibits and annexes thereto) in form and substance acceptable to the Required Consenting First Lien Lenders.

"**New JCP Term Loan Documents**" means, collectively, the New JCP Term Loan Credit Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the New JCP Term Loan, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents in form and substance acceptable to the Required Consenting First Lien Lenders.

"**New REIT Governance Documents**" means the organizational and governance documents for the REIT, including, without limitation, articles of incorporation, bylaws, charter, and other similar organizational and constituent documents for the REIT, which the New REIT Governance Documents shall be in accordance with this Agreement (including the RSA Term Sheet, and all exhibits and annexes thereto), all in form and substance acceptable to the Required Consenting First Lien Lenders.

"**Owned Real Estate Optimization Plan**" means a plan developed by the Company Parties and their advisors (including the Brokers) for the optimization of the Company Parties' owned real estate including information regarding all indications of value received by a Company Party or their advisors for any such owned real estate in the last twelve months.

"**Pari Passu Collateral Agent**" means Wilmington Trust, National Association, together with its permitted successors in its capacity as collateral agent pursuant to the Pari Passu Intercreditor Agreement.

"**Pari Passu Intercreditor Agreement**" means that certain Pari Passu Intercreditor Agreement, dated as of June 23, 2016, by and among *inter alios*, the Pari Passu Collateral Agent, JPMorgan Chase Bank, as Term Loan Authorized Representative for the Term Loan Secured Parties, Wilmington Trust, National Association, as Notes Authorized Representative for the Notes Secured Parties, and each of the additional Authorized Representatives party thereto from time to time, as amended, restated, amended and restated, extended, supplemented, or otherwise modified from time to time.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transfer**" means each transfer of any Company Claims/Interests that meets the requirements of Section 9.01.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 9.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the joint plan of reorganization filed by the Debtors under chapter 11 of the Bankruptcy Code that embodies the Restructuring.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court, all in form and substance acceptable to the Required Consenting First Lien Lenders.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**REIT**" means a [newly formed] [] [corporation or statutory real estate investment trust], formed in accordance with the terms of the RSA Term Sheet, the REIT Term Sheet, and the REIT Governance Term Sheet.

"**REIT Exit Loan**" means the REIT Revolver and REIT Term Loan, collectively, in form and substance acceptable to the Required Consenting First Lien Lenders.

"**REIT Exit Loan Documents**" means, collectively, the REIT Revolver Agreement, the REIT Term Loan Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the REIT Exit Loan, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents in form and substance acceptable to the Required Consenting First Lien Lenders..

"**REIT Interests**" has the meaning set forth in the RSA Term Sheet.

"**REIT Interests Documents**" means the definitive documentation with respect to the New REIT Interests to be issued in accordance with the Plan in form and substance acceptable to the Required Consenting First Lien Lenders.

"**REIT Revolver**" has the meaning set forth in the RSA Term Sheet.

"**REIT Revolver Agreement**" means that certain agreement evidencing the REIT Revolver in accordance with the terms, and subject in all respects to the conditions, as set forth in this Agreement, and the RSA Term Sheet (and all exhibits and annexes thereto) in form and substance acceptable to the Required Consenting First Lien Lenders.

"**REIT Revolver Documents**" means, collectively, the REIT Revolver Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the REIT Revolver, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents in form and substance acceptable to the Required Consenting First Lien Lenders.

"**REIT Term Loan**" has the meaning set forth in the RSA Term Sheet.

"**REIT Term Loan Agreement**" means that certain agreement evidencing the REIT Term Loan in accordance with the terms, and subject in all respects to the conditions, as set forth in this

Agreement, and the RSA Term Sheet (and all exhibits and annexes thereto) in form and substance acceptable to the Required Consenting First Lien Lenders.

"**REIT Term Loan Documents**" means, collectively, the REIT Term Loan Agreement, and all other agreements, documents, and instruments delivered or entered into in connection with the REIT Term Loan, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, subordination agreements, fee letters, and other security documents in form and substance acceptable to the Required Consenting First Lien Lenders.

"**REIT Transaction**" has the meaning set forth in the recitals to this Agreement.

"**Reorganized Debtor**" means, collectively, a Debtor, or any successor or assign thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

"**Required Consenting First Lien Lenders**" means, as of the relevant date, Consenting First Lien Lenders holding at least 50.01% of the aggregate outstanding principal amount of First Lien Debt held by Consenting First Lien Lenders.

"**Required DIP Lenders**" means the Required Lenders, as defined in the DIP Term Sheet.

"**Restructuring**" has the meaning set forth in the recitals to this Agreement.

"**RSA Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Second Lien Indenture**" means that certain Indenture, dated as of March 12, 2018 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among J. C. Penney Corporation, Inc., as issuer, certain of the Company Parties, as guarantors, and Wilmington Trust, National Association, as the trustee.

"**Second Lien Notes**" means the 8.625% Senior Secured Notes, due 2025, outstanding under the Second Lien Indenture.

"**Second Lien Notes Claim**" means any Claim on account of the Second Lien Notes.

"**Second Lien Notes Trustee**" means Wilmington Trust, National Association, in its capacity as trustee under the Second Lien Indenture, together with its successors and permitted assigns.

"**Solicitation Materials**" means all solicitation materials in respect of the Plan.

"**Term Lenders**" means the lenders party from time to time to the Term Loan Credit Agreement.

"**Term Loan Agent**" means JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the Term Loan Credit Agreement.

"**Term Loan Claims**" means any Claim on account of the Term Loans.

"**Term Loan Credit Agreement**" means that certain Amended and Restated Credit and Guaranty Agreement (as amended, restated, amended and restated, extended, supplemented or otherwise modified from time to time), dated as of June 23, 2016, by and among, *inter alios*, J. C. Penney Corporation, Inc., as borrower, certain of the Company Parties, as guarantors, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto from time to time.

"**Term Loans**" means loans outstanding under the Term Loan Credit Agreement.

"**Term Sheets**" has the meaning set forth in the recitals.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, 12.04, or 12.05.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit C**.

"**Trustee**" means any indenture trustee, collateral trustee, or other trustee or similar entity under the First Lien Notes.

"**Unsecured Indenture**" means that certain Indenture, dated as of September 15, 2014 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and among JCP and J. C. Penney Corporation, Inc., as issuers and Wilmington Trust, National Association, as the trustee.

"**Unsecured Notes**" means the 8.125% Unsecured Notes, due 2025, outstanding under the Unsecured Indenture.

"**Unsecured Notes Claim**" means any Claim on account of the Unsecured Notes.

"**Unsecured Notes Trustee**" means Wilmington Trust, National Association, in its capacity as trustee under the Unsecured Indenture, together with its successors and permitted assigns.

1.02.   Interpretation.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribe or allowed herein.  If any payment, distribution, act or deadline under the Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

(f)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(g)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(h)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(i)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws; and

(j)      the use of "include" or "including" is without limitation, whether stated or not.

**Section 2.**      ***Effectiveness of this Agreement***.  This Agreement shall become effective and binding upon each of the Parties as of 12:01 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Parties and

(b)      Consenting First Lien Lenders with respect to at least 66 2/3% of the aggregate outstanding principal amount of First Lien Debt shall have executed and delivered counterpart signature pages of this Agreement.

**Section 3.**      ***Definitive Documents***.

3.01.   The definitive documents governing the Restructuring shall include without limitation the following (collectively with any other material documents necessary to consummate the Restructuring, the "Definitive Documents"): (A) the Plan (and any and all exhibits, annexes, and schedules thereto);  (B) the Plan Supplement (which shall include the form of the Management Incentive Plans, the form of the New Organizational Documents, [and the form of the New Employment Agreements]; (C) the Confirmation Order; (D) the Disclosure Statement and the other Solicitation Materials; (E) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (F) all pleadings filed by the Company Parties in connection with the Chapter 11 Cases (or related orders) to the extent such pleadings seek relief in connection with the transactions contemplated herein, including the First Day Pleadings and all orders sought pursuant thereto; (G) the Cash Collateral Order; (H) the DIP Loan Documents; (I) the DIP Order; (J) the New JCP Common Stock Documents; (K) the New REIT Interests Documents; (L)  the JCP Exit Facilities Documents; (M) the REIT Exit Loan Documents; (N) any other disclosure documents related to the issuance of the New JCP Common Stock; (O) any other disclosure documents related to the issuance of the New REIT Interests, and (P) any Market Test Documents.

3.02.   The Definitive Documents not executed or in a form attached to this Agreement as of the Agreement Effective Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 13.  Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Agreement Effective Date shall otherwise be in form and substance consistent with the term sheets attached hereto and otherwise acceptable to the Company Parties and the Required Consenting First Lien Lenders.  Each Party agrees that it shall act in good faith and use and undertake commercially reasonable efforts to negotiate and finalize the terms of the Definitive Documents that are not finalized as of the date hereof, *provided* that the Parties shall act in good faith to negotiate and finalize the terms of the Term Sheets that are not finalized as of the Agreement Effective Date as soon as practicable following the Petition Date.

**Section 4.**   *Milestones*.

4.01.   The following Milestones shall apply to the Restructuring unless extended or waived in writing by the Company Parties and the Required Consenting First Lien Lenders:

(a)   no later than May 16, 2020 the Debtors shall commence the Chapter 11 Cases;

(b)   no later than 14 Business Days after the Petition Date, the Debtors shall have filed a motion to retain Brokers acceptable to the Required Consenting First Lien Parties;

(c)   no later than 18 calendar days after the Petition Date, the Bankruptcy Court shall have entered the DIP Order;

(d)   no later than June 15, 2020, the Debtors will have delivered a Lease Optimization Plan and an Owned Real Estate Optimization Plan, each in form and substance acceptable to the Required Consenting First Lien Lenders, to the Consenting First Lien Lenders.

(e)　　no later than June 15, 2020 the Company Parties shall have delivered proposed Business Plan Parameters to the Consenting First Lien Lenders and the DIP Lenders;

(f)　　no later than June 20, 2020 the Company Parties and the Required Consenting First Lien Lenders shall have agreed on acceptable Business Plan Parameters;

(g)　　no later than July 8, 2020, the Company Parties shall have delivered a Business Plan (consistent with the acceptable Business Plan Parameters) to the Consenting First Lien Lenders and the DIP Lenders;

(h)　　no later than July 14, 2020, the Company Parties and the Required Consenting First Lien Lenders shall have agreed on an acceptable Business Plan;

(i)　　no later than 130 days after the Petition Date the Bankruptcy Court shall have entered an order either (A) approving the Disclosure Statement or (B) acceptable bidding procedures;

(j)　　no later than 160 days after the Petition Date, the Bankruptcy Court shall have entered either (A) the Confirmation Order or (B) approving an acceptable sale or sales; and

(k)　　no later than November 15, 2020 the Plan Effective Date shall have occurred.]

4.02.　　The Milestones may be extended by the Company Parties with the prior written consent (email from counsel being sufficient) of the Required Consenting First Lien Lenders.

**Section 5.**　　***Commitments of the Consenting First Lien Lenders***

5.01.　　<u>General Commitments and Waivers</u>.

(a)　　During the Agreement Effective Period, each Consenting First Lien Lender (severally and not jointly) agrees, in respect of all of its Company Claims/Interests, to:

(i)　　support the Restructuring, including without limitation the REIT Transaction and the Market Test, and vote for or otherwise support any matter requiring approval to the extent necessary to implement the Restructuring;

(ii)　　use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring from the Company Parties' other First Lien Lenders;

(iii)　　negotiate in good faith and use commercially reasonable efforts to execute and deliver any appropriate additional or alternative provisions or agreements to address any legal, financial, or structural impediment that may arise that would prevent, hinder, impede, delay, or are necessary to effectuate the consummation of, the Restructuring;

(iv)　　negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement and to which it is required to be a party;

(v)     give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the Restructuring, including, to the extent such Consenting First Lien Lenders holds First Lien Notes Claims or Term Loan Claims, directing the Pari Passu Collateral Agent, the First Lien Notes Trustee,  and the Term Loan Agent, as applicable, to consent to adequate protection arrangements set forth in the [DIP Term Sheet/DIP Loan Documents];

(vi)    act in good faith to negotiate and finalize the terms of the Term Sheets that are not finalized as of the Agreement Effective Date as soon as practicable;

(vii)   use commercially reasonable efforts to cause the Company Parties to extend any offer made by the Company Parties to such Consenting First Lien Lender to all Consenting First Lien Lenders on a ratable basis; and

(b)     During the Agreement Effective Period, each Consenting First Lien Lender (severally and not jointly) agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring, including the DIP Facility; or (y) encourage any person or entity to do any of the foregoing;

(ii)    propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)   file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(iv)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)     exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Company Claims/Interests, including rights or remedies arising from or asserting or bringing any Claims under or with respect to the Term Loan Credit Agreement or the First Lien Indenture that are inconsistent with this Agreement or the Definitive Documents;

(vi)    object to or commence any legal proceeding challenging the adequate protection granted or proposed to be granted to the holders of First Lien Note Claims and Term Loan Claims under the DIP Order or Cash Collateral Order; or

(vii)   object to or commence any legal proceeding challenging the liens or claims (including the priority thereof) granted or proposed to be granted to the DIP Lenders under the DIP Order or Cash Collateral Order.

5.02.   <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting First Lien Lender (severally and not jointly) that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting First Lien Lenders of the Solicitation Materials:

(i)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    not object to the Plan;

(iii)    support the mutual release, exculpation, and injunction provisions to be provided in the Plan;

(iv)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

(v)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i),(ii), (iii), and (iv) above.

(b)    During the Agreement Effective Period, each Consenting First Lien Lender (severally and not jointly), in respect of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

**Section 6.    *Additional Provisions Regarding the Consenting First Lien Lenders' Commitments*.**

6.01.    <u>Generally</u>.  Notwithstanding anything contained in this Agreement, nothing in this Agreement shall: (a) affect the ability of any Consenting First Lien Lenders to consult with any other Consenting First Lien Lenders, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting First Lien Lenders to assert or raise any objection permitted under this Agreement in connection with the Restructuring; and (c) prevent any Consenting First Lien Lenders from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

6.02.    <u>DIP Facility</u>.  Capitalized terms used but not defined in this Section 6.02 shall have the meaning set forth in the DIP Term Sheet, the DIP Loan Documents, the DIP Order, or the Cash Collateral Order, as applicable.

(a)    Notwithstanding anything contained in this Agreement, nothing in this Agreement shall affect the rights of the DIP Agent and the DIP Lenders under the DIP Order or the DIP Loan

Documents and to the extent of any conflict between this Agreement and the DIP Order or the DIP Loan Documents, the DIP Order or the DIP Loan Documents, as applicable, shall govern.

(b)     Each of the Consenting First Lien Lenders irrevocably consents to (i) the DIP Facility as set forth in the DIP Term Sheet, (ii) entry of the DIP Order, and (iii) entry of the Cash Collateral Order.

**Section 7.**     *Commitments of the Company Parties*.

7.01.     <u>Affirmative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, the Company Parties agree to:

(a)     support and take all steps reasonably necessary and desirable to consummate the Restructuring in accordance with this Agreement;

(b)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(c)     use best efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring;

(d)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring as contemplated by this Agreement;

(e)     use commercially reasonable efforts to seek additional support for the Restructuring from their other material First Lien Lenders to the extent reasonably prudent;

(f)     provide counsel to the Consenting First Lien Lenders a reasonable opportunity to review draft copies of all First Day Pleadings and all other material pleadings filed by the Company Parties in the Chapter 11 Cases

(g)     provide on the first day of each month an updated Exit Costs Estimate to the Consenting First Lien Lenders;

(h)     provide the Consenting First Lien Lenders with drafts of the Lease Optimization Plan and the Owned Real Estate Optimization Plan no later than the Friday of each week beginning with June 1, 2020, consult with the Consenting First Lien Lenders and their advisors regarding the same, and consider in good faith all suggestions of the Consenting First Lien Lenders and their advisors regarding the same; and

(i)     Extend any offer made to one or more Consenting First Lien Lenders to all Consenting First Lien Lenders (on a *pro rata* basis).

7.02.     <u>Negative Commitments</u>.  Except as set forth in Section 8, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring described in, this Agreement or the Definitive Documents;

(c)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects; or

(d)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with this Agreement or the Plan.

**Section 8.     *Additional Provisions Regarding Company Parties' Commitments*.**

8.01.   Notwithstanding anything to the contrary in this Agreement, if a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel determines that applicable Law or its fiduciary obligations under applicable Law requires taking an action prohibited by this Agreement or refraining from taking an action required by this Agreement, the relevant Company Party may terminate this Agreement in accordance with Section 12.02(B) of this Agreement.

8.02.   Notwithstanding anything to the contrary in this Agreement (but subject to Section 8.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions or negotiations of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiation with holders of Claims against or Equity Interests in a Company Party (including any Consenting First Lien Lenders), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring or Alternative Restructuring Proposals.

8.03.   Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 9.     *Transfer of Interests and Securities*.**

9.01.   During the Agreement Effective Period, no Consenting First Lien Lender shall Transfer any ownership (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated

or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)    the authorized transferee is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act, (iii) an institutional accredited investor (as defined in the Rules), or (iv) a Consenting First Lien Lender; and

(b)    either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement or (ii) the transferee is a Consenting First Lien Lender and the transferee provides notice of such Transfer (including the amount and type of Company Claim/Interest Transferred) to counsel to the Company Parties at or before the time of the proposed Transfer.

9.02.    Upon compliance with the requirements of Section 9.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 9.01 shall be void *ab initio*.

9.03.    This Agreement shall in no way be construed to preclude the Consenting First Lien Lenders from acquiring additional Company Claims/Interests; *provided*, *however*, that such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting First Lien Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the Consenting First Lien Lender).

9.04.    This Section 9 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting First Lien Lender to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreements.

9.05.    Notwithstanding Section 9.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (a) such Qualified Marketmaker subsequently Transfers such Company Claims/Interests within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee; and (c) the Transfer otherwise is a Permitted Transfer.  To the extent that a Consenting First Lien Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting First Lien Lender without the requirement that the transferee be a Permitted Transferee.

9.06.    Notwithstanding anything to the contrary in this Section 9, the restrictions on Transfer set forth in this Section 9 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 10.    *Representations and Warranties of Consenting First Lien Lenders*.**    Each Consenting First Lien Lender severally, and not jointly, represents and warrants that, as of the date such Consenting First Lien Lender executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it (or its affiliates and its and their respective accounts and funds managed by any of them or other entities that hold interests directly or indirectly on behalf of its affiliates its and their respective accounts and funds managed by any of them): (i) is the direct or indirect beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting First Lien Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 9); and (ii) has the full power and authority to act on behalf of, vote and consent to matters concerning such Company Claims/Interests;

(b)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction (including, for the avoidance of doubt, any placement "on loan"), right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting First Lien Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(c)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in the Rules), and (ii) any securities acquired by the Consenting First Lien Lenders in connection with the Restructuring will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 11.    *Mutual Representations, Warranties, and Covenants*.**    Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, on the Plan Effective Date:

(a)    it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)      except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement;

(c)      the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)      except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring contemplated by, and perform its respective obligations under, this Agreement; and

(e)      except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.**      *Termination Events*.

12.01.   <u>Consenting First Lien Lenders Termination Events</u>.   This Agreement may be terminated by the Required Consenting First Lien Lenders by the delivery to the Company Parties of a written notice in accordance with Section 14.10 hereof upon the occurrence of the following events:

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured for ten (10) Business Days after such terminating Consenting First Lien Lenders transmit a written notice in accordance with Section 14.10 hereof detailing any such breach;

(b)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) remains in effect for thirty (30) calendar days after such terminating Consenting First Lien Lenders transmit a written notice in accordance with Section 14.10 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Consenting First Lien Lenders group if a holder of such Consenting First Lien Lenders group sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(c)      the Bankruptcy Court enters an order denying confirmation of the Plan;

(d)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting First Lien Lenders, not to be unreasonably withheld), (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iii) rejecting this Agreement;

(e)      the Company Parties lose access to the use of Cash Collateral in accordance with the Cash Collateral Order, subject to any applicable remedies notice period;

(f)      the Company Parties lose access to the use of the DIP Facility in accordance with the DIP Order, subject to any applicable remedies notice period; or

(g)      subject to any extension set forth in Section 4.02, the failure of the Company Parties to comply with a Milestone, which Milestone has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of a holder included in the applicable the terminating Consenting First Lien Lenders group in violation of its obligations under this Agreement.

12.02.  <u>Company Party Termination Events</u>.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

(a)      the breach in any material respect by one or more of the Consenting First Lien Lenders of any provision set forth in this Agreement that remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting First Lien Lenders of notice of such breach;

(b)      the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring and (ii) remains in effect for thirty (30) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; <u>provided</u>, that this termination right shall not apply to or be exercised by the Company Parties if any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement;

(d)      the Bankruptcy Court enters an order denying confirmation of the Plan.

12.03.  <u>Individual Termination.</u>  Any individual Consenting First Lien Lender may terminate this Agreement, as to itself only, by the delivery to counsel to the Company Parties and the Consenting First Lien lenders of a written notice setting forth the basis for such termination:

(a)      in the event that the Required Consenting First Lien Lenders agree to extend or waive a Milestone or to amend this Agreement to remove a Milestone, any Consenting First Lien Lender that has not agreed to such extension, waiver, or removal may terminate this Agreement as to itself by notice delivered within the earlier of (X) five Business Days after such extension, waiver, or removal and (Y) the second Business Day after such Milestone would have been required to occur but for such waiver, extension, or removal; provided that any such termination must occur before the satisfaction of such Milestone;

(b)       if the Company Parties fail to meet any Milestone (and such Milestone is not extended, waived, or removed in accordance with the terms of this Agreement) then any Consenting First Lien Lender may terminate this Agreement as to itself by notice delivered within five Business Days of such Milestone failure;

(c)       if such Consenting First Lien Lender has not consented to the form and substance of the Lease Optimization Plan or the Owned Real Estate Optimization Plan by June 15, 2020, such Consenting First Lien Lender may terminate this Agreement as to itself by notice delivered no later than June 22, 2020;or

(d)       if such Consenting First Lien Lender has not consented to the form and substance of the Plan, such Consenting First Lien Lender may terminate this Agreement as to itself by notice delivered no later than five Business Days after such Plan is filed with the Bankruptcy Court by a Company Party.

12.04.   Mutual Termination.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting First Lien Lenders; and (b) each Company Party.

12.05.   Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.  This Agreement shall also automatically terminate in the event that Consenting First Lien Lenders representing a majority of the aggregate outstanding principal amount of First Lien Debt that was held by Consenting First Lien Lenders as of the Agreement Effective Date exercise their individual termination rights pursuant to Section 12.03.

12.06.   Effect of Termination.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise; provided, however, any Consenting First Lien Lender withdrawing or changing its vote pursuant to this Section 12.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting First Lien Lender from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under

this Agreement), remedies, and interests, including its claims against any Consenting First Lien Lenders, and (b) any right of any Consenting First Lien Lender, or the ability of any Consenting First Lien Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting First Lien Lenders.  No purported termination of this Agreement shall be effective under this Section 12.06 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(b) or Section 12.02(d).  Nothing in this Section 12.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b).

**Section 13.**  *Amendments and Waivers*.

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by each Company Party and the Required Consenting First Lien Lenders; *provided*, *however*, that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting First Lien Lender in a manner different from the effect on the Company Claims/Interests held by other Consenting First Lien Lenders, then the consent of each such affected Consenting First Lien Lender shall also be required to effectuate such modification, amendment, waiver or supplement.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 14.**  *Miscellaneous*.

14.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

14.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part

of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the RSA Term Sheet, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern. In the event of any inconsistency between the RSA Term Sheet (without reference to the exhibits, annexes, and schedules thereto) and the exhibits, annexes, and schedules thereto, such exhibits, annexes, and schedules thereto shall govern. In the event of any inconsistency between the terms of this Agreement (including all exhibits, annexes, and schedules hereto) and the Plan, the terms of the Plan shall govern.

14.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring, as applicable.

14.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in federal or state courts located in the City of New York, Borough of Manhattan. Notwithstanding the foregoing consent to jurisdiction, upon the commencement of the Chapter 11 Cases, each of the Parties hereby agrees that, if the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with this Agreement. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:  (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto; and (d) consents to entry of a final order or judgment by the Bankruptcy Court.

14.06.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute

the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting First Lien Lenders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting First Lien Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

14.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

J. C. Penney Corporation, Inc.
6501 Legacy Drive
Plano, Texas 75024
Attn: Brandy Treadway
E-mail address: btreadwa@jcp.com

with copies to (which shall not constitute notice):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attn:   Joshua Sussberg
          Christopher Marcus
          Aparna Yenamandra
E-mail address:       joshua.sussberg@kirkland.com;
                      christopher.marcus@kirkland.com;
                      aparna.yenamandra@kirkland.com

(b)     if to a Consenting First Lien Lender, to the address set forth on such Consenting First Lien Lenders' signature page hereto:

with copies to (which shall not constitute notice):

Milbank LLP

55 Hudson Yards
New York, New York 10001
Attn:   Dennis F. Dunne
          Andrew M. Leblanc
          Thomas R. Kreller
          Brian Kinney
E-mail address:          ddunne@milbank.com
                              aleblanc@milbank.com
                              tkreller@milbank.com
                              bkinney@milbank.com


Any notice given by delivery, mail, or courier shall be effective when received.

14.11.  Independent Due Diligence and Decision Making.  Each Consenting First Lien Lenders hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

14.12.  Enforceability of Agreement.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  Waiver.  If the Restructuring are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

14.14.  Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  Several, Not Joint, Claims.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

14.16.  Severability and Construction.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions

shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

14.17. <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18. <u>Capacities of Consenting First Lien Lenders</u>.   Each Consenting First Lien Lender has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

14.19. <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 13, or otherwise, including a written approval by the Company Parties or the Required Consenting First Lien Lenders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.20. <u>Publicity</u>.  The Company Parties will submit to counsel to the Consenting First Lien Lenders all press releases, public filings, or public announcements, in each case, to be made relating to this Agreement or the transactions contemplated hereby and any amendments thereof in advance of release and will consult with such counsel with respect to such communications. For the avoidance of doubt, such press releases, public filings, or public announcements are to be made solely by the Company Parties and not by any other Party to this Agreement.  Nothing contained herein shall be deemed to waive, amend or modify the terms of any Confidentiality Agreement.

*[Remainder of page intentionally left blank.]*

**EXHIBIT A**

**RSA Term Sheet**

---

**J. C. PENNEY COMPANY, INC.**

**RESTRUCTURING TERM SHEET**

**May 15, 2020**

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES AS TO ANY EXCHANGE OR CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH SECTION 4(A)(2) OF THE SECURITIES ACT OF 1933 AND/OR SECTION 1145 OF THE BANKRUPTCY CODE AND ALL APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS.

---

This Term Sheet (the "**Term Sheet**") sets forth the principal terms of a restructuring (the "**Restructuring**") of J. C. Penney Company, Inc. ("**JCP**"), a company incorporated under the Laws of Delaware, and each of its affiliates party to the Restructuring Support Agreement ("**RSA**") to which this Term Sheet is attached as <u>Exhibit A</u> (together with JCP, collectively, the "**Company Parties**" or the "**Debtors**"). The regulatory, corporate, tax, accounting, and other legal and financial matters related to the Restructuring have not been fully evaluated, and any such evaluation may affect the terms and structure of any Restructuring. The transactions contemplated in this Term Sheet are subject in all respects to the negotiation, execution, and delivery of definitive documentation.

This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this Term Sheet and the information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions. Nothing contained in this Term Sheet shall be an admission of fact or liability or, until the occurrence of the Execution Date on the terms described herein and in the RSA, deemed binding on any of the parties hereto.

This Term Sheet does not purport to summarize all of the terms, conditions, covenants, and other provisions that may be contained in the fully negotiated and definitive documentation necessary to implement the Restructuring. Capitalized terms used but not otherwise defined in this Term Sheet shall have the meanings ascribed to such terms in the annexes attached hereto or in the RSA.

| KEY PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| **Overview** | The Restructuring will be accomplished through the Company Parties commencing Chapter 11 Cases under the Bankruptcy Code in the Bankruptcy Court for the Southern District of Texas. |
| | The goal of the Parties will be to pursue a Chapter 11 Plan on the terms below that establishes both a financially sustainable operating company ("**New JCP**") and a Real Estate Investment Trust (the "**REIT**").[1] In order to achieve this result, the Debtors will, in accordance with the provisions of this Term Sheet and the RSA: |
| | • Prepare a Plan and Disclosure Statement consistent with this term sheet; |
| | • Prepare additional diligence materials as necessary to determine the assets to be contributed to the REIT; |
| | • Pursue a sale/leaseback of the Debtors' owned distribution centers; |
| | • Conduct an in-depth analysis of the Debtors' existing leases and determine whether to reject or seek concessions form their landlords; |
| | • Seek an order approving the adequacy of the Disclosure Statement and approving solicitation procedures; and |
| | • Conduct a market testing process (the "**Market Test**") seeking interest and bids in providing debt or equity financing to New JCP and/or purchasing some or all of the assets of the Debtors. |
| **Current Capital Structure** | Current capital structure: |
| | i. the extensions of credit made under the Credit Agreement, dated as of June 20, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**ABL Facility**"), by and among JCP, J. C. Penney Corporation, Inc. ("**JCP Corp.**"), J. C. Penney Purchasing Corporation, the Lenders party thereto (the "**ABL Lenders**"), Wells Fargo Bank, National Association, as Administrative Agent, Collateral Agent, Revolving Agent, Swingline Lender, and LC Agent, and the other parties thereto and (B) each counterparty to a swap agreement constituting a Secured Swap Obligation (as defined in the ABL Facility) (a "**Swap Counterparty**") ((A) and (B), collectively, the "**ABL Claims**"); |
| | ii. the loans (the "**Term Loans**") borrowed under the Amended and Restated Credit and Guaranty Agreement, dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among, *inter alios*, JCP Corp., as Borrower, the Guarantors party thereto, the Lenders party thereto (the "**Term Loan Lenders**"), and JP Morgan Chase Bank, N.A., as Administrative Agent (in such capacity, the "**Term Loan Agent**") (the "**Term Loan Claims**"); |
| | iii. the 5.875% Senior Secured Notes due 2023 (the "**First Lien Notes**" and, the holders of the First Lien Notes, the "**First Lien Noteholders**"); the First Lien Noteholders, together with the Term Loan Lenders, |

---

[1]   The REIT shall be organized as an "UPREIT," with its assets indirectly owned through an operating partnership (the "**OP**"). References in this term sheet to the REIT may include the REIT or the OP as context requires.

| KEY PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | the "**First Lien Lenders**") issued under the Indenture, dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among JCP Corp., as Issuer, the Guarantors party thereto, and Wilmington Trust National Association, as Trustee (in such capacity, the "**First Lien Notes Trustee**") (the "**First Lien Note Claims**," and together with the Term Loan Claims, the "**First Lien Claims**"); |
| | iv.  the 8.625% Senior Secured Second Priority Notes due 2025 issued under the Indenture (as amended, restated, amended and restated, supplemented or otherwise modified from time to time), dated as of March 12, 2018, by and among JCP Corp., as Issuer, the Guarantors party thereto, and Wilmington Trust, National Association, as Trustee (the "**Second Lien Note Claims**"); |
| | v.  all outstanding unsecured senior notes issued by the Debtors (the "**Unsecured Note Claims**"); and |
| | vi.  all other unsecured claims against the Debtors (the "**Other Unsecured Claims**"); and |
| | vii.  common equity interests in JCP. |
| **DIP Facilities** | Certain Consenting First Lien Lenders (in such capacity, collectively, the "**DIP Lenders**") commit to provide a $900 million senior secured superpriority DIP Facility, $450 million of which will be in the form of new money, on the terms set forth in the DIP Term Sheet attached hereto as **Annex 1**. |
| **REIT Structure** | A subset of the Debtors' properties, mutually identified by the Debtors and the Required Consenting First Lien Lenders, will be transferred to the REIT. The stores in the REIT shall be leased to New JCP pursuant to a market-rate master lease.  Pursuant to the Plan and with the consent of the Required Consenting First Lien Lenders, up to 35% of the REIT Interests (defined below) may be sold to a strategic third party investor, and the proceeds of such sale may either be used to provide funding for the REIT or to allow for the distribution of cash in lieu of such equity under the Plan. |
| **Business Plan** | The Debtors will develop a business plan acceptable to the Required Consenting First Lien Lenders for New JCP and the REIT.[2]  The Debtors will retain a nationally recognized real estate broker acceptable to the Required Consenting First Lien Lenders to analyze the Debtors' store portfolios and any excess real estate.  The Debtors and such advisors will consult with the Consenting First Lien Lenders with respect any determination whether to assume, reject, assume with modifications, or sell any such real property leases and/or real property (or enter into any similar transaction).  The assumption, rejection, or sale of such real property leases and/or real property (or enter into any similar transaction) shall be subject to the consent of the Required Consenting First Lien Lenders.  The Required |

---

[2]   Parties to discuss in good faith and reasonably agree on the inclusion of financial tests (if any) following review of updated budget and provision of updated Business Plan that will form the basis for operational covenants. Financial conditions to be calculated based on financial levels needed to exit.

| KEY PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | Consenting First Lien Lenders will inform the Debtors by May 21, 2020 whether they consent to the rejection of the leases associated with the stores identified for closure in connection with the business plan provided on May 6, 2020 (if they so consent, the "Agreed Closing Stores"). |
| **Distribution Centers** | The Debtors will retain a nationally recognized broker specializing in warehouse and distribution centers (acceptable to the Required Consenting First Lien Lenders) to analyze the Debtors' distribution centers and will pursue the sale (including by way of full or partial sale/leaseback) of the Debtors' owned distribution centers property (or enter into a similar transaction) and will use the proceeds to fund the Plan.  Any such sale (or similar transaction) will be subject to the approval of the Required Consenting First Lien Lenders and the Bankruptcy Court. |
| **Plan Overview** | Unless the Market Test achieves a superior outcome (as determined by the Required Consenting First Lien Lenders) or the Toggle Event occurs, the Debtors and the Consenting Lenders will pursue a Plan of Reorganization under which parties may receive the treatment set forth below.   The composition of the forms of consideration set forth below (including for the avoidance of doubt the entities at which Holders of Claims receive such consideration) are preliminary and subject to change in the Definitive Documentation (which Definitive Documentation may provide for parties to hold portions of such consideration on a temporary or bridge basis): |

i.   The Plan will be funded, in part by (a) a new money revolving ABL loan in an amount not less than $[●] on New JCP (the "**New JCP ABL"**) on terms acceptable to the Required Consenting First Lien Lenders (including with respect to pro forma borrowing base) (b) a new money first lien revolving loan in an amount not less than $[●] at the REIT (the "**REIT Revolver**") on terms acceptable to the Required Consenting First Lien Lenders, (c) the sale of certain owned real property and (d) the sale of the equity interests in New JCP and/or the REIT, pursuant to the Market Test described below.

ii.   Holders of DIP Loans will receive $[●] in first lien take-back term debt against New JCP on terms acceptable to the DIP Lenders and the Required Consenting First Lien Lenders in full and final satisfaction of their DIP Claims.

iii.   Holders of ABL Claims will receive (a) $[●] million in first lien term take-back debt against the REIT on terms acceptable to the Required Consenting First Lien Lenders (the "**REIT Term Loan**"), (b) an appropriate sized portion of the New JCP ABL, and/or (c) cash as appropriate.

iv.   Holders of First Lien Claims will receive $[●] in first lien take-back term debt against New JCP on terms acceptable to the Required Consenting First Lien Lenders and [●]% of the equity in the REIT.

v.   The Plan will be subject to a number of conditions to its confirmation and its effectiveness, including acceptance by ABL Lenders on terms acceptable to the Debtors and Required Consenting First Lien Lenders, satisfaction of an acceptable and achievable level of go-forward vendor support/terms, minimum rent savings for New JCP, minimum liquidity for New JCP and the REIT, acceptable maximum

| KEY PROVISIONS REGARDING THE RESTRUCTURING | |
|---|---|
| | exit costs and acceptable funding structure for such costs, and appropriate tax structuring and the rendering of an opinion from a nationally-recognized accounting or law firm that the REIT meets the requirements for qualification and taxation as a "real estate investment trust" and that the Master Lease is a "true lease" for US federal income tax purposes. |
| **Equity Interests in the Reorganized Company** | On the Plan Effective Date, New JCP shall issue new common stock or other equity interests (the "**New JCP Common Stock**"). The New JCP Common Stock shall have voting rights in New JCP on a one vote per share basis in all matters stockholders are entitled to vote on. <br><br> On the Plan Effective Date, the REIT shall issue new equity interests of the REIT (the "**REIT Interests**") and the OP shall issue common interests, to the extent necessary (the "**OP Interests**") as set forth on the REIT Term Sheet. The voting structure of the REIT shall conform to a typical "UPREIT" structure. <br><br> The Reorganized Debtors shall use commercially reasonable efforts to list the New JCP Common Stock and REIT Interests (but not, for the avoidance of doubt, the OP Interests) on a national securities exchange, as soon as reasonably practicable following the Plan Effective Date. |
| **Market Test** | Concurrently with the Plan process, the Debtors will, in consultation with the Required Consenting First Lien Lenders, conduct a robust Market Test process in accordance with the Milestones attached to the RSA. In the Market Test the Debtors shall solicit interest (a) from parties wishing to provide new money debt financing to New JCP and/or the REIT (including financing that would "take-out" any of the "take back" paper otherwise proposed for the Plan), (b) in the sale or sale sale/leaseback of the Debtors' owned distribution centers, (c) in the provision of new capital to New JCP and/or the REIT in exchange for equity in such entity, (d) in the purchase of New JCP, the REIT or substantially all of the assets of either as a going concern, and (e) in the purchase of all or part of the Debtors' assets. <br><br> The DIP Lenders and First Lien Lenders shall have the right to credit bid in connection with any sale conducted in connection with the Market Test. |
| **Toggle Event** | By July 14, 2020, the Debtors and the Required Consenting First Lien Lenders shall have agreed on an acceptable Business Plan. <br><br> By August 15, 2020, the Debtors shall also obtain binding commitments for all third-party financing (on terms acceptable to Required Consenting First Lien Lenders) necessary to finance such a business plan in accordance with the other Plan provisions of the term sheet. <br><br> Upon a failure of either condition, the Debtors shall immediately cease pursing the Plan and instead pursue a 363 sale of all of their assets unless otherwise instructed by the Required Consenting First Lien Lenders and shall seek approval of any relief required to undertake such 363 sale on an expedited basis. |

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| **Distributions** | | Each holder of an Allowed Claim or Interest, as applicable, shall receive under the Plan the treatment described below (or less favorable treatment that may be agreed by the Debtors and the holder of such allowed Claim or Interest) in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest.  Any action to be taken by the Debtors on the Plan Effective Date may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter. | |
| **Class No.** | **Type of Claim** | **Treatment** | **Voting** |
| **Unclassified Non-Voting Claims** | | | |
| N/A | DIP Facility Claims | On the Plan Effective Date, each holder of an allowed DIP Facility Claim shall receive its pro rata share of [●]. | N/A |
| N/A | Administrative Claims | On the later of the Plan Effective Date and the date on which such Administrative Claim becomes due and payable in the ordinary course, each holder of an allowed Administrative Claim shall receive, at the option of the applicable Debtor(s), payment in full in cash or such other treatment (a) to render such Administrative Claim unimpaired under section 1124 of the Bankruptcy Code or (b) as otherwise permitted by section 1129(a)(9) of the Bankruptcy Code. | N/A |
| N/A | Priority Tax Claims | On the later of the Plan Effective Date and the date on which such Priority Tax Claim becomes due and payable in the ordinary course, each holder of an allowed Priority Tax Claim shall receive treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
| **Classified Claims and Interests of the Debtors** | | | |
| Class 1 | Other Secured Claims | On the Plan Effective Date, each holder of an allowed Other Secured Claim shall receive, at the option of the applicable Debtor(s): (a) payment in full in cash; (b) the collateral securing its allowed Other Secured Claim; (c) reinstatement of its allowed Other Secured Claim; or (d) such other treatment to render such Other Secured Claim unimpaired under section 1124 of the Bankruptcy Code. | Unimpaired; deemed to accept |
| Class 2 | Other Priority Claims | On the later of the Plan Effective Date and the date on which such Other Priority Claim becomes due and payable in the ordinary course, each holder of an allowed Other Priority Claim shall receive, at the option of the applicable Debtor(s), payment in full in cash or such other treatment (a) to render such Administrative | Unimpaired; deemed to accept |

| TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | | |
|---|---|---|---|
| | | Claim unimpaired under section 1124 of the Bankruptcy Code or (b) as otherwise permitted by section 1129(a)(9) of the Bankruptcy Code. | |
| Class 3 | ABL Claims / Hedge Claims | On the Plan Effective Date, each holder of an allowed ABL Claim or Hedge Claim shall receive its pro rata share of (a) [●], (b) payment in full in cash, or (c) such other treatment to render such ABL Claim or Hedge Claim unimpaired under section 1124 of the Bankruptcy Code. | [TBD] |
| Class 4 | First Lien Claims | On the Plan Effective Date, each holder of an allowed First Lien Claim shall receive its Pro Rata share of [●]. | Impaired; entitled to vote |
| Class 5 | Second Lien Notes Claims[3] | On the Plan Effective Date, each holder of an allowed Second Lien Notes Claim shall receive [●]. | Impaired; [entitled to vote] |
| Class 6 | First Lien Deficiency Claims | On the Plan Effective Date, each holder of an allowed Secured Notes Deficiency Claim shall receive [●]. | Impaired; [entitled to vote] |
| Class 7 | Unsecured Notes Claims | On the Plan Effective Date, each holder of an allowed Unsecured Notes Claim shall receive [●]. | Impaired; [entitled to vote] |
| Class 8 | Non-Funded Debt General Unsecured Claims at [funded debt obligor entities][4] | On the Plan Effective Date, each holder of an allowed Non-Funded Debt General Unsecured Claim at [●] shall receive [●]. | Impaired; [entitled to vote] |
| Class 9 | Non-Funded Debt General Unsecured Claims at [non-obligor entities] | On the Plan Effective Date, each holder of an allowed Non-Funded Debt General Unsecured Claim at [●] shall receive [●]. | Impaired; [entitled to vote] |
| Class 10 | Intercompany Claims | On the Plan Effective Date, each allowed Intercompany Claim shall be, at the option of the applicable Debtor(s) and subject to the Restructuring Transactions Memorandum, either reinstated, compromised, set off, distributed, contributed, settled, or canceled and released without any distribution. | Impaired; deemed to reject or Unimpaired; deemed to accept |
| Class 11 | Intercompany Interests | On the Plan Effective Date, each Intercompany Interest shall be, at the option of the applicable Debtor and subject to the Restructuring Transactions Memorandum, | Impaired; deemed to reject or Unimpaired; |

---

[3]     Note:  May classify Second Lien Notes Claims and First Lien Deficiency Claims together.

[4]     Note:  Division of Non-Funded Debt General Unsecured Claims by Debtor entity (i.e., classes 8-9) subject to change.

| | TREATMENT OF CLAIMS AND INTERESTS OF THE DEBTORS UNDER THE PLAN | | |
|---|---|---|---|
| | | either reinstated or canceled and released without any distribution. | deemed to accept |
| Class 12 | Existing Equity Interests | On the Plan Effective Date, all Equity Interests in JCP shall be extinguished and cancelled.  Holders of Existing Equity Interests shall receive no recovery on account of such Existing Equity Interests. | Impaired; deemed to reject |
| Class 13 | Section 510(b) Claims | Section 510(b) Claims shall be discharged, cancelled, released, and extinguished without any distribution to holders of such claims. | Impaired; deemed to reject |

| GENERAL PROVISIONS REGARDING THE PLAN | |
|---|---|
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Term Sheet or the Plan, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from SEC registration under applicable law. |
| **Release and Exculpation** | The Plan shall include the exculpation, Debtor releases, and "Third-Party" releases provisions set forth on **Annex 2**, attached hereto, in all material respects, subject to the completion of the Disinterested Directors' investigation into potential claims held by the Company Parties, which investigation shall be completed before the entry of the Confirmation Order. Each Consenting First Lien Lender will, pursuant to the RSA, agree to "opt in" to, or not to "opt out" of, as applicable, the consensual "Third-Party" releases, including those granted to the Company's current and former officers, directors, and employees. |
| **Conditions Precedent to the Plan Effective Date** | The occurrence of the Plan Effective Date shall be subject to the following conditions precedent: i.   the RSA shall have been executed and shall not have been terminated and remains in full force and effect; ii.  the Plan and all related Plan exhibits and other documents shall have been executed and delivered, and any conditions (other than the occurrence of the Plan Effective Date or certification by the Debtors that |

| GENERAL PROVISIONS REGARDING THE PLAN | |
|---|---|
| | the Plan Effective Date has occurred) contained therein shall have been satisfied or waived in accordance therewith; |
| | iii.  the orders approving the Disclosure Statement and confirming the Plan shall have been entered, consistent with the RSA, and such orders shall not have been vacated, stayed, or modified; |
| | iv.  the Bankruptcy Court shall have entered the DIP Order, consistent with the RSA, and the DIP Order shall not have been vacated, stayed, or modified without the prior written consent of the Required Lenders (as defined in the DIP Credit Agreement) or, with respect to any provisions that affect the rights or duties of the DIP Agent (as defined in the DIP Credit Agreement), the DIP Agent, and there shall be no default or event of default existing under the DIP Facility; |
| | v.  All financing necessary for the Plan shall have been obtained, and any documents related thereto shall have been executed, delivered, and be in full force and effect (with all conditions precedent thereto, other than the occurrence of the Plan Effective Date or certification by the Debtors that the Plan Effective Date has occurred, having been satisfied or waived); |
| | vi.  the issuance of the New JCP Stock, REIT Interests, and OP Interests; |
| | vii.  the Required Consenting First Lien Lenders shall have consented to the assumption or rejection of every store lease assumed or rejected by the Debtors; |
| | viii.  all professional fees and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Plan Effective Date have been placed in a professional fee escrow account pending approval by the Bankruptcy Court; |
| | ix.  all accrued and unpaid fees and expenses of the Consenting First Lien Lenders in connection with the Restructuring (including fees and expenses of the Consenting First Lien Lenders' Advisors) shall have been paid in accordance with the terms and conditions set forth in the RSA and the DIP Credit Agreement; and |
| | x.  any and all requisite governmental, regulatory, environmental, and third-party approvals and consents shall have been obtained. |
| **Allocation of Administrative Expenses** | All Administrative Expenses, including professional fees and any wind-down expenses, shall be allocated between activities related to New JCP and the REIT pursuant to a formula  mutually agreeable to the Debtors and the Required Consenting First Lien Lenders. |
| **Post-Plan Effective Date Administration** | [●] |

| GENERAL PROVISIONS REGARDING THE PLAN | |
| --- | --- |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Conditions Precedent to the Plan Effective Date may be waived by the Debtors, including, in the case of any Conflict Matter between any Debtors, each Debtor acting at the direction of its respective Disinterested Director or Manager (as applicable) and without the consent of any other Debtor, but with the prior written consent of the Required Consenting First Lien Lenders. |
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |

| OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING | |
| --- | --- |
| **Governance** | The board of directors for each of New JCP and the REIT (collectively, the "**New Boards**") shall be determined or selected, as applicable, by the Required Consenting First Lien Lenders.<br><br>Corporate governance documents for New JCP, the other Reorganized Debtors, and the REIT, including charters, bylaws, operating agreements, or other organization documents, as applicable (collectively, the "**New Organizational Documents**"), shall be consistent with section 1123(a)(6) of the Bankruptcy Code and shall otherwise be in form and substance reasonably acceptable to the Required Consenting First Lien Lenders. Substantially final forms of the New Organizational Documents shall be filed as part of the Plan Supplement prior to the date upon which the Bankruptcy Court enters the Confirmation Order. |
| **Management Incentive Plans and Employment Agreements** | On the Plan Effective Date, New JCP and the REIT will implement management incentive plans that provide for New JCP Common Stock and REIT Interests to be reserved for issuance to management of New JCP, the other Reorganized Debtors, and the REIT after the Plan Effective Date on terms to be agreed by the respective boards of directors of New JCP and the REIT. |
| **Employee Compensation and Benefit Programs** | On the Plan Effective Date, the Debtors shall assume (and assign to the applicable Reorganized Debtor, if necessary) the employee compensation and benefits plans and programs applicable to any of the Debtors' employees and retirees, in each case existing as of the Plan Effective Date, on terms to be agreed between the Debtors and the Required Consenting First Lien Lenders and as will be set forth in the Plan. |
| **Indemnification of Prepetition Directors, Officers, Managers, *et al.*** | Consistent with applicable law, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other |

| OTHER MATERIAL PROVISIONS REGARDING THE RESTRUCTURING |
|---|

| | professionals of the Debtors than the indemnification provisions in place prior to the Restructuring. |
|---|---|
| **Director, Officer, Manager, and Employee Tail Insurance Coverage** | On or before the Petition Date, the Debtors shall purchase and maintain directors, officers, managers, and employee liability tail coverage for the six-year period following the Plan Effective Date on terms no less favorable than the Debtors' existing director, officer, manager, and employee coverage and with an aggregate limit of liability upon the Plan Effective Date of no less than the aggregate limit of liability under the existing director, officer, manager, and employee coverage upon placement.  Directors and officers insurance policies shall remain in place in the ordinary course during the Chapter 11 Cases and from and after the Plan Effective Date.<br><br>Furthermore, the Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including, without limitation, the "tail policy") in effect prior to the Plan Effective Date, and any directors and officers of the Company Parties who served in such capacity at any time before or after the Plan Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Plan Effective Date.  Notwithstanding anything herein to the contrary, the Company Parties shall retain the ability to supplement such directors' and officers' insurance policies as the Company Parties deem necessary, including purchasing any tail coverage. |

**<u>Annex 1</u>**

**DIP Term Sheet**

**EXECUTION VERSION**

### $450 MILLION SECURED SUPERPRIORITY DEBTOR IN POSSESSION CREDIT FACILITY

#### SUMMARY OF TERMS AND CONDITIONS

This summary of terms and conditions (this "**DIP Term Sheet**") outlines certain terms and conditions of the DIP Facility referred to below. Capitalized terms used and not defined herein have the meanings assigned to such terms in the Restructuring Support Agreement ("**RSA**") or the Restructuring Term Sheet (the "**RSA Term Sheet**") to which this DIP Term Sheet is attached as Annex 2.

| | |
|---|---|
| **Executive Summary:** | This DIP Term Sheet provides for a $450 million secured superpriority debtor in possession credit facility, to be funded on a delayed draw basis as appropriate in light of case liquidity needs, access to cash collateral, and milestones in order to (i) finance the Debtors and their operations in accordance with the Budget and (ii) ensure that the Debtors have sufficient liquidity, taking into account access to cash collateral. |
| | Pursuant to the RSA and as described herein, the DIP Lenders will agree to convert certain of their Loans into loans under an exit facility to be made available on terms and conditions customary for facilities and transactions of such type and in each case satisfactory to the DIP Lenders and the Debtors (such loans, the "**Exit Loans**"). |
| | The DIP Facility will be fully committed to by the DIP Lenders (determined on a pro rata basis among the DIP Lenders based on the aggregate amount of the Prepetition First Lien Obligations held by the DIP Lenders as of the date of this DIP Term Sheet (the "**Pro Rata Allocations**")) pursuant to the terms and conditions described in this DIP Term Sheet and the Commitment Letter to which this DIP Term Sheet is attached (the "**Commitment Letter**"). |
| **Borrower:** | J. C. Penney Corporation, Inc. (the "**DIP Borrower**"), as a debtor and debtor in possession under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**"). The DIP Borrower and its affiliated debtors and debtors in possession, collectively, the "**Debtors**". |
| **DIP Facility:** | A non-amortizing senior secured priming multi-draw delayed draw term loan facility (the "**DIP Facility**") with a maximum funded principal amount equal to $450 million in "new money" (such principal amount, together with the Prepetition First Lien Obligations rolled up into the DIP Facility as set forth below, the "**Total Aggregate Commitment**" and the loans thereunder, the "**Loans**") to be funded in two borrowings as follows: (a) $225 million made not later than one business day following |

the entry of the DIP Order (as defined below) (the "***Initial Borrowing***") and subject to satisfaction of the Conditions Precedent to Initial Borrowing and (b) the remainder of the Total Aggregate Commitment in an aggregate principal amount equal to $225 million (the ***"Subsequent Borrowing"***) shall be made available following the entry of the DIP Order on July 15, 2020 subject to satisfaction of the Conditions Precedent to Initial Borrowing and the Conditions Precedent to The Subsequent Borrowing (and no other conditions precedent), and otherwise on the terms and conditions in this DIP Term Sheet, the Commitment Letter and the Operative Documents referred to below.

With respect to the DIP Facility, (i) upon satisfaction of the Conditions Precedent to Initial Borrowing, funds with respect to the Initial Borrowing shall be funded directly to the Debtors for use in accordance with the Budget and (ii) upon satisfaction of the Conditions Precedent to The Subsequent Borrowing, all funded amounts shall be deposited in a blocked controlled account in favor of the DIP Agent (the "***Escrow Account***"; the funds deposited therein "***Drawn Funds***").  The Subsequent Borrowing shall be in an aggregate principal amount equal to $225 million, which represents the remainder of the Total Aggregate Commitment.  Drawn Funds may be withdrawn from the Escrow Account once per week, subject to a draw request being delivered to the DIP Agent, which shall certify (i) that such applicable Drawn Funds will be required during the subsequent week in accordance with the Budget (giving effect to any maximum Permitted Variances with respect to such week) and (ii) no Default or Event of Default (each as defined in the Operative Documents) shall have occurred and be continuing.

**Guarantors:**

The obligations of the DIP Borrower shall be unconditionally guaranteed, on a joint and several basis, by each other Debtor (each, a "***Guarantor***" and collectively, the "***Guarantors***"). Each entity which guarantees (or is required to guarantee) the Prepetition First Lien Obligations shall be a Guarantor and a Debtor.

**Case:**

The bankruptcy cases (the "***Chapter 11 Cases***") of the Debtors to be filed under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") (the date of filing of such petition, the "***Petition Date***").  The Petition Date shall be no later than May 16, 2020.

2

| | |
|---|---|
| **DIP Agent:** | GLAS USA LLC ("***GLAS***") shall act as administrative agent and collateral agent for the DIP Facility (in such capacity, the "***DIP Agent***") on behalf of the DIP Lenders (as defined below). Any action, exercise of remedies, approval, consent or similar action to be taken or not taken by the DIP Agent in respect of the DIP Facility shall only be taken (or not taken) as may be directed by the Required Lenders.  The DIP Agent and the DIP Borrower shall enter into an agency fee letter providing for fees to be payable to the DIP Agent to be mutually agreed and reasonably acceptable to the Debtors. |
| **DIP Lenders:** | All rights and obligations of the DIP Lenders under the DIP Facility shall be several and not joint. |
| **Prepetition ABL Credit Agreement:** | The Amended and Restated Credit Agreement dated as of June 20, 2017 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Prepetition ABL Credit Agreement***") by and among the DIP Borrower, Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "***Prepetition ABL Agent***"), the lenders from time to time party thereto (the "***Prepetition ABL Lenders***") and the other parties thereto. |
| **Prepetition Term Loan Credit Agreement:** | The Amended and Restated Term Loan Credit Agreement dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Prepetition Term Loan Credit Agreement***") by and among the DIP Borrower, the Lenders party thereto (the "***Prepetition Term Loan Lender***"), JPMorgan Chase Bank, N.A., as administrative agent (the "***Prepetition Term Loan Agent***"), and the other parties thereto.  The loans under the Prepetition Term Loan Credit Agreement are referred to herein as the "***Prepetition Term Loans***". |
| **Prepetition First Lien Notes** | The senior secured notes (the "***Prepetition First Lien Notes***") outstanding under that Indenture, dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Prepetition First Lien Notes Indenture***") by and among the DIP Borrower, Wilmington Trust, National Association, as trustee (the "***Prepetition First Lien Notes Trustee***"), and the other parties thereto.  The holders of such Prepetition First Lien Notes are referred to herein as the "***Prepetition First Lien Noteholders***". The Prepetition Term Loans together with the Prepetition First Lien Notes are referred to herein as the "***Prepetition First Lien Obligations***". |

| | |
|---|---|
| **ABL Intercreditor Agreement:** | The Intercreditor and Collateral Cooperation Agreement dated as of June 23, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***ABL Intercreditor Agreement***") by and among the DIP Borrower, the Prepetition ABL Agent, Wilmington Trust, National Association, as collateral agent under the Prepetition Term Loan Credit Agreement and the Prepetition First Lien Notes Indenture (the "***Prepetition First Lien Collateral Agent***"), and the other parties thereto. |
| **Restructuring Support Agreement:** | A restructuring support agreement executed on or prior to the Petition Date and which is mutually acceptable to the DIP Lenders and the Debtors (the "***RSA***"). |
| **Tenor of DIP Facility:** | The DIP Facility will mature on the earliest of (such earliest date, the "***Maturity Date***"): |

(a) the date that is 180 days after the Petition Date (the "***Scheduled Maturity Date***");

(b) 20 days after the Petition Date, if the DIP Order (as defined below) has not been entered by the Bankruptcy Court prior to the expiration of such 20-day period;

(c) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases;

(d) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise;

(e) without the DIP Agent's prior written consent, the date of filing or express written support by the Debtors of bidding procedures, sale processes, transactions, plans of liquidation or reorganization or related disclosure statements that are not in accordance with the RSA, if applicable, and that are not otherwise acceptable to the DIP Lenders;

(f) the date of termination of the DIP Lenders' commitments and the acceleration of any outstanding Loans, in each case, under the DIP Facility in accordance with the terms of the DIP Facility credit agreement (the "***DIP Credit Agreement***") and the other definitive documentation with respect to the DIP Facility (collectively with the DIP Credit Agreement and the related security documents, the "***Operative Documents***");

(g) any breach by the Debtors which has not been cured or

waived or termination of the RSA after the effectiveness thereof;

(h) dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code;

(i) the Debtors shall lose access to the use of cash collateral in accordance with the Cash Collateral Order (as defined below), subject to any applicable remedies notice period; and

(j) other customary circumstances to be mutually agreed.

**Closing Date:** The date of the effectiveness of the Operative Documents (the "***Closing Date***") (which, for the avoidance of doubt, shall not occur prior to the entry of the DIP Order).

**DIP Facility Interest Rate:** Loans under the DIP Facility will bear interest at a rate, at the DIP Borrower's option, equal to the Base Rate plus 10.75% per annum or LIBOR (subject to a 1.25% floor) plus 11.75% per annum, compounded monthly and payable monthly in cash in arrears.

At any time when an Event of Default under the DIP Facility has occurred and is continuing, all outstanding amounts under the DIP Facility shall bear interest, to the fullest extent permitted by law, at the interest rate applicable to base rate loans plus 2.00% per annum and shall be payable on demand in cash (the "***Default Rate***"). Interest on overdue amounts under the DIP Facility shall also accrue at the Default Rate and shall be payable in cash.

**DIP Facility Premiums:** A commitment premium payable in cash to the DIP Lenders equal to 6.00% of each DIP Lender's initial commitments in respect of the $450 million "new money" portion of the DIP Facility on the Petition Date, which shall be earned, due and payable upon execution of the Commitment Letter.

An upfront premium payable in cash to the DIP Lenders equal to 4.00% of each DIP Lender's commitments in respect of the $450 million "new money" portion of the DIP Facility on the Petition Date, which shall be earned, due and payable upon execution of the Commitment Letter.

An exit premium payable in cash to the DIP Lenders equal to 3.00% of each DIP Lender's funded Loans or unfunded commitments under the DIP Facility (including the "new money" and rolled up portion of the DIP Facility) on the Maturity Date or on the date of any earlier voluntary or

mandatory prepayment (the "***Exit Premium***").

|                        |                                                                                                                                                                                                                                                            |
|------------------------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| **Exit Loans:**        | Upon terms and conditions to be agreed in the RSA, but in any event including the following:                                                                                                                                                                |

Exit Loans will bear interest at a rate, at the DIP Borrower's option, equal to the Base Rate plus 10.00% per annum or LIBOR (subject to a 1.25% floor) plus 11.00% per annum, compounded monthly and payable monthly in cash in arrears.

A commitment premium payable in cash equal to 2.00% of the commitments in respect of the Exit Loans, which shall be due and payable in cash on the date that the Business Plan is approved (in accordance with the timeline set forth in the DIP Milestones (as defined below)).

An upfront premium payable in cash equal to 3.00% of the commitments in respect of the Exit Loans, which shall be earned, due and payable on the closing date of the Exit Loans.

**Roll Up:**
On the date of entry of the DIP Order, $225 million in principal amount of the Prepetition Term Loans held by the DIP Lenders (or their applicable designees) shall be rolled up into the DIP Facility in accordance with each such DIP Lender's (or its applicable designee's) share of the DIP Facility. On the date of the Subsequent Borrowing, an additional $225 million of principal amount of the Prepetition Term Loans held by the DIP Lenders (or their applicable designees) shall be rolled up into the DIP Facility on a dollar-for-dollar basis in accordance with each such DIP Lender's (or its applicable designee's) share of the DIP Facility. Except with respect to the Exit Premium, the premiums set forth above shall only be payable with respect to the $450 million "new money" portion of the DIP Facility and shall not be payable with respect to any rolled up Prepetition Term Loans. Notwithstanding the foregoing, in the event that any DIP Lender (or any of its designees) does not hold sufficient Prepetition Term Loans to fully participate in the roll up on a pro rata basis based on its pro rata share of the funded Loans, such DIP Lender (or its applicable designee) shall be permitted to roll up its Prepetition First Lien Notes to the extent necessary to achieve such pro rata share of the roll up.

**Adequate Protection:**
As adequate protection for any diminution in the value of the interests of the Prepetition Term Loan Lenders and the Prepetition First Lien Noteholders in the collateral securing the Prepetition Term Loan Credit Agreement and the Prepetition First Lien Noteholders in the collateral securing the Prepetition

First Lien Notes Indenture, respectively, the Prepetition Term Loan Lenders and the Prepetition First Lien Noteholders will receive, subject in all cases to the Carve-Out, the following as adequate protection: (A) the payment of the reasonable and documented out-of-pocket fees and expenses of legal counsel and financial advisors retained by the Prepetition Term Loan Lenders that are also DIP Lenders, (B) cash payments of accrued and unpaid interest on the Prepetition Term Loans and Prepetition First Lien Notes upon entry of the DIP Order and each date thereafter on which such interest payment would otherwise become due under the Prepetition Term Loan Credit Agreement or Prepetition First Lien Notes Indenture, as applicable, (C) validly perfected liens on and security interests in the Debtors' post-petition Collateral junior only to the liens granted to the DIP Lenders under the DIP Facility and existing valid, perfected, and superior liens in the Collateral held by other creditors (including, for the avoidance of doubt, the liens of the Prepetition ABL Lenders with respect to the ABL Priority Collateral) and (D) a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code, which claim shall have priority over all priority claims (other than the claims of the DIP Lenders under the DIP Facility) and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c), 507(a), 507(b), 546(c), 726(b), and 1114 of the Bankruptcy Code or otherwise (collectively, "**_Adequate Protection_**").

| | |
|---|---|
| **Optional Prepayments and Commitment Reductions:** | The DIP Borrower may, upon at least one business day's notice, prepay or terminate in full (but not in part), with the payment of the Exit Premium but without other premium or penalty, subject to breakage costs, if applicable, the outstanding Loans and unfunded commitments. Once repaid, Loans may not be re-borrowed. |
| **Mandatory Prepayments:** | Mandatory prepayments of the Loans customary for similar debtor-in-possession financings shall be required, including, in an amount equal to (a) 100% of insurance and condemnation proceeds, (b) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the DIP Credit Agreement and (c) 100% of the net cash proceeds of any sale of assets constituting Collateral and other asset sales (without any reinvestment rights, but subject to de minimis dollar carveouts to be agreed, but subject, in the case of ABL Priority |

Collateral (or proceeds thereof), to prior repayment of the Prepetition ABL Credit Agreement solely to the extent required pursuant to the Cash Collateral Arrangements).

All voluntary prepayments and mandatory prepayments (within one business day of receipt thereof) shall be applied as follows: first, to pay accrued and unpaid interest on, and expenses in respect of, the obligations under the DIP Facility, to the extent then due and payable; and second, to any principal amounts or other obligations (including the Exit Premium) which are outstanding under the DIP Facility.  Other than the Exit Premium, there shall be no premium or penalty payable in connection with mandatory prepayments.

| | |
|---|---|
| **Security:** | All amounts owing by the DIP Borrower under the DIP Facility and by the Guarantors in respect thereof will be secured by a perfected security interest in, with the priority described below under "Priority," and lien on substantially all of the Debtors' tangible and intangible assets, including, without limitation, the following (collectively, the "***Collateral***"): accounts receivable, equipment, inventory, contracts, fee owned and ground leased real estate, real property leaseholds, investment property, insurance proceeds, deposit accounts (other than payroll, trust and tax accounts), monies, equity interests of subsidiaries of each Debtor and the products and proceeds thereof and, upon entry of the DIP Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates pursuant to the Bankruptcy Code, subject to certain exclusions to be mutually agreed.  Notwithstanding anything to the contrary, no mortgages shall be required and perfection on the Collateral shall be obtained solely through entry of the DIP Order. |
| **Priority:** | Subject in all cases to the Carve-Out and certain exclusions to be mutually agreed, all amounts owing by the DIP Borrower under the DIP Facility and by the Guarantors in respect thereof shall at all times: |

(a)     pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claims status in the Chapter 11 Cases;

(b)     pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all Collateral that is not subject to valid, perfected, and non-avoidable liens as of the Petition Date, including all unencumbered fee-owned, ground-leased and space-

leased real estate, and including upon entry of the DIP Order, any proceeds of avoidance actions available to the Debtors' bankruptcy estates pursuant to the Bankruptcy Code;

(c)      (i) pursuant to section 364(d) of the Bankruptcy Code, be secured by a perfected first priority and priming lien on all collateral that secures obligations under the Prepetition Term Loan Credit Agreement (other than ABL Priority Collateral, as defined in the ABL Intercreditor Agreement ("***ABL Priority Collateral***")) and (ii) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected second priority lien on all ABL Priority Collateral, junior only to the lien securing the claims in respect of the Prepetition ABL Credit Agreement ("***Prepetition Collateral***"); and

(d)      pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected second priority lien on all other property of the Debtors that is subject to valid and perfected liens in existence as of the Petition Date (including liens (if any) perfected subsequent to the Petition Date as permitted by and in accordance with section 546(b) of the Bankruptcy Code) but with a priority immediately junior to such liens.

Such liens shall be senior to all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

All liens authorized and granted pursuant to the DIP Order, as applicable, in each case, entered by the Bankruptcy Court approving the DIP Facility shall be deemed effective and perfected as of the Petition Date, and no further filing, notice or act will be required to effect such perfection. The DIP Lenders, or the DIP Agent on behalf of the DIP Lenders, shall be permitted, but not required, to make any filings, deliver any notices or take any other acts as may be desirable under state law or other law in order to reflect the perfection and priority of the DIP Lenders' claims described herein.

| | |
|---|---|
| **Carve-Out:** | See Schedule II to this DIP Term Sheet. |
| **Conditions Precedent to Initial Borrowing:** | The Operative Documents will contain customary conditions precedent to the Initial Borrowing under the DIP Facility and other conditions deemed by the DIP Agent to be appropriate to the specific transaction, and in any event, including, without |

limitation:

(a)  The execution of the RSA and the filing of the executed RSA.

(b)  The preparation, authorization and execution of the Operative Documents with respect to the DIP Facility, in form and substance satisfactory to the DIP Agent.

(c)  No later than 18 calendar days after the Petition Date, the Bankruptcy Court shall have entered a final order approving the DIP Facility on a final basis (the "***DIP Order***"), in form and substance satisfactory to the DIP Agent in their sole discretion as confirmed by the DIP Agent in writing, authorizing and approving the DIP Facility and the transactions contemplated hereby, including Adequate Protection and the DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the DIP Agent.

(d)  All premiums, fees and documented out-of-pocket fees and expenses (including fees and expenses of counsel and financial advisors) required to be paid to the DIP Lenders and DIP Agent (and with respect to which invoices have been received by the Debtors at least one (1) business day before the Closing Date) on or before the Closing Date (whether incurred before or after the Petition Date and including estimated fees and expenses through the Closing Date) shall have been paid.

(e)  The delivery of a 13-week cash flow projection (the "Initial DIP Budget") in form and substance reasonably satisfactory to the DIP Agent in its reasonable discretion as confirmed by the DIP Agent in writing. Such Initial DIP Budget and all updates thereto (in accordance with reporting requirements described herein) shall include the same line item detail as provided in the Alix Partners 13 week cash flow provided on May 13, 2020 prepetition, and will forecast, on a weekly basis, the period commencing May 17, 2020 through the end of the fiscal month following the last week of such 13-week period, and on a monthly basis for each month thereafter through the Maturity Date; provided that with the written consent and approval of the DIP Agent the Initial Budget may be updated by the DIP Borrower no more than once per month, which update shall be effective three calendar

days following delivery to the DIP Agent except to the extent objected to by the DIP Agent in writing. Upon effectiveness, such updated budget shall thereupon become the "budget" for purposes of the DIP Facility (as so approved, the "***Budget***").

(f) The Debtors shall have obtained requisite consents from the Prepetition ABL Agent and the Prepetition ABL Lenders to the use of cash collateral in the Chapter 11 Cases in an amount and on terms satisfactory to the Prepetition ABL Agent, the Prepetition ABL Lenders and the DIP Lenders, or the Bankruptcy Court shall have entered a cash collateral order acceptable to the DIP Agent (the "***Cash Collateral Order***"). For the avoidance of doubt the DIP Agent may not determine the Cash Collateral Order is not acceptable solely on account of the Prepetition ABL Agent and the Prepetition ABL Lenders not consensually consenting to the use of such cash collateral.

(g) Subject to a post-closing period to be agreed upon, the DIP Agent shall have received endorsements naming the DIP Agent as additional insureds, loss payee, lender loss payee and mortgagee under all insurance policies to be maintained with respect to the properties of the Debtors forming part of the Collateral.

(h) The DIP Agent shall have a valid and perfected lien on and security interest in the Collateral with the priority described herein. All filings, recordations and searches necessary or desirable in connection with such liens and security interests shall have been duly made; and all filing and recording fees and taxes shall have been duly paid.

(i) Since January 31, 2020, there shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Chapter 11 Cases) or threatened in any court or before any arbitrator or governmental authority that, in the opinion of the DIP Agent, affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a material adverse change or material adverse condition in or affecting the businesses, assets, operations or condition (financial or otherwise) of any of the Debtors and their respective direct and indirect subsidiaries or any of the transactions contemplated hereby; provided, that none of (i) the Chapter 11 Cases, the events and conditions

11

leading up to the Chapter 11 Cases, or their reasonably anticipated consequences, (ii) the actions required to be taken pursuant to the DIP Credit Agreement, the RSA, the DIP Order, or the Cash Collateral Order, or (iii) the occurrence of the COVID-19 pandemic or the impacts thereof on the business, financial condition or results of the DIP Borrower or its subsidiaries shall constitute a "material adverse effect" for any purpose.

(j) No default or event of default shall exist under the Operative Documents.

(k) The representations and warranties of the DIP Borrower and each Guarantor under the Operative Documents shall be true and correct in all material respects after giving effect to such funding.

(l) The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(m) The DIP Agent shall have received all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the U.S. Patriot Act.

(n) No later than five business days after the Petition Date, the Debtors shall have filed a motion seeking the retention of AlixPartners LLP as the Debtors' restructuring advisor and Lazard as the Debtors' investment banker.

(o) An order approving the Debtors' cash management system, the form of which is reasonably acceptable to the DIP Agent, shall have been entered by the Bankruptcy Court.

(p) Orders approving customary "first day" relief, the form of which is reasonably acceptable to the DIP Agent, shall have been entered by the Bankruptcy Court.

(q) The Debtors shall not have entered into, or made any payment in respect of, any critical vendor agreements or otherwise entered into any agreement to pay, or made on a postpetition basis any payment in respect of, any prepetition trade obligations except as consented to by the DIP Agent pursuant to an order of the Bankruptcy Court (which may be via consent to the "first day" orders).

(r)  Other customary conditions to be mutually agreed.

**Conditions Precedent to The Subsequent Borrowing**:

On the funding date of the Subsequent Borrowing, the following conditions precedent shall have been satisfied:

(a)  The RSA shall be in full force and effect.

(b)  No default or event of default shall exist under the Operative Documents.

(c)  The representations and warranties of the DIP Borrower and each Guarantor under the Operative Documents shall be true and correct in all material respects after giving effect to such funding (except to the extent such representation relates to an earlier date, in which case such representation shall have been true and correct in all material respects as of such date).

(d)  The making of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)  The DIP Agent shall have received a borrowing notice, substantially in the form as attached to the DIP Credit Agreement, at least three business days in advance of the requested borrowing.

(f)  The DIP Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the DIP Agent.

(g)  All premiums, fees and documented out-of-pocket fees and expenses (including fees and expenses of counsel and financial advisors) required to be paid to the DIP Lenders and the DIP Agent on or before the date of such funding shall have been paid  in cash.

(h)  The Debtors shall be in compliance with the Operative Documents and the DIP Milestones; provided that the DIP Milestones relating to the Business Plan (other than the receipt of the Business Plan and the Business Plan Parameters in accordance with the DIP Milestones) shall not be a condition precedent to the funding of the Subsequent Borrowing into the Escrow Account; provided, further, that no Drawn Funds in respect of the Subsequent Borrowing shall be permitted to be withdrawn from the Escrow Account until the Business Plan has been approved or disapproved in accordance with the DIP Milestones, with (i) $225

13

million permitted to be withdrawn from the Escrow Account commencing July 15, 2020 in accordance with the Budget if the Business Plan is approved in accordance with the DIP Milestones or (ii) upon the occurrence of a Toggle Event, $50 million shall be permitted to be drawn from the Escrow Account on July 15, 2020 for a toggle to a 363 sale, with the release of such $50 million from the Escrow Account subject to agreement among the DIP Borrower, the DIP Agent and the Prepetition ABL Agent to an acceptable 363 sale budget, and $175 million shall be released from the Escrow Account and remitted to the DIP Lenders within 2 business days of the date of the occurrence of such Toggle Event.

| | |
|---|---|
| **Representations and Warranties:** | The Operative Documents will contain representations and warranties that are (a) customary for similar debtor-in-possession financings and (b) and additional representations and warranties required by the DIP Lenders as mutually agreed with the Debtors. |
| **Reporting Requirements:** | The Operative Documents will contain financial reporting requirements that are customary for similar debtor-in-possession financings, including, without limitation, (i) monthly updates of the Budget for each fiscal month of the Debtors to be provided within five business days following the end of any fiscal month of the Debtors, (ii) all financial, operating and other reporting provided to the Prepetition ABL Lenders during the Chapter 11 Cases, including pursuant to the Cash Collateral Order, as and when so provided, (iii) a weekly cash flow forecast budget to actuals for each line item in a form to be attached to the DIP Credit Agreement and otherwise acceptable to the DIP Agent, with management commentary on any individual line item with a positive or negative variance of 5.0% or more as compared to the Budget (unless the dollar amount corresponding to such percentage variance is less than $1,000,000, in which case no management commentary shall be required) (the "***Weekly Variance Report***"), (iv) monthly delivery of operating statements and balance sheets for the Debtors and their consolidated subsidiaries within 15 business days following the end of the applicable period, (v) quarterly store-level operating statements for all properties within 45 days following the end of the applicable period and (vi) reasonable reporting requirements to be agreed with respect to professional fee monitoring no later than June 15, 2020. |

The Operative Documents will contain additional requirements

that the Debtors' counsel provide advance copies of all pleadings and/or filings in the Chapter 11 Cases to be made by the Debtors. The Debtors shall also provide copies of any monthly reporting provided to the Bankruptcy Court or the U.S. Trustee.

**Other Maintenance Covenants:**

The Debtors shall not pay any expenses or other disbursements other than those set forth in the Budget.

The DIP Borrower's cumulative actual receipts shall not be less than 85% of budgeted receipts for the corresponding test period (the "*Permitted Collections Budget Variances*").

The DIP Borrower's cumulative actual disbursements (excluding professional fees) will be not more than 12.5% greater than the budgeted disbursements for the corresponding test period (the "*Permitted Expenditures Budget Variances*").

The DIP Borrower's cumulative actual disbursements to merchandise vendors (domestic and foreign) will not be more than 10% greater than the budgeted disbursements for the corresponding test period (the "*Permitted Inventory Budget Variances*").

The Permitted Collections Budget Variances, Permitted Expenditures Budget Variances, and Permitted Inventory Budget Variances, collectively the "*Budget Variances*", in each case, as set forth in the then operative Budget. Notwithstanding anything to the contrary herein, the Debtors and Required Lenders shall agree to include provisions in the Operative Documents providing for the implementation of increased Permitted Expenditures Budget Variances and Permitted Inventory Budget Variances, in each case, in the event that the Debtors are able to more rapidly open store locations than anticipated in the Initial DIP Budget; provided, that Permitted Collections Budget Variances shall be adjusted accordingly to the extent agreed.

The Budget Variances shall each be tested (i) first, on June 6, 2020 on a cumulative basis for the prior two weeks, (ii) second, on June 13, 2020 on a cumulative basis for the prior three weeks, and (iii) at the end of each week thereafter on a cumulative four week basis for the prior four weeks. The Debtors shall deliver a Weekly Variance Report to the DIP Agent by 12:00 p.m., Eastern time, on Friday of each week.

Simultaneously with the delivery of the Weekly Variance Report, the DIP Borrower shall report on consolidated unrestricted book cash as of the end of the preceding week (as

15

reported in the Weekly Variance Report), which shall not be less than $50 million.

By June 1, 2020, the DIP Borrower and its real estate advisors will present to the DIP Agent and the DIP Lenders a summary of lease renegotiation discussions with content of such presentation to be acceptable to the DIP Agent with landlords, including the asks made of each landlord by property. Thereafter, the DIP Borrower shall report on a weekly basis the status of lease renegotiations by property, including any settlements achieved with any landlords by property, to the DIP Agent and the DIP Lenders, with associated terms of such settlements acceptable to the DIP Agent.

By July 1, 2020, the DIP Borrower and its real estate advisors will present to the DIP Agent and the DIP Lenders a proposed monetization strategy of the DIP Borrower's fee-owned and ground-leased real estate assets, including any offers or indications of value received by property for the last 12 months. Thereafter, the DIP Borrower shall report on a bi-weekly basis any offers or indications of value received by property to the DIP Agent and the DIP Lenders.

Process for construct for monthly reporting on allocation of disbursements by entity to be agreed between Required Lenders and the DIP Borrower by June 15, 2020, which shall be implemented as promptly as practical thereafter and provided on a monthly basis once implemented.

**Affirmative Covenants:**   The Operative Documents will contain (a) affirmative covenants that are customary for similar debtor-in-possession financings and (b) additional affirmative covenants required by the DIP Lenders and mutually agreeable to the Debtors and shall, in any event, include without limitation (i) the advance delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Debtors in the Chapter 11 Cases to the DIP Lenders and their counsel, (ii) compliance with Budget covenants consistent with the section titled "Budget and Variances," (iii) compliance with the DIP Milestones in the administration of the Chapter 11 Cases, (iv) update meetings and/or calls with the Debtors' senior management and advisors and the DIP Lenders no less than weekly if requested and (v) one or more members of the Debtors' senior management team shall be available for discussion with the DIP Lenders upon reasonable notice.

**Negative Covenants:**   The Operative Documents will contain negative covenants that are (a) customary for similar debtor-in-possession financings

16

and (b) additional negative covenants required by the DIP Lenders and mutually agreeable to the Debtors, and including, without limitation, restrictions on (i) incurrence of additional debt and liens (it being understood that any debt secured by the ABL Priority Collateral on a senior basis shall be capped at the amount of the Prepetition ABL Credit Agreement as of the Petition Date, subject to providing the ability of the DIP Borrower to access renewals or replacements of letters of credit thereunder, in each case, subject to the requirements and terms of the Cash Collateral Order), (ii) asset sales, (iii) investments, (iv) restricted payments, (v) fundamental changes and (vi) affiliate transactions.

**Events of Default:**
The Operative Documents will contain (a) events of default that are customary for similar debtor-in-possession financings and (b) additional events of default required by the DIP Lenders and mutually agreeable to the Debtors (collectively, the "***Events of Default***") and shall, in any event, include without limitation the following (subject to mutually agreeable grace periods as applicable):

(i)     failure to make any payment when due under the Operative Documents;

(ii)    noncompliance with covenants or breaches in any material respect of representations and warranties, in either case, under the Operative Documents;

(iii)   cross-default to any prepetition indebtedness in a principal amount above a threshold to be agreed that is not stayed by the automatic stay in the Chapter 11 Cases;

(iv)    failure to satisfy or stay execution of judgments above a threshold to be agreed;

(v)     the existence of certain employee benefit or environmental liabilities,, which would constitute a material adverse effect;

(vi)    impairment of the Operative Documents or the security interests described in "Security" above;

(vii)   change of ownership or control;

(viii)  a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases;

(ix)    appointment of a responsible officer or examiner with enlarged powers relating to the

17

operation of the business of any Debtor;

(x)   granting of relief from any stay of proceeding (including the automatic stay) so as to allow a third party to proceed against any asset of the Debtors in an amount in excess of $1,000,000 in the aggregate;

(xi)   entry of an order granting any superpriority claim which is senior to or *pari passu* with the DIP Lenders' claims under the DIP Facility without the prior consent of the DIP Agent (other than as described under the caption "Priority" above);

(xii)   any termination of the RSA as to all parties thereto, except as to any individual DIP Lender pursuant to Section 12.03 of the RSA;

(xiii)   any Debtor shall have filed, proposed, or supported a plan of reorganization, plan of liquidation, or a motion seeking to approve a sale of any material portion of the Collateral, in each case unless contemplated by, and in accordance with, the RSA or as otherwise agreed to by the DIP Agent;

(xiv)   entry of an order staying, reversing, vacating or otherwise modifying, without the prior written consent of the DIP Agent, the DIP Facility, or the DIP Order;

(xv)   payment of, or granting adequate protection with respect to, prepetition debt (other than as contemplated by the Operative Documents) unless otherwise agreed by the DIP Agent;

(xvi)   cessation of liens or superpriority claims granted with respect to the Collateral securing the Debtors' obligations in respect of the DIP Facility to be valid, perfected and enforceable in all respects with the priority described herein;

(xvii)   failure to comply with this DIP Term Sheet, the Operative Documents or any of the DIP Milestones; and

(xviii)   entry into, or the making of any payment in respect of, any critical vendor agreements or otherwise entry into any agreement to pay, or the making of any payment in respect of, any

prepetition trade obligations except as consented to by the DIP Agent (which may be via consent to the "first day" orders).

**Remedies:**

Upon the occurrence and during the continuance of an Event of Default:

    (a) the Required Lenders (as defined below) may direct the DIP Agent, in their discretion, to immediately take any or all of the following actions: (i) deliver a notice of an Event of Default; (ii) charge the Default Rate of interest on the Loans and other outstanding obligations; and (iii) terminate all commitments under the DIP Facility; and

    (b) upon five (5) business days' written notice from the DIP Lenders, in their sole and absolute discretion, the automatic stay of section 362 of the Bankruptcy Code shall be terminated without further order of the Bankruptcy Court, without the need for filing any motion for relief from the automatic stay or any other pleading, for the limited purpose of permitting the DIP Lenders  Trustee, and counsel to the  to do any of the following: (i) foreclose on the Collateral; (ii) enforce all of the guaranty rights; (iii) accelerate all Loans and other outstanding obligations under the DIP Facility; and (iv) declare the principal of and accrued interest, premiums, fees and expenses constituting the obligations under the DIP Facility to be due and payable. Section 362 relief from the stay in favor of the DIP Lenders shall be embodied in any order approving the DIP Facility and the use of cash collateral. At any hearing addressing the exercise of remedies by the DIP Lenders under the Operative Documents, the only objection that may be raised by the Debtors or the Committee shall be whether an Event of Default has in fact occurred and is continuing, and the Debtors and the Committee shall waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit, restrict or delay the rights and remedies of the DIP Agent under the Operative Documents.

**Milestones:**

The DIP Borrower shall comply with the following chapter 11 milestones which Milestones may be extended in writing by the DIP Agent in its sole and absolute discretion (the "***Milestones***"):

(a) on the Petition Date, the Debtors shall have filed a motion seeking approval of the DIP Facility;

(b) no later than 14 business days following the Petition Date, the Debtors shall have filed a motion to retain Brokers acceptable to the Required Lenders;

(c) no later than 18 calendar days after the Petition Date, the Bankruptcy Court shall enter an order approving the DIP Credit Agreement, in form and substance satisfactory to the DIP Agent in its discretion as confirmed by the DIP Agent in writing;

(d) no later than 18 calendar days after the Petition Date, the Bankruptcy Court shall have entered the DIP Order;

(e) no later than June 15, 2020, the Debtors will have delivered a Lease Optimization Plan and an Owned Real Estate Optimization Plan, each in form and substance acceptable to the Required Lenders;

(f) no later than June 15, 2020 the Debtors shall have delivered proposed processes and parameters related to a proposed business plan (the "**Business Plan**") including those related to vendor agreements, lessor agreements, and go-forward self-funding capability (the "**Business Plan Parameters**") to the DIP Lenders;

(g) no later than June 20, 2020 the Debtors and the Required Lenders shall have agreed on acceptable Business Plan Parameters;

(h) no later than July 8, 2020, the Debtors shall have delivered a Business Plan (consistent with the agreed acceptable Business Plan Parameters) to the DIP Lenders;

(i) no later than July 14, 2020, the Debtors and the Required Lenders shall have agreed on an acceptable Business Plan;

(j) no later than 90 days after the Petition Date, the Debtors will (unless otherwise provided for in the RSA) have filed either (A) a motion seeking approval of a disclosure statement with respect to a chapter 11 plan that is acceptable to the DIP Agent or (B) a motion seeking approval of bidding procedures and a sale that is acceptable to the DIP Agent;

(k) no later than 130 days after the Petition Date, the

20

Bankruptcy Court shall have entered an order acceptable to the DIP Agent either approving (A) an acceptable disclosure statement or (B) acceptable bidding procedures;

(l) no later than 160 days after the Petition Date, the Bankruptcy Court shall have entered one or more orders acceptable to the DIP Agent either (A) confirming an acceptable chapter 11 plan or (B) approving an acceptable sale or sales; and

(m) no later than November 15, 2020 the Plan Effective Date shall have occurred.

**Toggle Event:**

A "***Toggle Event***" shall occur if either: (x) by July 15, 2020, the failure of 66.7% of the DIP Lenders to approve the Business Plan or (y) by August 15, 2020, the Debtors shall have failed to obtain binding commitments for all third-party financing (on terms acceptable to the Required Lenders) necessary to finance Business Plan in accordance with the other plan provisions of the RSA Term Sheet.

Upon a failure of such condition, the Debtors shall immediately cease pursing the Plan and instead pursue a 363 sale of all of their assets unless otherwise instructed by the Required Lenders and shall seek approval of any relief required to undertake such 363 sale on an expedited basis.

**Indemnification:**

The DIP Borrower shall indemnify and hold harmless the DIP Agent, each DIP Lender, each of their respective affiliates and each of their respective officers, directors, partners, security-holders, employees, agents, advisors, attorneys and representatives (each, an "***Indemnified Party***") from and against any and all claims, damages, losses, liabilities and expenses (including all reasonable and documented fees, expenses and disbursements of their respective specified legal counsel, specified financial advisors or other specified professionals retained by the DIP Agent or DIP Lenders, in each case as agreed and specifically set forth in the Commitment Letter and the Operative Documents[1]), joint or several, that may be incurred by or asserted or awarded against any Indemnified Party (including in connection with or relating to any investigation, litigation or proceeding or the preparation of any defense in connection therewith), in each case, arising out of or in connection with or by reason of the DIP Facility,

---

[1] In all cases, DB, Hillco, Houlihan, Milbank, S&C and others to be determined.

the Operative Documents or any of the transactions contemplated thereby, or any actual or proposed use of the proceeds of the DIP Facility, or any operation of any business by any Debtor. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the DIP Borrower, any of its directors, security-holders or creditors, an Indemnified Party or any other person, or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

**Expenses**:

Each Debtor shall jointly and severally be obligated to pay all reasonable and documented out-of-pocket costs and expenses of the DIP Lenders and the DIP Agent, including all reasonable and documented fees, expenses and disbursements of their respective specified legal counsel, specified financial advisors or other specified professionals retained by the DIP Agent or DIP Lenders, in each case as agreed and specifically set forth in the Commitment Letter and the Operative Documents[2], in connection with (a) the discussion, negotiation, preparation, execution and delivery of any documents in connection with the proposed financing contemplated by this DIP Term Sheet, including the Operative Documents and the funding of all Loans under the DIP Facility, the administration of the DIP Facility and any amendment, modification or waiver of any provision of the Operative Documents, (b) the interpretation, enforcement or protection of any of their rights and remedies under the Operative Documents or (c) the Chapter 11 Cases.

**Other Bankruptcy Matters:**

The DIP Order shall be in form and substance reasonably satisfactory to the DIP Agent as confirmed by the DIP Agent in writing (it being understood that any communication by email shall suffice), and all motions relating thereto, shall be in form and substance reasonably satisfactory to the DIP Agent in its discretion and, unless otherwise agreed by the DIP Agent in writing, shall include the following provisions:

(a) modifying the automatic stay to permit the creation and perfection of the DIP Lenders' liens on the Collateral;

(b) prohibiting the assertion of claims arising under section 506(c) of the Bankruptcy Code against any of the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the

---

[2] In all cases, DB, Hillco, Houlihan, Milbank, S&C and others to be determined.

Prepetition First Lien Notes Trustee, the Prepetition First Lien Noteholders or, except as expressly permitted therein, the commencement by the Debtors of other actions adverse to the DIP Agent, the DIP Lenders, the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the Prepetition First Lien Notes Trustee, the Prepetition First Lien Noteholders or any of their respective rights and remedies under the DIP Facility, the Prepetition Term Loan Credit Agreement or the Prepetition First Lien Notes Indenture, as applicable, the DIP Order, or any other order;

(c) prohibiting the incurrence of any debt with priority equal to or greater than the DIP Facility;

(d) prohibiting any granting or imposition of liens senior to the liens granted under the Operative Documents;

(e) authorizing and approving the DIP Facility and the transactions contemplated thereby, including the granting of the superpriority status, security interests and liens and the payment of all premiums and fees, referred to herein;

(f) acknowledging the validity and enforceability of the Prepetition Term Loan Credit Agreement and the Prepetition First Lien Notes Indenture, the debt outstanding thereunder and the liens granted in connection therewith;

(g) waiving any and all claims or causes of action against the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the Prepetition First Lien Notes Trustee and the Prepetition First Lien Noteholders, whether arising prior to or after the Petition Date including, without limitation, any lender or noteholder liability claims, any subordination claims or any claims under any non-disclosure or confidentiality agreement;

(h) providing that the DIP Lenders and their respective counsel, advisors and consultants shall be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code;

(i) providing that the DIP Lenders, the Prepetition First Lien Lenders and the Prepetition First Lien Noteholders reserve the right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the Loans (including any prepetition loans or notes

23

rolled-up) and the Prepetition First Lien Obligations, in each case, in whole or in part, in connection with any sale or disposition of assets in the Chapter 11 Cases and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code;

(j) providing that the Prepetition Term Loan Lenders, the Prepetition Term Loan Agent, the Prepetition First Lien Notes Trustee and the Prepetition First Lien Noteholders are entitled to all of the benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception thereunder shall not apply to any of the Prepetition Term Loan Lenders, the Prepetition Term Loan Agent, the Prepetition First Lien Notes Trustee or the Prepetition First Lien Noteholders with respect to proceeds, product, offspring, or profits of any of the collateral securing the Prepetition Term Loan Credit Agreement or the Prepetition First Lien Notes Indenture; and

(k) providing that in no event shall any of the Prepetition Term Loan Agent, the Prepetition Term Loan Lenders, the Prepetition First Lien Notes Trustee, the Prepetition First Lien Noteholders the DIP Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

**Assignments:** Customary for similar debtor-in-possession financings; _provided_ that if no Event of Default has occurred and is continuing, the DIP Borrower's consent shall be required (except with respect to an assignment to any other DIP Lender or any entity described in the definition of DIP Lender) for assignments of the Loans, which such consent shall not be unreasonably withheld, conditioned or delayed, and the DIP Borrower shall deemed to consent to any such assignment if it is has failed to respond to any such request for consent within five business says thereof.

**Required Lenders:** DIP Lenders, as of any date of determination, holding greater than 50% of the outstanding Loans and commitments under the DIP Facility (the "**_Required Lenders_**"); _provided_ that the consent of each DIP Lender adversely affected thereby shall be required to any amendment or modification (i) to extend the final maturity of any Loan, (ii) to waive, reduce or postpone any scheduled repayment (but not prepayment) of any Loan, (iii) to reduce the rate of interest on any Loan (other than any

waiver of default interest) or any premium set forth in this DIP Term Sheet, (iv) to the definition of Pro Rata Allocation or (v) that adversely and disproportionately affects such DIP Lender in a material respect relative to the other DIP Lenders taken as a whole (it being understood that, for the avoidance of doubt, any DIP Lender declining an opportunity or option offered ratably to all DIP Lenders shall not constitute disproportionate treatment for purposes of this clause (v)); <u>provided</u>, <u>further</u>, that in each case such adversely affected DIP Lender is in compliance with its funding obligations under the Commitment Letter; <u>provided</u>, <u>further</u>, that any amendment or modification of any of the dates or consents in clauses (f), (g), (h) or (i) of the DIP Milestones related to the Business Plan, the Toggle Event or the funding the Subsequent Borrowing will require the consent of 66.7% of the DIP Lenders.

| | |
|---|---|
| **Governing Law and Submission to Jurisdiction**: | State of New York. Exclusive jurisdiction of the Bankruptcy Court, including with respect to the exercise of the remedies by the DIP Lenders and preservation of the value of the Collateral. |
| **Counsel to the DIP Lenders:** | Milbank LLP. |
| **Local Counsel to the DIP Lenders:** | To be determined. |
| **Counsel to the DIP Agent**: | Arnold & Porter. |

Schedule II

DIP Carve Out

(a)       Notwithstanding anything to the contrary in this Final Order, the Debtors' obligations to the DIP Secured Parties and [Prepetition Secured Parties] and the liens, security interests, and superpriority claims granted herein, under the DIP Loan Documents, and/or under the Prepetition Loan Documents, including the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Claims, and the Prepetition Liens, shall be subject in all respects and subordinate to the Carve Out.

(b)       As used in this Order, the "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (including any restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors of the Debtors or any Official Committee) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee   pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount

27

not to exceed $4,000,000 incurred after the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to the Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c)       Carve Out Reserves.  The Debtors shall establish and fund a segregated account (the "Funded Reserve Account") for purposes of funding the Carve Out.  The Funded Reserve Account will be funded first from the [DIP Proceeds Account],  then from the DIP Priority Collateral. Notwithstanding anything to the contrary in this Order, the DIP Documents, or the Prepetition Loan Documents, (i) in no circumstances (which, for the avoidance of doubt, includes, but is not limited to, an Event of Default or a termination of the DIP Credit Agreement or DIP Loan Documents) shall the Debtors be prohibited in any way from accessing or drawing upon the [DIP Proceeds Account] for the purpose of funding the Funded Reserve Account, and (ii) the [DIP Proceeds Account] shall not be ABL Priority Collateral or Prepetition ABL Collateral.  Upon entry of this Order, the Debtors will deposit into the Funded Reserve Account an amount equal to the aggregate amount of Allowed Professional Fees projected to accrue from entry of this Order through June 30, 2020 (the "Initial Funded Reserve Amount"), which, for the avoidance of doubt, shall not include the Post-Carve Out Trigger Notice Cap.  Commencing July 1, 2020 (or the first business day thereafter), on the first business day of each month, the Debtors shall deposit in the

28

Funded Reserve Account an amount equal to the aggregate amount of Allowed Professional Fees (excluding restructuring, sale, financing, or other success fees) projected to accrue for the following month in the Budget plus twenty percent of such aggregate amount of Allowed Professional Fees in the following month in the Budget (the "Monthly Funded Reserve Amount"). Each Professional Person may deliver to the Debtors a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred in the preceding month (each such statement, a "Fee Statement"), and to the extent the amount of Allowed Professional Fees accrued and claimed in a Fee Statement exceeds the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount for the applicable period or month, respectively, and such fees and expenses have otherwise not been paid by the Debtors, the Debtors shall, within one business day, fund additional amounts into the Funded Reserve Account equal to the difference between, as applicable, the Initial Funded Reserve Amount or the Monthly Funded Reserve Amount and the amount accrued and claimed in the applicable Fee Statement (each, a "Top Off Amount").  At any time, if the Debtors in good faith believe a restructuring, sale, financing, or other success fee has been earned by a Professional Person and is then due and payable, the Debtors shall deposit in the Funded Reserve Account an amount equal to such fee.  Upon entry of the Order, the Debtors shall deposit into the Funded Reserve Account an amount equal to (i) the Post Carve Out Trigger Notice Cap plus (ii) the amounts contemplated under (b)(i) and (ii) above.  The Funded Reserve Account shall be maintained, and the funds therein (the "Funded Reserve Amount") shall be held in trust for the benefit of Professional Persons.  Any and all amounts in the Funded Reserve Account shall not be subject to any cash sweep and/or foreclosure provisions in the Prepetition Loan Documents or DIP Loan Documents and neither the [Prepetition Secured Parties] nor the DIP Secured Parties shall be entitled to sweep or foreclose on such amounts notwithstanding any provision to the contrary

in the [Prepetition Loan Documents] or DIP Loan Documents. Notwithstanding the foregoing, any and all payments to Professional Persons allowed by the Court (excluding restructuring, sale, financing, or other success fees) shall be paid first from the Funded Reserve Account.

(d)      On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors in accordance with paragraph [[___](b)] above, with a copy to counsel to the Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, including cash in the DIP Proceeds Account, to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees in excess of the Funded Reserve Amount; provided that in the event that a Termination Declaration Date occurs, Professional Persons shall have two business days to deliver additional Fee Statements to the Debtors, and the Debtors shall fund into the Funded Reserve Amount and Top Off Amounts.  The Debtors shall deposit and hold such amounts in the Funded Reserve Account in trust to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor, including cash in the DIP Proceeds Account, after funding the Pre-Carve Out Trigger Notice Reserve, to fund a reserve in an amount equal to the Post Carve Out Trigger Notice Cap to the extent not already funded (including upon entry of the Order as set forth above).  The Debtors shall deposit and hold such amounts in a segregated account at an institution designated by the DIP Agent in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.   All

funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash (or other form of payment pursuant to an Acceptable Plan), and all Commitments have been terminated, in which case any such excess shall be paid to the [Prepetition Secured Parties] in accordance with their rights and priorities as set forth herein.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash (or other form of payment pursuant to an Acceptable Plan), and all Commitments have been terminated, in which case any such excess shall be paid to the [Prepetition Secured Parties] in accordance with their rights and priorities as set forth herein. Notwithstanding anything to the contrary in the DIP Loan Documents, or this Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph [___], then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph [___], prior to making any payments to the DIP Agent or the [Prepetition Secured Parties], as applicable.  Notwithstanding anything to the contrary in the DIP Loan Documents or this Order, following delivery of a Carve Out Trigger Notice, the DIP Agent and the [Prepetition Agents] shall not sweep or foreclose on cash (including

cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Loan Documents.  Further, notwithstanding anything to the contrary in this Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out, and (iii) in no way shall the Initial Budget, Budget, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary in this Order, the DIP Loan Documents, or in any Prepetition Loan Documents, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the Prepetition Liens, and the DIP Superpriority Claims, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.

(e)     *Payment of Allowed Professional Fees Prior to the Termination Declaration Date.*  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out and shall be funded first from the Funded Reserve Account.

(f)     *No Direct Obligation To Pay Allowed Professional Fees.*  None of the DIP Agent, DIP Lenders, or the [Prepetition Secured Parties] shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code.

Nothing in this Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the [Prepetition Secured Parties], in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)     Payment of Carve Out On or After the Termination Declaration Date.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar for-dollar basis.

**Annex 2**[5]

**Exculpation and Release Language**

---

[5] [NOTE – ALL DEFINITIONS SUBJECT TO REVIEW AND CHANGE BASED ON PLAN STRUCTURE]

## Defined Terms[6]

"*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

"*Causes of Action*" means claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

"*Disinterested Directors' Settlement*" means the settlement negotiated by and among the Disinterested Directors regarding Debtor Intercompany Claims incorporated in [this Plan].

"*Exculpated Party*" means collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL Agent; (d) the ABL Lenders; (e) the Term Loan Agent; (f) the Term Loan Lenders; (g) the First Lien Notes Trustee; (h) the First Lien Noteholders; (i) the Second Lien Notes Trustee; (j) the Second Lien Noteholders; (k) the Unsecured Notes Trustee; (l) the Unsecured Noteholders; (m) the Plan Sponsors; (n) the DIP Agent; (o) the DIP Lenders; (p) the Consenting First Lien Lenders; (q) the Plan Administrator; (r) with respect to each of the foregoing parties in clauses (a) through (q), each of such party's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (s) with respect to each of the foregoing parties in clauses (a) through (r), each of such party's current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors, and other professionals.

"*Released Party*" means each of the following, solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Wind-Down Debtors; (d) the Plan Administrator; (e) the ABL Agent; (f) the ABL Lenders; (g) the Term Loan Agent; (h) the Term Loan Lenders; (i) the First Lien Notes Trustee; (j) the First Lien Noteholders; (k) the Second Lien Notes Trustee; (l) the Second Lien Noteholders; (m) the Unsecured Notes Trustee; (n) the Unsecured Noteholders; (o) the Plan Sponsors; (p) the DIP Agent; (q) the DIP Lenders; (r) the Consenting First Lien Lenders; (s); with respect to each of the foregoing parties in clauses (a) through (r), each of such party's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; and (r) with respect to each of the foregoing parties in clauses (a) through (r), each of such party's current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board

---

[6]  Capitalized terms used but not defined in this **Annex 2** to the RSA Term Sheet shall have the meanings ascribed to them in the Plan.

members, investment advisors, and other professionals; *provided* that any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) files an objection to the releases contained in the Plan, or (z) votes to reject the Plan shall not be a "Released Party."

"*Releasing Party*" means each of the following, solely in its capacity as such: (a) the ABL Agent; (b) the ABL Lenders; (c) the Term Loan Agent; (d) the Term Loan Lenders; (e) the First Lien Notes Trustee; (f) the First Lien Noteholders; (g) the Second Lien Notes Trustee; (h) the Second Lien Noteholders; (i) the Unsecured Notes Trustee; (j) the Unsecured Noteholders; (k) the Plan Sponsors; (l) the DIP Agent; (m) the DIP Lenders; (n) the Consenting First Lien Lenders; (o) with respect to the foregoing clauses (a) through (n), each of such party's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), assigns, subsidiaries, direct and indirect equity holders, funds, portfolio companies, and management companies; (p) with respect to each of the foregoing parties in clauses (a) through (o), each of such party's current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, advisory board members, investment advisors, and other professionals; and (q) all holders of Claims or Interests; *provided* that any holder of a Claim or Interest that (x) validly opts out of the releases contained in the Plan, (y) files an objection to the releases contained in the Plan, or (z) votes to reject the Plan shall not be a "Releasing Party."

**Releases by the Debtors**

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, the Wind-Down Debtors, and their Estates from any and all Claims and Causes of Action, including Claims and Causes of Action identified, claimed, or released in the Disinterested Directors' Settlement, as well as other Claims and Causes of Action, whether known or unknown, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, the Wind-Down Debtors, or their Estates (as applicable) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:  the Debtors or the Wind-Down Debtors (including the management, ownership, or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' or the or the Wind-Down Debtors' restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), any intercompany transactions, the Tax Sharing Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Disinterested Directors' Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Disinterested Directors' Settlement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim or

Causes of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Restructuring and implementing the Plan; (b) a good faith settlement and compromise of the Claims released by the Debtor Release; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

**Releases by Holders of Claims and Interests**

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, Wind-Down Debtor, and Released Party from any and all Claims and Causes of Action, including Claims and Causes of Action identified, claimed, or released in the Disinterested Directors' Settlement, as well as other Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, the Wind-Down Debtors, or their Estates (as applicable), that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the management, ownership or operation thereof), any securities issued by the Debtors and the ownership thereof, the Debtors' or the Wind-Down Debtors' restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions, the Tax Sharing Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the RSA, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Disinterested Directors' Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Disinterested Directors' Settlement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (b) any individual from any claim or Causes of Action related to an act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties; (d) a good faith settlement and compromise of the Claims released by the Third-Party Release; (e) in the best interests of the Debtors and

their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

**Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the RSA and related prepetition transactions, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Disinterested Directors' Settlement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the RSA, the DIP Facility, the Disclosure Statement, the Plan, the Plan Supplement, the Disinterested Directors' Settlement, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for claims related to any act or omission that is determined in a Final Order by a court competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

The Exculpated Parties and other parties set forth above have, and upon confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## EXHIBIT B

### Company Parties

Future Source, LLC
J. C. Penney Company, Inc.
J. C. Penney Corporation, Inc.
J. C. Penney de Guatemala, Sociedad Anonimad
J. C. Penney de Honduras, S.A.
J. C. Penney Direct Marketing Services, LLC
J. C. Penney Export Merchandising Corporation
J. C. Penney Business Information Consulting (Shanghai) Co., Ltd.
J. C. Penney International, Inc.
J. C. Penney Korea
J. C. Penney Properties, LLC
J. C. Penney Purchasing Corporation
J. C. Penney Purchasing Hong Kong Limited
J. C. Penney Purchasing India Private Limited
J. C. Penney Services India Private Limited
JCP Construction Services, Inc.
JCP Media, Inc.
JCP New Jersey, LLC
JCP Procurement, Inc.
JCP Real Estate Holdings, LLC
JCP Realty, LLC
JCP Telecom Systems, Inc.
JCPenney Insurance Agency, Inc.
JCPenney Puerto Rico, Inc.
JCPenney Services, LLC
jcpSSC, Inc.

## EXHIBIT C

### Provision for Transfer Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**")[1] by and among J. C. Penney Company, Inc. ("**JCP**") and its affiliates and subsidiaries bound thereto and the Consenting First Lien Lenders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting First Lien Lenders" and a ["Consenting Term Lender"] ["Consenting First Lien Noteholder"] under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed the above-named Transferee, its affiliates and its and their respective accounts and funds managed or advised by any of them or other entities that hold interests directly or indirectly on behalf of such Transferee, its affiliates its and their respective accounts and funds managed or advised by any of them* | |
|---|---|
| [ABL Loans] | |
| First Lien Notes | |
| [Second Lien Notes] | |
| [Unsecured Notes] | |
| Term Loans | |
| [Equity Interests] | |

---

[1] Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

# EXHIBIT D

**Form of Joinder Agreement**

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among J. C. Penney Company, Inc. ("**JCP**") and its affiliates and subsidiaries bound thereto and the Consenting First Lien Lenders and agrees to be bound by the terms and conditions thereof to the extent the other Parties are thereby bound, and shall be deemed a ["Consenting Term Lender"] ["Consenting First Lien Noteholder"] under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed the above-named Joinder Party, its affiliates and its and their respective accounts and funds managed or advised by any of them or other entities that hold interests directly or indirectly on behalf of such Joinder Party, its affiliates its and their respective accounts and funds managed or advised by any of them* | |
| --- | --- |
| [ABL Loans] | |
| First Lien Notes | |
| [Second Lien Notes] | |
| [Unsecured Notes] | |
| Term Loans | |
| [Equity Interests] | |

---

[1]   Capitalized terms used but not otherwise defined herein shall having the meaning ascribed to such terms in the Agreement.

## Exhibit C

### Corporate Organization Chart

