~~DRAFT~~*Proposed Solicitation Version*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| J. C. PENNEY COMPANY, INC., *et al.*,[1] | ) | Case No. 20-20182 (DRJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DISCLOSURE STATEMENT FOR THE**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF J. C. PENNEY COMPANY, INC. AND ITS DEBTOR AFFILIATES**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher J. Marcus, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     joshua.sussberg@kirkland.com
     christopher.marcus@kirkland.com
     aparna.yenamandra@kirkland.com

Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
**JACKSON WALKER L.L.P.**
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:     mcavenaugh@jw.com
     jwertz@jw.com
     kpeguero@jw.com
     vpolnick@jw.com

*Co-Counsel to the Debtors and Debtors in Possession*

Dated:  October 2~~0~~6, 2020

**IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT**

**SOLICITATION OF VOTES ON THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE FROM THE HOLDERS OF OUTSTANDING:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 4 | FIRST LIEN CLAIMS |
| CLASS 6 | SECOND LIEN NOTES CLAIMS |

---

[1]     A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/JCPenney.  The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 6501 Legacy Drive, Plano, Texas 75024.

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| **CLASS 7** | **UNSECURED NOTES CLAIMS** |
| **CLASS 8A** | **GENERAL UNSECURED CLAIMS** |
| **CLASS 8B** | ~~GO-FORWARD LANDLORD CLAIMS AND~~ **KEY GO ~~GO-~~ FORWARD ~~CREDITOR~~SUPPLIER CLAIMS** |

**IF YOU HOLD A CLAIM IN CLASS 4, CLASS 6, CLASS 7, CLASS 8A, OR CLASS 8B, YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN**

---

**DELIVERY OF BALLOTS**

**MASTER BALLOTS, PRE-VALIDATED BENEFICIAL OWNER BALLOTS, AND DIRECT BALLOTS MUST BE ACTUALLY RECEIVED BY THE CLAIMS AND NOTICING AGENT BY THE VOTING DEADLINE, WHICH IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON NOVEMBER 17, 2020, VIA THE ENCLOSED PRE-PAID, PRE-ADDRESSED RETURN ENVELOPE, OR AS OTHERWISE DIRECTED ON THE BALLOT:**

*If you received an envelope addressed to your nominee, please return your ballot to your nominee, allowing enough time for your nominee to cast your vote on a master ballot before the Voting Deadline.*

**BY REGULAR MAIL, HAND DELIVERY, OR OVERNIGHT MAIL AT:**
J. C. Penney Company, Inc. Ballot Processing
c/o Prime Clerk LLC
One Grand Central Place
60 East 42nd Street, Suite 1440
New York, NY 10165

**BALLOTS RECEIVED VIA EMAIL OR FACSIMILE WILL NOT BE COUNTED**

**IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE CONTACT THE CLAIMS AND NOTICING AGENT BY CALLING THE TELEPHONE NUMBER INCLUDED IN YOUR BALLOT**

---

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VII HEREIN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS

CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. THE DEBTORS' MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED, HAS PROVIDED THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS AND THE PLAN ADMINISTRATOR, AS APPLICABLE, MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS

SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND RSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.  THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO MAY BE ELIGIBLE TO SUBMIT BALLOTS BUT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY AND NEITHER THE SEC NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

THE SECURITIES DESCRIBED HEREIN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, (THE "SECURITIES ACT"), OR ANY SIMILAR FEDERAL, STATE OR LOCAL LAW, IN RELIANCE ON THE EXEMPTIONS SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE TO THE MAXIMUM EXTENT PERMITTED AND APPLICABLE AND, TO THE EXTENT THAT SECTION 1145 OF THE BANKRUPTCY CODE IS EITHER NOT PERMITTED OR NOT APPLICABLE, THE EXEMPTION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT, THE EXEMPTION SET FORTH IN SECTION 701 PROMULGATED UNDER THE SECURITIES ACT OR ANOTHER EXEMPTION THEREUNDER.  IN ACCORDANCE WITH SECTION 1125(E) OF THE BANKRUPTCY CODE, A DEBTOR OR ANY OF ITS AGENTS THAT PARTICIPATES, IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, IN THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY, OFFERED OR SOLD UNDER THE PLAN, OF THE DEBTOR, OF AN AFFILIATE PARTICIPATING IN A JOINT PLAN WITH THE DEBTOR, OR OF A NEWLY ORGANIZED SUCCESSOR TO THE DEBTOR UNDER THE PLAN, IS NOT LIABLE, ON ACCOUNT OF SUCH PARTICIPATION, FOR VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE OFFER, ISSUANCE, SALE, OR PURCHASE OF SECURITIES.

**RECOMMENDATION BY THE DEBTORS**

EACH DEBTOR'S BOARD OF DIRECTORS, GENERAL PARTNER, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM AND INTEREST HOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.

EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND NOTICING AGENT NO LATER THAN <u>NOVEMBER 17, 2020 AT 4:00 P.M. (PREVAILING CENTRAL TIME)</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.

**DISCLAIMER**

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All Holders of Claims or Interests entitled to vote to accept or reject the Plan are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims or Interests reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No Holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to Holders of Claims against, or Interests in, the Debtors or any other party in interest. Please refer to Article VII of this Disclosure Statement, entitled "Risk Factors," which begins on page 30, for a discussion of certain risk factors that Holders of Claims or Interests voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan, or the solicitation of votes to accept or reject the Plan to give any information or to make any representation or statement regarding this Disclosure Statement, the Plan, or the solicitation of votes to accept or reject the Plan, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein. When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the

cautionary statements set forth in this Disclosure Statement.  Forward-looking statements speak only as of the date on which they are made.  Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

*[Different first page link-to-previous setting changed from on in original to off in modified.]*
*[Link-to-previous setting changed from on in original to off in modified.]*

# Table of Contents

**Page**

I.      INTRODUCTION ......................................................................................................... 1

II.     PRELIMINARY STATEMENT ................................................................................... 1

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        PLAN ........................................................................................................................ 4̶5

        A.      What is chapter 11? ......................................................................................... 4̶5
        B.      Why are the Debtors sending me this Disclosure Statement? ........................... 4̶5
        C.      Am I entitled to vote on the Plan? ................................................................... 5
        D.      What will I receive from the Debtors if the Plan is consummated? .................. 5̶6
        E.      What will I receive from the Debtors if I hold an Administrative Claim, Professional Fee
                Claim, Priority Tax Claim, or DIP Claim? ....................................................... 8̶10
        F.      Are any regulatory approvals required to consummate the Plan? ..................... 1̶02
        G.      What happens to my recovery if the Plan is not confirmed or does not go effective? ... 1̶02
        H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
                "Consummation?" .......................................................................................... 1̶12
        I.      What are the sources of Cash and other consideration required to fund the Plan? ... 1̶13
        J.      Are there risks to owning the New PropCo Securities upon emergence from chapter 11? ... 1̶13
        K.      Is there potential litigation related to the Plan? ............................................. 1̶13
        L.      How will the preservation of the Causes of Action impact my recovery under the Plan? ... 1̶23
        M.      Will there be releases and exculpation granted to parties in interest as part of the Plan? ... 1̶24
        N.      What is the deadline to vote on the Plan? ...................................................... 1̶79
        O.      How do I vote for or against the Plan? ........................................................... 1̶89
        P.      Why is the Bankruptcy Court holding a Confirmation Hearing? ...................... 1̶820
        Q.      When is the Confirmation Hearing set to occur? ............................................ 1̶820
        R.      What is the purpose of the Confirmation Hearing? ........................................ 1̶820
        S.      What is the effect of the Plan on the Debtors' ongoing businesses? ............... 1̶820
        T.      Who do I contact if I have additional questions with respect to this Disclosure Statement
                or the Plan? ................................................................................................. 1̶820
        U.      Do the Debtors recommend voting in favor of the Plan? ................................ 2̶19
        V.      Who Supports the Plan? ............................................................................... 2̶19
IV.     THE DIP FACILITY AND PLAN .............................................................................. 2̶19

        A.      The DIP Facility ........................................................................................... 2̶19
        B.      The Plan ...................................................................................................... 2̶02
V.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ...... 2̶02

        A.      JCPenney's Corporate History ....................................................................... 2̶02
        B.      JCP Corp. Pension Plan. ............................................................................... 25
        B̶C.    The Debtors' Key Assets and Operations ....................................................... 2̶36
        C̶D.    The Debtor's Prepetition Capital Structure ..................................................... 2̶47
VI.     EVENTS LEADING TO THE CHAPTER 11 FILINGS ............................................. 2̶831

        A.      Prolonged Market Decline and Industry-Specific Challenges ........................... 2̶831
        B.      The Pandemic ............................................................................................... 2̶831
        C.      Brick-and-Mortar Retail Microenvironment, Marketing Missteps, and the Leadership
                Carousel. ..................................................................................................... 2̶831
        D.      Prepetition Strategic, Financing, and Governance Initiatives. ......................... 3̶29

*[Different first page link-to-previous setting changed from on in original to off in modified.]*

*[Different first page link-to-previous setting changed from on in original to off in modified.]*
*[Link-to-previous setting changed from on in original to off in modified.]*

| | | | |
|---|---|---|---|
| **VII.** | **RISK FACTORS** | | **30~~31~~** |
| | A. | Bankruptcy Law Considerations | 31~~1~~ |
| | B. | Risks Related to Recoveries under the Plan | 34~~7~~ |
| | C. | Risks Related to the Debtors' and PropCo's Businesses | 36~~9~~ |
| **VIII.** | **SOLICITATION AND VOTING** | | **39~~42~~** |
| | A. | Holders of Claims or Interests Entitled to Vote on the Plan | 40~~2~~ |
| | B. | Voting Record Date | 40~~3~~ |
| | C. | Voting on the Plan | 40~~3~~ |
| | D. | Ballots Not Counted | 42~~5~~ |
| | E. | Confirmation Hearing. | 42~~5~~ |
| **IX.** | **CONFIRMATION OF THE PLAN** | | **43~~6~~** |
| | A. | Requirements for Confirmation of the Plan | 43~~6~~ |
| | B. | Best Interests of Creditors/Liquidation Analysis | 43~~6~~ |
| | C. | Market Test | 44~~7~~ |
| | D. | Feasibility | 45~~8~~ |
| | E. | Acceptance by Impaired Classes | 45~~8~~ |
| | F. | Confirmation Without Acceptance by All Impaired Classes | 46~~9~~ |
| **X.** | **CERTAIN SECURITIES LAW MATTERS** | | **47~~9~~** |
| | A. | Issuance of Securities under the Plan | 47~~50~~ |
| | B. | Subsequent Transfers | 47~~50~~ |
| **XI.** | **CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN** | | **48~~51~~** |
| | A. | Introduction. | 48~~51~~ |
| | B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors. | 50~~3~~ |
| | C. | Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims. | 52~~4~~ |
| | D. | Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Allowed Claims. | 56~~9~~ |
| **XII.** | **RECOMMENDATION** | | **61~~4~~** |

*[Different first page link-to-previous setting changed from on in original to off in modified.]*

**EXHIBITS**[2]

EXHIBIT A     Plan of Reorganization

EXHIBIT B     RSA

EXHIBIT C     Corporate Organization Chart

---

[2]    Each Exhibit is incorporated herein by reference.

## I.  INTRODUCTION

J. C. Penney Company, Inc. ("JCP") and its debtor affiliates, as debtors and debtors in possession (collectively,  the "Debtors,"  "JCPenney,"  or  the "Company"),  submit  this  disclosure  statement (this "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Reorganization of J. C. Penney Company, Inc. and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan"),[1] dated October 20, 2020.  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS AND THE CONSENTING FIRST LIEN LENDERS SUPPORT THE PLAN, AND THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.  PRELIMINARY STATEMENT

On May 15, 2020, the Company entered into a restructuring support agreement (the "RSA") with certain consenting First Lien Lenders party thereto (the "Consenting First Lien Lenders"), which contemplates a comprehensive reorganization of the Company's businesses by establishing both a financially sustainable operating company ("OpCo") and a holding entity for certain of the Debtors' real property assets ("PropCo") and provides for various financing arrangements geared towards a successful going-concern outcome for the Debtors.  The restructuring transactions contemplated therein aim to substantially deleverage the Debtors' balance sheet and allow the Debtors to move expeditiously through chapter 11.  The series of transactions set forth in the Plan and the Asset Purchase Agreement (collectively, the "Restructuring Transactions") effectuate such a reorganization.

To ensure the Restructuring Transactions maximize value for all stakeholders, the RSA also provided for (i) a robust market-testing process seeking interest in and bids for, among other things, providing debt or equity financing to OpCo and/or purchasing some or all of the assets of the Debtors (the "Market Test") and (ii) a sale "toggle" feature allowing for a potential sale of all or substantially all of the Debtors' assets to a third-party purchaser if certain plan-related milestones were unmet.  Further, to signal to potential bidders the Debtors' interest in pursuing all value-maximizing bids, the Debtors sought, and the Bankruptcy Court authorized, procedures pursuant to which work fees may be paid to select potential bidders.[2]

Throughout the Debtors' chapter 11 cases, the Debtors and their advisors solicited interest regarding new money debt financing (including financing that would "take out" any of the "take back" paper otherwise contemplated under the RSA), the sale or sale and leaseback of certain owned distribution centers, the provision of new capital, the purchase of the entire company, and/or the purchase

---

[1]  Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan or the Asset Purchase Agreement, as applicable.

[2]  *See, Order Approving Procedures to Pay Fees and Expenses of Potential Investors in Connection with the Market Test* [Docket No. 470].

of a part of the Debtors' business.  Following a comprehensive outreach initiative, as further described herein, the Market Test yielded four bids for certain of the Debtors' assets and, most importantly, resulted in entry into the Letter of Intent and the Asset Purchase Agreement, each described in more detail below.

The following is a description of the significant events leading up to the Restructuring Transactions:

**RSA and Market Test**.  On May 15, 2020, the Debtors and the Consenting First Lien Lenders entered into the RSA.  As a condition to maintaining the support included in the RSA, the Debtors agreed to run the Market Test. The Market Test consisted of a robust process during which the Debtors and their advisors scoured the market for potential partners or buyers.  This Market Test, which the Debtors' investment bank, Lazard Frères & Co. LLC ("Lazard"), officially launched on May 28, 2020, followed the Debtors' efforts since mid-2019 to survey the market in search of a transaction to address the Debtors' capital structure.

As part of their outreach, Lazard contacted a broad list of traditional banks, alternative investment firms, private equity firms, and strategic investors as potential buyers—86 parties in total, comprising 29 potential strategic partners and 57 potential financial partners.  Lazard also fielded 15 inbound inquiries from other interested parties, with all of whom Lazard engaged regarding a potential transaction.  Of approximately 100 parties, 25 executed non-disclosure agreements and received access to the virtual data room through which the Debtors provided extensive information regarding the Debtors' business and financial condition.

After numerous discussions and the expiration of the bid deadline on July 22, 2020, three parties emerged as most likely to consummate a transaction for the Acquired Assets. The Debtors thoroughly reviewed the bids and determined, in their reasonable business judgment, that the OpCo Purchaser's bid included terms most favorable to their estates.  Most importantly, the OpCo Purchaser's bid provided for a going-concern solution for substantially all of the Acquired Assets.

**Delivery of the Letter of Intent**.  On September 10, 2020, Brookfield Property Group and Simon Property Group (together, the "OpCo Purchaser"), the Debtors, and that certain ad hoc group of first lien lenders represented by Milbank LLP (the "First Lien Ad Hoc Group," and together with OpCo Purchaser and the Debtors, the "Restructuring Transaction Parties") executed the Letter of Intent (the "Letter of Intent"), which the Debtors filed on September 25, 2020 [Docket No. 1489].  The Letter of Intent sets forth the Restructuring Transaction Parties' agreed-upon key terms for the purchase and sale of certain of the Debtors' operating assets (the "OpCo Assets") and lays out the general terms and conditions pursuant to which the OpCo Purchaser agreed to purchase the OpCo Assets (the "OpCo Transaction").

**The Credit Bid Term Sheet**.  On September 25, 2020, the Debtors and the First Lien Ad Hoc Group executed the *Second Amendment to Restructuring Support Agreement* (the "RSA Amendment"), which incorporated into the RSA a term sheet (the "Credit Bid Term Sheet") setting forth the Restructuring Transaction Parties' agreed-upon key terms for a credit bid for the sale of PropCo (the "PropCo Transaction").  The OpCo Transaction and PropCo Transaction together form a unified, comprehensive

restructuring transaction for the Debtors' businesses, the terms of which are finalized and memorialized in the Asset Purchase Agreement.

***Entry into the Asset Purchase Agreement***.  Central to the Restructuring Transactions is the Asset Purchase Agreement entered into between the OpCo Purchaser, the PropCo Purchaser, and the Debtors dated as of [___], 2020 (the "Asset Purchase Agreement"). Notably, the Asset Purchase Agreement includes standard "fiduciary-out" provisions, whereby the Debtors are able to pursue a superior transaction, in the event of an alternate bid.  The Bankruptcy Court will hear the Debtors' motion to approve the Asset Purchase Agreement at a hearing scheduled for November 2, 2020.  It is possible that the OpCo Sale may close and OpCo may emerge before the Effective Date. In connection with the consummation of the transactions set forth in the Asset Purchase Agreement, in connection with their $1 billion aggregate credit bid, the holders of DIP Claims and First Lien Claims will receive their ratable portion of each of (A) the New PropCo Securities, (B) a secured term loan facility at OpCo (which will be issued in ~~a notional~~an aggregate principal amount of $520 million), (C) the interests in an entity, which has the right to receive certain potential payments from OpCo, and (D) cash, in each case to the extent and as set forth in the Asset Purchase Agreement.

***Formation of PropCo.***  The Debtors will initially form PropCo as a new trust, and subsidiary of JCP for the benefit of the Holders of New PropCo Securities.  PropCo will have only nominal capitalization and will hold no assets until the consummation of the Plan. After confirmation of the Plan, the Debtors will transfer their fee or leasehold interest (as applicable) in certain land, buildings, improvements and other real property currently operated as retail or in support of retail operations, together with certain related liabilities to specified subsidiaries of PropCo.  The transferred assets will include 160 retail stores and 6 distribution centers.  PropCo's future operations are expected to consist solely of, in each case through one or more subsidiaries, (a) owning the foregoing assets, (b) leasing such assets to OpCo pursuant to two new triple-net master leases with respect to the retail stores and distribution centers, and (c) subject to market conditions, selling the PropCo Acquired Assets to third party investors as promptly as practicable after PropCo's emergence.

The core terms of the RSA will be implemented through (i) the Sale Order which will approve entry into the Asset Purchase Agreement, and (ii) the Plan, which contemplates, among other things:

- Each Holder~~s~~ of Other Priority Claims shall receive payment in full in Cash on the later of the Effective Date and such date such Other Priority Claim becomes an Allowed Other Priority Claim or such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired;

- Each Holder~~s~~ of Other Secured Claims shall receive, at the option of the applicable Debtor or Plan Administrator, as applicable:  (i) payment in full in Cash; (ii) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Claim; or (iv) such other treatment rendering such Claim Unimpaired;

3

- To the extent their claim has not already been satisfied, Holders of an Allowed ABL Claim or Allowed Secured Swap Claim shall receive payment in full, in Cash;

- Each Holders of First Lien Claims shall receive  (a) pursuant to the Sale Transaction, on account of the Aggregate Bid, its Credit Bid Pro Rata share of the Credit Bid Distribution, subject to dilution under the Plan and (b) its Pro Rata share of any cash remaining in the [Wind-Down Reserve, Professional Fee Escrow, and Administrative / Priority Claims Reserve] once all Allowed Claims entitled to payment therefrom have been satisfied and no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated;

- Each Holders of Second Lien Notes Claims shall receive its Pro Rata share (taken together with the Unsecured Notes Claims, General Unsecured Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full;

- Each Holders of Unsecured Notes Claims shall receive its Pro Rata share (taken together with the Second Lien Notes Claims, General Unsecured, and Key Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims and Second Lien Notes Claims have been satisfied in full;

- Each Holder of General Unsecured Claims shall receive its Pro Rata share of its Pro Rata share (taken together with the Second Lien Notes Claims, Unsecured Notes Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims and Second Lien Notes Claims have been satisfied in full; and

- Each Holder of Key Go Forward Supplier Claims shall receive (i) its Pro Rata share (taken together with the Second Lien Notes Claims, Unsecured Notes Claims, and General Unsecured Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full; and (ii) a waiver of any preference actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law.

- Holders of General Unsecured Claims shall receive its Pro Rate share of [___]; and

- Holders of Go-Forward Landlord Claims and Key Go-Forward Creditor Claims shall receive [___].

The Restructuring Transactions embodied by the Plan, the Sale Order, and the RSA are a significant achievement for the Debtors in the midst of an unprecedented and challenging operating environment. The Debtors strongly believe that the Plan is in the best interests of their estates, and represents the best available alternative at this time. The Debtors are confident that they can implement the Restructuring Transactions contemplated by the Plan to maximize stakeholder recoveries and ensure that JCP can efficiently emerge from chapter 11 and continue to serve as an American retail icon. For these reasons, the Debtors strongly recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan.

## III.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.   What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.   Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims or interests whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C.   Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold and whether you held that Claim as of the Voting Record Date (as defined herein). Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote |

5

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| | | | (Deemed to Accept) |
| Class 3 | ABL Claims and Secured Swap Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | First Lien Claims | Impaired | Entitled to Vote |
| Class 5 | [Reserved] | | |
| Class 6 | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class 7 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 8A | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 8B | ~~Go-Forward Landlord Claims and~~ Key Go ~~Go-~~Forward ~~Creditor~~Supplier Claims | Impaired | Entitled to Vote |
| Class 9 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 10 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 11 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 12 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.    What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims or Interests under the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]**

---

[3]    The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means, as to a Claim or an Interest, a Claim or an Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  For the avoidance of doubt, (a) there is no requirement to file a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy Law.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| 1 | Other Priority Claims | Each holder of an Other Priority Claim shall receive: (i) payment in full in Cash of the unpaid portion of its Other Priority Claim on the later of the Effective Date and such date such Other Priority Claim becomes an Allowed Other Priority Claim; or (ii) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. | [—]N/A | 100% |
| 2 | Other Secured Claims | Each holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Plan Administrator, as applicable: (i) payment in full in Cash; (ii) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (iii) Reinstatement of such Claim; or (iv) such other treatment rendering such Claim Unimpaired. | [—]N/A | 100% |
| 3 | ABL Claims and Secured Swap Claims | To the extent a holder's Allowed ABL Claim or Allowed Secured Swap Claim has not been paid in full, in Cash prior to the Effective Date, each holder of an Allowed ABL Claim or Allowed Secured Swap Claim shall receive payment in full, in Cash. | $1,258,687,395[4] | 100% |

---

[4]  The projected amount of ABL Claims and Secured Swap Claims includes the projected amount of outstanding principal and accrued and unpaid interest as of the Petition Date.

| **SUMMARY OF EXPECTED RECOVERIES** |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims (in millions)** | **Projected Recovery Under the Plan** |
| 4 | First Lien Claims | On the Effective Date, each holder of an allowed First Lien Claim shall receive, (a) pursuant to the Sale Transaction, on account of the Aggregate Bid, its Credit Bid Pro Rata share of the Credit Bid Distribution, subject to dilution under the Plan and (b) its Pro Rata share of any cash remaining in the [Wind-Down Reserve, Professional Fee Escrow, Administrative / Priority Claims Reserve] once all Allowed Claims entitled to payment therefrom have been satisfied and no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated. | $1,571,414,063 | [———]0 - 6.4%[5] |
| 5 | [Reserved] | [Reserved] | | |

---

[5] Pursuant to the proposed Asset Purchase Agreement, BidCo is delivering a $1 billion credit bid (collectively defined in the Asset Purchase Agreement as the "Credit Bid Amount"). Further, pursuant to the proposed Asset Purchase Agreement, at the OpCo Closing, BidCo shall be deemed to assign a portion of the Credit Bid Amount to the OpCo Purchaser (referred to as the "OpCo Credit Bid Amount" in the Asset Purchase Agreement), with the remaining Credit Bid Amount to be credit bid at the PropCo Closing (referred to as the "PropCo Credit Bid Amount" in the Asset Purchase Agreement).

The range of recoveries set forth herein for Holders of Allowed First Lien Secured Claims (a) assumes illustratively, that (x) on the one hand, all of the Credit Bid Amount is assigned to the OpCo Purchaser at the OpCo Closing (thus establishing the low end of the range of recovery for Holders of Allowed First Lien Secured Claims on account of distributions contemplated to be received under the Plan) and (y) on the other hand, all of the Credit Bid Amount is credit bid at the PropCo Closing (thus establishing the high end of the range of recovery for Holders of Allowed First Lien Secured Claims on account of distributions contemplated to be received under the Plan); (b) does not take into account the reduction in the Allowed Claim amount following the assignment and application of the OpCo Credit Bid Amount; and (c) only takes into account distributions to Holders of Allowed First Lien Secured Claims to be made under this Plan.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| 6 | Second Lien Notes Claims | Except to the extent that a Holder of an Allowed Second Lien Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Second Lien Notes Claim, each Holder of an Second Lien Notes Claim shall receive, up to the full amount of such Holder's Allowed Second Lien Notes Claim, its Pro Rata share (taken together with the Unsecured Notes Claims, General Unsecured Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full. | $405,765,753 | [—]≤1% |
| 7 | Unsecured Notes Claims | Except to the extent that a Holder of an Allowed Unsecured Notes Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Unsecured Notes Claim, each Holder of an Unsecured Notes Claim shall receive, up to the full amount of such Holder's Allowed Unsecured Notes Claim, its Pro Rata share (taken together with the Second Lien Notes Claims, General Unsecured Claims, and Key Go Forward Supplier Claims) of any cash remaining in the Wind- Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims and Second Lien Notes Claims have been satisfied in full; | $1,346,126,431 | [—]≤1% |
| 8A | General Unsecured Claims | Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive, up to the full amount of such Holder's Allowed General Unsecured Claim, [—]its Pro Rata share (taken together with the Second Lien Notes Claims, Unsecured Notes Claims, and Key | [—]$710,090,918 | [—]≤1% |

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (in millions) | Projected Recovery Under the Plan |
| | | Go Forward Supplier Claims) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full. | | |
| 8B | Go-Forward Landlord Claims and Key Go Go-Forward CreditorSupplier Claims | Except to the extent that a Holder of an Allowed Go-Forward Landlord Claim or an Alloweda Key Go Go-Forward CreditorSupplier Claims agrees to less favorable treatment, on the Effective Date, in full and final satisfaction, compromise, settlement, and release of and in exchange for such Allowed Go-Forward Landlord Claim or Key Go Go-Forward CreditorSupplier Claims, each Holder of an Allowed Go-Forward Landlord Claim or Key Go Go-Forward Creditor Claim shall receive, (i) up to the full amount of such Holder's AllowedKey Go Forward Supplier Claims, its Pro Rata share (taken together with the Second Lien Notes Claims, Unsecured Notes Claims, and General Unsecured Claims, [ ]) of any cash remaining in the Wind-Down Reserve once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated, and all First Lien Claims have been satisfied in full; and (ii) a waiver of any preference actions arising under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law | [ ]$629,423,595 | [ ]<1% + value of preference waiver |
| 9 | Intercompany Claims | Each Intercompany Claim shall be, at the option of the Debtors, setoff, contributed, distributed, compromised, settled, Reinstated, canceled and released without any distribution, or otherwise addressed in a manner determined by the Debtors. | N/A | 0% / 100% |
| 10 | Intercompany Interests | Each Intercompany Interest shall be, at the option of the Debtors, contributed, distributed, eliminated via merger or other corporate transaction, Reinstated, canceled and released without any distribution, or otherwise addressed in a manner determined by the Debtors. | N/A | 0% / 100% |

| | | | | |
|---|---|---|---|---|
| **SUMMARY OF EXPECTED RECOVERIES** | | | | |
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims (in millions)** | **Projected Recovery Under the Plan** |
| 11 | Existing Equity Interests | Existing Equity Interests will be canceled, released, and extinguished, and will be of no further force or effect.  Each holder of an Interest will not receive any distribution on account of such Interest. | N/A | 0% |
| 12 | Section 510(b) Claims | Section 510(b) Claims will be canceled, released, and extinguished, and will be of no further force or effect.  Each holder of an Interest will not receive any distribution on account of such Interest. | N/A | 0% |

### E.    What will I receive from the Debtors if I hold an Administrative Claim, Professional Fee Claim, Priority Tax Claim, or DIP Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims or Interests set forth in Article III of the Plan.

### 1.    Administrative Claims

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or Plan Administrator, as applicable, to the extent an Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (1) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 45 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (4) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Plan Administrator, as applicable; or (5) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; *provided* that any Allowed Administrative Claim that is an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of the Debtors or the Wind-Down Debtors; *provided, further,* that any Allowed Administrative Claim that is not an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of Purchasers.

Except for Professional Fee Claims and DIP Claims, and unless previously Filed, requests for payment of Administrative Claims must be Filed and served on the Plan Administrator no later than the Administrative Claim Bar Date pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order.  Objections to such requests must be Filed and served on the Plan Administrator (if the Plan Administrator is not the objecting party) and the requesting party on or

before the Administrative Claim Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Except for Professional Fee Claims and DIP Claims, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not file and serve such a request on or before the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Estates, the Wind-Down Debtors, the Plan Administrator, or the property of any of the foregoing, and such Administrative Claims shall be deemed released as of the Effective Date without the need for any objection from the Debtors, the Wind-Down Debtors or the Plan Administrator or any notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

### 2.     Payment of Fees and Expenses under the ~~DIP~~Financing Order.

On the Effective Date, and thereafter as invoiced, the Debtors shall pay all fees, expenses, disbursements, contribution or indemnification obligations, including without limitation, attorneys' and agents' fees, expenses, and disbursements incurred by each of the following, whether prior to or after the Petition Date and whether prior to or after the Effective Date, of the DIP Agents, the DIP Lenders, the First Lien Notes Trustee, the Term Loan Administrative Agent, and the Term Loan/First Lien Notes Collateral Agent, in each case ~~that have accrued and are unpaid as of the Effective Date and are required to be paid~~to the extent payable or reimbursable under or pursuant to the ~~DIP Order~~Financing Order, the DIP Credit Agreement, the First Lien Notes Indenture, the Prepetition Security Agreement, or the Term Loan Credit Agreement, as applicable.  Such fees, expenses, disbursements, contribution, or indemnification obligations shall constitute Allowed Administrative Claims.  Nothing herein shall require the DIP Agents, DIP Lenders, the First Lien Notes Trustee, the Term Loan Administrative Agent, the Term Loan/First Lien Notes Collateral Agent, or their respective Professionals, to file applications, a Proof of Claim, or otherwise seek approval of the ~~Bankruptcy~~ Court as a condition to the payment of such Allowed Administrative Claims.  For the avoidance of doubt, nothing in the Plan shall be deemed to impair, discharge, or negatively impact or affect the rights of the DIP Agents, the First Lien Notes Trustee, the Term Loan Administrative Agent, and the Term Loan/First Lien Notes Collateral Agent to exercise their charging liens pursuant to the terms of the DIP Credit Agreement, the First Lien Notes Indenture, the Prepetition Security Agreement, or the Term Loan Credit Agreement, as applicable.

### 3.     Professional Fee Claims.

Treatment and discussion of Professional Fee Claims is set forth in Article II.C of the Plan.

### 4.     DIP Claims.

As of the Effective Date, the DIP Claims shall be Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Credit Agreement, including principal, interest, fees, costs, other charges, and expenses.  Upon the satisfaction of the Allowed DIP Claims in accordance with the terms of the Plan and the Asset Purchase Agreement, or other such treatment as contemplated by Article II.E of the Plan on the Effective Date all Liens and security interests granted to secure such obligations shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Except to the extent that a Holder of an Allowed DIP Claim agrees to a less favorable treatment, and solely with respect to that portion of a Holder's Allowed DIP Claim that has not been satisfied in

accordance with the Asset Purchase Agreement prior to the Effective Date, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each such unsatisfied portion of a Holder's Allowed DIP Claim, on the Effective Date each such Holder of an Allowed DIP Claim shall receive, pursuant to the Sale Order and the Confirmation Order, its Credit Bid Pro Rata share of the Credit Bid Distributions.  The DIP Claims shall be Allowed in the aggregate amount outstanding under the DIP Facility as of the Effective Date.

Pursuant to the DIP Credit Agreement, all distributions pursuant to Article II.E of the Plan shall be made to the DIP Agent for distributions to the DIP Lenders in accordance with the DIP Credit Agreement and DIP Credit Documents unless otherwise agreed upon in writing by the DIP Agent and the Debtors.  The DIP Agent shall hold or direct distributions for the benefit of the Holders of DIP Claims. The DIP Agent shall retain all rights as DIP Agent under the DIP Credit Documents in connection with the delivery of the distributions to the DIP Lenders.  The DIP Agent shall not have any liability to any person with respect to distributions made or directed to be made by such DIP Agent, except for liability arising from gross negligence, willful misconduct, or actual fraud of the DIP Agent.

### 5.      Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code; *provided* that any Allowed Priority Tax Claim that is an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of the Debtors or the Wind-Down Debtors.

### F.      Are any regulatory approvals required to consummate the Plan?

The Debtors are subject to the expiration of applicable antitrust waiting periods and/or approval by certain antitrust authorities. There are no other known regulatory approvals that are required to consummate the Plan.  However, to the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

### G.      What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide Holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article IX.B of this Disclosure Statement, which begins on page 43.

### H.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article IX of this Disclosure Statement, entitled

"Confirmation of the Plan," which begins on page 43, for a discussion of the conditions precedent to consummation of the Plan.  "Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (1) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (2) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (3) commencement of distributions under the Plan.

**I.      What are the sources of Cash and other consideration required to fund the Plan?**

All amounts necessary for the Debtors, Wind-Down Debtors, OpCo Purchaser, and the PropCo Purchaser, as applicable, to make payments or distributions pursuant to the Plan shall be, in each case subject to the terms of the Asset Purchase Agreement and the Sale Order, obtained from the proceeds of the Exit ABL Facility, the Exit FILO Facility, Cash of the Debtors, and the OpCo-Company Cash Payment. Unless otherwise agreed, distributions required by the Plan on account of Allowed Claims that are Assumed Liabilities under the Asset Purchase Agreement shall be the sole responsibility of the OpCo Purchaser or PropCo Purchaser, as applicable; *provided* that any Allowed Administrative Claim that is not an Assumed Liability under the Asset Purchase Agreement shall not be an obligation of Purchasers.

**J.      Are there risks to owning the New PropCo Securities upon emergence from chapter 11?**

Yes.  *See* Article VII of this Disclosure Statement, entitled "Risk Factors," which begins on page 30.

**K.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation. *See* Article VII.C.6 of this Disclosure Statement which begins on page 39.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes.  The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article IX.F of this Disclosure Statement which begins on page 46.

**L.      How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Articles IV.D and IV.L of the Plan and the Asset Purchase Agreement, the Plan Administrator shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action and notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan, other than Avoidance Actions and the Causes of Action (a) that constitute OpCo Acquired Assets, (b) released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VII, or (c) waived in accordance

14

with Article IV.J, which in the case of the foregoing (b) or (c) shall be deemed released and waived by the Debtors and the Wind-Down Debtors as of the Effective Date.

The Plan Administrator may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. The Plan Administrator shall retain and may exclusively enforce any and all such Causes of Action. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Plan Administrator will not pursue any and all available Causes of Action against it, except as assigned or transferred to the Purchaser Group in accordance with the Asset Purchase Agreement or otherwise expressly provided in the Plan, including Articles IV.D and IV.L of the Plan.** Unless any such Causes of Action against an Entity are expressly waived (including pursuant to Article IV.L of the Plan), relinquished, exculpated, released, compromised, assigned, or transferred to the Purchaser Group in accordance with the Asset Purchase Agreement, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all such Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, Claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Asset Purchase Agreement provides that, among other things, all claims of the Debtors under section 547 or any comparable "preference" action under applicable non-bankruptcy law against suppliers, vendors, merchants, manufacturers, or counterparties to any OpCo Assigned Contracts shall be transferred to OpCo Purchaser or one or more Designees other than actions under section 547 of the Bankruptcy Code or any comparable "preference" action arising under applicable non-bankruptcy law against Entities designated as Key Go Forward Suppliers in accordance with the Plan that are in fact waived pursuant to consummation of the Plan. Based on preliminary estimates, the Debtors made approximately $1 billion in transfers during the 90 days prior to the Petition Date, which transfers may be susceptible to a claim by the Debtors or the Plan Administrator, as applicable, under section 547 of the Bankruptcy Code or any comparable "preference" action under applicable non-bankruptcy law, subject to applicable defenses.

**M.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations among the Debtors and the Consenting First Lien Lenders in obtaining their support for the Plan pursuant to the terms of the RSA.

The Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions. Each Holder of Claims or Interests has the ability to exempt itself from the definition of "Releasing Party" by using the applicable ballot or opt-out form provided by the

Debtors.  By opting out of the Third-Party Release, such Holder will forgo the benefit of obtaining the releases set forth in Article X of the Plan if such party would otherwise by a Released Party.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES:  ALL HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT (X) VALIDLY OPT OUT OF THE RELEASES CONTAINED IN THE PLAN, (Y) FILE AN OBJECTION TO THE RELEASES CONTAINED IN THE PLAN BY THE PLAN OBJECTION DEADLINE, OR (Z) TIMELY VOTE TO REJECT THE PLAN.  THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in pertinent part below.

1. **Releases by the Debtors.**

**Notwithstanding anything contained in the Plan to the contrary, effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including the service of the Released Parties in facilitating the expeditious reorganization of the Debtors and implementation of the restructuring contemplated by the Plan, the adequacy of which is hereby confirmed, on and after the Effective Date each Released Party is deemed released and discharged by each and all of the Debtors, their Estates, and the Wind Down Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted or assertable on behalf of any of the Debtors, their Estates, or the Wind Down Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in Law, equity, or otherwise, that the Debtors, their Estates, or the Wind Down Debtors, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' or the Wind-Down Debtors' in- or out of-court restructuring efforts, intercompany transactions, the ABL Documents, the Term Loan Credit Documents, the Restructuring Transactions, the Sale Transaction, entry into the Asset Purchase Agreement, the Exit Facilities, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or Consummation of the RSA, the Disclosure Statement, the DIP Facility, the Sale Transaction, the Asset Purchase Agreement, the Plan, the Plan Supplement, other Definitive Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure**

Statement, the DIP Facility, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any liabilities or obligations of the PropCo Purchaser to the Debtors relating to the Asset Purchase Agreement, (2) any post Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including the Asset Purchase Agreement and any documents set forth in the Plan Supplement, each as applicable) executed to implement the Plan, (3) any Causes of Action listed on the Schedule of Retained Causes of Action, or (4) any Claims by any of the Debtors arising out of any ordinary course dealings between such parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties including, without limitation, the Released Parties' contributions to facilitating the Restructuring Transactions and implementing the Plan, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, their respective Estates, or the Wind Down Debtors asserting any Claim or Cause of Action released pursuant to the Debtor Release.

2.      **Third-Party Releases.**

Notwithstanding anything contained in the Plan to the contrary, effective as of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties in facilitating the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, to the fullest extent permissible under applicable law, as such Law may be extended or integrated after the Effective Date, on and after the Effective Date each of the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, or because of the foregoing entities, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each Released Party from any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in Law, equity, or otherwise, including any derivative Claims, asserted or assertable on behalf of any of the Debtors or their Estates, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors or the Wind-Down Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any

Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' or the Wind-Down Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Documents, the First Lien Debt Documents, the Restructuring Transactions, the Sale Transaction, entry into the Asset Purchase Agreement, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or Consummation of the RSA, the Disclosure Statement, the DIP Facility, the Sale Transaction, the Asset Purchase Agreement, the Plan, the Plan Supplement, other Definitive Documents, the Exit Facilities, the New Takeback Debt, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the RSA, the Disclosure Statement, the DIP Facility, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Releasing Party on the Plan or the Confirmation Order in lieu of such legal opinion), or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any liabilities or obligations of any Entity to the Purchaser Group relating to the Asset Purchase Agreement, (2) any post-Effective Date obligations of any party or Entity under the Plan (or preserved by the Plan), any Restructuring Transaction, or any document, instrument, or agreement (including the Asset Purchase Agreement and any documents set forth in the Plan Supplement, each as applicable) executed to implement the Plan, or (3) any Claims by any of the Debtors arising out of any ordinary course dealings between such parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that each Third-Party Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, (2) a good-faith settlement and compromise of such Claims; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

3.    Exculpation.

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any Cause of Action for any Claim related to any act or omission based on the formulation, preparation, dissemination, negotiation, entry into, filing, execution, and implementation of any transactions approved by the Bankruptcy Court in the Chapter 11 Cases, including the RSA, the Asset Purchase Agreement, the Disclosure Statement, the Plan, the Plan Supplement, other Definitive Documents, the Confirmation Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation

Order, or created or entered into in connection with the RSA, the Asset Purchase Agreement, the Disclosure Statement, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the pursuit of the Sale Transaction, the administration and implementation of the Plan, including the issuance of any securities pursuant to the Plan or the distribution of property under the Plan or any other related agreement, and the implementation of the Sale Transaction and the Restructuring Transactions contemplated by the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors or the Wind-Down Debtors, except for Claims related to any act or omission that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes on, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding the foregoing, the exculpation shall not release (1) any obligation or liability of any Entity relating to the Asset Purchase Agreement, (2) for any post Effective Date obligation under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (3) any Claims by any of the Debtors arising out of any ordinary course dealings between such parties.

4. **Injunction.**

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article X.A of the Plan, released pursuant to the Debtor Release, the Third Party Release, or another provision of the Plan (including the release of liens pursuant to Article X.B of the Plan), or are subject to exculpation pursuant to Article X.E of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind Down Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any

kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article X.F of the Plan.

For the avoidance of doubt and notwithstanding section 1141(d)(3) of the Bankruptcy Code, as of the Effective Date, except as otherwise specifically provided in the Plan and Sale Order, all Persons or Entities who have held, hold, or may hold Claims or Interests that are treated under the Plan shall be precluded and permanently enjoined on and after the Effective Date from enforcing, pursuing, or seeking any setoff or relief with respect to such Claim or Interest from the Debtors, the Estates, the Purchaser Group, or the Wind Down Debtors, except for the receipt of the payments or distributions, if any, that are contemplated by the Plan from the Wind-Down Debtors or otherwise contemplated under the Sale Order. Such injunction will not enjoin Persons or Entities that do not consent to the Third Party Release from pursuing any direct (but not derivative) Claims or Cause of Action such Persons or Entities may have against Released Parties other than the Debtors, the Estates, the Purchaser Group, or the Wind Down Debtors.

5.     Release of Liens.

On the Effective Date, concurrently with the Consummation of the PropCo Sale and except as otherwise set forth in the Asset Purchase Agreement, the PropCo Acquired Assets shall be transferred to and vest in PropCo free and clear of all Liens, Claims, charges, interests, or other encumbrances pursuant to sections 363(f) and 1141(c) of the Bankruptcy Code and in accordance with the terms of the Confirmation Order, the Plan, and the Asset Purchase Agreement, each as applicable. Without limiting the foregoing, except as otherwise provided in the Asset Purchase Agreement, the Plan, the Plan Supplement, the Exit Facility Documents, or any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of an Other Secured Claim, satisfaction in full of the portion of the Other Secured Claim that is Allowed as of the Effective Date and required to be satisfied pursuant to the Plan, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with Article III of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert automatically to the applicable Debtor and its successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed to release any collateral or other property of any Debtor (including any Cash Collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Plan Administrator to evidence the release of such Lien, including the execution, delivery, and filing or recording of such releases, and the Debtors and their successors and assigns shall be authorized to file and record such terminations or releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

For more detail, see Article X of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

**N.      What is the deadline to vote on the Plan?**

The Voting Deadline is November 17, 2020, at 4:00 p.m. (prevailing Central Time).

**O.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims or Interests that are entitled to vote on the Plan. All ballots (including master ballots and pre-validated ballots) for Holders of Claims in Classes 4, 6, 7, 8A, or 8B must be properly completed, executed, and delivered, so that the applicable ballot is **actually received** by the Debtors' claims and noticing agent, Prime Clerk, LLC (the "Claims and Noticing Agent") **on or before the Voting Deadline, *i.e.* November 17, 2020, at 4:00 p.m., prevailing Central Time**. *See* Article VIII of this Disclosure Statement, entitled, "Solicitation and Voting" which begins on page 39 for more information.

**P.      Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**Q.      When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for November 24, 2020 at 9:00 a.m. (prevailing Central Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than November 17, 2020, at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

**R.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest Holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.      What is the effect of the Plan on the Debtors' ongoing businesses?**

It is anticipated that substantially all of the Debtors' remaining assets following consummation of the OpCo Transaction will be transferred to PropCo immediately before consummation of the Plan, with

the exception of the Excluded Assets which will vest in the Wind-Down Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges or encumbrances.

~~Transaction will be transferred to PropCo, with the exception of the Excluded Assets which will vest in the Wind-Down Debtors for the purpose of liquidating the Estates, free and clear of all Liens, Claims, charges, or encumbrances.~~

**T.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Claims and Noticing Agent, Prime Clerk LLC, via one of the following methods:

> *By calling the telephone number included in your Ballot, or by contacting the Claims and Noticing Agent by phone at:*
>
> (877) 720-6576 (US/Canada)
> (646) 979-4417(International)
>
> *By regular mail, hand delivery, or overnight mail at:*
>
> J. C. Penney Company, Inc.,
> c/o Prime Clerk LLC
> One Grand Central Place
> 60 East 42nd Street, Suite 1440
> New York, NY 10165

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Claims and Noticing Agent at the address above or by downloading the exhibits and documents from the website of the claims and noticing agent at http://www.cases.primeclerk.com/JCPenney (free of charge) or the Bankruptcy Court's website at www.txsb.uscourts.gov (for a fee).

**U.     Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe that the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all Holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**V.     Who Supports the Plan?**

The Plan is supported by the Debtors, certain Holders of Claims, and certain Consenting First Lien Lenders that have executed the RSA, including Holders of [  ]at least 66 2/3% in principal amount outstanding of the First Lien Claims.

## IV.     THE DIP FACILITY AND PLAN

### A.     The DIP Facility

To fund the administration of the Chapter 11 Cases, certain Consenting First Lien Lenders committed to provide a $900 million senior secured super-priority delayed-draw postpetition credit facility (the "DIP Facility"), consisting of $450 million in new money term loans and $450 million in Term Loan Obligations and First Lien Notes Obligations "rolled up" into the DIP Facility.  $225 million of the new money financing was advanced upon entry of the ~~DIP~~Financing Order and has been comingled into the Debtors' cash management system and used for working capital, operating expenses, capital investments and to pay for the costs of the Chapter 11 Cases.  The subsequent $225 million was advanced upon satisfaction of certain conditions precedent and remains in a segregated account, available for the Debtors' use subject to certain conditions.

The DIP Facility provides liquidity that is essential to fund the administrative cost of the Chapter 11 Cases, and it allows the Debtors to pay suppliers and other participants in the Debtors' supply chain in the ordinary course to ensure the continuing and uninterrupted flow of inputs to the Debtors' businesses. The DIP Facility was made available to the Debtors contingent upon, among other things, the Debtors' compliance with certain covenants set forth therein and the Debtors administering their chapter 11 cases in accordance with the milestones set forth therein.

The Debtors believe that the DIP Facility gives the Debtors sufficient liquidity to stabilize their operations and fund the administration of the Chapter 11 Cases as the Debtors seek to implement the Restructuring Transactions contemplated by the Plan.

### B.     The Plan

The key terms of the Plan, specific aspects of the restructuring transactions, and PropCo's operations following the Consummation of the Plan can be found in the Plan, attached hereto as **Exhibit A**, among others described herein and therein:

| Provision | Plan Section |
|---|---|
| General Settlement of Claims and Interests | Article IV, Section A |
| Restructuring Transactions | Article IV, Section B |
| Sources of Consideration for Plan Distributions | Article IV, Sections C |
| Plan Administrator and the Wind-Down Debtors | Article IV, Sections D |
| Cancellation of Existing Securities and Agreements | Article IV, Section F |
| Corporate Action | Article IV, Section G |
| New Organizational Documents | Article IV, Section H |
| Effectuating Documents; Further Transactions | Article IV, Section I |
| Section 1146 Exemption | Article IV, Section J |
| Exemption from Securities Act Registration | Article IV, Section K |

| Provision | Plan Section |
|---|---|
| Preservation of Causes of Action | Article IV, Section L |
| Releases<br><br>(The Releases are also described in Article III.M of this Disclosure Statement, which begins on page 12) | Article X, Sections B, C, and D |

## V.  THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.  JCPenney's Corporate History

JCPenney is a 118-year old American retail icon that plays an important role in the lives of their customers throughout hundreds of communities throughout the country.  As of the Petition Date, the Debtors operated 846 locations across 49 states and Puerto Rico, employed nearly 85,000 associates, and managed a massive supply chain network with nearly 3,000 vendors and 11 domestic shipping facilities. The Debtors concluded 2019 with approximately $10.7 billion in net sales.

Having endured and played a vital role in America's recovery during some of its most difficult periods, including the Great Depression and World War II, JCPenney now finds itself facing another monumental challenge to its business: emerging from the disruption caused by the novel Coronavirus pandemic ("COVID-19").

Before the pandemic, the Debtors had a substantial liquidity cushion, were improving their operations, and were proactively engaging with creditors to deleverage their capital structure and extend their debt maturities to build a healthier balance sheet.  Unfortunately, that progress was wiped out with the onset of COVID-19.  And now, the Debtors are unable to maintain their upward trajectory through their "Plan for Renewal."

On March 11, 2020, the World Health Organization officially declared COVID-19 a pandemic.[56] In response, national, state, and local governments in the United States, and around the world, imposed shelter-in-place and stay at home orders, as well as social distancing protocols.[67]  As a result, the American retail industry entered into a new reality, requiring the Debtors to make difficult decisions to protect the safety of their associates, customers, and the long-term future of JCPenney.  The Debtors temporarily closed all of their stores and offices and dramatically reduced supply chain operations on March 18, 2020.  These developments disrupted the Debtors' meaningful progress on their "Plan for Renewal" transformation strategy, having just achieved comparable store sales improvement in six of eight merchandise divisions in the second half of 2019 over the first half, and successfully meeting or exceeding guidance on all key financial objectives for the 2019 fiscal year.[78]  Under a new management

---

[56]  Jamie Ducharme, *World Health Organization Declares COVID-19 a 'Pandemic.' Here's What That Means*, TIME (Mar. 11, 2020), https://time.com/5791661/who-coronavirus-pandemic-declaration/.

[67]  *See, e.g.*, Exec. Order by the Governor of the State of Tx. Executive Order GA 14 (Mar. 31, 2020), https://gov.texas.gov/uploads/files/press/EO-GA-14_Statewide_Essential_Service_and_Activity_COVID-19_IMAGE_03-31-2020.pdf.

[78]  The five financial objectives were: (a) comparable stores sales were expected to be down between 7-8% (stores sales were down 7.7%); (b) adjusted comparable store sales, which excludes the impact of the Company's exit from major appliances and in-store furniture categories, were expected to be down in a range of 5-6% (adjusted

team spearheaded by Chief Executive Officer Jill Soltau, JCPenney was improving revenue, while simultaneously cutting costs and expanding margins.

Due to the pandemic, April year-over-year net sales decreased by ~88% and store sales decreased to nearly zero. The severe sales decrease resulting from these crucial but economically painful public safety measures has necessitated these Chapter 11 Cases.

In response to the pandemic, the Debtors immediately went into liquidity conservation mode. *First*, JCPenney drew down $1.25 billion on the ABL Facility (as defined herein). *Second*, JCPenney paused all hiring, cut spending, reduced receipts of merchandising goods, and suspended all merit pay increases for 2020. *Third*, JCPenney extended payment terms with their vendors. *Fourth*, the Debtors made the incredibly difficult decision to implement both partial and full furloughs that have affected nearly all of the Debtors' employees (the "Furlough Program"). *Fifth*, the Debtors began to discuss contingencies with their landlords regarding the temporary store closures.

For the last several years, department stores and much of the retail industry have faced challenging times. Advances in online shopping combined with the reduction in brick-and-mortar store traffic have forced virtually all retailers into a Hobson's Choice:[89] reinvention or extinction. While the retail environment was deteriorating, the highly experienced JCPenney executive team continued to innovate and work hard to restore financial strength to the Company. Watching many of its peers plodding down the path to extinction, even before the global pandemic, JCPenney took proactive steps to reinvent itself through its "Plan for Renewal."

After a series of unsuccessful initiatives over the last decade that were designed to stabilize JCPenney's business, the Company appointed industry veteran Jill Soltau as Chief Executive Officer on October 2, 2018. Ms. Soltau had most recently served as President and CEO of JoAnn Stores, Inc. News outlets and industry experts had consistently accused JCPenney of losing its way in the retail landscape and alienating its core customers by trying to be all things to all people.[910] Ms. Soltau's mandates were clear—refocus the Company on the fundamentals that made JCPenney a household name and win back its core customers' business.

Ms. Soltau began making deliberate and rigorous strategic modifications over the 18 months preceding these Chapter 11 Cases starting with conducting holistic research related to JCPenney's customers' preferences. This research included speaking to thousands of retail consumers. Efforts centered on determining what drives its customers attitudinally and behaviorally. The Company's goal was to truly understand its customers' priorities. These diligent efforts led to the identification of its core customer: the "All-in Shopping Enthusiast."

---

comparable store sales were down 5.6%); (c) cost of goods sold, as a rate of net sales, was expected to decrease 150-200 basis points (it decreased approximately 210 basis points over prior year, which correspondingly improved gross margin); (d) adjusted EBITDA was $583 million (a 2.6% improvement over prior year); and (e) free cash flow for fiscal year 2019 was $145 million (beating the target of positive).

[89]  Hobson's Choice, Dictionary.com, https://www.dictionary.com/browse/hobson-s-choice (describing a Hobson's choice as one which is offered where the options are to take what is offered or nothing; the absence of a real alternative).

[910]  *See* J. C. Penney Has Hired a New CEO Months After an Abrupt Resignation by its Former Chief Executive; https://www.businessinsider.com/J. C. Penney-hires-new-ceo-jill-soltau-2018-10.

Following this research, Ms. Soltau developed and rolled out the Company's transformation strategy, the "Plan for Renewal," which is centered around five components:

1. *Offer Compelling Merchandise* by redefining the brand architecture to reflect how customers live every day.

2. *Deliver an Engaging Experience*. The Company used extensive research and customer insights to create tests and develop featured occasion merchandising, improved visual merchandising, and a redesigned shopping experience. The Company expanded the learnings from tests in more than 90 stores.

3. *Drive Traffic* online and in stores. The Company considers its website to be its flagship store. To meet the Company's increasing fulfillment demands, it strengthened its execution on fulfillment, including shipping merchandise from stores and enabling customers to Buy Online, Pickup In Store, or have Curbside Pickup. The Company has developed three distinct work streams to increase foot traffic in its stores: personalization, affinity programs, and improvements to its eCommerce site.

4. *Fuel Growth*. The Company is developing a more efficient operating model, reinvesting in value-creating activities, and establishing a capital structure that supports the long-term needs of the Company.

5. Develop a *Results-Minded Culture* focused on accountability, urgency, and innovative problem solving at all levels of the organization, and a culture that connects all associates to achievements larger than the individual.

At the heart of Ms. Soltau's vision for the Company is a reversion to the Company's historically strong merchandising areas. This includes focusing on high-margin goods, like the Company's private brand lines of women's apparel, and soft home goods like linens, bedding, and pillows. Indeed, these lines are JCPenney's legacy strengths and are expected to propel the Company into another successful century.

To effectuate her vision and return JCPenney to prosperity, Ms. Soltau has brought together a leadership team with broad experiences in retail merchandising, operations, and finance. Combining Ms. Soltau's vision, the experience, and expertise of the leadership team, and extensive consumer research, the Company has taken several steps to return to its principles as a value retailer providing everyday goods for the entire family at low prices and to re-engage its core customers. These steps include: (a) removing the Company from low-margin furniture and appliances spaces; (b) reducing inventory to lower costs; and (c) developing a new look for JCPenney's stores, exemplified in the "Brand-Defining Store."

The Debtors have now reopened all stores and nearly all employees affected by the Furlough Program have been brought back. Company-and store-level employees are continuing to take the necessary safety precautions to ensure all team members and customers are protected. The Debtors have also nearly concluded the process of right-sizing their operational footprint, and have conducted "going out of business" sales at 146 store locations. As of the date of this Disclosure Statement, nearly all of the "going out of business" sales have been completed, with the last of these locations closing by the end of October. As of the date hereof, the Debtors operate 839 locations across forty-nine states and Puerto Rico and employ 63,800 associates.

**B.      JCP Corp. Pension Plan.**

PBGC is a wholly-owned United States government corporation and agency created under Title IV of ERISA to administer the federal pension insurance program and to guarantee the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. Debtor JCP Corp. sponsors the JCP Corp. Pension Plan (the "Pension Plan"), which is covered by Title IV of ERISA. PBGC asserts that the other Debtors are each members of JCP Corp.'s controlled group, as defined in 29 U.S.C. § 1301(a)(14).

During the bankruptcy proceeding, the Pension Plan may terminate under the distress termination provisions of 29 U.S.C. § 1341(c) or under the provisions for PBGC initiation of termination under 29 U.S.C. § 1342(a). If the Pension Plan terminates, PBGC asserts a claim that the sponsor of the Pension Plan and all members of its controlled group are jointly and severally liable for the unfunded benefit liabilities of the terminated Pension Plan. PBGC has filed an estimated contingent claim, subject to termination of the Pension Plan during the bankruptcy proceeding, against each of the Debtors for unfunded benefit liabilities in the amount of approximately $270,200,000. PBGC asserts that this termination liability claim is entitled to priority under 11 U.S.C. §§ 507(a)(2) and (a)(8) in unliquidated amounts. The Debtors reserve all rights relating to any asserted liability, including but not limited to contesting the validity, priority and amount of such claims.

PBGC asserts that the sponsor of the Pension Plan and all other members of its controlled group are obligated to pay the contributions necessary to satisfy the minimum funding standards under sections 412 and 430 of the Internal Revenue Code and sections 302 and 303 of ERISA. PBGC has filed an unliquidated claim against each of the Debtors for any unpaid required minimum contributions, if any, owed to the Pension Plan. PBGC asserts that the claim for required minimum contributions owed is entitled to priority under 11 U.S.C. §§ 507(a)(2) and(a)(5) in the amounts of the unpaid contributions. The Debtors assert that there are no such Pension Plan contributions that have not been paid or have become due, and the Debtors reserve all rights relating to any asserted liability, including but not limited to contesting the validity, priority and amount of such claims.

PBGC asserts that the sponsor of the Pension Plan and all other members of its controlled group are jointly and severally liable to PBGC for all premium obligations owed to the Pension Plan. PBGC has filed a claim against each of the Debtors for unpaid statutory premiums, if any, owed to PBGC on behalf of the Pension Plan in an unliquidated amount. The Debtors assert that there are no such premiums that have not been paid, and the Debtors reserve all rights relating to any asserted liability, including but not limited to contesting the validity, priority and amount of such claims.

If the Pension Plan terminates in a distress or PBGC-initiated termination during the course of the bankruptcy proceeding, PBGC asserts that the sponsor of the Pension Plan and its controlled group are liable to PBGC for a termination premium at the rate of $1,250 per plan participant per year for three years under 29 U.S.C. § 1306(a)(7). PBGC estimates that the amount of the termination premium liability for the Pension Plan would total approximately $146,482,500. The Debtors reserve all rights relating to any asserted liability, including but not limited to the validity, priority and amount of such claims.

With respect to the Pension Plan, no provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code shall be construed to discharge, release, or relieve any parties in interest (as defined in 29 U.S.C. § 1002(14)) to the Pension Plan from liabilities or requirements that are both (i) described within 29 U.S.C. §§ 1101 – 1114 and (ii) enforced solely by the PBGC or the Pension Plan. PBGC and the Pension Plan will not be enjoined or precluded from

enforcing such liability with respect to the Pension Plan as a result of any provision of the Disclosure Statement, Plan, Confirmation Order, or section 1141 of the Bankruptcy Code.

### C. ~~B.~~ The Debtors' Key Assets and Operations

- <u>J. C. Penney Brand</u>.  JCPenney has a longstanding heritage of providing quality products at affordable prices to its loyal customers.  In the 118 years since its founding, JCPenney has cemented itself as a staple of the American retail landscape.  Its private brands have been central to its success.  JCPenney's current private brands—such as Okie Dokie, Worthington, Stafford, St. John's Bay, Arizona Jean Co., JCPenney Home, and Liz Claiborne—include, among other things, women's apparel, home goods, and various accessories.  JCPenney's private brands are so loved that, according to numerous surveys, many people think they are national brands.

- <u>Merchandise and Key Customer Base</u>.  JCPenney primarily sells family apparel and footwear, accessories, fine and fashion jewelry, beauty products, and home furnishings.  In addition, JCPenney department stores provide services such as salons, optical, portrait photography, and custom decorating.  JCPenney's inventory falls into the following categories: 21.7% men's apparel; 23.7% women's apparel (includes specialty apparel); 11.7% home furniture and leisure; 12.8% footwear, handbags, and accessories; 10.0% jewelry and watches; and 20.1% other (cosmetics, children's apparel and products).  JCPenney's core customers, the "All-in Shopping Enthusiasts," are those seeking value for merchandise that can be used every day, particularly apparel and home furnishings.  Approximately 75% of sale transactions are made to JCP rewards members and approximately 40-45% of sale transactions are made to JCP credit card holders.

- <u>Supply Chain</u>.  JCPenney's core business is delivering quality, dependable products at fair prices.  The ability to adapt to an ever-changing market is thus an essential component of JCPenney's success, which the Debtors have been able to achieve through strong relationships with hundreds of domestic and foreign vendors and suppliers.  Therefore, JCPenney's business depends on maintaining an integrated supply chain aimed at ensuring the uninterrupted flow of merchandise to its brick-and-mortar locations as well as on-demand delivery to customers' homes and stores for customer pickup.  Generally, for private brand merchandise, the Debtors, through their purchasing company, J. C. Penney Purchasing Corporation ("<u>Purchasing</u>"), and its foreign subsidiaries, contract with various foreign manufacturers and suppliers to source and ship merchandise.  After procuring the merchandise, Purchasing then sells the merchandise to the operating company, J. C. Penney Corporation, Inc. ("<u>JCP Corp.</u>") for eventual sale to the consumer.  For non-private brand merchandise, the Debtors' primarily contract with domestic suppliers.

- <u>Real Estate Footprint</u>.  As of the Petition Date, JCPenney operated 846 stores across the United States, including six stores in Puerto Rico.  Of these 846 stores, 387 are owned, including 110 stores operating on ground leases.  The stores are located in lifestyle centers, shopping malls, power centers, street level shops, and outlets.  As detailed in the *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Assume and Perform Under the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving the Continuation or Implementation of Related Non-Insider Discretionary Payments, and (IV) Granting Related Relief* [Docket No. 542] (the "<u>Store Closing Motion</u>"), and pursuant to the authority granted to the Debtors by the *Order (I) Authorizing the Debtors to Assume and Perform Under the Consulting Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving the Continuation or Implementation of Related Non-Insider*

*Discretionary Payments, and (IV) Granting Related Relief* [Docket No 727] (the "Store Closing Order") the Debtors are authorized, but not directed, to close stores in accordance with the terms of the store closing procedures attached thereto (the "Store Closings").  The Debtors are in the process of closing 146 stores pursuant to the Store Closing Motion [Docket Nos. 835, 986, and 1166].  Following such closures, the Debtors will operate approximately 690 stores.

- E-Commerce Platform.  JCPenney was one of the first retail companies to launch an e-Commerce website in 1996.  It maintains this website today.  Customers may also purchase merchandise through JCPenney's mobile application, which was launched in 2009.  JCP fulfills online customer purchases by direct shipment to the customer from distribution facilities and stores or from its suppliers' warehouses.  In recent months, JCPenney has seen substantial growth in online sales, representing a shift in shopping behavior as least in part due to the pandemic, with April, May, and June monthly e-commerce sales showing increases of over 14% compared to 2019 performance.

### D.   ~~C.~~ The Debtor's Prepetition Capital Structure

As of the date of this Disclosure Statement, the Debtors had approximately $4.9 billion in total outstanding principal amount of prepetition funded debt obligations and, as of September 4, 2020, approximately 322,663,112 shares of outstanding common stock.  The following table summarizes the Debtors' capital structure as of the Petition Date:

| Obligation | Maturity | Annual Interest Expense (millions) | Approx. Principal Amount (millions) |
|---|---|---|---|
| **ABL Facility** | June 2022 | Varying (LIBOR + 1.75%–2.25%)~~10~~ [1112] | $1,1~~79~~80 million |
| **Term Loan Agreements** | June 2023 | LIBOR + 4.25% | $1,521 million |
| **First Lien Notes** | July 2023 | 5.875% | $500 million |
| **Second Lien Notes** | March 2025 | 8.625% | $400 million |
| *Total Secured Debt* | | | *$3,60~~0~~1 million* |
| **Unsecured Notes** | Varying (202~~3~~0–2097) | Varying (5.65%–7.625%) | $1,318 million |
| *Total Unsecured Debt* | | | *$1,318 million* |
| **Total:** | | | **$4,91~~8~~9 million** |

---

[12012]   The interest rate varies based on the Quarterly Average Excess Availability ("QAEP").  If the QAEP is (i) equal to or greater than 66.67% of the Revolving Commitments, the applicable interest rate is 1.75%, (ii) greater than or equal to 33.33% of the Revolving Commitments but less than 66.67% of the Revolving Commitments, the applicable interest rate is 2.00%, or (iii) less than 33.33% of the Revolving Commitments, the applicable interest rate is 2.25%.

1.      **The ABL Revolving Credit Facility.**

Certain of the Debtors are party to that certain Credit Agreement, dated as of June 20, 2014 (as amended by that certain Amendment No. 1 to Credit Agreement, dated as of December 10, 2015, that certain Amendment No. 2 to Credit Agreement, dated as of June 20, 2017, that certain Amendment No. 3 to Credit Agreement, dated as of March 8, 2018, and as may be further amended, restated, modified or supplemented from time to time, the "ABL Credit Agreement"), by and among, inter alios, OpCo, JCP, and Purchasing, each as borrowers (collectively, the "ABL Borrowers"), the lenders party thereto, and Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "ABL Agent"). The Prepetition ABL Credit Agreement provides for a $2.35 billion credit facility (subject to a borrowing base composed primarily of accounts receivable, credit card receivables and inventory) with a maturity date of June 20, 2022 (the "ABL Facility").

The obligations under the ABL Facility (the "ABL Obligations") are secured by substantially all of each Debtor's working capital assets, including, without limitation, by a first priority lien on substantially all of the Secured Debt Loan Parties' (as defined below) accounts (including receivables), inventory, deposit accounts, and cash (but excluding the Debtors' equipment, real estate assets, intellectual property, equity interests and intercompany indebtedness owed to such Secured Debt Loan Parties (as defined below)) and identifiable proceeds of the foregoing (collectively, the "ABL Priority Collateral"). Each of JCP Real Estate Holdings, LLC ("RE HoldCo") and J. C. Penney Properties, LLC (together with RE HoldCo and the ABL Borrowers, the "Secured Debt Loan Parties") has guaranteed all obligations under the ABL Facility. Given the onset of COVID-19, prior to the Petition Date, the ABL Borrowers drew on the ABL Facility in order to meet anticipated liquidity needs. As of the Petition Date, there were approximately $1,390 million of outstanding obligations under the ABL Facility (consisting of borrowings and obligations in respect of undrawn letters of credit).

The ABL Facility allows for certain lenders thereunder (or their affiliates) to enter into certain swap, treasury services or supply chain financing agreements outside of the ABL Facility. Obligations under these agreements are secured under the security documents related to the ABL Facility (and share in any liens created thereunder) on a pari passu basis with the ABL Obligations. As of the Petition Date, there were approximately $75 million of such outstanding obligations, which are fully reserved against in the borrowing base under the ABL Facility.

2.      **The Term Loans.**

The Secured Debt Loan Parties are party to that certain Amended and Restated Credit and Guaranty Agreement, dated as of June 23, 2016 (as amended, restated, amended and restated, modified, or supplemented from time to time, the "Term Loan Agreement"), by and among, inter alios, OpCo, as borrower, JPMorgan Chase Bank, N.A., as administrative agent (the "Term Loan Administrative Agent"), and the lenders from time to time party thereto (the "Term Loan Lenders"). Under the Term Loan Agreement, OpCo borrowed approximately $1.7 billion (the "Term Loans"), approximately $1.521 billion of which remains outstanding. The Term Loans amortize quarterly at a rate of 2.5 percent per annum, with the balance due at its maturity.

The obligations under the Term Loan Agreement (the "Term Loan Obligations") are secured on a pari passu basis with the First Lien Notes by substantially all of each Secured Debt Loan Party's assets other than certain unencumbered real estate, including, without limitation, by a first priority lien on substantially all of the Secured Debt Loan Parties' equipment, real estate assets, intellectual property, equity interests and intercompany indebtedness owed to such Secured Debt Loan Parties, and identifiable proceeds of the foregoing (the "Term Priority Collateral"), and a second priority lien on the ABL Priority

Collateral (collectively, the "Term Loan/First Lien Notes Collateral"). Each non-borrower Secured Debt Loan Party has guaranteed all of the Term Loan Obligations.

### 3. Secured Bonds.

The Debtors are also obligated under the following two issuances of secured debt securities:

- **5.875% senior notes due 2023**. On June 23, 2016, JCP Corp. issued $500 million of 5.875% senior secured notes due July 2023 (the "First Lien Notes," and the holders thereof, the "First Lien Noteholders," and the obligations thereunder, the "First Lien Notes Obligations," and the First Lien Notes Obligations together with the Term Loan Obligations, collectively, the "Term Loan/First Lien Notes Obligations"), all of which remains outstanding as of the Petition Date. JCP, Purchasing, RE HoldCo and J. C. Penney Properties, LLC are guarantors under the First Lien Notes, and the First Lien Notes Obligations are secured on a pari passu basis with the Term Loan Obligations by the Term Loan/First Lien Notes Collateral, including a first priority lien on the Term Priority Collateral and a second priority lien on the ABL Priority Collateral.

- **8.625% notes due 2025**. On March 12, 2018, JCP Corp. issued $400 million of 8.625% second lien secured notes due March 2025 (the "Second Lien Notes", and the holders thereof, the "Second Lien Noteholders," and the obligations thereunder, the "Second Lien Notes Obligations"), all of which remains outstanding as of the Petition Date. JCP, Purchasing, RE HoldCo and J. C. Penney Properties, LLC are guarantors under the Second Lien Notes, and the Second Lien Notes Obligations are secured on a junior basis to the Term Loan/First Lien Notes Obligations by the Term Loan/First Lien Notes Collateral other than real estate (which does not secure the Second Lien Notes Obligations), including a second priority lien on the Term Priority Collateral (other than real estate) and a third priority lien on the ABL Priority Collateral.

### 4. Unsecured Bonds.

The Debtors are also obligated under the following six issuances of unsecured debt securities:

- **5.65% senior notes due 2020**. On May 24, 2010, JCP and JCP Corp. issued $400 million of 5.65% senior unsecured notes due June 2020 (approximately $105 million of which remained outstanding as of the Petition Date). No other Debtor entity guarantees or is otherwise obligated under the notes.

- **7.125% debentures due 2023**. On November 23, 1993, JCP Corp. issued $275 million of 7.125% unsecured debentures due November 15, 2023 (approximately $10 million of which remained outstanding as of the Petition Date). On January 27, 2002, JCP became a co-obligor with respect to the debentures. No other Debtor entity guarantees or is otherwise obligated under the debentures.

- **6.90% debentures due 2026**. On August 19, 1996, JCP Corp. issued $200 million of 6.90% debentures due August 2026 (approximately $2 million of which remained outstanding as of the Petition Date). On January 27, 2002, JCP became a co-obligor with respect to the debentures.

- **6.375% senior notes due 2036**. On April 27, 2007, JCP and JCP Corp. issued $700 million of 6.375% senior unsecured notes due October 2036 (approximately $388

million of which remained outstanding as of the Petition Date).  No other Debtor entity guarantees or is otherwise obligated under the notes.

- **7.40% debentures due 2037**.  On April 14, 1997, JCP Corp. issued $400 million of 7.40% unsecured debentures due April 2037 (approximately $312 million of which remained outstanding as of the Petition Date).  On January 27, 2002, JCP became a co-obligor with respect to the debentures.  No other Debtor entity guarantees or is otherwise obligated under the debentures.

- **7.625% debentures due 2097**.  On February 25, 1997, JCP Corp. issued $500 million of 7.625% unsecured debentures due March 2097 (all of which remained outstanding as of the Petition Date).  On January 27, 2002, JCP became a guarantor with respect to the debentures.  No other Debtor entity guarantees or is otherwise obligated under the debentures.

### 5. Existing Equity Interests

JCP's certificate of incorporation authorizes two classes of stock:  common stock and preferred stock.  As of September 4, 2020, JCP had approximately 322,663,112 shares of common stock and no shares of preferred stock outstanding.  JCP has not paid a dividend since May 2012.  In addition, the ABL Credit Agreement, Term Loan Agreement, and First Lien Notes require that certain financial covenants must be satisfied at the time dividend payments are made.

On May 18, 2020, the staff of NYSE Regulation, Inc. ("NYSE Regulation") notified JCP of its determination to immediately suspend trading in JCP's common stock on the New York Stock Exchange (the "NYSE") after determining that JCP was no longer suitable for listing as a result of the commencement of the Chapter 11 Cases.  On May 20, 2020, NYSE Regulation filed a delisting application with the SEC, and the delisting became effective 10 days later; however JCP shares have continued to trade over-the-counter. As of the date of this Disclosure Statement, JCP's stock had a closing price of $0.24 per share.

## VI. EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A. Prolonged Market Decline and Industry-Specific Challenges

A number of factors, both macro and micro, contributed to the need to commence these Chapter 11 Cases.  Most significantly was the closure of all retail stores and offices in response to the unprecedented pandemic.  While JCPenney has been proactive in addressing changing trends, it faces the same macro-trends that have crippled many apparel and retail companies, including a general trend from brick-and-mortar to online retail channels and a shift in consumer demographics.  Recognizing this, prior to the COVID-19 temporary store closures, the Debtors immediately implemented a series of cost-saving and cash conservation initiatives to grow their profit margins and address their debt obligations.  However, JCPenney experienced a significant decline in in-store traffic and related consumer spending as well as numerous operational challenges as a result of the pandemic.

### B. The Pandemic

In-store shopping at JCPenney, the Debtors' largest revenue stream, came to an abrupt halt as a result of the pandemic.  In response to state and local government mandates and recommendations, on March 18, 2020, the Debtors temporarily closed all retail stores and offices.  The Debtors later extended their store closures through May 2020.  These store closures significantly contributed to missed sales targets, unsold inventory, and depressed profit margins.  Over the course of the Chapter 11 Cases, in

accordance with state and local orders, the Debtors reopened their stores as it was safe to do so in a phased approach. JCPenney communicates with its customers regarding the pandemic and the opening of stores on its COVID-19 website.¹¹⁺¹³ The Debtors are taking exceptional measures to ensure that their associates and customers remain safe at their stores. Specifically, the Debtors are performing diligent nightly cleaning of their stores, offering contact-free curbside pickup, installing plexiglass shields at the register, providing training to their associates on safety practices, and providing masks to each associate, among other measures.

### C.   Brick-and-Mortar Retail Microenvironment, Marketing Missteps, and the Leadership Carousel.

JCPenney was experiencing headwinds prior to the pandemic, with COVID-19 being the ultimate reason for these chapter 11 filings. Prior to the pandemic, the Debtors' projections showed sufficient liquidity to maintain operations without any restructuring transaction for years. The Debtors, however, intend to utilize these chapter 11 proceedings to work to improve their operations and progress the "Plan for Renewal."

*First*, JCPenney, along with many other apparel and retail companies, had been facing a challenging commercial environment over the past several years brought on by increased competition and the shift away from shopping at brick-and-mortar stores. Given the Debtors' substantial brick-and-mortar presence in the United States, and the expenses associated therewith, the business had been heavily dependent on physical consumer traffic, and resulting sales conversion, to meet sales and profitability targets. Further, the majority of the Debtors' locations are in shopping malls, which have seen an even steeper decline in traffic than other brick-and-mortar locations. These factors contributed to the Debtors falling short of their sales targets and depressed profitability performance and a need for change.

*Second*, over the past decade, the Debtors have experienced substantial turnover at the executive level. Prior leadership made certain merchandising decisions that misread the Debtors' core audience, failed to attract new customers, and ultimately hurt sales. By May 2018, the Debtors were on their fourth CEO in seven years. The four separate management teams each came with a different business plan and execution strategy. The regular transition periods disrupted efforts to pursue any of these plans and effectuate a cohesive, long-term strategy. After the Debtors' CEO abruptly stepped down from his post in May 2018, management and the board of directors of JCP needed to identify and appoint an individual who could immediately step into the colossal challenge of bringing this American staple back from years of declining revenue and profits.

Despite the foregoing, the Debtors, under the leadership of Ms. Soltau, were on the brink of an operational and financial shift that would prepare JCPenney for a resurgence in the retail industry. Notwithstanding the incredibly challenging macro-economic climate, the "Plan for Renewal" has already improved the sales in several categories. A leadership team with extensive and valuable retail experience was assembled. Further, the Debtors' management prioritized a right-sizing of its capital structure and proactively sought the cooperation of several key stakeholders.

---

¹³⁺¹³   For more information related to the Company's response to COVID-19, see the following website: https://companyblog.jcpnewsroom.com/storesopen/).

### D.      Prepetition Strategic, Financing, and Governance Initiatives.

#### 1.      Liability Management Transaction.

In August 2019, the Debtors had approximately $1.68 billion of aggregate liquidity but were levered at ~7.7x Adjusted EBITDA, substantially higher than the industry median.  Their Last Twelve Months (LTM) Gross Leverage was substantially above the median for apparel retail.

Ms. Soltau, together with senior management and JCP's advisors, recognized that a substantial delevering was critical to propel JCP into another successful century.  Immediately, JCP's advisors began a robust evaluation of the Debtors' potential strategic alternatives to provide time to grow back into its capital structure.  Although JCP had substantial liquidity runway, its forecasts showed that they might drop below the threshold of sufficient liquidity in the coming years.

Through numerous in-person meetings with the Debtors' management, K&E and Lazard identified four primary strategic capital structure goals:  (a) maintain liquidity, (b) address the more than $2 billion of first lien debt maturing in June 2023; (c) capture discount in the remaining secured debt and unsecured notes, and (d) reduce interest expense, all while simultaneously maintaining operational flexibility.

In early August and September 2019, the Debtors' advisors market-tested the appetite for such a transaction.  Given the Debtors' storied history and expectation for a bright future with the new management team, there was substantial interest from lenders and potential lenders.  Over the following months, the Debtors traded a number of proposals with an ad hoc group of their First Lien Noteholders, Term Loan Lenders, and Second Lien Noteholders (each as defined herein, together, the "Crossover Group") that had aligned with one of the Debtors' largest funded debt holders.  Through mid-November and December 2019, the Debtors and their advisors traded term sheets with such advisors, but ultimately an impasse was reached.

Subsequently, JCP engaged with another potential transaction counterparty who is a frequent player in distressed situations ("Counterparty X").  Counterparty X proposed a transaction whereby it would facilitate an amend-and-extend transaction through, among other transactions, the purchase of more than $750 million of the Term Loans (as defined herein).  The deal gained substantial traction in late-December 2019 and January 2020 as Counterparty X became restricted, and fulsome negotiations commenced.  With the support of Counterparty X, the Debtors also continued discussions to raise a new FILO facility from separate commercial lenders.  In early February 2020, the Debtors and Counterparty X agreed to major structural and economic terms of the transaction in principal.  Generally, Counterparty X was prepared to purchase and extend the maturity of the Term Loan Obligations in conjunction with the funding of a $360 million FILO facility in exchange for fees and a lien on unencumbered assets. Such transaction would have been the first of a multi-step process to extend JCP's debt maturity and provide it with the flexibility to augment liquidity and delever its capital structure through discount capture on its unsecured notes.

As a next step, JCP proposed a broader amend-and-extend transaction involving its other Term Loan Lenders and First Lien Noteholders that would have provided the same consideration to extending debtholders in exchange for extending debt maturity by three years.  Contemporaneously, or shortly thereafter, the Debtors would launch a tender and/or exchange offer for their long-dated unsecured notes at a discount.

Unfortunately, once COVID-19 was declared a pandemic, and the Debtors' primary revenue stream—in-store sales—evaporated overnight, talks regarding the potential transactions came to a grinding halt. As the Debtors have discovered new ways to operate their stores effectively during the pandemic, although not entirely, in-store sales have rebounded.

### 2. Implementation of Cost-Saving Initiatives.

Even before the temporary store closures due to COVID-19, the Debtors were in the process of implementing a series of cost saving initiatives to address their debt obligations and grow their profit margins. These cost-saving initiatives included, among other things, expense reduction, contract renegotiations, and optimization of the Debtors' merchandise labor-force, and real estate portfolios.

Due to the unprecedented and unforeseen disruption to JCPenney's business caused by COVID-19, the Debtors instituted the Furlough Program. While the Debtors initially maintained wages and salaries for their Employees when they closed their stores and corporate offices, effective April 2, 2020, the Debtors placed approximately 78,000 full- and part-time employees on temporary furlough. The Debtors have since resumed store operations, and brought back nearly all previously furloughed employees, as further detailed below in Article V.A.

### 3. Governance Initiatives.

Finally, once it became clear that a near-term chapter 11 process was a possibility, JCP proactively evaluated its corporate governance structure and, after extensive interviews, made a determination to add four new directors, two to JCP Corp. and two to RE HoldCo and J. C. Penney Properties, LLC, only.

Effective May 1, 2020, Alan Carr and Steven Panagos, were appointed to the board of directors of JCP Corp. (the "Old JCP OpCo Independents"). The Old JCP OpCo Independents have retained their own legal counsel, Katten Muchin Rosenman LLP.

Also on May 1, 2020, William Transier and Heather Summerfield (the "Subsidiary Independents," together with the Old JCP OpCo Independents, the "Independent Directors") were appointed to the board of directors of RE HoldCo and J. C. Penney Properties, LLC. Mr. Transier and Ms. Summerfield were appointed to Purchasing's board of directors on May 4, 2020. The Subsidiary Independents also retained their own independent legal counsel, Quinn Emanuel Urquhart & Sullivan LLP.

## VII. RISK FACTORS

Holders of Claims or Interests should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A. Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims or Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims or Interests in such Impaired Classes.

### 1. There Is a Risk of Termination of the RSA

To the extent that events giving rise to termination of the RSA occur, the RSA may terminate prior to the Confirmation or Consummation of the Plan, which could result in the loss of support for the Plan by important creditor constituencies and could result in the loss of use of cash collateral by the Debtors under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

### 2. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 3. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims or equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear what, if anything, Holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors, subject to the terms and conditions of the Plan and the RSA (including the requirement that the Plan be in form and substance acceptable to the Consenting First Lien Lenders), reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting class of Claims or Interests, as well as any class junior to such non-accepting class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.        Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.        Continued Risk Upon Confirmation

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in consumer demand for, and acceptance of, their products, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code gives the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan.  Subsequently, the Debtors sought and the Bankruptcy Court granted the *Order Extending the Exclusivity Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1533], extending this exclusivity period through and including January 10, 2021. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

### 7.        The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion

over a short period of time, when commodities prices are at historically low levels, rather than reorganizing or selling the business as a going concern at a later time in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8.      The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection.  Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims or Interests under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims or Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 10.      Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article X of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, the Wind-Down Debtors, or Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties is necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their claims against the Debtors' estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions.  The Plan's release and exculpation provisions are an inextricable component of the RSA and Plan and the significant deleveraging and financial benefits that they embody.

**11.  Risk of Non-Occurrence of the Effective Date**

There can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.  As more fully set forth in Article XI of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent.  If such conditions precedent are not waived or not met, the Effective Date will not take place.

**B.  Risks Related to Recoveries under the Plan**

**1.  A Liquid Trading Market for the New PropCo Securities Does Not Exist and May Not Develop**

The New PropCo Securities are new securities for which there is currently no public market.  Neither the Debtors not PropCo currently intends to apply for listing of the New PropCo Securities on any national securities exchange.  Although the Debtors and PropCo may in the future apply to list the New PropCo Securities on a national securities exchange, no assurances may be given that this listing will be sought or obtained and even if listed, that liquid trading markets for New PropCo Securities will develop.  The liquidity of any market for New PropCo Securities will depend upon, among other things, the number of Holders of New PropCo Securities, PropCo's financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that an active trading market for the New PropCo Securities will develop, nor can any assurance be given as to the liquidity or prices at which such interests might be traded.  In the event an active trading market does not develop, the ability to transfer or sell New PropCo Securities may be substantially limited.

**2.  The Trading Price for the New PropCo Securities May Be Depressed Following the Effective Date**

Assuming that the Effective Date occurs, New PropCo Securities will be issued to Holders of DIP Claims and First Lien Claims based on the relative amount credit bid by each of them.  Following the Effective Date of the Plan, New PropCo Securities may be sold to satisfy withholding tax requirements, to the extent necessary to fund such requirements.  In addition, Holders of Claims or Interests (as applicable) that receive New PropCo Securities may seek to sell such securities in an effort to obtain liquidity.  These sales and the volume of New PropCo Securities available for trading could cause the trading price for New PropCo Securities to be depressed, particularly in the absence of an established trading market for the New PropCo Securities.

**3.  Certain Holders of New PropCo Securities May Be Restricted in Their Ability to Transfer or Sell Their Interests**

Pursuant to section 1145(a)(1) of the Bankruptcy Code, New PropCo Securities issued under the Plan may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities.  Resales by Holders of Claims or Interests (as applicable) who receive New PropCo Securities pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  Such holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.  ~~The Debtors intend to propose a confirmation order that includes a finding that a Holder with less than 50 percent of all outstanding New PropCo Securities but greater than 10 percent of the outstanding New PropCo Securities will be deemed not to be~~

39

~~an "underwriter" for purposes of Section 1145; however no assurance can be given that the Bankruptcy Court will grant such request.~~

The New PropCo Securities may not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any Holder of New PropCo Securities to freely resell the New PropCo Securities.  *See* Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 47.

### 4. Restricted Securities Issued under the Plan May Not Be Resold or Otherwise Transferred Unless They Are Registered Under the Securities Act or an Exemption from Registration Applies

To the extent that securities issued pursuant to the Plan are not covered by section 1145(a)(1) of the Bankruptcy Code, such securities shall be issued pursuant to section 4(a)(2) under the Securities Act and will be deemed "restricted securities" that may not be sold, exchanged, assigned, or otherwise transferred unless they are registered, or an exemption from registration applies, under the Securities Act. Holders of such restricted securities may not be entitled to have their restricted securities registered and may be required to agree not to resell them except in accordance with an available exemption from registration under the Securities Act.  Under Rule 144 of the Securities Act, the public resale of restricted securities is permitted if certain conditions are met, and these conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer, as defined in Rule 144.  In order to resell securities under Rule 144, both non-affiliates and affiliates will need to meet the holding period requirements specified by Rule 144. In addition, in order to resell securities under Rule 144, an affiliate must comply with the volume, manner of sale, and notice requirements of Rule 144.

Holders of New PropCo Securities who are deemed to be "underwriters" under Section 1145(b) of the Bankruptcy Code will also be subject to restrictions under the Securities Act on their ability to resell those securities.  Resale restrictions are discussed in more detail in Article X to this Disclosure Statement, entitled "Certain Securities Law Matters," which begins on page 47.

### 5. Holders of New PropCo Securities Will Have Limited Influence Over PropCo Following the Effective Date and Not All Income of PropCo Will be Distributed.

~~[~~Assuming that the Effective Date occurs, Holders of Claims or Interests (as applicable) who receive distributions ~~representing a substantial percentage~~ of the outstanding New PropCo Securities will have limited influence with respect to the operations of Prop<u>e</u>Co other than approving <u>certain limited</u> activit<u>y</u><u>ies</u> or directing PropCo by either a majority or supermajority <u>vote</u> of such New PropCo Securities. Individual Holders may have interests that differ from those of the other majority or supermajority Holders of New PropCo Securities and may vote in a manner adverse to the interests of other Holders of New PropCo Securities but will nevertheless be bound by the directions of the majority or supermajority as applicable.~~]~~<u>12</u>

Prop<u>e</u>Co's ability to make distributions with respect to the New PropCo Securities is dependent on Prop<u>e</u>Co's ability to generate sufficient revenues from lease payments at, and sales of, the retail stores and distribution centers. The New Prop<u>e</u>Co Securities are not obligations of OpCo or any of their affiliates. In addition, if the Restructuring Transactions are effectuated, the amounts reported in PropCo's subsequent consolidated financial statements may materially differ compared to the Debtors' historical

---

~~12~~   ~~[NTD: to be revised to reflect ultimate governance structure.]~~

consolidated financial statements and such difference may be material and should not be relied upon as an indication of future results of PropCo. Moreover, distributions to Holders are subordinated to certain other distributions such as taxes and expenses related to PropeCo and its operations. For any distribution date, it is possible that expenses are in excess of the amounts of cash that can be distributed and therefore Holders may receive nothing for that month. Additionally, PropeCo will be entitled to retain or set aside monthly cash reserves (which may be increased as approved by a majority of Holders of the New PropCo Securities) that would otherwise be distributable to the Holders of the New PropCo Securities, for the purposes of paying taxes, expenses, and other administrative costs. The establishment of such reserves will have the effect of delaying the distribution to Holders of amounts that would otherwise be distributable and may result in these amounts not being distributed at all.

### 6. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement entitled "Certain U.S. Federal Tax Consequences of the Plan" which begins on page 47, to determine how the tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, PropCo, and Holders of Claims or Interests, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

### C. Risks Related to the Debtors' and PropCo's Businesses

#### 1. The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with brand partners, suppliers, landlords, customers, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' business and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with brand partners, suppliers, landlords, customers, employees, and other third parties, which in turn could adversely affect the Debtors' business, results of operations and financial condition. In addition, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

**2.      The OpCo Sale Will Affect the Debtors' Operations, and the Performance of OpCo May Affect PropCo.**

Pursuant to the Sale Order, the OpCo Assets are being sold to the OpCo Purchaser. Additionally, and as provided in the Plan, certain of the Debtors' real property assets are being sold to the PropCo Purchaser.  The remaining assets of the Debtors will be transferred to the Wind-Down Debtors for the purpose of winding down the Debtors' remaining operations. The Wind-Down Debtors will have no active ongoing operations after the remaining operations are wound down.

As described in the Sale Motion, Plan, and herein, OpCo will be the primary obligor on certain of the PropCo Assets, pursuant to the Master Lease Agreement.  Accordingly, any negative effect on OpCo's operations and their credit quality may have an effect on PropCo's performance.

**3.      ~~2.~~ Recent Global Economic Trends, Especially in Response to COVID-19, Could Adversely Affect the Debtors', Wind-Down Debtors, and PropCo's Business, Results of Operations and Financial Condition, Primarily Through Disruption to the Debtors', Wind-Down Debtors', and PropCo's Customers' Business, as applicable.**

Recent global economic conditions, including disruption of financial markets, could adversely affect the Debtors', Wind Down Debtors, or PropCo's business, results of operations and financial condition, primarily through disrupting their customers' businesses.  Higher rates of unemployment and lower levels of business activity generally adversely affect the level of demand for certain of the Debtors' and PropCo's products and services.  In addition, continuation or worsening of general market conditions in the U.S. economy or other national economies important to the Debtors' or PropCo's business may adversely affect ~~the Debtors'~~ customers' level of spending, ability to obtain financing for purchases and ability to make timely payments to the Debtors, PropCo, or Wind Down Debtors for their products and services, which could require the Debtors to increase the Debtors' allowance for doubtful accounts, negatively impact their days sales outstanding and adversely affect their results of operations.

COVID-19 has significantly disrupted financial markets.  The outbreak and the actions taken by federal, state and local governments in response to the outbreak have significantly affected virtually all facets of the U.S. and global economies.  Restrictions on and public concern regarding travel and public interaction have materially curtailed retail and hospitality activity.  The COVID-19 outbreak resulted in the temporary closure of all of the Debtors' retail stores.  And while the Debtors have since reopened all retail locations, there is a significant risk that additional closures are possible.  Additionally, a substantial majority of the Debtors' merchandise is manufactured in numerous locations around the globe.  The timely delivery of merchandise to the Debtors by their brand partners and private label manufacturers could be adversely affected by supply chain disruptions and travel restrictions which could, in turn, negatively impact the Debtors' ability to meet customers' demand.

Global financial markets have experienced significant volatility and losses as a result of the recent COVID-19 outbreak.  Any resulting economic downturn could negatively impact customer demand and spending in the impacted regions and cause an oversupply of goods that could result in meaningful margin pressure.  In response to anticipated liquidity pressures stemming from a potential downturn, many companies are exploring liquidity options, including drawing on revolving debt facilities.

The Debtors are closely monitoring developments in connection with this outbreak.  Restrictions on travel, quarantines and other measures imposed in response to the COVID-19 outbreak, as well as

ongoing concern regarding the virus' potential impact, have had and will likely continue to have a negative effect on economies and financial markets, including supply chain shortages and other business disruptions. The Debtors expect the outbreak will materially affect results ~~in the current and potentially future operating periods;~~during these Chapter 11 Cases and may affect OpCo's operations in the near- and mid-term. ~~h~~However, the duration and extent of ~~potential supply chain, demand~~these and other ~~disruptions~~negative effects is highly uncertain and will depend on future developments with respect to the spread and severity of the virus. An extended period of further economic deterioration could exacerbate the other risks described herein.

Additional effects of the recent conditions in the global economy include higher rates of unemployment, consumer hesitancy, and limited availability of credit, each of which may constrict the Debtors' business operations during these Chapter 11 Cases. These ~~factors~~ have had an effect on the Debtors' revenue growth and incoming payments, and the impact may continue. ~~If these or other conditions limit the Debtors' ability to grow revenue or cause the Debtors' revenue to decline and the Debtors cannot reduce costs on a timely basis or at all, the Debtors' operating results may be materially and adversely~~ for the duration of these Chapter 11 Cases, as well as after the completion of the OpCo Sale. Additionally, as OpCo's financial results are inextricably linked to OpCo's credit quality and financial performance, to the extent that OpCo's operations are affected by these factors, PropCo may be negatively imp~~a~~ffected.

### 4. ~~3.~~ Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' and Subsequently OpCo's and PropCo's Businesses

~~The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.~~ A long period of operations under Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of ~~the Debtors'~~OpCo's and PropCo's businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships, potentially negatively impacting the Debtors' and subsequently OpCo's and PropCo's operations.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. ~~Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection and operates in the retail industry, which has been dramatically affected by the recent COVID-19 outbreak.~~

### 5. ~~4.~~ Financial Results May Be Volatile and ~~May Not Reflect Historical Trends~~Are Not Indicative of Future Results

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated

financial statements.  Moreover, there have been mandates from federal, state and local authorities requiring forced closures of non-essential retailers in response to the recent COVID-19 outbreak, and regional or national surges in COVID-19 cases may require additional closures.  The duration of such closures and the extent of the outbreak's effects on the Debtors' business is highly uncertain and will depend on future developments with respect to the spread and severity of COVID-19.  As a result, the Debtors' historical financial performance will not be indicative of their financial performance after the Petition Date or of the future financial performance of OpeCo or PropePo.

In addition, if the Restructuring Transactions are effectuated, the amounts reported in PropCo's subsequent consolidated financial statements may materially differ compared to the Debtors' historical consolidated financial statements and such difference may be material.  PropCo may also be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.

### 6.  5. PropCo May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, PropCo may become party to litigation.  Any claims against PropCo, whether meritorious or not, could be time-consuming, result in costly litigation, and divert significant resources.  If any of these legal proceedings were to be determined adversely to PropCo, or PropCo were to enter into a settlement arrangement, PropCo could be exposed to monetary damages itthat could have an adverse effect on the PropeCo's business, financial condition and results of operations and therefore any distributions made to Holders of New PropeCo Securities.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims or Interests under the Plan.  It is not possible to predict the potential litigation that PropCo may become party to, nor the final resolution of such litigation.  The impact of any such litigation on PropCo's businesses and financial stability, however, could be material.

### 7.  6. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  Because competition for experienced personnel in the retail industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their business for the duration of these Chapter 11 Cases.  In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations for the duration of these Chapter 11 Cases.

### 8.  7. Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Business, Financial Condition, and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would

be discharged in accordance with the terms of the plan of reorganization.  Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on PropCo's business, financial condition, and results of operations.

## VIII.    SOLICITATION AND VOTING

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.

### A.        Holders of Claims or Interests Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan.  The table in Article III.D of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 4, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Classes 4, 6, 7, 8A, and 8B collectively, the "Voting Classes").  The Holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims or Interests in Classes 1, 2, 3, 5, 9, 10, 11, and 12, as Holders in these Classes are not entitled to vote on the Plan and are deemed to either Accept or Reject the Plan, as applicable.

### B.        Voting Record Date

**The Voting Record Date is October 19, 2020** (the "Voting Record Date").  The Voting Record Date is the date on which it will be determined which Holders of Claims or Interests in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.        Voting on the Plan

**The Voting Deadline is November 17, 2020, at 4:00 p.m. (prevailing Central Time)**.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered as directed, so that your ballot or the master ballot containing your vote is **actually received** by the Claims and Noticing Agent on or before the Voting Deadline.  Ballots or master ballots returned by facsimile will not be counted. Additionally, certain Holders of Class 4, Class 6, or Class 7 Claims may need to abide by certain voting procedures, as discussed further in this section.

---

**DELIVERY OF BALLOTS**

**J. C. PENNEY COMPANY, INC. BALLOTS PROCESSING**
**C/O PRIME CLERK LLC**
**ONE GRAND CENTRAL PLACE**
**60 EAST 42ND STREET, SUITE 1440**

---

| NEW YORK, NY 10165 |
|---|

**PLEASE RETURN A PROPERLY EXECUTED PAPER BALLOT WITH YOUR VOTE**

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE PRIME CLERK LLC TOLL FREE AT (877) 720-6576 (TOLL FREE) OR (646) 979-4417 (INTERNATIONAL). ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED EXCEPT AS OTHERWISE PROVIDED FOR IN THE SOLICITATION PROCEDURES OR IN THE SOLE AND ABSOLUTE DISCRETION OF THE DEBTORS.**

    1.        **Voting Procedures for Certain Holders of Notes in Class 4, Class 6, and Class 7**

Certain voting parties hold their Claims in "street name" through a nominee, including Holders of certain First Lien Notes Claims, Second Lien Notes Claims, and Unsecured Notes Claims. Such Holders may vote on the Plan by one of the following two methods (as selected by such Holder's nominee):

- Complete and sign the enclosed beneficial holder ballot. Return the beneficial holder ballot to your nominee as promptly as possible and in sufficient time to allow such nominee to process your instructions and return a completed master ballot to the Claims and Noticing Agent by the Voting Deadline. If no self-addressed, postage-paid envelope was enclosed for this purpose, contact the Claims and Noticing Agent for instructions; or

- Complete and sign the pre-validated beneficial holder ballot (as described below) provided to you by your nominee. Return the pre-validated beneficial holder ballot to the Claims and Noticing Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Any beneficial holder ballot returned to a nominee will not be counted for purposes of acceptance or rejection of the Plan until such nominee properly completes and delivers to the Claims and Noticing Agent that beneficial holder ballot (properly validated) or a master ballot casting the vote of such holder.

If any Holder holds First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims through more than one nominee, such Holder may receive multiple mailings containing beneficial holder ballots. The Holder should execute a separate beneficial holder ballot for each block of certain First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims that it holds through any particular nominee and return each beneficial holder ballot to the respective nominee in the return envelope provided therewith. Holders who execute multiple beneficial holder ballots with respect to certain First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims held through more than one nominee must indicate on each beneficial holder ballot the names of all such other nominees and the additional amounts of such First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims so held and voted.

A nominee that, on the Voting Record Date, is the record Holder of certain First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims for one or more Holders can obtain the votes of

the Holders of such First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

### (a) Pre-Validated Ballots

The nominee may "pre-validate" a beneficial holder ballot by: (i) signing the beneficial holder ballot and indicating on the beneficial holder ballot the name of the nominee and DTC Participant Number; (ii) indicating on the beneficial holder ballot the amount and the account number of the First Lien Claims, Second Lien Notes Claims, and Unsecured Notes Claims held by the nominee for the Holder; and (iii) forwarding such beneficial holder ballot—together with this Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to, and provided by, the Claims and Noticing Agent, and other materials requested to be forwarded—to the Holder for voting. The Holder must then complete the remaining portions of the beneficial holder ballot and return the beneficial holder ballot directly to the Claims and Noticing Agent in the pre-addressed, postage-paid return envelope so that it is **actually received** by the Claims and Noticing Agent on or before the Voting Deadline. A list of the Holders to whom "pre-validated" beneficial holder ballots were delivered should be maintained by nominees for inspection for at least one year from the Voting Deadline.

### (b) Master Ballots

If the nominee elects not to pre-validate beneficial holder ballots, the nominee may obtain the votes of Holders by forwarding to the Holders the unsigned beneficial holder ballots—together with this Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the nominee, and other materials requested to be forwarded. Each such Holder must then indicate its vote on the beneficial holder ballot, complete the information requested on the beneficial holder ballot, review the certifications contained on the beneficial holder ballot, execute the beneficial holder ballot, and return the beneficial holder ballot to the nominee. After collecting the beneficial holder ballots, the nominee should, in turn, complete a master ballot compiling the votes and other information from the beneficial holder ballots, execute the master ballot, and deliver the master ballot to the Claims and Noticing Agent so that it is **actually received** by the Claims and Noticing Agent on or before the Voting Deadline. All beneficial holder ballots returned by holders should either be forwarded to the Claims and Noticing Agent (along with the master ballot) or retained by nominees for inspection for at least one year from the Voting Deadline. EACH NOMINEE SHOULD ADVISE ITS ELIGIBLE HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE CLAIMS AND NOTICING AGENT SO THAT IT IS **ACTUALLY RECEIVED** BY THE CLAIMS AND NOTICING AGENT ON OR BEFORE THE VOTING DEADLINE.

### D. Ballots Not Counted

**No ballot will be counted toward Confirmation if, among other things**: (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was sent to the Debtors, the Debtors' agents/representatives (other than the Claims and Noticing Agent), or the Debtors' financial or legal advisors instead of the Claims and Noticing Agent; (5) it is unsigned; or (6) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Scheduling Order to be entered by the Bankruptcy Court for additional requirements with respect to voting to accept or reject the Plan.**

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION AND VOTING PROCEDURES PROVIDED IN THIS ARTICLE VIII OF THE DISCLOSURE STATEMENT WILL <u>NOT</u> BE COUNTED.**

### E.    Confirmation Hearing.

The Bankruptcy Court has scheduled the Confirmation Hearing for November 24, 2020 at 9:00 a.m. (prevailing Central Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than November 17, 2020, at 4:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the New York Times (national edition) and the Houston Chronicle, to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

## IX.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims or Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11 for plan confirmation; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that the non-accepting Holder would receive or retain if the debtors liquidated under chapter 7 on such date.

The Debtors believe that liquidation of the Debtors' estate under chapter 7 of the Bankruptcy Code would not result in any Holder receiving any greater recovery as compared to distributions contemplated under the Plan.

*First*, the Bankruptcy Court is currently scheduled to consider approval of the Asset Purchase Agreement pursuant to section 363 of the Bankruptcy Code on November 2, 2020 (the "Sale Hearing"). The Plan assumes that the Asset Purchase Agreement has been approved, and a section 363 Sale Order has been entered, on or shortly after November 2, 2020, and prior to the confirmation hearing scheduled for November 24, 2020 and November 25, 2020.

*Second*, the Debtors and the parties to the Asset Purchase Agreement expect to ask the Bankruptcy Court to include in the Sale Order a provision binding any subsequent chapter 7 trustee to the terms of the Sale Order.  As will be more fully set forth at the hearing to consider approval of the Asset Purchase Agreement, it will be important for OpCo—as the operating business—to close the OpCo Sale as expeditiously as possible following the Sale Hearing to, among other things, restore vendor confidence in advance of the holiday season and ensure the operating business (and the employees that rely on the stability of that business) returns to normal in advance of the critical holiday season.  As a result, it is highly likely that, if the section 363 Sale Order has been entered, the OpCo Sale will close prior to the confirmation hearing.

During the period between the OpCo Sale closing and the Effective Date, OpCo and the Debtors will enter into the Master Lease Agreement with the understanding that upon the Effective Date, the Debtors will assign the Master Lease Agreement to PropCo, such that after the Effective Date, the parties to the Master Lease will be OpCo, on the one hand, and PropCo on the other hand. Importantly, it is the Debtors' expectation that the OpCo Purchaser will be unwilling to close the OpCo Sale if a chapter 7 trustee is not bound by the Sale Order and that, as a result, OpCo could find itself party to a Master Lease Agreement with no control or visibility into its counterparty.

*Third*, it is the Debtors' expectation that if the Bankruptcy Court does not approve the Asset Purchase Agreement on November 2, 2020 or soon thereafter (or enters a Sale Order that is not acceptable to the parties to the Asset Purchase Agreement), the Debtors and the other parties to the Asset Purchase Agreement will not pursue the Plan as proposed and will consider, among other alternatives, modifications to both the Asset Purchase Agreement and the Plan in response to the Bankruptcy Court's ruling at such time.

In sum, the Plan is premised on: (a) the Bankruptcy Court's approval on or shortly after November 2, 2020, of the Asset Purchase Agreement under a Sale Order containing provisions binding a chapter 7 trustee (based on the record set forth at the hearing to consider approval of the Asset Purchase Agreement); and (b) the closing of the OpCo sale prior to the confirmation hearing scheduled to begin on November 24, 2020.  Accordingly, if these cases were converted to a Chapter 7, the estate (and any appointed Chapter 7 Trustee) would still be contractually bound by the Asset Purchase Agreement and bound to comply with the terms of the Sale Order.  Upon consummation of the transactions contemplated by the Asset Purchase Agreement and the Sale Order, the only assets remaining in the Debtors' Estates in a Chapter 7 liquidation would be "Excluded Assets" and reserves set aside for the sole purpose of satisfying Administrative Claims and Priority Claims (which are obligations of the Debtors under the Asset Purchase Agreement) as well as a wind-down reserve (to administer the Excluded Assets and wind-down the Debtors following the close of the transactions contemplated by the Asset Purchase Agreement).  These Excluded Assets are not expected to have any distributable liquidation value.  The result is that conversion to a Chapter 7, and payment of a Chapter 7 Trustee's fees and other administrative expenses, would not result in any additional recovery to any Holder of any Claim.

### C.    Market Test

The Debtors, with the assistance of Lazard, have conducted a comprehensive marketing process for the sale of substantially all of the Debtors' Assets.  During that Market Test, the Debtors received

input from each of their major creditor constituencies as well as a broad range of potential third-party acquirers. In support of the Market Test, the Debtors paid certain Court-approved work fees to select potential bidders to signal the Debtors' seriousness in pursuing all value-maximizing bids. These payments ensured that all potential bidders had the resources necessary to evaluate a potential transaction. For more information regarding the marketing process and Market Test, *see* Section II of this Disclosure Statement, entitled "Preliminary Statement," which begins on page 1.

After evaluating all available restructuring alternatives, the Debtors determined that the Restructuring Transaction, as embodied in the Plan and the Asset Purchase Agreement, is the highest and otherwise best available transaction in light of, among other factors, (a) the fact that the Asset Purchase Agreement and Plan collectively provide for a going-concern transaction that best maximizes the long-term value of the Debtors' businesses; (b) the consideration provided under the transactions reflected in the Asset Purchase Agreement and the Plan; and (c) the greater certainty of closing provided by the Asset Purchase Agreement compared to other potential but less actionable proposals. For more information regarding the Restructuring Transactions, see Article IV, Section B of the Plan, entitled "Restructuring Transactions," which begins on page 27.

This information regarding the Market Test is presented solely for the purpose of providing "adequate information" under section 1125 of the Bankruptcy Code to enable the Holders of Claims entitled to vote to accept or reject the Plan make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of Claims against the Debtors or any of their affiliates.

The Debtors' Marketing Test should be considered in conjunction with the "Risk Factors" described in Section VII, entitled "Risk Factors," which begins on page 30. The valuation analysis is based on data and information as of that date.

### D.       Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

The Debtors believe that PropCo will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

### E.       Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[14]

---

[14]     A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of allowed interests in that class, counting only those interests that have *actually* voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.E of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class shall be deemed to have accepted the Plan.

### F.     Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code. To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.     No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.     Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than

100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cram down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims or Interests in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims or Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

## X.    CERTAIN SECURITIES LAW MATTERS

The Debtors believe that the New PropCo Securities will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and any applicable state securities law (a "Blue Sky Law").  The Debtors further believe that the offer, sale, issuance, and initial distribution of the New PropCo Securities by PropCo pursuant to the Plan is exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law as described in more detail below.

### A.    Issuance of Securities under the Plan

As discussed herein, the Plan provides for the offer, issuance, sale, and distribution of the New PropCo Securities (the "1145 Securities").

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any Blue Sky Laws regulating the issuance of a security do not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property.  The Debtors believe that the issuance of the 1145 Securities, in exchange for the Claims and Interests described above satisfy the requirements of section 1145(a) of the Bankruptcy Code.

Accordingly, no registration statement will be filed under the Securities Act or any state securities laws with respect to the initial issuance of the New PropCo Securities.  Recipients of the New PropCo Securities are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.

### B.    Subsequent Transfers

The 1145 Securities may be freely transferred by most recipients following the initial issuance under the Plan, and all resales and subsequent transfers of the 1145 Securities are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities.  Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of

such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all "affiliates" which are all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  ~~The Debtors intend to propose a confirmation order that includes a finding that a Holder with less than 50 percent of all outstanding New PropCo Securities will be deemed not to be an "underwriter" for purposes of Section 1145 of the Bankruptcy Code; however no assurance can be given that the Bankruptcy Court will grant such request.~~

Resales of 1145 Securities by entities deemed to be "underwriters" (which definition includes Controlling Persons) are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of New PropCo Securities who are deemed to be "underwriters" may be entitled to resell their New PropCo Securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New PropCo Securities would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New PropCo Securities and, in turn, whether any Person may freely resell New PropCo Securities.

**Persons who receive securities under the Plan are urged to consult their own legal advisor with respect to the restrictions applicable under the federal or state securities laws and the circumstances under which securities may be sold in reliance on such laws.  The foregoing summary discussion is general in nature and has been included in this Disclosure Statement solely for informational purposes.  JCPenney makes no representations concerning, and do not provide, any opinions or advice with respect to the securities or the bankruptcy matters described in this Disclosure Statement.  In light of the uncertainty concerning the availability of exemptions from the relevant provisions of federal and state securities laws, we encourage each recipient of securities and party in interest to consider carefully and consult with its own legal advisors with respect to all such matters.  Because of the complex, subjective nature of the question of whether a security is exempt from the registration requirements under the federal or state securities laws or**

whether a particular recipient of securities may be an underwriter, JCPenney makes no representation concerning the ability of a person to dispose of the securities issued under the Plan.

## XI.      CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN

### A.      Introduction.

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims.  The following summary does not address the U.S. federal income tax consequences to Holders of Claims not entitled to vote to accept or reject the Plan.  This summary is based on the U.S. Internal Revenue Code of 1986, as amended ("IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, banks, broker-dealers, mutual funds, trusts, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, small business investment companies, foreign taxpayers, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, Persons who are related to the Debtors within the meaning of the IRC, Persons that actually or constructively own shares in the Debtors representing 10% or more of the Debtors' voting power or value, Persons that will actually or constructively own more than 5% of the New PropCo Securities, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, Persons subject to the alternative minimum tax, accrual-method Holders that prepare an "applicable financial statement" (as defined in Section 451 of the IRC), real estate investment companies, regulated investment companies and those holding Claims, or who will hold consideration received pursuant to the Plan, as part of a hedge, straddle, conversion, or other integrated transaction).  No aspect of state, local, non-U.S. or non-income taxation is addressed.

Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds Claims as "capital assets" (within the meaning of section 1221 of the IRC).  This summary also assumes that the various debt and other arrangements to which the Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below.  This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.  This

summary does not address the U.S. federal income tax consequences associated with consideration being received only pursuant to the Asset Purchase Agreement.

For purposes of this discussion, a "U.S. Holder" is a Holder that for U.S. federal income tax purposes is:  (1) an individual citizen or resident of the United States; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC).  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is not a U.S. Holder or a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

    **B.**    **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

        **1.**    **Characterization of the Restructuring Transactions.**

The Restructuring Transactions are intended to be structured as a taxable sale of the assets and/or stock of the Debtors and/or their subsidiaries (a "Taxable Transaction").  Gain or loss, if any, upon the transfer will be recognized based on the difference between the tax basis in the assets that were disposed of and the sale price allocable to such assets.  Realized gain, if any, may be offset by current-year losses and deductions, which may include interest deductions that may be (or become) available under section 163(j) of the IRC, and net operating loss ("NOL") carryforwards from prior years; *provided*, that any such gain that is ordinary in nature may not be offset by capital losses.  Any taxable gain remaining after such offsets would result in a cash tax obligation.  The Debtors do not currently anticipate any material federal income cash tax liability as a result of the Restructuring Transactions.

To the extent the Debtors are treated, for tax purposes, as continuing to own any assets that are sold or otherwise collected upon following the implementation of the Restructuring Transactions (*i.e.*, during the Wind-Down), the sale of or collection upon such assets will give rise to taxable income or loss, as the case may be, depending upon the Debtors' tax basis in such assets.  So long as such sales or collections occur prior to the end of the tax year in which Claims against the Debtors are discharged, the Debtors' available tax attributes will be available to offset any resulting taxable income.  It is unclear whether the Debtors will incur any taxable income as a result of the sale of, or collection upon, any assets

that were not disposed of in the Restructuring Transactions.

### 2.      Cancellation of Debt and Reduction of Tax Attributes.

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the issue price of new debt instruments, (ii) the fair market value of other non-cash consideration, and (iii) the amount of cash, in each case, given in satisfaction of such indebtedness at the time of the exchange.

A taxpayer will not, however, be required to include COD Income in gross income pursuant to section 108 of the IRC if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes and aggregate tax basis in assets (including the stock of subsidiaries) by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined.  In general, tax attributes will be reduced in the following order:  (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject immediately after the discharge); (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers.  Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.  Interest expense deductions allowable under section 163(j) of the IRC (and carryforwards of any such deductions) are not subject to reduction under these rules.  Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Where the taxpayer joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that certain tax attributes of other members of the group also be reduced.

The exact amount of any COD Income and, accordingly, the amount of tax attributes required to be reduced, will depend, in part, on the issue price of new debt instruments, if any, and the value of non-cash consideration, neither of which can be determined until after the Effective Date. As a general matter, the rules related to COD Income is only expected to be relevant to the Debtors to the extent that taxable income is realized following the conclusion of the current tax year.  In that case, the Debtors' existing tax attributes would, to the extent they are subject to reduction as a result of the rules described above, be unavailable to offset any taxable income arising in, *e.g.*, the Wind-Down, after the conclusion of the current tax year.

### 3.      Transfer of Assets to PropCo.

Pursuant to the Plan, on or before the Effective Date, the Debtors will transfer to PropCo all of the Debtors' right, title and interest in the PropCo Acquired Assets and PropCo Assumed Liabilities.  On the Effective Date, the New PropCo Securities will be distributed to Holders of DIP Claims and First Lien Claims. As currently contemplated, PropCo is intended to qualify under United States Treasury Regulation Section 301.7701-4(d) as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). Establishing a trust for the purpose of liquidating assets does not automatically result in treatment as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining a ruling as to the status of a liquidating trust under a Chapter 11 plan. PropCo is expected to be

structured with the intention of complying with such general criteria, however, no opinion of counsel or ruling has been sought regarding the tax characterization of PropCo. If PropCo is not treated as a grantor trust, it is expected to be treated as a partnership for U.S. federal income tax purposes.

Assuming PropCo qualifies as a liquidating trust for U.S. federal income tax purposes, the Debtors' transfer of assets to PropCo will be treated as the deemed transfer of an undivided interest in such assets by the Debtors directly to Holders of DIP Claims and Class 4 First Lien Claims in full or partial satisfaction of such Claims, followed by the deemed transfer of such assets by such Holders to PropCo in exchange for the New PropCo Securities. The Debtors' deemed transfer of assets directly to Holders of DIP Claims and Class 4 First Lien Claims in satisfaction of such Claims would be a taxable exchange and, as described above, is expected to result in the recognition of gain or loss by the Debtors, depending in part on the purchase price treated as paid for such assets and the Debtors' tax basis in such assets. The Debtors believe that their available tax attributes should offset gain (if any) on such transfer and do not expect any material federal income tax cash liability as a result of the transfer.

There is no assurance, however, that the IRS would not take a contrary position as to the treatment of PropCo as a liquidating trust, in which case, the tax consequences of the Debtors' transfer to PropCo may be different that described above. All Holders are urged to consult their tax advisors regarding the U.S. federal income tax treatment of PropCo.

**C.      Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Allowed Claims.**

The character as capital or ordinary of any gain or loss recognized by a U.S. Holder as a result of receiving its distribution under the Plan will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands (including whether the Claim constitutes a capital asset), whether the Claim was purchased at a discount, whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim, and whether any part of the U.S. Holder's recovery is treated as being on account of accrued but untaxed interest. Accrued interest and market discount are discussed below. If recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss if the U.S. Holder held its Claim for more than one year at the time of the exchange.

Prior to the Effective Date, holders of First Lien Claims will, pursuant to the Asset Purchase Agreement, transfer a portion of their First Lien Claims to the OpCo Purchaser in exchange for certain consideration to facilitate the OpCo Purchaser's acquisition of OpCo from the Debtors. Because such distributions are not being received pursuant to the Plan, the receipt of such additional consideration in exchange for First Lien Claims is not addressed here, and the U.S. federal income tax consequences of owning and disposing of such other forms of consideration is not discussed below. This discussion assumes that the sale of certain Claims to the OpCo Purchaser is respected for U.S. federal income tax purposes as a transaction that is separate and distinct from the receipt of the New PropCo Securities pursuant to the Plan. In the event that characterization is not respected, the tax consequences of the Plan discussed below could be materially different.

U.S. Holders are urged to consult their tax advisors regarding the tax consequences of the sale of First Lien Claims to the OpCo Purchaser and the other aspects of the Restructuring Transactions.

**1.      Consequences to U.S. Holders of Class 4 First Lien Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of the portion of their First Lien Claims allocated to the Credit Bid, each U.S. Holder of a Class 4 First

Lien Claim shall receive its Pro Rata share of New PropCo Securities and potentially cash. Such U.S. Holders generally should be treated as receiving their distributions under the Plan in a taxable exchange under section 1001 of the IRC.

Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder of such a Claim generally should recognize gain or loss equal to the difference, if any, between (a) the sum of (i) cash, if any, (ii) the amount treated as the fair market value of the underlying assets attributable to its New PropCo Securities based on the Restructuring Transactions and (iii) the fair market value (or issue price, in the case of debt instruments) of any other non-cash consideration, in each case, received in exchange for such U.S. Holder's Claim, and (b) the U.S. Holder's adjusted tax basis, if any, in such Claim.

Subject to the rules regarding accrued but untaxed interest, a U.S. Holder generally should obtain an aggregate tax basis in its undivided beneficial interest in the underlying assets transferred to PropCo equal the amount taken into account by such U.S. Holder for purposes of determining gain or loss on its Claim, increased by its share of certain liabilities assumed by PropCo and liabilities (if any) to which such assets remain subject upon transfer to PropCo. A U.S. Holder's holding period for the New PropCo Securities and the undivided beneficial interest in the underlying assets received in exchange for such U.S. Holder's Claim should begin on the day following the date on which such property is distributed to the U.S. Holder in satisfaction of its Claim.

The tax basis of any non-cash consideration determined to be received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for such non-cash consideration should begin on the day following receipt of such property.

2.      **Consequences to U.S. Holders of [Class 6 Second Lien Notes Claims, Class 7 Unsecured Notes Claims, andClass 8A General Unsecured Claims] or Class 8B Key Go Forward Supplier Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release, and discharge of their Claims, each U.S. Holder of a Class 6 Second Lien Notes Claim, a Class 7 Unsecured Notes Claim, a Class 8A General Unsecured Claim or a Class 8B Key Go Forward Supplier Claim shall receive its Pro Rata share of cash remaining in the Wind-Down Reserve, to the extent available once all Allowed Claims entitled to payment therefrom have been satisfied, no Disputed Claims that may be entitled to payment therefrom remain to be adjudicated, and all First Lien Claims have been satisfied in full.

Such U.S. Holders generally should be treated as receiving their distributions under the Plan in a taxable exchange under section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, each U.S. Holder of such a Claim generally should recognize gain or loss equal to the difference, if any, between the amount of cash received in exchange for such U.S. Holder's Claim, and the U.S. Holder's adjusted tax basis, if any, in such Claim.

[To Come.]

3.      **Accrued Interest.**

To the extent that any amount received by a U.S. Holder of a Claim under the Plan is attributable to accrued but untaxed interest or original issue discount ("OID") during its holding period on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder). Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss to the extent that any

accrued interest on the debt instruments constituting such Claim was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration received by a U.S. Holder is not sufficient to fully satisfy all principal and interest on Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Claims in each Class will be allocated first to the principal amount of Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest.  Certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 4.      Market Discount.

In the case of a U.S. Holder that acquired its Claim with market discount, any gain recognized on the sale or exchange of such Claim generally will be treated as ordinary income to the extent of the market discount treated as accruing during such U.S. Holder's holding period for such Claim.  Any such market discount is generally the excess of the "revised issue price" of such Claim over such U.S. Holder's initial tax basis in such Claim upon acquisition, if such excess equals or exceeds a statutory *de minimis* amount.  Such market discount is generally treated as accruing during such U.S. Holder's holding period for such Claim on a straight-line basis or, at the election of such U.S. Holder, on a constant yield basis, unless such U.S. Holder has previously elected to include such market discount in income as it accrues.  For this purpose, the "revised issue price" of a Claim generally equals its issue price, increased by the amount of OID that has accrued over the term of the Claim.  U.S. Holders who acquired their Claims other than at original issuance should consult their own tax advisors regarding the possible application of the market discount rules to their Claims.

### 5.      Limitations on Use of Capital Losses.

A U.S. Holder who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  A corporate U.S. Holder who has more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

### 6.      U.S. Federal Income Tax Consequences to U.S. Holders of Ownership of the New PropCo Securities.

(a)      *Tax Classification of PropCo.*

As currently contemplated, PropCo is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes under Treasury Regulations Section 301.7701-4(d). In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., all income and loss is taxed on a pass-through basis, directly to the trust beneficiaries). However, merely establishing a trust for the purpose of liquidating assets does not automatically result in treatment as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining a ruling as to the status of a liquidating trust under a Chapter 11 plan. PropCo is expected to be structured with the intention of complying with such general criteria. As such, PropCo will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of PropCo.  The PropCo Trustee shall be the trustee of PropCo and shall have the rights, powers, and obligations set forth in PropCo Trust Agreement.  All parties will be required for U.S. federal income tax purposes to treat PropCo as a liquidating trust taxed as a grantor trust, with each Holder of a First Lien Claim that receives New PropCo Securities being treated as the owner and grantor of an undivided interest in its respective share of the underlying assets of PropCo that they are deemed to contribute.

No ruling from the IRS is expected to be requested concerning the tax status of PropCo as a liquidating trust taxed as a grantor trust. In the absence of a ruling, there can be no assurances that the IRS would not take a contrary position either from the inception of PropCo or at any time prior to the termination of PropCo when it might determine that PropCo no longer qualifies as a liquidating trust for U.S. federal income tax purposes. Most significantly, PropCo's status as a liquidating trust might be jeopardized after it has initially satisfied the requirements to qualify as a liquidating trust if any of the following were to occur prior to the termination of PropCo: (i) the liquidation purpose of PropCo becomes so obscured by business activities that the declared purpose of liquidation can be said to be lost or abandoned; (ii) the term of PropCo is unreasonably prolonged; or (iii) all of PropCo's net income and net proceeds from the sale of its assets are not distributed at least annually to its beneficiaries, subject to an exception for amounts retained that are reasonably necessary to maintain the value of the trust's assets or to meet claims and contingent (or disputed) claims. If the IRS were to successfully challenge the classification of PropCo, the U.S. federal income tax consequences to PropCo, the Holders of First Lien Claims receiving the New PropCo Securities pursuant to the Plan and the Debtors could vary from those discussed herein (including the possibility of entity-level tax on income of PropCo). If, contrary to the parties' intent, PropCo were determined to be a business entity for U.S. federal income tax purposes, it would be treated as a partnership unless it was considered a "publicly traded partnership" taxable as a corporation.  If PropCo is treated as a partnership it is not expected to be treated as a "publicly traded partnership" taxable as a corporation.

The following discussion assumes that PropCo will be respected as a liquidating trust taxed as a grantor trust for U.S. federal income tax purposes.  Holders are urged to consult their tax advisors regarding the U.S. federal income tax treatment of PropCo.

(b)      *Tax Treatment of Funding PropCo.*

Pursuant to the Plan, on the Effective Date, the Debtors will transfer all of the Debtors' right, title and interest in the PropCo Acquired Assets and PropCo Assumed Liabilities to PropCo, on behalf of the Holders of DIP Loans and Class 4 First Lien Claims.

All parties (including, without limitation, the Debtors, the PropCo Trustee and the Holders of DIP Loans and Holders of First Lien Claims receiving the New PropCo Securities pursuant to the Plan) will be required to treat the Debtors' transfer to PropCo as (1) a transfer of the assets (subject to any

obligations relating to such assets) directly from the Debtors to the Holders of DIP Loans and Class 4 First Lien Claims in full or partial satisfaction of such Claims, followed by (2) such Holders' contribution of the assets to PropCo in exchange for New PropCo Securities. Accordingly, except in the event of contrary definitive guidance, holders of New PropCo Securities will be treated, and required to report, for U.S. federal income tax purposes as the grantors and direct owners of an undivided interest in their respective share of the underlying assets of PropCo. The beneficiaries of PropCo shall report consistently with the valuation of the PropCo Acquired Assets transferred to PropCo as determined by the PropCo Trustee.

(c)    *Income with Respect to the New PropCo Securities.*

For all applicable U.S. federal income tax purposes, the parties will be required to treat PropCo as a liquidating trust taxed as a grantor trust of which Holders of DIP Loans and First Lien Claims receiving the New PropCo Securities pursuant to the Plan are the owners and grantors. Accordingly, each holder of New PropCo Securities will be treated for U.S. federal income tax purposes as the direct owner of an undivided interest in the underlying assets of PropCo, consistent with its economic interests therein. All income, gain, loss, deduction or credit recognized or incurred by PropCo will be allocated among holders of New PropCo Securities in accordance with each such holder's New PropCo Securities. Such items will be treated as directly earned and incurred by the holders of New PropCo Securities with respect to such holders' interests in the underlying assets of PropCo (and not as income or loss with respect to the prior Claims with respect to which such holders received their New PropCo Securities). Accordingly, any amount a holder receives as a distribution from PropCo in respect of its New PropCo Securities should not be included, for U.S. federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such holder's New PropCo Securities.

Upon PropCo's sale or other disposition (or deemed disposition) of any assets, each holder of New PropCo Securities must report on its U.S. federal income tax return its share of any gain or loss measured by the difference between (1) its share of the amount of cash and/or the fair market value of any property received by PropCo in exchange for the assets so sold or otherwise disposed of and (2) such holder's adjusted tax basis in its share of such assets. The character of any such gain or loss to the holder of New PropCo Securities will be determined as if such holder had, itself, directly sold or otherwise disposed of the relevant assets.

All of the income of PropCo will be treated as subject to tax on a current basis. Each holder of New PropCo Securities will be required to report its share of any income, gain, loss, deduction and credit on its U.S. federal income tax return. The character of such items to any holder and the ability of such holder to benefit from any deductions or losses will depend on the particular situation of the holder. The U.S. federal income tax reporting obligation of a holder of New PropCo Securities is not dependent upon PropCo distributing any cash or other proceeds. Therefore, a holder of New PropCo Securities could incur a U.S. federal income tax liability regardless of the fact that PropCo has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its New PropCo Securities, the holder may be allowed a subsequent or offsetting loss. Because the holder is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed as appropriate at the time the cash was earned or received by PropCo), a distribution of cash or other assets by PropCo will not, in and of itself, constitute taxable income to a holder.

(d)    *Income Tax Reporting by PropCo.*

The trustee for PropCo will file federal income tax returns for PropCo as a grantor trust pursuant

to Section 671 of the IRC and Treasury Regulations Section 1.671-4 promulgated thereunder. Although PropCo will not pay tax, the PropCo Trustee will file a blank IRS Form 1041 (U.S. Income Tax Return for Estates and Trusts) annually, attach a separate statement to that form and issue such statement to each holder of New PropCo Securities, separately stating each such holder's Pro Rata portion of PropCo's items of income, gain, loss, deduction, and credit. The trustee will instruct the holders of New PropCo Securities to use the information provided to them in the annual statements in preparing their U.S. federal income tax returns. The tax return of each holder of New PropCo Securities must treat any reported items attributable to their New PropCo Securities in a manner that is consistent with the treatment of such items on PropCo's return and attached statements, unless such holder notifies the IRS of any inconsistent treatment.

### D.     Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Allowed Claims.

This discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders and does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S. and non-income tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of consideration received under the Plan.

#### 1.     Gain Recognition with Respect to Claims.

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

#### 2.     Accrued Interest.

Subject to the discussion of backup withholding and FATCA, payments to a non-U.S. Holder that are attributable to accrued interest generally will not be subject to U.S. federal income tax or withholding pursuant to the portfolio interest exemption, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of JCP's stock entitled to vote, within the meaning of Section 871(h)(3) of the IRC and Treasury Regulations thereunder;

- the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to JCP, actually or constructively through the ownership rules under Section 864(d)(4) of the IRC;

- the Non-U.S. Holder is a bank that is receiving the interest on an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business, as described in section 881(c)(3)(A) of the IRC; or

- such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for the portfolio interest exemption generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued interest. For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and, as applicable, must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### 3.    PropCo Income.

PropCo is being formed for the purpose of disposing of its assets and distributing the proceeds to the holders of New PropCo Securities and is not intended to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of PropCo. However, pending sale of its assets, PropCo will receive rent from OpCo pursuant to the Master Lease Agreement. While the Master Lease Agreement is a triple net lease pursuant to which all maintenance of the underlying properties is the responsibility of OpCo. PropCo's real estate activities may nonetheless be treated as a U.S. trade or business for U.S. federal income tax purposes and, to the extent that such activities are so treated, a Non-U.S. Holder would be deemed to be engaged in that underlying U.S. trade or business. If PropCo is treated as engaged in a U.S. trade or business, a Non-U.S. Holder owning New PropCo Securities would likely be treated as engaged in a U.S. trade or business. In that case, a Non-U.S. Holder's share of PropCo's effectively connected income would be subject to tax at normal graduated U.S. federal income tax rates and, if the Non-U.S. Holder is a corporation for U.S.

federal income tax purposes, may also be subject to U.S. branch profits tax. A Non-U.S. Holder generally will be required to file a U.S. federal income tax return if PropCo is deemed to be engaged in a U.S. trade or business.  Each Non-U.S. Holder receiving New PropCo Securities should consult their own tax advisor regarding the U.S. federal income tax consequences to such Non-U.S. Holder of owning New PropCo Securities.

<strong>4.        Income with Respect to PropCo's Disposition of Assets.</strong>

In general, a Non-U.S. Holder of New PropCo Securities would not be subject to U.S. federal income tax or U.S. federal withholding tax with respect to amounts received on account of its New PropCo Securities that are attributable to the disposition of underlying assets of PropCo unless (a) in the case of gain only, such Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition, and certain other requirements are met; (b) any gain attributable to the disposition is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the U.S. (and, if required by any applicable tax treaty, is attributable to a permanent establishment maintained by the Non-U.S. Holder in the United States) or (c) the assets constitute USRPIs for U.S. federal income tax purposes.  If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the disposition in the same manner as a U.S. Holder.  In addition, a Non-U.S. Holder that is a corporation also may be subject to a branch profits tax equal to 30 percent (or such lower rate specified by an applicable tax treaty) of its effectively connected earnings and profits for the taxable year, as adjusted for certain taxes. If the third exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax on any recognized gain attributable to the disposition of all or a portion of its USRPI and will be required to file U.S. federal income tax returns. Under the Foreign Investment in Real Property Tax Act ("FIRPTA"), taxable gain from the disposition of a USRPI (generally equal to the difference between the amount realized on the disposition and the Non-U.S. Holder's adjusted tax basis in such USRPI) will constitute effectively connected income, subject to U.S. federal net income tax in the hands of a Non-U.S. Holder in the same manner as a U.S. Holder. The PropCo Trustee would be required to withhold tax at the highest applicable rate on any gain allocable to the Non-U.S. Holder's New PropCo Securities (unless either a special large trust election is made or the New PropCo Securities are considered to be regularly traded on an established securities market, in which case the applicable withholding agent will withhold tax at the highest applicable rate on distributions to Non-U.S. Holders that are attributable to gain from the disposition of USRPIs), although this amount generally would be allowed as a credit against the Non-U.S. Holder's federal income tax liability described in the preceding sentence and may entitle the Non-U.S. Holder to a refund, provided that the Non-U.S. Holder properly and timely files a tax return with the IRS.

<strong>5.        Disposition of New PropCo Securities.</strong>

The disposition of New PropCo Securities generally will be treated for U.S. federal income tax purposes as though the holder of such New PropCo Securities disposed of an undivided interest in each of the underlying assets of PropCo. In particular, the tax consequences of a U.S. Holder's disposition of the New PropCo Securities will depend on whether the New PropCo Securities are considered to be regularly traded on an established securities market.  As discussed above, PropCo's assets consist primarily of real properties constituting USRPIs. If the New PropCo Securities are not considered to be regularly traded on an established securities market to the extent that amounts received on the disposition of New PropCo Securities are attributable to the holder's deemed disposition of underlying assets that

64

constitute USRPIs, such amounts would be treated as effectively connected income subject to U.S. federal net income tax in the hands of a Non-U.S. Holder in the same manner as a U.S. Holder. Further, the buyer of such New PropCo Securities generally would be required to withhold 15 percent of the amount realized on such New PropCo Securities to the extent the disposition of such New PropCo Securities is attributable to the deemed disposition of underlying assets constituting USRPIs.

To the extent that amounts received on a Non-U.S. Holder's disposition of New PropCo Securities are attributable to the deemed disposition of PropCo's underlying assets (if any) that do not constitute USRPIs, such Non-U.S. Holder generally would not be subject to U.S. federal income tax or U.S. federal withholding tax with respect to amounts unless (a) in the case of gain only, such Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition, and certain other requirements are met or (b) any gain attributable to the disposition is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the U.S. (and, if required by any applicable tax treaty, is attributable to a permanent establishment maintained by the Non-U.S. Holder in the United States). If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the disposition in the same manner as a U.S. Holder.  In addition, a Non-U.S. Holder that is a corporation also may be subject to a branch profits tax equal to 30 percent (or such lower rate specified by an applicable tax treaty) of its effectively connected earnings and profits for the taxable year, as adjusted for certain taxes.

If the New PropCo Securities are considered to be regularly traded on an established securities market, then for purposes of FIRPTA, the disposition of the New PropCo Securities generally will be subject to the rules under FIRPTA that govern interests in publicly traded corporations.  As such, the New PropCo Securities would only be considered USRPIs in the hands of a holder of New PropCo Securities that, at any time during an applicable measuring period, owns more than 5% of the New PropCo Securities (the "5% Public Holder Exception").  A Non-U.S. Holder that meets the 5% Public Holder Exception would not be subject to tax under FIRPTA on the disposition of the New PropCo Securities, though such a Non-U.S. Holder could still be subject to U.S. federal income tax on the disposition if, as described in the prior paragraph, (a) in the case of gain only, such Non-U.S. Holder is a nonresident alien individual present in the United States for 183 days or more during the taxable year of the disposition, and certain other requirements are met or (b) any gain attributable to the disposition is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the U.S. (and, if required by any applicable tax treaty, is attributable to a permanent establishment maintained by the Non-U.S. Holder in the United States).  It is not clear whether the New PropCo Securities will be considered to be regularly traded on an established securities market.

## 6.     FATCA.

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.  FATCA withholding will apply even if the applicable

payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

### 7. Information Reporting and Back-Up Withholding.

The Debtors and applicable withholding agents will withhold all amounts required by law to be withheld from any amounts payable under the Plan or in connection with payments made on account of consideration received pursuant to the Plan. The Debtors will comply with all applicable information reporting requirements of the IRC. The IRS may make the information returns reporting such amounts available to the tax authorities in the country in which a Non-U.S. Holder is resident. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding (currently at a rate of 24 percent) with respect to distributions or payments made pursuant to the Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8) (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Holders subject to the Plan are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  October 2~~0~~6, 2020

J. C. Penney Company, Inc.
on behalf of itself and all other Debtors

/s/ *~~DRAFT~~Bill Wafford*
_____
Bill Wafford
Chief Financial Officer
J. C. Penney Company, Inc.

## Exhibit A

**Plan of Reorganization**

*Filed at Docket No. 1591*

## Exhibit B

**Restructuring Support Agreement**

## Exhibit C

### Corporate Organization Chart



| Summary report: Litera® Change-Pro for Word 10.8.2.11 Document comparison done on 10/26/2020 2:29:54 PM | |
|---|---|
| **Style name:** Color (Kirkland Default) | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** iw://DMS.KIRKLAND.COM/LEGAL/72009135/1 | |
| **Modified DMS:** iw://DMS.KIRKLAND.COM/LEGAL/72009135/11 | |
| **Changes:** | |
| Add | 214 |
| Delete | 169 |
| Move From | 1 |
| Move To | 1 |
| Table Insert | 9 |
| Table Delete | 13 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 407 |