### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| J. C. PENNEY COMPANY, INC., *et al.*,[1] | § | Case No. 20-20182 (DRJ) |
|  | § |  |
| Debtors. | § | (Jointly Administered) |
|  | § |  |

### DEBTORS' WITNESS DISCLOSURE
### FOR CONFIRMATION HEARING

Pursuant to the schedule for Confirmation Proceedings contained in the Disclosure Statement [ECF No. 1655], the above-captioned debtors (the "Debtors") submit their Witness Disclosure for the Confirmation Hearing set to begin **November 24, 2020**, **at 9:00 a.m. (CT)**:

The Debtors may call any one or more of the following witnesses:

1.      David Kurtz, Vice Chairman and Global Head of Restructuring, Lazard Ltd (fact and expert witness)[2];

2.      James A. Mesterharm, Managing Director, AlixPartners LLP (fact and expert witness)[3];

3.      Bill Wafford, Chief Financial Officer, J. C. Penney Company, Inc. (fact witness);

4.      Any witness designated by any another party, any witness necessary to lay the foundation for admission of exhibits, and any witnesses necessary for rebuttal.

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://cases.primeclerk.com/JCPenney. The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.

[2]    Initial report attached as Exhibit A.

[3]    Initial report attached as Exhibit B.

The Debtors reserve their right to supplement or amend this list based on the arguments made or evidence adduced by opponents (if any) to confirmation of the proposed plan of reorganization.

Dated: November 6, 2020

/s/ *Matthew D. Cavenaugh*

**JACKSON WALKER L.L.P.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Jennifer F. Wertz (TX Bar No. 24072822)
Kristhy M. Peguero (TX Bar No. 24102776)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:     (713) 752-4200
Facsimile:      (713) 752-4221
Email:           mcavenaugh@jw.com
                     jwertz@jw.com
                     kpeguero@jw.com
                     vpolnick@jw.com

*Co-Counsel to the Debtors and Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Aparna Yenamandra (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900
Email:           joshua.sussberg@kirkland.com
                     christopher.marcus@kirkland.com
                     aparna.yenamandra@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

## CERTIFICATE OF SERVICE

I hereby certify on that the 6th day of November 2020 a true and correct copy of the foregoing was sent via the Court's CM/ECF electronic notification system to all parties requesting service through same and to the parties listed below:

/s/ *Matthew D. Cavenaugh*
Matthew D. Cavenaugh

# Exhibit A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| J. C. PENNEY COMPANY, INC., *et al.*,[1] | ) | Case No. 20-20182 (DRJ) |
| | ) | |
| Debtors. | ) | |
| | ) | |

**DECLARATION AND EXPERT REPORT OF DAVID KURTZ IN SUPPORT OF THE CONFIRMATION OF THE DEBTORS' PROPOSED PLAN OF REORGANIZATION**

I, David Kurtz, make this Declaration pursuant to 28 U.S.C. § 1746:

1.     I submit this declaration (this "<u>Declaration</u>") in support of the confirmation of the Debtors' proposed Plan.  I am familiar with the proposed Plan and believe that the proposed Plan should be confirmed.[2]

2.     The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have from the Debtors' books and records, the Debtors' employees, the Debtors' advisors and their employees, or employees working directly with me or from other members of the team at Lazard Frères & Co. LLC ("<u>Lazard</u>") working under my supervision or direction.

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/JCPenney.  The location of Debtor J. C. Penney Company, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 6501 Legacy Drive, Plano, Texas 75024.

[2]     I submitted a similar declaration and expert report in support of the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) Entry Into and Performance Under the Asset Purchase Agreement, and (B) the Sale of the OpCo Acquired Assets and the PropCo Acquired Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (II) Granting Related Relief* (the "<u>Sale Declaration</u>").  For the avoidance of doubt, the Sale Declaration is incorporated by reference herein.

3.      I have overseen a Lazard team which has been one of the principal advisors for the Debtors, and in that capacity I have been directly involved in the matters relating to the Debtors' chapter 11 proceedings.

4.      I am not being specifically compensated for this testimony other than through payments received by Lazard as a professional whose retention the Debtors his Court has approved.  I am over the age of 18 years and authorized to submit this declaration on behalf of the Debtors.  If I were called upon to testify, I could and would competently testify to the facts set forth herein.

## Background and Qualifications

5.      I am a Vice Chairman and the Global Head of the Restructuring Group of Lazard. I have a broad range of experience in financial advisory assignments, including extensive experience with chapter 11 restructurings.  During the course of my career, I have advised companies and creditor groups in connection with raising capital in the bankruptcy context, including assisting chapter 11 debtors in obtaining and negotiating the terms of debtor-in-possession and exit financing loans.  I also have extensive experience representing companies, creditors, and other constituencies in transactions involving the sale of all or substantially all of a company's assets.   Additionally, I have performed numerous enterprise valuations in the bankruptcy context.  I have submitted declarations and provided expert testimony related to those matters in a number of chapter 11 cases.

6.      I have been employed by Lazard since 2002 and have extensive experience as an advisor in corporate restructurings.  I have advised companies, creditors, and investors in connection with numerous in-court and out-of-court restructurings and recapitalizations.

7.      Prior to joining Lazard, I was a partner at Mayer, Brown & Platt from 1986 to 1989, a partner at Jones Day from 1989 to 1999, and a senior partner in the Corporate Restructuring

2

Department at Skadden, Arps, Slate, Meagher & Flom LLP from 1999 to 2002.  I hold FINRA Series 7 General Securities Representative, Series 79 Investment Banking Representative, and Series 24 General Securities Principal licenses.  I have a J.D. and B.A. from Case Western Reserve University.  I am a fellow of the American College of Bankruptcy and served as a member of its board of directors from 2005 to 2011.  I am also a frequent lecturer on bankruptcy and reorganization-related topics and I have co-authored "Representing the Unsecured Creditors' Committee in Insolvency Restructurings," Workout & Turnarounds II (1999), Wiley and Sons.

8.      Lazard is the primary U.S. operating subsidiary of an international financial advisory and asset management firm.  Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority.  Together with its predecessors and affiliates, Lazard has been advising clients around the world for more than 150 years.  Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.  In addition, Lazard's investment banking professionals have extensive experience in advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees, and buyers in chapter 11 proceedings.

## The Debtors' Marketing Process

9.      Since the end of May, the Debtors and their advisors have been engaged in a robust marketing process aimed at finding a buyer for or an investor in the Debtors that will keep the Debtors' business operating as a going concern, employing tens of thousands of people and doing business with many landlords and thousands of vendors.  The process has been very challenging. When the Debtors entered chapter 11 on May 15, 2020, most of the Debtors' stores were closed,

the Debtors' operations were significantly cash flow negative, and no one knew when stores would reopen and (even when stores did reopen) whether stores would remain open and how the stores would do when they reopened (whenever that was). Even today the ultimate progression of COVID-19 was (and remains) uncertain, and potential buyers remain vulnerable to another full or partial shutdown at an unpredictable time in the future.

10.     Time was the essence for the Debtors' marketing process. Throughout the post-petition marketing process, we recognized that there was no guarantee that any potential bidder or buyer would remain interested in acquiring the Company if it took them too long to do so—as the specter of potential liquidation loomed over the Company at all times— or if, for example, there was a resurgence in COVID-19. Compounding the problem was the lack of a "back-to-school" uptick because there was no "back to school." Moreover, any prospective buyer would be relying in large part on the cash-flow projected to be generated from the 2020 holiday season and may walk away from the deal if they are unable to reap the benefit of this year's holiday sales.

11.     Shortly after the commencement of these cases, Lazard began to contact over 100 parties regarding their potential interest in some or all of the Debtors' assets or businesses, including existing lenders, large money-center banks, and other sophisticated alternative investment institutions. Lazard reached out to department stores, off-price and other retail parties, IP licensing parties, international entities, financial sponsors, sources for long-term capital, landlord investors, and real estate financial investors.

12.     Lazard (and the Debtors) were open to any going concern solution for the business, regardless of form or structure. As one option, and in effort to increase the pool of potential bidders, Lazard and the Debtors, with the First Lien Lender group, created the potential structure known today as "OpCo/PropCo." No one was required to adopt that structure as a precondition of

their bid.  However, the structure offered an opportunity to partner with the First Lien Majority Group on a transaction that contained a number of advantages, such as seller financing through take-back debt and separating the operating business from certain real estate, which would appeal to bidders who were not interested in paying immediately for real estate that they did not want to own.  At the same time, by creating the prospect of a pure real estate company (i.e., PropCo), we opened the door to real estate investors who might be interested in acquiring the Debtors' real estate but not the retail business. The purpose of the exercise was to increase the potential pool of bidders for the Debtors and to make the proposition as attractive as possible.

13.     Unfortunately, interest in the Debtors' businesses and assets was limited.  While 25 parties executed NDAs and received data-room access, by the end of June, there were only three parties that emerged as serious players and they were only interested in the OpCo.  By such time, not a single party under NDA was interested in acquiring the whole Company.  The parties interested in acquiring the OpCo included Simon and Brookfield and two other parties—a total of only three parties who submitted a letter of intent for the OpCo.  Other parties declined interest entirely early on or dropped from the process and, ultimately, the two other parties interested in acquiring OpCo (other than Simon and Brookfield) by late August made clear that they were not willing to make any equity investment in the business and were only willing to consider operating it for a fee if were owned by someone else.

14.     Following a bid deadline of July 22, 2020, no bidders emerged for PropCo, and the Debtors focused on developing OpCo bids with the three potential buyers, ultimately leading to an executed Letter of Intent from Simon & Brookfield on September 10, 2020, and an Asset Purchase Agreement agreed to in form and substance on October 20, 2020.  The Asset Purchase Agreement reflects an integrated transaction for the acquisition of substantially all of the Debtors' assets.  If

5

consummated, the proposed Asset Purchase Agreement will keep the Debtors' business operating as a going concern, and it is the only alternative for the Debtors to do so.

15.     It is my opinion that the marketing process seeking interest in the Debtors was full, fair and exhaustive.  The Debtors' chapter 11 cases are mature and the Debtors have been extensively marketing the Debtors' business in a highly visible sales process since May.  In addition, we announced the Simon/Brookfield letter of intent in early September and, since then, the transaction has not materially changed.  Yet no additional parties have emerged with an interest in buying or investing in the Company.  I do not believe that additional marketing of the Debtors or delay in the sales process would have produced a better outcome for the Company.

## The Restructuring Transaction Demonstrates That The Market Value For The Debtors Is Less Than The Amount Of The First Lien Debt

16.     The Asset Purchase Agreement that will be presented to the Court on November 9 is an integrated transaction for substantially all of the Debtors' assets between Brookfield Property Group ("Brookfield") and Simon Property Group ("Simon" and, with Brookfield, the "OpCo Buyers"), the Debtors, and an ad hoc group of first lien lenders represented by Milbank LLP (the "First Lien Ad Hoc Group").

17.     The Debtors, the OpCo Buyers, and the First Lien Ad Hoc Group entered into the Asset Purchase Agreement on an arm's-length basis, in good faith.  The Asset Purchase Agreement was the result of months of hard fought negotiations and thousands of hours of effort, including days of round-the-clock mediation.  It was complicated and acrimonious, and at no point a sure thing; there were times that each side walked away from the table.  At the end of the day, the Debtors determined in the sound exercise of their business judgment that it was the highest or otherwise best bid received; in fact, it was the only actionable bid.  The Asset Purchase Agreement

is being presented to the Court for approval on November 9, 2020, and I agree that it is the best option for the Debtors and their stakeholders.

18.     I believe entering into the Asset Purchase Agreement was a sound exercise of the Debtors' business judgment and that the proposed Plan premised on the approval of that transaction was proposed in good faith.  The transaction would avoid a liquidation and ultimately save more than 60,000 jobs by allowing the Debtors to continue business as a going concern.  The transaction also allows the Debtors to maintain their relationships and continue significant business with thousands of vendors and to pay rent to many landlords.

19.     In my opinion, the marketing process pursued for the Debtors over a period of multiple months, combined with the lack of any bid or proposal that would exceed the amount of the Debtors' first lien debt, is the best evidence of the fair market value of the Debtors.  The marketing process establishes that the value of the Debtors is nowhere close to providing value for shareholders, as despite a very public sale process, no third-party bids were received that put the value of the Debtors within billions of dollars of the amount at which shareholders would be in the money.  Again, if the Debtors' assets are worth (even in a liquidation) anywhere near the amount that would be needed for shareholders to get a recovery, then one or more bidders would have bid at least an amount sufficient to clear the ABL and First Lien debt.  None of the bidders did that, suggesting (again) that there is no value for shareholders in any realistic scenario.

### The "Reorganization Alternative" is Not Viable Option

20.     I am also aware that the Ad Hoc Equity Committee engaged William K. Snyder who submitted two Declarations and Expert Reports in these chapter 11 cases. *See* Dkt. Nos. 1454 and 1692.  Mr. Snyder created a hypothetical "Reorganization Alternative" whereby the Debtors would not sell the company, but instead try to have the DIP Order unwound, use cash on hand to pay part of the DIP Facility, either pay down the existing ABL Term Loan facilities or convince

the ABL Lender to accept a continued extension of credit, reinstate the First and Second Lien debt, convert unsecured notes and unsecured claims to equity, all the while leaving some consideration available for current shareholders.

21.   It is my opinion that Mr. Snyder's hypothetical "Reorganization Alternative" is not a viable option for many reasons.  From a practical perspective, for any value to be potentially available to shareholders, one would have to believe that at least the following seven things are *all* true—and each of them range from the highly doubtful to the absurd:

- the Debtors would convince the Court to vacate the final DIP Order and unwind the roll-up;

- the Debtors would then win an adequate protection fight against the ABL and First Lien lenders, over their strong objection;

- the Debtors would then succeed in cramming the ABL lenders at confirmation, over the ABL lenders' objection—given that the Debtors would be trying to force the ABL lender to lend to a company with a capital structure the ABL lender has already advised it will not voluntarily lend into;

- the Debtors would then successfully reinstate the First Lien debt in a plan of reorganization, over those creditors' vehement objection;

- the Debtors would then propose a plan that reinstated both the First Lien debt (which, even if it were reinstated, would mature in 2 years) *and* the Second Lien debt, and still somehow prove that a Plan with $3 billion of secured debt behind the ABL is feasible—even though the Debtors don't believe such a plan would be feasible;

- the Debtors would then equitize $3 billion in unsecured claims for a company that would have an ABL and $3 billion in senior secured (reinstated) debt, while *still* somehow leaving some value for shareholders; and

- the Debtors would be able to achieve their forecast, even though the Company operating under this proposed capital structure would not have vendor support.

While each of these steps are (at a minimum) highly doubtful, collectively this proposal is beyond far-fetched and could never be achieved.  I would not advise the Debtors to pursue this so-called "reorganization alternative" because it is doomed to failure.

22.     In sum, the suggestion in Mr. Snyder's declaration is simply not realistic.  Pursuing that path would not realistically lead to anything other than a liquidation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

New York, New York
November 6, 2020

/s/ *David Kurtz*
_____

David Kurtz
Vice Chairman and Global Head of Restructuring
Lazard Frères & Co. LLC

*Financial Advisor and*
*Investment Banker to the Debtors*

9

# Exhibit B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| J. C. PENNEY COMPANY, INC., *et al.* | ) Case No. 20-20182 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) (Emergency Hearing Requested) |
| | ) |

## DECLARATION AND EXPERT REPORT OF JAMES A. MESTERHARM IN SUPPORT OF CONFIRMATION OF THE DEBTORS' PROPOSED PLAN OF REORGANIZATION

I, James A. Mesterharm, hereby declare under penalty of perjury:

1.    I am a Managing Director at AlixPartners LLP ("AlixPartners"), financial advisor to the debtors and the debtors in possession (collectively, the "Debtors"). I submit this declaration (this "Declaration") in support of confirmation of the Debtors' proposed Plan.[1]

2.    Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including the team working under my supervision, my review of the relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my experience and knowledge.  I am not being specifically compensated for this testimony other than through payments received by AlixPartners as a professional retained by the Debtors.  I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1]    I previously submitted a declaration and expert report in support of the Debtors' *Emergency Motion for Entry of an Order (I) Authorizing (A) Entry into and Performance Under the Asset Purchase Agreement, (B) the Sale of the OpCo Acquired Assets and the PropCo Acquired Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (C) Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 1592] (the "Sale Declaration").  For the avoidance of doubt, I incorporate the Sale Declaration into this Declaration.

## Background and Qualifications

3.      In addition to the background and qualifications already provided to this Court in other declarations,[2] I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

## Opinions

4.      I believe that the Plan should be confirmed.  To the best of my knowledge, the Plan satisfies the requirements of 11 U.S.C. § 1129.

5.      As described in my Sale Declaration, I believe that the proposed sale pursuant to an Asset Purchase Agreement (the "Sale Transaction") between the Debtors, Simon Property Group ("Simon"), Brookfield Property Group ("Brookfield," together with Simon, the "OpCo Purchaser"), and the Ad Hoc Group of First Lien Lenders represented by Milbank LLP (the "First Lien Ad Hoc Group"), is in the best interests of the Debtors and their stakeholders.  The Debtors have no other options to continue operating as a going concern, and the proposed Asset Purchase Agreement, among other things, saves 60,000+ jobs, thousands of vendor relationships, and hundreds of landlord relationships.  As of the filing of this Declaration, the Sale Transaction and the Plan now has support from, in addition to Simon and Brookfield and the First Lien Ad Hoc Group, the other minority first lien lenders represented by Akin Gump LLP (the "First Lien Minority Group"), and the official committee of unsecured creditors (the "UCC"), both of whom have agreed to settlements and are now supportive of both the Sale Transaction and the Plan.

---

[2]     In addition to the Sale Declaration, *see Declaration of James A. Mesterharm in Support of Debtors' Emergency Motion for Entry of an Order (I) Extending Time for Performance of Obligations Arising Under Unexpired Non-Residential Real Property Leases and (II) Granting Related Relief* [Docket 659]; *Declaration and Expert Report of James A. Mesterharm in Support of the Debtors ' Motion for Entry of a Final Order Authorizing the Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code* [Docket No. 452]; *Declaration and Expert Report of James A. Mesterharm in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 39].

6.      I understand and believe that the Plan satisfies the applicable confirmation standards for, among other reasons, those stated below.

7.      *First*, the proposed Plan classifies Holders[3] of Claims and Interests into Classes, which generally reflect the Debtors' capital and corporate structure (and therefore relative priority between the Claims and Interests).  I believe the classification of Claims in the proposed Plan has a valid business justification.

8.      *Second,* I believe the manner and means by which the Debtors disclosed the Plan and solicited its acceptance were appropriate and consistent with the Bankruptcy Code.  The Debtors provided Court-approved solicitation packages (the "Solicitation Materials") to Holders of Claims and Interests entitled to vote on the Plan, non-voting materials to creditors not entitled to vote on the Plan, and publicly disclosed the relevant dates for voting and objecting to the Plan. Moreover, the Debtors distributed the Disclosure Statement and solicited acceptance of the Plan through Prime Clerk LLC, its Claims and Noticing Agent, as required by the *Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Plan and Disclosure Statement Objection and Related Procedures, (III) Approving the Solicitation Procedures, and (IV) Approving the Confirmation Hearing Notice* [Docket No. 1655], and transmitted the same appropriate Solicitation Materials to all parties entitled to vote on the Plan.

9.      *Third*, I believe that the Plan was proposed in good faith, for the legitimate and honest purpose of keeping the Debtors' operations alive as a going concern and providing the best

---

[3]      Capitalized terms here refer to the capitalized terms in the *Joint Chapter 11 Plan of Reorganization of J. C. Penney Company, Inc. and Its Debtor Affiliates* [Docket No. 1646] (the "Plan"). and the Disclosure Statement related to the Joint Chapter 11 Plan of Reorganization of J. C. Penney Company, Inc. and Its Debtor Affiliates [Docket No. 1647] (the "Disclosure Statement").

outcome reasonably possible for the Debtors' stakeholders.  As described above, I am aware that the Plan has been accepted—and is supported—by two groups of first-lien lenders, the ABL Lenders, and the UCC (on which the Second Lien Notes Trustee, among others, sits).  The Plan is the product of extensive collaboration and good faith negotiations among the Debtors, both groups of DIP and First Lien Lenders, the ABL Lenders, the UCC, and the OpCo Purchaser, among others.

10.     *Fourth*, it is my understanding that, pursuant to the Plan, the administrative payments for professional fees that the Debtors have made or will make prior to the Effective Date in connection with these Chapter 11 Cases have been approved by the Court, or are subject to approval of the Court, as reasonable.

11.     *Fifth*, I understand that to satisfy the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code a debtor must demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization, of a debtor or any successor to such debtor other than what is called for in the Plan.  I believe that the Debtors' Plan satisfies this requirement.  The Plan is premised on the Court's approval of the proposed Asset Purchase Agreement on or about November 9, 2020.  If approved, it is my opinion that the Sale Transactions contemplated by the Asset Purchase Agreement are highly likely to close, either before (in the case of OpCo) or after (in the case of PropCo) the hearing on confirmation of the Debtors' proposed Plan.  The Plan provides for the payment of timely-filed, allowed administrative claims, and I believe, if the Asset Purchase Agreement is approved and the Plan is later confirmed, confirmation will not be followed by liquidation or further reorganization of the Debtors other than what is called for under the Plan.

12.     *Sixth*, I believe the Plan satisfies the absolute priority rule with respect to all Claims and Interests to whom it applies.  As described above and in a prior Declaration and Expert Report

submitted by David Kurtz, the Plan follows a marketing process and sale to the highest bidder, which is a group of DIP Lenders and First Lien Lenders who have provided a credit bid of less than the amount of their debt.  Under a settlement with the UCC that has been incorporated into the Plan, certain consideration that would otherwise be paid to holders of First Lien Claims is instead being provided to holders of Second Lien Notes Claims and unsecured claims as a "gift."

13.     *Seventh*, the Plan does not unfairly discriminate between holders of Claims and Interests with similar legal rights because all similarly situated holders of Claims and Interests will receive substantially similar treatment.

14.     *Eighth*, the Plan contains several discretionary provisions, including standard and customary releases and exculpation provisions.  The Debtors have determined in their business judgment that each of these discretionary provisions is appropriate and in the best interests of the Debtors and their creditors, and I agree.  The Debtor Releases were the product of arm's-length negotiations and have been important to obtaining support for the Plan from various constituencies, including the First Lien Lenders, the ABL Lenders, and the UCC, which agreed to the terms of the transactions embodied in the Plan.  The Third Party Releases are consensual because those bound to them have the right to opt-out, and they are adequately noticed: the existence of the Third Party Releases was expressly set forth in the Disclosure Statement and the Plan, and the non-voting materials, which state that individuals who do not opt out are deemed to have consented to the releases.  All told, these releases are important parts of the overall packages and the settlements embodied in the Plan.  Similarly, each of the proposed Exculpated Parties played an important role in the formulation of the Plan, including the settlements reflected in it.

15.     *Finally*, I have reviewed two Declarations of William K. Snyder, proposing that the Debtors pursue a stand-alone reorganization in which: (a) the Financing Order is vacated; (b) the

outstanding DIP Facility is paid down in full; (c) the ABL is partially repaid and otherwise remains in place; (d) the First Lien Debt and the Second Lien Notes are reinstated; and (e) the unsecured debt and unsecured claims are equitized; with (f) some value remaining for equity.

16.     Respectfully, this is not logical.  Mr. Snyder's proposal is not possible, for numerous reasons, including but not limited to those described below.  The Debtors and their advisors reviewed Mr. Snyder's proposal and did not pursue it for good reasons.

17.     First, the Company does not have the option of unwinding the roll-up portion of the DIP Facility.  The DIP Credit Agreement does not provide the Debtors that right.

18.     Second, the Company's current liquidity position simply does not allow for the proposal.  All but approximately $230 million of the Debtors' cash is subject to a lien held by the ABL Lenders and even if the ABL Lenders agreed to allow the Debtors to use some of the ABL cash to pay off the DIP, there would then not be enough ABL cash available for the Debtors to maintain compliance with the ABL borrowing base requirements and have enough cash in the system to operate its business.  A demonstrative slide demonstrating as much is attached hereto as **Exhibit A**.

19.     Moreover, there is no likelihood that the ABL Lenders would consent to the Debtors using their cash in the manner suggested by Mr. Snyder.  In May 2020, when the Company was negotiating the DIP, the ABL Lenders initially proposed that the Debtors pay down, or pay off, the ABL Facility in full.  And now, while they are willing to finance the OpCo Purchaser, it is only on more expensive terms with lower advance rates and more restrictions than the Company has today.  Furthermore, the ABL Lenders are requiring OpCo to have $550 million of availability under the ABL line at close to provide for sufficient operating funds and cushion.  Lastly the ABL

Lenders are only willing to provide this new loan since the new borrower will be significantly delevered and will only have $520M of take back debt junior to the ABL.

20.     Even if the Company paid all of its cash toward the DIP and retained the support of the ABL Lenders, it would have no cash left to run its business, including paying employees, vendors, and landlords.

21.    Third, for equity to receive any value, every other creditor would have to be either unimpaired or paid in full, or agree to different treatment. This is not realistic.

22.    In summary I note the following:

- the Debtors do not believe they could unwind the Financing Order, as it is a final court order that was entered at the Debtors' request and was not appealed;

- the Debtors do not have enough cash to pay off the DIP and satisfy the ABL Lenders;

- even if the Debtors did have enough cash to pay off the DIP and satisfy the ABL Lenders, they would not have enough cash to do both and still run their businesses (even under the currently proposed structure, the ABL is willing to extend less credit on more expensive terms than the current ABL agreement provides for);

- the ABL Lenders would never agree to this option and, to the contrary, have advised that they will not continue to extend credit at all unless the Debtors substantially de-lever their capital structure consistent with the proposed Sale Transaction and the Plan;

- reinstating the First Lien Debt and Second Lien Debt seems highly unlikely for a variety of reasons, including that while the Debtors have been paying interest on the First Lien Debt as adequate protection, but not at the default rate, and reinstatement may require the Debtors to make an additional interest payment immediately reflecting default interest with funds the Debtors do not have (the First Lien Lenders would also no doubt fight any efforts at reinstatement) let alone pay any obligations for unpaid interest owed to the Second Lien Debt in order to reinstate it;

- the Debtors would then have to convince unsecured creditors, some of whose debt has matured during the bankruptcy and unsecured creditors (including hundreds of millions of dollars in unpaid trade debt and lease rejection damages) to accept equity on their claims and *still* leave equity available for shareholders, and it is unclear why any of them would agree to do so.

In sum, for these and other reasons, the suggestion in Mr. Snyder's declarations is simply not realistic.

23.     Finally, even if the Debtors attempted to implement Mr. Snyder's suggestion and somehow succeeded in getting parties to make consensual deleveraging decisions, the Debtors are short on liquidity for funding this plan and would have to raise substantial capital in order to execute on the plan, re-leveraging instead of de-leveraging.  I do not believe that any lender would support such an exercise or make capital available to the Debtors under that scenario.

24.     In short, the proposed structure in Mr. Snyder's declaration requires the consent of parties that would clearly object to it and massive amounts of liquidity that the Debtors do not have and likely cannot acquire and would likely be opposed and require risky litigation.  It is not realistic, and I see no viable scenario that would leave value for Holders of Existing Equity Interests.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated:  November 6, 2020

                                        /s/ James A. Mesterharm
                                        Name:  James A. Mesterharm
                                        Title:  Managing Director, AlixPartners LLP

# Exhibit A

# DEMONSTRATIVE #1

## J.C. Penney Company, Inc.
### Components of Cash Balance
(US $ MMs)

|  | Actuals (A) | Estimate (B) |
|---|---|---|
| *as of date* | 10/3/2020 | 10/31/2020 |
| **STI Cash** | 633.3 | 476.2 |
|  |  |  |
| Credit Card - Accounts Receivable (C) | 49.2 | 60.2 |
| Cash on Hand | 28.4 | 28.6 |
| Cash in Transit | 26.2 | 14.6 |
| Cash in Deposit Accounts | 24.9 | 7.3 |
| Cash in Foreign Accounts | 5.4 | 5.0 |
| Cash in Disbursement Accounts | 84.4 | 83.8 |
| **Total Non-STI Cash** | **218.6** | **199.5** |
|  |  |  |
| BoA P-Card Collateral | 2.2 | 2.2 |
| Utility Assurance Acct | 5.2 | 5.2 |
| Asset Sale Proceeds | 0.0 | 0.1 |
| Pro Fee Escrow Acct | 71.1 | 77.6 |
| ABL Builder Acct | 183.1 | 194.6 |
| Consignment Receipts Acct | 5.1 | 5.1 |
| DIP Loan Proceeds Acct | 225.0 | 230.1 |
| **Total Restricted Cash** | **491.6** | **514.8** |
|  |  |  |
| **Total Cash** | **1,343.5** | **1,190.5** |
|  |  |  |
| **Legend:** |  |  |
| Cash Readily Available for ABL Paydown | 816.4 | 670.8 |
| Cash Available for DIP Paydown | 225.0 | 230.2 |
| Cash Not Readily Available for Debt Paydown (D) | 302.1 | 289.6 |
|  |  |  |
| **Memo:** |  |  |
| Est. ABL + Swap Paydown |  | 1,349.94 |
| Est. DIP Paydown |  | 937.08 |

**Sources**

(A) 10/3/2020 actuals sourced from detailed trial balance supporting the company's 8-K filed on 10/23/2020.

(B) 10/31/2020 estimate sourced from internal JCP Treasury reports (STI and Restricted Cash amounts) and Net Working Capital Rollforward Analysis provided to various notice parties on 10/5/2020 (Non-STI cash amounts).

(C) The company's accounts receivable is subject to a first priority lien held by the ABL.

(D) In addition to practical challenges of using cash spread across the company's cash management system to pay down debt, the company's deposit accounts above are subject to a first priority lien held by the ABL (as perfected in the Final DIP Order) with some nominal exceptions (e.g. accounts with less than $10M excluded although the total in excluded accounts cannot exceed a total of $25M).