**FOLEY & LARDNER LLP**                          Hearing Date: November 24, 2020 at 9:00 a.m. (CT)
Douglas E. Spelfogel (admitted *pro hac vice*)
Harold L. Kaplan (admitted *pro hac vice*)
Richard J. Bernard (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016-1314
Telephone: (212) 682.7474
Facsimile: (212) 687.2329

John P. Melko
Jennifer Huckleberry
1000 Louisiana Street
Suite 2000
Houston, TX 77002
Telephone: (713) 276.5500
Facsimile: (713) 276.5555

*Attorneys for Wilmington Trust, National Association*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **J.C. Penney Company, Inc.,** *et al.*, | ) | |
| | ) | **Case No. 20-20182 (DRJ)** |
| | ) | |
| Debtors. | ) | **Hearing Date: November 24, 2020** |
| | ) | |
| | ) | **(Jointly Administered)** |

## LIMITED OBJECTION AND RESERVATION OF RIGHTS OF
## WILMINGTON TRUST, NATIONAL ASSOCIATION AS INDENTURE
## TRUSTEE TO AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF J.C. PENNEY COMPANY, INC. AND ITS DEBTOR AFFILIATES

Wilmington Trust, National Association, in its capacity as indenture trustee (the

"Indenture Trustee") for the 5.875% senior secured notes due July 2023 (the "First Lien Notes")

issued in the principal amount of $500 million by the Debtor J.C. Penney Corporation, Inc.

pursuant to that certain indenture dated June 23, 2016 (the "First Lien Notes Indenture"), hereby

submits this limited objection and reservation of rights to the *Amended Joint Chapter 11 Plan of*

*Reorganization of J.C. Penney Company, Inc. and its Debtor Affiliates* [Doc. No. 1973] (the "Amended Plan")[1] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"), and requests that revisions be made to the Amended Plan in order to (i) clarify or correct the confusing or inaccurate Allowance of First Lien Claims just inserted in the Amended Plan filed on November 20, 2020 insofar as such do not take into account the effect of the roll-ups under the Final DIP Order (and, consequently, would result in an erroneous allocation with respect to the pro rata distributions between respective holders of such claims); (ii) equalize treatment to otherwise unrepresented First Lien Noteholders consistent with the within Objection; and (iii) modify the 180-day forfeiture provision for uncashed distributions to make clear that such does not apply to First Lien Noteholders and/or extend such period as discussed below, and respectfully states as follows:

## INTRODUCTION

Under the First Lien Notes Indenture, the Indenture Trustee represents interests of all First Lien Noteholders as a class. This Limited Objection does not object to – and in fact supports – confirmation of the Amended Plan for Debtors, but addresses certain issues created by revisions made to the Plan after Plan and Disclosure Statement solicitation was authorized by the Court on October 26, 2020 (Docket No. 1655) and completed by October 30, 2020 (*See* Docket No. 1819).

The first issue was introduced by revisions to the Amended Plan dealing with newly inserted Allowed First Lien Claim amounts as filed by the Debtors late Friday November 20, 2020 (Docket No.1973) – just as the Indenture Trustee was preparing to file its Limited Objection to certain inequalities of treatment to a discrete amount of otherwise unrepresented

---

[1] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Amended Plan.

First Lien Noteholders first introduced in Debtors' revised Amended Plan filed November 8, 2020 (Docket No. 1788).

**First Lien Claim Allowance Amounts**

The further Amended Plan filed late Friday, November 20, 2020 filled in, *for the first time*, Allowed Claim Amounts for First Lien Claims.  Specifically, Article III Section A. 4(b) of the Amended Plan dealing with Allowance of First Lien Claims for the first time states: The First Lien Claims shall be deemed Allowed in the amount of $2,021,414,062.50 (consisting of $1,521,414,062.50 in Term Loan Claims and $500,000.00 in First Lien Notes Claims) as of the Petition Date…"

These inserted Allowed Claim Amounts appear to not factor in the results of the roll-ups approved and effectuated pursuant to the Final DIP Order (Docket No. 566).  While such results need to be confirmed, the Indenture Trustee has been advised that such Allowed Claims are actually (after factoring in roll-ups, including cancellation of certain First Lien Notes (and Loans) held by Debtors):  $1,571,414,062.56 (consisting of $1,102,153,062.56 in Term Loan Claims and $469,261,000.00 in First Lien Notes Claims).

It is imperative that it be clarified or corrected that First Lien Claims be Allowed in such amounts not only for accuracy, but insofar as distributions to First Lien Debt are to be allocated pro rata between and based upon the respective Allowed First Lien Term Loan Claims and First Lien Notes Claims.

**Disparate Treatment of First Lien Noteholders**

As described further herein, various ad hoc groups including holders of First Lien Debt have been formed in this case including a majority group (the "Majority Group") and a minority group (the "Minority Group").  Through their own respective counsel, the Majority and Minority

Groups have negotiated and renegotiated among themselves various aspects of the Sale Transaction and Amended Plan, following solicitation of Debtors' disclosure statement and plan, resulting in adjusted, and now disparate, recoveries to First Lien Noteholders to the exclusion and relative detriment of a remaining group of First Lien Noteholders that is not part of either the Majority or Minority Group (the "Remaining Noteholders").

The Indenture Trustee generally supports the Debtors' proposed Sale Transaction to be implemented through the Asset Purchase Agreement and Amended Plan.  However, the Indenture Trustee has concerns with respect to the proposed disparate treatment of the Remaining Noteholders and the lack of notice to First Lien Noteholders regarding such treatment.  In particular, immediately before the Court held a hearing on the Asset Purchase Agreement, the Debtors filed a proposed sale order that included, *for the first time*, reference to and proposed approval of a proposed settlement agreement by and among the Majority Group, the Minority Group and the Debtors [Doc. No. 1786, Ex. B] (the "Minority Settlement Agreement") through which the Debtors proposed to pay a $40 million "supplemental distribution" to the Minority Group coming off the top of a distribution account – the Final Loan Escrow Account which is to be allocated and distributed 90% to DIP Lenders and 10% to First Lien Lenders and Noteholders in the First Interim Distribution.  The Indenture Trustee's primary concern is that the supplemental distribution appears to dilute the distribution pool available to Remaining Noteholders while providing a significantly differential windfall to the Minority Group – at least 13 cents on the dollar  – *i.e.*, resulting in materially disparate treatment of the Remaining Noteholders' First Lien Claims in contravention of, *inter alia*, Bankruptcy Code section 1123(a)(4).

4

Further, such disparate treatment is inconsistent with the Direction Letter (defined below) the Majority Group gave the Indenture Trustee (and are so bound by) which required, among other things, that distributions received by creditors on account of the Credit Bid shall be allocated ratably between First Lien Noteholders, among others.  As is clear from the face of the Minority Settlement Agreement, distributions are not being made ratably among First Lien Noteholders in so far as the Minority Group is to receive $40 million off the top before further, *and diluted*, distributions are made ratably among all First Lien Debt.

Moreover, the Amended Plan now reflects the Minority Settlement Agreement after the prior plan had been sent out for solicitation, as approved by the Court.  As a result, the solicited plan, and in particular, the proposed distribution to First Lien Noteholders, is not the same plan and distribution the Debtors now seek to confirm, and First Lien Noteholders thereby did not receive proper notice and due process.  As a consequence of the foregoing, the Indenture Trustee respectfully submits that the Amended Plan be modified to provide for equal treatment of the Remaining Noteholders with other holders of First Lien Debt (who did not agree to less favorable treatment) as required pursuant to the Direction Letter and the Bankruptcy Code. Undoubtedly, the easiest fix would be to include the Remaining Holders in the Minority Settlement Agreement such that they are entitled to the same distributions as the Minority Group. Notably, the Remaining Noteholders are perhaps only holding approximately $10-15 million in First Lien Notes so the relief requested is a very discrete amount.

**Application of Six Month Undeliverable Distribution Forfeiture**

Finally, and in addition to the above, the Indenture Trustee has concerns with respect to the application of the Amended Plan's forfeiture provision in Article VI, D., 4 which has been highlighted and brought into question by the election form sent out by Debtors relating to Term

Loan B interests to be distributed pursuant to the Asset Purchase Agreement.  Specifically, the election form includes a six month forfeiture period, apparently be based on the Amended Plan's forfeiture provision, which even though the Indenture Trustee believes is not applicable to First Lien Noteholders, to the extent such may be unclear, needs to be clarified but in any case, is unauthorized and in any case, too short.

For these reasons, described further below, the Indenture Trustee files this Limited Objection and Reservation of Rights to the Amended Plan.

## BACKGROUND

On May 16, 2020 (the "Petition Date"), each of the Debtors filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") initiating the above-captioned Chapter 11 cases (together, the "Bankruptcy Case").  During the Bankruptcy Case, the Debtors proposed an integrated Sale Transaction for the sale of substantially all of the Debtors' assets, to be implemented through a sale of the Debtors' operating and certain real property assets (collectively, "OpCo") and their remaining real property assets (collectively, "PropCo").  The Sale Transaction is to be implemented through the Asset Purchase Agreement and the Amended Plan.  (*See* Minority Settlement Agreement, Doc. No. 1814, Ex. B, p.2).

On October 28, 2020, the Majority Group gave a written instruction (the "Direction Letter") to the DIP Agent, the Term Agent and the Indenture Trustee in connection with a "credit bid" (the "Credit Bid") of an aggregate $900 million of obligations under the DIP Agreement (the "DIP Debt") and an aggregate $100 million of First Lien Debt.  (*Id*.)  The Credit Bid provides the mechanism to effectuate the OpCo and Prop Co sales, including to consummate the Amended Plan.  The Direction Letter provides for the consideration to be provided to

6

beneficiaries of the Credit Bid to be allocated on the ratable amount of the DIP Debt and First Lien Debt being contributed to the Credit Bid (*i.e.*, 90% of the consideration being allocated to DIP Loan Lenders on account of the DIP Debt and 10% of the consideration being allocated to holders of the First Lien Debt) (the "Current Credit Bid Allocation"), with such First Lien Debt further allocated between the First Lien Term Loans and First Lien Notes based on their respective outstanding allowed claim amounts.  (*Id*.)  This was a key material term negotiated between the parties and integral to acceptance of the Direction Letter.  Under the Direction Letter, the foregoing terms were required to be memorialized in the Asset Purchase Agreement, Sale Order and Amended Plan.

On November 9, 2020, the Court conducted a hearing on the Asset Purchase Agreement (the "Sale Hearing").  The day of the Sale Hearing, the Debtors filed a revised, proposed sale order which included, for the first time, reference to and approval of the Minority Settlement Agreement.  The Minority Settlement Agreement purports to resolve certain objections by the Minority Group to the Sale Transaction and related documents and transactions and provides, among other things:

> [T]he Debtors shall pay the members of the Minority Group a supplemental distribution in the amount of $40 million in cash in settlement and resolution of all disputes with respect to the [Sale] Transaction, the Credit Bid, the APA, the [Bankruptcy] Case[s], the Sale Order and the Plan (the "Supplemental Distribution").  The Supplemental Distribution shall be paid out of (and contemporaneously with) the First Interim Distribution (as defined in the APA).  The Supplemental Distribution will be structured such that it does not dilute the distribution that the members of the Minority Group would have otherwise received from the First Interim Distribution (i.e., the members of the Minority Group shall receive, in the aggregate, their ratable distribution of the First Interim Distribution (calculated as though there was no Supplemental Distribution) plus their ratable distribution of the Supplemental Distribution (based on the percentage of [First Lien] Debt held by each member of the Minority Group as of November

4827-7188-1170.6

> 1, 2020 as compared to the total [First Lien] Debt held by all members of the Minority Group as of November 1, 2020).

(*Id*., ¶ 4).

At the Sale Hearing, the Court entered the Sale Order [Doc. No. 1814] (the "Sale Order"), which approved the Asset Purchase Agreement as well as  the Minority Settlement Agreement [Doc. No. 1814, Ex. B] pursuant to Bankruptcy Rule 9019 (through a short two-sentence paragraph added immediately before the Sale Hearing).

On the same day that the revised Sale Order with Minority Settlement Agreement was filed, the Debtors filed the Amended Plan.  Class 4 under the Amended Plan consists of all First Lien Claims and provides for the following treatment:

> On the Effective Date, each holder of an Allowed First Lien Claim shall receive, subject to the terms of the Minority First Lien Group Settlement, (a) pursuant to the Sale Transaction, on account of the Aggregate Credit Bid, its Credit Bid Pro Rata share of the Credit Bid Distributions subject to distribution under the Plan and (b) its Pro Rata share of any Cash remaining in the Wind-Down Reserve, Professional Fee Escrow, Administrative/Priority Claims Reserve once all Allowed Claims entitled to payment therefrom have been satisfied and no Disputed Claims that may be entitled to payment from such sources remain to be adjudicated.

(Doc. No. 1788, Art. III, B., 4.)

Significantly, the Amended Plan provides that the treatment of Class 4 First Lien Claims is "subject to the terms of the Minority First Lien Group Settlement."  (*Id*.)  This means, in effect, that the Minority Group – and not the Remaining Noteholders – receive the additional $40 million Supplemental Distribution in addition to the other distributions provided for First Lien Claims under the Amended Plan.  In addition, as discussed below, the Amended Plan was filed after the Court ordered deadline for solicitation of the plan (*see* Section C below).

### LIMITED OBJECTION AND RESERVATION OF RIGHTS

8

A.      **The Minority Settlement Agreement Results In Disparate Treatment of Class 4 Claimants in Violation of Bankruptcy Code Section 1123(a)(4)**

"Bankruptcy Code Section 1123(a)(4) requires that a plan provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment.  Thus, once a plan has classified creditors, it must provide the same treatment for each claim or interest of a particular class, unless the holder agrees to less favorable treatment."  *See In re ISC Bldg. Materials, Inc.,* 2011 Bankr. LEXIS 2036, *7-8 (Bankr. S.D. Tex. 2011).  If the Plan does not provide for equal treatment, the court will deny confirmation.  *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 260 (S.D. Tex. 2015) (denying confirmation and holding that where the plan "did not provide the same treatment for each claim or interest of a particular class…the Debtor has not established by a preponderance of evidence that the requirements of § 1123 (a)(4) are met.").

Here, the Minority Settlement Agreement and payment of the Supplemental Distribution results in disparate treatment within Class 4 of the Amended Plan.  The Supplemental Distribution to the Minority Group is <u>*in addition to*</u> the Minority Group's pro rata distribution under the Amended Plan and Asset Purchase Agreement and necessarily means that the Minority Group will be treated better under the Amended Plan than Remaining Noteholders.  Specifically, based on its share of First Lien Debt (~ $300 million), the Supplemental Distribution provides the Minority Group an additional distribution  of over 13% on its total First Lien Debt holdings while diluting the distributions to Remaining Holders.  Indeed, the Minority Settlement Agreement states that "the Supplemental Distribution will be structured such that it *does not* dilute the distribution that members of the Minority Group would have otherwise received …" (Doc. No. 1814, Ex. B, ¶ 4 (emphasis added)).  Accordingly, where the Amended Plan's treatment of Class 4 First Lien Claims is subject to the Minority Settlement Agreement and

Supplemental Distribution, the Amended Plan, on its face, provides less favorable treatment to the Remaining Holders.

Under similar circumstances, courts have found that a settlement resulting in more favorable treatment for certain claims within a class constitutes improper discrimination under Bankruptcy Code section 1123(a)(4). For example, in *In re Cajun Elec. Power Coop.*, 230 B.R. 715, 733 (Bankr. M.D.La. 1999), a plan proponent reached a settlement with a creditor whereby, among other things, it was agreed that the proponent would purchase certain designated trade claims for their full value. Meanwhile, the purchase price for certain assets under the proposed plan would be increased by up to $7 million. *Id*. The extra $7 million of the purchase price would then be used to pay the settling creditor on account of its secured claims who would then use those funds to purchase the trade claims from the proponent for the same price paid for them. *Id*. The result was that the trade creditors whose claims were purchased would be paid in full while a substantially lower payment would be made to other creditors in the same class. *Id*. The court held that "this circuitous use of an increase in the purchase price is nothing other than a method of attempting to disguise discrimination against those unsecured creditors whose claims are not being so purchased …" and denied confirmation based on § 1123(a)(4). *Id*.

Here, the Minority Settlement Agreement results in similar discrimination although it is not so disguised. The Supplemental Distribution is only provided to the Minority Group resulting is far less favorable treatment to the Remaining Holders. Moreover, the Remaining Holders were not given the opportunity to participate in the Minority Group Settlement, and were not afforded proper notice and due process, and therefore, did not choose, or otherwise agree to receive less favorable treatment of their claims.

**B.     The Minority Settlement Agreement Is Inconsistent with the Direction Letter Requiring Ratable Distribution Among All First Lien Noteholders**

10

The Direction Letter provides, among other things:  "The Directing Holders acknowledge and agree that all distributions received by creditors on account of the Credit Bid shall be allocated ratably (a) between the DIP Obligations and the Term Loan/First Lien Notes Obligations based on the amounts of such obligations actually credit bid and (b) between Holders of First Lien Notes issued under the First Lien Indenture and Lenders under the Prepetition First Lien Credit Agreement based on the relative outstanding obligations owing thereunder."  (Doc. No. 1668, Ex. 4, p.4).

Here, $40 million of the First Interim Distribution goes directly to the Minority Group as the Supplemental Distribution rather than as a pro rata distribution among all First Lien Noteholders, in direct contravention of the Direction Letter.  As a result, the Indenture Trustee has received no proper direction (or any direction) to act with respect to the Minority Settlement Agreement and the Minority Settlement Agreement is inconsistent with the terms of the Direction Letter.  Moreover, the terms as provided for in the Direction Letter, were carried forward in the Asset Purchase Agreement and Sale Order (and required to be incorporated in the Amended Plan), yet the Amended Plan does not provide for ratable distributions to all holders within  Class 4.

**C.**     **The Plan Was Amended After Solicitation to Negatively Impact First Lien Notes Distributions**

On October 26, 2020, the Court entered an order that, among other things, scheduled a combined hearing on the Debtors' plan and disclosure statement, conditionally approved the disclosure statement and approved solicitation procedures [Doc. No. 1655] (the "Confirmation Hearing Order").  The solicitation procedures approved through the Confirmation Hearing Order (the "Solicitation Procedures") provide, among other things, that the Debtors reserve the right to

11

make *non-substantive* or *immaterial* changes to the Disclosure Statement and Plan before their distribution.

Here, the Debtors filed their Amended Plan *after* the previous plan and disclosure statement were distributed for solicitation.  Not only is this inconsistent with the approved Solicitation Procedures as ordered by the Court, but as a result, the plan that was solicited is not, as to treatment of First Lien Noteholders, the same plan the Debtors now seek approval of, calling into question the validity of the Debtors' solicitation process.  *See In re Young Broadcasting Inc*., 430 B.R. 99 (Bankr. S.D.N.Y. 2010) (requiring resolicitation of an amended plan); *see also*, *In re American Solar King Corp.,* 90 B.R. 808, 824-25 (Bankr. E.D. Tex. 1988) ("The proponent of a modified plan may not, as a rule, use pre-modification acceptances solicited with a pre-modification disclosure statement, if the effect of the modification is to substantially change other terms of the original plan.").

**D.      Debtors Provided Insufficient Notice of the Minority Settlement Under FRBP 9019**

As described above, the Minority Settlement Agreement was noticed for the first time on Friday, November 6, 2020 one business day before the Sale Hearing on November 9, 2020. Through the Sale Order, the Minority Settlement Agreement was approved under Bankruptcy Rule 9019.  (Doc. No. 1814, ¶ 4).

Federal Bankruptcy Rule 2002(a)(3) requires 21 days' notice for "the hearing on approval of a compromise or settlement of a controversy other than approval of an agreement pursuant to Rule 4001(d), unless the court for cause shown directs that notice not be sent."  While a court may shorten notice for "good cause," there is nothing in the Sale Order addressing "good cause" for the lack of notice of the Minority Settlement Agreement or otherwise addressing any deficiencies of notice of the Minority Settlement Agreement at all.

12

Accordingly, the Remaining Noteholders were not provided sufficient notice of the Minority Settlement Agreement.

**E.     Proposed Modification to the Amended Plan**

As a consequence of the foregoing, the Indenture Trustee respectfully submits that the Amended Plan be modified to provide for equal treatment to the holders of the remaining First Lien Notes as required pursuant to the Direction Letter and Bankruptcy Code.  Undoubtedly, the easiest fix would be to include the Remaining Holders in the Minority Settlement Agreement such that they are entitled to the same distributions as the Minority Group.  Indeed, as a matter of equity and good faith, the Remaining Noteholders should have been included in the Minority Settlement Agreement from the beginning, but were not, were never given the opportunity, and certainly did not agree to the less favorable treatment under the Amended Plan which would result from the Remaining Noteholders' current exclusion from the Minority Settlement Agreement.  Notably, the Remaining Noteholders are perhaps only holding approximately $10-15 million in First Lien Notes so the relief requested is a very discrete amount.

**F.     Proposed Clarification that the Six Month Forfeiture Period Is Inapplicable or Unauthorized as to Distributions to First Lien Noteholders**

In addition to the issues raised above, the Indenture Trustee has concerns with respect to the application of the forfeiture provision Art. VI, D., 4 of the Amended Plan as highlighted by the election form sent out by Debtors, without its prior review, relating to Term Loan B interests to be distributed pursuant to the Asset Purchase Agreement.  In particular, the election form includes a six month forfeiture period, which is apparently based on the forfeiture provision in the Amended Plan (Art. VI, D. 4).  As an initial matter, while the Indenture Trustee believes that section of the Amended Plan does not apply, it seems unclear to some whether this provision applies to distributions to First Lien Noteholders, particularly those made pursuant to the Asset

4827-7188-1170.6

Purchase Agreement and which may or may not be DTC eligible, and the Indenture Trustee requests clarification regarding the same.  If deemed applicable to distributions to First Lien Noteholders, the Indenture Trustee objects that such forfeiture period is unauthorized and in any case, too short.  *See, e.g., In re Kawin Assocs., L.P.*, 2005 Bankr. LEXIS 3328 at *19 (Bankr. E.D.Pa. 2005) (addressing extension of a plan's one-year forfeiture period and stating that the outside date for forfeiture is five years).

**G.      Proposed Correction of Allowed First Lien Debt Amounts**

*See* Introduction section above with respect to First Lien Claim Allowance Amounts.

**H.      Reservation of Rights**

The Indenture Trustee further expressly reserves all rights, claims, arguments, defenses and remedies with respect to the Amended Plan.  Specifically, the Indenture Trustee reserves the right to (i) amend, modify or supplement this Limited Objection and Reservation of Rights and otherwise take any additional or further action with respect to the Amended Plan; and (ii) be heard before the Court with respect to the Amended Plan and any other objection or issue raised by other parties or the Debtors with respect to the same and to raise additional arguments or objections in connection therewith at the Confirmation Hearing.

 Dated:  November 21, 2020
         New York, New York

14

4827-7188-1170.6

**FOLEY & LARDNER LLP**

By:  /s/ *Douglas E. Spelfogel*
Douglas E. Spelfogel (admitted *pro hac vice*)
Harold L. Kaplan (admitted *pro hac vice*)
Richard J. Bernard (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016-1314
Telephone: (212) 682.7474
Facsimile: (212) 687.2329

John P. Melko
Jennifer Huckleberry
1000 Louisiana Street
Suite 2000
Houston, TX 77002
Telephone: (713) 276.5500
Facsimile: (713) 276.5555

*Attorneys for Wilmington Trust, National Association*

15

4827-7188-1170.6