**FOLEY & LARDNER LLP**
Douglas E. Spelfogel (admitted *pro hac vice*)
Harold L. Kaplan (admitted *pro hac vice*)
Richard J. Bernard (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016-1314
Telephone: (212) 682.7474
Facsimile: (212) 687.2329

John P. Melko
Jennifer Huckleberry
1000 Louisiana Street
Suite 2000
Houston, TX 77002
Telephone: (713) 276.5500
Facsimile: (713) 276.5555

*Attorneys for Wilmington Trust, National Association*

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **J.C. Penney Company, Inc.,** *et al.***,** | ) | |
| | ) | **Case No. 20-20182 (DRJ)** |
| | ) | |
| **Debtors.** | ) | |
| | ) | |
| | ) | **(Jointly Administered)** |
| | ) | |

### WILMINGTON TRUST, NATIONAL ASSOCIATION'S MOTION TO ALTER OR AMEND THIS COURT'S ORDER (I) AUTHORIZING (A) ENTRY INTO AND PERFORMANCE UNDER THE ASSET PURCHASE AGREEMENT AND (B) THE SALE OF THE OPCO ACQUIRED ASSETS AND THE PROPCO ACQUIRED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (C) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES AND (II) GRANTING RELATED RELIEF</u>

4813-3851-6690

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE APPLICATION AT THE HEARING. REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

Wilmington Trust, National Association, in its capacity as indenture trustee (the "Indenture Trustee") for the 5.875% senior secured notes due July 2023 (the "First Lien Notes") issued in the principal amount of $500 million by the Debtor J.C. Penney Corporation, Inc. pursuant to that certain indenture dated June 23, 2016 (the "First Lien Notes Indenture"), and prepetition collateral agent, hereby respectfully requests (the "Motion") that this Court alter or amend its November 9, 2020 order [Doc. No. 1814] (the "Sale Order")[1] (I) Authorizing (A) Entry Into and Performance Under the Asset Purchase Agreement and (B) the Sale of the OpCo Acquired Assets and the PropCo Acquired Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, and (C) Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Granting Related Relief, solely with respect to the approval of a settlement agreement [Doc. No. 1814, Ex. B] (the "Minority Settlement Agreement") by and among the Majority Group, the Minority Group and the Debtors through which the Debtors agreed to pay a $40 million "supplemental distribution" to the Minority Group to the exclusion

---

[1] Capitalized terms used, but not otherwise defined herein, shall have the meanings ascribed to them in the Sale Order or the Asset Purchase Agreement, as applicable.

4813-3851-6690

and relative detriment of a remaining group of First Lien Noteholders that is not part of either the Majority or Minority Group (the "Remaining Noteholders"). In support hereof, the Indenture Trustee states as follows:

## INTRODUCTION

At the outset, the Indenture Trustee does not object to the Court's approval of the Sale Transaction through the Asset Purchase Agreement. Rather, the Indenture Trustee's sole concern is with respect to the inclusion and approval of the Minority Settlement Agreement through the Sale Order without any consideration of its impact on excluded Remaining Noteholders.

Specifically, on the eve of the Sale Hearing, the Debtors filed a revised, proposed sale order which included, *for the first time*, reference to and approval of the Minority Settlement Agreement pursuant to Federal Rule of Bankruptcy Procedure (the "FRBP") 9019. This last minute inclusion raises at least three central issues as to the validity of the resulting Sale Order approving the Minority Settlement Agreement: (i) the lack of notice of the Minority Settlement Agreement as required under the Federal Rules of Bankruptcy Procedure; (ii) the failure to provide either the Court or interested parties with the material facts and consequences of the Minority Settlement including the fact that the Minority Settlement Agreement and Supplemental Distribution appear to dilute the distribution pool available to Remaining Noteholders and strip collateral belonging to the Remaining Noteholders without providing adequate protection, while providing a significantly differential windfall to the Minority Group of at least 13 cents on the dollar; and (iii) as a result of the foregoing, the Minority Settlement Agreement improperly imposes disparate and discriminatory treatment as to the distributions to

4813-3851-6690

the Remaining Noteholders in direct contravention of the subject Direction, Asset Purchase Agreement *and* Sale Order.

*First*, insufficient notice was provided of the Minority Settlement Agreement under FRBP 9019.  FRBP 2002(a)(3) requires 21 days' notice for "the hearing on approval of a compromise or settlement of a controversy other than approval of an agreement pursuant to Rule 4001(d), unless the court for cause shown directs that notice not be sent."  Here, no formal notice of a hearing on the Minority Settlement Agreement was filed; rather, the request to approve the Minority Settlement Agreement pursuant to Bankruptcy Rule 9019 was embedded in a draft of the proposed Sale Order, specifically, in a two-sentence paragraph on page 20, that was filed *for the first time* on Sunday, November 8, 2020, the day before the Sale Hearing.  Based on this lack of notice alone, the Court should amend the Sale Order to disallow approval of the Minority Settlement Agreement unless and until (i) the Indenture Trustee is provided the reasonable opportunity to raise its objections with respect to the same or (ii) the Minority Settlement Agreement is amended as proposed herein.

*Second*, without providing any material facts to the Court or parties – in particular, that the Minority Settlement Agreement inexplicably excluded the Remaining Noteholders who are similarly situated secured creditors with the Minority Group and entitled to pro rata treatment – the Court was not able to sufficiently consider the proposed settlement and determine whether it was fair and equitable, supported under the law (in particular, where the effect of the Settlement Agreement was to strip collateral from the Remaining Noteholders without adequate protection or notice) and in the best interests of creditors.  With respect to the Remaining Holders, it clearly was not.

4

*Third*, the Minority Settlement Agreement and $40 million Supplemental Distribution solely to the Minority Group results in the disparate treatment of the Remaining Noteholders in direct contravention of the Direction Letter, Asset Purchase Agreement *and* Sale Order itself that are each part of the integrated Sale Transaction approved through the Sale Order.  In particular, the Direction Letter and Asset Purchase Agreement – as incorporated and approved through the Sale Order – provide that distributions stemming from the Credit Bid and Sale Transaction must be made on a pro rata basis to First Lien Noteholders, among others.  However, as is clear from the face of the Minority Settlement Agreement, distributions are not being made ratably among First Lien Noteholders in so far as the Minority Group is to receive $40 million off the top before further, *and diluted*, distributions are made ratably among all First Lien Debt.  As a consequence, the terms of the Sale Order contain competing and contradictory provisions that are not grounded in law.  Further, and notably, the Remaining Noteholders are perhaps only holding approximately $10-$15 million in First Lien Notes so the relief requested is a very discrete amount requiring an estimated $1.3-$1.95 million to equalize distributions.

Accordingly, for each of the reasons described herein, this Court should alter or amend the Sale Order to specifically condition the Minority Settlement Agreement on (i) the inclusion of the Remaining Noteholders as parties and beneficiaries of the Minority Settlement Agreement and Supplemental Distribution or (ii) increasing the Supplemental Distribution in order to provide a ratable distribution to the Remaining Noteholders or otherwise provide a cash payout to Remaining Noteholders in the same amount.

## **BACKGROUND**

On May 16, 2020 (the "Petition Date"), each of the Debtors filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the Southern District of Texas (the

4813-3851-6690

"Bankruptcy Court") initiating the above-captioned Chapter 11 cases (together, the "Bankruptcy Case"). During the Bankruptcy Case, the Debtors proposed an integrated Sale Transaction for the sale of substantially all of the Debtors' assets, to be implemented through a sale of the Debtors' operating and certain real property assets (collectively, "OpCo") and their remaining real property assets (collectively, "PropCo"). The Sale Transaction is to be implemented through the Asset Purchase Agreement and the Amended Plan. (*See* Minority Settlement Agreement, Doc. No. 1814, Ex. B, p.2).

On October 28, 2020, the Majority Group gave a written instruction (the "Direction Letter") to the DIP Agent, the Term Agent and the Indenture Trustee in connection with a "credit bid" (the "Credit Bid") of an aggregate $900 million of obligations under the DIP Agreement (the "DIP Debt") and an aggregate $100 million of First Lien Debt. (*Id.*) The Credit Bid provides the mechanism to effectuate the OpCo and Prop Co sales, including to consummate the Asset Purchase Agreement and Amended Plan. The Direction Letter provides for the consideration to be provided to beneficiaries of the Credit Bid to be allocated on the ratable amount of the DIP Debt and First Lien Debt being contributed to the Credit Bid (*i.e.*, 90% of the consideration being allocated to DIP Loan Lenders on account of the DIP Debt and 10% of the consideration being allocated to holders of the First Lien Debt) (the "Current Credit Bid Allocation"), with such First Lien Debt further allocated between the First Lien Term Loans and First Lien Notes based on their respective outstanding allowed claim amounts. (*Id.*) This was a key material term negotiated between the parties and integral to acceptance of the Direction Letter. Under the Direction Letter, the foregoing terms were required to be memorialized in the Asset Purchase Agreement, Sale Order and Amended Plan.

4813-3851-6690

On November 9, 2020, the Court conducted a hearing on the Asset Purchase Agreement (the "Sale Hearing"). The day before the Sale Hearing, the Debtors filed a revised, proposed sale order which included, for the first time, reference to and approval of the Minority Settlement Agreement. The Minority Settlement Agreement purports to resolve certain objections by the Minority Group to the Sale Transaction and related documents and transactions and provides, among other things:

> [T]he Debtors shall pay the members of the Minority Group a supplemental distribution in the amount of $40 million in cash in settlement and resolution of all disputes with respect to the [Sale] Transaction, the Credit Bid, the APA, the [Bankruptcy] Case[s], the Sale Order and the Plan (the "Supplemental Distribution"). The Supplemental Distribution shall be paid out of (and contemporaneously with) the First Interim Distribution (as defined in the APA). The Supplemental Distribution will be structured such that it does not dilute the distribution that the members of the Minority Group would have otherwise received from the First Interim Distribution (i.e., the members of the Minority Group shall receive, in the aggregate, their ratable distribution of the First Interim Distribution (calculated as though there was no Supplemental Distribution) plus their ratable distribution of the Supplemental Distribution (based on the percentage of [First Lien] Debt held by each member of the Minority Group as of November 1, 2020 as compared to the total [First Lien] Debt held by all members of the Minority Group as of November 1, 2020).

(*Id.*, ¶ 4).

At the Sale Hearing, the Court entered the Sale Order, which approved the Asset Purchase Agreement as well as the Minority Settlement Agreement [Doc. No. 1814, Ex. B] pursuant to Bankruptcy Rule 9019 (through a short two-sentence paragraph added immediately before the Sale Hearing).

7

4813-3851-6690

**ARGUMENT**

**A.      Standard Applicable To Motion**

Fed. R. Civ. P. 59(e), made applicable to this proceeding through Fed. R. Bankr. P. 9023, "serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." *In re Berg*, 383 B.R. 631, 639 (Bankr. W.D. Tex. 2008) (quoting *Templet v. HydroChem, Inc.* 367 F.3d 473, 479 (5th Cir. 2004). "Because rule 59(e) motions are subject to much more stringent time requirements that Rule 60(b) motions, Rule 59(e) motions provide relief for the movant on grounds at least as broad as Rule 60 motions." *Id*. (citing *Smith v. Morris & Manning*, 657 F.Supp. 180, 181 (S.D.N.Y. 1987) (When filing a motion under Rule 59(e), "[a] party need not meet the somewhat stringent requirements of Rule 60, which is aimed at protecting the finality of judgments from belated attack.")). "Rule 59(e), therefore, provides district courts with the power to consider equitable factors and provide relief for 'any … reason justifying relief from the operation of the judgment.'" *Id*. (citations omitted).

Among the factors courts consider as grounds for granting a motion for reconsideration under Rule 59(e) are: (1) an intervening change in controlling law; (2) the availability of new evidence not previously available; or (3) the need to correct a clear error of law or prevent manifest injustice. *Id*. at 644 (citing *In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002). Manifest injustice exists when there is a "fundamental flaw in the court's decision that without correction would lead to a result that is both inequitable and not in line with applicable policy." *Bender Square Partners v. Factory Mut. Ins. Co.*, 2012 WL 1952265, *4 (S.D. Tex. May 30, 2012) (citations omitted) (granting a motion for reconsideration and finding that manifest injustice occurred where the court did not consider certain evidence and granted summary judgment to the plaintiff without consideration of that evidence).

4813-3851-6690

As described herein, there are ample grounds to reconsider the Sale Order's approval of the Minority Settlement Agreement including, among other things, the total exclusion of material facts with respect to the Minority Settlement Agreement that were not previously disclosed to either to the Court or interested parties and the manifest injustice that would result in allowing the disparate and discriminatory treatment resulting for the Remaining Noteholders without proper notice and hearing.

**B.      Insufficient Notice and Information Was Provided of the Minority Settlement Under FRBP 9019**

FRBP 2002(a)(3) requires 21 days' notice for "the hearing on approval of a compromise or settlement of a controversy other than approval of an agreement pursuant to Rule 4001(d), unless the court for cause shown directs that notice not be sent."

Here, no formal notice of a hearing on the Minority Settlement Agreement was filed; rather, the request to approve the Minority Settlement Agreement pursuant to Bankruptcy Rule 9019 was embedded in a draft of the proposed Sale Order, specifically, in a two-sentence paragraph on page 20.  Indeed, the Minority Settlement Agreement itself was noticed for the first time on Friday, November 6, 2020, just one business day before the Sale Hearing on November 9, 2020 [Doc. No. 1774], and the draft proposed Sale Order seeking approval of the Minority Settlement Agreement pursuant to FRBP 9019 was not filed until Sunday, November 8, 2020, the day before the Sale Hearing.  (Doc. No. 1786).

Not only is such notice deficient under the FRBP, it did not provide the Indenture Trustee, or the Remaining Noteholders, the opportunity to fully understand, let alone raise an objection to, the nature of the relief requested in advance of the Sale Hearing.  Accordingly, and on this basis alone, the Court should amend the Sale Order to require that (i) the Indenture

Trustee is provided the reasonable opportunity to raise its objections with respect to the Minority Settlement Agreement or (ii) the Minority Settlement Agreement is amended as proposed herein.

**C.      Material Facts Were Not Provided Describing the Consequences of the Minority Settlement Agreement to the Remaining Holders**

In addition to lack of notice generally, there was a total failure to provide material central and background facts with respect to the Minority Settlement Agreement, either to the Court or interested parties.  Here, as set forth above, the Minority Settlement Agreement provides the Minority Group the Supplemental Distribution of $40 million, which is to be paid in connection with the First Interim Distribution.  The First Interim Distribution (as defined in the Asset Purchase Agreement) is to be paid from the Final Lien Escrow Account (as defined in the DIP Credit Agreement).  Importantly, the Final Loan Escrow Account *is an asset of the Debtors' estates*.

Notwithstanding, the Minority Settlement Agreement inexplicably excludes and does even recognize the existence of the Remaining Noteholders who are similarly situated with the Minority Group and entitled to pro rata treatment.  The effect of the Minority Settlement Agreement, if not the intent, is to dilute the assets and otherwise strip collateral from the Remaining Noteholders, without adequate protection, notice or a hearing.  Further, without such information, the Court was not able to sufficiently consider the proposed settlement and determine whether it was fair and equitable, complied with applicable law and in the best interests of creditors.  With respect to the Remaining Holders, it clearly was not.  *See In re Berg*, 383 B.R. at 640 (vacating a sale order to, among other things, prevent manifest injustice and holding "it is of overwhelming importance that the rights of creditors in a concern in bankruptcy should be protected and that a disposal of property on terms which violate this rule should not be

10

permitted to stand." (quoting *Procter & Gamble Mfg. Co. v. Metcalf*, 173 F.2d 207, 209 (9th Cir. 1949)).

**D.** **The Minority Settlement Agreement Improperly Imposes Disparate and Discriminatory Treatment as to the Distributions to Remaining Noteholders, Inconsistent with the Requirement That All Distributions Made as a Result of the Credit Bid Shall Be Allocated Ratably Among All First Lien Noteholders**

The Direction Letter provides, among other things:  "The Directing Holders acknowledge and agree that all distributions received by creditors on account of the Credit Bid shall be allocated ratably (a) between the DIP Obligations and the Term Loan/First Lien Notes Obligations based on the amounts of such obligations actually credit bid and (b) between Holders of First Lien Notes issued under the First Lien Indenture and Lenders under the Prepetition First Lien Credit Agreement based on the relative outstanding obligations owing thereunder."  [. No. 1668, Ex. 4, p.4].

Consistent with the Direction Letter, the Asset Purchase Agreement provides, among other things:  "The portion of the Credit Bid Amount in respect of the Term Loan Obligations and First Lien Notes Obligations shall be allocated ratably based on relative outstanding obligations of each of the Term Loan Obligations and First Lien Notes Obligations.  Any consideration received by PropCo Purchaser in exchange for the Credit Bid that is to be distributed by or on behalf of PropCo Purchaser shall be proportionately allocated between the DIP Collateral Agent and the Term Loan/First Lien Notes Collateral Agent based upon the amount of the Credit Bid made on behalf of each such agent for its holders at such time."  (Doc. No. 1668, § 4.4).

Meanwhile, pursuant to the Sale Order, "the DIP Administrative Agent, the DIP Collateral Agent, the Term Loan Administrative Agent and the Term Loan/First Lien Notes

4813-3851-6690

Collateral Agent are authorized and directed, pursuant to the [Direction] Letter and this Order, to effectuate the Credit Bid in accordance with the Asset Purchase Agreement and this Order…"

Accordingly, pursuant to the Direction Letter and Asset Purchase Agreement, as incorporated and approved through the Sale Order, distributions on account of the Credit Bid must be made ratably to all First Lien Noteholders, among others.

Notwithstanding, based on the terms of the Minority Settlement Agreement, $40 million of the First Interim Distribution goes directly to the Minority Group as the Supplemental Distribution rather than as a pro rata distribution among all First Lien Noteholders, in direct contravention of the Direction Letter, Asset Sale Agreement and Sale Order.  As a consequence, the Sale Order suffers from a glaring inconsistency where on the one hand, it authorizes and directs the pro rata distribution of the First Interim Distribution, while on the other hand, approves the Minority Settlement Agreement that on its face, does not provide for such ratable distribution – another result of the failure to disclose material facts related to the Minority Settlement Agreement.

Accordingly, the Court should amend the Sale Order to require that the Minority Settlement Agreement is amended (or other agreement is reached) to provide for ratable distribution among the First Lien Noteholders.

**E.      Proposed Modification to the Minority Settlement Agreement**

As a consequence of the foregoing, the Indenture Trustee respectfully submits that the Sale Order be amended to either disallow the Minority Settlement as currently drafted or require that the Minority Settlement be modified to provide for equal treatment to the Remaining Noteholders.  Undoubtedly, the easiest fix would be to include the Remaining Holders in the Minority Settlement Agreement such that they are entitled to the same distributions as the

12

Minority Group.  Indeed, as a matter of equity and good faith, the Remaining Noteholders should have been included in the Minority Settlement Agreement from the beginning, but were never given the opportunity to participate (or the reasonable opportunity to object).  Alternatively, the Court could require that a separate cash settlement be granted for the Remaining Noteholders in order to equalize treatment.  Notably, the Remaining Noteholders are perhaps only holding approximately $10-$15 million in First Lien Notes so the relief requested is a very discrete amount requiring approximately $1.3-$1.95 million to equalize distributions.

For the reasons provided above, it is respectfully submitted that the Court grant the Motion in its entirety and grant such other and further relief as is just and proper.

Dated:  November 23, 2020
New York, New York

**FOLEY & LARDNER LLP**

By:  /s/ *Douglas E. Spelfogel*
Douglas E. Spelfogel (admitted *pro hac vice*)
Harold L. Kaplan (admitted *pro hac vice*)
Richard J. Bernard (admitted *pro hac vice*)
90 Park Avenue
New York, NY 10016-1314
Telephone: (212) 682.7474
Facsimile: (212) 687.2329

John P. Melko
Jennifer Huckleberry
1000 Louisiana Street
Suite 2000
Houston, TX 77002
Telephone: (713) 276.5500
Facsimile: (713) 276.5555

*Attorneys for Wilmington Trust, National Association*

4813-3851-6690